# EXHIBIT K

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CRED INC., *et al.*,[1] | Case No. 20-12836 (JTD) |
| Debtors. | (Jointly Administered) |

## <u>REPORT OF ROBERT J. STARK, EXAMINER</u>

**BROWN RUDNICK LLP**
Andrew M. Carty
Michael W. Reining
Tiffany B. Lietz
Seven Times Square
New York, NY 10036
212-209-4800
acarty@brownrudnick.com
mreining@brownrudnick.com
tlietz@brownrudnick.com

Stephen R. Cook
2211 Michelson Drive, 7th Floor
Irvine, CA 92612
949-752-7100
scook@brownrudnick.com

E. Patrick Gilman
601 Thirteenth Street NW, Suite 600
Washington, DC 20005
202-536-1730
pgilman@brownrudnick.com

**ASHBY & GEDDES, P.A.**
Gregory A. Taylor (DE Bar No. 4008)
Katharina Earle (DE Bar No. 6348)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
gtaylor@ashbygeddes.com
kearle@ashbygeddes.com

**ANKURA CONSULTING GROUP, LLC**
Vikram Kapoor
485 Lexington Avenue, 10th Floor
New York, NY 10017
212-818-1555
vikram.kapoor@ankura.com

**Dated: March 8, 2021**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

## TABLE OF CONTENTS

I.     EXECUTIVE SUMMARY ............................................................................1

     A.     Scope of the Investigation, In Brief. ................................................ 1

     B.     What Was Cred and What Was It Supposed to Do?................................ 3

     C.     Why Did Cred Fail? ............................................................... 3

         1.     Cred's Corporate Governance and Business Management........................ 4

         2.     Cred's Business Functions. ...................................................... 4

         3.     The moKredit Relationship........................................................ 6

         4.     Mr. James Alexander. ............................................................ 6

         5.     Summary of the Events Giving Rise to Cred's Bankruptcy. ..................... 7

     D.     Additional Topics Included within the Investigation and this Report. ................ 10

II.     KEY ENTITIES AND INDIVIDUALS ...........................................................11

     A.     Debtor Entities. .................................................................. 11

     B.     Involved Entities. ................................................................ 12

     C.     Relevant Individuals. ............................................................ 15

III.     RELEVANT CASE BACKGROUND ............................................................18

     A.     The Commencement of the Chapter 11 Cases and Appointment of Examiner. ... 18

     B.     The Examiner's Work Plan for the Investigation. ................................ 20

     C.     The Methods Employed to Conduct the Investigation. ......................... 21

IV.     GENERAL BACKGROUND REGARDING THE DEBTORS .......................................23

     A.     Corporate History and Organization................................................ 23

     B.     Cred's Primary Products. ........................................................ 25

i

V.    CRED'S OPERATIONS AND CIRCUMSTANCES LEADING TO THE FINANCIAL
COLLAPSE ...................................................................................................................28

    A.    Cred's Business Functionality. .......................................................................... 28

        1.    Cryptocurrency Asset Storage. ................................................................ 28

        2.    Diligence Process and Procedures. .......................................................... 33

        3.    Financial and Accounting Practices. ........................................................ 35

        4.    Insurance Coverage. ................................................................................. 37

        5.    Internal Compliance Function. ................................................................. 40

    B.    Cred's Relationship and Dealings with moKredit. ............................................ 41

        1.    moKredit, In General. ............................................................................... 41

        2.    Cred's Business Dealings with moKredit. ................................................ 43

        3.    Cred's Failed Attempts to Withdraw moKredit Investments. .................. 45

        4.    Potential Conflicts of Interest. ................................................................. 47

        5.    Diligence and Risk Management Respecting moKredit. .......................... 49

        6.    Disclosures to Customers Regarding moKredit Relationship. ................. 50

        7.    Luxembourg Bonds. ................................................................................. 52

    C.    Cred's Pre-Petition Losses and Liquidity Crisis. .............................................. 54

        1.    JST Capital. ............................................................................................... 54

        2.    Cred's Other Asset Managers. ................................................................. 69

        3.    Cred Develops, But Does Not Implement, the So-Called "All-Weather"
Strategy. ................................................................................................... 76

    D.    Cred's Relationship with QuantCoin. ................................................................ 77

        1.    Inception of Relationship. ........................................................................ 77

2.     Chronology of Material Events Involving Cred and QuantCoin. ............. 80

E.     Lu Hua's Transfer of 300 Bitcoin to Cred. ........................................ 86

F.     Cred's Dealings with James Alexander. ............................................ 89

     1.     General Background on James Alexander. ............................... 89

     2.     Organization of Cred Capital. .................................................. 91

     3.     James Alexander's Alleged Misappropriation of Assets. ........................ 91

VI.     INVESTIGATIVE CONCLUSIONS ................................................................95

# I. EXECUTIVE SUMMARY

## A. Scope of the Investigation, In Brief.

On December 23, 2020, the United States Bankruptcy Court for the District of Delaware (the "**Court**") Ordered the appointment of an examiner in the Chapter 11 cases of Cred Inc., *et al.* ("**Cred**" or the "**Debtors**"). On January 7, 2021, the Office of the United States Trustee filed its notice of appointment of Robert J. Stark, as Examiner, and its motion seeking approval of such appointment. On January 8, 2021, the Court entered its Order approving such appointment (the "**Examination Order**"). In the Examination Order, the Court directed the Examiner to investigate allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the Debtors of or by current or former management of the Debtors, and otherwise perform the duties of an examiner, as set forth in Bankruptcy Code Sections 1106(a)(3) and 1106(a)(4) (the "**Investigation**").

In organizing his Investigation, the Examiner was mindful that these bankruptcy cases have involved "dueling narratives." Cred, on the one hand, pinned much of its troubles on its former Chief Capital Officer, failed investments in a Chinese entity named moKredit, and a failed investment in an entity named QuantCoin. Other case constituents have put blame elsewhere, raising allegations of gross mismanagement and potentially fraud. The Examiner viewed his charge as collecting and analyzing the available evidence, providing an objective view of the facts underlying these cases, and enabling the Court and all stakeholders to better understand why Cred failed and who might be responsible for such failure.

To conduct his Investigation, the Examiner obtained documents from the Debtors, the Official Committee of Unsecured Creditors (the "**Committee**"), and certain customers of the

Debtors.[2]   In total, approximately 13,000 documents were delivered and reviewed.   The Examiner's professionals interviewed 23 individuals, including Daniel Schatt (founder, co-owner, director, former CEO), Lu Hua (founder, co-owner, director, former CEO), James Alexander (former Chief Capital Officer), Matthew Foster (Chief Restructuring Officer), Scott Wiley (interim Chief Financial Officer), Joseph Podulka (former Chief Financial Officer), Daniel Wheeler (former General Counsel), and Daniyal Inamullah (former Vice President of Capital Markets).   Those interviews were conducted over a span of one month, and each lasted for several hours.   None of those interviews were conducted under oath, but the Examiner's professionals conducted the interviews in deposition style.   In general, the Examiner found the Debtors, Committee members, executives, and other interviewees responsive to the Examiner's information requests, willing to provide/volunteer information and, during the interviews, answer questions largely without interruption by counsel.   In sum, even though the Investigation was conducted in a very short time frame (i.e., approximately 8 weeks), the Examiner believes that he was able to conduct a sufficient Investigation[3] to acquit his charge under the Examination Order.[4]

---

[2] The Examiner wishes to particularly thank the Debtors' and the Committee's professionals for their assistance in connection with the Investigation.   The Examiner believes that the various case professionals were attentive to the Examiner's information needs, forthcoming and candid, and that their insights were critically important to the Investigation.

[3] It is important to note that this Investigation was conducted under very tight time constraints, under very pressured circumstances and, given those obstacles, was necessarily reliant on voluntary cooperation of the parties.   No assurances can be given that all relevant documents were produced or that no other relevant information/evidence would be revealed in formal discovery bearing on the matters discussed herein.

[4] An earlier draft Report was shared with the Debtors and the Committee, and their feedback was solicited.   The Examiner did not make any substantive revisions or modifications to the Report based on commentary from the Debtors or Committee after their review.

### B.     What Was Cred and What Was It Supposed to Do?

Cred was a cryptocurrency financial services platform that offered holders of cryptocurrencies the option of investing those assets with Cred (through the "CredEarn" program) or borrowing against those cryptocurrencies (through the "CredBorrow" program). Those participating in CredEarn agreed to invest their cryptocurrency with Cred for a finite period of time, during which Cred guaranteed those customers a predetermined rate of return. CredBorrow, on the other hand, allowed customers to deposit their cryptocurrency with Cred and obtain a loan against those assets, usually in an amount not to exceed 50% of the cryptocurrency value at the time of the deposit, for a fixed period and with a fixed interest rate.

Although the loan agreements reviewed by the Examiner (particularly under the CredEarn program) contained terms and conditions as to repayment and yield, they did not dictate precisely how cryptocurrency proceeds would be used or invested by Cred, or include any conditions/constraints with respect to such investments. Based on interviews with certain Cred customers, it appears some believed, based on statements from Cred's website and blog posts (among other things), that Cred's investments were collateralized. For the most part, this was not the case, and certain Cred employees expressed concern that such statements were potentially misleading.

### C.     Why Did Cred Fail?

The specific causative event was a "flash crash" in cryptocurrency trading value in March 2020, followed by a run-up in April and May 2020 resulting in a liquidity crisis. The Examiner believes, however, that the firm's failure is more aptly attributed to dereliction in corporate responsibility. Swings in cryptocurrency trading value were, after all, a foreseen aspect of the firm's business model. But, Cred's corporate managers did not run the business to effectively

3

counterbalance such risk, as was promised to customers. This dereliction was grave. Noticeable failures include, among other things: (i) un-systemic, chaotic and, in some instances, non-existent diligence, accounting, and compliance functions; (ii) allowance for currency migration to non-Cred entities operating in mainland China (moKredit), without legal or practical capacity to repatriate capital as and when requested/needed by Cred; and (iii) allocation of important managerial and operating functions to an individual with an extremely worrisome past. Cred, it seems, excelled at its marketing objectives; but, its failures in the most basic of business functions portended its eventual demise.

### 1. Cred's Corporate Governance and Business Management.

Cred's Board consisted of only two directors (Messrs. Schatt and Hua), one of whom (Hua) was recused on all "big" operations issues, purportedly on advice of his counsel. The Board and senior management seemingly did not adopt clear and effective policies and procedures for virtually any day-to-day functions. There is little evidence that the Board (i.e., Mr. Schatt) ran the business to ensure operative systems/practices, consistent with customer expectations, and to effectively ward off risks inherent in the business.

### 2. Cred's Business Functions.

For much of its existence, Cred maintained only an informal and "ad hoc" diligence process with respect to material aspects of its business, from the hiring of key officers and employees to the deployment of its assets. Cred did not have formal diligence or oversight policies respecting investment decisions, including the selection of asset managers with whom to invest Cred's assets and customer deposits. Nor did it develop and maintain a standardized, formal process for decision-making pertaining to Cred's investment proposals, investment allocations, risk management strategies, or liquidity. Although certain employees indicated that

4

they employed informal diligence processes relating to investment decisions, no such processes were formally adopted by the company or implemented consistently.

Cred operated in a similarly undisciplined manner respecting asset management, storage, and transfers. Cred did not maintain records identifying or tracking assets between the CredEarn, CredBorrow, or other programs, and had no discernable method for identifying or tracking specific assets or transfers. Rather, customer assets were comingled and maintained together without a standardized method for distinguishing which assets were deposited by whom and from which program they were derived. Additionally, Cred did not develop and maintain a standardized, comprehensive protocol for tracking customer deposits and for initiating and authorizing transfers. Cred's method for initiating, authorizing, and executing transfers often came through informal channels of communication and all steps were often performed by a single individual without a defined, discernible method of approval or oversight. Moreover, Cred did not maintain reliable records for its trading accounts and did not adopt a regular practice of issuing transaction statements.

These deficiencies extended to the accounting and compliance functions. Cred did not have a centralized, integrated accounting function. Certain accounting information was maintained in offline Excel spreadsheets, but they were not regularly updated. By the time Cred filed for bankruptcy, it had not performed a comprehensive financial reconciliation of accounts in almost a year.

Cred did not implement a formal reporting or compliance policy concerning its investments (either internally, with respect to employees tasked with overseeing investments, or externally, with respect to asset managers overseeing Cred's investments). Again, certain Cred employees indicated that they had developed informal procedures for obtaining investment

5

information and updates from asset managers, but the Examiner is unaware of any formal Cred policy governing this process.

Given the foregoing, the Examiner endeavored to reconcile Cred's books and records to more accurately appreciate its financial posture and to determine whether funds were properly accounted for or, potentially, improperly diverted from the company. However, given the disorganized and incomplete state of Cred's books and records, as well as the time constraints on the Investigation, the Examiner was not able to complete such reconciliation.

### 3. The moKredit Relationship.

Throughout its history, Cred was tightly bound to the fortunes of moKredit – a Chinese microlender owned by Lu Hua, Cred's co-founder and 50% equity owner. Cred's business primarily involved converting customer cryptocurrencies into fiat currency for moKredit to lend to its borrowers. Converting cryptocurrencies into fiat currency exposed Cred to fluctuations in cryptocurrency trading prices, a risk that required constant hedging. Even though Cred placed a significant portion of its asset-base with moKredit, it had little visibility as to moKredit's ability to return capital when/if needed to, among other things, maintain an effective hedging position. Cred had, in fact, almost no information respecting moKredit's loan portfolio at any given point in time. When the "flash crash" caused a liquidity crisis for Cred, Cred had to repatriate substantial capital from moKredit, but moKredit was not positioned to return any capital. Cred's hedge positions fell away, rendering it "naked" to future swings in cryptocurrency trading prices. Its fate was thereby sealed.

### 4. Mr. James Alexander.

Considerable corporate authority was vested in James Alexander, Cred's Chief Capital Officer ("**CCO**"). Neither Cred's CEO, Dan Schatt, nor the Cred Board, nor any other employee

at Cred appears to have conducted any meaningful diligence (e.g., background search, credit check) with respect to Mr. Alexander either prior to his hiring or during his period of employment.  It has come to the Examiner's attention that Mr. Alexander was convicted on December 3, 2007 in the United Kingdom for crimes related to illegal money transfers, for which he was sentenced to three years and four months in prison to be served at HMP Ford Prison in West Sussex, England.  At the time of his incarceration, there was a prison break at this facility. Mr. Alexander has been identified by the UK government as a fugitive.[5]

Mr. Alexander is an important figure in the story of Cred's demise.  Again, the Examiner attributes responsibility for the firm's demise largely to failures in corporate leadership, primarily Messrs. Schatt and Hua.  But, Alexander's participation/involvement in poor decision-making is a recurring theme, especially when evaluating particularized errors in business oversight (e.g., undisciplined diligence and asset-allocation functions) and points of loss (e.g., QuantCoin and repayment of the Luxembourg Bonds, both discussed below).  At the end of his tenure with the company, and at various times thereafter, Mr. Alexander engaged in behavior that may be charitably described as aberrant.  His actions, described herein, only add to the aura of suspicion.

### 5.    Summary of the Events Giving Rise to Cred's Bankruptcy.

Set forth below is a brief synopsis of the circumstances leading to Cred's bankruptcy filings:

---

[5] MN Form UCF-17-2, Order Granting Name Change, Aug. 18, 1994, (Exhibit 167); *see also* Letter from Andrew Selous MP, Parliamentary Under-Secretary of State for Justice, to Philip Davies MP, House of Commons (Nov. 7, 2014) (Exhibit 168); Rachel Millard, *Exposed: Inmates on the run from Ford Prison*, The Argus (Apr. 7, 2015), https://www.theargus.co.uk/news/12873674.exposed-inmates-on-the-run-from-ford-prison/. All "Exhibit" references in this Report refer to exhibits set forth in the *Compendium of Exhibits to Report of Robert J. Stark, Examiner*, a copy of which is being provided to the Court, the U.S. Trustee, the Debtors, and the Committee.

- Under Cred's initial business model, customers would deposit their cryptocurrency assets with Cred (through the CredEarn program) for a fixed term and return. Cred would convert these assets into other forms of currency (e.g., "USDT," which is a cryptocurrency backed by the U.S. dollar) and use the proceeds to make short-term loans to moKredit. moKredit would convert the assets to Yuan and make short-term, high-interest microloans, typically to Chinese consumers.

- Based on the evidence obtained by the Examiner, Cred's loans to moKredit were unsecured and not backed by any collateral. Cred appears to have performed minimal diligence before entering into the moKredit arrangement, and it does not appear that Cred had considered or developed an effective mechanism to ensure repayment of the loans.

- In an effort to manage the risk and volatility present in the cryptocurrency market, and Cred's exposure to such risk when it converted its cryptocurrency assets to more stable currency, Cred entered into a series of hedge positions (e.g., options, swaps, futures) that were, in theory, structured so as to insulate Cred from fluctuations in cryptocurrency prices. The hedges established under this program did not, however, protect Cred from a significant downturn in the market, and instead exposed Cred to exacerbated losses in such a downturn scenario.

- On March 12, 2020, the price of Bitcoin (Cred's most significant cryptocurrency asset) experienced a quick and precipitous decline (a "flash crash"), after which Cred encountered margin calls in connection with certain of its hedge positions. Cred was unable to satisfy the margin calls and, so, the hedges were terminated. Following the "flash crash," Cred had a cumulative net short position with respect to its hedges of approximately $27 million.

- With approximately 50% of its assets invested with moKredit, Cred did not have in its possession the assets (i.e., $9 million in Bitcoin) necessary to reconstitute its hedges. Failure to reconstitute the hedges left Cred exposed ("naked") to market fluctuations, and, if Bitcoin prices increased, would result in Cred's liabilities (i.e., the market price of the Bitcoin it owed its customers) increasing. In the ensuing weeks and months, the price of Bitcoin steadily rose and, because Cred did not reestablish its hedges (due to a lack of liquidity), so too did Cred's liabilities.

- On or about March 12, 2020, Cred attempted to recall $10 million of the approximately $38 million principal loan amount it had extended to moKredit in order to reconstitute its hedges. Notwithstanding the terms of moKredit's loan agreement, moKredit did not meet that recall request. Despite representations that it would be able to satisfy at least part of the redemption within 10 days, moKredit did not. moKredit's failure to satisfy the request may be attributed, at least in part, to the economic fallout from the COVID-19 pandemic. At this time,

moKredit's loan default rates rose to above 60%, making it difficult (if not impossible) for moKredit to collect on outstanding loans.

- moKredit's situation significantly and adversely impacted Cred's liquidity profile. But, it was not the only cause of Cred's deteriorating liquidity position. Beginning in February 2020, Cred transferred a total of 800 Bitcoin to an entity named QuantCoin, which Cred believed to be an asset management firm. Cred's relationship with QuantCoin seemingly began on the recommendation of James Alexander,[6] as did the execution of an initial 500 Bitcoin transfer. As discussed further herein, Cred ended up losing its entire 800 Bitcoin investment with QuantCoin, valued at approximately $9 million (August 2020). Based on the evidence reviewed by the Examiner, it appears that Cred did minimal diligence on QuantCoin before making its investment.[7]

- As the Chief Capital Officer of Cred, and head of Cred Capital, James Alexander was responsible for raising and deploying capital for Cred. Information delivered to the Examiner indicates that Alexander had "free reign" to choose asset managers and raise and deploy assets in his discretion, with little or no oversight from the Board, Schatt, or other management personnel. When Schatt discovered that Alexander and Dan Wheeler (Cred's former General Counsel) established Cred Capital in a manner contrary to his instructions, Alexander promptly transferred to his personal accounts $200,000 USD and 225 Bitcoin of Cred's assets (Cred Capital) with the assistance, wittingly or not, of Daniyal Inamullah.

- In January 2020, Cred sold $14 million of its moKredit loans through an independent entity in Luxembourg, Income Opportunities (the "**Luxembourg Bonds**"), to two investors. Alexander served as a director of Income Opportunities and was responsible for developing and proposing the investment. The Luxembourg Bonds matured on June 30, 2020, at which time it appears, based on the Examiner's review of relevant documents, only moKredit bore responsibility to Income Opportunities. By June 2020, it was evident that moKredit could not repay the loan balance. Cred purchased the Luxembourg Bonds (i.e., $14 million in exposure to moKredit) from the two investors, notwithstanding its own acute liquidity problems.[8]

---

[6] According to Alexander, he was introduced to QuantCoin through Schatt. The Examiner was not furnished with any information corroborating this statement.

[7] The Examiner was unable to fully investigate the QuantCoin transaction, given time and information constraints. The Examiner was unable to discern, for example, if anyone at the company (e.g., Alexander) received any payments from those involved with QuantCoin.

[8] The Examiner was unable to fully investigate the Luxembourg Bonds transaction, given time and information constraints. The Examiner was unable to discern, for example, if Alexander separately received any payments in connection with his involvement with Income Opportunities and the Luxembourg Bonds.

In the Examiner's opinion, the cumulative effect of these events, coupled with (and in some cases, a result of) Schatt's and the Board's failure to adequately oversee and manage the day-to-day operations of the company, led to Cred's decline and ultimate Chapter 11 filings.

### D.    Additional Topics Included within the Investigation and this Report.

The Investigation also included a review of Lu Hua's transfer of 300 Bitcoin to Cred in March 2020, which was prompted after Hua informed Cred that moKredit would not be able to repay $10 million of its principal loan balance as requested by Cred in March 2020.  Hua and Schatt characterize the 300 Bitcoin transfer as a loan.  Relevant documents indicate, however, that Hua made the transfer as an equity contribution in exchange for 5,000,000 shares of Class B common stock in Cred Capital.

Finally, the Examiner analyzed certain issues implicated by Cred's Chapter 11 plan of liquidation,[9] specifically, the estate release provisions contained therein.[10]  Based on his review of the definition of "Released Parties" under the Chapter 11 Plan, and discussions with professionals for the Debtors and Committee, the Examiner understands that the estate releases under the Chapter 11 Plan encompass only those professionals retained by the Debtors and the Committee in the Chapter 11 Cases (and certain related parties).[11]  During the course of his

---

[9] *See First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries under Chapter 11 of the Bankruptcy Code*, Jan. 21, 2021, ECF No. 380 (as amended, modified, or supplemented, the "**Chapter 11 Plan**") (Exhibit 169).

[10] *See id.* § 18.2.

[11] Under the Chapter 11 Plan, the term "Released Parties" is defined as "Professionals retained by the Debtors, Grant Lyon as the Debtors' independent director, Matthew Foster as the Debtors' chief restructuring officer, any other staff supplied by Sonoran Capital Advisors, LLC, the Professionals retained by the Committee, and the respective agents and representatives of each of the foregoing."  *See id.* § 1.113.  The term 'Professional" is, in turn, defined as "any professional Person employed in the Chapter 11 Cases pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code pursuant to an Order of the Bankruptcy Court and to be compensated for services rendered pursuant to sections 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code."  *See id.* § 1.106.

Investigation, the Examiner did not become aware of any facts that, in his opinion, would give rise to any viable estate claims or causes of action against any of the Released Parties.

In this respect, the Examiner notes that, following discussions with the U.S. Trustee's Office, the Committee, and the Debtors, the Examiner reviewed work performed by Cred's outside counsel, Paul Hastings LLP ("**Paul Hastings**"), prior to the Petition Date.  The Examiner received a list of matters on which Paul Hastings performed work for Cred (including a privilege log of purportedly privileged materials and information) and conducted an interview of a representative of Paul Hastings regarding such matters (and related issues, as deemed appropriate by the Examiner).   As with the other Released Parties, the Examiner did not become aware of any facts that would, in his opinion, give rise to any viable estate claims or causes of action against Paul Hastings.

## II.    KEY ENTITIES AND INDIVIDUALS

### A.    Debtor Entities.[12]

- **Cred, Inc.:** The parent company of the below subsidiaries. Cred, Inc. handled business with international customers.

- **Cred (US) LLC:** A wholly-owned subsidiary of Cred, Inc.  Cred (US) LLC handled borrowing and lending for domestic customers.

- **Cred Capital, Inc.:** A wholly-owned subsidiary of Cred, Inc.  Formed in March 2020, its stated purpose was to sell securities products.

- **Cred Merchant Solutions LLC:** A wholly-owned subsidiary of Cred Inc. Formed in October 2019, its stated purpose was to facilitate the purchase of cryptocurrency assets at the physical point of sale.  Cred Merchant Solutions had no business and no assets as of the Petition Date.

---

[12] Unless otherwise specified, the Debtors are collectively referred to herein as "Cred" or the "Debtors".

- **Cred (Puerto Rico) LLC:** A wholly-owned subsidiary of Cred. Inc. Formed in March 2020, its stated purpose was to facilitate transactions for customers in Puerto Rico.[13]

All Debtor entities are organized under Delaware law and have their principal place of business in California, except Cred (Puerto Rico) LLC, which was formed under the laws of Puerto Rico.[14] Cred (US) LLC holds a California Finance Lender license.[15]

### B.    Involved Entities.

- **100 Acre Ventures ("100AV"):** Formed in Delaware and registered as a foreign LLC in California. A technical investment firm focused on institutional investment and risk management in digital assets.[16] Cred invested with 100AV beginning in April 2020, based on James Alexander's recommendation.[17]

- **Blockfills.com ("Blockfills"):** A DBA of Reliz Limited and registered in the Cayman Islands, is a digital asset liquidity provider. It provides an off-exchange platform for customers to exchange cryptocurrency and fiat currency.[18] Cred Capital initiated a relationship with Blockfills on the recommendation of Daniyal Inamullah, Cred's Vice President of Capital Markets, who oversaw due diligence on Blockfills.[19]

- **CryptoLab Capital LLC ("Cryptolab Capital"):** Based in California, a now-defunct hedge fund that used a data-heavy approach to invest cryptocurrency assets.[20] Cred invested in Cryptolab Capital (also referred to as the "Martingale investment"). Cryptolab lost 100% of its assets

---

[13] *Decl. of Daniel Schatt in Supp. of Debtors' Chapter 11 Pet. and First Day Mot.* ¶ 12. (ECF No. 12) ("**Schatt Decl.**") (Exhibit 1).

[14] *Id.* ¶ 13.

[15] Base Prospectus, Jan. 30, 2020 at 2 (Exhibit 2); License Search, California Dept. of Fin. Protection and Innovation, https://docqnet.dfpi.ca.gov/LicenseSearch/LicenseDetails/ (last visited Mar. 7, 2021) (search for License No. 60DbO-91480).

[16] 100 Acre Ventures Form ADV, May 15, 2020 (Exhibit 20); 100 Acres Ventures Mission Page, https://www.100acreventures.com/mission (last visited Mar. 4, 2021).

[17] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

[18] Blockfills FAQ Page, https://www.blockfills.com/faq/ (last visited Mar. 4, 2021).

[19] Videotaped Dep. of Daniyal Inamullah, Dec. 8, 2020 ("**Inamullah Dep.**") 46:16–47:7 (Exhibit 9).

[20] Laurence Fletcher, *Crypto hedge funds struggle to recover from 'bloodbath'*, Fin. Times, May 20, 2020 (Exhibit 19).

when Bitcoin prices fell in March 2020, resulting in a 14% loss for Cred on its position.[21]

- **Cyber Quantum Pte. Ltd. ("Cyber Quantum"):** Founded by Daniel Schatt, Cyber Quantum is a Singapore entity registered by Hua in January 2018 used to raise funding for Cred through an Initial Coin Offering.[22]

- **JST Capital ("JST"):** Also known as JST Systems, a limited liability company organized under New Jersey law.[23] JST provides financial services to individuals in the digital asset market in two primary areas: trading and asset management, and risk and balance sheet management.[24] In late 2018, Cred hired JST as a consultant to assist Cred with a hedging platform.[25] JST created hedging positions against various cryptocurrencies for Cred, including Bitcoin (BTC), Ripple (XRP), Ethereum (ETH), Bitcoin Cash (BCH), Litecoin (LTC), XLMedia (XLM), OMG Network (OMG) and Cardano (ADA). Cred also used JST as its "paying agent" in connection with interest payments received from moKredit.[26] Under this arrangement, JST received interest payments from moKredit in cryptocurrency and transferred those payments to Cred in the form of USD.[27] In connection with this service, JST invoiced Cred for monthly "profit share" fees.[28]

- **Kingdom Trust:** Kingdom Trust is an escrow agent for and custodian of both fiat and alternative assets, including cryptocurrencies.[29] Cred did not

---

[21] Inamullah Dep. 104:9–16, 210:11–211:1 (Exhibit 9).

[22] Cyber Quantum Pte. Ltd. Unaudited Financial Statements, 2018 (Exhibit 7); Cyber Quantum Pte. Ltd. Directors' Resolutions, 2018 (Exhibit 8).

[23] Business Name Search, NJ Division of Revenue and Enterprise Services, https://www.njportal.com/DOR/BusinessNameSearch/Search/BusinessName (last visited Mar. 4, 2021) (search for JST Capital).

[24] Services, JST Capital, https://jstcap.com/#services (last visited Mar. 4, 2021).

[25] Inamullah Dep. 105:8–14; 110:4–17 (Exhibit 9) ("[W]e're essentially taking cryptocurrency liabilities in the form of CredEarn participations and translating that into a dollar asset, which is – in moKred. Now, if crypto starts to rise, we will not be able to return the same number of cryptocurrency units back to the customer if we do not hedge the upside exposure."); Emails exchanged between H. Ng, K. Wong, D. Schatt and InnReg representative regarding JST onboarding process, Dec. 7–20, 2018 (Exhibit 10).

[26] Email from J. Alexander to K. Wong, Jan. 22, 2019 (Exhibit 11).

[27] Email from D. Granet to L. Hua, copying in Messrs. J. Alexander, K. Wong, S. Zhang and S. Freeman, Jan. 14, 2019 (Exhibit 12).

[28] Exhibit 11; JST Systems Invoice, Jan. 22, 2019 (Exhibit 13).

[29] Qualified Custodian Executive Summary, Kingdom Trust, https://www.kingdomtrust.com/qualified-custodian/executive-summary (last visited Mar. 4, 2021).

transact with Kingdom Trust, but transferred 800 Bitcoin to a person or entity purporting to be a Kingdom Trust employee between February and April 2020.[30]

- **moKredit Inc. ("moKredit"):** Founded by Cred co-founder Lu Hua in 2012, moKredit Inc.[31] is a Chinese consumer lending platform that provides microcredit loans to Chinese borrowers.[32] moKredit is incorporated in the Cayman Islands and based in Shanghai, China.[33] Beginning in 2018, Cred lent funds obtained through its customers' investments – generally retail customers – to moKredit. Cred received 20% interest return on those loans.[34] Cred passed between 6-10% of that interest on to its customers, depending on the cryptocurrency invested (i.e., Bitcoin, Ethereum, XRP) and the amount of time those customers "locked up" their funds.[35] Cred allocated to itself the remaining 10% of the moKredit interest proceeds as revenue.[36]

- **Sarson Funds Inc. ("Sarson Funds"):** A cryptocurrency "marketing company" that advertises investment products ("sub-funds," organized as separate entities).[37] Cred invested in two Sarson Funds sub-funds in or around March 2020: (a) Fifth Khagan, a small coin/small token fund;[38] and (b) AX Momentum,[39] a "covered call options fund."[40]

- **UpgradeYa Investments, LLC ("UpgradeYa"):** A cryptocurrency investment firm and a customer of Cred's borrowing program,

---

[30] Inamullah Dep. 155:4–156:16 (Exhibit 9); Cred Inc. Update for the Creditors Committee, Dec. 14, 2020 at 23 (Exhibit 25).

[31] moKredit Inc. Overview Report at 2.1 Corporate History, Aug. 7, 2019 (Exhibit 3). At times, parties also refer to moKredit as "moKred," "mo9," and previously "GamaxPay, Inc."

[32] Videotaped Dep. of Dan Schatt 26:18–24, Dec. 14, 2020 ("**Schatt Dep.**") (Exhibit 4).

[33] Articles of Association of moKredit, Oct. 25, 2017 (Exhibit 170); Note Purchase Escrow Agreement, Jan. 28, 2020 (Exhibit 171).

[34] Schedule of Advances (Exhibit 46).

[35] Loan and Security Agreement between moKredit Inc., and Cred LLC, Dec. 27, 2018 (Exhibit 5).

[36] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[37] Sarson Funds, https://www.sarsonfunds.com/ (last visited Mar. 4, 2021).

[38] Sarson Funds Fact Card: Fifth Khagan (Exhibit 14).

[39] Sarson Funds Fact Card: AX Momentum (Exhibit 15).

[40] Inamullah Dep. 208:24–209:1 (Exhibit 9).

"CredBorrow."[41]  On April 20, 2020, UpgradeYa and Cred entered into a Loan and Security Agreement whereby Cred agreed to provide UpgradeYa with a $2 million revolving line of credit secured by Bitcoin pledged by UpgradeYa equal to an initial maximum loan-to-value ratio of 50%.[42]  UpgradeYa also participated in the CredEarn plan to earn interest on its cryptocurrency.[43]

- **Uphold:**  A cloud-based asset platform that enables users to store, buy, and convert classes of assets.[44] At Cred's founding, Schatt served on Uphold's board of directors and later added Uphold as a partner for Cred in early 2019.[45]  For Cred, Uphold assisted with operations and acted as its customer wallet.[46] Throughout 2019, Uphold was also one of Cred's primary sources for customer leads.[47]

## C. Relevant Individuals.

- **Daniel ("Dan") Schatt:** Co-founder and former Chief Executive Officer ("**CEO**") of Cred.  Schatt has 20 years of experience in the finance and financial technology sectors.  Schatt met Cred's other co-founder, Lu Hua, while both worked at PayPal in 2009.  When Schatt and Hua founded Cred (then called Libra Credit), Schatt became the company's president and Hua the CEO.  Schatt stepped into the CEO role after Hua resigned in mid-to-late-2018.  Schatt resigned as CEO in December 2020.  Schatt and Hua each own 50% of Cred's equity.[48]

---

[41] *Suppl. Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362* ¶ 2 (ECF No. 128) (Exhibit 172); Nathan DiCamillo, *Here's What Happened at Crypto Lender Cred's Latest Bankruptcy Hearing*, CoinDesk, Dec. 18, 2020 (Exhibit 18).

[42] *Mot. of UpgradeYa Investment, LLC for Relief from Stay Under Bankruptcy Code Section 362* ¶ 8 (ECF No. 89) (Exhibit 17); UpgradeYa Loan and Security Agreement, Apr. 20, 2020 (Exhibit 176); Holdings Update, Oct. 11, 2020 (Exhibit 177).

[43] *Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362* ¶ 5 (ECF No. 91) (Exhibit 173); UpgradeYa Tranche 1 Closing Statement (Exhibit 178); Exhibit 177.

[44] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021); Uphold About Page, https://uphold.com/en/resources/about (last visited Mar. 4, 2021).

[45] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[46] *Id.*

[47] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[48] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

- **Lu Hua:** Founder of moKredit in 2012. In 2018, Hua also founded what is now Cred with Dan Schatt, his former PayPal colleague.[49] Hua owns a 50% equity stake in Cred and sat on its Board from its inception until the eve of its bankruptcy filing. Initially, Hua served as Cred's CEO before yielding the role to Schatt in mid-to-late 2018 as Cred shifted its operations from China to the United States.[50]

- **Joseph ("Joe") Podulka:** Cred's Chief Financial Officer from July 2019 to December 2020.[51] In that role, he oversaw Cred's corporate cash management and expenses incurred by Cred Capital.[52] On June 29, 2020, he became a member of Cred Capital's board of directors.[53] Podulka, also a former PayPal employee, was Head of Finance with PayPal Europe from 2010 to 2011 and Head of Finance at PayPal New Ventures from 2011 to 2014.[54]

- **Daniel ("Dan") Wheeler:** Joined Cred as its General Counsel in August 2019. Wheeler previously served as Cred's primary outside counsel while a partner at Bryan Cave Leighton Paisner LLP ("**Bryan Cave**") from May 2012 to August 2019.[55] In 2020, Wheeler oversaw the organization of Cred Capital,[56] and was appointed Cred Capital's Corporate Secretary and General Counsel on or about March 16, 2020.[57]

- **James Alexander:** Hired as Cred's Chief Capital Officer in August 2018.[58] Alexander's primary roles included soliciting cryptocurrency investments and allocating assets.[59] In March 2020, Cred directed

---

[49] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[50] *Id.*

[51] *Decl. of Joe Podulka in Supp. of Debtors' Obj. to Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case* (Jan. 29, 2021) ¶ 12 ("**Podulka Decl.**") (Exhibit 21).

[52] *Id.* at ¶ 6.

[53] *Id.* at ¶ 9–11.

[54] Podulka Decl. ¶ 2; LinkedIn Profile of Joe Podulka https://www.linkedin.com/in/Podulka/ (last visited Mar. 4, 2021).

[55] *Decl. of Daniel F. Wheeler RE Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case* ¶ 1 (ECF No. 386) ("**Wheeler Decl.**") (Exhibit 24); Schatt Dep. 43:8-14 (Exhibit 4).

[56] Wheeler Decl. ¶¶ 2–3 (Exhibit 24).

[57] *Id.* ¶ 1.

[58] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021).

[59] Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021).

Alexander to establish and manage Cred Capital as a subsidiary of Cred.[60] Instead, Alexander organized Cred Capital as a separate, independent, entity over which he had almost complete control.[61] On June 24, 2020, two days before Cred terminated him, Alexander directed Daniyal Inamullah to transfer 225 Bitcoin from a Cred Capital account to a blockchain address provided by Alexander.[62]

- **Daniyal Inamullah:** Served as Cred's Vice President of Capital Markets from January 2020 to April 2020.[63] In that role, Inamullah reported to James Alexander and was responsible for seeking investment opportunities, conducting due diligence, and proposing investments to Cred's "investment committee."[64] From April 2020 to July 2020, Inamullah served as Cred Capital's Vice President of Capital Markets, where he was responsible for underwriting and selling debt products and marketing bonds.[65] Amid a corporate shuffle, Cred Capital terminated Inamullah in July 2020 and Cred immediately re-hired him as Vice President of Capital Markets, where he reported to Schatt.[66] Inamullah left Cred in November 2020 and is now the Chief Investment Officer at Sarson Funds, one of Cred's asset managers.[67]

- **Grant Lyon:** The co-founder of Arete Capital Partners and has over 30 years' experience in financial restructuring.[68] On November 3, 2020, Cred appointed Lyon as an Independent Director, and he is now the sole remaining member of Cred's Board. In that capacity, Lyon effectively has sole decision-making authority over all matters requiring Board approval.[69]

---

[60] Schatt Decl. ¶ 22 (Exhibit 1); Podulka Decl. ¶ 5 (Exhibit 21); Exhibit C, Decl. of Daniel Schatt in Supp. Of Def.'s Opp. To Pl.'s Mot. for Prelim. Inj., *Alexander v. Schatt*, No. 20-CIV-02728 (Cal. Super. Ct. Aug. 27, 2020) (Exhibit 174).

[61] Schatt Decl. ¶ 22 (Exhibit 1).

[62] Podulka Decl. ¶ 2 (Exhibit 21).

[63] *Decl. of Daniyal Inamullah in Supp. of Mot. of the United States Trustee for Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases* (ECF No. 133) ¶ 1 ("**Inamullah Decl.**") (Exhibit 6).

[64] *Id.* at ¶ 2.

[65] Inamullah Dep. 30:23–31:3 (Exhibit 9).

[66] *Id.* at 31:24–32:2.

[67] Inamullah Decl. ¶ 1 (Exhibit 6).

[68] *Decl. of Grant Lyon in Supp. of Debtors' Obj. to Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case* ¶ 2 (ECF No. 433) ("**Lyon Decl.**") (Exhibit 26).

[69] *Id.* ¶ 2.

- **Matthew ("Matt") Foster:** A managing director and founding partner of Sonoran Capital Advisors, a turnaround, crisis management, and financial advisory firm.[70] Cred hired Foster as its Chief Restructuring Officer ("**CRO**") in November 2020. Foster reports to Cred's Board and manages Cred's day-to-day operations. He is also responsible for assessing and implementing the restructuring of Cred's businesses, including overseeing Cred's liquidity needs. Foster has 15 years of restructuring experience and Cred is his fifth CRO appointment in the last 36 months.[71]

- **Scott Wiley:** Senior Advisor at Sonoran Capital Advisors, a turnaround, crisis management, and financial advisory firm. Wiley is Cred's interim Chief Financial Officer, overseeing Cred's day-to-day accounting, finance, and cash management functions.[72]

- **Paul Maniscalco / Pablo Bonjour (MACCO):** Paul Maniscalco is a senior managing director and Pablo Bonjour is a managing director at MACCO Restructuring Group, LLC ("**MACCO**").[73] MACCO provides interim executive leadership, financial advisory services, and fiduciary services to businesses in financial and operational distress. Bonjour and Maniscalco are financial advisors to Cred. Bonjour has an investment banking and consulting background, having worked with more than 1,000 U.S. and international clients.[74] Maniscalco has over 20 years' experience in corporate finance, capital markets, and business restructurings.[75]

## III. RELEVANT CASE BACKGROUND[76]

### A. The Commencement of the Chapter 11 Cases and Appointment of Examiner.

The Debtors filed for Chapter 11 relief on November 9, 2020, citing, among other things:

(i) material losses incurred in connection with or as a result of the alleged misconduct of its

former Chief Capital Officer, James Alexander; (ii) the purported theft of certain cryptocurrency

---

[70] Exhibit 25 at 34.

[71] *Id.* at 3.

[72] *Id.* at 35.

[73] *Id.* at 32–33.

[74] *Id.* at 32.

[75] *Id.* at 33.

[76] For this section, references made to affirmative actions taken by the "Examiner," necessarily include those actions taken by Examiner's counsel and experts.

assets in connection with a failed investment with QuantCoin; and (iii) the Debtors' deployment of significant assets with moKredit and the subsequent inability or unwillingness of moKredit to return those assets to Cred pursuant to the terms of the parties' agreement.[77]

Amid allegations of fraud, theft, and mismanagement, the Office of the United States Trustee, on December 4, 2020, filed its *Motion for Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases*.[78]  On December 18, 2020, the Court conducted a hearing with respect to this motion and, on December 23, 2020, the Court entered its *Order Denying in Part, and Granting in Part, the Trustee/Examiner Motions*, pursuant to which the Court granted the U.S. Trustee's request for the appointment of an examiner pursuant to Bankruptcy Code Section 1104(c).[79]  The Examination Order provides, in pertinent part, that the Examiner will investigate any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the Debtors of or by current or former management of the Debtors, and otherwise perform the duties of an examiner set forth in Bankruptcy Code Sections 1106(a)(3) and 1106(a)(4).

On January 7, 2021, the U.S. Trustee appointed Robert J. Stark as Examiner and filed a motion seeking Court approval of such appointment,[80] and on January 8, 2020, the Court entered an Order approving Mr. Stark's appointment as Examiner.[81]

---

[77] *See* Schatt Decl. ¶¶ 18–40 (Exhibit 1).

[78] *See United States Trustee Mot. For Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases* (ECF No. 133) ("**UST Motion**") (Exhibit 27).

[79] *See Order Den. in Part, and Granting in Part, the Trustee/Examiner Mot.* (ECF No. 281) ("**Examination Order**") (Exhibit 28).

[80] *See App. of the United States Trustee for Order Approving Appointment of Examiner* (ECF No. 330) (Exhibit 29).

Promptly following his appointment, the Examiner and his counsel met and conferred with the U.S. Trustee, the Debtors, and the Committee regarding the scope, timeline, and budget with respect to the Investigation. Thereafter, on January 20, 2021, the Examiner filed his *Proposed Scope, Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Stark, as Examiner*,[82] which the Court approved by order dated January 28, 2021.[83] On February 24, 2021, the Examiner filed a proposed amendment to the work plan and budget.[84]

**B.    The Examiner's Work Plan for the Investigation.**

Pursuant to his work plan, the Examiner identified the following specific topics of the Investigation:

(i)     investigating the Debtors' business and operations including allegations of comingling corporate and client accounts and possible insider transactions;

(ii)    examining the facts and circumstances surrounding the substantial losses the Debtors' endured as a result of the liquidation of certain hedge positions;

(iii)   the Debtors' relationship with moKredit, including investments made by the Debtors, and outstanding debt owed by moKredit;

(iv)    the facts and circumstances surrounding Lu Hua's transfer of 300 Bitcoin to the Debtors and the related controversy that ensued;

(v)     the facts and circumstances surrounding the transfer of 800 Bitcoin to QuantCoin and the losses associated therewith; and,

(vi)    the facts and circumstances involving certain dealings between the Debtors and James Alexander.

---

[81] *See Order Approving Appointment of Examiner* (ECF No. 338) (Exhibit 30).

[82] *Notice of Filing of Proposed Scope, Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Start, as Examiner* (ECF No. 376) ("**Examiner Work Plan**") (Exhibit 31).

[83] *Order Approving Examiner's Proposed Scope, Work Plan, and Budget for Investigation* (ECF No. 431) (Exhibit 32).

[84] *Notice of Filing of Proposed Amend. to Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Stark, as Examiner* (ECF No. 552) (Exhibit 33).

Although completing an investigation and report of this scale in approximately 8 weeks was a large undertaking, the Examiner endeavored to complete and file his report in advance of the plan confirmation hearing, presently scheduled for March 9, 2021.

### C.   The Methods Employed to Conduct the Investigation.

Because of the complex nature of this Investigation and the specialization it demands, the Examiner engaged (a) Brown Rudnick LLP and Ashby & Geddes, P.A. to serve as his counsel, and (b) Ankura Consulting Group, LLC to assist with the digital asset market analysis. Additionally, and as provided in the Examination Order, the Examiner utilized and leveraged work performed by advisors to the Debtors and Creditors' Committee in conducting the Investigation, including Dundon Advisers, LLC and CipherTrace, Inc.

The Examiner obtained documents from the Debtors, the Committee, and other parties in interest.  In total, the Examiner received and analyzed approximately 13,000 documents and over 55 gigabytes of information.

The Examiner conducted 23 witness interviews.  Because of health and safety protocols, all witness interviews were conducted over video conference.  All interviewees participated willingly.  The majority of those interviewed were represented by counsel.  The following is a list of the persons interviewed in connection with the Investigation and the dates of the interviews:

| Interviewee | Title | Date of Interview |
|---|---|---|
| **Tim Kuhman** | General Counsel, Kingdom Trust | February 3, 2021 |
| **Barbara J. Valliere** | Assistant United States Attorney, United States Attorney's Office for the Northern District of California | February 4, 2021 |
| **Alexandra E. Bryant** | Special Agent, Federal Bureau of Investigation | February 4, 2021 |

21

| Matthew Foster | Chief Restructuring Officer, Cred Inc. | February 8, 2021 |
| | Managing Director and Founding Partner, Sonoran Capital Advisors | |
| Scott Wiley | Interim Chief Financial Officer, Cred Inc. | February 9, 2021 |
| | Senior Advisor, Sonoran Capital Advisors | |
| Pablo Bonjour | Financial Advisor to Cred Inc. | February 10, 2021 |
| | Managing Director, MAACO Restructuring Group | |
| Paul Maniscalco | Financial Advisor to Cred Inc. | February 10, 2021 |
| | Senior Managing Director, MAACO Restructuring Group | |
| Daniyal Inamullah | Former Vice President of Capital Markets, Cred Inc. | February 10, 2021 |
| | Former Vice President of Capital Markets, Cred Capital Inc. | February 23, 2021 |
| Grant Lyon | Independent Director, Cred Inc. | February 11, 2021 |
| | Co-Founder and Managing Partner, Arete Capital Partners | |
| Daniel Wheeler | Former General Counsel, Cred Inc. | February 12, 2021 |
| Joseph Podulka | Former Chief Financial Officer, Cred. Inc | February 16, 2021 |
| Daniel Schatt | Co-Founder, Cred Inc. | February 17, 2021 |
| | Former Chief Executive Officer, Cred Inc. | |
| Mr. C.M. | Creditor and former customer, Cred Inc. | February 18, 2021 |
| Mr. M.M. | Creditor and former customer, Cred Inc. | February 18, 2021 |
| Lu Hua | Founder moKredit | February 18, 2021 |
| | Co-Founder, Cred Inc. | |
| Mr. C.dL. | Creditor and former customer, Cred Inc. | February 19, 2021 |
| Tonia Tautolo | Interim Chief Financial Officer, Cred Inc. | February 19, 2021 |
| Mr. D.F. | Creditor and former customer, Cred Inc. | February 24, 2021 |
| Mr. E.S. | Creditor and former customer, Cred Inc. | February 24, 2021 |
| Mr. J.S. | Creditor and former customer, Cred Inc. | February 24, 2021 |
| Mr. G.B. | Creditor and former customer, Cred Inc. | February 24, 2021 |
| James Grogan | Paul Hastings | March 2, 2021 |

| James Alexander | Former Chief Capital Officer, Cred Inc. | March 3, 2021 |
| | Former Director, Cred Capital Inc. | |

## IV.    GENERAL BACKGROUND REGARDING THE DEBTORS

### A.    Corporate History and Organization.

Daniel Schatt and Lu Hua formed Cred, Inc. and its affiliated Debtors in or around May 2018.[85]   At inception, Hua and Schatt each owned 50% of the equity in Cred.  Before forming Cred, Schatt and Hua worked together at PayPal, overlapping from 2007 until 2011.  Hua left PayPal in or around mid-2011 and subsequently formed moKredit, a microcredit lending company in Singapore and Shanghai.  Schatt and Hua stayed in contact following their time at PayPal.[86]

In January 2018, Schatt and Hua established an entity named Cyber Quantum in Singapore.  Cyber Quantum's stated purpose was to conduct an Initial Coin Offering ("**ICO**") in or around May 2018.  The proceeds of the Cyber Quantum ICO would be used to provide initial funding for a different and newly-formed entity, Cred.  Through the ICO, Schatt and Hua raised approximately $5 million.[87]

---

[85] The responsible parties originally organized Cred as an LLC in Delaware, which also was originally known as Libra Credit and also transacted through Cyber Quantum Pte. Ltd., a Singaporean entity.  Schatt Dep. 37:1–10 (Exhibit 4); Cred LLC and Subsidiary Financial Statements, 2018 (Exhibit 34).

[86] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021); Interview with Daniel Schatt, co-Founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[87] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021).  According to Alexander, Cyber Quantum raised $26 million in Ethereum during the ICO.  The Examiner has not seen any evidence to substantiate this assertion.

Schatt and Hua initially intended for Cred to operate out of China, with Hua (a resident of China) serving as CEO and Schatt (a resident of California) serving as president.[88]  At some point in 2018, Schatt and Hua decided to relocate the business to the U.S. in an apparent effort to increase scale.[89]  After relocating Cred to the U.S., Schatt assumed the CEO role and Hua resigned his position as an officer of Cred, although Hua remained a member of Cred's Board until November 2020.[90]

Cred brought in more than $135 million in "borrowed" capital from its CredBorrow and CredEarn programs (discussed further below) between December 2018 and October 2020.  It did so by offering guaranteed rates of return against investments (CredEarn) and providing loans to institutional and retail customers backed by their pledged cryptocurrency (CredBorrow).

CredEarn customers were told that regardless of the market trends, they would "receive the upside potential of [their] crypto."[91]  Cred advertised that customer cryptocurrency was used to lend and transact with a variety of customers including retail borrowers and money managers (but not short-sellers).[92]  CredBorrow customers received credit lines based on a loan-to-value ratio calculated on a monthly basis.[93]

Cred customers executed CredEarn or CredBorrow agreements memorializing the terms of the arrangements.  The Examiner was provided with copies of certain (but not all) of the agreements under the CredEarn and CredBorrow programs.  In those agreements, Cred did not

---

[88] Schatt Dep. at 20:22–21:12 (Exhibit 4); Interview with Daniel Schatt, co-Founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[89] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[90] Schatt Dep. 21:2–12; 22:4–6; 37:9–38:2 (Exhibit 4).

[91] CredEarn Page, https://mycred.io/earn/ (last visited Mar. 4, 2021).

[92] *Id.*

[93] Standard CredBorrow Multi-Tranche Credit Agreement at 2–3 (Exhibit 36).

make representations respecting or covenant as to how Cred would invest its customers' cryptocurrency.[94] Further, none of the agreements reviewed by the Examiner spoke to whether customer funds or Cred's investments were to be collateralized.

### B. Cred's Primary Products.

#### (a) CredBorrow.

CredBorrow was Cred's first consumer product. Cred launched the CredBorrow program in December 2018 as a mechanism to offer customers loans in U.S. dollars (USD) using a customer's cryptocurrency as collateral for the loan.[95] Cred marketed the program to customers as "cash on your crypto without cashing out," meaning that a customer could lend its cryptocurrency to Cred and receive payment streams from Cred, without having to sell the cryptocurrency.[96]

Under the CredBorrow program, customers would transfer their cryptocurrency to Cred, which would hold such assets in a Cred account (typically with an entity named BitGo), and receive a loan in USD from Cred. CredBorrow loans would typically bear interest at between 9% and 14% on an annual basis, depending on the length of the loan and the underlying collateral.[97] Cred also typically charged a 3% "origination" fee. The credit line was available to

---

[94] Exhibit 36; Email from J. Alexander to K. Wong, Feb. 12, 2019 (Exhibit 39) (James Alexander sending samples of Cred's Enhanced Yield Agreement and Multi-Tranche Credit Agreement when asked for sample contracts for CredEarn and CredBorrow customers); Enhanced Yield Agreement for CredEarn Customers (Exhibit 40).

[95] CredEarn CredBorrow Information Sheet (Exhibit 35); Interview with Lu Hua, Chief Executive Officer, moKredit, Inc. (Feb. 18, 2021).

[96] CredBorrow Page, https://mycred.io/borrow/ (last visited Mar. 4, 2021).

[97] Exhibit 35; Standard Cred Multi-Tranche Credit Agreement at 2–3 (Exhibit 36).

CredBorrow customers for three years, with payments due annually. The loan-to-value ratio was calculated on a monthly basis.[98]

After Cred received cryptocurrency assets through the CredBorrow program, it often converted the assets to USD or Stablecoin (USDT) – a cryptocurrency with a market value pegged to a "stable asset," in this case U.S. dollars – and used the proceeds to make loans to moKredit for interest rates typically ranging from 18% to 24%.[99] The loan agreements between Cred and moKredit provided that moKredit had to return principal on the sooner of the maturity date of the loan or upon 30 days' notice at Cred's discretion.[100]

(b) **CredEarn.**

Schatt and Hua recognized that the CredBorrow business model was susceptible to the volatility of underlying cryptocurrency prices, which directly impact the collateral value of the loans.[101] Following a significant drop in Bitcoin prices in 2018, Schatt and Hua began developing another business line that could, in theory, compliment the CredBorrow business and off-set certain of the risk attendant to that business.[102]

In February 2019, Cred launched its CredEarn program. Under CredEarn, customers were offered the opportunity to earn interest on their cryptocurrency assets by depositing them with Cred for a predetermined period of time at a set interest rate (similar to a certificate of

---

[98] CredBorrow Page, https://mycred.io/borrow/ (last visited Mar. 5, 2021).

[99] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021); Interview with Daniel Schatt, co-Founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[100] *See, e.g.,* Exhibit 36; moKredit Tranche Agreement No. 29, May 1, 2019 (Exhibit 37).

[101] Interview with Daniel Schatt, co-Founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[102] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

26

deposit).[103] Cred would then convert cryptocurrency assets deposited under the CredEarn program into fiat currency and use the proceeds to make loans.[104] According to Cred's investment thesis, Cred would generate profits based on the spread between the interest rate offered to customers and the rate charged by Cred under the relevant loans.[105]

Cred boasted that customers would "still receive the upside potential of [their] crypto in a bull market."[106] Cred advertised that customer loans were used to lend and transact with a variety of customers, including retail borrowers and money managers, but not to short-sellers.[107] CredEarn contracts did not detail precisely how Cred intended to invest customer assets and made no mention of converting digital assets to USD/Stablecoin (USDT) and loaning those assets to a company in China.[108] As discussed further in Section V(B), the vast majority of CredEarn assets were utilized to make loans to moKredit.

CredEarn enrollment occurred on the 1st and 15th of every month, after Cred conducted a Know Your Customer ("**KYC**") check and executed a yield agreement with the customer.[109] Cred advertised the program on their website as a 6 month program, after which cryptocurrency was returned to the customer. Customers also had the ability to opt for a 3 month auto-enroll.[110] Contracts obtained by the Examiner provided that the agreements between the customer and

---

[103] Interview with Dan Schatt, co-Founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[104] Crypto-to-Fiat Process Diagram (Exhibit 175).

[105] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[106] CredEarn Page, https://mycred.io/earn/ (last visited Mar. 4, 2021).

[107] *Id.*

[108] Interview with Mr. M.M., Creditor and former customer, Cred Inc. (Feb. 18, 2021).

[109] CredEarn Process and Asset Flow (Exhibit 38).

[110] CredEarn Page, https://mycred.io/earn/ (last visited Mar. 5, 2021).

Cred were structured as so-called "Enhanced Yield Agreements" – agreements that linked to the performance of foreign exchange rates, and thus the potential for a higher return.[111]

In an effort to mitigate the risks associated with converting digital assets to fiat currency Cred established hedge positions through JST. As explained in greater detail below, Cred's positions were intended to protect Cred in the event cryptocurrency prices increased, but created a risk if they decreased.

## V. CRED'S OPERATIONS AND CIRCUMSTANCES LEADING TO THE FINANCIAL COLLAPSE

### A. Cred's Business Functionality.

#### 1. Cryptocurrency Asset Storage.

Cred held very few assets itself and, instead, worked with certain firms to, among other things, store and initiate transfers of Cred's cryptocurrency assets, typically through a digital "wallet" maintained with the firm.[112] A digital wallet acts as a bank that allows one to deposit, withdraw, and make transactions with cryptocurrencies.[113] Given that cryptocurrencies are not physical, all transactions are recorded on a ledger referred to as a blockchain.[114] By providing a wallet address (every cryptocurrency wallet has a distinct address) an individual can transfer funds to that wallet.[115] Given that all transactions are recorded on the blockchain, it is easy to

---

[111] Email from J. Alexander to K. Wong, Feb. 12, 2019 (Exhibit 39) (James Alexander sending samples of Cred's Enhanced Yield Agreement and Multi-Tranche Credit Agreement when asked for sample contracts for CredEarn and CredBorrow customers); Enhanced Yield Agreement for CredEarn Customers (Exhibit 40); Exhibit 36.

[112] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021); Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[113] Digital Wallet, https://www.investopedia.com/terms/d/digital-wallet.asp (last visited Mar. 7, 2021).

[114] What is Blockchain Technology, https://www.coindesk.com/learn/blockchain-101/what-is-blockchain-technology (last visited Mar. 7, 2021).

[115] *Id.*

track the total amount of funds designated to a particular wallet.[116]  Furthermore, an individual can possess as many digital wallets as he or she wants.[117]

> (a)  **JST Capital.**

JST Capital was Cred's initial wallet provider through March 2020.  During that time, CredEarn deposits were often transmitted directly to a JST wallet.[118]  JST converted those deposits into USD/Stablecoin and then executed transfers with moKredit pursuant to Cred's loan agreements with moKredit.[119]  Under its arrangement with JST, Cred was unable to confirm receipt of funds for customers until JST sent confirmation that funds had been received.[120]

> (b)  **Fireblocks.**

In or around February 2020, Cred began to transition from an exclusive relationship with JST.  Cred was looking to diversify its investment portfolio and wanted to find a new over-the-counter ("**OTC**") asset custodian that could both hold and facilitate the transfer of Cred's cryptocurrency.  At Schatt's direction,[121] Cred partnered with Fireblocks, an asset custodian that both holds and facilitates the transfer of cryptocurrency, to fill the company's OTC need.[122] Cred entered into a licensing agreement with Fireblocks on February 21, 2020.[123]

---

[116] What is a Distributed Ledger, https://www.coindesk.com/learn/blockchain-101/what-is-a-distributed-ledger (last visited Mar. 7, 2021).

[117] Digital Wallet, https://www.investopedia.com/terms/d/digital-wallet.asp (last visited Mar. 7, 2021).

[118] Interview with Scott Freeman, JST Capital (Mar. 2, 2021); Chat Log between S. Zhang and T. Perez, Aug. 28, 2019 (Exhibit 41).

[119] Chat Log between S. Zhang and T. Perez, Jul. 8, 2019 (Exhibit 182) (confirming investments did not always go through Cred).

[120] Chat Log between S. Zhang and T. Perez, Dec. 4, 2019 (Exhibit 183).

[121] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[122] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

[123] Fireblocks License Agreement, Feb. 21, 2020 (Exhibit 43).

The Fireblocks licensing agreement required Cred to put in place adequate controls to avoid so-called "collusion risk" (i.e., the risk of double-spending cryptocurrency), including enacting protocols and procedures to ensure that passwords and recovery passwords were appropriately stored and tracked.[124]  In this respect, Daniyal Inamullah (at the time, Cred's Vice President of Capital Markets) recommended that Cred adopt certain procedures (e.g., joint password managers) to avoid potential collusion and other risks.[125]

Joe Podulka was the Fireblocks "workspace owner," which gave him responsibility for Cred's policies and configuration as they related to Fireblocks, including the decision of who at Cred could access the platform.[126]  Although Podulka appeared to agree with Inamullah's suggestion regarding joint password managers, the Examiner found no evidence that this policy was adopted.  Ultimately, Podulka, Inamullah, Alexander and Adnan Khakoo (a former fund accountant) had access to Cred's Fireblocks accounts and each had the ability to individually initiate transactions and make transfers with little or no oversight.[127]

To transfer assets, Inamullah, among others with access, digitally submitted transfer requests that were then confirmed or denied by the authorizer.  As a matter of informal policy, the initiator of the transaction was not permitted to also authorize the transaction.[128]  The sender usually transferred a small test amount to ensure the receiving wallet address was correct.  Upon confirmation, the sender then completed the transaction.[129]

---

[124] Exhibit 43 at 5.2.

[125] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

[126] Exhibit 43 at 5.9.

[127] Inamullah Dep. 218:11–17 (Exhibit 9).

[128] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[129] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

When a user sent funds from Fireblocks, the Fireblocks ledger would create an outgoing entry, and Cred's NetSuite accounting platform would record the date of the transaction and where the assets were sent. Fireblocks' system only recorded the destination wallet address.[130] It was the user's responsibility to manually input identifying information regarding the transaction.[131] That rarely occurred such that, according to Scott Wiley (Cred's interim CFO), the information in Cred's journal entries was not particularly meaningful.[132]

Although Inamullah personally adopted an informal policy of requiring two persons to effect transfers (one to authorize and one to initiate) to ensure oversight,[133] that practice was not adopted prior to Cred's transition to Fireblocks.[134] Even then, however, it is unclear whether it was more widely implemented or an effective control.[135]

As a general practice, Cred did not (had no mechanism to) distinguish between its assets in its Fireblocks accounts: (i) customers would transfer assets to Cred's digital wallets; (ii) Cred would transfer those assets to a central concentration account where such assets would be comingled with all other customer deposits; and (iii) Cred would send assets from the concentration account to various asset managers. The Examiner saw no evidence that Cred

---

[130] Interview with Tonia Tautolo, Interim Controller, Cred Inc. (Feb. 19, 2021).

[131] *Id.*

[132] Interview with Scott Wiley, interim Chief Financial Officer, Cred Inc. (Feb. 9, 2021).

[133] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

[134] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[135] The Examiner received conflicting reports on this issue. *Compare* [135] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021) *with* Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021). Also, Cred's interim Controller, Tonia Tautolo, explained that wallets could be "whitelisted," i.e., pre-approved, on Fireblocks prior to a transfer. It was Tautolo's understanding that a wallet address needed to be whitelisted on Cred's Fireblocks system before it could receive a transfer. *See* Interview with Tonia Tautolo, interim Controller, Cred Inc. (Feb. 19, 2021). However, Inamullah indicated that, although wallets could be "whitelisted," it was not a requirement in order to effect an outgoing transfer from a Cred Fireblocks accounts to a particular wallet. Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

distinguished between assets deposited through the CredEarn or CredBorrow programs (or any other programs).

To further complicate matters, customer deposits in Fireblocks were intended to be tracked only manually in an Excel ledger, which was maintained offline and not updated regularly.[136] Cred maintained certain client folders that contained contracts indicating how much certain customers had deposited, but the Examiner has not seen any evidence that Cred kept records of what assets were received in which wallet and when.[137] In all, Cred's comingling of its assets and absence of meaningful financial records made it impracticable for the company to discern whose assets belonged to whom.

Due to the lack of available information for transactions, the Examiner has significant concerns regarding the reliability of Cred's books and records regarding pre-petition transfers sent from Cred's Fireblocks account.

(c)    **Uphold.**

Uphold is a cloud-based asset platform that enables users to store, buy, and convert classes of assets.[138] At Cred's founding, Schatt served on Uphold's board of directors and later added Uphold as a partner for Cred in early 2019.[139] For Cred, Uphold assisted with operations and acted as its customer wallet.[140] Throughout 2019, Uphold was also one of Cred's primary

---

[136] Interview with Tonia Tautolo, interim Controller, Cred Inc. (Feb. 19, 2021).

[137] *Id.*

[138] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021); Uphold About Page, https://uphold.com/en/resources/about (last visited Mar. 4, 2021).

[139] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[140] *Id.*

sources of customer leads.[141]   When a customer bought cryptocurrency on Uphold, Uphold would display an advertisement referencing its partnership with Cred and representing that Cred products allowed Uphold customers to earn interest on their assets.[142]

According to Matt Foster (Cred's CRO), Uphold customers could participate in the CredEarn program directly through Uphold's platform (its web application).[143]   Uphold was a customer generator for Cred and also operated a wallet service similar to Fireblocks.   Under the customer agreements furnished to the Examiner, Cred retained the discretion to invest funds obtained from Uphold customers as it saw fit (no differently than any other CredEarn customer).[144]

## 2.   Diligence Process and Procedures.

As Cred's Chief Capital Officer, James Alexander was tasked with primary responsibility for diligence respecting Cred's investment partners.[145]   Alexander delegated diligence responsibilities to Inamullah, Cred's former Vice President of Capital Markets, who stated that, as of his arrival in January 2020, Cred did not have an effective diligence process with respect to its investments, "at least on paper."[146]   Although in his sworn deposition Inamullah stated that he was responsible for conducting diligence on behalf of Cred, in his interview with the Examiner, Inamullah disclaimed any responsibility for Cred's diligence function.[147]

---

[141] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[142] *Id.*

[143] Interview with Matthew Foster, Chief Restructuring Officer, Cred Inc. (Feb. 9, 2021).

[144] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[145] Inamullah Dep. 34:15–35:2 (Exhibit 9).

[146] *Id.* at 52:2–14.

[147] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

According to his deposition testimony, Inamullah adopted what can best be described as an informal process for vetting potential investment partners. When evaluating a potential asset manager, Inamullah explained that he would first exchange general compliance information with the party, including beneficial ownership information, background on the business itself, and basic financial information.[148] He would then run the beneficial owner names through the relevant anti-money laundering or KYC software, and contact others in the industry for references.[149] To log information related to a potential investment, Cred used an internal Google form.[150]

Inamullah stated that he would question asset managers about experience, strategies, and points of risk,[151] then would compile his findings into a brief investment proposal (typically 3-5 pages) for consideration by an informal "investment committee," consisting of Schatt, Podulka, Inamullah, Wheeler, and Alexander.[152] In his deposition testimony, Inamullah stated that he developed a diligence checklist to vet investment managers but, in his subsequent interview with the Examiner, he stated that no such list existed.[153] In any event, even in his deposition testimony, Inamullah stated that he rarely used a diligence list during his tenure,[154] and that he took few steps to validate information provided by asset managers.[155]

---

[148] Inamullah Dep. 42:15–44:1 (Exhibit 9).

[149] *Id.* at 30:20–25, 35:9–14; 42:15–44:1.

[150] *Id.* at 45:20–46:5.

[151] *Id.* at 42:15–44:1, 53:18–24.

[152] *Id.* at 42:15–44:1. It also appears that Khakoo, Sally Zhang (Senior Accounting Manager), Heidi Ng (Director of Product and Partner Integrations), and Karen Wong (Cred's Head of Finance / CFO prior to Podulka) attended at least some "investment committee" meetings. *See* Cred Investment Committee Meeting Minutes (Exhibit 44).

[153] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

[154] Inamullah Dep. 47:23–50:7 (Exhibit 9).

[155] *Id.* at 53:25; 60:15–20.

In his deposition, Inamullah stated that he and Alexander would supplement their diligence efforts by contacting attorneys for counter-parties and other industry professionals, seeking to verify information provided by an asset manager (e.g., corporate documents, financial statements).[156]  In all, the diligence process described by Inamullah was, in the Examiner's opinion, informal and appeared, in places, to be cursory.

### 3.    Financial and Accounting Practices.

The Examiner reviewed extensive records and conducted several interviews with key financial personnel, all of whom described incomplete or inadequate accounting practices at Cred.[157]  The Examiner's review of Cred's financial documents and transaction history confirmed significant gaps in Cred's accounting and record keeping practices, gaps that were confirmed by the Debtors' advisors, MACCO and Sonoran Capital Advisors.[158]

Although Cred had access to Oracle's NetSuite accounting software to produce financial statements, Cred appears to have relied principally on Microsoft Excel and Google Sheets in place of an integrated accounting function.[159] According to Paul Maniscalco and Pablo Bonjour, MACCO was unable to readily identify Cred's beginning cash balance upon initiating its work

---

[156] *Id.* at 53:25–60:14.

[157] Interview with Matthew Foster, Chief Restructuring Officer, Cred Inc. (Feb. 8, 2021); Interview with Scott Wiley, interim Chief Financial Officer, Cred Inc. (Feb. 9, 2021); Interview with Pablo Bonjour and Paul Maniscalco, Financial Advisors, MACCO, (Feb. 10, 2021); Interview with Tonia Tautolo, interim Controller, Cred Inc. (Feb. 19, 2021).

[158] Interview with Matthew Foster, Chief Restructuring Officer, Cred Inc. (Feb. 8, 2021); Interview with Scott Wiley, interim Chief Financial Officer, Cred Inc. (Feb. 9, 2021); Interview with Pablo Bonjour and Paul Maniscalco, Financial Advisors, MACCO, (Feb. 10, 2021).

[159] Interview with Pablo Bonjour and Paul Maniscalco, Financial Advisors, MACCO, (Feb. 10, 2021); *see, e.g.*, Email from S. Hwang to J. Podulka, Nov. 12, 2020 (Exhibit 45) (referencing Google Sheets); Schedule of Advances (Exhibit 46) (tracking all of Cred's tranches with moKredit in Excel); Email from J. Podulka to F. Cottrell and A. Khakoo, Nov. 18, 2020 (Exhibit 47) (referencing NetSuite); *see also* Accounting Software, Netsuite, https://www.netsuite.com/portal/products/erp/financial-management/finance-accounting.shtml (last visited Mar. 4, 2020).

with Cred due to incomplete accounting records.[160] MACCO representatives had to manually determine Cred's cash balance by obtaining and/or creating financial statements.[161]

Cred's interim Controller, Tonia Tautolo, confirmed that Cred's financial records were in a state of disarray when she arrived in December 2020.[162] Very few transaction records existed, and, in the instances where a transaction record did exist from Uphold or Fireblocks, Cred did not consistently input the statement information into its accounting system, leaving Cred's records incomplete and/or out-of-date.[163] Instead, Cred attempted to track liabilities in what was referred to as the "Cred Ledger" in Excel, which Tautolo described as falling short of any reasonable accounting standards.[164] As just one example, Cred relied on a series of Excel spreadsheets to track tens of millions of dollars' worth of transactions with moKredit. Based on the evidence obtained by the Examiner, these spreadsheets appear to be Cred's only records of when funds moved between Cred, moKredit, and JST.

Further, it appears that Cred did not perform a financial reconciliation of any accounts for the 2020 financial year. The Examiner was able to obtain only unaudited 2019 financial statements for Cred.[165] It bears noting that, although MACCO could not identify the last point at which Cred had a complete and accurate records reconciliation, Armanino LLP – an independent accounting and business consulting firm – produced a signed audit report dated December 31,

---

[160] Interview with Pablo Bonjour and Paul Maniscalco, Financial Advisors, MACCO, (Feb. 10, 2021).

[161] *Id.*

[162] Interview with Tonia Tautolo, interim Controller, Cred Inc. (Feb. 19, 2021).

[163] *Id.*

[164] Interview with Tonia Tautolo, interim Controller, Cred Inc. (Feb. 19, 2021); Cred LLC General Ledger, 2020 (Exhibit 48).

[165] Cred Financial Statements, 2019 (Exhibit 49).

2018.[166]   Cred engaged Armanino to audit Cred's financial statements for the year ending December 31, 2019, but work papers that MACCO examined suggest that the audit was still on-going as of Cred's bankruptcy filing.[167]

Cred did not appear to regularly mark-to-market or record unrealized gains in any system.[168]  MACCO informed the Examiner that it did not find profit and loss or mark-to-market account entries in Cred's general ledger.[169]  According to Foster, Cred did not complete monthly account reconciliations,[170] which is also inconsistent with financial industry standards.[171]

### 4.    Insurance Coverage.

In soliciting customers, Cred advised potential customers that the company had "one of the most comprehensive insurance policies available,"[172] and provided information about its policies through its website.[173]   In certain instances, Cred claimed that customers' cryptocurrency investments were insured up to $100 million through industry-leading custodians like BitGo.[174] In communicating with certain customers, Cred further represented that its asset custodians –namely, BitGo and Bittrex – provided an extra layer of security through their own

---

[166] Exhibit 34.

[167] Email from J. Podulka to H. Moore and E. Rye, May 21, 2020 (Exhibit 50).

[168] Interview with Pablo Bonjour and Paul Maniscalco, Financial Advisors, MACCO, (Feb. 10, 2021).

[169] *Id.*

[170] Interview with Matthew Foster, Chief Restructuring Officer, Cred Inc. (Feb. 8, 2021).

[171] *Id.*

[172] Email from M. Zhang to M. Parrish, June 24, 2020 (Exhibit 59).

[173] Screenshot of Cred website discussing insurance policies (Exhibit 60).

[174] Screenshot of Cred website discussing partnership with BitGo (Exhibit 61); Email chain between M. Zhang and T. Miyauchi, June 19, 2020 (Exhibit 62).

insurance policies.[175]   Additionally, Cred touted its cyber hacking coverage obtained through Lockton.[176]

Snapshots from Cred's website are excerpted below:[177]



**Backup plans**
The blockchain, buttoned-up

Cred has one of the most comprehensive insurance policies available, including cyber hacking, E&O and regulatory coverage.

**Security first**
Decentralized doesn't mean dangerous

Cred works with trusted security and insurance providers Fireblocks to ensure that our customers' digital assets have enterprise-grade security. We are proud to be fully vetted and partnered with BitGo, Ledger, and Xapo, with BitGo and Ledger fully supporting the LBA token

Cred also sent customers links to blog posts and webpages with insurance information that, according to certain customers, led them to believe that their investment was fully protected by Cred's insurance policies.[178]   One customer noted that he placed confidence in Cred due to its "advertised claim to have 'industry leading' insurance."[179]   When another customer asked whether Cred would compensate for losses resulting from customers' Bitcoin being hacked or stolen, he was assured that, once assets were in Cred's custody, Cred took "full responsibility for [their] safety and redelivery."[180]

---

[175] Exhibit 59; Email from T. Perez to C.D. Nov. 14, 2019 (Exhibit 63); Email chain between M. Zhang and J.S., Apr. 15, 2020 (Exhibit 64).

[176] Exhibit 59.

[177] Exhibit 60; Exhibit 61.

[178] Exhibit 59; Interview with Mr. M.M., Investor, Cred. Inc., (Feb. 18, 2021).

[179] Email from D.F. to T. Perez, Nov. 8, 2020 (Exhibit 66).

[180] Exhibit 62.

Based on the information obtained by the Examiner, it appears that Cred's assertions regarding the strength and scope of its insurance coverage were inaccurate and/or overstated. Cred maintained several insurance policies that it acquired through Lockton Insurance Brokers, LLC ("**Lockton**").[181]  The policies in effect during 2020 were the following:[182]

- Commercial package from The Hartford Financial Services Group, Inc. ("**The Hartford**").[183]  Cred's commercial package from The Hartford provides general liability, property, automotive, and umbrella liability for a total premium of $4,121.[184]  The Hartford policy provides $2 million in general liability insurance for each occurrence with a general aggregate limit of $4 million.[185]  Cred's umbrella policy provides an additional $1 million coverage limit.[186]  Cred renewed its policy from The Hartford in 2020 to extend coverage through November 6, 2021.[187]

- Cyber liability from AXIS Insurance, which provides Cred with cyber liability coverage up to a $5 million limit for a total premium of $29,314.[188]  Although the AXIS policy covered certain events, including crisis management, fraud response, and business interruptions up to the full $5 million policy limit, its coverage for "social engineering fraud loss" was subject to a $250,000 coverage limit.[189]

- Errors and omissions ("**E&O**") from Validus Specialty ("**Validus**"), which provides $1 million of coverage for a total premium of $270,000.[190]  This policy does not cover third-party losses and contains a "Crypto Currency, Token or Coin Exclusion."[191]  That policy exclusion, applies to

---

[181] Lockton Summary of Insurance, 2020–2021 (Exhibit 51).

[182] Policy terms ran from October 2019 to October 2020 or January 2020 to January 2021.  In any event, the coverage periods encompassed all relevant events for the purpose of the insurance claim discussion. *Id.*

[183] Hartford Business Owners Policy, Oct. 1, 2020 (Exhibit 52); Hartford Workers' Compensation and Employers' Liability Busines Insurance Policy, Nov. 30, 2020 (Exhibit 53).

[184] Exhibit 51; Exhibit 52; Exhibit 53.

[185] Exhibit 51.

[186] *Id.*

[187] Exhibit 53.

[188] Certificate of Liability Insurance, Nov. 11, 2020 (Exhibit 54); Axis Insurance Policy (Exhibit 55).

[189] Exhibit 54; Exhibit 55.

[190] Validus Errors and Omissions Policy Declarations (Exhibit 56).

[191] Email from T. Khuu to B. De Lude, D. Schatt, and J. Podulka, Oct. 30, 2020 (Exhibit 146); Exhibit 56 at 31–32.

any claim arising out of "any investment of any kind, whether or not a security, that is in the form of crypto currency, crypto token or coin, digital token or coin" or "any theft, misappropriation, or conversion of any crypto currency, crypto token or coin, digital token or coin."[192]

- Directors and officers insurance ("**D&O**") from Validus, which provides $1 million in coverage for a total premium of $40,000.[193]  This policy does not cover third-party losses and contains a cryptocurrency exclusion, as explained above.[194]

- Excess D&O insurance from Euclid Insurance, which provides an additional $1 million in coverage for covered losses exceeding $1 million, for a total premium of $35,200.[195]

- Coverage for lawyers from One Beacon Insurance, which provides $1 million in coverage for Cred's employed lawyers for a total premium of $4,957.[196]

### 5. Internal Compliance Function.

In 2018, Cred hired InnReg LLC ("**InnReg**") to assist Cred in developing internal compliance protocols addressing, among other things, information security, privacy, credit risk, and marketing products.  However, it appears that, as late as June 2020, no compliance program had been created, let alone implemented.[197]  In connection with the Investigation, the Examiner requested that Cred produce all of its internal policies concerning trading risk management and leverage limits, but was advised by Cred's counsel that no such document exists.  The only responsive document that the Examiner received was an advertising and marketing policy.[198]

---

[192] Exhibit 146 (ellipses omitted); Exhibit 56 at 31–32.

[193] Validus Directors and Officers Policy Declarations at 3 (Exhibit 57).

[194] Exhibit 57 at 30–31.

[195] Euclid Financial Excess Insurance Policy (Exhibit 58).

[196] Exhibit 51; Exhibit 54.

[197] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[198] Cred Advertising and Marketing Policy (Exhibit 67).

As noted in Sections V(A) and V(F)(3), it appears that Cred's compliance policies with respect to asset transfers were deficient. Inamullah once observed that Cred did not "have robust (or for that matter, any) reporting from [its] primary lender (MoKred) which [made] up ~50% of [its] portfolio."[199]

In June 2020, Cred hired Bethany De Lude to be the company's Chief Information Security Officer. After reviewing Cred's internal controls and procedures, De Lude promptly imposed background checks for all employees and vendors of Cred. Up to that time, this was not a function Cred was performing.[200]

### B. Cred's Relationship and Dealings with moKredit.

#### 1. moKredit, In General.

After leaving PayPal in 2011, Lu Hua founded moKredit Inc. to facilitate payment systems for the emerging Chinese mobile gaming market.[201] Hua recruited early PayPal co-workers to join his venture,[202] and the company raised money from angel investors and venture capitalists.[203]

Through moKredit, Hua sought to build a peer-to-peer payment application to connect mobile game customers with developers, while providing an alternative to credit cards for online payments.[204] By initial design, moKredit served as an intermediary that collected a service fee

---

[199] Email from D. Inamullah to D. Kline, July 6, 2020 (Exhibit 68).

[200] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[201] Exhibit 3 at 3; Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[202] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[203] Exhibit 3 at 6–7.

[204] Exhibit 3 at 6–7.

from borrowers for each loan it originated.[205]  The premise for the company was that a customer could submit a short application online, which allowed moKredit to perform a quick credit check and then offer a credit line to mobile users based on the data output.[206]  While moKredit initially offered lines of credit ranging from $1.45 to $145, the company soon scaled up to offering loans from $20 to $1,000.[207]  Customers would use the credit line subject to a 7-, 14-, or 30-day repayment term.[208]

From 2013 to 2014, moKredit's mobile platform experienced rapid growth.[209]  However, the original intermediary concept appeared to reach a plateau after larger competitors entered the market.  In response, moKredit pivoted its business model to focus on microcredit lending.[210]  After ramping up in 2016, moKredit's business proved to be, at least initially, successful, generating 510 million RMB ($78 million) of revenue, 174 million RMB ($26.5 million) of gross profit, and 93 million RMB ($14 million) of net profit in 2017.[211]  Increased competition cut into moKredit's business by 2018, but the company remained profitable.[212]

By this time, moKredit sought to expand its operations, with funding organized through a pool of lenders led by credit unions and high net worth individuals.[213]  To access funds,

---

[205] *Id.* at 9.

[206] *Id.* at 7.

[207] Exhibit 3 at 7; Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[208] Exhibit 3 at 7–8.

[209] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[210] Exhibit 3 at 3.

[211] *Id.* at 12–13.

[212] *Id.*

[213] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

moKredit traditionally paid funding costs ranging from 10-15% to its lenders.[214]   moKredit capitalized on a significant spread between its borrowing costs and rates at which it loaned funds to customers, which were as high as 36%[215] on an annual basis.[216]

### 2. Cred's Business Dealings with moKredit.

On December 27, 2018, Cred entered into its first loan and security agreement with moKredit.[217]   Pursuant to the agreement, Cred extended a $100 million line of credit to moKredit.[218]   JST was Cred's "paying agent" in connection with its lending arrangement with moKredit.[219]   JST received interest payments from moKredit in USDT and subsequently converted and transferred funds back to Cred in USD.[220]   JST was paid a percentage of the funds managed based on a monthly "profit share" fee agreement.[221]

In early 2019, Cred began "investing" converted fiat currency from its cryptocurrency assets with moKredit.[222]   As Schatt described the deal between the companies, Cred could allocate funds to moKredit at an agreed-upon interest rate – starting at 18-24% per annum and dropping to 12-18% per annum over time[223] – with a callable period within each tranche.[224]

---

[214] Id.

[215] Initially, moKredit lent against interest rates as high as 80% until the Chinese government capped consumer interest rates at 36%.  Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[216] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[217] Exhibit 5.

[218] Id.

[219] Exhibit 11.

[220] Exhibit 12.

[221] Exhibit 11; Exhibit 13.

[222] Schatt Decl. ¶ 19 (Exhibit 1); Exhibit 46.

[223] Schatt Decl. ¶ 19 (Exhibit 1); Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[224] Schatt Dep. 47:18–48:14 (Exhibit 4).

Cred controlled the allocations, which required moKredit to make monthly interest payments on the principal and send principal back upon Cred's request.[225] Cred took cryptocurrency it received from its customers and converted it to fiat currency before transferring it through a series of entities – including JST as Cred's broker – to moKredit. moKredit lent out fiat currency in China (typically through short-term, high interest rate microloans) before returning interest to Cred every 15 days.[226]



Transactions between Cred and moKredit initially reflected attributes of formal arm's-length dealing, with funds frequently sent back and forth, typically through JST as Cred's broker.[227] Cred and moKredit soon shifted to a more casual style of business dealings, often without "proper controls" (e.g., transferring funds before receiving a signed tranche agreement;

---

[225] *Id.*

[226] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021); Exhibit 175.

[227] *See, e.g.*, January 2019 transaction documents: Email from K. Wong to L. Hua, Jan. 15, 2019 (Exhibit 70); Exhibit 12; Email from J. Alexander to L. Hua and K. Wong, Jan 22, 2019 (Exhibit 71); Exhibit 11.

not issuing monthly statements for moKredit's loan balance).[228]  This might be explained by the companies' connectivity through Hua, even though they were not otherwise legally affiliated. The lack of formality caused confusion about finances and how to account for different payments that the companies routinely sent back-and-forth.[229]  Nevertheless, Cred's book of loans to moKredit rapidly grew to approximately $20 million by May 2019 and $40 million by September 2019.[230]  As Cred's book of loans to moKredit grew, so too did Cred's risk.[231]

### 3. Cred's Failed Attempts to Withdraw moKredit Investments.

According to Schatt, by the fourth quarter of 2019, Cred had stopped allocating new funds to moKredit in a purported effort to diversify Cred's asset managers.[232]  However, based on the evidence obtained by the Examiner, it appears that allocations to moKredit did not end until the January 2020 timeframe.[233]  The majority of Cred's assets were already loaned to

---

[228] Email from K. Wong to S. Zhang and J. Alexander, Feb. 4, 2019 (Exhibit 72).

[229] Email from K. Wong to L. Hua and D. Schatt, Feb. 13, 2019 (Exhibit 73) (Wong asked, "are we accounting for the loan as a fixed $1.5M or a USD equivalent of an RMB amount?"); Email from K. Wong to H. Ng, J. Alexander, and S. Zhang, Feb. 14, 2019 (Exhibit 74) (Wong: "Although MoKredit will be signing another loan agreement for the amount of the funds, we will not be sending the funds to them this time around as they are paying down the principal on tranche 3."); Email from J. Alexander to K. Wong, Feb. 15, 2019 (Exhibit 75) (Alexander asked Wong: "How do you want to do the accounting for this tranche? Are we adding this as another loan to MoKredit? Or reducing the interest payable on others?" Wong replied, "We agreed to consider this a paydown of principal on tranche 3 (the $1.5M loan), but we also still need to consider it another loan to MoKredit in order for the numbers to foot, right?").

[230] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (February 18, 2021); Schedule of Advances (Exhibit 46).

[231] *See* Email from J. Alexander to K. Wong, May 21, 2019 (Exhibit 77) (Alexander raised inconsistencies or incomplete information in Cred's financial reports to Wong and Schatt: "I recall an initial advance to Cred of about $750k in March, which was to be repaid by the T3 $790k you reference. However, an additional $500k was advanced to Cred. We need to account for any advances to Cred within our loan book. Can you help reconcile the amount please?").

[232] Schatt Dep. 42:13–20 (Exhibit 4).

[233] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Exhibit 46 (last transaction logged is on Jan. 1, 2021).

moKredit.[234]  Thus, when Cred experienced a sudden and increased need for liquidity (discussed further in Section V(C)(1)), it was largely reliant on moKredit to make principal payments on loaned funds.[235]

On or about March 12, 2020, Cred attempted to recall $10 million in principal from moKredit, but Hua responded that it was not possible.[236]  moKredit's inability to repay the loan when requested was attributed in part to the economic fallout from the COVID-19 pandemic, including large default rates (e.g., 50% - 70%) among moKredit's microloans and the Chinese government's unwillingness to enforce consumer loan agreements.[237]

moKredit's failure to repay the requested principal when called by Cred had a significant and adverse impact on Cred's liquidity and cash flow position.[238]  Cred's executive team agreed to an updated plan with Hua for moKredit to repay principal about 10 days later, but moKredit failed to meet the updated plan's schedule.[239]  Instead, at Alexander's request, Hua offered personal assistance in the form of a transfer of 300 BTC (discussed further in Section V(E)).[240] Hua alleges that this transfer "was intended as a loan," notwithstanding that Hua signed a Cred

---

[234] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[235] Schatt Dep. 70:17–72:24 (Exhibit 4).

[236] Email from J. Alexander to L. Hua, D. Inamullah, S. Zhang, and J. Podulka, Mar. 12, 2020 (Exhibit 79); Inamullah Decl. ¶ 14 (Exhibit 6).

[237] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021); Inamullah Dep. at 77:16–19 (Exhibit 9).

[238] Liquidity Analysis Post March 2020 Flash Crash and Recommended Steps, Apr. 5, 2020 (Exhibit 113); Inamullah Dep. at 113:25–114:7 (Exhibit 9).

[239] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021); Inamullah Decl. ¶ 10 (Exhibit 6).

[240] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

Capital equity contribution agreement in or around this time exchanging 300 Bitcoin for class B non-voting shares in Cred Capital.[241]

As Bitcoin prices plummeted in March 2020, Cred encountered substantial margin calls in connection with its hedge positions, further eroding Cred's liquidity profile.   With a significant portion of its asset base invested with moKredit and, at the time, yielding no return, Cred did not have sufficient liquidity to satisfy the margin calls or reinstate its hedge positions. By June 2020, Cred recognized internally that its moKredit loans were "distressed."[242]   As of the Petition Date, moKredit owed Cred no less than $38 million.[243]

### 4.   Potential Conflicts of Interest.

As the founder of moKredit and co-founder of Cred, Hua consulted his personal counsel to determine whether a conflict of interest existed.[244]   He purportedly received guidance that, so long as he was only a shareholder in Cred and stayed away from so-called "big" operations, there was no conflict.[245]   The Examiner has not seen evidence of Board minutes or other customary documents reflecting the Board's decision-making process.   The only "minutes" the Examiner received were those attributed to the "investment committee," which was not a Board committee.

---

[241] Schatt Dep. 73:22–23 (Exhibit 4); Contribution Agreement between L. Hua and Cred Capital, LLC, Mar. 31, 2020 (Exhibit 80).  Hua claims that he did not read the relevant agreement with any level of scrutiny before signing. Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[242] Email from D. Schatt to D. Wheeler, June 16, 2020 (Exhibit 81); Email from D. Inamullah to D. Schatt, J. Podulka, and A. Khakoo, June 29, 2020 (Exhibit 82).

[243] Email from J. Podulka to D. Schatt, Dec. 1, 2020 (Exhibit 83); Cred Near Term Liquidity Analysis, Nov. 7, 2020 (Exhibit 84).

[244] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[245] *Id.*

Hua was, however, one of two members of Cred's Board from its inception until the eve of bankruptcy in November 2020.[246]  The Examiner has not been furnished with any information explaining how a Board of two directors could function effectively when one director must be recused from "big" operational issues.

According to Hua, he delegated all decision-making regarding loan amounts and timing to Cred employees after advising them how much capacity he had to take on loans at moKredit.[247]  Additionally, Hua states that he ensured that Cred would have the highest priority if it had to call back funds.[248]

The issue of a potential conflict of interest came to a head when moKredit became unable to repay principal.[249]  Hua could not identify a serious recourse path for Cred to recall money from moKredit if moKredit was unwilling or unable to repay principal.[250]  Schatt confirmed that discussions took place internally about retail customer funds being loaned to an insider-affiliate company that could not repay.[251]  Schatt acknowledged that Cred never hired an independent financial advisor to review proposed transactions with moKredit, nor did it seek a fairness opinion.[252]  However, Schatt advised the Examiner that he had a level of comfort based on

---

[246] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021); Email from L. Hua to D. Schatt, J. Grogan, and M. Zuppone, Nov. 4, 2020 (Exhibit 179).

[247] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[248] *Id.*

[249] *Id.*

[250] *Id.*

[251] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[252] Schatt Dep. 45:23–46:2 (Exhibit 4).

Cred's supposed long-term relationship with Hua,[253] and because Hua was purportedly not involved in Cred's day-to-day operations.[254]

### 5. Diligence and Risk Management Respecting moKredit.

Schatt informed the Examiner that he removed himself from the moKredit due diligence process due to his relationship with Hua, leaving Alexander to manage such efforts.[255]  This, again, raises serious questions of Board functionality and business oversight.  Schatt represented that, at an incipient stage of this relationship, he sought legal advice from external counsel on a number of issues regarding Cred's interaction with moKredit, including whether there were potential conflicts of interest and what disclosures Cred would need to provide customers.[256]  According to Schatt, Cred relied on Wheeler to draft the company's disclosures to customers.[257]  Schatt also claims that he consulted external counsel on whether the moKredit loan could be considered a security and whether a partner could be considered a loan broker and therefore subject to lending regulations.[258]  moKredit did not have any financing licenses in China, but

---

[253] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[254] *Id.*

[255] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Schatt Dep. 44:23–47:17 (Exhibit 4) (Alexander "was responsible for the whole due diligence and formulation of the relationship and the contract and evaluating the terms" with moKredit); Schatt Dep. 55:1–7 (Exhibit 4) (confirming Alexander "was the only employee who performed the analysis of due diligence" of moKredit "in collaboration with counsel").

[256] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).  Based on the information provided to the Examiner, the external counsel referenced in this paragraph was not the Debtors' current bankruptcy counsel retained in these Chapter 11 cases.

[257] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[258] *Id.*

Cred and moKredit believed that moKredit did not need a license because, according to them, moKredit fell into China's largely unregulated peer-to-peer lending sector.[259]

Alexander appears to have performed minimal (if any) due diligence with respect to moKredit.[260]  The Examiner's review of records and interviews failed to reveal evidence of substantive due diligence in connection with the moKredit relationship, other than Alexander's representations of having done "exhaustive diligence."[261]  It does not appear that Cred's Board ever formally approved any moKredit agreements or business dealings.[262]

According to Schatt, Alexander's diligence of moKredit included reviewing financial statements and an investor presentation.[263]  Schatt stated that he tasked Alexander with setting up a data room and ensuring that Cred had an appropriate understanding of moKredit's risk profile and the people to whom it lent funds.  Schatt was, however, unaware whether Cred received documentation or information regarding moKredit's outstanding consumer loans, and the Examiner did not find evidence of any such records.

### 6.    Disclosures to Customers Regarding moKredit Relationship.

To raise capital for the moKredit loan, Cred needed to raise funds.  Cred, primarily through Alexander, spent the first quarter of 2019 marketing its business thesis to cryptocurrency

---

[259] Email chain between J. Alexander and A. Derar, Apr. 16, 2019 (Exhibit 85); Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[260] Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021); *see also* moKredit Diligence Checklist, Feb. 11, 2019 (Exhibit 180) (nearly blank due diligence checklist dated after Cred began loaning moKredit funds).

[261] Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021).

[262] Schatt Dep. 44:23–45:3 (Exhibit 4).

[263] *Id.* at 46:20–47:2.

holders.[264]   According to its pitch materials, Cred operated similar to a commercial bank –

offering something akin to certificates of deposit to cryptocurrency customers who lent their

assets to Cred through the CredEarn program.  Cred would then lend such assets to moKredit at a

higher rate (typically 20%) until Cred had to return the cryptocurrency "deposit" back to its

customer.[265]   Cred offered retail customers up to a 10% return on their cryptocurrency if they

agreed to lock up the funds with Cred for at least 6 months.[266]   Cred's return came in the form of

the spread between the 20% interest paid by moKredit to Cred, and the return paid by Cred to its

customers.[267]

The Investigation did not reveal evidence that Cred disclosed to retail customers that

funds would be going to China or to an entity founded by a Cred insider.[268]   Cred's culture, at

least at times, appeared to promote secrecy rather than transparency when potential customers

asked questions regarding their assets and the company's investments.[269]   One Cred employee

expressed concern that, "if I were reading [a statement on Cred's website that pledged assets

were loaned 'on a fully collateralized and guaranteed basis'] as a consumer, and I later learned

---

[264] *See, e.g.*, Email from J. Alexander to J. Bunting, Mar. 14, 2019 (Exhibit 86); Email chain between J. Alexander and R. Flowers, Mar. 15, 2019 (Exhibit 87); Email from J. Alexander to D. Davis, Mar. 14, 2019 (Exhibit 88); moKredit Investment Opportunity Slide Deck, Mar. 2019 (Exhibit 89).

[265] UST Motion (Exhibit 27) ¶ 10; *see also* Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[266] UST Motion (Exhibit 27) ¶ 10; *see also* Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[267] Inamullah Decl. ¶ 10.

[268] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[269] Cred Employee Chat Logs, Mar. 26, 2019 (Exhibit 90) (Meghan LNU writes: "We should not be disclosing to the public where exactly we are using the assets to generate interest rates." Rafael Cosman: "I have not disclosed anything from any conversations with James to the public and I do not intend on doing so. But I'm concerned because if I were reading that as a consumer, and I later learned all the details of Cred's business, I think I would feel like I was misled.").

all the details of Cred's business, I think I would feel like I was misled."[270]   Another employee

cautioned not to disclose "public[ly] where exactly we are using the assets to generate interest

rates."[271]   Alexander did disclose to certain potential customers that Cred was raising funds to

send to moKredit in China, most notably in connection with placement of the Luxembourg

Bonds.[272]

### 7.     Luxembourg Bonds.[273]

In late 2019, Alexander identified Income Opportunities (Luxembourg) S.A. ("**Income**

**Opportunities**"), a Luxembourg company "acting through its compartment" Cred Global Notes

1,[274] as an entity that might issue bonds backed by moKredit loans.[275]   Alexander was a director

on the Income Opportunities board of directors.[276]

The initiative culminated in the issuance of $14 million worth of bonds bearing interest at

8%.[277] According to Inamullah, prior to the issuance, Cred's principal loan balance with

moKredit was approximately $40 million.   Cred essentially securitized approximately $15

million of this exposure, selling $14 million of this receivable to investors through bonds issued

by Income Opportunities.   Cred retained approximately 10% of the securitization (i.e., the

"equity tranche").

---

[270] *Id.*

[271] *Id.*

[272] *See, e.g.*, Exhibit 86; Exhibit 87; Exhibit 88.

[273] The information contained in this section is based on a review of all relevant documentation available to the Examiner at the time of drafting.   To date, the Examiner has not received, nor reviewed, copies of the individual notes issued under this program.

[274] Income Opportunities Board Minutes, Feb. 4, 2020 (Exhibit 91).

[275] Schatt Dep. 58:19–62:8 (Exhibit 4).

[276] Exhibit 91.

[277] Schatt Dep. 58:19–62:8 (Exhibit 4).

Alexander and Cred's capital markets team were responsible for overseeing funds received in connection with the bond offering.[278]  At least two entities purchased the bonds from Cred: JST[279] and Winslow Strong, an individual investor.  JST purchased approximately $9 million worth of bonds in Bitcoin, and Strong purchased 500 BTC worth of bonds in January 2020.[280]

The issued bonds were structured as participation interests in moKredit loans, meaning Income Opportunities was responsible for collecting from moKredit upon redemption. According to the Base Prospectus, Cred was not a guarantor or an obligor in any other way respecting the Luxembourg Bonds.[281]  By the maturity date (June 30, 2020), Cred was aware of moKredit's inability to pay any meaningful amount of its principal balance owed, let alone between $14 million and $15 million; but, according to the Base Prospectus, it bore no liability if the Luxembourg Bonds defaulted.  Regardless, Cred agreed to purchase the bonds at par,[282] thereby buying back more than $14 million dollars of debt it knew could not be repaid.[283]  As discussed in the next section, Cred was facing an acute liquidity crisis of its own at the time of this purchase.

---

[278] *Id.*

[279] JST may have functioned as a broker/dealer, i.e., holding the bonds while attempting to sell them to other investors.

[280] Spreadsheet concerning W. Strong's investment (Exhibit 92).

[281] *See* Exhibit 2.

[282] Email chain between A. Khakoo, H. Ha, D. Inamullah, and M. Zhang, June 30, 2020 (Exhibit 42).

[283] Based on the terms of the Prospectus and Participation Agreements, it appears that Income Opportunities was responsible for redeeming the bonds at the maturity date and failure to do so would result in Income Opportunities' default. *See* Exhibit 2.  However, the Examiner neither received nor reviewed the actual notes issued to investors, and therefore cannot say, with a reasonable degree of certainty, whether Cred had any obligation under the bonds.

## C.    Cred's Pre-Petition Losses and Liquidity Crisis.

### 1.    JST Capital.

Notwithstanding representations to the market, Cred's actual business operations carried significant risks associated with the volatility of digital currency. Converting digital currency to fiat currency compounded that risk. Cred's practice was to do just that. As part of CredEarn, Cred converted customers' cryptocurrency to fiat currency and then loaned the proceeds to moKredit, which would, in turn, extend microloans (presumably far and wide) in fiat currency. Cred sought to mitigate the risk inherent in this strategy by hiring JST as a consultant to assist Cred with a hedging platform.[284] Illustration 1 below shows Cred's hedged investment strategy with respect to CredEarn.

**<ins>Illustration 1</ins>**



---

[284] Inamullah Dep. 105:8–14; 110:4–17 (Exhibit 9) ("[W]e're essentially taking cryptocurrency liabilities in the form of CredEarn participations and translating that into a dollar asset, which is – in moKred. Now, if crypto starts to rise, we will not be able to return the same number of cryptocurrency units back to the customer if we do not hedge the upside exposure.").

Illustration 1 explains by way of hypothetical. As part of the CredEarn program, Cred hypothetically received a 100 Bitcoin cryptocurrency investment from a customer. Cred then took 60 Bitcoin from that investment and converted it into a USD Stablecoin, which it then loaned to moKredit. moKredit, in turn, converted these funds to Yuan and loaned the proceeds to consumers through microfinance loans in China.

Not depicted in Illustration 1 are the payments from moKredit to Cred, which would be expected to come in the form of interest and principal repayments in USD Stablecoin. These payments from moKredit would then be converted back into Bitcoin, which Cred would use to make payments to the customer in respect of the 100 Bitcoin that had been transferred to Cred.

In the hypothetical above, the 60 Bitcoin is converted into USD Stablecoin at an exchange rate of $8,700. This yields $522,000 worth of USD Stablecoin. If the price of Bitcoin was fixed against the U.S. dollar (and did not change at all between the time when the 100 Bitcoin investment was initially made by the customer, and when then investment was fully repaid by Cred), then all interest payments and principal repayments would take place at the same exchange rate. In this scenario, Cred would not need any hedges because the exchange rate between Bitcoin and U.S. dollars remains constant.

However, the price of Bitcoin is not fixed against the U.S. dollar and can fluctuate, sometimes significantly, on a daily basis. If the price of Bitcoin were to increase against the U.S. dollar, then Cred would have less principal and interest to repay the customer. Conversely, if the

price of Bitcoin were to decrease against U.S. dollar, then Cred would have a surplus of Bitcoin and could repay the customer in full with an excess amount.[285]

Cred purported to minimize risks from fluctuations in the exchange rate. In an effort to achieve a fixed exchange rate, Cred purchased hedging contracts. The hedging contracts were intended to provide Cred with, in effect, a fixed exchange rate based on the time the customer deposited assets and the time Cred loaned the proceeds of such assets to moKredit.

Returning to Illustration 1, Cred used 20 Bitcoin out of the 100 Bitcoin investment to buy hedging contracts. These hedging contracts were generally in the form of futures, swaps, and options contracts. In the hypothetical, Cred used the 20 Bitcoin to buy futures and swaps contracts to fully hedge the 60 Bitcoin it had lent to moKredit. Because Cred was using 20 Bitcoin to hedge the 60 Bitcoin that it had lent out to moKredit, Cred was effectively using a leverage ratio of 3x to achieve this hedge. Illustration 2 below shows how the value of Cred's position would change with changes in the price of Bitcoin.

---

[285] This is similar to fluctuations in price a person who lives and works in the United States and earns in U.S. dollars would experience when trying to book a hotel in London. The price of the hotel in London would be quoted in British Pounds and therefore the price in U.S. dollars would fluctuate with changes in exchange rates between U.S. dollar and the British Pound. If the U.S. dollar went up in value against the British Pound, the hotel would be cheaper in U.S. dollar terms (i.e., it would take fewer U.S. dollars to book a night at the hotel). Conversely, if the U.S. dollar went down in value against the British pound, the hotel would be more expensive in U.S. dollar terms (i.e., it would take more U.S. dollars to book a night at the hotel). Staying with this example, if the exchange rate between the U.S. dollar and British Pound was 1:1 (meaning someone can purchase 1 British Pound using 1 U.S. dollar) and if one night at the hotel in London cost 100 British Pounds, the equivalent cost in U.S. dollars would be USD 100. However, if before the hotel room was booked the price of U.S. dollars went up by 5%, then the hotel room would be worth USD 95, even though the price in British Pounds was still 100 pounds. Similarly, if the price of U.S. dollars went down by 5%, then the hotel room would be worth USD 105, even though the price in British Pounds was still 100 pounds.

**Illustration 2**



Considering the first panel in Illustration 2, the 100 Bitcoin received by Cred is its liability since it has to pay this amount back to the customer at the end of the term of the loan. When the loan was made, Cred took 60 Bitcoin and converted it to USD Stablecoin at a rate of $8,700.  In doing so it received $522,000 in USD Stablecoin.  The first panel illustrates the change in value of the $522,000 as the value of Bitcoin changes.  Without any hedges, if the price of Bitcoin were to drop by 20% to $6,960, Cred would need only $417,600 in USD Stablecoin to repay the 100 Bitcoin that the customer invested.  Principal repayments from

57

moKredit would have been $522,000. Therefore, in this scenario, Cred would have a surplus. Conversely, if the price of Bitcoin were to increase by 20% to $10,440, Cred would need $626,400 in USD Stablecoin to pay the 100 Bitcoin. Since moKredit was paying only $522,000, in this scenario, Cred would have a loss.

The second panel illustrates the performance of the hedging contract. As the price of Bitcoin goes up or down, the value of the hedging contract also goes up or down proportionately.

The third panel illustrates the performance of both the 60 Bitcoin liability and the hedging contract. Because the hedge goes up in value on a dollar for dollar basis as the liability goes down, and similarly the hedge goes down in value on a dollar for dollar basis as the liability goes up, the net effect of both positions is that the value of the 60 Bitcoin when converted to USD Stablecoin, loaned to moKredit, returned back to Cred from moKredit and then converted back from USD Stablecoin into Bitcoin, does not change. The transaction is, in this example, considered effectively hedged.

Illustration 3 below demonstrates Cred's net profit and loss on the 100 Bitcoin investment from the customer in Illustration 2, after considering all hedges, interest payments received from moKredit, and interest payments made to the customer. As can be seen, Cred pays 10% to the customer on 100 Bitcoin, and receives 20% on the 60 Bitcoin from moKredit. Because the transaction is fully hedged, there are no profits or losses from any change in the price of Bitcoin. The net profit to Cred in this simplified example after paying interest and principal to the customer is 2 Bitcoin.

**Illustration 3**

| All amounts are in Bitcoin | Principal | Annual Interest Rate | Interest at end of 1-year | Total (at end of 1-year) |
|---|---|---|---|---|
| Investment received from Customer | 100 | | | |
| Total Funds paid to Customer | | 10% | 10 | 110 |
| | | | | |
| Funds sent to moKredit | 60 | | | |
| Funds received from moKredit net of hedges | | 20% | 12 | 72 |
| Reserve | 20 | 0% | 0 | 20 |
| Margin returned after closing hedge | 20 | | | 20 |
| Total Funds Received | | | | 112 |
| | | | | |
| **Profit/Loss** (ignoring hedging costs and other operating costs) | | | | **2** |

In the simplified example above, once Cred has established its hedging position using 20 Bitcoin to hedge the 60 Bitcoin it had converted to USD Stablecoin, it was fully protected irrespective of any price movements in Bitcoin.

In reality, however, the hedge positions implemented by Cred only protected Cred from a certain amount of decline in Bitcoin prices. This is because, as the price of Bitcoin would decrease, the value of the hedge would become more and more negative. And, because of the 3x leverage, the 20 Bitcoin that had been used as collateral (also known as "margin") to acquire the hedge position would not be sufficient to continue maintaining the hedging position. If the price of Bitcoin were to fall below a particular threshold, the exchange where the hedge had been established could either: (i) issue a "margin call" that would require Cred to post additional collateral; or (ii) in the absence of additional collateral being posted, liquidate the hedge position.

If a hedge position was liquidated, Cred would first experience a loss on the hedge position and, if it was not able to reestablish the hedge position, it would no longer be able to repurchase Bitcoin at the price at which it had originally borrowed funds from the customer. As a result, if Bitcoin prices were to rise above the price at which Cred had borrowed from the

59

customer ($8,700 in the hypothetical above), assuming the hedge position was liquidated and not subsequently reestablished, then Cred would suffer a loss and may not be able to return the funds.  As discussed further below, between March 11, 2020 and March 12, 2020, Bitcoin prices experienced a sharp decline (i.e., a "flash crash"), which ultimately resulted in the termination of Cred's hedges.

At this point, it bears particular observation that none of the risks associated with exchange rates were contractually allocated to any of Cred's customers.  Cred did not, for example, covenant to certain levels of hedging responsibility, leaving customers to "own" losses beyond those levels.  Rather, to the best of the Examiner's knowledge,[286] Cred assumed all risks associated with currency fluctuations.  During interviews with Cred customers, the Examiner was told repeatedly that this was an important attribute of Cred's marketing appeal; it was, essentially, a commitment to customers that Cred would alone "own" this kind of market exposure.

To help implement its hedging strategy, Cred retained JST in late 2018.[287]  JST helped Cred establish its hedges using swaps, futures and option positions,[288] and sent daily "Risk

---

[286] *See* n.3.

[287] JST Consulting Agreement, Dec. 25, 2018 (Exhibit 93).

[288] A swaps position is generally a contract where two parties agree to exchange cash flows from two different financial instruments.  For example, an investor may agree to exchange principal and interest payments on a loan in one currency for payments and interest on a loan in another currency.  A swaps position typically requires parties to post margin.  If the value of the swaps position falls/rises below a certain threshold, the party that has experienced losses may need to post additional margin, in the absence of which the position would likely be liquidated by the counterparty.  A futures position is generally a standardized contract that allows the parties to buy or sell a particular asset or security at a predetermined price at a specified time in the future.  Like the swaps position, a futures position also typically requires parties to post margin.  And like the swaps positions, if the value of the futures position falls/rises below a certain threshold, the party that has experienced losses may need to post additional margin, in the absence of which the position would likely be liquidated by the counterparty.  An options position gives the owner of the option the right to either buy (call option) or sell (put option) the underlying position at a fixed price within a certain amount of time.  The buyer of the option pays the seller of the option a "premium" for that right.  The price of a call option goes up in value as the price of the underlying instrument increases.  The price of a put option

Reports" to Cred, detailing Cred's hedge positions and Cred's exposure to liabilities based on Cred's cryptocurrency holdings.[289]

As of February 28, 2020, Cred had transferred digital assets valued at between $71.6 million (market value) and $74.7 million (inception value) to JST.[290] Once JST received the assets, they were allocated as follows:

- JST converted $44 million worth of cryptocurrency received from Cred into USD/Stablecoin (e.g., USDT), the majority of which was transferred to moKredit pursuant to loan arrangements with Cred;

- JST allocated/tracked funds to margin accounts of certain exchanges (including Bittrex, Huobi and Drawbridge) to allow JST to trade on behalf of Cred; and

- JST entered into options, futures and swap transactions for the purpose of hedging Cred's portfolios and generating cash for Cred.[291]

Based on the above allocation of funds, including the hedges established, Cred was essentially fully hedged on a $74.7 million loan book. Therefore, excluding large price movements that would require the posting of additional collateral in its margin account, Cred was protected from Bitcoin price movements.

JST established hedge positions on various cryptocurrencies for Cred.[292] Bitcoin, XRP, Ether and Bitcoin Cash were used to establish the majority of the positions. By February 28, 2020, the market value of Cred's hedge positions was: negative $4,511,511 for swaps,

---

increases in value as the price of the underlying instrument decreases. The maximum loss to the buyer of the call and the put options is limited to the premium amount paid by the buyer to the seller of the option.

[289] Interview with Scott Freeman, co-founder and Partner, JST Capital (Mar. 2, 2021); *see, e.g.*, Risk Report, Mar. 12, 2020 (Exhibit 164).

[290] JST Risk Report, Feb. 28, 2020 (Exhibit 117).

[291] Exhibit 117; Emails between JST and Cred regarding a February invoice, Mar. 3, 2020 (Exhibit 121).

[292] BTC, XRP, ETH, BCH, LTC, XLM, OMG and ADA. *See e.g.,* Exhibit 117.

61

$12,664,998 for futures, and $61,760 for options.[293]  The hedge positions, at different exchanges
like BitMEX and Huobi, were tracked on the monthly risk reports provided by JST.

The following contracts were reported by JST in its February 28, 2020 risk report for
Bitcoin:

| SYMBOL | EXPOSURE | MARK PRICE | LEVERAGE | LIQUIDATION PRICE / MARGIN CALL PRICE | SPOT EQUIVALENT | BREAKEVEN PRICE* | LIQUIDATION / MARGIN CALL PROBABILITIES | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2 DAYS | 3 DAYS |
| BTC | 0.00 | $8,567 | | | | | | |
| XBTUSD | 177.16 | $8,569 | 33% | $5,795.13 | $5,793.13 | $5,795.13 | 0.00% | 0.00% |
| XBTM20 | 1662.57 | $8,814 | 34% | $6,174.44 | $5,927.44 | $5,816.28 | 0.00% | 0.00% |
| XBTH20 | 839.51 | $8,667 | 24% | $6,943.12 | $6,843.12 | $6,550.29 | 0.00% | 0.02% |
| XBT-MARGIN | 1188.61 | $8,567 | | | | | | |
| BTC-IMPLIED | (65.15) | $8,567 | | | | | | |
| BTC-Mar | 335.02 | $8,686 | 37% | $5,577.20 | $5,458.20 | $5,494.79 | 0.00% | 0.00% |
| HUOBI-MARGIN | 194.57 | $8,567 | | | | | | |
| swap#24 3/24 | 282.00 | $8,567 | | | | | | |
| 3/27 9250 Call | (112.55) | $8,567 | | | | | | |
| Drawbridge-Margin | 300.00 | $8,567 | | | | | | |
| | | | | | | | | |
| TOTAL | 4,801.74 | | | | | | | |

As of February 28, 2020, Cred's swaps contract XBTUSD, listed on the BitMex
exchange, had a mark price of $8,569 and liquidation price of $5,795.13.[294]  XBTUSD is known
as a "perpetual swaps" contract.  This contract closely tracks the price of Bitcoin in U.S. dollars
and gains and losses are experienced based on the change in the price of Bitcoin relative to U.S.
dollars.  This contract hedged Cred to a notional amount of 177.16 BTC ($1.5 million based on
the Risk Report market price of $8,569) using a 3x leverage factor.  In other words, Cred had
applied approximately 59 BTC in its margin account to enter into the XBTUSD contract amount
of 177.16 BTC.  If Bitcoin dropped below $5,795.13, the hedge position would be liquidated
which is exactly what occurred on March 12, 2020.

The other contracts for Bitcoin traded on the BitMex exchange identified in the JST risk
report were "XBTM20" and "XBTH20."  These two positions are futures contracts that expire at
different dates.  XBT-Margin of 1,188.61 Bitcoin reflected the total margin that was posted at the

---

[293] Exhibit 117.

[294] *Id.*

BitMex exchange. "BTC-Mar" was a futures contract traded on the Huobi exchange. "BTC-Implied" was a contract that referenced XRP (instead of U.S. dollars) and also traded on the Huobi exchange. Huobi-Margin of 194.57 was the total Bitcoin in the Huobi margin account.

"Swap#24 3/24" was a bilateral repurchase obligation between Cred and JST. In this contract Cred deposited 282 Bitcoin with JST and Cred loaned funds to JST on an over-collateralized basis in U.S. dollars.

The contract "3/27 9250 Call" was a call option that Cred had sold that was held with an asset manager (Drawbridge), but tracked by JST in its risk report. The "Drawbridge-Margin of 300 Bitcoin" reflected the total Bitcoin that Cred had deposited with Drawbridge.

JST had similar hedging contracts for the other cryptocurrencies as well. Each of these contracts had a price at which they would be liquidated or require additional collateral to be posted to their margin accounts. Using Bitcoin as an example, the liquidation prices for these contracts varied by contract and was between $5,500 and $6,900. This meant that, if the price of Bitcoin were to drop from the February 28, 2020 price of approximately $8,500 such that the contract prices were to decrease to their liquidation price (implying drops of more than 20%), then the contracts would be liquidated if no additional collateral was deposited into the margin accounts. The charts below illustrate the price of Bitcoin in 2019 and 2020 as well as in March 2020:[295]

---

[295] BTC-USD prices from CoinDesk.



Between March 11 and March 12, 2020, the price of Bitcoin fell from $7,900 to $3,800 overnight. As a result of this price drop, the hedge contracts for all currencies were liquidated. JST's March 17, 2020 risk report illustrates the loss suffered by this dip in the market, with each exposure listed as "0" in the chart below.[296]

| SYMBOL | EXPOSURE | MARK PRICE | LEVERAGE | LIQUIDATION PRICE / MARGIN CALL PRICE | SPOT EQUIVALENT | BREAKEVEN PRICE* | LIQUIDATION / MARGIN CALL PROBABILITIES | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2 DAYS | 3 DAYS |
| BTC | 0.00 | $5,297 | | | | | | |
| XBTUSD | 0.00 | $5,298 | | | | | | |
| XBTM20 | 0.00 | $5,167 | | | | | | |
| XBTH20 | 0.00 | $5,224 | | | | | | |
| XBT-MARGIN | 95.44 | $5,297 | | | | | | |
| BTC-IMPLIED | (66.82) | $5,297 | | | | | | |
| BTC-Mar | 0.00 | $5,260 | | | | | | |
| HUOBI-MARGIN | 0.00 | $5,297 | | | | | | |
| swap#24 3/24 12.5% | 282.00 | $5,297 | | | | | | |
| 3/27 9250 Call | (0.00) | $5,297 | | | | | | |
| Drawbridge-Margin | 300.00 | $5,297 | | | | | | |
| | | | | | | | | |
| TOTAL | 610.61 | | | | | | | |

When the price of Bitcoin fell, Cred lacked sufficient reserves to maintain its hedging positions.[297]   On March 12, 2020, JST informed Cred that a drastic overnight move in the markets resulted in the liquidation of all of Cred's Bitcoin futures positions, in addition to the

---

[296] JST Risk Report Mar. 17, 2020 (Exhibit 118).

[297] Schatt Decl. ¶ 21 (Exhibit 1).

liquidation of some of Cred's XRP futures.[298]  Cred's futures profit and loss went from a profit of $12.6 million as of February 28th to a loss of $5.8 million as of March 17th.[299]  Similarly, Cred's Swaps profit and loss went from a loss of $4.5 million on February 28, 2020 to a further loss of $10.5 million as of March 17, 2020.[300]  The total losses resulting from the "flash crash," as reflected in the change in values in its futures and swaps positions between February 28th and March 17th, was approximately $24 million.[301]

As discussed, Cred had placed margin in various accounts at JST and at exchanges to support its hedging positions.[302]  The rapid decline in cryptocurrency prices caused Cred to be overleveraged beyond what was supportable by its margin position, and its futures and swaps positions were, as a result, liquidated by the exchanges.[303]  Cred was left with a net short position equal to $27,483,181; for every $100 move in Bitcoin, Cred stood to make or lose approximately $400,000.[304]  Further, JST asked Cred to post an additional $3 million of collateral for the outstanding repos that Cred had with JST.[305]  At some point in March 2020, Cred ceased using accounts at JST.[306]

---

[298] Email from S. Freeman to J. Alexander, H. Ng, D. Schatt, J Podulka, S. Zhang, and D. Inamullah, Mar. 12, 2020 (Exhibit 119).

[299] *Compare* Exhibit 117 *with* JST Risk Report, Mar. 12, 2020 (Exhibit 164).

[300] *Compare* Exhibit 117 *with* JST Risk Report, Mar. 12, 2020 (Exhibit 164).

[301] *Compare* Exhibit 117 *with* JST Risk Report, Mar. 12, 2020 (Exhibit 164).

[302] Email from J. Alexander to D. Inamullah, Mar. 18, 2020 (Exhibit 120).

[303] Inamullah Dep. 105:15-20 (Exhibit 9).

[304] Exhibit 119.

[305] *Id.*

[306] Chat messages between S. Zhang, Han LNU and S. Hwang, Aug. 20, 2020 (Exhibit 165) (Zhang comments that Cred stopped using all JST accounts on March 31, 2020. There is a conversation regarding the disposition of the assets that were held at JST.  Han LNU notes that D (Inamullah's nickname) said: "we had some assets to go to FB [Fireblocks].  Most of what we had outstanding was liquidated (i.e., the swaps, futures, and options margin)."  There is some confusion as to whether Cred's relationship with JST ended on March 10 or March 31, 2020).

The table below summarizes the losses that Cred experienced from its hedge positions as a result of the March 2020 "flash crash." For example, as of March 11, 2020, the total margin at two of the three Bitcoin margin accounts at JST totaled 977 Bitcoin (excludes 300 Bitcoin at the Drawbridge margin account, which was used for a covered call strategy). After the "flash crash," only 90.4 Bitcoin remained on margin in these two margin accounts combined.[307] As a result, Cred lost 866 Bitcoin from these two margin accounts alone.[308] As illustrated below, based on the mark prices in the JST risk reports from March 11th and 12th, the total loss across all margin accounts at JST was 1,130 Bitcoin.[309]

**Calculation of Margin lost as a result of Flash Crash in March 2020**

| Currency | | 11-Mar-20 | 12-Mar-20 | Diff | Change in USD 3/11/2020 Prices | | Change in USD 3/12/2020 Prices | |
|---|---|---|---|---|---|---|---|---|
| BTC | Mark Price | 7,838 | 5,872 | 1,966 | | | | |
| BTC | XBT-Margin | 882 | 90.4 | 791 | $ | 6,201,112 | $ | 4,645,692 |
| BTC | Huobi-Margin | 95 | - | 95 | $ | 742,964 | $ | 556,607 |
| BTC | Drawbridge-Margin | 300 | 300 | - | | | | |
| XRP | Mark Price | 0.2069 | 0.1545 | 0.0524 | | | | |
| XRP | Huobi-Margin | 4,586,658 | - | 4,586,658 | $ | 948,980 | $ | 708,639 |
| ETH | Mark Price | 196.50 | 130.1 | 66.40 | | | | |
| ETH | ETH-Margin | 21,468 | 16,815 | 4,653 | $ | 914,342 | $ | 605,374 |
| BCH | Mark Price | 265 | 169 | 96 | | | | |
| BCH | BCH-Margin | 1,595 | 1,041 | 554 | $ | 146,979 | $ | 93,794 |
| LTC | Mark Price | 48.3 | 32.0 | 16.3 | | | | |
| LTC | LTC-Margin | 1,187 | 446 | 741 | $ | 35,774 | $ | 23,701 |
| XLM | Mark Price | 0.0505 | 0.0357 | 0.0148 | | | | |
| XLM | Options Margin | 16,000,000 | 16,000,000 | - | | | | |
| Total (USD) | | | | | $ | 8,990,150 | $ | 6,633,806 |
| Total (BTC) | | | | | | 1,147 | | 1,130 |

Sources: JST Risk Report, Mar. 11, 2020 (Exhibit 152); Exhibit 164.

---

[307] JST Risk Report, Mar. 17, 2020 Exhibit 118.

[308] *Id.*

[309] *Id.*

The table below summarizes the repo positions that Cred maintained with JST.  As discussed above, JST issued margin calls and demanded that Cred post additional collateral on these repo positions.  For the reasons discussed herein, Cred lacked the assets to satisfy JST's margin call and, as a result, JST liquidated these positions.   The liquidation of these positions resulted in additional losses to Cred.  The total amount due to JST from Cred after considering the repo positions and certain option positions net of the cryptocurrency margin Cred had deposited with JST (and which JST had liquidated) was approximately $3 million.[310]

| Currency | Repo Positions | Quantity | Price in USD (March 17, 2020) | USD |
|---|---|---|---|---|
| BTC | Swap #24 3/24 12.5% | 282 | 5,297 | $ 1,493,754 |
| XRP | Swap #21 4/13 7.5% | 14,187,651 | 0.15 | $ 2,099,772 |
| XRP | Swap #22 3/16 9.5% | 20,000,000 | 0.15 | $ 2,960,000 |
| ETH | Swap #9 open 11% | 14,367 | 117 | $ 1,675,192 |
| BCH | Swap #13 open 9.5% | 9,472 | 181 | $ 1,714,472 |
| **Total** | | | | **$ 9,943,190** |

Source: Exhibit 118.

On April 5, 2020, Inamullah circulated a Cred LLC liquidity analysis prepared by Cred Capital.[311]  The report outlined a liquidity analysis and recommended steps following the March 2020 "flash crash."  The futures and swaps positions had been a hedge to protect Cred from an increase in the prices of cryptocurrencies.[312]  When Cred's futures and swaps positions were liquidated, however, Cred lost funds in its margin accounts at JST, as well as lost its hedging

---

[310] JST Cred Exposure Summary (Exhibit 181).

[311] Liquidity Analysis Post March 2020 Flash Crash and Recommended Steps, Apr. 5, 2020 (Exhibit 113).

[312] Email from J. Alexander to D. Inamullah, Mar. 18, 2020 (Exhibit 120).

positions (i.e., the right to purchase the underlying assets at the agreed price).[313]   Further exacerbating the problem, Cred lacked sufficient liquidity to reinstate the hedging positions at a reasonable market price.[314]   JST issued margin calls for outstanding repo positions, but Cred did not have sufficient liquidity to meet those demands.[315]

Cred intended to reinstate its hedge position by recalling $10 million from moKredit.[316] As discussed further in Section V(B)(3), moKredit did not pay Cred the requested amount.  Hua, however, agreed to transfer 300 Bitcoin to Cred in multiple transactions (discussed further in Section V(E)).   The 300 Bitcoin was transferred from a Fireblocks wallet at Cred, Inc. to OKEx,[317] and purportedly used to re-appropriate certain hedges on the long side of Bitcoin in March, while Bitcoin prices were still at the bottom of the market.[318]   It appears, however, that Cred closed out these hedge position shortly thereafter (at a small profit) and, according to Inamullah, determined that, because they had terminated their relationship with JST, they no longer had the ability/skillset to apply hedges using the derivatives market, leaving Cred effectively "naked" against market fluctuations.

Cred being "naked" against market fluctuation was a significant factor in Cred's demise. Though Cred lost approximately $10-$12 million when its positions were liquidated, Cred's liabilities effectively decreased two-fold as a result of the >50% drop in Bitcoin price.  This is because, instead of being able to buy one Bitcoin for $7,900 on March 11, 2020, Cred could buy

---

[313] Exhibit 120.

[314] Exhibit 113.

[315] *Id.*

[316] *Id.*

[317] Cred, Inc Fireblocks logs (Exhibit 124).

[318] Inamullah Dep. 167:3-19; 188:11-14 (Exhibit 9).

a bit more than two Bitcoin for $7,900 on March 12, 2020.  Had Cred had access to the $9 million it needed to establish new hedges at 3x leverage, Cred could have made significant profits on the new hedge positions, both because of establishing the new hedges after the drop in Bitcoin price and the increase that followed in the coming months.  These profits from the hedge positions could then have netted out against the losses on Cred's liability positions (Cred's liability position would also go up in U.S. dollar terms as the price of Bitcoin went up).  However, because so much of its liquidity was tied up in moKredit, and because Cred had a month earlier given 500 in Bitcoin to QuantCoin, Cred did not have the capital to establish new hedges.  Thus, with every increase in Bitcoin (and other cryptocurrency) above Cred's conversion price, Cred's liabilities increased proportionately against a class of assets – loans to moKredit – that Cred never realized.  In the months that followed, Bitcoin prices increased from approximately $4,000 in March 2020 to approximately $10,000 in June 2020.  Cred's inability to access moKredit capital disabled it from fending off its increasing liability load, until it finally collapsed into bankruptcy.

### 2.  Cred's Other Asset Managers.

#### (a)  Elevar.

Cred established a relationship with Elevar LLC ("**Elevar**"), a secondary lending company, in October/November 2019.[319]  In the summer of 2019, Schatt instructed Cred employees to seek other income-generating opportunities in order to diversify Cred's portfolio, and Elevar became Cred's first partner toward that end.[320]  Inamullah recalled that Alexander

---

[319] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

[320] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

and the founder of Elevar knew each other before Cred's relationship with Elevar began.[321]
Under its relationship with Elevar, Cred would lend Elevar cryptocurrency assets (and
occasionally fiat currency) at interest rates as high as 16% on an annual basis.[322]  Elevar would
utilize such assets in lending transactions with consumer lending and telecom receivable finance
companies.[323]  Inamullah stated that he did not know who at Cred, if anyone, conducted any
form of diligence on Elevar before Cred entered into its arrangement.[324]  By May 31, 2020, Cred
had an asset allocation worth $1,850,000 with Elevar.[325]  By September 2020, moKredit and
Elevar were described as Cred's only "sources" of finance.[326]  On November 12, 2020,
Cred attempted to recall its funds with Elevar.[327]  However, based on Cred's contract with
Elevar, it was not able to access such funds until February 2021.[328]

(b)    **Cambrian**

Cambrian is an asset manager whose fund (Cambrian Systematic Strategies, LP) Cred
contributed or "subscribed" to.[329]  Cred entered into a subscription agreement with Cambrian on
July 29, 2019,[330] and wired a $500,000 investment to Cambrian on July 30, 2019.[331]  Cred

---

[321] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

[322] Interview with Pablo Bonjour and Paul Maniscalco, Managing Director and Senior Managing Director, MACCO Restructuring Group (Feb. 12, 2021).

[323] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

[324] *Id.*

[325] Email from J. Podulka to D. Schatt, July 24, 2020 (Exhibit 94).

[326] Email from D. Inamullah to D. Schatt, A. Khakoo, and J. Podulka, Sept. 16, 2020 (Exhibit 95).

[327] Email from D. Schatt to J. Podulka, Nov. 14, 2020 (Exhibit 96).

[328] Email from D. Inamullah to J. Podulka and D. Schatt, July 13, 2020 (Exhibit 97).

[329] Email chain between J. Podulka, H. Moore, G. Estrada, S. Hwang, H. Ha, Nov. 5, 2020 (Exhibit 98); Cred LLC Subscription Agreement with Cambrian Systematic Strategies LP, July 29, 2020 (Exhibit 99).

[330] Exhibit 99.

[331] Chat log between S. Zhang and J. Alexander, July 30, 2019 (Exhibit 100).

indicated that this figure constituted 1% of the Company's total assets at that time.[332]  Inamullah did not personally interface with Cambrian and believed that Alexander led the due diligence on the company.[333]  Cred received quarterly statements from Cambrian,[334] and withdrawals were subject to a 30-day notice period.[335]  Cred's full redemption of its investment in Cambrian Systematic Strategies, LP was confirmed on January 31, 2020.[336]  Cred recalled its assets from Cambrian because Alexander was purportedly unhappy with Cambrian's performance, and because Cred wanted to move assets to another asset manager, 100 Acre Ventures.[337]  On February 21, 2020, Cred withdrew 95% of its investment in Cambrian,[338] with the remaining 5% to be wired to Cred upon the finalization of Cambrian's 2020 audit.[339]  As of November 5, 2020, Podulka did not believe that Cred had received the remaining 5% of its investment from Cambrian.[340]

### (c)    100 Acre Ventures

Cred began investing with 100 Acre Ventures, a cryptocurrency investment firm, beginning in or around April 2020 on Alexander's recommendation.[341]  Inamullah stated that he oversaw the due diligence process for onboarding 100 Acre Ventures, which purportedly

---

[332] Exhibit 99.

[333] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

[334] Chat log between S. Zhang and J. Alexander, Feb. 14, 2020 (Exhibit 184); Cambrian Systematic Strategies LP Quarterly Statement, Sept. 30, 2019 (Exhibit 101).

[335] Email from S. Zhang to J. Alexander, Feb. 6, 2020 (Exhibit 102).

[336] Redemption Confirmation, Jan. 22, 2020 (Exhibit 103).

[337] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

[338] Metropolitan Commercial Bank Account Statement, Feb. 28, 2020 (Exhibit 104).

[339] Email from HC Global Fund Services to D. Schatt, Feb. 21, 2020 (Exhibit 105).

[340] *Id.*

[341] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021); 100 Acres Ventures Mission Page, https://www.100acreventures.com/mission (last visited Mar. 4, 2021).

included the exchange of standard corporate documents.[342]  Inamullah said that, when Bethany De Lude joined Cred as Chief Information Security Officer in the summer of 2020, she identified deficiencies in the firm's diligence responses and initiated a second round of diligence.[343]  Cred paid a 1-2% management fee and 10-20% incentive fee to 100 Acre Ventures for its asset management services.[344]  Cred's Adnan Khakoo emailed 100 Acre Ventures to request a full redemption of Cred's assets on June 29, 2020.[345]  However, as of October 2020, 100 Acre Ventures owed Cred approximately $1 million.[346]

### (d)   Sarson Funds

Sarson Funds LLC is a third-party marketing company that does not directly manage assets or provide investment advice; rather, the organization is structured in such a way that different entities carry out investing activities and Sarson Funds markets those entities' investment strategies.[347]  However, Cred considered Sarson Funds to be the functional equivalent of an asset manager.[348]  Sarson Funds also provided certain technical services to Cred.[349] Inamullah proposed Cred engage Sarson Funds to the "investment committee,"[350] and claimed

---

[342] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

[343] *Id.*

[344] *Id.*

[345] Email from A. Khakoo to P. Collins, June 29, 2020 (Exhibit 106).

[346] Email from D. Inamullah to D. Schatt, J. Podulka, D. Wheeler and A. Khakoo, Oct. 1, 2020 (Exhibit 112).

[347] Inamullah Dep. 207:9–208:10 (Exhibit 9).

[348] *Id.* at 205:17–22.

[349] *Id.* at 25:3–26:2; 205:17–21.

[350] *Id.* at 95:11–15.

that he conducted due diligence with respect to the firm.[351]   Inamullah now works for Sarson Funds as its Chief Investment Officer.[352]

In March 2020, Cred invested in two Sarson sub-funds: Fifth Khagan, LP,[353] a small coin/small token fund, and AX Momentum, LP, a covered call options fund.[354] Sarson Funds is the general partner of these funds.[355]  The premise of Fifth Khagan was to send Sarson Ethereum and invest in products that would outperform Ethereum in the long run.[356]  AX Momentum involved selling an out-of-the-money call against Bitcoin to make premium income and then permitting the call to expire or buying it back in accordance with specific parameters.[357] According to Matthew Foster, Cred represented a large portion of the investments in AX Momentum and Fifth Khagan, and profited from those investments.[358] Sarson used an administrator to provide Cred with daily reports on the performance of its investments.[359] Cred allegedly grew its assets by $4 million with Sarson and 100 Acre Ventures between April 2020 and August 2020.[360]

On November 14, 2020, Brittany Keels of Sarson contacted Sundrania—a cloud based fund administration service Sarson used to prepare statements and keep track of its funds—

---

[351] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

[352] *Id.*

[353] Exhibit 14.

[354] Inamullah Dep. 208:24–209:1 (Exhibit 9); Exhibit 14; Exhibit 15.

[355] Interview with Matthew Foster, Chief Restructuring Officer, Cred Inc. (Feb. 9, 2021).

[356] Inamullah Dep. 89:21–90:1 (Exhibit 9).

[357] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[358] Interview with Matthew Foster, Chief Restructuring Officer, Cred Inc. (Feb. 9, 2021).

[359] Inamullah Dep. 100:13–16 (Exhibit 9).

[360] Email from J. Podulka to D. Schatt, Aug. 8, 2020 (Exhibit 107); Email from J. Podulka to D. Schatt, Aug. 28, 2020 (Exhibit 108).

investor support seeking to withdraw 75 Bitcoin (approximately $1.2 million at that time) from Cred's AX Momentum account. A 30-day notice period was waived in order to provide Cred with a redemption of 75 Bitcoin on November 30, 2020, and a withdrawal of the remainder of Cred's assets at the end of 2020.[361]

On January 6, 2021, Foster emailed John Sarson giving formal notice that Cred wished to redeem its investments in both the AX Momentum and Fifth Khagan funds.[362] Foster explained that Cred's initial agreement with Sarson required the Company to give Sarson 120 days' notice before retrieving funds.  According to Foster, Cred retrieved $4 million worth of Bitcoin in early February 2021, and expected additional returns of $1.5 million in Bitcoin by the end of February, the remainder at the end of March 2021.[363]  The Examiner has been advised that Sarson Funds redeemed an additional $1.5 million of Bitcoin in early March 2021.

### (e)    Blockfills

Blockfills is an electronic, off exchange, digital liquidity provider.  Blockfills utilizes a so-called "alpha strategy" with respect to its investments.[364]  Under this strategy, Blockfills seeks to arbitrage the price difference of its digital currencies and derivatives based on these currencies across various exchanges.  As such, the strategy did not rely on the market moving in a particular direction, but rather attempted to make an arbitrage profit independent of market conditions.  The risk lay in the technology to be able to execute the arbitrage since, ideally, the arbitrage trades needed to be applied simultaneously across exchanges.  Inamullah claims to have conducted

---

[361] Email from J. Sarson to D. Schatt, A. Khakoo, Nov. 17, 2020 (Exhibit 109).

[362] Email from M. Foster to J. Sarson, Jan 6, 2021 (Exhibit 110).

[363] Interview with Matthew Foster, Chief Restructuring Officer, Cred Inc. (Feb. 9, 2021).

[364] Inamullah Dep. 47:3–7 (Exhibit 9).

diligence regarding Blockfills consisting of a review of corporate organizational documents and information requests regarding beneficial owners.[365]  But, unlike most of Cred's asset managers, Blockfills was considered an "offshore" fund and, so, Cred (principally through Dan Wheeler) took additional steps in an effort to make sure it could enforce its agreements with Blockfills.[366] Cred profited from its investments with Blockfills, albeit at lower than originally estimated (8%-10% yield, rather than an estimated 20% yield).[367]

(f)    <strong>Drawbridge Lending</strong>

Cred entered into an investment arrangement with Drawbridge Lending in early 2020. Inamullah does not recall Cred having conducted any material diligence on Drawbridge prior to entering into its investment.  Drawbridge's model was to act as a fund to run covered calls against Cred's cryptocurrency, including Bitcoin.[368]  For example, under the strategy, if Bitcoin was trading at $10,000, Cred sold its covered call options at a strike price of $12,000 for a 3-month term and received a premium for the same (e.g., a premium of $1,500); the idea being that Cred would keep the full premium if the price of Bitcoin stayed below the strike price of $12,000 by the time the call option expired.[369]  Records reviewed by the Examiner indicate that Cred entered into only one transaction with Drawbridge, which was closed out by March 2020.[370]

---

[365] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

[366] *Id.*

[367] *Id.*

[368] *Id.*

[369] *Id.*

[370] *Id.*

75

### 3. Cred Develops, But Does Not Implement, the So-Called "All-Weather" Strategy.

In November 2019, in an apparent response to Cred's significant reliance on (and thus exposure to) moKredit, Cred's "investment committee" developed a so-called "all-weather" investment strategy.[371]  Under this strategy (purportedly modeled after a strategy developed by hedge fund manager Ray Dalio[372]), Cred would utilize a mixture of lending, hedging, and arbitrage strategies, with the goal of earning a profit regardless of whether cryptocurrency prices increased or decreased, as had been promised to customers.  As part of this strategy, Cred was willing to trade expected yield by recalling principal from moKredit for liquidity – which would, in turn, reduce weighted average return of the loan portfolio for Cred – by allocating more assets to its investment managers.[373]

Although Cred's target allocation rates changed over time, the strategy emphasized diversification and a move away from direct lending and avoiding credit risk.[374]  But, following moKredit's inability to repay principal in March 2020, Cred created an internal liquidity analysis dated April 5, 2020 that promoted a heavier reliance on the "all-weather" strategy (although by that time, as described in greater detail herein, a shift in strategy may have been too late) and Cred was unable to fully implement this strategy due to Cred's persisting liquidity issues. [375]

---

[371] Inamullah Dep. 117:4–16 (Exhibit 9) (describing the strategy as a "diversified allocation of four or five different types of allocations that Cred should diversify assets into").

[372] Inamullah Dep. 117:4–16 (Exhibit 9); Brett Arends, *Opinion: How did these 'All-Weather' portfolios weather 2020?* MarketWatch (Dec. 21, 2020) (Exhibit 111).

[373] Cred LLC Investment Committee: Liquidity Analysis, Apr. 5, 2020 (Exhibit 113)

[374] Email with attachments from D. Inamullah to D. Schatt, H. Ng, J. Podulka, S. Zhang, and J. Alexander, Feb. 12, 2020 (Exhibit 114); Cred Asset Management Overview at 3, Aug. 2020 (Exhibit 115).

[375] Exhibit 113.

### D.      Cred's Relationship with QuantCoin.

#### 1.      Inception of Relationship.

Further exacerbating the liquidity crisis, Cred, beginning in February 2020, transferred (via a "lockup" agreement) 800 Bitcoin to an entity named QuantCoin, in what Cred alleges was a fraudulent scheme.  Cred has, to date, lost the entirety of this investment.

Cred's initial contact with QuantCoin occurred at the Consensus Conference, an "annual gathering of the cryptocurrency and blockchain technology world," in May 2019.[376]  There, James Alexander allegedly met Richard Chapman, QuantCoin's purported portfolio manager.[377] According to Joe Podulka, Alexander is the only person who ever met Chapman in person.[378] According to Cred, QuantCoin purported to use a derivatives-based strategy to provide investors with a return of 20-30% per year.[379]

Alexander first mentioned QuantCoin to Dan Schatt in December 2019.[380]  According to Alexander, it was Schatt who brought QuantCoin to Alexander;[381] the Examiner is not aware of any evidence corroborating this assertion.  At the time, QuantCoin was presented as a strong investment opportunity and, according to Schatt, Alexander indicated that he was performing diligence on the company.[382]

---

[376] Consensus: 2019, Coindesk, https://www.coindesk.com/events/consensus-2019 (last visited Mar. 4, 2021).

[377] The record does not reveal who else, if anyone, from Cred attended the conference.  Inamullah Decl. ¶ 19 (Exhibit 6); Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[378] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[379] Inamullah Decl. ¶ 20 (Exhibit 6).

[380] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[381] Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021).

[382] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

According to Alexander, Schatt served as a reference for QuantCoin and insisted that Cred invest significantly and immediately.[383]   Available documents, however, do not support Alexander's version of events.  On February 2, 2020, Chapman sent Alexander an email stating, "[s]ince meeting you at the consensus, our performance here exceeded our expectations and the numbers are looking even better than they did when I shared them with you then," and requested a call to discuss "possible collaboration" with Cred.[384]   The email exchange indicates that Chapman and Alexander, who were both purportedly traveling in Europe at the time, met in Paris that week to discuss a potential investment by Cred in QuantCoin.[385]   Following the meeting, on February 3, 2020, Alexander told Chapman that Cred would move forward with a 500 Bitcoin investment and asked Chapman to provide the offering documents for a February subscription.[386]

In February 2020, Alexander informed Cred's "investment committee" of the potential opportunity with QuantCoin.  Based on Alexander's representations and purported due diligence, the "investment committee" approved QuantCoin to manage a portion of Cred's Bitcoin.[387]

The Examiner received conflicting accounts regarding the use of a third-party to conduct due diligence on QuantCoin.  It is unclear what, if any, diligence Cred performed on QuantCoin or Richard Chapman prior to making its investments.  Schatt claims that Alexander completed due diligence himself; Podulka could not confirm what, if any diligence, was conducted (other than indicating that Alexander did not typically conduct thorough background searches with

---

[383] Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021).

[384] Email chain between J. Alexander and R. Chapman, Feb. 2, 2020 (Exhibit 125).

[385] *Id.*

[386] Email from H. Ng to S. Foster, J. Alexander, S. Zhang, R. Chapman and L. Tabers, Feb. 5, 2020 (Exhibit 126).

[387] Schatt Decl. ¶ 32 (Exhibit 1).

respect to investment opportunities); Inamullah represented that Cred retained a third-party to perform diligence, but the Examiner has not been furnished with evidence corroborating this assertion.[388]

As detailed below, Cred made several investments with QuantCoin, totaling 800 Bitcoin in the aggregate, over several months.  Although Cred's capital markets team (at the time, led by Inamullah) was typically responsible for periodically reviewing asset managers, [389] Inamullah did not conduct additional due diligence on QuantCoin following Cred's initial investment, indicating that "there [was] no reason not to believe the original diligence" because Cred's second placement with QuantCoin occurred only ten days after its first.[390]  Inamullah stated that he had searched the email addresses provided for QuantCoin representatives on Google and found a "slash page" for at least one.[391]

After Cred's initial Bitcoin transfer to QuantCoin in early February, Alexander emailed Ryan Ortega, a consultant hired by Alexander, on February 11, 2020, seeking diligence support on three asset managers, including QuantCoin.  Alexander stated that "we scrambled to make these initial allocation *[sic]* and I need to ensure we didn't miss anything."[392]  Although Ortega

---

[388] Inamullah Decl. ¶ 19 (Exhibit 6). Ryan Ortega may have been the third-party diligence provider used by Alexander.  *See* Email from R. Ortega J. Alexander, Mar. 10, 2020, (Exhibit 127) ("Thanks for your time and effort on sourcing and screening managers."); Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[389] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb 16, 2021); Inamullah Dep. 180:12–16 (Exhibit 9).

[390] Inamullah Dep. 152:6–10 (Exhibit 9).

[391] *Id.* at 152:22–153:5.

[392] Exhibit 127.

agreed to assist Alexander, the Examiner has not been furnished with any evidence that Ortega carried out any due diligence work for Alexander or Cred.[393]

Cred's server contained minimal documents regarding the QuantCoin investment and no evidence of material due diligence.[394] Cred apparently did not create a written process governing transfers of funds to outside parties until a few months after the QuantCoin transfers.[395] Further, Cred's General Counsel, Dan Wheeler, did not review the QuantCoin contract before Cred executed it.[396] In fact, Wheeler stated he had never even heard of QuantCoin until after Cred uncovered the alleged fraud (discussed below).[397]

### 2. Chronology of Material Events Involving Cred and QuantCoin.

(a)  On February 4, 2020, Cred executed a subscription agreement with Quanta Capital Feeder Fund, L.P.[398] Schatt signed the agreement authorizing a subscription of 500 Bitcoin in QuantCoin on behalf of Cred, which listed Joe Podulka, Sally Zhang, and James Alexander as additional relationship contacts.[399] Alexander and Chapman subsequently agreed upon certain additional terms via email on February 5, 2020 to be contained in a side letter.[400] The agreement provided that transfers to QuantCoin and interest payable by QuantCoin would be denominated in Bitcoin to avoid translation.[401]

(b)  On February 5, 2020, while setting up Cred's initial subscription with QuantCoin, Chapman emailed Alexander to loop in his "admin," a person whom Chapman

---

[393] Id.

[394] See Email from D. Inamullah to J. Podulka and D. Schatt, July 13, 2020 (Exhibit 128) (Inamullah told Podulka he cannot find the fee documents for QuantCoin. It is unclear if these have ever been located); Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

[395] Inamullah Dep. 153:25-154:5 (Exhibit 9).

[396] Interview with Daniel Wheeler, former General Counsel, Cred Inc. (Feb. 12, 2021).

[397] Id.

[398] Quanta Capital Subscription Agreement, Feb. 4, 2020 (Exhibit 129)

[399] Id.

[400] Id.

[401] Email from J. Alexander to D. Inamullah and S. Zhang, Mar. 10, 2020 (Exhibit 130).

identified as Scott Foster of Kingdom Trust.[402] Although Kingdom Trust's website lists a Scott Foster as a financial services professional with over 25 years of experience, the Examiner has not been furnished with any evidence indicating that this real Scott Foster was in any way involved with QuantCoin. Chapman asserted that "Foster" would serve as the digital asset custodian and account administrator for the Cred account.[403]

(c)     On February 5, 2020, "Foster" sent Inamullah an email that included a wallet address and transfer instructions for the first Bitcoin transfer.[404] Upon receiving the address and instructions, Alexander asked a Cred employee, Sally Zhang, to process the transaction.[405] Another Cred employee, Heidi Ng, sent a test transaction of 0.01 Bitcoin and "Foster" confirmed receipt. Ng then transferred the remaining 499.999 BTC via BITTREX to the wallet address provided by "Foster."[406] Cred completed its initial transfer of 500 Bitcoin to QuantCoin on February 5, 2020,[407] valued at $4,806,710 at the time.[408]

(d)     On February 13, 2020, Inamullah sent an email to Chapman inquiring whether QuantCoin required additional paperwork for a further allocation of Bitcoin.[409] Chapman replied that it did not.[410] "Foster" once again provided the wallet address for the transaction, which Inamullah sent to Fireblocks to be "whitelisted," and sent a deposit address image to "Foster" as a security measure to "prevent swap attacks."[411] After "Foster" confirmed the address and receipt of a test transaction for 0.01 Bitcoin, Inamullah executed a transfer of an additional 200 Bitcoin over two separate transactions: 80 Bitcoin on February 13, 2020 (valued at $817,150); and 120 Bitcoin on February 18, 2020 (valued at $1,217,040).[412]

---

[402] Exhibit 126.

[403] *Id.*

[404] Email from S. Foster to D. Inamullah, Feb. 13, 2020 (Exhibit 131).

[405] *Id.*

[406] Exhibit 126 (Wallet address: 1HhGiE2JgUqweztdjpd5prpSt3YSkMs5Gk); Transaction Log, Feb. 5, 2020 (Exhibit 132) (Source address: 17Nk1hu2VPRREuANREgASdVyF1HcbY1kJf).

[407] Exhibit 126.

[408] Exhibit 25 at 23.

[409] Exhibit 131.

[410] *Id.*

[411] *Id.*

[412] Exhibit 131; Exhibit 25 at 23.

(e)    Beginning in March 2020, "Foster" began providing Cred with monthly investor statements, all containing positive performance updates.[413]  "Foster" subsequently provided Cred with status updates and investment reports, and answered questions regarding the QuantCoin relationship.[414]  According to Inamullah, the positive performance reports motivated Cred to invest more with QuantCoin while it waited to on-board other asset management funds.[415]

(f)    On March 13, 2020, Inamullah asked Chapman if QuantCoin would be able to receive another 200 Bitcoin from Cred.[416]  In response to this request, Chapman advised that he could receive 200 additional Bitcoin.[417]  Inamullah recommended to the "investment committee" that Cred invest more assets with QuantCoin.[418]  However, due to the crash in March, Cred did not send the additional 200 Bitcoin.

(g)    In or around April 14, 2020, Inamullah sought to increase Cred's allocation by 100 Bitcoin, after QuantCoin informed Cred that its account exceeded 6% profit in March.[419]  Chapman instructed Inamullah to send the funds to the wallet already "whitelisted" on Cred's system.  Inamullah sent the customary 0.01 Bitcoin test transaction.[420]  Once receipt was confirmed, Inamullah sent the remaining of 99.99 Bitcoin (valued at $711,680).[421]  As with prior transfers, the Fireblocks log shows that Inamullah sent this transaction to a wallet address under the name "QuantCoin."[422]

(h)    Thereafter, Cred continued to receive positive performance reports on its purported 800 Bitcoin investment.[423]

(i)    By May 3, 2020, the market value of Cred's purported Bitcoin investment with QuantCoin totaled $7,026,402.[424]

---

[413] Email from S. Foster to D. Inamullah, Mar. 23, 2020 (Exhibit 133); Kingdom Trust Investor Monthly Statement, Feb. 2020 (Exhibit 134); Cred Incident Investigation Report, Nov. 25, 2020 (Exhibit 135)  ("The false Scott Foster provided regular performance updates (all positive) on a monthly basis.").

[414] *See e.g.,* Exhibit 135; Email chain between D. Inamullah and S. Foster, May 9, 2020 (Exhibit 137).

[415] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

[416] Email chain between D. Inamullah and R. Chapman, Mar. 15, 2020 (Exhibit 136).

[417] Exhibit 136.

[418] Email from D. Inamullah to J. Podulka, D. Schatt and J. Alexander, Apr. 4, 2020 (Exhibit 122).

[419] Exhibit 137.

[420] Exhibit 135; Exhibit 137.

[421] Exhibit 135; Exhibit 137; Exhibit 25 at 23.

[422] Exhibit 124 (wallet address: 1HhGiE2JgUqweztdjpd5prpSt3YSkMs5Gk).

[423] *See* Email with attachments from S. Foster to A. Khakoo, June 1, 2020 (Exhibit 138).

(j)     By June 2020, QuantCoin representatives had become increasingly difficult to contact. On June 1, 2020, "Foster" apologized for a delay in sending Cred the April report, stating that he "was out for the weekend with no internet access."[425]

(k)     At a July 9, 2020 meeting of Cred's Board, Cred identified its QuantCoin investments as its best source for obtaining much needed short-term liquidity despite QuantCoin's positive performance.[426]

(l)     On July 16, 2020, Inamullah asked Chapman to speak to prospective investors about Cred during its fundraising process, but Chapman replied that he was addressing some medical issues and could not assist.[427]

(m)     On July 28, 2020, Cred notified "Foster" by email that Cred wanted to rebalance its portfolio and inquired about a receiving a redemption in the first week of August.[428] "Foster" replied that redemptions generally required one months' notice and that any August redemption would affect other investors' positions, proving costly. "Foster," however, did indicate that he would agree to fulfill a redemption request in the first week of September to provide enough time to wind down the positions.[429]

(n)     On July 30, 2020, "Foster" confirmed Cred's request for a $2 million redemption during the first week of September 2020.[430]

(o)     After the redemption request, Cred's follow-up emails to Foster and Chapman were returned as "undelivered."[431]

(p)     In or around August, Joe Podulka requested that Inamullah obtain July financial statements for the account.

(q)     Eventually, Podulka contacted Kingdom Trust directly to verify the account statement.[432] Podulka contacted Kingdom Trust several times by telephone before receiving a response from Kingdom Trust's General Counsel, Tim

---

[424] Email from D. Inamullah to J. Podulka, May 3, 2020, (Exhibit 139).

[425] Exhibit 138.

[426] Exhibit 44 (July 9, 2020 meeting notes).

[427] Email from R. Chapman to D. Inamullah, July 16, 2020 (Exhibit 140).

[428] Email from S. Foster to A. Khakoo, July 29, 2020 (Exhibit 141).

[429] Exhibit 141; Inamullah Dep. 154:21-156:16 (Exhibit 9).

[430] Email from S. Foster to A. Khakoo, July 30, 2020 (Exhibit 142).

[431] Email from A. Khakoo to D. Inamullah, Aug. 21, 2020 (Exhibit 143).

[432] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

Kuhman.[433]  On August 26, 2020, Kuhman informed Podulka that the emails from "Foster" were not authentic and that the real Kingdom Trust did not hold any of Cred's assets.[434]

(r)   On August 26, 2020, Kingdom Trust advised Cred to immediately report the matter to the FBI and other law enforcement in Cred's jurisdiction.[435]  On the same day, Cred's security team, Bethany De Lude (Chief Information Security Officer) and Marie Kacmarik (Director of Information Security) contacted the FBI's San Francisco Division.[436]  Over the following days, De Lude and Kacmarik coordinated with the FBI to provide relevant materials and information, and to discuss next steps.[437]

(s)   On August 31, 2020, the FBI informed De Lude that it would initiate a formal investigation along with Assistant U.S. Attorney Barbara Valliere.[438]  The FBI checked the QuantCoin wallet against law enforcement databases but the wallet came up empty, prompting the need to conduct additional tracing.[439]

(t)   On September 8, 2020, Dan Wheeler received an FBI subpoena and managed the information production and submission request with a target completion date of September 24, 2020.[440]  Wheeler collected the documents that the FBI requested and spoke to agents about the case.[441]

(u)   On September 14, 2020, De Lude recommended that Cred pursue an insurance claim related to QuantCoin, but Podulka did not act at that time.[442]

(v)   On October 14, 2020, Special Agent Bryant informed De Lude that it required no further information from Cred.[443]

(w)   On November 24, 2020, Cred notified the FBI about its plans to freeze the accounts relating to the transferred Bitcoin.[444]

---

[433] *Id.*

[434] Email from T. Kuhman to J. Podulka, Aug. 26, 2020 (Exhibit 144); Exhibit 135.

[435] *Id.*

[436] Exhibit 135.

[437] *Id.*

[438] *Id.*

[439] *Id.*

[440] Email from B. De Lude to D. Schatt, Dec. 8, 2020 (Exhibit 145).

[441] Interview with Daniel Wheeler, former General Counsel, Cred Inc. (Feb. 12, 2021).

[442] Exhibit 145; Email from T. Khuu to B. De Lude, D. Schatt, and J. Podulka, Oct. 30, 2020 (Exhibit 146).

[443] Exhibit 145.

Kingdom Trust operates, *inter alia*, as a custodian and escrow agent for digital and fiat currencies of individuals and institutions.[445] As noted above, Scott Foster is an employee at Kingdom Trust who, it appears, an unidentified individual impersonated while claiming to manage the QuantCoin account in his name. While the real Scott Foster has a company email address of "sfoster@kingdomtrust.com,"[446] all emails Cred received from the purported "Foster" came from "scott.foster@kingdom**s**trust.com" (emphasis added).[447]

As part of an internal investigation at Cred, Podulka and Inamullah researched key contacts and information about QuantCoin and found nothing online or on social media.[448] De Lude asked Inamullah who at Cred authorized the transfers to QuantCoin, but Inamullah suggested that he did not actually know how the authorization process worked.[449] Inamullah recalled that Alexander likely told him to "initiate on the phone or in person" because he could not find anything in email.[450]

As of August 28, 2020, when Cred removed the assets held at QuantCoin and CredBorrow from its asset calculation, Cred had short-term liabilities (using a 6 month redemption calculation) of $100 million compared to purported assets of $80 million.[451] Schatt

---

[444] Exhibit 135.

[445] Executive Summary, Kingdom Trust, https://www.kingdomtrust.com/qualified-custodian/executive-summary (last visited Mar. 4, 2021).

[446] Exhibit 135.

[447] Exhibit 126.

[448] Exhibit 135; Email from B. De Lude to D. Inamullah, Aug. 27, 2020 (Exhibit 147).

[449] Email from B. De Lude to D. Inamullah, Aug. 27, 2020 (Exhibit 148).

[450] Exhibit 147.

[451] Exhibit 107 ("Cred Earn liabilities today are about $110M v. assets of about $97M. That asset number includes the Quanta funds. Removing Quanta assets and those with Cred Borrow and the comparing to short-term liabilities, assets are $80M v. short-term (next 6 month redemptions) liabilities of $100M assuming full redemption. Expected

commented to Podulka that the loss of $9 million in assets was "unfortunate," but did not "impair the company's day-to-day operations or pose a significant risk to returning client funds."[452]

Cred continued to present confidence in its ability to grow assets, manage client redemptions, and close the asset gap created by the QuantCoin situation.[453]  On September 1, 2020, in response to questions on Cred's write-up of the QuantCoin incident, Podulka stated that the loss from the situation was approximately $7.4 million if recognized in February, but "because the funds didn't actually generate any return, it's not really a loss."[454]  As Podulka framed it to a customer, the QuantCoin loss is really "more of a reduction against the budget expectations."[455]

By September 16, 2020, the market value of the QuantCoin loss was $8,758,872.[456]  On October 28, 2020, Cred sent a notice to customers regarding the QuantCoin loss.[457]

### E.     Lu Hua's Transfer of 300 Bitcoin to Cred.

According to Schatt, after Bitcoin dropped in value in March 2020, Alexander sought to recall $10 million from moKredit to provide Cred with liquidity to reestablish its hedge

---

redemptions would only be about $30M, so we could frame it differently and compare current non-LBA assets of $84M v. expected redemptions of $30M.").

[452] Exhibit 108.  According to Podulka, he made comments to a draft Schatt had already written, which included the "unfortunate" comment.  Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[453] Exhibit 108.

[454] Email between J. Podulka and S. Ichimiya, Sept. 1, 2020 (Exhibit 149).

[455] *Id.*

[456] Exhibit 95.

[457] *Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362*, Exhibit G (ECF No. 91) (Exhibit 150).

positions.[458]   As discussed in Section V(B)(3), Hua claimed that he was not in a position to satisfy Cred's demands.  Instead, Hua proposed a twofold solution:  a staggered repayment plan instead, and providing Cred with 300 Bitcoin to assist Cred with reestablishing hedges.[459]

According to Schatt, Alexander indicated that he could utilize the 300 Bitcoin to reestablish Cred's hedge positions, despite the fact that the market value of the 300 Bitcoin at the time totaled only approximately $1.5 million ($8.5 million less than the $10 million requested by Cred).[460]   After Cred's hedges were liquidated in March 2020, Cred had a net short cryptocurrency position of approximately $27 million.  Using Cred's traditional leverage of 3x, Cred would have needed approximately $9 million in Bitcoin to hedge itself against this short position.  Utilizing Cred's traditional leverage of 3x, Cred would only have been able to hedge approximately $4.5 million of its net short position using the 300 Bitcoin ($1.5 million leveraged 3x).

Hua transferred 300 Bitcoin to Cred over five separate transactions: on March 13, 2020, Hua made two transfers of .01 Bitcoin and 49.9 Bitcoin to Cred; on March 14, Hua made another two transfers of 50 Bitcoin and 100 Bitcoin to Cred; and on March 16, Hua transferred the final 100 Bitcoin to Cred.[461]

Hua and Schatt both characterize the Bitcoin transfers as a personal loan made by Hua to Cred.  Although the Examiner obtained emails from Hua and Schatt characterizing the transfer as

---

[458]  Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[459]  Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[460]  Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[461]  *Decl. of Matthew K. Foster in Support of Debtors' Objection to Motion of James Alexander to Dismiss the Cred Capital, Inc. Case* ¶ 6 (ECF No. 434) (Exhibit 153); *see also* Email from S. Hwang to P. Bonjour, H. Ng, and D. Hummer, Dec. 15, 2020 (Exhibit 154).

a loan, the Examiner found no contract, loan agreement, or other documentary evidence supporting this position.  Hua did, however, execute a contribution agreement, effective as of March 31, 2020, in which Hua agreed to make a capital contribution of 300 Bitcoin to Cred Capital in exchange for an aggregate of 5,000,000 shares of Class B common stock.[462]  Along with Hua, Alexander signed the agreement as President and CEO of Cred Capital.[463]

According to Hua, he signed the contribution agreement without reading it, two weeks after he transferred the Bitcoin to Cred, and had assumed the agreement was a routine Cred lending document.[464]  Hua further states that he did not show the document to an attorney before signing it and did not learn that what he had signed was an equity agreement until several months later.[465]

According to Inamullah, the 300 Bitcoin was initially used to establish certain swaps and/or future hedges using Cred's traditional leverage ratio of 3x on the OKEx exchange.[466]  Also according to Inamullah, it was determined that, without JST, Cred did not have the knowledge necessary to manage hedges in derivate form (i.e., as swaps or futures).  At some point 300 Bitcoin was sent to OKEx; however, the Examiner has not seen any documents supporting any other hedge positions being reestablished.  In any event, insofar as hedges existed, they were terminated shortly after they were established.[467]

---

[462] Exhibit 80.

[463] *Id.*

[464] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[465] *Id.*

[466] Interview with Daniyal Inamullah, former Vice President of Capital Markets at Cred Inc. (Feb. 23, 2021); Inamullah Dep. 191:16–3:3 (Exhibit 9).

[467] Interview with Daniel Schatt, Chief Executive Officer, Cred Inc. (February 17, 2021).

Cred Capital liquidated 75 of Hua's 300 Bitcoin and utilized the proceeds to pay Cred Capital consultants, fund fees associated with the Luxembourg Bonds, and to satisfy minimal balance requirements for Cred Capital's bank account.[468]

### F.   Cred's Dealings with James Alexander.

#### 1.   General Background on James Alexander.

Schatt first met Alexander at a venture capital event in or around 2013.[469]  The pair had limited contact over subsequent years, but remained connected via LinkedIn.[470]  During Summer 2018, Schatt contacted Alexander and proposed that he provide consulting services for Cred.[471] After working for Cred in this advisory capacity for approximately a month, Alexander met with Hua, Wheeler, and other members of the Cred team in Shanghai.[472]  At that point, Cred offered Alexander a permanent position as Chief Capital Officer, commencing in August 2018.[473]

It does not appear that Cred conducted any formal vetting of Alexander prior to making him an offer of employment, nor does it appear that Cred contacted any of Alexander's prior employers.[474]

On December 3, 2007, Alexander was convicted in the United Kingdom for crimes related to illegal money transfers.  He was sentenced to three years and four months in prison to

---

[468] Chat logs between J. Alexander and D. Inamullah, June 24, 2020 (Exhibit 155); Interview with Daniyal Inamullah, former Vice President of Capital Markets at Cred Inc. (Feb 23, 2021).

[469] Interview with Daniel Schatt, Chief Executive Officer, Cred Inc. (February 17, 2021).

[470] *Id.*

[471] *Id.*

[472] *Id.*

[473] *Compare* First Amended Complaint ¶ 14, *Alexander v. Schatt*, No. 20-CIV-02728 (Cal. Super. Ct. Oct. 15, 2020) (Exhibit 22) (stating that Cred hired Alexander on Aug. 27, 2018), *with* Employment Offer Letter for J. Alexander (Exhibit 16) (Alexander's unsigned employment offer letter states that his role would commence on Aug. 1, 2018).

[474] Interview with Daniel Schatt, co-founder and Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

be served at HMP Ford Prison in West Sussex, England.  On October 15, 2008, while serving his sentence, there was a prison break at the HMP Ford Prison.  It appears that Alexander is a fugitive in the United Kingdom.[475]

In his role as Chief Capital Officer, Alexander was responsible for raising and deploying capital for Cred.[476]  In this role, Alexander was granted broad power and discretion over Cred's investment decisions and the control and ability to transfer Cred's assets with little oversight.[477]

Alexander received from Cred an annual salary of $240,000[478] and a $95,523.76 advance against a future profit share.[479]  He also received two different types of loans from Cred: a series of LBA token loans, and a cash loan.[480]  The precise amount of LBA tokens that Alexander obtained through the loan program is disputed (ranging from 5.2 million to 1.75 million tokens).[481]  Given time and information constraints, the Examiner was unable to ascertain if Alexander received additional payments from any other organizations or parties referenced in this Report.

---

[475] Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021); *see* MN Form UCF-17-2, Order Granting Name Change, Aug. 18, 1994 (Exhibit 167); s*ee also* Letter from Andrew Selous MP, Parliamentary Under-Secretary of State for Justice, to Philip Davies MP, House of Commons (Nov. 7, 2014) (Exhibit 168); Rachel Millard, *Exposed: inmates on the run from Ford Prison*, The Argus (Apr. 7, 2015), https://www.theargus.co.uk/news/12873674.exposed-inmates-on-the-run-from-ford-prison/.

[476] Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021).

[477] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[478] Exhibit 16.

[479] Exhibit 22 at ¶ 14.

[480] *Id.*

[481] *Compare* Exhibit 22 at ¶ 14 (5.2 million LBA tokens), *with* Employee Loan Agreement I, June 1, 2019 (Exhibit 156) (1,333,333 tokens), Employee Loan Agreement II, June 1, 2019 (Exhibit 157) (375,000 LBA tokens), and Employee Loan Agreement III, June 1, 2019 (Exhibit 158) (41,667 LBA tokens).

### 2.     Organization of Cred Capital.

Alexander was closely involved in the formulation and organization of Debtor Cred Capital.[482]  The Examiner notes that, pursuant to its Order entered February 5, 2021, the Court made certain factual findings regarding the organization of Cred Capital and related matters.[483] This Order followed extensive briefing on the matter by the Debtors, the Committee, and Alexander.  Specifically, the Court found that:

- the initial certificate of incorporation for Cred Capital, filed with the Delaware Secretary of State on March 10, 2020, was improperly filed; and

- upon discovering the improperly filed incorporation filings, Cred took steps to correct the improper filings and made Schatt and Podulka the directors of Cred Capital.[484]

The Examiner will, therefore, address the facts and circumstances surrounding Cred Capital's formation only as necessary to inform other aspects of this Report.

### 3.     James Alexander's Alleged Misappropriation of Assets.

On June 24, 2020, Alexander instructed Inamullah to transfer 225 Bitcoin and 200,000 USDC to wallet addresses that Alexander provided.[485]  Because of the poor state of Cred's books and records, the Examiner could not ascertain whether the 225 Bitcoin was among the same Bitcoin transferred to Cred by Lu Hua.

---

[482] Exhibit 22 ¶ 7.

[483] *See Order Denying Motion of James Alexander to Dismiss the Cred Capital, Inc. Case* (ECF. No. 487) ("Order Denying Alexander MTD") (Exhibit 159).

[484] *See Id.*

[485] Email from D. Inamullah to D. Schatt and J. Podulka, June 30, 2020 (Exhibit 160); Videotaped Deposition of James Alexander 72:13–15 ("Alexander Dep.") (Exhibit 161).

Inamullah represented that Alexander told him the transfers were being made to a Cred Capital account.[486] When asked how he confirmed this, Inamullah said that a separate entity was onboarded for Cred Capital on Cred's Fireblocks account, and this entity had a separate domain name.[487] In reality, the addresses that Alexander provided were for wallets belonging to an individual named Christopher Giovanni Silvio Spadafora, a consultant to Cred Capital since April 2020.[488] During his deposition, Alexander said he transferred these funds to Spadafora's wallets because Alexander did not have a wallet available to receive the funds at that time, and because he considered Spadafora a "trusted consultant and experienced crypto market participant."[489] However, during his interview with the Examiner, Alexander stated that he transferred the assets to Spadafora's asset management company "alwayshodl" but decided after a few days that "hodl didn't have the standing" to hold and manage the assets so he had them transferred to himself.[490] Further, Alexander stated that Inamullah understood what Alexander was attempting to accomplish through the transfer process.[491] According to Inamullah, he believed that he was, in fact, transferring the funds to a Cred Capital wallet.[492]

Inamullah represents that, when initially questioned about these transfers by Schatt, he believed that the address information had been transmitted by Alexander via Telegram

---

[486] Inamullah Dep. 158:24–159:4, 165:12–16 (Exhibit 9).

[487] *Id.* at 221:8–13.

[488] Alexander Dep. 72:17–25 (Exhibit 161).

[489] *Id.* 72:17–73:11.

[490] Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021).

[491] *Id.*

[492] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

messenger and confirmed by Alexander via telephone call.[493] Inamullah said he later remembered that Alexander provided all the necessary information in person because it is "much safer that way."[494] However, Inamullah subsequently advised the Examiner that Alexander sent the wallet addresses to Inamullah via WhatsApp messenger while they were both in the office, and Inamullah copied and pasted the addresses from WhatsApp into Fireblocks in order to complete the transfers.[495] Alexander informed the Examiner that he did not recall his communication with Inamullah regarding the transfer instructions.[496]

Alexander informed the Examiner that he directed the assets be transferred out of the Cred Capital account because he believed that he was the sole director of Cred Capital and that Schatt and Podulka were improperly attempting to take control of Cred Capital.[497] The following provides a chronology and factual observations regarding the relevant asset transfers:

- On July 1, 2020, Alexander received 224.899 Bitcoin from Spadafora.[498]

- On July 15, 2020, Cred filed a complaint against Alexander in California state court seeking, among other things, the recovery of 225 Bitcoin and other assets.[499]

- On July 16, 2020, Alexander liquated 65 of the approximately 225 Bitcoin that he had received by transferring those assets to his Coinbase wallet.[500]

---

[493] Inamullah Dep. 158:6–18 (Exhibit 9).

[494] *Id.* at 158:18; 160:13–17.

[495] Interview with Daniyal Inamullah, former Vice President of Capital Markets at Cred Inc. (Feb. 23, 2021).

[496] Alexander Dep. 71:14–19 (Exhibit 161).

[497] *Id.* at 69:4–11.

[498] *Id.* at 78:5–9.

[499] Verified First Amended Complaint, *Cred v. Alexander*, No. 20-CIV-02915 (Cal. Super. Ct. Aug. 14, 2020) (Exhibit 23).

[500] Alexander Dep. 83:16–85:2 (Exhibit 161).

- On July 17, 2020, a temporary restraining order and preliminary injunction enjoining Alexander from using or transferring any Cred or Cred Capital digital assets was issued by the California state court.[501]

- On January 16 and 17, 2021, Alexander transferred Bitcoin valued at approximately $1.832 million – in evident conflict with the terms of the California state court's TRO.[502] Specifically, Alexander transferred 50 Bitcoin on January 16th, and 50 additional Bitcoin on January 17th, into his Coinbase wallet to be liquidated into USD. Alexander acknowledged that the transfers did not comport with the TRO, but claimed that a purported medical emergency precipitated his actions.[503]

- At a bankruptcy hearing attended by Alexander on February 3, 2021, the Court determined that an emergency hearing would be held regarding the January 16th and 17th transfers completed by Alexander.[504]

- That same day, Alexander withdrew $10,000 in the form of a cashier's check from an account named "Alexander Custom Management." Alexander stated that this withdrawal was a salary payment to himself,[505] and said he deposited it into a personal account.[506]

- The following day, February 4, 2021, Alexander transferred $100,000 from a Wells Fargo bank account that he managed for Cred Capital to the "Alexander Custom Management" account, and then withdrew $60,000 in cash from that account.[507] Alexander stored this money in the trunk of his car, which, at the time of his deposition, was parked on Finely Avenue in Los Angeles, California, a street on which Alexander previously resided.[508] Alexander stated that he withdrew this cash to settle a purported tax liability, which he stated was a part of his 2020 compensation.[509] Alexander claimed that he had planned to deposit the cash into his personal account the day he withdrew it, but had not had the chance

---

[501] Id. at 85:11–86:11.

[502] Transcript of Zoom Hearing Re: Emergency Motions of the Official Committee of Unsecured Creditors 5:22–6:4, Feb. 5, 2021 (Exhibit 166).

[503] Alexander Dep. 105:20–108:7.

[504] Id. at 39:16–40:22.

[505] Id. at 47:21–48:18.

[506] Id. at 49:24–50:7.

[507] Id. at 42:12–45:18.

[508] Id. at 14:15–19, 46:15–18.

[509] Id. at 47:1–10.

to do so by the date of his deposition, five days later.[510]  When asked how much cash was still in his car since withdrawing it over a week prior, Alexander stated that he did not recall and could not remember if he had spent any of the funds, since, as Alexander stated, "cash is fungible."[511]

- According to information that the Examiner received from the Committee's advisors, on February 5, 2021, Alexander returned 49.9980892 BTC and $2,773,489.24 USDC to the estates.[512]

- On February 7, 2021, Alexander returned to the estates an additional $35,000 from a JP Morgan Chase account and $50,355 from a Wells Fargo account.[513]

- The proceeds from the January 16th and 17th Bitcoin transactions totaled approximately $3,437,956.53 in the aggregate.  As of the date of his February 9, 2021 deposition, Alexander had returned assets totaling, in the aggregate, approximately $2,773,488.  When asked where the approximately $664,468 dollar difference in value between transferred and returned assets was, Alexander refused to answer, stating that the whereabouts of the funds was an "open question."[514]

- Thereafter, Alexander requested a break in the deposition, during which Alexander filed a personal Chapter 11 bankruptcy petition in the Central District of California.  Upon return from break, Alexander ended his participation in the Court-ordered deposition.[515]

## VI.  INVESTIGATIVE CONCLUSIONS

The information that the Examiner was able to obtain and review within the constricted timeframe of the Investigation lends itself to the following conclusions:

### General Management/Oversight

1.     Lu Hua and Dan Schatt either failed to acknowledge or failed to realize the likely conflict of interest, both fiduciary and personal, that existed in their relationships with each other and between moKredit as a debtor and Cred as a lender.

---

[510] *Id.* at 52:1–11.

[511] *Id.* at 56:16–19.

[512] Email from J. Evans to E. Gilman, Feb. 28, 2021 (Exhibit 162).

[513] *Id.*

[514] Alexander Dep. 115:6–117:22 (Exhibit 161).

[515] Alexander Dep. 118:3–121:24 (Exhibit 161); Suggestion of Bankruptcy (ECF. No. 500) (Exhibit 163).

2.      Dan Schatt likely failed to make reasonable efforts to investigate James Alexander's background prior to hiring him as Cred's Chief Capital Officer.  Had Schatt done so, he likely would have learned that Alexander was convicted of a felony and sentenced to prison for acts amounting to fraud, and appears to be a current fugitive in the United Kingdom.

3.      Cred likely failed to develop and maintain a standardized and formal process for decision-making pertaining to Cred's liquidity situation, new investment proposals, investment allocations, and risk management strategies.

**Accounting Practices**

1.      Cred failed to keep reliable, defensible records for its trading accounts and never adopted a regular practice of issuing transaction statements.

2.      Cred did not endeavor to complete account reconciliations.  At the time Cred filed for Chapter 11 relief, it had not reconciled its accounts for fiscal year 2020. The Examiner could not ascertain the last point at which Cred had a complete and accurate records reconciliation.

3.      Because of the lack of up-to-date books and records, the Examiner could not ascertain the reliability and efficacy of Cred's stated financial position at any time, up to and including the filing of its Chapter 11 petitions.

4.      Cred failed to develop and maintain a standardized, comprehensive protocol for tracking customer deposits and initiating and authorizing transfers.  Cred's method for initiating, authorizing, and executing transfers appears to have been informal, with all steps often performed by a single individual without a discernible method for approval or oversight.

5.      Cred did not keep consistent records of Fireblocks transactions, and the records it did keep were not comprehensive.

6.      Customer deposits derived from Uphold, CredEarn, and CredBorrow, were all maintained together without a standardized, repeatable method for distinguishing whose assets belonged to whom and from which offering they were derived.

**Risk/Due Diligence**

1.      Cred failed to maintain a comprehensive, standardized process for performing due diligence on prospective or current asset managers.

2.      Cred failed to incorporate and maintain internal compliance policies, including due diligence policies.  It was not until Summer of 2020 that Cred began to initiate background checks on prospective employees and custodians and, even then, those checks do not appear to have been conducted retroactively.

96

3.      Cred's "investment committee" discussed, at least as early as November 2019, pursuing an "all-weather" strategy to diversify Cred's asset allocation and minimize risk. Cred, however, never fully implemented this strategy due to, among other things, continued liquidity issues beginning with the March 2020 crash, the inability to obtain repayment under the moKredit loan, the failed QuantCoin investment, and asset transfers involving Alexander.

## moKredit

1.      Cred did not receive or review written due diligence materials (e.g., moKredit's asset-to-liability ratio, customer transactions, customer default rate, or customer receivables) before entering into its loan agreement with moKredit.

2.      Prior to entering into the moKredit loan agreement, Cred did not take reasonable steps to ensure that it could enforce the loan agreement and effectuate repayment in the event that moKredit, a company located and doing business in China, defaulted or was otherwise unwilling or unable to satisfy its repayment obligations.

3.      Cred and moKredit appeared to operate without "proper controls." Cred transferred funds without signed tranche agreements and failed to issue periodic statements. As a result, Cred's informal accounting system – comprised of an Excel spreadsheet and a Google document – remained out-of-date and likely inadequate to track tens of millions of dollars of transactions between the companies.

## QuantCoin

1.      Cred did not conduct material due diligence prior to transferring 800 Bitcoin to QuantCoin. Cred management relied on statements made by James Alexander that QuantCoin due diligence was properly conducted without receiving any evidence substantiating such a claim.

2.      Dan Schatt signed the QuantCoin subscription agreement before it was reviewed by Cred's general counsel and adequate diligence was performed.

3.      Despite assertions made by Alexander, it does not appear that he conducted due diligence of QuantCoin on Cred's behalf.

4.      Daniyal Inamullah also did not conduct any due diligence of QuantCoin and, despite being the main contact on the account and initiating Cred's transfer of funds, Inamullah attempted to distance himself from the relationship thereafter by blaming the lack of diligence on the absence of a written process.

5.      After the series of Bitcoin transfers to QuantCoin, Cred, with reasonable diligence, could have discovered that, contrary to QuantCoin's assertions, Kingdom Trust did not have a relationship with QuantCoin and the real Scott Foster was not managing the Cred account.

97

**Hedge Positions**

1.    Cred hired outside consultant JST Capital to assist Cred in operating a cryptocurrency hedging program.

2.    Certain hedges established under this program failed to protect Cred from a downturn in the market and, instead, likely caused Cred to incur significant losses when the price of Bitcoin dropped significantly overnight on March 11, 2020.

3.    The decision not to reestablish its hedge positions after the March 2020 "flash crash" left Cred exposed ("naked") to market fluctuations.  As the price of Bitcoin increased towards the end of March and beyond, so too did Cred's liabilities.

**Luxembourg Bonds**

1.    At the time that Cred purchased the Luxembourg Bonds, it knew that moKredit would be unable to make the payments necessary to repay them.

2.    Cred's decision to purchase the Luxembourg Bonds in June 2020 (at par) significantly and adversely impacted Cred's already tenuous liquidity position.

**300 Lu Hua Bitcoin**

1.    After moKredit failed to repay $10 million of its principal balance, Hua sent 300 Bitcoin to Cred.  In or around this time, Hua executed an equity contribution agreement under which Hua agreed to transfer 300 Bitcoin in exchange for equity in Cred Capital.  Thus, despite Hua and Schatt's characterization of the Bitcoin transfer as a loan, the documentary evidence suggests an equity placement.

2.    Although Cred appears to have indicated that it intended to use the 300 Bitcoin to reestablish hedges liquidated by JST in the March 2020 crash, it does not appear that 300 Bitcoin would have been sufficient to reestablish such hedges.

**Certain Representations Made by or Attributed to Cred**

1.    It appears that, in certain instances, Cred mischaracterized the nature of its collateralization.  The funds Cred lent to moKredit and other asset managers after converting CredBorrow and CredEarn deposits to fiat currency were largely not collateralized.

2.    It appears that, in certain instances, Cred mischaracterized the nature of its insurance coverage.

3.    In communications with customers after the discovery of the failed QuantCoin investment, Cred indicated that the loss was insignificant and did not pose a significant risk to client funds.  At the same time, certain Cred employees were recommending that

Cred pull 100% of its assets from three asset managers in an effort to address liquidity concerns stemming, in part, from the failed QuantCoin investment.

4. It appears that Cred understated its assets-to-liabilities gap internally and mischaracterized its ability to close that gap to customers in or around August 2020, a time at which Cred knew that moKredit was either unable or unwilling to pay down the principal balance on the moKredit loan.

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 11 |
| | |
| | Case No. 20-12836 (JTD) |
| CRED INC., *et al.*,[1] | |
| | (Jointly Administered) |
| Debtors. | |

## <u>CERTIFICATE OF SERVICE</u>

I, Gregory A. Taylor, hereby certify that, on March 8, 2021 I caused one copy of the

*Report of Robert J. Stark, Examiner* reference pleadings to be served to (1) all parties of record

via CM/ECF and (2) to the attached service list via electronic mail unless otherwise indicated.

Dated: March 8, 2021
Wilmington, Delaware

*/s/ Gregory A. Taylor*
Gregory A. Taylor (DE Bar No. 4008)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

## SERVICE LIST

| | | |
|---|---|---|
| **VIA FIRST CLASS MAIL**<br>Arizona Attorney General Office<br>P.O. Box 6123<br>MD 7611<br>Phoenix, AZ 85005-6123 | Baker Hostetler LLP<br>Attn: Jeffrey J. Lyons<br>1201 North Market St.,14th Floor<br>Wilmington, DE 19801-1147<br>Email: JLyons@bakerlaw.com | Baker Hostetler LLP<br>Attn: Jorian L. Rose and Michael Sabella<br>45 Rockefeller Plaza<br>New York, NY 10111<br>Email: JRose@bakerlaw.com<br>Email: MSabella@bakerlaw.com |
| Billion Law<br>Attn: Mark M. Billion<br>1073 S. Governor Ave<br>Dover, DE 19904<br>Email: markbillion@billionlaw.com | Buchalter, P.C.<br>Attn: Shawn M. Christianson<br>55 Second St., 17th Floor<br>San Francisco, CA 94105-3493<br>Email: schristianson@buchalter.com | Buchanan Ingersoll & Rooney P.C.<br>Attn: Geoffrey G. Grivner<br>919 N Market St., Suite 900<br>Wilmington, DE 19801<br>Email: Geoffrey.grivner@bipc.com |
| Carlton Fields, PA<br>Attn: David L. Gay<br>2 Miami Central<br>700 NW 1st Ave., Suite1200<br>Miami, FL 33136-4118<br>Email: DGay@carltonfields.com | Cousins Law LLC<br>Attn: Scott D. Cousins<br>Brandywine Plaza West<br>1521 Concord Pike, Suite 301<br>Wilmington, DE 19803<br>Email: scott.cousins@cousins-law.com | **VIA FIRST CLASS MAIL**<br>Cred Inc.<br>Attn: President/CEO<br>3 East Third Avenue<br>San Mateo, CA 94401 |
| DCP Capital<br>Attn: Kevin Hu<br>Kingston Chambers<br>P.O. Box 173<br>Rd Town<br>Tortola Vg1110<br>British Virgin Islands<br>Email: Kevin@dcp.capital | **VIA EMAIL AND**<br>**FIRST CLASS MAIL**<br>Delaware Attorney General<br>Bankruptcy Dept.<br>Carvel State Office Building<br>820 N French St., 6th Floor<br>Wilmington, DE 19801<br>Email: attorney.general@state.de.us | **VIA EMAIL AND**<br>**FIRST CLASS MAIL**<br>Delaware Division Of Revenue<br>Attn: Christina Rojas<br>Carvel State Office Building<br>8th Floor<br>820 N. French St.<br>Wilmington, DE 19801<br>Email: Christina.rojas@delaware.gov |
| **VIA EMAIL AND**<br>**FIRST CLASS MAIL**<br>Delaware Secretary of State<br>Division Of Corporations Franchise Tax<br>P.O. Box 898<br>Dover, DE 19903<br>Email: dosdoc_ftax@state.de.us | **VIA FIRST CLASS MAIL**<br>Delaware Secretary of State<br>Division of Corporations<br>401 Federal St., Suite 4<br>Dover, DE 19901 | **VIA FIRST CLASS MAIL**<br>Delaware State Treasury<br>Bankruptcy Dept.<br>820 Silver Lake Blvd.<br>Suite 100<br>Dover, DE 19904 |
| Dragonfly International Holding Limited<br>Attn: Lindsay Lin<br>Maples Corporate Services (BVI) Limited<br>Kington Chambers<br>P.O. Box 173<br>Road Town Tortola, British Virgin Islands<br>Email: lindsay@dcp.capital | Faegre Drinker Biddle & Reath LLP<br>Attn: Patrick A. Jackson<br>222 Delaware Ave., Suite 1410<br>Wilmington, DE 19801-1621<br>Email:<br>Patrick.jackson@faegredrinker.com | Faegre Drinker Biddle & Reath LLP<br>Attn: Dustin R. Deneal<br>600 E. 96th St., Suite 600<br>Indianapolis, IN 46240<br>Email: dustin.deneal@faegredrinker.com |

| | | |
|---|---|---|
| Quinn Emanuel Urquhart & Sullivan, LLP<br>Attn: Toby E. Futter and Marc L. Greenwald<br>51 Madison Avenue, 22nd Floor<br>New York, NY 10010<br>Email: tobyfutter@quinnemanuel.com<br>Email: marcgreenwald@quinnemanuel.com | Lubin Olson & Niewiadomski LLP<br>Attn: Mia S. Blackler<br>The Transamerica Pyramid<br>600 Montgomery Street, 14th Floor<br>San Francisco, CA 94111<br>Email: mblackler@lubinolson.com | **VIA FIRST CLASS MAIL**<br>Franchise Tax Board<br>Bankruptcy Section MS A340<br>P.O. Box 2952<br>Sacramento, CA 95812-2952 |
| Gellert Scali Busenkell & Brown LLC<br>Attn: Michael Busenkell and Amy D. Brown<br>1201 N. Orange St., Suite 300<br>Wilmington, DE 19801<br>Email: MBusenkell@gsbblaw.com<br>Email: ABrown@gsbblaw.com | **VIA FIRST CLASS MAIL**<br>Internal Revenue SVC<br>Centralized Insolvency Operation<br>P.O. Box 7346<br>Philadelphia, PA 19101-7346 | **VIA FIRST CLASS MAIL**<br>Internal Revenue SVC<br>Centralized Insolvency Operation<br>2970 Market St.<br>Mail Stop 5 Q30 133<br>Philadelphia, PA 19104-5016 |
| JST Capital<br>Attn: Scott Freeman<br>350 Springfield Ave, Suite 200<br>Summit, NJ 07901<br>Email: SFreeman@jstcap.com | Maple Partners LLC<br>Attn: Joshua Segall<br>1309 Coffeen Ave., Suite 1200<br>Sheridan, WY 82801<br>Email: maplepartnersllc@gmail.com | McDermott Will & Emery LLP<br>Attn: Timothy W. Walsh and Darren Azman<br>340 Madison Ave<br>New York, NY 10173-1922<br>Email: twwalsh@mwe.com<br>Email: dazman@mwe.com |
| McDermott Will & Emery LLP<br>Attn: David R. Hurst<br>The Nemours Building<br>1007 North Orange St.,4th Floor<br>Wilmington, DE 19801<br>Email: dhurst@mwe.com | **VIA FIRST CLASS MAIL**<br>Michigan Dept. of Treasury Tax Pol Div.<br>Litigation Liaison<br>430 West Allegan St.<br>2nd Floor Austin Building<br>Lansing, MI 48922 | **VIA EMAIL AND FIRST CLASS MAIL**<br>Office of the United States Trustee<br>Attn: Joseph J. McMahon, Jr. and John Schanne<br>844 King St., Suite 2207<br>Wilmington, DE 19801<br>Email: joseph.mcmahon@usdoj.gov<br>Email: john.schanne@usdoj.gov |
| Paul Hastings LLP<br>Attn: James T. Grogan and Mack Wilson<br>600 Travis Street<br>58th Floor<br>Houston, TX 77002<br>Email: jamesgrogan@paulhastings.com<br>Email: mackwilson@paulhastings.com | **VIA EMAIL AND FIRST CLASS MAIL**<br>US Attorney For Delaware<br>Attn: Charles Oberly and Ellen Slights<br>1313 North Market St.<br>Wilmington, DE 19801<br>Email: usade.ecfbankruptcy@usdoj.gov | Paul Hastings LLP<br>Attn: G. Alexander Bongartz and Derek Cash<br>200 Park Avenue<br>New York, NY 10166<br>Email: alexbongartz@paulhastings.com<br>Email: derekcash@paulhastings.com |
| **VIA FIRST CLASS MAIL**<br>US EPA Region 3<br>Office Of Reg. Counsel<br>1650 Arch St.<br>Philadelphia, PA 19103 | Saul Ewing Arnstein & Lehr LLP<br>Attn: Mark Minuti<br>1201 North Market St., Suite 2300<br>P.O. Box 1266<br>Wilmington, DE 19899<br>Email: mark.minuti@saul.com | **VIA FIRST CLASS MAIL**<br>Social Security Administration<br>Office of The Gen. Counsel Region 3<br>300 Spring Garden St.<br>Philadelphia, PA 19123 |
| Uphold, Inc.<br>Attn: JP Thieriot<br>900 Larkspur Landing Circle<br>Suite 209<br>Larkspur, CA 94939<br>Email: jp.thieriot@uphold.com | Fox Rothschild LLP<br>Attn: Keith C. Owens<br>10250 Constellation Blvd., Suite 900<br>Los Angeles, CA 90067<br>Email: kowens@foxrothschild.com | Fox Rothschild LLP<br>Attn: Seth A. Niederman<br>919 North Market Street<br>Wilmington, DE 19899<br>Email: sniederman@foxrothschild.com |

| Connolly Gallagher LLP<br>Attn: Karen C. Bifferato<br>1201 N. Market Street, 20th Floor<br>Wilmington, DE 19801<br>Email:<br>kbifferato@connollygallagher.com | Archer & Greiner, P.C.<br>Attn: Alan M. Root<br>300 Delaware Ave, Suite 1100<br>Wilmington, DE 19801<br>Email: aroot@archerlaw.com | Foley & Lardner LLP<br>Attn: Joanne Molinaro and Geoffrey S. Goodman<br>321 N. Clark Street, Suite 300<br>Chicago, IL 60654<br>Email: jmolinaro@foley.com<br>Email: ggoodman@foley.com |
|---|---|---|