# EXHIBIT U

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CRED INC., *et al.*, | Case No. 20-12836 (JTD) |
| Debtors.[1] | (Jointly Administered) |
| | Related to Docket No. 356 |
| CRED INC. LIQUIDATION TRUST, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 22-_____ (JTD) |
| EARNITY, INC., EARNITY FINANCIAL, INC., EARNITY FINANCIAL INC., ET TRADER, INC. and DOMENIC CAROSA, | |
| Defendants. | |

## COMPLAINT

The Cred Inc. Liquidation Trust (the "Trust") established in the above-captioned Chapter 11 cases (the "Chapter 11 Cases") of Cred Inc. and its affiliated debtors (collectively, the "Debtors" or "Cred"), by and through its undersigned counsel, files this complaint against Defendants Earnity, Inc. ("Earnity"), Earnity Financial, Inc. (a Delaware corporation) ("Earnity Financial"), Earnity Financial, Inc. (a Florida corporation) ("Earnity Financial (FL)"), and ET Trader, Inc. ("ET Trader") (collectively, the "Earnity Defendants"), and Domenic Carosa ("Carosa") (together with the Earnity Defendants, "Defendants") and alleges as follows:

---

[1] The Debtors in the Chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

## INTRODUCTION

1.      Knowing that Cred's bankruptcy was near, Carosa and Cred's most senior management stole a new business line that Cred's senior executives and technical staff had been creating for Cred. They planned to implement the work-in-progress decentralized and centralized finance platform by stealing Cred's intellectual property and hiring its most senior employees to continue work and launching the platform at their own company, which would later become Earnity. ████████████████████████████████████████████

████████████████████████. As senior Cred executives described in an internal email on October 26, 2020, they planned to "rename or create [a] new company" by "keeping the "remaining team (and likely current investors)" and emphasized that "*the key will be segregating all of the unnecessary, risky, and unwanted parts of the company away from everything we want to keep*."[2] With Cred on the brink of bankruptcy, former CEO Dan Schatt was planning his exit with his inner circle to start a new company—Earnity—that would use what he called the "secret sauce" they had been creating at Cred:[3]

| |  |
|---|---|
| **To:** | Ray Ma[lma@mycred.io]; Daniel Goldstein[danny@mycred.io] |
| **Cc:** | Lu Hua[lu@mycred.io] |
| **From:** | Dan Schatt[dan@mycred.io] |
| **Sent:** | Thur 9/24/2020 10:58:09 PM (UTC-04:00) |
| **Subject:** | Re: A bit of thinking around DeFi |

Hi Ray – absolutely we should add all stablecoins!

Regarding the platform, we will start offering higher fixed rates than CeFi or DeFi because we have found a way to combine the earnings, which will be our secret sauce! Get ready to attract back all our users!!

Dan

2.      During the months leading up to Cred's bankruptcy, Cred's management team was fully aware of Cred's growing financial difficulties. Cred suffered massive trading losses in March

---

[2] Exhibit A (emphasis added).

[3] Exhibit B.

2020 and there was little, if any, hope that Cred was ever going to be repaid the tens of millions of dollars' worth of cryptocurrency ("crypto," defined below) that Cred was owed in outstanding loans. As its debts and losses mounted, Cred faced a severe liquidity crisis. But Cred was not yet finished, and its management team was looking for ways that it could pull Cred out of its tailspin. To that end, Cred was quietly working on a new plan to re-invent its business—which, if successful, could turn Cred around and make the company a leader in the digital asset industry.

3.      Cred invested company time and resources into developing this new business platform, which was called "Cred 2.0" which was referred to internally as a "billion-dollar opportunity" for the company. The plan was to create a social media-focused crypto investment platform that would make it easy for retail investors to participate in various forms of crypto investing. These included yield-earning opportunities in the form of loans (as part of Cred's "centralized finance" or "CeFi" (defined below) offerings), as well as more complex "staking" transactions and other opportunities built around "decentralized finance" or "DeFi" (defined below). The business would be a retail-focused "CeFi/DeFi router" that would drive crypto investors to innovative yield-earning and trading opportunities that were previously inaccessible to typical retail investors. But while Cred was busy developing "Cred 2.0", Cred's financial situation continued to deteriorate.

4.      When it became clear that bankruptcy was inevitable, Cred's plan was to focus on restructuring the company so that it could emerge from bankruptcy centered around the new platform it was developing. However, Cred's senior executives—including Chief Executive Officer ("CEO") Dan Schatt ("Schatt"), Chief Financial Officer ("CFO") Joseph Podulka ("Podulka"), and Chief Technology Officer ("CTO") Daniel ("Danny") Goldstein ("Goldstein")—had other ideas. They wanted to take Cred's new platform for themselves.

5.      By the time Cred declared bankruptcy on November 7, 2020, Schatt, Podulka, and Goldstein had agreed on a plan to take Cred 2.0 and start a new company of their own.  Schatt, Podulka and Goldstein started by recruiting key Cred employees (mostly product developers and engineers) who were already working on Cred 2.0 to join them in their new venture.  They needed these employees to identify and extract Cred's software, hardware, programming tools and data, branding and marketing designs, and other highly confidential and proprietary information that they would need to complete Cred 2.0 at their new company.

6.      But Cred's senior management team could not loot Cred and launch Cred 2.0 alone.  That is where Carosa, Earnity's other co-founder, came into play.  Carosa is the founder of Banxa Holdings, Inc. ("Banxa"), a fiat-to-cryptocurrency payment processing company.   He was first introduced to Schatt by Cred's restructuring mergers and acquisitions ("M&A") advisor after identifying Banxa as a potential buyer for Cred.  Schatt and Carosa took an immediate liking to each other and were soon communicating privately about "Cred 2.0."  Instead of having Banxa buy Cred, Carosa joined Schatt and his co-conspirators' plan to steal "Cred 2.0" without paying a penny to Cred.

7.      Carosa and Schatt both knew that Banxa was not going to purchase Cred.  Yet Banxa engaged in negotiations with Cred and its advisors for months under that pretense.  These protracted "negotiations" served two purposes.  *First*, they gave Goldstein's team of developers and programmers additional time and use of Cred's limited resources to continue their work on the platform they were supposed to be building for Cred.  *Second*, they gave Carosa and his team time to mine Cred's data room for key intellectual property ("IP") and other proprietary information that would be used to continue building Cred 2.0 at the new companies that would become the Earnity Defendants.

8.      Then, with Carosa's assistance, Goldstein and his team of Cred employees used the additional time that Banxa's sham proposal gave them to retrieve everything that would be of value to the new company.  When Goldstein and his team were finally laid off in mid-January 2021, Goldstein and Carosa sent Schatt instructions to steal the remaining items they needed to continue building Cred 2.0 elsewhere.  This material included hardware that Goldstein described as "must-have", customer lists and other data that Carosa had seen from Cred's data room, as well as information technology ("IT") equipment and other tangible assets that Goldstein wanted. ███

████████████████████████████████████████████████████████████████████[4]

9.      As part of the liquidation of Cred's assets, Carosa—without disclosing his affiliation with Cred's senior management—████████████████████████████████

████████████████████████████.  ████████████████████████████,

Cred's former executives and Carosa took great pains to operate in secret, even directing a technical consultant hired by the Trust not to disclose his involvement with the new entity to the Trust.  Using Cred's intellectual property, employees, and equipment, Earnity launched on March 5, 2021, and raised in excess of $16 million using the "Cred 2.0" business model that Cred had developed in the months prior to its bankruptcy filing.

10.      ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[4] Exhibit C.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

11.     Earnity was built using resources and property paid for and developed by Cred. Schatt, Podulka, Goldstein, Carosa and their team of former Cred employees stole this confidential and proprietary information from Cred after Cred filed for bankruptcy but before the former Cred management team was laid off.

12.     ████████████████████████████████, Earnity is now operating the social media/CeFi-DeFi Router platform (defined below) that was created and developed by Cred and its employees, for Cred and using Cred's limited resources. Defendants have raised millions of dollars in outside investment by pitching the same business concept that Cred conceived in early 2020 and invested precious company time and resources developing while it was on the verge of bankruptcy.

13.     Defendants have benefited and will continue to benefit from the same confidential and proprietary information, including trade secrets, that former Cred executives, employees, and their co-conspirators stole from Cred.  Because these assets are property that belong to Cred's estate and that should and would have inured to the benefit of Cred and its creditors had they not been wrongfully misappropriated, the Trust brings this action to recover them.

## PARTIES

14.     The Trust was created pursuant to the *Modified First Amended Combined Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code* (D.I. 629-1) (as amended, the "Plan"), which this Court confirmed on March 11, 2021.  The Plan became effective on April 19, 2021 (D.I.  730), whereupon the Debtors' assets were transferred and assigned to the Trust. (*See* Plan § 12.3.)  The Trust is being administered by the Liquidation Trustees (as defined in the Plan).  (*See id.* § 12.3(a).)

15.     Defendant Earnity is a corporation organized under Delaware law with its principal place of business located at 3 East Third Avenue, Suite 200 in San Mateo, California.  Earnity was first incorporated as Earn Blockchain Holdings Inc. on February 9, 2021, and changed its name to Earnity Inc. on March 5, 2021.  Earnity operates as a social media-based blockchain platform that offers retail customers a combination of "CeFi" and "DeFi" (both defined below) investment opportunities in which customers can lend, borrow, or trade directly in crypto and other digital assets.

16.     Defendant Earnity Financial is a corporation organized under Delaware law with its principal place of business located at 3 East Third Avenue, Suite 200 in San Mateo, California.  Earnity Financial was formed on July 25, 2021 as a wholly-owned subsidiary of Earnity, and provides centralized administrative services to Earnity, including facilitating customer transactions as a registered money transmitter.

17.     Defendant Earnity Financial (FL) is a corporation organized and incorporated under Florida law on October 19, 2021 with the same name as Earnity Financial.  Earnity Financial (FL) is based out of the same offices as Earnity and Earnity Financial, located at 3 East Third Avenue,

Suite 200 in San Mateo, California, and, upon information and belief, operates in the same capacity as Earnity Financial as a wholly-owned subsidiary of Earnity.

18.     Defendant ET Trader is a Delaware corporation with its principal place of business located at 3 East Third Avenue, Suite 200 in San Mateo, California. ET Trader was formed on July 2, 2021 as a wholly-owned subsidiary of Earnity to undertake the capital markets functions required to support Earnity's retail customer operations.

19.     Defendant Carosa is the other co-founder of the Earnity Defendants. Upon information and belief, Carosa is a citizen of Australia and resides in the Netherlands. Carosa serves as Chairman of Earnity's Board of Directors and, upon information and belief, holds a substantial ownership stake in Earnity. Carosa also is or has served as Earnity's President and CEO.

## RELEVANT NON-PARTIES

20.     Schatt is the co-founder and former CEO of Cred. Schatt became Cred's CEO in 2018 and resigned from that position in December 2020. Schatt owns 50% of Cred's equity. Shortly after Cred filed for bankruptcy in November 2020, Schatt co-founded Earnity in February 2021. He is currently Earnity's majority shareholder and the CEO of each of the Earnity Defendants.

21.     Podulka was Cred's CFO from July 2019 to December 2020, where he oversaw Cred's corporate cash management and the expenses incurred by Cred Capital. On June 29, 2020, Podulka became a member of Cred Capital's board of directors. Shortly before Cred filed for bankruptcy in November 2020, Podulka and Schatt began building the team of Cred executives and employees who would go on to found the Earnity Defendants. Upon formation of the Earnity

Defendants, Podulka became the CFO of each Earnity Defendant and continues to serve in that capacity.

22.    Goldstein served as Cred's CTO from April 2020 to January 2021, where he was hired to develop a new platform and product for Cred. Prior to Cred's bankruptcy filing on November 7, 2020, Goldstein was recruited by Schatt and Podulka to be the CTO of the new company they were planning to form in the aftermath of Cred's bankruptcy, which later became Earnity. Goldstein currently serves as CTO for each of the Earnity Defendants.

23.    Daniel Hummer ("Hummer") is Earnity's Director of IT. Hummer previously served as Cred's Director of IT from November 2019 until January 2020, where he worked on developing Cred's new platform. Hummer worked as a consultant during the Trust during Cred's liquidation. Like Goldstein, Hummer was recruited by Schatt and Podulka to join the company that would later become Earnity prior to Cred's bankruptcy filing, and was hired by Earnity after its formation in February 2021.

24.    Daniyal Inamullah ("Inamullah") served as Cred's Vice President of Capital Markets from January 2020 to April 2020. In that role, Inamullah was responsible for seeking investment opportunities, conducting due diligence, and proposing investments to Cred's "investment committee." Inamullah was also recruited by Schatt and Podulka to join Earnity's future executive team, but declined their overtures.

## RELEVANT TERMS AND DEFINITIONS

25.    The term "crypto" or "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," "digital assets," "coins," and "tokens." Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay. Most

customers purchase cryptocurrency speculating that the price of that particular cryptocurrency will increase. Some cryptocurrencies are also used to buy goods and services. Bitcoin ("BTC") and Ethereum ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other cryptocurrencies.

26. A "blockchain" is an open-sourced string of code which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency.

27. A crypto exchange ("exchange") is a marketplace where users buy and sell cryptocurrencies. Many exchanges are designed to be user friendly. Although exchanges are not necessary to buy and sell crypto, exchanges are the most popular mechanism for retail customers to buy and sell crypto.

28. Centralized finance, or "CeFi", is a term that has been used in the crypto industry to describe yield earning and lending opportunities with third parties. The term "centralized" generally refers to a company or entity to which an investor lends its crypto in exchange for interest payments. That "centralized" entity often relends that crypto or engages in proprietary crypto trading to earn a yield in excess of that owed to its customers. By way of example, Cred was a CeFi platform. Crypto investors who participate in CeFi platforms assume credit risk of the centralized entity offering the platform as well as the CeFi platform's borrowers. Like many terms in the crypto industry, different market participants ascribe different meanings. But for purposes of this complaint, CeFi will be defined in accordance with this paragraph.

29. Decentralized finance, or "DeFi" is a term that is used in the crypto industry to describe offerings in which crypto investors earn yield by "staking" or other automated "smart contracts." "Smart contracts" underly every crypto and can also be set up to automate payments or rewards. The terms of a smart contract are implemented on the blockchain and will self-execute

when certain conditions are met.  In DeFi, Crypto investors "stake" or "post" their crypto into smart contracts that define the terms by which staking rewards will be paid.  Usually, the crypto is "staked" for a specified period of time after which the investor will be automatically repaid its crypto plus rewards.  In effect, the rewards are newly created crypto and so there is no counterparty that must pay interest.  The key difference between DeFi and CeFi is that in DeFi (if done correctly) the investor does not incur credit risk because the DeFi opportunity will pay rewards automatically pursuant to the automated smart contract.  DeFi is one term in the crypto industry that is often misused and many projects or opportunities are referred to as being "DeFi," when they are actually better described as CeFi.

30.     A "CeFi/DeFi Router" is a website or other application that directs crypto investors to various CeFi and DeFi opportunities and assists in facilitating those investments. The CeFi/DeFi Router creates a marketplace where crypto investors can choose which CeFi or DeFi opportunities to invest, usually with some direction, information, and marketing proliferated by the CeFi/DeFi router.

## JURISDICTION AND VENUE

31.     This Court has original jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because it arises under Title 11 of the United States Code (the "Bankruptcy Code") and relates to cases under the Bankruptcy Code pursuant to 28 U.S.C. §§ 157 and 1334(b).  This adversary proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter final orders for matters contained herein.

32.     In accordance with Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"),

the Trust confirms its consent to the entry of a final order or judgment by the Court in connection with this adversary proceeding to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

33.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## **BACKGROUND**

### A.     **Cred's Crypto Lending Platform Leads To Significant Financial Problems**

34.     Schatt and Lu Hua ("<u>Hua</u>") co-founded Cred in 2018 as a crypto "yield earning" platform.[5]  Under this business model, Cred's customers lent crypto to Cred through a program called "CredEarn", in which Cred agreed to repay its customers the loaned crypto, plus interest.

35.     Cred used approximately 90% of the crypto Cred received from its customers to make secondary loans to MoKredit, a Chinese lending company owned by Hua (Cred's 50% owner and co-founder).[6]  MoKredit was in the business of making unsecured and uninsured micro-loans ranging from RMB10 ($1.45 USD) to RMB1000 ($145 USD) to young, low-income videogamers in China with no credit history.  These micro-loans were funded by the crypto Cred loaned to MoKredit.

---

[5] Schatt and Hua initially established an entity named "Libra Credit" in Singapore, which later became known as "Cyber Quantum Pte. Ltd."  On May 14, 2018, Schatt and Hua organized "Libra Credit (US) LLC," in Delaware, which changed its name to "Cred LLC" in August 2018.  On May 13, 2020, Cred LLC converted to Cred Inc.

[6] The entities comprising the defined term MoKredit are MoKredit Inc., MoKredit Technology (Hong Kong) Company Limited, MoKredit (Shanghai) Information Technology, Co. Ltd, and Shanghai Bestone Information Technology Co. Ltd.  They are collectively referred to herein as "<u>MoKredit</u>.")

36.     Given the unsecured nature of MoKredit's micro-loans, Cred's reliance on MoKredit exposed Cred to substantial risk.  MoKredit also consistently failed to repay the principal on its outstanding loans from Cred.

37.     In addition to the risk of MoKredit defaulting, MoKredit would accept only stablecoin from Cred.[7]  Because Cred was obligated to repay its customers' loans in BTC, ETH, and other cryptocurrencies (plus interest), Cred assumed a significant risk of loss if BTC and/or other cryptocurrencies increased in value before Cred could repay its obligations.

38.     To mitigate this risk, Cred hired a trading firm (the "Trading Firm") to design and execute a hedging strategy that would protect Cred against the risk that the price of BTC and other crypto would increase.  Despite this mandate, the Trading Firm executed an extremely risky trading strategy that was completely unsuitable for Cred's needs.

39.     This strategy failed.  In just one night, on March 12, 2020, the price of BTC plummeted and Cred lost hundreds of millions of dollars' worth of crypto as a result of the overleveraged positions that the Trading Firm has established for Cred.  These losses depleted Cred's balance sheet and completely eliminated its hedging positions.  Cred was left with naked exposure to tens of millions of dollars in additional losses if and when the price of BTC and other crypto again increased in value.

40.     Cred faced a severe liquidity crisis in the wake of its March 12, 2020 trading losses and lacked the cash or crypto to re-establish its hedging positions and avoid further losses.

41.     On April 5, 2020, Cred's Vice President of Capital Markets, Inamullah, prepared a memorandum listing Cred's remaining sources of liquidity:  (i) approximately $350,000 in cash

---

[7] "Stablecoin" is cryptocurrency that is supposed to be identical in value to a fiat currency, usually, and, as in this case, the U.S. dollar.

on the balance sheet; (ii) loans from its portfolio amounting to approximately $2 million; (iii) revenue from generating net interest margin from its loan portfolio amounting to approximately $700,000 to $1 million; and (iv) additional contributions that would come from new CredEarn customer deposits.[8]   With few options left, the vast majority of Cred's "liquidity recovery strategy" hinged upon receiving more than $8 million in loan repayments from MoKredit in the immediate future.

42.     ██████████████.[9] As a result, Cred's financial situation became increasingly dire.  On June 1, 2020, Schatt circulated a memorandum to his management team stating that: (1) "Cred's current liabilities exceeded its invested assets and current assets by approximately $19.5 million or 19% of the total principal balance of liabilities"; and (2) that "Cred does not have the capacity to repay the full liabilities if assets were liquidated today[.]"[10]

43.     With little, if any, chance of being repaid by MoKredit, Cred's only option was to seek funding from outside investors.  On or around June 10, 2020, Schatt and other executives announced that Cred was seeking its first round of capital and began reaching out to potential investors.[11]  These efforts led to multiple conversations between Cred's management team and a number of prospective investors throughout the summer of 2020.

44.     In July 2020, Cred struck a deal with Dragonfly Capital LLC ("Dragonfly") whereby Dragonfly would be the lead investor for a round of convertible notes.  These funds provided a lifeline to the Company to keep it afloat.

---

[8] Exhibit D.
[9] Transcript of December 8, 2020 Deposition of Daniyal Inamullah ("Inamullah Dep.") at 222.
[10] Exhibit E.
[11] Exhibit F.

45.     At the same time, however, Cred executives were quietly working on a plan that would re-invent Cred's entire business—which, if successful, could turn the company around and make Cred an industry-wide leader in blockchain-based financial services.

**B.     Cred Develops Cred 2.0**

46.     In or around the first quarter of 2020, Cred's executive team began to formulate an idea referred to internally as "Cred 2.0."  At the time, Cred offered only CeFi investment products to customers through its third-party lending-based yield earning platform.  Cred 2.0 would turn Cred into a CeFi-Defi Router with the ability to not only direct its customers' crypto to traditional counterparty loans, but also blockchain-validated DeFi yield-earning transactions.

47.     This plan would allow Cred to expand its services and revenue base by combining its crypto lending business with a platform that would offer retail customers a wide variety of CeFi and DeFi investment products where customers could lend, borrow, or trade their crypto and other digital assets.  The goal for Cred 2.0 was to make Cred a one-stop shop that would direct customers from traditional blockchain-based CeFi investment products (which would remain available) to new opportunities in the rapidly-expanding market for DeFi products in the digital asset space.

48.     In addition to this core concept, these plans focused on incorporating several other key elements into Cred's new platform.  One was to develop Cred's trading infrastructure to facilitate bilateral trades (as opposed to loans) and other transactions involving digital assets that customers could easily access.  Another was to incorporate a social media element into Cred's new product where users could share, follow and interact with each other while trading and transacting on Cred's platform.

49.     Prior to founding Cred, Schatt had worked at a company called Stockpile that allowed customers to purchase and transact with gift cards or tokens representing fractionalized shares of publicly traded companies that could be shared with or gifted to other users.  Schatt

wanted to incorporate a similar user-to-user token or gift card function into a product that Cred could offer customers separately from its yield earning platform.

50.     To lead the project, Schatt hired Goldstein as Cred's CTO in April 2020.  Goldstein had previously served as an executive at Western Union, Symantec, and Emergent Technology. In that last role, Goldstein led the development of Emergent Technology's G-Coin digital token, a digital certificate of title to "responsibly-sourced" gold, which customers could trade as an investment or use to make payments.

51.     Schatt also recruited Don Kingsborough ("Kingsborough"), a high-profile fintech and retail entrepreneur, to join Cred as a Senior Advisor in March 2020.  Like Goldstein, Kingsborough added experience and know-how to the team tasked with building Cred's new business platform through his executive and operational roles at the intersection of retail, technology and fintech.

52.     Transforming Cred into a combined CeFi-DeFi Router was a priority for Cred's executive team.  It also was a relatively novel idea at the time to create a single social media-based platform that would allow customers access to the full spectrum of CeFi and DeFi investment opportunities for their crypto and other digital assets.

53.     Presentations from the weekly "Cred All Hands" meetings from May 2020 onwards demonstrate that Cred was ramping up development of this new platform and discussing "Cred 2.0" regularly.

54.     Likewise, emails from Schatt and other Cred executives in late June 2020 show that Cred was discussing a move towards DeFi-focused products with prospective investors as part of its plan to offer both CeFi and DeFi optionality on a single platform.  Kevin Hu, the head of "Liquid Strategies" at Dragonfly agreed with Schatt in a June 28, 2020 email that ███████████

████████████████████████████████████████████

████████████████████████████████ [12]

55.     By early July 2020, internal memoranda and draft marketing emails show that Cred was planning a "New Product Announcement" in late 2020 or early 2021,[13] and was clearly investing company time and assets into developing this new business line.

56.     On July 2, 2020, Inamullah circulated a memorandum titled "Cred Strategy" to Schatt, Podulka, and another member of Cred's senior management team "to help with ideation for go-forward strategy."[14] The "Strategy Overview" section of this memorandum outlined a plan for a "three phased roadmap to growth":

**Strategy Overview**

*Conduct a three phased roadmap to growth*

**Stage 1: Balance sheet / team strengthening**
Core tenets:
 - Focus on fee-based services
 - Minimize balance sheet restrictive operations
 - Increase product diversity for direct sales force execution

**Stage 2: Technology stack and product differentiation**
Core tenets:
 - Cred 2.0 API integrations
 - Build tech sales force
 - DeFi integrations (need engineers)
 - Payments

**Stage 3: Expansion**
Core tenets:
 - Revisit securitization
 - Project / developer finance (VC)

---

[12] Exhibit G.
[13] Exhibit H.
[14] Exhibit I.

57.     As part of this "roadmap to growth", the memorandum detailed a number of "New Product Concepts" in development as of July 2, 2020, including:   (1) Private Debt; (2) Money Markets; (3) Fund Management; (4) Private Wealth Management; (5) DeFi-related Staking Partnerships; (6) Gold Product Ideation; and (7) Celebrity NFTs.[15]  All of these concepts reflect the expanded CeFi-to-DeFi "gateway" that Cred was developing as its future business.

58.     On July 20, 2020, Cred's CTO, Goldstein, created a new Slack Messaging channel for a group of Cred developers and engineers which he called the "cred-10c-platform" team. The term "10c" refers to the Polish-based blockchain and Fintech software development company 10Clouds, S.P. Z.O.O. ("10Clouds"), which Cred had hired in March 2020 to help design the new platform that Cred was developing.[16]  The new Slack channel shows that Cred had started hiring the developers and engineers that were needed to build it.

59.     Schatt was also reaching out to his former colleagues at PayPal for long-term funding to develop Cred's new platform.  On July 29, 2020, Schatt introduced Jeremy Jonker, head of PayPal Ventures, to his contacts at Dragonfly, noting that Cred had "lots of commercial possibilities….just a longer timeframe to implement…."[17]

60.     In August 2020, Schatt and his executive team prepared a "Cred Investor Presentation for Q3 2020" that incorporated several of the concepts described in Inamullah's strategy memorandum into business plans that were being pitched to Dragonfly and other prospective investors.  These concepts included initiatives for Cred to launch "payment cards, trading and market operations, [and] Defi services" as new products in the first quarter of 2021.[18]

---

[15] *Id*.
[16] Exhibit J.
[17] Exhibit K.
[18] Exhibit L at 8.



61. Cred's last-minute fundraising drive to secure critically needed funds in the wake of Cred's massive trading losses in March 2020 and MoKredit's subsequent default had achieved some small success by August 2020. Dragonfly had signed on to lead the first funding round, joined by several other blockchain and digital asset-focused investment firms.[19]

62. The funding Cred was able to obtain from these investors was due in large part to Cred's plan to reinvent its business into a CeFi-DeFi Routing platform. Investors were interested in the wide-range of services that Cred's new business model would offer. Schatt summarized the pitch for Cred 2.0 in an August 27, 2020 message he sent to members of Cred's creative and marketing teams:[20]

---

[19] Exhibit M.
[20] Exhibit N.

Dan Schatt <dan@mycred.io>                                          8/27/2020, 7:00 PM

1. We allow you to earn where you are most comfortable – your favorite wallet, exchange, or even NBA player 😊
2. Want to mix and match between crypto and fiat? Give us your crypto and we'll give you USD interest, or vice versa! We're highly versatile, across 30+ assets!
3. Interested in going into new asset classes? Cred is the only company offering interest on gold tokens!
4. Want to borrow at single digit rates? If you have some crypto, it's very easy with Cred!
5. Are you located in a country that doesn't have very good financial services? We're in 190 countries!
6. Are you interested in compounding your interest to make your money work even harder? We can help!
7. Do you have a new token that you'd like to borrow against or earn? We can probably help!
8. Interested in purchasing crypto? Coming soon!
9. Interested in spending a line of credit against your crypto? Coming soon!
10. Interested in taking advantage of cefi AND defi opportunities all in one place? Coming soon!

👍 1 · Nicole Skillern

63.     By September 2020, however, Cred had secured only $2 million in cash from its fundraising drive.[21]  These funds were hardly sufficient to overcome the severe liquidity crisis that Cred was still experiencing following its March 2020 trading losses (in addition to other financial losses).  That was in part because Cred allocated a significant portion of the money it raised to hiring more developers to build out its new combined CeFi-DeFi platform.[22]

64.     Despite Cred's financial constraints, Schatt and his executive team continued to prioritize the development of a new CeFi-DeFi platform in the months that followed.  Schatt stated as one of his four main points in a September 6, 2020 "Strategy" message to Podulka, Inamullah, and Maxim Rokhline ("Rokhline"), Cred's Chief Product Officer, that "DeFi is exploding…and *we'll want to position ourselves as a company that can act as a gateway to CeFi and DeFi services*, in terms of our allocations, [] liquidity, and in our future consumer interface."[23]

65.     By mid-September 2020, Cred was moving closer to making "Cred 2.0" a reality.

██████████████████████████████████████████████████████████████

████████████ [24] ████████████████████████████████████████████

---

[21] Exhibit O.

[22] *See id.*

[23] Exhibit P (emphasis added).

[24] Exhibit Q.



.[25]

"[26]

66.    Schatt outlined Cred's plans to begin incorporating DeFi investment options and other diversified products that were part of Cred 2.0 in a September 21, 2020 email to Hua, Goldstein, Rokhline, and Inamullah.[27]  In response to a message that Cred developer Ray Ma ("Ma") had sent Schatt with DeFi-related ideas for Cred to consider, Schatt wrote:

> Thanks for your email, we've been doing LOTs of thinking on this topic, and I'm glad you are involved in helping us lead the charge to do much more in DeFi!
>
> Here's the current thinking:
>
> Phase 0: Start accepting DeFi tokens through our institutional channels, and allocating these to DeFi projects through our asset managers
>
> Phase 1: Retail: Begin supporting key DeFi tokens including Algo, Tezos, Compound, Curve, Yearn
>
> Phase 2: Become a staking node / allocate to DeFi projects directly through Cred / investigate insurance capabilities on DeFi / extend credit card purchasing to DeFi tokens
>
> Phase 3: Retail interface: Offer customers the choice of DeFi vs. CeFi from one interface
>
> We're looking forward to working with you to figure this all out! We'll plan to start setting up some regular meetings soon to make progress!

67.    Later in the thread, Schatt discussed his plans for the new platform—stating that "we will start offering higher fixed rates than CeFi or Defi because we have found a way to combine the earnings, *which will be our secret sauce*!"[28]

---

[25] Exhibit R; Exhibit S.

[26] Exhibit T.

[27] Exhibit U.

[28] Exhibit B (emphasis added).

To:     Ray Ma[lma@mycred.io]; Daniel Goldstein[danny@mycred.io]
Cc:     Lu Hua[lu@mycred.io]
From:   Dan Schatt[dan@mycred.io]
Sent:   Thur 9/24/2020 10:58:09 PM (UTC-04:00)
Subject: Re: A bit of thinking around DeFi

Hi Ray – absolutely we should add all stablecoins!

Regarding the platform, we will start offering higher fixed rates than CeFi or DeFi because we have found a way to combine the earnings, which will be our secret sauce!  Get ready to attract back all our users!!

Dan

68.     Goldstein followed up in response to additional suggestions from Ma later on the chain, writing in a September 24, 2020 email:[29]

good analysis. the points you bring are in all of our minds and we have almost daily discussions on the subject. We started to assemble a "brain trust" of internal and external contributors to chart the path forward. I am creating a slack channel for us to chat on this subject.

Danny

69.     The next day, Goldstein invited Schatt, Hummer, Inamullah, Ma, and another software developer to a new Slack channel called "Cred-DeFi."[30]  They later added others who would play critical roles in Earnity's growth and development to this Slack channel, including fundraising consultant Miroshnik.[31]

70.     Cred's executives continued advertising Cred's new strategy to potential business partners.  On September 24, 2020, Schatt told the head of corporate development at Ripple, a leading provider of crypto solutions for businesses (and a potential source of financing for Cred), that Cred was "Rolling out DeFi+CeFi strategy next month! (hint—combines the best of both)."[32]

---

[29] Exhibit V.
[30] Exhibit W.
[31] Exhibit X; Exhibit Y.
[32] Exhibit Z.

71.     Cred maintained its focus on the new CeFi- DeFi "gateway" that it was developing through September and into mid-October 2020.   Discussion took place at weekly "Innovation Meetings", "All Hands" meetings, and on multiple Slack Messaging channels where the concepts and supporting software and coding for the new platform were regularly shared and discussed internally with Cred's management and developer teams.

72.     But Cred's financial situation remained dire.  It was unlikely that MoKredit was going to repay Cred for the vast majority of the $38 million that had been outstanding for many months and by October 2020 Cred's fundraising efforts had yielded a total of only $2.65 million.[33]

73.     It was by now apparent that Cred would have to file for bankruptcy protection. Cred's plan at the time was to focus on restructuring the company so that it could emerge from bankruptcy centered around the new CeFi-DeFi platform Cred had been developing.  However, Schatt and Podulka had other ideas.

## C.     Schatt And Podulka Conspire To Steal Cred's New Platform

74.     Throughout its development, Schatt avoided disclosing any specific details or creating a clear paper trail about Cred's new "billion-dollar opportunity".  Schatt preferred to hold discussions about the new platform on phone calls or at in-person meetings and generally did not circulate memoranda or presentations discussing the plan to reinvent the company.

75.     The reason for this practice is now clear: Schatt knew that Cred was in deep financial trouble.  He wanted to save the idea that Cred had developed on Cred's time, with Cred's resources, Cred's employees, and Cred's know-how for himself when Cred went under.

76.     But Schatt was not the only one on Cred's management team who was quietly planning to steal the "Cred 2.0" platform that Cred had been building over the past year.  Cred's

---

[33] Exhibit AA.

CFO, Joe Podulka, had exactly the same idea. The same day Cred's counsel advised Schatt and Podulka to prepare for Cred's imminent bankruptcy, Podulka shared his plan to start a new company with the product Cred had been developing in an October 25, 2020 email to Schatt:[34]

---

On Oct 25, 2020, at 10:01 PM, Joe Podulka <joe@mycred.io> wrote:

Hi Dan.

I have most of this stuff and can put in a folder or share directly over email tomorrow.

I also had an idea about keeping the company alive. Assuming Chapter 11 is a possibility, I think the objective should be to select the non-balance sheet elements of the company that could possibly grow into a stand-alone business. Maybe products like Amun, payments for buying/selling crypto, other things Product and Engineering are building today. This way, the focus could be on closing CredEarn and CredBorrow, but coming away with a leaner company and hopefully some start-up capital to focus on areas of Cred we've been working on lately. If we're able to make progress on these items over the next 90 days, there may be a company to operate in 2021.

One key will be communicating with employees and investors that the company is not ending, but pivoting. We'll need to communicate that we're pivoting away from a risky balance sheet business and into a more stable and sustainable one.

Joe

---

77.     Schatt wrote back: "*Really great thoughts, agree wholeheartedly*."[35] Podulka followed up later that night with more thoughts on the plan—including calling the new company "CreDeFi", listing which Cred employees to take with them, and emphasizing that the key to their success would be "*segregating all of the unnecessary, risky, and unwanted parts of the company away from everything we want to keep*."[36]

---

[34] Exhibit A.
[35] *Id*.
[36] *Id*.

---

To: Dan Schatt[dan@mycred.io]
From: Joe Podulka[joe@mycred.io]
Sent: Mon 10/26/2020 2:21:38 AM (UTC-04:00)
Subject: RE: Cred Follow-up

We could rename or create new company 'CreDeFi' and probably raise capital just on the name **

I also have some ideas about reducing staff, as we would no longer need anyone working on bringing in Cred Earn money, liquidity, or supporting Uphold/Retail.

- No Randy, Travis, Michael, Devon, Delon, Colin. Would close the LA (and SM) office as part of bankruptcy and be fully remote.
- No Megan (only would need Min for BD/Marketing)
- No Poland or Shanghai. Danny could use the local engineering team to support current initiatives. Maybe Amit goes.
- Maybe no Jonathan or Nicole (and contractors) depending on future projects.
- Maybe no Addy if D could and would be willing to manage Amun and similar initiatives. Although depending on what we decide to pursue, having a #2 and an analyst in capital markets might be a good idea. Maybe we could work closer with and also be somewhat of a lead-gen for 1AV.
- Not sure what level Security would be required.
- Not sure about Product beyond Maxim and maybe Dhiraj
- Probably no AscaleX, although would likely need Pawan and Cristiane for sure through bankruptcy and likely after given they would manage reporting, account management, integration, customer service, etc.
- Could outsource Legal through PH and/or Scott (or similar)

All energy and resources would be dedicated to fee-based or revenue sharing products – nothing balance sheet related. I think the remaining team (and likely current investors) could rally around a more focused company. The key will be segregating all of the unnecessary, risky, and unwanted parts of the company away from everything we want to keep.

Joe

---

78.     This is the plan they would execute, but instead of "CreDeFi", they adopted the

name Carosa suggested for the new company and called it Earnity.

## D.     Cred's Executive Team Misallocated Resources Leading Up To Cred's Bankruptcy In Furtherance Of Their Scheme

79.     On November 7, 2020, just twelve days after Schatt and Podulka agreed to siphon

off the most promising and potentially lucrative parts of the company, Cred filed for Chapter 11

bankruptcy. By that time, Schatt and Podulka had already recruited a number of other Cred

executives, board members, and employees to join the team for the new company they intended to

form, including Cred's CTO, Goldstein.

80.     Two days later, Goldstein created a new Slack channel he named "Cred-2."[37] Goldstein invited Cred's top developers and software engineers, including the team that had been working with 10Clouds to develop Cred's new CeFi-DeFi platform.

81.     Several of the employees Goldstein recruited to join his "Cred-2" team were only recently hired by Cred: (i) Pawan Chawla ("Chawla"), a software developer hired on September 19, 2020; (ii) Maitri Kotak ("Kotak"), a business intelligence developer hired on October 6, 2020, (iii) Alex Zavodnik ("Zavodnik"), a programmer hired in mid-October 2020, and (iv) Christiane Ferreira ("Ferreira"), another programmer hired on October 12, 2020.

82.     For a company on the verge of bankruptcy, hiring software programmers and developers was a dubious decision. Both are highly-paid positions and generally cannot contribute anything in the short term to a company that needed cash to remain a going concern. Software programmers and developers are, however, essential to *start-up* companies like the one Schatt, Podulka, and Goldstein intended to create with the product that had been conceived and developed at Cred, for Cred, by Cred, and with Cred resources.[38]

83.     By using the outside funding that Cred had received to consolidate this team of new hires, who were immediately assigned to work with 10Clouds on the new CeFi-DeFi platform for Cred, Goldstein was already doing what Podulka had recommended to Schatt in his October 25-26, 2020 emails: "coming away with a leaner company and…[using] start-up capital to focus on areas of Cred we've been working on lately."

---

[37] Exhibit BB.

[38] Given the timing of these moves, it appears that Goldstein and Schatt had already been working in concert on a similar plan prior to Podulka's October 25-26 proposal.

84. As Cred's bankruptcy progressed through November 2020, it appeared less and less likely that Cred would be able to emerge from Chapter 11 as an independent company. Cred would either have to be sold or liquidated.

85. Keeping Cred's programmers and developers on its payroll (including some of its most recent hires) under these circumstances did not make sense. Yet that is exactly what Schatt, Podulka, Goldstein and others in on their scheme intended to do in order to continue developing the combined CeFi-DeFi platform they sought to take for themselves.

86. They soon found the perfect excuse for keeping these programmers and developers on staff even after it was clear that Cred itself was no longer viable: a sham sale to a purportedly willing counterparty who was in on their plan.

**E.    Cred's Proposed Sale To Banxa Was A Sham Used To Loot Cred Of Valuable Assets That Cred's Executives Would Use To Start Their New Company**

87. ██████████████████████████████████████████ ██████████████████████████████████.[39] ████████████████ ████████████████████████████████████████.[40]

88. One of the prospective buyers Teneo identified was Banxa, a Canadian publicly-traded fiat-to-crypto payment processing company founded in 2014 by Carosa.

89. A mutual contact introduced Teneo to Carosa on November 27, 2020 in connection with Cred's proposed sale.[41] Teneo arranged a meeting between Schatt and Carosa, where they took an immediate liking to each other. Soon Schatt and Carosa were privately communicating

---

[39] Exhibit CC.
[40] *Id*. at 7.
[41] Exhibit DD.

with each other about Cred 2.0, which was not advertised or described as a company asset in the Cred "Teaser" that Teneo sent Banxa and other prospective buyers.[42]

90.     On December 1, 2020, Carosa informed Teneo and Schatt that Banxa would be interested in submitting a "Stalking Horse" bid to acquire Cred.[43]  Carosa requested further information about Cred and specifically wanted access to Cred's key IP.[44] ███████████████

████████████████████████████████████████████████████████████████████

████████████████.[45]

91.     ████████████████████████████████████████████████████

████████████████████████[46]  Schatt and Podulka turned their full attention to their plan to misappropriate everything Cred had created and developed for its future business model. These assets included, above all, the programming IP, business plans and customer lists, and employees with past experience and know-how behind the new CeFi-DeFi routing platform that Cred had been developing as Cred 2.0.

92.     Carosa soon proved a willing participant in the scheme hatched by Schatt and Podulka. ████████████████████████████████████████████████

████████████.[47] ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████.

---

[42] Exhibit EE.
[43] Exhibit FF at 5-6.
[44] *Id.*
[45] *See* Exhibit DD at 2; Exhibit GG.
[46] Exhibit HH.
[47] Exhibit II.

93.     Like Schatt, Carosa did not want to create a paper trail showing his involvement in their scheme. ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████ [48]

████████████████████████████████████████████████████████████████████████

94.     ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████ [49] ████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████

---

[48] Exhibit RRR.
[49] Exhibit JJ; Exhibit KK; Exhibit LL.

95.   

96.

97.     Goldstein, Hummer, and their team of developers and engineers worked to build and retrieve anything that would be of value to the new company.  Goldstein's team continued these efforts right up until they were finally laid-off by Cred on January 15, 2021.

98.   

99.     Although he was no longer Cred's CEO, Schatt still had access to computers and other hardware and IT equipment in Cred's office.  Almost immediately after Goldstein and his

---

[50] Exhibit MM; Exhibit NN.
[51] *Id.*
[52] *See, e.g.*, Exhibit OO; Exhibit PP; Exhibit QQ.
[53] Exhibit RR.
[54] Exhibit SS.

30

team were let go, Goldstein sent Schatt instructions on which items they needed from Cred to continue work on the platform they had been building for Cred while still employed by Cred.

100.    At the same time, Carosa was also sending Schatt instructions on other items that they needed from Cred to continue developing its platform at their new company. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ [55]

101.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

102.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[55] Exhibit TT.

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████ (Emphasis added).

103. ████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████ █

███████████████████████████████████████

███████████████████████████.[57]

104. ████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████.[58]



---

[56] Exhibit UU.
[57] *Id*. at 2.
[58] Exhibit VV.

105.     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████.[59]

## F.     Schatt, Podulka, Goldstein, And Carosa Launch Earnity

106.     Having taken everything from Cred that they could, Schatt, Podulka, Goldstein, Carosa and the rest of their team were almost ready to complete the final stage of their plan: setting up Earnity.

107.     Through January 2021, Schatt and Carosa discussed the structure and composition of the new company's board and management team.     ████████████████████

████████████████████████████████████████████████

████████████████████████████.[60]

108.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████.[61]

109.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████.[62]

---

[59] *Id.*
[60] Exhibit WW.
[61] Exhibit XX.
[62] Exhibit YY.

[redacted].[68]

---

[63] *Id.*
[64] Exhibit ZZ; Exhibit AAA.
[65] Exhibit BBB.
[66] Exhibit CCC.
[67] Exhibit DDD.
[68] Exhibit EEE.



## G.     The Trust Uncovers Earnity

113.     For obvious reasons, Schatt, Podulka, Goldstein, Hummer, and Carosa tried to conceal Earnity from the Trust.  They failed.

114.     Most of Cred's IT equipment was secured by the Trust.  Along with Cred's office furniture and supplies, this equipment was placed in a storage unit near Cred's former offices in San Mateo, California, to await a sale as part of the liquidation of Cred's remaining assets.

115.     ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████[69] That same day, Hummer resigned as a consultant to the Trust and, upon

---

[69] Exhibit FFF.

information and belief, shortly thereafter began working exclusively for Earnity with Carosa and Schatt.

116. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████.

117. Hummer realized that Carosa had made a mistake. ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████[70]



118.    Hummer was right.   Although the Trust was not yet aware that Earnity was

Cred 2.0, ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████.[72]

---

[71] Exhibit HHH.
[72] Exhibit III.

119.



---

[73] Transcript of July 23, 2021 Deposition of Joseph J. Podulka ("Podulka Dep.") at 217.

[74] Podulka Dep. at 215-17 (emphasis added).

120.

121.



---



123.

124.

125.

126.

<sup></sup>

---

[77] Transcript of July 28, 2021 Deposition of Daniel Schatt at 269-71.
[78] Exhibit JJJ.



127.    The Trust and its counsel never received a response to this question.  However, the Trust had enough information by now to know that there was more to their story and that the answer was an inevitable "Yes."

128.    ████████████████████████████████████████████████

████████████████████████████   ██████████████████████████████

██████████████████████████████████████████████████████████

████████

129.    ████████████████████████████████████████████  the Trust served the Earnity Defendants with subpoenas pursuant to Bankruptcy Rule 2004 on August 12, 2021 (the "Subpoenas").  The Subpoenas sought information concerning Cred's property—including Cred's intellectual property—that may be in Earnity's possession, custody, or control.

130.    Although Earnity agreed to comply voluntarily with the Subpoenas the Trust served upon it, Earnity refused to produce any documents in response.  Rather, Earnity objected to the Subpoenas in their entirety and claimed that it did not possess responsive documents concerning Cred or Cred's property.

131.    Following repeated communications, discovery letters, and meet and confers, on December 2021, the Trust moved to compel the production of documents from Earnity.  After a

hearing in early January 2022, the Court ordered Earnity to comply with the Subpoenas' document requests. ███████████████████████████████████████████████████

████████ Earnity produced hundreds of responsive documents, many of which formed the basis for this Complaint.

## H.    Earnity Is "Cred 2.0"

132.    Earnity is based on and created from the platform that Cred developed prior to its bankruptcy filing in November 2020. ██████████████████████████████████████

██████████████████████████████████████████████████████████████,

Earnity uses the same mailing address (as well as a workspace located across the street).

133.    Earnity's team is and was largely composed of former Cred executives, advisors, and employees.  Earnity's counsel confirmed that, at a minimum, eight (8) former Cred employees work for Earnity and, upon information and belief, that number has since increased and includes, among others:   CEO Schatt, CFO Podulka, CTO Goldstein, senior advisor Kingsborough, IT Director Hummer, Security Director Marie Kacmarek, programmers and developers Chawla, Zavodnik, and Kotak, software engineers Joseph Lally and Joseph Liyana, creative director Nicole Skillern, senior accountant Han Ha, and senior product director Heidi Ng.

134.    Just like Cred 2.0, Earnity was built as a full-service CeFi-DeFi routing platform. It was specifically designed to provide a combination of traditional CeFi investment products— including customer-to-customer and third-party trading and lending transactions—that would direct customers to a variety of DeFi investment opportunities on a user-friendly blockchain platform that incorporated a social media element into its platform.  These are the same core elements of the platform that was intended to become "Cred 2.0".

135.    Internal memoranda describing Earnity's operations and product offerings only confirm this. ████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

136.   ██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

137.   Again, these functions reflect the same core elements that defined Cred 2.0 as a novel combination of CeFi and DeFi on a single easy-to-use platform. ██████████████

██████████████████████████████████████████████

---

[79] Exhibit KKK.
[80] Exhibit LLL.

████████████████████████████████████████████████████████

██████████████████████████████████████. [81]

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[81] *Compare* Exhibit I *with* Exhibit LLL.

138. ███████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████



139. ██████████████████████████████████████████

███████████████████████████████████████████████.[83]

These are among the core elements of the product and platform that were being developed by Cred executives and employees using Cred software for nearly an entire year before and up through Cred's bankruptcy filing in November 2020.

---

[82] Exhibit MMM.
[83] Exhibit NNN.

140.     Led by Schatt and Carosa, Earnity has built partnerships and obtained funding from investors by pitching the same business plans that were conceived and developed for and by Cred in 2020—namely, creating a blockchain-based platform to facilitate crypto investment opportunities for retail customers using social media.

141.     For example, on December 27, 2021, Schatt sent an email to Ault Global Holdings ("Ault Global"), a publicly-traded investment holding company. ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████.[84]



---

[84] Exhibit OOO.



142.    In addition to its flagship social media-based CeFi-DeFi routing platform, Earnity formed two subsidiaries—Earnity Financial and ET Trader.  These companies were designed to perform supporting services and functions that could and would have been utilized by Cred and similarly reflect the key components of what was intended to become "Cred 2.0."

143.    Earnity formed Earnity Financial on June 25, 2021, as a wholly-owned subsidiary

"[85]

Among other things, Earnity Financial's website explains that it "offers customers the ability to fund crypto purchases via wire transfers, ACH, as well as debit and credit cards; exchange cryptocurrencies across multiple platforms with low transfer costs; curate bespoke cryptocurrency collections; share and gift cryptocurrency with social communities; [and] seamlessly integrate custodial and non-custodial wallets."[86]

---

[85] Exhibit PPP.
[86] https://www.earnityfinancial.com/

144.    Earnity also formed another subsidiary under Florida law with the same name as Earnity Financial.  Upon information and belief, Earnity Financial (FL) operates in the same capacity as Earnity Financial for customers and business operations located in Florida.

145.    In addition to Earnity Financial and Earnity Financial (FL), Earnity formed ET Trader on July 2, 2021.  ET Trader was designed to expand Earnity's CeFi trading capabilities and generate additional revenue by operating as a third-party intermediary in customer transactions and trades on cryptocurrency exchanges. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[87]



146.    As with Earnity Financial, ET Trader's services could and would have been a significant asset to Cred in supporting traditional CeFi cryptocurrency trading and investment services that formed one of the key parts of the "Cred 2.0".  And both its concept and the supporting software were developed at Cred, by Cred, and for Cred.

**I.    Earnity Has Raised A Significant Amount Of Money Off "Cred 2.0"**

147.    ▮▮▮▮▮▮▮▮, Earnity sought funding from Ault Global in late 2021 as part of its Series A funding round, which raised $15 million.  The lead investor in that financing round was BitNile Holdings, Inc. ("BitNile"), a cryptocurrency mining company owned by Ault Global.[88]

---

[87] Exhibit QQQ.
[88] Dec. 6, 2021 CoinDesk Article, *DeFi Startup Earnity Raises $15M Led by Miner BitNile*.

148.    In addition to using these funds to build the Cred 2.0 platform at Earnity, upon information and belief, Earnity used these funds, in part, to sponsor an IndyCar for the 2022 IndyCar racing season.  In the February 24, 2022 press release, Earnity described itself as the "world's first community-based crypto platform and marketplace" and "is a new crypto platform and marketplace that was created to take the complexity out of crypto, making it more accessible and secure to manage."[89]  Earnity also noted that it "combines a social media community with a cryptocurrency and decentralized (DeFi) marketplace to give users a place to earn, learn and collect crypto assets."



---

[89] https://www.prnewswire.com/news-releases/earnity-the-worlds-first-community-based-crypto-platform-and-marketplace-joins-with-ed-carpenter-racing-and-bitnile-holdings-on-2022-indycar-program-301490148.html

149.    These promotional descriptions of Earnity's business are, essentially, a carbon copy of the plan devised for Cred 2.0.

150.    Earnity apparently also continues to raise money based off of the confidential and proprietary plans for the new platform that it took from Cred, as members of the Trust recently received emails from a company Earnity hired to solicit funding from prospective investors. This email disclosed a number of facts about Earnity's current activities, including that it was seeking to raise $20 million in "Strategy Series A" funding:

> I am contacting you to set a meeting between Valhalla Capital and Earnity (founded 02/2021). It is a high growth, U.S. based fintech | blockchain crypto trading and investment marketplace that just opened its $20M Strategic Series A.
>
> Earnity's US$20M Strategic Series A capital raise, co-lead investors, and upcoming closing date are outlined in the presentation link below. As of today, US$8M is committed by co-lead investors/insiders and US$12M is available for investment by funds, family offices and accredited investors.
>
> More information about the project can be found by clicking this link:
> https://docsend.com/view/dyaiv8ywwn8b5zns
>
> Click link here to schedule Earnity Management Presentation meeting:
> https://calendly.com/earnity-corp-dev/earnity-management-presentation-dan-arturas-30-min
>
> Earnity makes it simple to learn and transact with custodial & decentralized crypto platforms, all in one place.
> - Regulatorily compliant | Investment marketplace | Users in over 60 countries
> - US headquarters | Financially healthy | High growth
> - Fintech | Blockchain | Crypto accessible in over 120 countries
> - Traditional Finance | Decentralized Finance
>
> Kindly let me know about meeting to explore the potential investment fit.

151.    Along with this email, Earnity also shared a presentation outlining its business as part of its efforts to raise funds from investors. ████████████████████

████████████████████████████████████████

████████████████████



152.     Because the business that Defendants now operate constitutes property, assets, and opportunities that belong to Cred and that should and would have inured to the Trust and its creditors if they not been wrongfully misappropriated, the Trust now brings this action.

## CAUSES OF ACTION

### Count I
### Avoidance of Unauthorized Post-Petition Transfers, 11 U.S.C. § 549
### (*Against All Defendants*)

153.     The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

154.     Pursuant to Bankruptcy Code § 549, the Trust is entitled to avoid the transfer to the Earnity Defendants of the tangible and intangible assets and property of Cred's estate relating to the platform described above as "Cred 2.0", including the trade secrets and other confidential and proprietary information developed by and for Cred—*i.e.*, a CeFi-DeFi platform to connect retail investors to centralized and decentralized cryptocurrency investment opportunities with a built-in social media component to acclimate investors to various CeFi and DeFi investment opportunities—prior to and through its bankruptcy filing on November 7, 2021 (the "Transferred Assets and Trade Secrets").

155.     The Transferred Assets and Trade Secrets belong to Cred's estate and were misappropriated by Cred's former officers and employees, including Schatt, Goldstein, and Podulka, as well as Carosa, after the commencement of these Chapter 11 Cases, and were subsequently transferred to the Earnity Defendants upon their respective formations (the "Post-Petition Transfer").

156.     The Post-Petition Transfer from Cred's estate to the Earnity Defendants was not authorized by the Bankruptcy Code or this Court.

157.    The Earnity Defendants received the Transferred Assets and Trade Secrets in the Post-Petition Transfer and continue to hold them with full knowledge that the Transferred Assets and Trade Secrets were created by and for Cred and properly belonged to Cred's estate.

158.    Thus, the Post-Petition Transfer is avoidable under Bankruptcy Code § 549(a).

**Count II**
**Recovery of Avoided Transfer, 11 U.S.C. § 550**
(*Against All Defendants*)

159.    The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

160.    The Trust is entitled to avoid the Post-Petition Transfer of the Transferred Assets and Trade Secrets pursuant to Bankruptcy Code § 549.

161.    The Earnity Defendants are the subsequent or mediate transferee of the Transferred Assets and Trade Secrets, which they received pursuant to the Post-Petition Transfer and continue to hold with full knowledge that the Transferred Assets and Trade Secrets were created by and for Cred and properly belong to Cred's estate.

162.    The Earnity Defendants knew that the Post-Petition Transfer was voidable at the time they received the Transferred Assets and Trade Secrets.  Therefore, the Earnity Defendants do not constitute good faith transferees under Bankruptcy Code § 550.

163.    Cred and its estate have been damaged by the loss of the value of the Transferred Assets and Trade Secrets and related business opportunities, as well as by reason of the costs and attorneys' fees that the Trust has incurred in connection with investigating the relevant misconduct underlying and in bringing this action.

164.    Accordingly, the Trust is entitled to recover the Transferred Assets and Trade Secrets, or if this Court so orders, to recover the value of the Transferred Assets and Trade Secrets,

53

for the benefit of Cred's estate pursuant to Bankruptcy Code § 550(a), as well as the value of the costs that the Trust has had to incur in order to recover them.

### Count III
### Misappropriation Of Trade Secrets, 18 U.S.C. § 1836 and Cal. Civ. Code § 3426
### (*Against All Defendants*)

165.     The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

166.     Cred created and developed the confidential and proprietary financial, business, technical, and engineering information relating to the platform described above as "Cred 2.0" prior to and through its bankruptcy filing on November 7, 2021.

167.     The foregoing confidential and proprietary financial, business, technical, and engineering information relating to the Cred 2.0 platform that Cred created and developed constitute trade secrets as defined under 18 U.S.C. § 1839(3) and Cal. Civ. Code § 3426.1 (the "Cred 2.0 Trade Secrets"), and rightfully and legally belong to Cred and its estate.

168.     The Cred 2.0 Trade Secrets that Cred owned derived independent and actual or potential economic value from not being generally known to the public and/or other persons who could obtain economic value from their disclosure or use, and at all relevant times Cred took reasonable measures to keep the Cred 2.0 Trade Secrets confidential and secret including, but not limited to, discussing and developing the Trade Secrets with a limited number of employees using dedicated messaging channels, and requiring its employees to agree to various confidentiality provisions in their employment agreements.

169.     The Cred 2.0 Trade Secrets were willfully and maliciously misappropriated by Cred's former officers and employees, including Schatt, Goldstein, and Podulka, as well as Carosa, after the commencement of these Chapter 11 Cases, and were subsequently transferred to the Earnity Defendants upon their formation as part of the Post-Petition Transfer described above.

170.    Defendants knew or had reason to know that the Cred 2.0 Trade Secrets were secret and valuable information that belonged to Cred and/or Cred's estate at the time Defendants received them, and Defendants continue to hold and benefit from the Cred 2.0 Trade Secrets with full knowledge that their receipt and continued use of the Cred 2.0 Trade Secrets is unlawful.

171.    Defendants have never received authorization from Cred, Cred's estate, or the Trust to use or possess the Cred 2.0 Trade Secrets, and Defendants have and continue to possess and use the Cred 2.0 Trade Secrets for their own benefit and profit.

172.    Defendants have and continue to do so with full knowledge that the Cred 2.0 Trade Secrets were willfully and maliciously misappropriated from Cred and/or Cred's estate.

173.    Cred and its estate have suffered actual monetary damages as a direct and proximate result of Defendants' unlawful use and possession of the Cred 2.0 Trade Secrets, as the value of the Cred 2.0 Trade Secrets (and the business opportunities they would have brought) should and would have inured to the Trust and its creditors if they not been wrongfully misappropriated.

174.    Accordingly, the Trust is entitled to recover damages from Defendants in the form of actual loss, unjust enrichment, and/or reasonable royalty for the benefit of Cred's estate under Cal. Civ. Code § 3426.3(a) and (b).  Further, because Defendants have and continue to use and benefit from the Cred 2.0 Trade Secrets with the knowledge that they were willfully and maliciously misappropriated from Cred and/or Cred's estate, the Trust is entitled to recover exemplary damages under Cal. Civ. Code § 3426.3 and its attorneys' fees and costs under Cal. Civ. Code § 3426.4.

## Count IV
### Unfair Competition, Cal. Bus. & Prof. Code § 17200, *et seq.*
### (*Against All Defendants*)

175.    The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

176.    Cred conceived of and developed the confidential and proprietary financial, business, technical, and engineering information relating to the platform described above as "Cred 2.0" as a novel idea and business concept prior to its bankruptcy filing on November 7, 2021.

177.    The founding members of the Earnity Defendants, including former Cred officers and employees, and Carosa wrongfully misappropriated these tangible and intangible assets that Cred had created, developed, and owned prior to its bankruptcy filing and fraudulently transferred them to Defendants.

178.    Defendants have and continue to engage in business acts and practices deemed "unlawful" under Cal. Bus. & Prof. Code § 17200, *et seq.* because, as alleged above, the Earnity Defendants have and continue to operate businesses that represent property and assets that belong to Cred and that should and would have inured to the Trust and its creditors if they had not been wrongfully misappropriated by Cred's former officers and employees in violation of the law and the fiduciary duties that they owed to Cred.

179.    Defendants have and continue to engage in business acts and practices deemed "unfair" under Cal. Bus. & Prof. Code § 17200, *et seq.* because, as alleged above, Defendants have and continue to benefit from property, assets, and corporate opportunities that Cred invested its time and resources in creating and developing, yet neither Cred nor its estate received anything of value in return from Defendants.

180.     Defendants have and continue to engage in business acts and practices deemed "fraudulent" under Cal. Bus. & Prof. Code § 17200, *et seq.* because, as alleged above, Defendants obtained the property, assets, and corporate opportunities that Cred invested its time and resources in creating and developing through fraudulent means.  These acts include, among other things, the fraudulent Post-Petition Transfer, which was itself the product of the fraudulent scheme of the Earnity Defendants' founding officers and employees (including Carosa) to steal Cred 2.0 for themselves through the formation and operation of the Earnity Defendants, as well as the fraudulent and deceitful acts they engaged in during Cred's bankruptcy proceedings.

181.     Cred and its estate have and continue to suffer actual monetary damages as a result of Defendants' unlawful, unfair, and fraudulent business acts and practices—including, without limitation, the loss of the Transferred Assets and Trade Secrets, and the loss of other corporate opportunities that should have inured to Cred and its estate rather than to Defendants.

182.     Accordingly, the Trust is entitled to recovery and restitution of all such damages for the benefit of Cred's estate under Cal. Bus. & Prof. Code § 17200, *et seq.*

## Count V
## Common Law Unfair Competition
### (*Against All Defendants*)

183.     The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

184.     Cred invested a substantial amount of company time and resources in developing the new "Cred 2.0" platform from early 2020 through and even after Cred filed for bankruptcy on November 7, 2020, with the intention that the new platform would reinvent and expand Cred's business.

185.     Defendants unlawfully, unfairly, and fraudulently obtained the confidential and proprietary financial, business, technical, and engineering information that Cred created  and

developed for this new "Cred 2.0" platform without providing Cred with anything of value in exchange.

186.     Accordingly, the Trust is entitled to recovery and restitution of all such damages that Cred and/or its estate suffered as a result of Defendants' wrongful misappropriation of the property, assets, and corporate opportunities that rightfully belong to and should and would have inured to Cred and/or its estate.

## Count VI
### Conversion
#### (*Against All Defendants*)

187.     The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

188.     Cred created and developed the confidential and proprietary financial, business, technical, and engineering information, including the Transferred Assets and Trade Secrets, as well as other tangible and intangible assets relating to the "Cred 2.0" platform, prior to and through its bankruptcy filing on November 7, 2021.

189.     These assets properly rightfully and legally belong to Cred and its estate.

190.     The Defendants wrongfully obtained and disposed of these valuable assets through the unlawful, unfair, and fraudulent acts of the Defendants, and the Defendants continue to use and benefit from them, with the knowledge that doing so is wrongful and unlawful.

191.     As a result, Cred and its estate have suffered injury and harm, including through the loss of property and assets which should and would have inured to the Trust and its creditors if they not been wrongfully converted.  Accordingly, the Trust is entitled to recover these assets including, but not limited to, the Transferred Assets and Trade Secrets, or their equivalent value.

## Count VII
## Unjust Enrichment
### (*Against All Defendants*)

192.    The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

193.    Cred created and developed the confidential and proprietary financial, business, technical, and engineering information, including the Transferred Assets and Trade Secrets, as well as other tangible and intangible assets relating to the "Cred 2.0" platform, prior to and through its bankruptcy filing on November 7, 2021.

194.    These assets properly rightfully and legally belong to Cred and its estate.

195.    Defendants wrongfully obtained these assets through the unlawful, unfair, and fraudulent acts of Defendants, without providing Cred with anything of value in exchange, and Defendants continue to use and benefit from these assets with the knowledge that doing so is wrongful and unlawful.

196.    As a result of the foregoing, Defendants have been and continue to be unjustly enriched at the expense of Cred and its estate.  The Trust is therefore entitled to restitution in an amount equal to the value of the property and assets that Defendants have wrongfully benefitted from at the expense of Cred's estate.

## Count VIII
## Aiding and Abetting Breach of Fiduciary Duty
### (*Against All Defendants*)

197.    The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

198.    Each Defendant aided and abetted Cred's Chief Executive Officer (Schatt), Chief Financial Officer (Podulka), and Chief Technology Officer (Goldstein) in breaching the fiduciary duties they owed to Cred as officers and executives.

199.    Specifically, Schatt, Podulka, and Goldstein breached the fiduciary duties that they owed to Cred including the duties of loyalty, care, and good faith by, among other things misappropriating and/or converting certain of Cred's tangible and intangible assets that Cred had created, developed, and owned prior to its bankruptcy filing, including those developed as part of the "Cred 2.0" project, and fraudulently transferred them to Defendants.

200.    Each Defendant knew or reasonably should have known that Schatt, Podulka, and Goldstein owed Cred fiduciary duties.

201.    Each Defendant substantially assisted Schatt, Podulka, and Goldstein's breach of their fiduciary duties by using their positions of knowledge and expertise, as well as the trust Cred placed in them, to misappropriate and/or convert certain of Cred's tangible and intangible assets, including corporate opportunities, for the benefit of Defendants and to Cred's detriment.

202.    Carosa knowingly or with reckless indifference participated in Schatt, Podulka, and Goldstein's breaches of their fiduciary duties by, among other things:  (i) collaborating with Schatt, Podulka, and Goldstein's misappropriation and/or conversion of the Cred 2.0 assets and corporate opportunities; (ii) assisting Schatt, Podulka, and Goldstein in segregating all of the unnecessary, risky, and unwanted parts of Cred away from everything the former managers wanted to keep; (iii) assisting Schatt, Podulka, and Goldstein's raising of capital for the Earnity Defendants based upon the use of the misappropriated and/or converted Cred 2.0 assets; and (iv) providing other material and operational support in setting up and founding the Earnity Defendants to take possession of the misappropriated and/or converted assets.

203.    The Earnity Defendants knowingly or with reckless indifference participated in Schatt, Podulka, and Goldstein's breaches of their fiduciary duties by, among other things, facilitating Schatt, Podulka, and Goldstein's misappropriation and/or conversion of the Cred 2.0

assets and corporate opportunities by taking possession of those assets and raising capital on the basis of those assets to run a business that is rightly the property of Cred.

204.    As a result of the knowing participating and substantial assistance that each Defendant provided to Schatt, Podulka, and Goldstein's breaches of fiduciary duties, Cred suffered an amount of damages to be determined at trial.

### Count IX
### Actual Fraudulent Transfer, Cal. Civ. Code § 3439.04(a)(1)
### (*Against All Defendants*)

205.    The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

206.    Cred was involved in a transfer whereby Cred's trade secrets and confidential and proprietary information is now in the possession of Defendants.

207.    In connection with the transfer, Cred, through Schatt, Podulka, and other former Cred executives and employees, acted with actual intent to hinder, delay, or defraud the creditors of Cred.

208.    Specifically and without disclosing the transfer, Schatt, Podulka, and other former Cred executives and employees conspired with Carosa to steal Cred's property, assets, and corporate opportunities and use them to create a post-bankruptcy entity—in the form of Earnity— when it became clear that Cred's bankruptcy was inevitable.  Schatt, Podulka, and other former Cred executives and employees thus misappropriated property which they knew rightfully belonged to Cred and its creditors.

209.    Accordingly, the Trust is entitled to void the transfer of Cred's trade secrets and confidential and proprietary information to Defendants pursuant to Cal. Civ. Code § 3439.04(a)(1).

## Count X
### Constructive Fraudulent Transfer, Cal. Civ. Code § 3439.04(a)(2)
### (*Against All Defendants*)

210.    The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

211.    Cred was involved in a transfer whereby Cred's trade secrets and confidential and proprietary information is now in the possession of Defendants.

212.    In connection with this transfer, Cred did not receive a reasonably equivalent value in exchange for the transfer of Cred's trade secrets and confidential and proprietary information made to Earnity and/or Carosa.

213.    Cred, which was insolvent at the time of the transfer, was therefore engaged in a business or transaction for which the remaining assets of Cred were unreasonably small in relation to the business or transaction.

214.    Accordingly, the Trust is entitled to void the transfer of Cred's trade secrets and confidential and proprietary information to Defendants pursuant to Cal. Civ. Code § 3439.04(a)(2).

## Count XI
### Constructive Fraudulent Transfer, Cal. Civ. Code § 3439.05
### (*Against All Defendants*)

215.    The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

216.    Cred was involved in a transfer whereby Cred's trade secrets and confidential and proprietary information is now held by Defendants.

217.    Cred made the transfer without receiving reasonably equivalent value in exchange for the transfer.

62

218.     Cred was insolvent at the time it made the transfer or became insolvent as a result of the transfer.

219.     Accordingly, the Trust is entitled to void the transfer of Cred's trade secrets and confidential and proprietary information to Defendants pursuant to Cal. Civ. Code § 3439.05.

## PRAYER FOR RELIEF

WHEREFORE, the Trust requests that this Court grant the following relief in favor of the Trust and against Defendants:

1.  Avoiding the Post-Petition Transfer of the Transferred Assets and Trade Secrets pursuant to Bankruptcy Code § 549(a), Cal. Civ. Code § 3439.04, and Cal. Civ. Code § 3439.05 and directing the Earnity Defendants to return the Transferred Assets and Trade Secrets, or an amount to be determined at trial equal to the value of the Transferred Assets and Trade Secrets, to the Trust pursuant to Bankruptcy Code § 550(a);

2.  Actual damages and/or restitution in an amount to be determined at trial equal to the lost value of the Cred 2.0 Trade Secrets that were misappropriated from Cred pursuant to 18 U.S.C. § 1836 and Cal. Civ. Code § 3426.3(a); and/or, alternatively, reasonable royalty for Defendants' use of the Cred 2.0 Trade secrets under Cal. Civ. Code § 3426.3(b);

3.  Exemplary damages under Cal. Civ. Code § 3426.3(c), as well as attorneys' fees and costs under Cal. Civ. Code § 3426.4;

4.  Actual damages and/or restitution in an amount to be determined at trial for Defendants' unlawful, unfair, and fraudulent business acts and practices under Cal. Bus. & Prof. Code § 17200, *et seq.* and/or the common law doctrine of unfair competition;

5.  Actual damages and/or restitution in an amount equal to the value of the property and assets that Defendants have wrongfully converted from Cred's estate and have been unjustly enriched at the expense of Cred's estate;

6.  Actual damages and/or restitution in an amount to be determined at trial as a result of Defendants' aiding and abetting of the breach of fiduciary duties of Cred's former officers and directors;

7.  Such other and further relief as this Court may deem just and proper.

Dated: December 5, 2022
       Wilmington, Delaware

**MCDERMOTT WILL & EMERY LLP**

/s/ *David R. Hurst*

David R. Hurst (I.D. No. 3743)
1007 North Orange Street 10th Floor
Wilmington, DE 19801
Telephone: (302) 485-3900
Facsimile: (302) 351-8711

- and -

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
Andrew B. Kratenstein (*pro hac vice*)
Michael R. Huttenlocher (*pro hac vice* application forthcoming)
Timothy C. Cramton (*pro hac vice* application forthcoming)
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

*Counsel to the Cred Inc. Liquidation Trust*

DM_US 192193248-4 113270.0023