# EXHIBIT W

1  QUINN EMANUEL URQUHART & SULLIVAN LLP
   Terry L. Wit (SBN 233473)
2  terrywit@quinnemanuel.com
   50 California Street, 22nd Floor
3  San Francisco, CA 94111
   Telephone: (415) 875-6600
4  Facsimile: (415) 875-6700

5  *Attorneys for Defendants Lockton Companies*
   *LLC and Lockton Companies, LLC – Pacific Series*

6

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**01/18/2023**
**Clerk of the Court**
BY: ANNIE PASCUAL
Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| CEDRIC DE LISSER, CHRISTOPHER MOSER, and MICHAEL MICHELIN, in their capacity as the Trustees of the Cred Liquidation Trust, | Case No. CGC-22-603638 |
| Plaintiffs, | **NOTICE TO STATE COURT AND ADVERSE PARTIES OF REMOVAL OF THIS ACTION TO FEDERAL COURT** |
| v. | |
| LOCKTON INSURANCE COMPANY LLC, d/b/a LOCKTON INSURANCE BROKERS LLC, a Missouri limited liability company; LOCKTON COMPANIES, LLC – PACIFIC SERIES, d/b/a LOCKTON INSURANCE BROKERS LLC, a Missouri limited liability company; and DOES 1-10, inclusive. | |
| Defendants. | |

**TO THE HONORABLE COURT, THE CLERK OF THE SAN FRANCISCO COUNTY SUPERIOR COURT, PLAINTIFFS, AND ALL ATTORNEYS OF RECORD:**

**NOTICE IS HEREBY GIVEN** that:

1.      On January 18, 2023, Defendants in the above-captioned action,[1] through their attorneys, Quinn Emanuel Urquhart & Sullivan LLP, filed in the United States District Court for the Northern District of California ("<u>Federal Court</u>") a Notice of the Removal of the above-captioned matter.  Attached hereto as Exhibit 1 is a true copy of the Notice of Removal filed with the Federal Court.

2.      Pursuant to 28 U.S.C. § 1446(d), filing the aforementioned paperwork with the Federal Court, along with filing a copy of this paperwork with the Court, effects the removal of this action and requires that this Court take no further action until this matter is remanded.

DATED:  January 18, 2023                    Respectfully submitted,

By _____
      Terry L. Wit

*Attorneys for Defendants Lockton Companies LLC and Lockton Companies, LLC – Pacific Series*

---

[1]   Although Plaintiffs' case caption lists Lockton Insurance Company LLC as a defendant, the body of the complaint refers to Lockton Companies LLC rather than Lockton Insurance Company LLC.  The undersigned is not aware of an entity called Lockton Insurance Company LLC, and a summons was not issued to Lockton Companies LLC.  Defendants reserve all rights, including to seek dismissal of improperly named defendants or based on lack of proper service.

NOTICE TO STATE COURT AND ADVERSE PARTIES OF REMOVAL OF THIS ACTION TO FEDERAL COURT

# PROOF OF SERVICE

I, Razmig Izakelian, declare as follows:

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and am not a party to this action. My business address is 865 S. Figueroa Street, 10th Floor, Los Angeles, CA 90017.

On January 18, 2023, I served true copies of the following document(s): Notice to State Court and Adverse Parties of Removal of this Action to Federal Court

on the parties below, by the following means of service:

| | |
|---|---|
| **REID COLLINS & TSAI LLP** | **GLUCK DANIEL ATKINSON LLP** |
| Angela J. Somers | Craig C. Daniel |
| Jeffrey Gross | GLUCK DANIEL ATKINSON LLP |
| Minyao Wang | 201 Mission Street, Ste. 1330 |
| REID COLLINS & TSAI LLP | San Francisco, CA 94105 |
| 420 Lexington Avenue, Ste. 2731 | Telephone: (415) 510-2114 |
| New York, New York 10170 | Facsimile: (415) 510-2208 |
| Telephone: (212) 344-5200 | Email: litigation@gluckdaniel.com |
| Facsimile: (212) 344-5299 | |
| asomers@reidcollins.com | |
| jgross@reidcollins.com | |
| mwang@reidcollins.com | |

*Special Litigation Counsel to Trustees of the Cred Inc. Liquidation Trust*

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused the document(s) to be sent from e-mail address razmigizakelian@quinnemanuel.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with the practice of Quinn Emanuel Urquhart & Sullivan, LLP for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope was placed in the mail at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on January 18, 2023, at Los Angeles, California.

_____
Razmig Izakelian

# EXHIBIT 1

QUINN EMANUEL URQUHART & SULLIVAN LLP
Michael B. Carlinsky (*pro hac vice* forthcoming)
michaelcarlinsky@quinnemanuel.com
Renita N. Sharma (*pro hac vice* forthcoming)
renitasharma@quinnemanuel.com
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Terry L. Wit (SBN 233473)
terrywit@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Eric D. Winston (SBN 202407)
ericwinston@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Attorneys for Defendants Lockton Companies*
*LLC and Lockton Companies LLC – Pacific Series*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| CEDRIC DE LISSER, CHRISTOPHER MOSER, and MICHAEL MICHELIN, in their capacity as the Trustees of the Cred Liquidation Trust,<br><br>Plaintiffs,<br><br>v.<br><br>LOCKTON INSURANCE COMPANY LLC, d/b/a LOCKTON INSURANCE BROKERS LLC, a Missouri limited liability company; LOCKTON COMPANIES, LLC – PACIFIC SERIES, d/b/a LOCKTON INSURANCE BROKERS LLC, a Missouri limited liability company; and DOES 1-10, inclusive.<br><br>Defendants. | Case No. 3:23-cv-00243<br><br>**[Removal from Superior Court of California, County of San Francisco, Case No. CGC-22-603638]**<br><br>**NOTICE OF REMOVAL**<br><br>(28 U.S.C. §§ 1334(b), 1446 and 1452(a))<br><br>**State Action Filed: December 22, 2022**<br><br>**[DECLARATION OF TERRY L. WIT FILED CONCURRENTLY HEREWITH]** |

**PLEASE TAKE NOTICE THAT**, pursuant to 28 U.S.C. §§ 1334(b), 1446 and 1452, and Rule 9027 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), Defendants Lockton Insurance Company LLC and Lockton Companies, LLC – Pacific Series (the "Defendants")[1] hereby remove the civil action titled *Cedric De Lisser et al. v. Lockton Insurance Company LLC et al.*, Case No. CGC-22-603638 pending in the Superior Court of California, County of San Francisco ("Action") to this Court.  This Court has jurisdiction over this Action under 28 U.S.C. § 1334(b) because, for the reasons stated below, this Action relates to the pending bankruptcy proceeding captioned *In re Cred Inc. et al.*, Case No. 20-bk-12836 ("Cred Bankruptcy") in the Bankruptcy Court for the District of Delaware ("Bankruptcy Court").

In support of this Notice of Removal, Defendants state as follows.

# I. PROCEDURAL HISTORY

1. On December 22, 2022, Plaintiffs Cedric de Lesser, Christopher Moser and Michael Michelin, in their capacity as the trustees of the Cred Liquidation Trust ("Plaintiffs" and "Liquidation Trust") commenced the Action in the Superior Court for the State of California, County of San Francisco, Case No. CGC-22-603638.  On January 9, 2023, Plaintiffs served the complaint ("Complaint") on certain of the Defendants.  A true and correct copy of the Complaint is attached as Exhibit A.[2]

2. Defendants have timely filed this Notice of Removal within 30 days of receipt, through service or otherwise, of a copy of the initial pleading in accordance with 28 U.S.C. § 1446(b) and Bankruptcy Rule 9027(a)(3).

---

[1]   Although Plaintiffs' case caption lists Lockton Insurance Company LLC as a defendant, the body of the complaint refers to Lockton Companies LLC rather than Lockton Insurance Company LLC.  The undersigned is not aware of an entity called Lockton Insurance Company LLC, and a summons was not issued to Lockton Companies LLC.  Regardless, the only proper party/defendant to this lawsuit is Lockton Companies, LLC – Pacific Series d/b/a Lockton Insurance Brokers, LLC.  Defendants reserve all rights, including to seek dismissal of improperly named defendants or based on lack of proper service.

[2]   All references to Exhibits or "Ex." are to the Exhibits to the Declaration of Terry L. Wit filed in support of this Notice of Removal.

3.      In accordance with 28 U.S.C. § 1446(a) and Bankruptcy Rule 9027(a)(1), true and correct copies of all process, pleadings and orders filed in the Superior Court for the State of California, County of San Francisco to date are attached as Exhibits A-E.

4.      All Defendants consent to removal of this action.

## II.      BACKGROUND

5.      The Liquidation Trust is a creature of the pending Cred Bankruptcy proceedings in the Bankruptcy Court.   Cred, Inc. and certain subsidiaries (collectively, "Cred") commenced Chapter 11 cases in the Bankruptcy Court on November 7, 2020 ("Petition Date").   The Liquidation Trust was formed under the Modified First Amended Combined Plan of Liquidation of Cred, Inc. and its subsidiaries ("Plan") that was confirmed by the United States Bankruptcy Court for the District of Delaware on March 11, 2021 ("Confirmation Order").  Exs. F (Order Confirming Modified First Amended Plan, Bankr. ECF 629), G (Modified First Amended Plan, Bankr. ECF 722).  The Plan went effective on April 19, 2021 ("Plan Effective Date").  Ex. H (Notice of Effective Date, Bankr. ECF 730).  On the Plan Effective Date, the Liquidation Trust was formed, and all property of the bankruptcy estates of Cred, including causes of action, was assigned to the Liquidation Trust.

6.      Plaintiffs, as trustees of the Liquidation Trust ("Liquidation Trustees"), are suing Defendants in California Superior Court for allegedly deceiving Cred's customers to do business with Cred by purportedly drafting a statement for Cred concerning Cred's insurance coverage that was posted by Cred on Cred's website.  Certain customers purportedly assigned to the Liquidation Trust their alleged causes of action against Defendants.

**Cred's Business**

7.      Cred was founded in 2018 and operated through the Petition Date.  Ex. I ¶ 15 (First Day Declaration, Bankr. ECF 16).  It provided lending and borrowing services that enabled its clients "to leverage value from their digital assets." *Id.* Cred "offer[ed] technology solutions for crypto assets, partnering with leading wallet and exchange providers to enable liquidity in the form of borrowing or lending" and in particular a "solution" called "CredEarn" which allowed "owners of crypto assets to earn interest on their crypto holdings." *Id.* Plaintiffs allege that

"CredEarn" launched in late December of 2018 to January of 2019.  Complaint ¶ 41.  It "utiliz[ed] pledged customer crypto-currency assets … in various yield-generating vehicles."  Ex. I ¶ 18.

8.     Specifically, Cred's business involved the transfer by customers of cryptocurrency to the Debtors, usually pursuant to a loan or financing agreement.  Ex. J at 14 (Disclosure Statement, Bankr. ECF 380).  Cred would then use the cryptocurrencies "in a variety of investment strategies involving third-party asset managers" to earn revenue by generating returns. *Id.* at 15.  However, because Cred's "business model was premised on … investing … with asset managers, [Cred] generally did not [] hold significant amounts of [c]ryptocurrency."  *Id.* at 14-15.  When customers terminated their accounts with Cred, Cred "generally had to withdraw [c]ryptocurrency from asset managers to purchase new [c]ryptocurrency in the open market at then-prevailing prices in order to repay [c]ustomers[.]"  *Id.*

**Lockton's Business**

9.     Prior to the bankruptcy filings, Cred maintained several insurance policies that were brokered by Lockton Companies, LLC – Pacific Series d/b/a Lockton Insurance Brokers, LLC.  Ex. K at 39-40 (Examiner Report, Bankr. ECF 605).  Those policies included a commercial package, a cyber liability policy, an errors and omissions policy, a directors and officers policy, excess directors and officers insurance, and coverage for certain of Cred's lawyers.  *Id.*

**Cred's Bankruptcy And Creation Of The Liquidation Trust**

10.    On the Petition Date, each Cred debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.  Ex. L (Bankr. ECF 1).  Upon the filing of the bankruptcy petitions, Cred became a debtor-in-possession.  11 U.S.C. § 1107.  It retained a national law firm and Delaware-based counsel (Paul Hastings LLP and Cousins Law LLP) as well as a financial advisor (MACCO Restructuring Group, LLC) in relation to the bankruptcy, Ex. L. at 13, and with the assistance of these firms, began the bankruptcy process.

11.    The day after it filed bankruptcy, Cred filed a *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Insurance Policies, (B) Pay All Related Obligations, and (II) Granting Related Relief* ("Insurance Motion").  Ex. M (Bankr. ECF

10).   Through the Insurance Motion, Cred sought Court approval to "continue their Insurance Policies (as defined below) on an uninterrupted basis in accordance with the same practices and procedures in effect prior to the Petition Date."   Insurance Motion at 1.   Cred asserted that it should maintain its pre-existing insurance policies because, among other things, the Office of the United States Trustee for the District of Delaware ("U.S. Trustee") requires that a debtor "maintain adequate coverage."   *Id.* at 3-4.

12.   With respect to its insurance broker – which the debtors alleged (but incorrectly referred to) was Lockton Companies, Inc. – Cred made the following admissions in the Insurance Motion:

> The Debtors obtain the Insurance Policies through their insurance broker, Lockton Companies, Inc. ("Lockton").   Lockton assists the Debtors in obtaining comprehensive insurance coverage for their operations in the most cost-effective manner, negotiating policy terms, provisions, and premiums, assisting Cred with claims, and providing ongoing support throughout applicable policy periods.   ***The Debtors do not pay Lockton any fees for the professional services rendered, as the Debtors' insurers pay Lockton on commission.***
>
> ***Continuation of the Lockton's services are necessary to assure*** the Debtors' ability to secure Insurance Policies on competitive terms at competitive rates, facilitate the proper administration of the Insurance Policies, and ***ensure adequate protection of the Debtors' property***.   Accordingly, ***the Debtors request authority to continue utilizing Lockton's services in a manner consistent with its prepetition practices in the ordinary course of business.***

*Id.* at 4 (emphases added).

13.   Cred argued to the Bankruptcy Court that the requested relief was appropriate for several reasons.   *First*, it asserted that there was a sound business purpose because Cred was acting "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."   *Id.* at 5.   *Second*, it argued that as a debtor-in-possession, Cred was required to act as a "fiduciary" to "'protect and preserve the estate, including an operating business' going-concern value,' on behalf of the debtor's creditors and other parties in interest."   *Id.* at 6.   And *third*, it took the position that relief was "necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors."   *Id.* at 7.

14.   The Bankruptcy Court entered interim and final orders approving the Insurance

Motion.   Exs. N, O.   In its December 18, 2020 final order ("Final Insurance Order"), the Bankruptcy Court found that the "relief **requested in the Motion is in the best interests of** the Debtors, their estates, **creditors and all parties in interest**," and retained "jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Final [Insurance] Order." Ex. O at 2, 4 (emphases added).

15.   By the time the Bankruptcy Court conducted the final hearing on the Insurance Motion, an official committee of unsecured creditors ("Committee") had been formed and had an opportunity to object to the Insurance Motion. Ex. P (Bankr. ECF 120).  The Committee included Christopher Moser and Kyle Wang, who are "Trust Assignors" identified in the Complaint. *Id.*; Ex. A ¶ 17.  The Committee retained a national law firm, McDermott Will & Emery LLP, as counsel, and began objecting to various matters and taking discovery, *see, e.g.*, Bankr. ECF 151, 167, 168, 190, 191, 193, but did not object to the Insurance Motion.

16.   In late December of 2020, the Committee "as fiduciary for unsecured creditors" and Cred agreed to a Plan Support Agreement ("PSA").  Ex. Q (Bankr. ECF 279) at 2.  Pursuant to the PSA, Cred would propose a plan that would, among other things, create a Liquidation Trust to be managed by a trustee selected by the Committee.  *Id.* at 5.  The trustee would be subject to a "Trust Advisory Board," and the Liquidation Trust would be administered in accordance with a to-be-filed Liquidation Trust Agreement.  *Id.*

17.   On March 22, 2021, the Bankruptcy Court entered the Confirmation Order confirming Cred's Plan.  Exs. F, G.  Among other things, the Plan created the Liquidation Trust and provided that certain of Cred's creditors would receive distributions from the Liquidation Trust.  Ex. F. at 46-47.  The Liquidation Trust was to be managed by the Liquidation Trustees, selected by the Committee, and subject to oversight by a Trust Advisory Board.  *Id.*  One of the members of the Trust Advisory Board, Kyle Wang, is also a "Trust Assignor" identified in the Complaint.  Ex. R (Bankr. ECF 589); Ex. A ¶ 17.

18.     The Plan provided that Cred would transfer all of its "Assets"[3] to the Liquidation Trust, and that the Trust would enforce the "Causes of Action."[4]   Ex. F. at 46-47.   The Trust would have the ability to "commence, litigate, and settle any Causes of Action or Claims relating to the Liquidation Trust Assets."[5]   *Id.* at 48.   Pursuant to the Liquidation Trust Agreement, the Liquidation Trust was responsible for liquidating and administering the "Liquidation Trust Assets, including the Avoidance Actions, the Debtors' commercial tort claims, the Debtors' claims or Causes of Action against the Debtors' directors and officers, and claims or Causes of Action that may be satisfied by insurance policies (collectively, the '**Causes of Action**')."   Ex. S (Bankr. ECF 579) § 2.1.

19.     On June 23, 2022, the Liquidation Trust filed in the Bankruptcy Court a *Motion of the Cred Inc. Liquidation Trust for Entry of Order Approving Third Party Claim Assignment Procedures* ("Third Party Claim Motion").   Ex. T (Bankr. ECF 1015).   The Liquidation Trust asserted that the Bankruptcy Court has "exclusive jurisdiction" over the matters set forth in the Motion, and relied on *In re MPC Computers, LLC*, 465 B.R. 384, 393 (Bankr. D. Del. 2012), for the proposition that the Bankruptcy Court has jurisdiction over lawsuits "involving claims assigned to the post-confirmation trust because the assignment of the claims was contemplated in the plan and trust agreement, and the confirmation order provides for the retention for

---

[3]   "Assets" were defined as "the assets of each of the Debtors," including the "Causes of Action." Ex. F. at 2.

[4]   "Causes of Action" were defined as "all claims, actions, causes of action, third-party claims, counterclaims, crossclaims, third-party claims, contribution claims, or any other claims whatsoever (including any Causes of Action described herein) of the Debtors and/or their Estates that may be pending on the Effective Date (including all such Causes of Action brought by the Committee pursuant to the Plan Support Agreement) or instituted after the Effective Date against any Entity based in law, equity, or otherwise, including under the Bankruptcy Code, whether known or unknown, whether direct, indirect, derivative, or otherwise, and whether asserted or unasserted as of the date of entry of the Confirmation Order, including Avoidance Actions."   Ex. F at 2.

[5]   "Liquidation Trust Assets" were defined as the Assets that were transferred to the Liquidation Trust.   Ex. F. at 9.

jurisdiction." Ex. T. at 1-2. The Liquidation Trust also asserted that it had the authority to pursue assigned claims. *Id.* at 6-7. Objections were filed, and the Bankruptcy Court held a hearing, where it denied the Third Party Claim Motion without prejudice. Bankr. ECF 1040. As of the date of this Notice of Removal, the Liquidation Trust has not filed a renewed Third Party Claim Motion.

20.     On December 5, 2022, the Liquidation Trust filed a lawsuit in the Bankruptcy Court against several defendants ("Bankruptcy Court Lawsuit"), alleging several causes of action, including under California law for conversion, unjust enrichment, aiding and abetting breach of fiduciary duty, common law unfair competition, and alleged violations of California Civil Code § 3426 (misappropriation of trade secrets), California Civil Code §§ 3439.04 and 3439.05 (fraudulent transfer), and California Business and Professions Code § 17200 (unfair competition). Ex. U.

**The Complaint**

21.     On December 22, 2022, the Liquidation Trust filed the Complaint against Defendants in the Superior Court of the State of California, County of San Francisco, initiating the Action. Ex. A. As noted above, the Liquidation Trust does not assert claims of Cred or the bankruptcy estate, but instead asserts claims of certain creditors of Cred, who purportedly assigned those claims to the Liquidation Trust. Complaint at 1 & ¶¶ 8, 17. The Complaint, however, does not allege the amounts each customer claims it lost, when it became a customer of Cred, whether its claims have been allowed by the Bankruptcy Court, or how much the customer has received from the Liquidation Trust.

22.     The Liquidation Trust alleges that Defendants "willingly helped promote" a program under which Cred's customers would lend cryptocurrencies to Cred, *id.* ¶¶ 1, 2, by assisting Cred in drafting a statement for its website concerning its insurance coverage. *Id.* ¶¶ 4-5. The Liquidation Trust further alleges that the representations on Cred's website concerning its insurance were not true, because even though the website claimed that customers would be "made whole," Cred in reality had "grossly inadequate" policies. *Id.* ¶¶ 5-7. According to the Liquidation Trust, "Cred's customers" relied on the statements on Cred's website, lent Cred

cryptocurrencies, and following Cred's bankruptcy, held claims against "the now-bankrupt Cred for more than $66 million in losses" that were not covered by insurance. *Id.* ¶¶ 9, 10. Based on these allegations, the Liquidation Trust asserts claims against Defendants for fraudulent misrepresentation, fraud in the inducement, negligent misrepresentation, intentional concealment, aiding and abetting fraudulent misrepresentation, aiding and abetting negligent misrepresentation, and aiding and abetting violations of California Business & Professions Code Section 17200 et seq.

### III.    BASIS FOR REMOVAL

23.    Under 28 U.S.C. § 1452(a), "[a] party may remove any claim or cause of action in a civil action … to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." Section 1334(b) provides the Court with original but not exclusive jurisdiction "of all civil proceedings arising under title 11, or arising in, or related to cases under title 11."

24.    The Supreme Court has held that "related to" jurisdiction under Section 1334(b) should be interpreted broadly. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307-08 (1995). In the context of post-confirmation actions, the Ninth Circuit has instructed courts to apply a "close nexus" test to determine whether an action is "related to" a bankruptcy proceeding. *In re Wilshire Courtyard*, 729 F.3d 1279, 1287 (9th Cir. 2013); *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1193 (9th Cir. 2005). Under this test, "a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter" exists where an action affects the "interpretation, implementation, consummation, execution, or administration of the confirmed plan" or litigation trust agreement. *Pegasus*, 394 F.3d at 1194 (internal quotation omitted).[6]

---

[6]    The Ninth Circuit adopted the Third Circuit's test for post-confirmation related-to jurisdiction. *Pegasus*, 394 F.3d at 1194 (citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 166-67 (3d Cir. 2004)).

**I.      THE ACTION IS "RELATED TO" TO THE CRED BANKRUPTCY BECAUSE IT ASSERTS CLAIMS THAT BELONGED TO CRED'S BANKRUPTCY ESTATE THAT WERE TRANSFERRED TO THE TRUST**

25.     The Action is "related to" the Cred Bankruptcy because all of the causes of action asserted in the Complaint are derivative claims, and thus were property of the estate, and under the Plan were transferred to the Liquidation Trust.  It follows that third parties, including the Trust Assignors, lack standing to assert or assign them.  The Plan further provides that the Bankruptcy Court retained jurisdiction over any of the estate's causes of action that were transferred to the Trust.  Therefore, the Action involves the implementation and enforcement of the Plan, and is "related to" the Cred Bankruptcy.

26.     After a company files bankruptcy, creditors lack standing to assert causes of action that are property of the estate under 11 U.S.C. § 541.  *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014).  For a cause of action to be property of the estate, it must be a "general one" whereas "[a] claim for an injury is personal to [a] creditor if other creditors generally have no interest in that claim." *Id.* (internal quotations omitted).  In other words, if a claim "could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim." *Id.* (internal quotations omitted); *see, e.g.*, *In re Stoll*, 252 B.R. 492, 495-96 (B.A.P. 9th Cir. 2000) (dismissing complaint without leave to amend because it was not brought by the estate and the underlying alleged conduct concerned harm to the estate generally); *In re Meehan*, 2014 WL 4801328, at *6 (B.A.P. 9th Cir. Sept. 29, 2014) ("Creditors in a bankruptcy case do not have standing to assert claims based on an alleged injury that is common to all creditors and is derivative from claims of the debtor.").

27.     Here, although the Complaint is brought by the Liquidation Trust as an assignee from the Trust Assignors, pursuant to bankruptcy law and the Plan, the claims could not be brought (or assigned) by the Trust Assignors.  According to the allegations in the Complaint, the alleged harm suffered by the Trust Assignors would apply equally to *all of* Cred's customers.  Complaint ¶¶ 9 ("As a result of the false and deceptive representations about insurance co-authored by Lockton, customers loaned over $280 million to Cred through the CredEarn program."), 10 ("Cred, and ultimately its customers, suffered massive losses caused by events that

-9-

1  were not, contrary to the promises in the Lockton/Cred Statements, covered by insurance. …

2  Contrary to the false assurances by Lockton and Cred, customers were not protected by

3  insurance.").  It follows that all of the causes of action in the Complaint were property of the estate

4  when Cred filed bankruptcy, and pursuant to the Confirmation Order and Plan, were transferred to

5  the Liquidation Trust.  Ex. F at 46-47.

6         28.     The Liquidation Trust, however, is not asserting its own claims – it is only

7  asserting the purported claims of the Trust Assignors.  But, as explained above, these were estate

8  causes of action, and the Plan transferred them to the Trust.  Further, the Confirmation Order and

9  Plan provide that the Bankruptcy Court retains exclusive jurisdiction over "all matters in

10  connection with, arising out of or related to the Chapter 11 Cases and the [Plan]" including,

11  "Claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code

12  or pursuant to any federal or state statute or legal theory."  Ex. F at 69 (Confirmation Order ¶ 33),

13  Ex. G at 69 (Plan § XIX(m)).[7]  Therefore, the causes of action were property of the estate and

14  transferred to the Trust under the Plan, and the Action is "related to" the Cred Bankruptcy.  *See,*

15  *e.g.*, *Delaat v. Dhillon*, 2014 WL 1022339, at *5 (N.D. Cal. Mar. 13, 2014) (finding post-

16  confirmation "related to" jurisdiction because the action would impact the rights and obligations

17  of the debtors, and the bankruptcy court reserved jurisdiction for implementation and

18  interpretation of the Plan).[8]

19  **II.     THE ACTION IS RELATED TO THE CRED BANKRUPTCY BECAUSE IT**

20  **ASSERTS CLAIMS THAT THE TRUST COULD NOT ACQUIRE UNDER**

---

21  [7]  Indeed, the Liquidation Trust has initiated the Bankruptcy Court Lawsuit where it asserts,

22  among other things, California law causes of action for conversion, unjust enrichment, aiding and

23  abetting breach of fiduciary duty, common law unfair competition, and violations of California

24  Civil Code § 3426 (misappropriation of trade secrets), California Civil Code §§ 3439.04 and
3439.05 (fraudulent transfer), and California Business and Professions Code § 17200 (unfair
competition), on the basis of "related to" jurisdiction.  Ex. U.

25  [8]  Even if the Liquidation Trust were properly asserting the claims of third parties, it has

26  represented to the Bankruptcy Court that the Bankruptcy Court has jurisdiction over lawsuits

27  "involving claims assigned to the post-confirmation trust because the assignment of the claims
was contemplated in the plan and trust agreement, and the confirmation order provides for the
retention for jurisdiction."  Ex. T. at 1-2.

28

## THE PLAN AND CONFIRMATION ORDER

29.    The Action is "related to" the Cred Bankruptcy for another reason.  Even if the Trust Assignors had standing to assert and assign the claims in the Complaint, pursuant to the Plan, Confirmation Order and Trust Agreement, the Liquidation Trust did not have the authority to acquire and assert the claims of third parties.  Therefore, the Action requires interpretation and enforcement of the Plan, Confirmation Order and Trust Agreement, and is "related to" the Cred Bankruptcy.  *Wilshire Courtyard*, 729 F.3d at 1287 ("[T]he test encompasses matters 'affecting the 'interpretation, implementation, consummation, execution, or administration of the confirmed plan.''"); *see, e.g.*, *McKinstry v. Sergent*, 442 B.R. 567, 569, 575 (E.D. Ky. 2011) (holding that the district court had "related to" jurisdiction over claims assigned to a post-confirmation trustee because the pursuit of such assigned claims required "implementation" and "execution" of the confirmed plan); *In re Lombard Flats, LLC*, 2014 WL 3963009, at *8 (N.D. Cal. Aug. 13, 2014) (holding that a post-confirmation dispute was "related to" the bankruptcy because the issue was whether one of the parties had acted in accordance with the plan when it obtained a judgment); *In re Consolidated Meridian Funds*, 511 B.R. 140, 148-49 (W.D. Wash. 2014) (finding that the court had "related to" jurisdiction because the post-confirmation trustee was pursuing claims assigned to it by others, plan reserved claims against the defendant to be pursued by the trustee for the benefit of creditors, and there was a "need to interpret certain Plan provisions" concerning "the validity of the assignment").

30.    The Plan and Trust Agreement provide that the Liquidation Trust is responsible for liquidating and administering the "Assets" or "Liquidation Trust Assets," which are defined to include the "Causes of Action."  Ex. F at 2, 9, 46-47.  The Causes of Action were defined as:

> [A]ll claims, actions, causes of action, third-party claims, counterclaims, crossclaims, third-party claims, contribution claims, or any other claims whatsoever (including any Causes of Action described herein) of the Debtors and/or their Estates that may be pending on the Effective Date (including all such Causes of Action brought by the Committee pursuant to the Plan Support Agreement) or instituted after the Effective Date against any Entity based in law, equity, or otherwise, including under the Bankruptcy Code, whether known or unknown, whether direct, indirect, derivative, or otherwise, and whether asserted or unasserted as of the date of entry of the Confirmation Order, including Avoidance Actions.

Ex. F at 2.

31.     Similarly, the Trust Agreement states that the Liquidation Trust was responsible for liquidating and administering the "Liquidation Trust Assets, including the Avoidance Actions, the Debtors' commercial tort claims, the Debtors' claims or Causes of Action against the Debtors' directors and officers, and claims or Causes of Action that may be satisfied by insurance policies (collectively, the '**Causes of Action**')."  Ex. S (Bankr. ECF 579) § 2.1.

32.     Because the claims of third parties are not within the meaning of "Liquidation Trust Assets," under the Plan, Confirmation Order and Trust Agreement, the Liquidation Trust did not have authority to acquire the claims of third parties.[9]  Therefore, the assignment of the claims to the Trust was not authorized under the Plan and Trust Agreement, and the Action is "related" to the Cred Bankruptcy.

**III.    THE ACTION IS RELATED TO THE CRED BANKRUPTCY BECAUSE IT CONCERNS THE INTERPRETATION AND ENFORCEMENT OF SEVERAL ORDERS OF THE BANKRUPTCY COURT**

33.     As explained above, the Action is "related to" to the Cred Bankruptcy because the Trust Assignors did not have the ability to assign the claims, and the Liquidation Trust did not have the authority to take the assignment.  There is a third reason why the Action is "related to" the Cred Bankruptcy.  The Complaint contains allegations that are flatly contrary to judicial admissions in the Insurance Motion, which the Bankruptcy Court approved by interim and final orders, requiring interpretation of those orders.

34.     On November 8, 2020, Cred filed the Insurance Motion, in which it asserted that it

_____

[9]   The Plan and Trust Agreement contain a provision authorizing the Plaintiffs to "adjudicat[e] third-party claims assigned, purchased, or otherwise transferred to the Liquidation Trust."  Ex. G at 47 (Plan §§ 12.3(b)(vii)); Ex. S at 3 (Trust Agreement § 2.4(7)).  However, the Liquidation Trust is not a court and cannot "adjudicate" claims.  *See Adjudicate*, Black's Law Dictionary (11th ed. 2019) ("Adjudicate" means "[t]o rule on judicially.").  In any event, these provisions, at a minimum, create a conflict concerning interpretation of the Plan, demonstrating that the Action is "related to" the Cred Bankruptcy.  And while the Bankruptcy Court has commented on the meaning of the Plan with respect to acquisition of third-party claims, Bankr. ECF 1041 at 67:8-10, it has not made any rulings, instead ***denying*** the Liquidation Trust's motion to approve procedures to take assignment of third-party claims.

should maintain its pre-existing insurance policies because, among other things, the U.S. Trustee requires that a debtor "maintain adequate coverage."  Ex. M. at 3-4.  With respect to Lockton, Cred asserted that: "Continuation of the Lockton's services are necessary to … ensure adequate protection of the Debtors' property.  Accordingly, the Debtors request authority to continue utilizing Lockton's services in a manner consistent with its prepetition practices in the ordinary course of business."  *Id.* at 4.

35.     Cred further argued that in seeking continuation of Lockton's pre-petition services and maintaining its pre-existing insurance policies, it was acting: (1) "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company;" and (2) as a "fiduciary" to "'protect and preserve the estate, including an operating business' going-concern value,' on behalf of the debtor's creditors and other parties in interest."  *Id.* at 5-6. Cred even asserted that continuation of Lockton's pre-petition services and maintenance of the pre-existing insurance policies was "necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors."  *Id.* at 7.

36.     No creditors or parties-in-interest opposed the Insurance Motion.  Weeks before the Final Insurance Order, the Committee was formed, which included Christopher Moser and Kyle Wang, who are "Trust Assignors."[10]  The Committee, which retained sophisticated counsel, also did not object to the Insurance Motion.  The Bankruptcy Court's Final Insurance Order stated that the: "relief ***requested in the Motion is in the best interests of*** the Debtors, their estates, ***creditors and all parties in interest***," and retained "jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Final [Insurance] Order."  Ex. O at 2, 4 (emphases added).

37.     Contrary to the debtor-in-possession's assertions in the Insurance Motion and the Court's Final Insurance Order, the Liquidation Trust now alleges that Cred maintained insufficient insurance coverage, *see, e.g.*, Complaint ¶ 51, and that its pre-petition insurance brokerage

---

[10]   Kyle Wang is also a member of the Trust Advisory Board.

-13-

services caused harm to Cred's customers, *see, e.g.*, *id.* ¶¶ 91-93, 120.  The inconsistencies between the allegations in the Complaint and the Insurance Motion and Final Insurance Order require interpretation of the Bankruptcy Court's orders, resulting in "related to" jurisdiction.  *See Cont'l Cas. Co. v. Chatz as Tr. for CFB/WFB Liquidating Tr.*, 591 B.R. 396, 408 (N.D. Cal. 2018) (affirming Bankruptcy Court's ruling that it had "related to" jurisdiction over a post-confirmation insurance coverage dispute because the issues in the dispute "overlapped significantly" with the issues that were raised in the bankruptcy court).

## IV.    RESERVATION OF RIGHTS

38.    Defendants deny the allegations contained in the Complaint and file this Notice of Removal without waiving any defenses, objections, exceptions or obligations that may exist in their favor in either state or federal court.

39.    In describing the allegations of the Complaint in this Notice of Removal, Defendants do not concede in any way that the allegations are accurate, that Plaintiffs have asserted claims upon which relief may be granted, or that recovery of any of the amounts sought is authorized or appropriate.

40.    Defendants reserve the right to amend or supplement this Notice of Removal.  If any questions arise as to the propriety of the removal of this action, Defendants request the opportunity to present such further evidence as necessary to support their position that this action is removable.

41.    For the reasons stated above, Defendants remove the Action, Case No. CGC-22-603638, pending the Superior Court for the State of California, County of San Francisco, to this Court.  Defendants respectfully request that the Court assume jurisdiction over this matter and grant Defendants such other and further relief as this Court deems just and proper.

## V.    PROCEDURAL REQUIREMENTS

42.    Plaintiffs' Action was commenced in the Superior Court of the State of California for the County of San Francisco and, under 28 U.S.C. §§ 84(a) and 1446(a) and Bankruptcy Rule 9027(a)(1), may be removed to the United States District Court for the Northern District of California, San Francisco Division, which embraces San Francisco County within its jurisdiction.

43.     As 28 U.S.C. § 1446(a) and Bankruptcy Rule 9027(a)(1) require, this Notice of Removal is signed pursuant to Federal Rule of Civil Procedure 11 and Bankruptcy Rule 9011 and contains a short and plain statement of the facts that entitle Defendants to remove.

44.     Pursuant to Bankruptcy Rule 9027(a)(1), Defendants do not consent to entry of final orders or judgments by the Bankruptcy Court.

45.     Pursuant to 28 U.S.C. § 1446(a) and Bankruptcy Rule 9027(a)(1), copies of all process and pleadings in the Action are attached hereto as:

      a.   **Exhibit A** – December 22, 2022 Complaint

      b.   **Exhibit B** – December 22, 2022 Civil Case Cover Sheet

      c.   **Exhibit C** – December 22, 2022 Notice to Plaintiff

      d.   **Exhibit D** – January 5, 2023 Summons

      e.   **Exhibit E** – January 10, 2023 Proof of Service Summons

46.     Pursuant to 28 U.S.C. § 1446(d) and Bankruptcy Rule 9027(b), Defendants will promptly serve a copy of this Notice of Removal on counsel for Plaintiffs.

47.     As 28 U.S.C. § 1446(d) and Bankruptcy Rule 9027(c) require, Defendants will file a copy of this Notice of Removal with the Clerk of Court for the Superior Court of the State of California, County of San Francisco.

WHEREFORE, Defendants hereby remove this action from the Superior Court for the State of California, County of San Francisco to the United States District Court for the Northern District of California.

DATED:  January 18, 2023                    Respectfully submitted,


By   */s/ Terry L. Wit*
    Terry L. Wit

*Attorneys for Defendants Lockton Companies LLC and Lockton Companies LLC – Pacific Series*

1  QUINN EMANUEL URQUHART & SULLIVAN LLP
   Michael B. Carlinsky (*pro hac vice* forthcoming)
2  michaelcarlinsky@quinnemanuel.com
   Renita N. Sharma (*pro hac vice* forthcoming)
3  renitasharma@quinnemanuel.com
   51 Madison Ave., 22nd Floor
4  New York, NY 10010
   Telephone: (212) 849-7000
5  Facsimile: (212) 849-7100

6  Terry L. Wit (SBN 233473)
   terrywit@quinnemanuel.com
7  50 California Street, 22nd Floor
   San Francisco, CA 94111
8  Telephone: (415) 875-6600
   Facsimile: (415) 875-6700

9
   Eric D. Winston (SBN 202407)
10 ericwinston@quinnemanuel.com
   865 S. Figueroa St., 10th Floor
11 Los Angeles, California 90017
   Telephone: (213) 443-3000
12 Facsimile: (213) 443-3100

13 *Attorneys for Defendants Lockton Companies*
   *LLC and Lockton Companies LLC – Pacific Series*

14
                 **UNITED STATES DISTRICT COURT**
15              **NORTHERN DISTRICT OF CALIFORNIA**
                    **SAN FRANCISCO DIVISION**
16

17 CEDRIC DE LISSER, CHRISTOPHER MOSER,          Case No. 3:23-cv-00243
   and MICHAEL MICHELIN, in their capacity as
18 the Trustees of the Cred Liquidation Trust,

19          Plaintiffs,                           **DECLARATION OF TERRY L. WIT IN**
                                                  **SUPPORT OF NOTICE OF REMOVAL**
20          v.

21 LOCKTON INSURANCE COMPANY LLC,
   d/b/a LOCKTON INSURANCE BROKERS
22 LLC, a Missouri limited liability company;
   LOCKTON COMPANIES, LLC – PACIFIC
23 SERIES, d/b/a LOCKTON INSURANCE
   BROKERS LLC, a Missouri limited liability
24 company; and DOES 1-10, inclusive.

25          Defendants.

26

27

28

## DECLARATION OF TERRY L. WIT

I, Terry L. Wit, hereby declare as follows:

1. I am a member of the State of California and admitted to practice before the Court. I am a partner of Quinn Emanuel Urquhart & Sullivan, LLP, counsel for Defendants in the above-captioned action. Except as otherwise noted, I have personal firsthand knowledge of the matters set forth in this Declaration, and if called as a witness I would testify competently to those matters.

2. Attached hereto as **Exhibit A** is a true and correct copy of the *erified Original Complaint* filed in the Superior Court of the State of California, County of San Francisco in Case No. CGC-22-60358 on December 22, 2022.

3. Attached hereto as **Exhibit B** is a true and correct copy of the *Civil Case Cover Sheet* filed in the Superior Court of the State of California, County of San Francisco in Case No. CGC-22-60358 on December 22, 2022.

4. Attached hereto as **Exhibit C** is a true and correct copy of the *otice to Plaintiff* filed in the Superior Court of the State of California, County of San Francisco in Case No. CGC-22-60358 on December 22, 2022.

5. Attached hereto as **Exhibit D** is a true and correct copy of the *Summons* filed in the Superior Court of the State of California, County of San Francisco in Case No. CGC-22-60358 on January 5, 2023.

6. Attached hereto as **Exhibit E** is a true and correct copy of the *Proof of Service Summons* filed in the Superior Court of the State of California, County of San Francisco in Case No. CGC-22-60358 on January 10, 2023.

7. Attached hereto as **Exhibit F** is a true and correct copy of the *Order Confirming and Approving on a Final Basis Modified First Amended Combined Plan of Liquidation and Disclosure Statement of Cred Inc. and its Subsidiaries nder Chapter of the Bankruptcy Code* filed in the United States Bankruptcy Court for the District of Delaware in Case No. 20-12836 on March 11, 2021.

8. Attached hereto as **Exhibit G** is a true and correct copy of the *Modified First Amended Combined oint Plan of Liquidation and Disclosure Statement of Cred Inc. and its*

1  *Subsidiaries nder Chapter of the Bankruptcy Code* filed in the United States Bankruptcy
2  Court for the District of Delaware in Case No. 20-12836 on April 16, 2021.

3       9.     Attached hereto as **Exhibit H** is a true and correct copy of the *otice of (A) Entry*
4  *of Order Confirming the First Amended Combined oint Plan of Liquidation and Disclosure*
5  *Statement of Cred Inc. and its Subsidiaries nder Chapter of the Bankruptcy Code and (B) the*
6  *Occurrence of the Effective Date* filed in the United States Bankruptcy Court for the District of
7  Delaware in Case No. 20-12836 on April 19, 2021.

8       10.     Attached hereto as **Exhibit I** is a true and correct copy of the *Declaration of Drew*
9  *McManigle, Founder and Chief Executive Officer, MACCO Restructuring Group, LLC* filed in the
10  United States Bankruptcy Court for the District of Delaware in Case No. 20-12836 on November
11  9, 2020.

12       11.     Attached hereto as **Exhibit** is a true and correct copy of the *First Amended*
13  *Combined oint Plan of Liquidation and Disclosure Statement of Cred Inc. and its Subsidiaries*
14  *nder Chapter of the Bankruptcy Code* filed in the United States Bankruptcy Court for the
15  District of Delaware in Case No. 20-12836 on January 21, 2021.

16       12.     Attached hereto as **Exhibit K** is a true and correct copy of the *Report of Robert .*
17  *Stark, Examiner* filed in the United States Bankruptcy Court for the District of Delaware in Case
18  No. 20-12836 on March 8, 2021.

19       13.     Attached hereto as **Exhibit L** is a true and correct copy of the *oluntary Petition*
20  *for on Individuals Filing for Bankruptcy* filed in the United States Bankruptcy Court for the
21  District of Delaware in Case No. 20-12836 on November 7, 2020.

22       14.     Attached hereto as **Exhibit M** is a true and correct copy of the *Motion of Debtors*
23  *for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Insurance Policies,*
24  *(B) Pay all Related Obligations, and (II) Granting Related Relief* filed in the United States
25  Bankruptcy Court for the District of Delaware in Case No. 20-12836 on November 8, 2020.

26       15.     Attached hereto as **Exhibit N** is a true and correct copy of the *Interim Order (I)*
27  *Authorizing Debtors to (A) Maintain Insurance Policies, (B) Pay all Related Obligations, and (II)*
28  *Granting Related Relief* filed in the United States Bankruptcy Court for the District of Delaware in

Case No. 20-12836 on November 10, 2020.

16.     Attached hereto as **Exhibit O** is a true and correct copy of the *Final Order (I) Authorizing Debtors to (A) Maintain Insurance Policies, (B) Pay all Related Obligations, and (II) Granting Related Relief* filed in the United States Bankruptcy Court for the District of Delaware in Case No. 20-12836 on December 18, 2020.

17.     Attached hereto as **Exhibit P** is a true and correct copy of the documents filed as ECF 120 in the United States Bankruptcy Court for the District of Delaware in Case No. 20-12836 on December 3, 2020.

18.     Attached hereto as **Exhibit Q** is a true and correct copy of the *Debtors' Motion Pursuant to Bankruptcy Code Sections   (b) and   (a) for Authorization to Enter into and Perform   nder a Plan Support Agreement Term Sheet* filed in the United States Bankruptcy Court for the District of Delaware in Case No. 20-12836 on December 23, 2020.

19.     Attached hereto as **Exhibit R** is a true and correct copy of the  *otice of Filing of Amended Plan Supplement for First Amended Combined  oint Plan of Liquidation and Disclosure Statement of Cred Inc. and its Subsidiaries  nder Chapter   of the Bankruptcy Code* filed in the United States Bankruptcy Court for the District of Delaware in Case No. 20-12836 on March 4, 2021.

20.     Attached hereto as **Exhibit S** is a true and correct copy of the  *otice of Filing of Liquidation Trust Agreement* filed in the United States Bankruptcy Court for the District of Delaware in Case No. 20-12836 on March 2, 2021.

21.     Attached hereto as **Exhibit T** is a true and correct copy of the *Motion of the Cred Inc. Liquidation Trust for Entry of Order Approving Third Party Claim Assignment Procedures* filed in the United States Bankruptcy Court for the District of Delaware in Case No. 20-12836 on June 23, 2022.

22.     Attached hereto as **Exhibit U** is a true and correct copy of the *Complaint* filed in the United States Bankruptcy Court for the District of Delaware in Case No. 20-12836 on December 5, 2022.

1          I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct.  Executed this 18th day of January, 2023, at Alameda, California.

3

4                  By  _/s/ Terry L. Wit_____

5                       Terry L. Wit

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF TERRY L. WIT IN SUPPORT OF NOTICE OF REMOVAL

# EXHIBIT A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Craig C. Daniel (State Bar No. 212588)
GLUCK DANIEL ATKINSON LLP
201 Mission Street, Ste. 1330
San Francisco, CA 94105
Telephone: (415) 510-2114
Facsimile: (415) 510-2208
Email: litigation@gluckdaniel.com

Angela J. Somers (*pro hac vice to be filed*)
Jeffrey Gross (*pro hac vice to be filed*)
Minyao Wang (*pro hac vice to be filed*)
REID COLLINS & TSAI LLP
420 Lexington Avenue, Ste. 2731
New York, New York 10170
Telephone: (212) 344-5200
Facsimile: (212) 344-5299
asomers@reidcollins.com
jgross@reidcollins.com
mwang@reidcollins.com

*Special Litigation Counsel to Trustees*
*of the Cred Inc. Liquidation Trust*

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**12/22/2022**
**Clerk of the Court**
BY: JEFFREY FLORES
Deputy Clerk

**CGC-22-603638**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| CEDRIC DE LISSER, CHRISTOPHER MOSER, and MICHAEL MICHELIN, in their capacity as the Trustees of Cred Liquidation Trust,<br><br>        Plaintiffs,<br><br>   v.<br><br>LOCKTON INSURANCE COMPANY LLC, d/b/a LOCKTON INSURANCE BROKERS LLC, a Missouri limited liability company; LOCKTON COMPANIES, LLC - PACIFIC SERIES, d/b/a LOCKTON INSURANCE BROKERS LLC, a Missouri limited liability company; and DOES 1-10, inclusive.<br><br>        Defendants. | CASE NO. _____<br> **VERIFIED ORIGINAL COMPLAINT FOR**<br>**(1) FRAUDULENT MISREPRESENTATION**<br>**(2) FRAUD IN THE INDUCEMENT**<br>**(3) NEGLIGENT MISREPRESENTATION**<br>**(4) INTENTIONAL CONCEALMENT**<br>**(5) AIDING AND ABETTING FRAUDULENT MISREPRESENTATION**<br>**(6) AIDING AND ABETTING NEGLIGENT MISREPRESENTATION**<br>**(7) AIDING AND ABETTING VIOLATIONS OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200 ET. SEQ.**<br><br>**DEMAND FOR JURY TRIAL** |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................................................... 1

PARTIES ...................................................................................................................................... 4

TRUST ASSIGNORS .................................................................................................................. 6

OTHER RELEVANT NON-PARTIES ........................................................................................ 7

    A.   Cred-Related Non-Parties ............................................................................................. 7

    B.   Relevant Lockton Employees ........................................................................................ 9

STATUTE OF LIMITATIONS ..................................................................................................... 9

JURISDICTION ............................................................................................................................ 9

FACTUAL BACKGROUND ...................................................................................................... 10

    A.   Cred Launched the CredEarn Platform ....................................................................... 10

    B.   Lockton Was Cred's Insurance Broker from Its Early Days and Knew Cred Had Only Limited Insurance .................................................................................................................... 11

    C.   Lockton and Cred Drafted the Lockton/Cred Statements on Insurance Coverage ................. 13

    D.   The Lockton/Cred Statements Were False ................................................................... 18

    E.   Cred Published the False and Misleading Lockton/Cred Statements, Which Accelerated Customer Deposits Based on the False Assurances about Insurance ...................................... 20

    F.   Customers Relied on the False Statements About Cred's Insurance ....................................... 24

    G.   Cred Collapsed as a Result of Its D&O's' Reckless, Fraudulent, and Self-Interested Conduct: Over $165 Million in Customer Claims Remained Unpaid ........................................ 29

FOR FRAUDULENT MISREPRESENTATION ........................................................................ 30

FOR FRAUD IN THE INDUCEMENT ..................................................................................... 32

FOR NEGLIGENT MISREPRESENTATION ........................................................................... 34

FOURTH CLAIM FOR RELIEF FOR INTENTIONAL CONCEALMENT .............................. 36

FOR AIDING AND ABETTING FRAUDULENT MISREPRESENTATION ............................ 38

FOR AIDING AND ABETTING NEGLIGENT MISREPRESENTATION ................................ 40

AIDING AND ABETTING VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. AND PROFESSIONS CODE, § 17200 ET. SEQ ........................................................... 42

DEMAND FOR A JURY TRIAL ............................................................................................... 43

PRAYER FOR RELIEF .............................................................................................................. 43

## ORIGINAL COMPLAINT

The trustees of The Cred Inc. Liquidation Trust (the "**Trust**"),[1] Cedric de Lisser, Christopher Moser, and Michael Michelin, ("**Trustees**" or "**Plaintiffs**"), as assignee of certain claims from CredEarn customers (the "**Trust Assignors**"), by and through their undersigned counsel, allege against Lockton Companies LLC and Lockton Companies, LLC - Pacific Series (together "**Lockton**") as follows:

## INTRODUCTION

1.      Lu Hua and Daniel Schatt were the founders and directors of Cred, Inc., a cryptocurrency[2] company that was based in San Mateo, California. Schatt was also Cred's CEO. With Schatt at the helm, Cred sought to raise crypto for a yield-earning program called CredEarn in which customers lent their crypto to Cred.

2.      Lockton, which is the world's largest independent insurance brokerage firm and a self-proclaimed crypto insurance expert, willingly helped promote the CredEarn program to customers. Lockton and Cred jointly drafted false and misleading representations that claimed that Cred and its CredEarn customers were fully insured for losses. These deceptive representations convinced customers that their crypto loans were protected by insurance. Cred lured customers into the CredEarn program with these egregiously false promises.

3.      The CredEarn program allowed customers to earn a return on their crypto by lending their crypto to Cred for a fixed period. Cred would then convert the crypto into fiat currency (*i.e.*, a government-issued currency) and attempt to invest the funds at a higher rate of interest than it was required to pay the CredEarn customers. At the end of the lending term, Cred would repurchase the

---

[1] The Trust was established in accordance with the First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and its Subsidiaries Under Chapter 11 of the Bankruptcy Code, the Liquidation Trust Agreement, and the Confirmation Order.

[2] The term "cryptocurrency" refers to a digital asset on a blockchain, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," "digital assets," "coins," and "tokens." Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay. Bitcoin and Ethereum are the most popular cryptocurrencies, but there are many others.

crypto[3] and return it to the customer along with the interest earned. Cred's customers' crypto loans were unsecured loans to Cred.

4.      Cred understood that customers would be hesitant to enter into the CredEarn program since unsecured loans to a new and untested company were risky. To solve this problem, Schatt and others at Cred used Lockton, an enthusiastic partner, to hype the program through false assurances that would induce participants into joining the program. Cred and Lockton—which agreed to make sure the insurance coverage description was accurate—crafted a public statement that falsely represented that Cred was comprehensively insured for Cred's and its customers' losses. Lockton knew these representations would be posted on or linked to Cred's website, sent directly to potential customers, disseminated on the internet, and used or distributed in other ways that customers could see them. But contrary to these fraudulent statements, Cred's insurance clearly did not cover CredEarn customers' losses or the vast majority of the losses that led to Cred's downfall.

5.      Lockton's work on the misstatements began in the spring of 2019. Schatt worked primarily with Jeff Koo of Lockton, who was based in California, to "craft a public-facing 1-3 paragraphs on [Cred's] website" relating to Cred's insurance coverage. These Lockton/Cred joint statements, misleadingly titled "Going Above and Beyond," falsely claimed that Cred had "comprehensive insurance" that it had acquired through Lockton. Lockton and Cred also wrongly claimed that Cred had insurance "for a service that [Cred] failed to provide" or if the CredEarn program "did not have the promised results." Lockton and Cred further falsely claimed that Cred was insured for "the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement," and that customers would be "made whole" in the event of a loss. Lockton allowed its name and well-known brand to feature prominently in these public and blatant misrepresentations about Cred's insurance.

6.      Lockton and Cred both knew that none of the insurance representations were true. For example, Cred had just a minimal errors and omissions policy, which was grossly inadequate in size, and which had exclusions that excepted coverage for CredEarn losses. Cred's other policies, including its cyber policy, similarly did not insure against the losses suffered by CredEarn customers and covered

---

[3] Cred retained some crypto, and on occasion, would use crypto on hand to return to customers.

little, if any, of Cred's other losses. Likewise, Cred's directors' and officers' policy had blanket exclusions for crypto, among other exclusions.

7.    Nevertheless, Lockton helped Cred draft these false joint statements knowing and expecting that customers would rely on them. The claims in the Lockton/Cred statements, backed prominently by the Lockton logo and words that touted Lockton's industry-leading reputation, were published on Cred's website, copied in statements Cred made directly to customers, and distributed elsewhere. Cred consistently directed customers to view the false statements, including using what Cred and Lockton had prepared as a stock response that its sales personnel or agents sent to potential customers who asked about Cred's insurance.

8.    The Trust Assignors are customers of Cred who loaned funds through CredEarn. They assigned their claims against Lockton to the Trust so that the Trust may pursue them on behalf of all creditors of Cred. Each of the Trust Assignors reasonably relied on information in the Lockton/Cred representations. They read the Cred/Lockton statements on a website that was linked to Cred's website, reviewed the Cred/Lockton "Going Above and Beyond" post on Cred's website, and read business articles and blogs that repeated the false statements. In addition, they received emails from Cred emphasizing the fraudulent statements, and some of them spoke to Cred employees (including in some instances, Schatt, the CEO) who reinforced the statements. Each of the Trust Assignors would not have entered into the CredEarn program if he or she had not been assured through the joint Lockton/Cred statements that Cred had insurance that covered Cred's losses and their customer losses.[4]

9.    Lockton owed a duty to Cred's customers both because it had a duty not to issue false statements and/or to correct misstatements issued under its auspices, and because it was foreseeable that customers would rely on Lockton as an expert in crypto insurance. As a result of the false and deceptive representations about insurance co-authored by Lockton, customers loaned over $280 million to Cred through the CredEarn program. The Trust Assignors have claims against the now-bankrupt Cred for more than $66 million in losses.

---

[4] This includes the Trust Assignors' increases to their initial loans and rollovers.

10.     Cred, and ultimately its customers, suffered massive losses caused by events that were not, contrary to the promises in the Lockton/Cred Statements, covered by insurance. Losses arose from Cred's investments (made with crypto loan proceeds) that were tainted by officer's self-interest, if not fraud, and some of Cred's crypto mysteriously disappeared, among other causes of losses. Cred never returned over $165 million worth[5] of CredEarn customers' crypto to the customers, nor did Cred return the interest they earned. Contrary to the false assurances by Lockton and Cred, customers were not protected by insurance. Cred's supposed "comprehensive insurance" relating to the "borrowing of crypto" was wholly illusory.

11.     In sum, Lockton's and Cred's joint false assurances led to massive inflows of customer capital, but Cred had no way of repaying the customer loans once Cred collapsed. The joint Lockton/Cred statements had promised that "If the worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole." In the end, the "worst" did happen: Cred filed for Chapter 11 bankruptcy on November 7, 2020, leaving the Trust Assignors empty handed. Meanwhile, while the joint Lockton/Cred statements caused CredEarn customers massive harm, Lockton profited from the premiums on the insurance it sold Cred and Cred's insiders profited personally from the fraud.

12.     The Trustees seek to recover from Lockton over $66 million in damages by asserting claims for fraudulent misrepresentation, fraud in the inducement, negligent misrepresentation, intentional concealment, aiding and abetting fraudulent misrepresentation, aiding and abetting negligent misrepresentation, and aiding and abetting violations of California's Unfair Competition Law.

## PARTIES

13.     **Plaintiffs** are Cedric de Lisser, Christopher Moser, and Michael Michelin, solely in their capacity as **Trustees of the Trust**. The Trust was established by the Modified First Amended Combined Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code (D.I. 629-1, Case No. 20-12836, Bankr. Del.) (as amended, the

---

[5] While this total largely eliminates duplicates and other claims, the Trust's professionals continue to refine their calculations through the claims administration process.

"**Plan**"). The Plan was confirmed on March 11, 2021, by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and became effective on April 19, 2021 (the "**Effective Date**"). (*See* D.I. 730.)[6] Under the Plan, the Trust may obtain assignment of third-party claims that the Trustees may then pursue on behalf of all creditors. *See* D.I. 1041 at 67:8-10 (comments by Bankruptcy Judge John Dorsey). Pursuant to that authority, the Trust was assigned the claims asserted here from the Trust Assignors.

14.     **Defendant Lockton Companies LLC** is a Missouri limited liability company, with headquarters at 444 W 47th St., Suite 900, Kansas City, Missouri 64112. Lockton Companies LLC is licensed by the California Insurance Commissioner to engage in the sale of insurance policies in this State. During the relevant period, it did business with Cred from its office at (i) 3 Embarcadero Center, 6th Floor, San Francisco, California and (ii) 400 Capitol Mall, Suite 2600, Sacramento, California. Upon information and belief, it continues to conduct business from that location. Defendant does business as Lockton Insurance Brokers, LLC.

15.     **Defendant Lockton Companies, LLC - Pacific Series** is a Missouri limited liability company, with headquarters at 444 W 47th St., Suite 900, Kansas City, Missouri 64112. It is a series of Lockton Companies LLC pursuant to Missouri law. *See* Mo. Rev. Stat. § 347.186. It is registered with the California Secretary of State to do business in this State. It has an office in California located at 777 S. Figueroa Street, 52nd Floor, Los Angeles, California. It also does business as Lockton Insurance Brokers, LLC. Upon information and belief, Lockton Companies, LLC – Pacific Series conducts business from 3 Embarcadero Center, 6th Floor, San Francisco, California, operates brokage offices in California, and supervises employees at its California locations.

16.     Plaintiffs are informed and believe and thereon allege that each of the Defendants designated as DOE is in some manner responsible for the damages claimed by plaintiff herein.  Plaintiffs will seek leave to amend this complaint to add the true names of these Defendants when the same have been ascertained.

---

[6] On the Effective Date, the Trust was established, and the Debtors' assets were transferred and assigned to the Trust. (See Plan, § 12.3.) The Trust is being administered by the Liquidation Trustees (as defined in the Plan). (*See id.* at § 12.3(a)).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TRUST ASSIGNORS**

17.     **Trust Assignors** are the CredEarn customers who have assigned their customer claims to the Trust, including:

(i)      **Charles Lee,** who loaned 100 Bitcoin ("**BTC**") in CredEarn. His loan earned interest at a rate of 8% per annum on his BTC.

(ii)     **Chi King Wu**, who loaned 1,606 Bitcoin Cash ("**BCH**") and 1400 BTC in CredEarn.[7] His loan earned interest at a rate of 7% per annum on this BCH and 9% per annum on his BTC.

(iii)    **Christopher Moser,** who loaned 661.221 BCH; 426.10 BTC, and 5,471,710.732 LBA in CredEarn. His loan earned interest at a rate of 7-9% per annum on his BTC, 5% per annum on his BCH, and 5-10% per annum on LBA.

(iv)    **Gunther Baugh,** who loaned 170.95 BTC and 15.512 Ethereum ("**ETH**") in CredEarn. His loan earned interest at a rate of 7-9% per annum on his BTC and 5% per annum on his ETH.

(v)     **Joseph Shull,** who loaned 40.09 BTC and 10,000 LBA in CredEarn. His loan earned interest at a rate of 7% per annum on his BTC and 10% per annum on his LBA.

(vi)    **Julius Hudec**, who loaned 97.69 BTC in CredEarn.  His loan earned interest at a rate of 7-9% per annum on his BTC.

(vii)   **Koji Kanie,** who loaned 32.39 BTC in CredEarn. His loan earned interest at an interest rate of 7% per annum on his BTC.

(viii)  **Kyle Wang,** who loaned 1,500,000 USD Coin in CredEarn. His loan earned an interest rate of 10% per annum.

(ix)    **Olatunde Lapido,** who loaned 3,220.010 ETH and 10,000,000 Lumen ("**XLM**") in CredEarn. His loan earned interest at a rate of 5.0% per annum on his ETH and at a rate of 5.5% for XLM.

---

[7] The Trustees may amend this complaint to add the claims of additional Trust Assignors.

(x)    **Patrick Archambeau**, who loaned 30.74 BTC, 305,000 USD Coin ("**USDC**"), and 10,000 Cred LBA Coin ("**LBA**"). His loan earned interest at a rate of 7% per annum on his BTC, 12% per annum on his UDC, and 10% per annum on his LBA.

(xi)   **Robin Houck,** who loaned 95 BTC in CredEarn. His loan earned interest at a rate of 8% per annum on his BTC.

(xii)  **Teppei Miyauchi,** who loaned 1339.65 BTC in CredEarn. His loan earned interest at a rate of 8% per annum on his BTC.

## **OTHER RELEVANT NON-PARTIES**

### A.  **Cred-Related Non-Parties**

18.    **Alexander** is James Alexander. He was Cred's Chief Capital Officer from August 2018 through all relevant periods described in this Complaint. According to the Report issued by Cred's Examiner, it was revealed post-bankruptcy that Alexander had escaped prison in the United Kingdom.[8]

19.    **Cred Inc.** is a crypto company that filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on November 7, 2020 ("**Filing Date**"). Cred was a crypto currency company and has been liquidated in Chapter 11, with its remaining assets to be liquidated through the Trust. Cred was incorporated in Delaware and its principal place of business was at 3 East Third Avenue, Suite 200, San Mateo, California.

20.    **Examiner** is the person appointed in Cred's Chapter 11 case to examine Cred's past activities. On December 23, 2020, the Bankruptcy Court ordered the appointment of an examiner. On January 8, 2021, the Court entered an Order approving the appointment of Robert J. Stark as the Examiner. In the Order, the Court directed the Examiner to investigate allegations of fraud, dishonesty, incompetence, and misconduct in affairs of the Debtors and otherwise perform the duties of an examiner, as set forth in Bankruptcy Code §§ 1106(a)(3) and 1106(a)(4), 11 U.S.C. §§ 1106(a)(3) and 1106(a)(4). On March 8, 2021, the Examiner issued a report ("**Examiner Report**").

21.    **Gardler** is Meghan Gardler. She was the Director of Marketing at Cred during all relevant periods described in this Complaint. Upon information and belief, Gardler worked in California during all relevant periods described in this Complaint.

---

[8] Examiner Report at 7.

22. **Hua** is Lu Hua. He was a co-founder and 50% owner of Cred, and was one of Cred's two directors. He was a director of Cred during all relevant periods described in this Complaint. Hua served as Cred's CEO until late 2018, when Schatt became CEO.

23. **moKredit**[9] was and may currently still be a Chinese micro-lending platform in which the vast majority of CredEarn funds were invested. moKredit was incorporated in the Cayman Islands and is based in Shanghai, where it allegedly provides microcredit loans to Chinese borrowers. Hua is the founder and/or manager or director of moKredit.

24. **Perez** is Travis Perez. He served as Vice President for Wealth for Cred from April 2019 to December 2020. Upon information and belief, Perez worked in California during all relevant periods described in this Complaint.

25. **Podulka** is Joseph Podulka. He served as Cred's Chief Financial Officer from July 2019 to December 2020. Upon information and belief, Podulka worked in California during all relevant periods described in this Complaint.

26. **Schatt** is Dan Schatt. He was a co-founder and 50% owner of Cred. Schatt served as Cred's President and later as Chief Executive Officer during the periods described in this Complaint. Schatt was one of Cred's two directors during all relevant periods described in this Complaint. Upon information and belief, Schatt worked in California during all relevant periods described in this Complaint.

27. **Wheeler** is Daniel Wheeler. He served as Cred's General Counsel from August 2019 through all relevant periods described in this Complaint. Wheeler previously served as Cred's primary outside counsel as a partner at Bryan Cave Leighton Paisner LLP from 2018 until August 2019.

28. **Zhang** is Ka "Michael" Zhang. He served as Vice President of Wealth at Cred from August 2019 to November 2020. Upon information and belief, Zhang worked in California during all relevant periods described in this Complaint.

---

[9] The entities comprising the defined term "moKredit" are moKredit Inc., moKredit Technology (Hong Kong) Company Limited, moKredit (Shanghai) Information Technology, Co. Ltd, and Shanghai Bestone Information Technology Co. Ltd.

B. **Relevant Lockton Employees**

29.     **Arzu** is Nyreese Arzu, who served as an executive/employee of Lockton during all relevant periods described in this Complaint. Upon information and belief, Arzu worked in California during all relevant periods described in this Complaint.

30.     **Coe** is Lindsay Coe, who served as an executive/employee of Lockton during all relevant periods described in this Complaint. Upon information and belief, Coe worked in California during all relevant periods described in this Complaint.

31.     **Koo** is Jeff Koo, who served as an executive/employee of Lockton during all relevant periods described in this Complaint. Upon information and belief, Koo worked in California during all relevant periods described in this Complaint.

32.     **Tokatz** is Michael Tokatz, who was an Account Executive at Lockton during all relevant periods described in this Complaint. Upon information and belief, Tokatz worked in California during all relevant periods described in this Complaint.

## STATUTE OF LIMITATIONS

33.     The Trustees and the Trust Assignors did not discover and could not reasonably have discovered the false and fraudulent activities and misrepresentations relating to Cred's business and Cred's false representations until sometime after the Examiner Report was issued (on March 8, 2021) in the Cred Chapter 11 case or afterwards. The Trustees and the Trust Assignors could not have discovered the false and fraudulent activities of Lockton until after the Trustees were appointed to the Trust and permitted to investigate these issues.

34.     This action is timely filed after the discovery of the wrongdoing alleged herein.

## JURISDICTION

35.     This Court has original jurisdiction over the subject matter of this action pursuant to Section 10 of Article VI of the California Constitution.

36.     Pursuant to Cal. Civ. Proc. Code § 410.10, this Court has personal jurisdiction over Lockton because Lockton, among other things, purposely availed itself of the benefits of doing business in California by regularly conducting commercial activities that impact California in a substantial, continuous, and systematic basis. Lockton has offices from which it transacted the business that gives

rise to the claims asserted here: (i) 3 Embarcadero Center, 6th Floor, San Francisco, California, (ii) 400 Capitol Mall, Suite 2600, Sacramento, California, and (iii) 777 S. Figueroa Street, 52nd Floor, Los Angeles, California. Lockton sold Cred insurance coverage from these offices and coordinated with Cred on drafting the Lockton/Cred statements from these offices. Lockton advised Cred about insurance coverage in California, and Lockton employees in California worked with Cred to craft false and misleading statements to Cred customers in California.

37.     In addition, Cred's principal place of business at the time of the relevant events was 3 East Third Avenue, Suite 200, San Mateo, California. Most of the senior executives and employees of Cred who coordinated with Lockton and its employees in drafting the false Lockton/Cred Statements were based in California. Lockton employees based in California also sold Cred the policies. The Lockton/Cred Statements were made available through Cred's website and by other means.

38.     Venue is proper in this Court because (i) Lockton has an office that is located in the County of San Francisco and (ii) Lockton's misconduct that forms the crux of the allegations set forth herein took place in the County of San Francisco.

## FACTUAL BACKGROUND

### A. Cred Launched the CredEarn Platform

39.     Schatt and Hua established Libra Credit, which later became known as "Cyber Quantum Pte. Ltd," in 2018. On May 14, 2018, Schatt and Hua organized "Libra Credit (US) LLC" in Delaware. In August 2018, Libra Credit (US) LLC changed its name to "Cred LLC." Schatt and Hua also formed a subsidiary, "Cred (US) LLC," in August 2018, with Cred LLC as its sole member.

40.     On May 13, 2020, Cred LLC became incorporated as Cred Inc. Cred Puerto Rico LLC was also formed for the purpose of facilitating transactions for residents in Puerto Rico. The Trustees refer to Libra Credit, Cyber Quantum Pte. Ltd., Cred LLC, and Cred (US) LLC, Cred Puerto Rico LLC, and Cred Inc. collectively as "**Cred**."

41.     In late December 2018 to January 2019, Cred launched a cryptocurrency yield-earning program[10] called CredEarn. Through CredEarn, customers lent their crypto to Cred for a fixed period

---

[10] In a yield-earning program, the company that sponsors the program borrows crypto from its customer, and the customer become an unsecured lender of cryptocurrency. The company promises to repay the customer the crypto back at a fixed

of time. Cred promised to pay customers a fixed interest rate on their crypto (either in cash or more crypto) and return their crypto, plus interest, to customers on a specified date. Once Cred received customers' crypto, it converted the crypto into fiat currency, such as the United States dollar. Cred then purported to invest the funds at a higher rate of interest than it was required to pay the CredEarn customers. From June 2019 until the Filing Date, Cred borrowed over $280 million in crypto from CredEarn customers based on the false promise that customers' losses were insured.

**B.**   **Lockton Was Cred's Insurance Broker from Its Early Days and Knew Cred Had Only Limited Insurance**

42.   Once Cred started the CredEarn program, Cred knew that Lockton could help make the program more marketable. Cred had used Lockton for its insurance needs in its early days and deepened its relationship with Lockton.

43.   Lockton advertised itself as the world's largest independent insurance brokerage and claimed to have expertise in the financial services and cryptocurrency markets. It publicly touted its "expertise and influence in the insurance marketplace" and claimed it provided "exceptional results for its customers."[11] Lockton boasted that "[f]inancial institutions and financial service companies around the world select Lockton to strengthen their insurance."[12] Lockton also claimed its clients had the ability to "design and tailor [their] insurance program and risk transfer strategies to fit [their] unique needs."[13]

44.   Lockton acquired several policies for Cred. But the policies provided only minimal coverage for Cred and no coverage for CredEarn customers.

45.   Lockton sold Cred an errors and omissions insurance policy ("**E&O Policy**") from Validus Specialty ("**Validus**") that was supposed to cover wrongful acts of the company, its

---

date, plus interest earned during the duration of the loan. The company then seeks to earn a greater yield on the loaned cryptocurrency than it owes its customer under the yield-earning program. This is usually earned through the company turning the crypto into fiat currency and re-lending the money at a higher rate or through cryptocurrency trading strategies. The customer benefits from yield-earning programs because he or she maintains ownership of the cryptocurrency while earning interest. The company profits from yield-earning programs if it earns a greater yield than the company owes customers.

[11] https://global.lockton.com/us/en/financial-services

[12] https://global.lockton.com/us/en/financial-services.

[13] https://global.lockton.com/mena/en/products-services/cyber-and-technology.

executives, and employees. Although the CredEarn program took in over $280 million from customers, the E&O Policy provided only $1 million of coverage with a $350,000 self-insured retention. The details of the policy reflected that it did not cover CredEarn customers' losses, nor did it cover the Cred losses that pushed it into bankruptcy.

46.     Moreover, while the E&O Policy referred to insurance for Lending Services, *i.e.*, CredEarn,[14] the details of the policy reflect that CredEarn losses were largely excluded. *First*, the E&O Policy did not cover a loss "for liability arising out of any representation, promise or guarantee of the past performance or future value of any investment product." *Second*, the E&O Policy did not cover critical misdeeds of executives and employees of Cred, including acts that involved the gaining of any personal profit or financial advantage to which the insured was not legally entitled. *Third*, the E&O Policy did not cover any loss relating to theft, appropriation, misappropriation, misuse, or conversion of any crypto currency, crypto token or coin, digital token or coin, utility token or coin, or any blockchain asset, security, or other means of trade or transaction involving blockchain or equivalent software or technology. *Fourth*, the E&O Policy eliminated coverage for any loss arising out of the "insolvency, conservatorship, receivership, bankruptcy, or liquidation of any Insured, or the inability of the Insureds to perform Professional Services or Lending Services." *Fifth*, the E&O Policy specifically excluded losses from wrongful acts involving moKredit.

47.     Lockton also sold Cred a cyber liability policy from Axis Insurance ("**Axis Policy**") that provided similarly minimal and illusory coverage. While the Axis Policy supposedly provided Cred with cyber liability coverage up to a $5 million limit with a self-insured retention of $25,000, the most critical parts of the Axis Policy were subject to different caps. The endorsements decreased coverage for social engineering fraud and telecommunication theft provided only $250,000 of coverage with a self-insured retention of $25,000. The Axis Policy also excluded coverage for a loss resulting from the breach of an agreement or for fraudulent or intentional misconduct.

48.     Lockton also sold Cred two directors' and officers' insurance policies with gaping holes ("**D&O Policy**"). The first policy from Validus provided $1 million in coverage with a $200,000 self-

---

[14] Lending Services was defined in the E&O Policy as "(ii) the borrowing of Bitcoin from unsolicited third-party client self-directed investors through the creation of Enhanced Yield Accounts pursuant to the terms and conditions of a fully executed CredEarn Agreement."

insured retention; and the second policy from Euclid had a $1 million excess insurance policy that was subject to the essentially the same terms and conditions as the Validus Policy. Like the E&O Policy, the D&O Policies excluded acts that caused the CredEarn losses. It did not cover acts that (i) provided a personal profit or financial advantage to the D&Os, (ii) resulted from a written agreement, or (iii) related to the offering of securities by Cred.

49.     Furthermore, the D&O Policy has an "ICO and Crypto Currency, Token, or Coin Exclusion Endorsement." This exclusion provided that any kind of loss relating to crypto was not covered, including a loss from the ownership of crypto, investment in the form of crypto, transfer of crypto, or the theft, appropriation, misappropriation, misuse, or conversion of crypto.

50.     Lockton also sold Cred a general commercial insurance policy from The Hartford Financial Services Group, Inc. ("**Hartford Policy**"). The Hartford Policy expressly excluded losses Cred suffered from dishonest or criminal acts or losses resulting from "voluntarily parting with any property to a person the insured entrusted the property if induced by any fraudulent scheme, trick, device or false pretenses."[15]

51.     Lockton was Cred's broker and knew the terms and exclusions for all these policies. Lockton knew that Cred's insurance policies did not cover the losses CredEarn customers might suffer. Yet Lockton ignored this reality when it drafted public statements with Cred about Cred's insurance coverage.

### C.   **Lockton and Cred Drafted the Lockton/Cred Statements on Insurance Coverage**

52.     Lockton played a pivotal role in helping Cred promote the CredEarn program. On March 29, 2019, Coe, a Lockton account executive, and Arzu, a Lockton assistant vice president and account executive, began working with Cred to "craft a public-facing 1-3 paragraphs on [Cred's] website" about its insurance coverage.

53.     Arzu suggested Cred use "Coinbase's insurance web page" as a template, and he attached a link to it. This suggestion was odd since the kinds of insurance that Coinbase could acquire and afford were completely different than what Cred had. Coinbase was a far more mature company than Cred: Coinbase was valued at $8 billion by late 2018 and earned more than $500 million in revenue

---

[15] Cred also had $1 million coverage for lawyers from One Beacon Insurance.

in 2019. Arzu failed to point out any distinction when he inappropriately suggested using Coinbase's insurance as a model.

54.     Schatt replied to Arzu's email and said that Cred needed more guidance on the disclosure. That same day, in response to Schatt's request for more information, Coe said: "[w]e completely understand your need for some more information. I think this discussion would be better suited for a phone call." Schatt replied: "[s]ure, in the meantime, it would be helpful to send us something that can help us understand what can be said publicly." Coe and Arzu told Schatt that they could provide thoughts over the phone and suggested Cred consult its counsel for further assistance.

55.     Koo, who outranked Arzu and Coe, was dissatisfied with the answers that Arzu and Coe gave to Schatt. Thus, Koo took over this important project and made three important changes. ***First***, Koo eliminated Coe and Arzu from the emails with Lockton. Thereafter, Koo was in charge of the statements, and he did not appear to ask for others' viewpoints regarding the appropriateness of Lockton's direct participation in drafting the website statements. ***Second***, Koo made clear that he and his team would draft statements for the website, instead of merely providing thoughts over the phone. ***Third***, Koo agreed to ensure the accuracy of statements about the insurance coverage and the terms of the policies.

56.     Once he excluded Coe and Arzu from the email chain, Koo sent an email dated April 1, 2019, only to Schatt, in which Koo stated, "I want to help you draft what you want to put on your website." Koo explained that he was "more than happy to have a conversation over the phone and *get this written down on our end*."[16] In fact, he stressed that he "will be reaching out direct to have this drafted *with you*."[17] Koo and Schatt scheduled a phone call to discuss the insurance disclosure the next day.

57.     On April 3, 2019, Koo emailed Schatt about how to describe the insurance on Cred's website. Koo remarked: "This should be a great start in drafting an insurance paragraph on your website. We can discuss this once you have your first draft." On April 5, 2019, Koo diligently followed

---

[16] Emphasis added.

[17] Emphasis added.

1    up and wrote Schatt: "[c]hecking back in from my prior email. Let me know when you have your first

2    draft."

3        58.    A few weeks later, Coe and Arzu were unintentionally copied on an email chain that

4    mentioned the insurance-related statements for Cred's website. But Koo again excluded Coe and Arzu.

5    Koo told Schatt, "As for the language, for your website, we can have a separate email for this." Koo

6    followed up directly with Schatt on April 27, 2019: "Let me know how things are going as far as

7    drafting what you would like to put on your website."

8        59.    On May 13, 2019, Schatt finally sent Koo a "long overdue" "stab at the language for

9    the [w]ebsite." Schatt adopted Koo's suggestions. These draft statements were headlined "Going Above

10   and Beyond" ("**Draft GA&B Statements**"). A copy of the Draft GA&B Statements is attached hereto

11   as **Exhibit 1**. The Draft GA&B Statements claimed that Cred had "the industry's most comprehensive

12   set of risk management, information security and insurance protections available." The Draft GA&B

13   Statements also claimed that: "[i]f the worst happens and Cred loses customer funds, customers deserve

14   certainty that they will be made whole." In the Draft GA&B Statements, Cred claimed it was serious

15   about protecting client financial assets and that it believed it has "an obligation to take a leadership role

16   to go beyond today's status quo to obtain as many insurance and risk management protections as

17   possible."

18       60.    The Draft GA&B Statements included representations about Lockton and the process

19   by which Lockton had helped Cred about insurance, such as that Cred selected "Lockton in part due to

20   their competency in crypto, cybercrime and financial services." In addition, the Draft GA&B

21   Statements that Lockton co-authored proclaimed that Cred was "proud of the fact that Cred ha[d] some

22   of the most comprehensive insurance policies of any crypto financial services platform, spanning errors

23   and omissions (E&O), Directors and Officers (D&O),[18] Cyber and Regulatory claim coverage." The

24   Draft GA&B Statements further claimed that Cred was "selected by underwriters for insurance

25   coverage after it was evaluated against several criteria," including "Cred's licensed and well

26   documented business activities," its "highly reputable strategic partners," its "best practices with its

27

28   _____

[18] Lockton and Cred decided not to mention D&O insurance to avoid lawsuits, but the representations about comprehensive
insurance encompassed this policy. As explained above, the D&O coverage was woefully inadequate.

partners" and its "executive team [that] stands out for its depth of experience." Relatedly, the Draft GA&B Statements concluded that "[t]his comprehensive insurance coverage provided to Cred [was] a testament to the confidence Cred's underwriters have in Cred's ability to demonstrate to financial regulators that it can demonstrate sound policies and procedures and adequate supervision."

61.     The Draft GA&B Statements also made more specific representations about the insurance coverage that comprised Cred's "comprehensive cyber policy coverage." For example, they claimed that Cred's E&O Insurance covered a situation in which "a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not have the promised results." Services, "include[d] the *borrowing of crypto from a client related to the terms and conditions of a Cred Agreement* and the granting of business or consumer lines of credit against crypto assets."[19] The Draft GA&B Statements also claimed that Cred's insurance policies "cover product failure, meaning *the inability of customers to access or otherwise utilize Cred's intended service*" as well as "any wrongful act or product failure in the rendering of Cred's professional services."[20] In addition, the Draft GA&B Statements claimed that D&O insurance covered "claims that may arise from actual or alleged wrongful acts of directors and officers."

62.     Koo responded to the Draft GA&B Statements shortly after he received them on May 13th, praising it as a "[v]ery nice piece of work." He assured Schatt that he would review and make comments. Koo also agreed that he and his team would ensure that the policy details were accurately described. He emailed Schatt, "I will need some time to review the *insurance requirements with my team*. I will be in touch shortly."[21]

63.     Koo assured Schatt that his team was working on it nearly a week later. In an email dated May 20, 2019, Koo said to Schatt: "I am working with my team this week to ensure that the *coverage stated is within the terms and conditions*. I will want to set up a call with you on Friday to

---

[19] Emphasis added.

[20] Emphasis added.

[21] Emphasis added.

discuss."[22] A few days later, on May 22, 2019, Koo said he would like to set up a meeting to discuss the disclosure "preferably in person."

64.     On May 27, 2019, Koo proposed minor changes to just one section of the Draft Going Above and Beyond Statements, which related to Cyber and Regulatory Insurance.[23] But none of those changes changed the important claims in the Draft GA&B Statements cited above.

65.     Koo also gave the green light for Cred to use the disclosure. He stated that the E&O Policy disclosure, which was "fairly detailed," *could be used*.[24] This was the section that specifically addressed the CredEarn program and claimed Cred was insured for losses relating to that program.

66.     The drafting work by Lockton and Cred in this Section C resulted in the form statements that were used on Cred's website ("**Lockton/Cred Statements**").

67.     Lockton was instrumental to creating the Lockton/Cred Statements because the disclosure resulted from (i) Lockton executives' suggestion that Cred mirror language used by Coinbase; (ii) phone discussions and/or in-person meetings between Lockton executives and Cred's executives about the contents; (iii) Lockton executives sending Cred descriptions of the insurance policies; (iv) Koo's proactive measures to take responsibility for the statements, such as by writing them, having his team work on them, and taking responsibility for accurately relaying the terms of the policies; and (iv) Lockton and Cred exchanging drafts and a mark-up of the statements. Thus, Lockton

---

[22] Emphasis added.

[23] The modification was to change the sections below as follows:

**Cyber Insurance**
One of Cred's priority areas cyber insurance. Security and protection of client funds is our top priority. Cred's comprehensive cyber policy covers network security failure, cyber extortion, data recovery, costs, ransomware, forensics, reputational harm, business interruption and system failures. we [sic] believe it is particularly critical to focus on employee training related to privacy and data security. we've [sic] financially supported our employees to pursue advanced cyber security specializations (***name the certifications***).

**Regulatory Insurance**
Cred is covered for liability associated with privacy breaches and computer system security breaches. Cred also devotes significant time and resources to support user education.

Cred's policy also covers privacy notifications and claims brought by any regulatory or administrative agency.

[24] Emphasis added.

1    was a co-author that was instrumental in creating the false representations in the Lockton/Cred

2    Statements.

3         68.    As explained below, with very little modification, the Lockton/Cred Statements were

4    used for Cred's website and other places where customers could read them. Also as explained below,

5    the statements crafted by Lockton and Cred was used, posted, or otherwise made available to CredEarn

6    customers in a variety of ways.

7    **D. The Lockton/Cred Statements Were False**

8         69.    The Lockton/Cred Statements were littered with false information and blatant

9    misrepresentations. Lockton knew the representations were false. *First*, Lockton was an insurance

10   broker that touted its expertise in crypto, cybercrime, and financial services. *Second*, Lockton knew the

11   true extent of Cred's coverage because it had helped Cred find insurance carriers, discussed policies

12   with Cred, helped negotiate the policies, and sold them to Cred. *Third*, Lockton specifically assumed

13   responsibility to make sure the disclosure accurately reflected Cred's insurance coverage.

14        70.    The Lockton/Cred Statements were false for many reasons. First, Cred's insurance was

15   ***not*** "the industry's most comprehensive set of risk management, information security and insurance

16   protections available." This was false for a few reasons. First, Cred's total insurance was *de minimis* as

17   compared to the size of its CredEarn program. Cred had *$15 million* of Crypto, General liability, E&O,

18   D&O insurance (most of which did not cover Cred's or its customers' losses), *but it had exposure for*

19   *over $280 million* of CredEarn customer crypto loans. The amount of insurance coverage was not

20   comprehensive based on Cred's business, nor did Cred have the highest insured limits in the industry.

21        71.    Further, Cred's insurance was not comprehensive because it had no crime insurance.

22   Lockton knew Cred had no crime insurance because it investigated getting some for Cred. In September

23   2019, Koo referred Podulka to Michael Tokatz at Lockton to continue discussing crime coverage.

24   Crime coverage was difficult to obtain, though other crypto companies with stronger internal controls

25   and financial statements, like Coinbase and Gemini, had such policies. Cred gave up on getting crime

26   insurance when it learned about the rigorous underwriting process and standards.

27        72.    In May 2020, Podulka reconsidered possibility of getting crime insurance, but declined

28   again because he believed the potential premium was too high. Lockton knew that Cred had abandoned

---

its consideration of crime insurance. In sum, given the critical lack of crime coverage, Lockton knew that Cred did not "obtain as many insurance and risk management protections as possible" for the "crypto community."

73.     The Lockton/Cred Statements also misrepresented the process by which Cred had obtained its (limited) insurance. For example, the Lockton/Cred Statements falsely claimed that Cred was "selected by underwriters for insurance coverage after it was evaluated against several criteria," including "Cred's licensed and well documented business activities," its "highly reputable strategic partners," its "best practices with its partners" and its "executive team [that] stands out for its depth of experience."

74.     In fact, as Lockton knew, Cred had trouble finding cyber insurance and had been rejected by one carrier because of its poor practices. The carrier told Lockton why it declined for reasons such as:

> • Key management was inadequate, CRED did not appropriately backup and manage keys to their customer's wallets
> • Auditing in CRED services was inadequate
> • Protection of the Drivers License information and other KYC type data was inadequate
> • Authentication for services such as the Amazon AWS IaaS console, Email, and consumer did not offer adequate 2-Factor
> Authentication mechanisms, or did not require 2-Factor Authentication in general.
> • We believe that the crypto space should require 2-Factor Authentication for all services, and never rely on SMS for 2-Factor Authentication

Thus, the Lockton/Cred Statements falsely asserted that Cred's insurance coverage was "a testament to the confidence Cred's underwriters" had in Cred's ability to demonstrate "sound policies and procedures and adequate supervision."

75.     The Lockton/Cred Statements also falsely claimed that Cred had "the most comprehensive insurance policies of any crypto financial services platform, spanning errors and omissions (E&O), Directors and Officers (D&O), [and] Cyber and Regulatory claim coverage." In fact, each of these policies was not comprehensive and had gaping exclusions and exceptions described above. For example, the D&O insurance had a crypto exclusion and excluded acts that involved personal gain, while its Cyber Policy had a $250,00 limit for social engineering fraud and telecommunications theft and it lacked coverage for a loss resulting from the breach of an agreement

or for fraudulent or intentional conduct. Both policies also provided *de minimis* coverage considering the magnitude of potential losses.

76.    The Lockton/Cred Statements also falsely claimed that Cred's E&O Insurance covered potential CredEarn losses. In particular, the Statements misrepresented that coverage would apply in a situation in which "a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not have the promised results," which services, "include[d] the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement." It also claimed the insurance covered "the inability of customers to access or otherwise utilize Cred's intended service" as well as "any wrongful act or product failure."

77.    But contrary to this representation, the E&O Policy insured minimal losses. In addition, the E&O Policy excluded coverage for every activity that led to the CredEarn losses. There was no coverage for acts or events that involved personal profit, wrongful employee acts, theft or misappropriation, losses from bankruptcy, or any acts involving moKredit. These exceptions gutted the policy and provided no benefit for customers when Cred could not return their crypto. CredEarn customers filed claims in the bankruptcy for more than $165 million because there was no insurance coverage.

78.    Simply put, while the Lockton/Cred Statements claimed that: "[i]f the worst happens and Cred loses customer funds," customers "will be made whole" through the insurance, Lockton knew that would never happen. Instead, it was foreseeable that customers would be devastated by uninsured losses.

**E.    Cred Published the False and Misleading Lockton/Cred Statements, Which Accelerated Customer Deposits Based on the False Assurances about Insurance**

79.    In June 2019, Cred posted the false and misleading Lockton/Cred Statements with extremely minor (non-relevant) modifications. It was posted on Medium.com in early June 2019 and is attached hereto as **Exhibit 2** (*see https://medium.com/@ihaveCred/going-above-and-beyond-c1468769c563* ). The Medium Article bore the Lockton logo as set forth below:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



80.     CredEarn customers who visited Cred's website and wanted to read about the safety of CredEarn and Cred's insurance were directed to a link with the Medium article. The Medium article was viewed over 1300 times from the time it was posted until the Filing Date.

81.     On October 16, 2019, Cred again posted the false Lockton/Cred Statements linked to its website, at *https://mycred.io/blog/crypto-insurance/.* The Lockton/Cred Statements remained on the Cred website shortly before Cred filed for bankruptcy.[25]

---

[25] Examiner's Report at pp. 37-38.

82.     The post bore only the Lockton logo:



**Crypto Insurance: Going Above and Beyond**

web.archive.org/web/20201001082401/https://mycred.io/blog/crypto-insurance/

October 16, 2019

Cred goes above and beyond
with insurance coverage

LOCKTON

83.     The Lockton link remained on the website until it was removed on 10/31/2020, just before Cred's Filing Date. *See* **Exhibit 3** and attached hereto https://web.archive.org/web/20201001082401/https://mycred.io/blog/crypto-insurance/. Hundreds, if not thousands, of potential customers were directed to this site.

84.     From October 2019 through October 2020, Cred's marketing and sales team directed hundreds of customers to Cred's website, which contained the information that Lockton co-authored.

85.     Cred was quite successful in attracting loans based on the false statements that it crafted with Lockton, which became a distinguishing feature of CredEarn program.

86.     The Trust Assignors each relied on similar information. For example, Zhang at Cred told Mr. Shull that Cred had purchased the most insurance that any crypto company could purchase. An email dated October 14, 2019, from Zhang to Mr. Shull stated that Cred had a "comprehensive insurance policy on E&O, D&O and other cyber protection." In the same email, Zhang further expressly promised that "during the time that they [the crypto/funds] are with us we have a comprehensive insurance policy with Lockton that includes protection against any hacking, E&O, and regulatory coverage."

87.     CredEarn raised about $6 million per month on average in the first half of 2019. Once the Lockton/Cred Statements became public, however, the money Cred raised increased dramatically and rapidly because Cred's marketing efforts were built upon lies it crafted with Lockton. The following are the amounts Cred raised per month from July 2019 to October 2020:[26]

| July 2019 | $7,456,401 |
| August 2019 | $4,202,082 |
| September 2019 | $16,525,428 |
| October 2019 | $15,858,511 |
| November 2019 | $19,075,893 |
| December 2019 | $22,906,923 |
| January 2020 | $32,728,197 |
| February 2020 | $18,611,985 |
| March 2020 | $20,287,797 |
| April 2020 | $16,226,274 |
| May 2020 | $12,648,982 |
| June 2020 | $23,673,771 |
| July 2020 | $18,143,789 |
| August 2020 | $41,601,206 |
| September 2020 | $16,694,769 |
| October 2020 | $7,367,756 |

88.     Thus, customers poured into the CredEarn program based on the insurance misrepresentations that lured customers into a false sense of security. On November 30, 2019, Schatt emailed his team, praising them for bringing in customers at a rapid pace and remarked that they are breaking "Cred World Records." Schatt also exhorted his team that the new crypto loans were "Unbelievable!!!" By the end of 2019, Schatt said that "[i]t is hard to put this unbelievable year into

---

[26] These calculations are alleged on information and belief based on a review of Cred's records and efforts to reconstruct Cred's accounting records by the Trustees' professionals.

words, so I'll start with some unbelievable numbers." He attached a chart showing a 375,225% growth rate in attracting new CredEarn customers.

89.     Schatt continued to push the CredEarn program with success—using the false representations about Cred's insurance—through May 2020. The efforts to promote Cred remained successful despite volatility in the crypto market and the COVID pandemic. Schatt exclaimed to his team in May 2020: "What a month (again!)" and commented that "[t]he platform and sales team brought in over $18 million of additional funding, beating our $15 million goal."

90.     By using the false and misleading Lockton/Cred Statements and the purported comprehensive insurance to peddle the CredEarn program, Lockton and Cred together fraudulently induced customers to enter into the CredEarn at a furious pace.

**F.   Customers Relied on the False Statements About Cred's Insurance**

91.     Customers reasonably relied on the Lockton/Cred Statements. Since Lockton was regarded as the preeminent expert in the crypto insurance field, and it could be expected to source unusual products or even create a bespoke product, CredEarn customers reasonably believed that Cred's insurance would make them whole.

92.     The Examiner found that customers were pointed to or received "insurance information that, according to certain customers, led them to believe that their crypto loans were fully protected by Cred's insurance policies.[27] The Examiner observed that one customer, Darryl Ferguson, placed his confidence in Cred due to its "advertised claim to have 'industry leading' insurance."[28]

93.     Likewise, each of the Trust Assignors reasonably relied on the false statements about Cred's insurance. **Charles Lee** decided to participate in CredEarn after performing substantial due diligence on the CredEarn program. That process included an in-person meeting with Schatt. Mr. Lee relied upon Cred's insurance coverage. It was a major factor in his decision to join the CredEarn program, and at the time of Cred's filing, he recalled Cred having some sort of insurance that covered his losses.

---

[27] Examiner Report at 38.

[28] *Id.*

94.     **Chi King Wu** participated in CredEarn initially based on the representations concerning insurance coverage. Mr. Wu reviewed the Lockton/Cred Statements, information on Cred's website concerning insurance coverage, and the Medium article. Mr. Wu relied on the representations about comprehensive insurance that would have covered his losses. Mr. Wu also communicated with Michael Zhang, who promised Mr. Wu that there would be comprehensive insurance coverage. Mr. Wu would not have participated in Cred if it did not have extensive insurance coverage.

95.     **Christopher Moser** noticed that unlike Cred, other companies did not promise insurance coverage. CredEarn's insurance protection made a crypto loan to Cred more attractive than other yield-earning platforms. After an initial loan to try the program, Mr. Moser increased his crypto loans and rolled over his loans in CredEarn after he reviewed the information on Cred's website and the Medium article. Mr. Moser believed that his crypto loans to Cred were insured, and he relied on that insurance. Mr. Moser also received an email from a Cred email address, info@mycred.io, that stated that Cred was offering the industry's most comprehensive set of insurance protections. This email was also sent to many customers ("**The Insurance Email**").

96.     **Gunther Baugh** also relied on Cred's insurance. He understood that if Cred lost his crypto, he would be insured. Mr. Baugh spoke to Zhang at Cred, who assured him that CredEarn losses were covered by insurance. He thought the insurance was comprehensive. He received an email from Zhang stating that Cred had a comprehensive insurance policy with Lockton that includes protection against hacking, E&O, and regulatory coverage.

97.     **Joseph Shull** participated in CredEarn after the Lockton/Cred Statements were posted. Shull reviewed Cred's website and statements on insurance that talked about Cred making extensive efforts to get insurance. He understood it was called Going Above and Beyond. Based on these statements and Cred's email and phone conversations, Mr. Shull understood that if he lost his crypto, or Cred could not otherwise return it to him, Cred had insurance to cover for the loss.

98.     **Julius Hudec** relied on the promise of insurance coverage for his loans when he entered the CredEarn program. Based on communications from Cred personnel, Mr. Hudec understood that should his loans suffer losses, Cred's promised insurance would compensate him.  Mr. Hudec reviewed the Lockton/Cred Statements with regard to insurance. He never imagined Cred would not tell the truth

on its website about insurance. He remembers the Lockton name and Lockton logo. He believed that if the Lockton name was used in such a prominent manner, the statement was true.

99.    **Koji Kanie** read information about Cred's insurance on Cred's website and a Medium.com article that Cred directed him to about insurance. Mr. Kanie read the "Going Above and Beyond" statements and relied on it. When he participated in CredEarn's yield-earning program, he thought his crypto loan was insured. Mr. Koji would not have participated in CredEarn but for the statements about Cred's insurance that were posted on Medium. Mr. Kanie also received The Insurance Email.

100.   **Kyle Wang** participated in CredEarn initially and increased his crypto loans in reliance of Cred's insurance representations in the Lockton/Cred Statements, on Cred's website and the Medium article. Mr. Wang read the "Going Above and Beyond" statements and relied on it. Mr. Wang was familiar with other yield-earning programs and noticed that Cred distinguished itself based on its promised insurance coverage. Mr. Wang was impressed that Lockton, with its industry leading reputation, was working with Cred to provide the promised insurance. Mr. Wang also spoke by phone with Perez and also received The Insurance Email.

101.   **Olatunde Lapido** relied on representations about Cred's insurance before entering into the CredEarn program. They were a major factor in his decision. He did extensive diligence before he participated. He remembers reading a Business Wire article and likely read any Medium article. He wanted to exit the CredEarn program in the summer of 2020 and get his crypto/money back because he was starting to get worried. Schatt assured him his crypto loan was solid and that it was insured.

102.   **Patrick Archambeau** participated in CredEarn and rolled over his loans after he read Cred's insurance representations in the Lockton/Cred Statements from Cred's website. He was familiar with other yield-earning programs and noticed that few, if any, lending programs touted insurance like Cred did. He understood that Cred distinguished itself based on its insurance. Mr. Archambeau relied on the comprehensive insurance that would make customers whole, in addition to Cred's statements that if it did not provide the services or deliver the results Cred promised, customers were insured. Mr. Archambeau would not have participated in Cred if it did not have extensive insurance. Mr. Archambeau received the Insurance Email.

103. **Robin Houck** participated in CredEarn after the Lockton/Cred Statements were posted on Cred's website. He participated in the CredEarn program because he thought he could not lose his crypto or its value because it was insured. He reviewed the website and the Lockton/Cred Statements and learned that Cred had comprehensive insurance. Mr. Houck also spoke to Zhang at Cred about the CredEarn program. Mr. Houck obtained an assurance from Dan Schatt that Zhang had the authority to make representations about Cred and the CredEarn program. Zhang assured Mr. Houck that his crypto loan was insured.

104. In an email of August 25, 2020, Mr. Houck asked, "how would my coins be stored and secured?" In response, Zhang provided a link to the portion of the Cred website (https://mycred.io/blog/crypto-insurance/) that, as discussed *supra*, displayed a Lockton logo and contained materially false information concerning insurance coverage. Zhang further touted that: "[i]n addition to custodial insurance, Cred has one of the most comprehensive insurance policies available on the market, including Cyber hacking, E&O and regulatory coverage through Lockton one of the world's largest privately owned independently insurance brokage firms."

105. In response, Mr. Houck asked: "[s]pecifically, will my deposit be insured against data breach/theft if this were somehow to occur at Cred?" Zhang responded: "Yes, we have a comprehensive insurance policy that spans over E&O, regulatory changes, and cybersecurity underwritten by Lockton." Zhang embedded in the phrase "comprehensive insurance policy" a hyperlink to the webpage that contained false information about insurance coverage and the Lockton logo. Mr. Houck would not have participated in CredEarn without the assurance about insurance protection. He relied on the representations on the Cred website made by Lockton/Cred, and the reassurances he received that the insurance would protect him from losses.

106. **Teppei Miyauchi** participated in CredEarn based on its representations of extensive insurance coverage. Mr. Miyauchi reviewed the Lockton/Cred Statements, information on Cred's website concerning insurance coverage, and the Medium article. Mr. Miyauchi also communicated with Michael Zhang, who promised Mr. Wu that there would be comprehensive insurance coverage. Mr. Miyauchi therefore believed that any losses would be covered by insurance. Mr. Miyauchi would not have participated in Cred if it did not have the promised extensive insurance coverage.

107.    Lockton and Cred knew that all these representations made directly to CredEarn customers were false.

108.    At first, Cred's General Counsel recklessly failed to object to the false Lockton/Cred Statements. But as Cred later encountered difficulties, he became increasingly nervous about the blatantly fraudulent representations, likely fearing his own culpability when Cred eventually collapsed.

109.    Wheeler became General Counsel to Cred in August 2019, a few months after the Lockton/Cred Statements were first published. In October 2019, Wheeler reviewed the statements and suggested one minor comment: but his minor change was too cute by half. He suggested that Cred change the statements that the insurance was *the* best to "one of the best" policies a company could obtain. Even as modified, it was still false because Lockton was clearly not did not have "one of the best" insurance coverage that could be purchased. Wheeler had no problem with the other blatant false statements. But after Cred attracted hundreds of million in loans based on the false representations, Wheeler became increasingly nervous.

110.    On May 15, 2020, Wheeler advised Zhang in an email that the insurance representations that Cred had been making for about a year were false. Wheeler explained:

> We need to delete the entire bullet point about "insured custody of users crypto" because no insurance exists. We also need to delete the bullet point about "Cred has one of the most comprehensive insurances" because it could mislead someone into thinking that their crypto is insured when it is not.

111.    Wheeler explained the situation by email to Gardler, Director of Marketing, that same day:

> I am uncomfortable with continued references to Cred's insurance in our website or any of our marketing materials as our insurance has proven to be of no value to us and in no way insures our user's crypto against loss. I am inviting discussion on this point before we make a final decision, but I am strongly inclined to remove any and all references to Cred's insurance coverage.

112.    But Cred did not want to stop making false statements about its insurance. After some discussions that included Gardler and Schatt, the misrepresentations remained and continued to be publicized.

113.    By October 27, 2020, when Cred's bankruptcy filing was imminent, Wheeler made another lame and belated attempt to cover himself. He emailed, "Need to delete reference to insurance. There is no insurance that *protects client assets*." This was far too late: Cred had raised hundreds of millions of dollars from CredEarn customers who were never protected for their losses by Cred's far-from-comprehensive insurance policies.

### G.  Cred Collapsed as a Result of Its D&Os' Reckless, Fraudulent, and Self-Interested Conduct: Over $165 Million in Customer Claims Remained Unpaid

114.    A large part of Cred's losses resulted from Cred lending money to moKredit, a Chinese company related to Hua. Cred turned the crypto it borrowed from CredEarn customers into fiat currency and lent it to moKredit, which made microloans. moKredit borrowed the money from Cred at an extremely high interest rate. But even these rates did not account for the risk because moKredit's business activities were unacceptably risky and possibly illegitimate.[29] Yet Cred made over $80 million in loans to moKredit in 2019.

115.    moKredit never fully paid Cred for money it borrowed. After Cred filed for bankruptcy, though communications with Hua continued, Cred could not obtain any meaningful information from moKredit, such as loan tapes or other records. When a Cred representative tried to visit moKredit's headquarters, it was inaccessible. Because moKredit was a Chinese entity, Cred could not exercise remedies.[30]

116.    In 2020, Cred also used CredEarn funds for other "investments." Cred assigned Alexander—unbeknownst to Cred, he was a convicted felon and a fugitive—the job of selecting investments for Cred. Alexander introduced Cred executives to a fraudulent investment vehicle called "QuantCoin." Through a fraudulent administrator contact, Cred transferred 800 Bitcoin ("**BTC**") to a wallet number allegedly owned by QuantCoin. When Cred asked to be repaid its investment, no repayment was made. Cred could not recover any value for this investment.

---

[29] moKredit extended microloans to gamers. However, it was clear when Cred started lending to moKredit that the Chinese gaming industry was facing severe governmental restrictions and highly uncertain prospects. In August 2018, the Chinese Ministry of Education, in response to a direct public order from the country's paramount leader, announced plans to curb video-gaming activity by the country's children. The government enacted the next year strict limits on play time and how much money could be spent in game by Chinese children.

[30] Any remedies were unlikely to be capable of enforcement and would, at a minimum, be difficult and costly to attempt.

117.     Alexander also misappropriated assets in April 2020, when he improperly transferred approximately 225 BTC and 200 USDC to a crypto wallet. Alexander subsequently took control of the funds himself. Cred recovered only a portion of these assets.

118.     The Examiner found that many factors contributed to Cred's losses, including its failure to (a) properly investigate asset managers; (b) maintain internal compliance policies; (c) conduct due diligence on moKredit and the moKredit loans; (d) keep reliable records and statements for its trading accounts; (e) reconcile accounts; and (f) maintain reliable books and records, among other things. As noted above, the Examiner also described Cred's misstatements about its insurance coverage.

119.     When Cred filed for Chapter 11 relief on November 7, 2020, its stated reasons for filing were: (i) material losses incurred in connection with or as a result of the alleged misconduct of its former Chief Capital Officer, James Alexander; (ii) the purported theft of certain cryptocurrency assets in connection with a failed investment with QuantCoin; and (iii) the Debtors' deployment of significant assets with moKredit and the subsequent inability or unwillingness of moKredit to return those assets to Cred pursuant to the terms of the parties' agreement.[31] The Trust, which took over the assets of the Cred estate, has insufficient funds to repay any CredEarn customers on their claims.

120.     In sum, the Trust Assignors participated in CredEarn because they thought their losses were insured. But they were not. The "comprehensive insurance" that promised to compensate customers if Cred did not perform as promised, to protect Cred in the case of the misconduct of its executive and employees, and to ensure that Cred would be paid if outside parties harmed its business provided almost no protection. The Trust Assignors did not receive their crypto back, much less interest Cred owed on it. Instead, they suffered damages caused by Lockton's false statements it devised with Cred about its insurance.

## FIRST CLAIM FOR RELIEF
## FOR FRAUDULENT MISREPRESENTATION

121.     The Trustees re-allege the allegations set forth in the above paragraphs.

122.     Lockton, a crypto insurance broker expert, worked closely with Cred in drafting and revising Lockton/Cred Statements.

---

[31] Examiner Report at 19.

123.     Lockton made the following false representations to the Trust Assignors, among others, in the Lockton/Cred Statements:

- Cred is on a mission to dramatically improve that by working hard to secure the crypto lending industry's most comprehensive set of risk management, information security and insurance protections available. If the worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole.
- Let's start with crypto insurance . . . . We wholeheartedly believe we have an obligation to take a leadership role to go beyond today's status quo to obtain as many insurance and risk management protections as possible.
- As a result, we are proud of the fact that Cred has some of the most comprehensive insurance coverage spanning errors and omissions (E&O), Cyber and Regulatory claim coverage.
- Why was Cred selected by underwriters for insurance coverage?  Cred was evaluated against several criteria, including:  Cred's licensed and well documented business activities have helped underwriters become comfortable offering coverage. . . . Cred has had the opportunity to share best practices with its partners and grow quickly as a crypto financial platform.
- Errors and Omissions Insurance. Errors and Omission or "E&O" refers to the financial services industry's version of professional liability insurance. This insurance comes in the event a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not have the promised results. These services include the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement and the granting of business or consumer lines of credit against crypto assets.
- Cred's insurance policies cover product failure, meaning the inability of customers to access or otherwise utilize Cred's intended service.
- This comprehensive insurance coverage provided to Cred is a testament to the confidence Cred's underwriters have in Cred's ability to demonstrate to financial regulators that has sound policies and procedures and adequate supervision. Underwriters review personnel experience, independent third-party reports and conduct specific due diligence to make the policies available to Cred.

124.     The Trust Assignors read the Lockton/Cred Statements as directed by Cred's website and through Medium.com. Portions of the Lockton/Cred Statements or their substantive equivalents were repeated to the Trust Assignors in emails, and telephone conversations as cited in Section F. above, Customers Relied on the False Statements. The representations in the Lockton/Cred Statements were also repeated in blogs, articles and by other means reviewed by the Trust Assignors. Lockton knew the Lockton/Cred Statements were intended to be read by CredEarn customers, including the Trust Assignors.

125.     Lockton made the Lockton/Cred Statements, which falsely represented the scope of insurance coverage available to Trust Assignors in the event that their crypto loans suffered a loss.

126.    Lockton knew that the Lockton/Cred Statements were false when it was made and disseminated to the public. Alternatively, Lockton made the Lockton/Cred Statements recklessly and without regard for their truth.

127.    Lockton intended the Trust Assignors to rely upon the Lockton/Cred Statements when deciding whether to enter into CredEarn program.

128.    The Trust Assignors reasonably relied on the Lockton/Cred Statements when they decided to enter the CredEarn program.

129.    The Trust Assignors suffered damages as a proximate result of the Lockton/Cred Statements because the promised insurance coverage was not available to customers to recoup their losses when Cred was forced to file for bankruptcy protection.

130.    The Trust Assignors' reliance on the Lockton/Cred Statements was a substantial factor in causing their damages because had the insurance coverage promised in the Lockton/Cred Statements been available, it would have covered their losses when Cred went into bankruptcy.

131.    As a result of Lockton's fraud and misrepresentations against the Trust Assignors, the Trust, acting through its Trustees, seeks compensatory, general and/or special damages in an amount to be determined at trial, but in no event less than $66 million.

**SECOND CLAIM FOR RELIEF
FOR FRAUD IN THE INDUCEMENT**

132.    The Trustees re-allege the allegations set forth in the above paragraphs.

133.    Lockton, a crypto insurance broker expert, worked closely with Cred in drafting and revising Lockton/Cred Statements.

134.    Lockton made the following false representations to the Trust Assignors, among others, in the Lockton/Cred Statements:

- Cred is on a mission to dramatically improve that by working hard to secure the crypto lending industry's most comprehensive set of risk management, information security and insurance protections available. If the worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole.
- Let's start with crypto insurance . . . . We wholeheartedly believe we have an obligation to take a leadership role to go beyond today's status quo to obtain as many insurance and risk management protections as possible.

- As a result, we are proud of the fact that Cred has some of the most comprehensive insurance coverage spanning errors and omissions (E&O), Cyber and Regulatory claim coverage.
- Why was Cred selected by underwriters for insurance coverage?  Cred was evaluated against several criteria, including:  Cred's licensed and well documented business activities have helped underwriters become comfortable offering coverage. . . . Cred has had the opportunity to share best practices with its partners and grow quickly as a crypto financial platform.
- Errors and Omissions Insurance. Errors and Omission or "E&O" refers to the financial services industry's version of professional liability insurance. This insurance comes in the event a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not have the promised results. These services include the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement and the granting of business or consumer lines of credit against crypto assets.
- Cred's insurance policies cover product failure, meaning the inability of customers to access or otherwise utilize Cred's intended service.
- This comprehensive insurance coverage provided to Cred is a testament to the confidence Cred's underwriters have in Cred's ability to demonstrate to financial regulators that has sound policies and procedures and adequate supervision. Underwriters review personnel experience, independent third-party reports and conduct specific due diligence to make the policies available to Cred.

135.   The Trust Assignors read the Lockton/Cred Statements as directed by Cred's website and through Medium.com when deciding whether to sign the contracts to enter the CredEarn program. Portions of the Lockton/Cred Statements or their substantive equivalents were repeated to the Trust Assignors in emails, and telephone conversations as cited in Section F. above, Customers Relied on the False Statements. The representations in the Lockton/Cred Statements were also repeated in blogs, articles and by other means reviewed by the Trust Assignors. Lockton knew the Lockton/Cred Statements were intended to be read by CredEarn customers, including the Trust Assignors.

136.   Lockton made the Lockton/Cred Statements, which falsely represented the scope of insurance coverage available to Trust Assignors in the event that their crypto loans suffered a loss.

137.   Lockton knew that the Lockton/Cred Statements were false when it was made and disseminated to the public. Alternatively, Lockton made the Lockton/Cred Statements recklessly and without regard for their truth.

138.   Lockton intended the Trust Assignors to rely upon the Lockton/Cred Statements when deciding whether to enter into CredEarn program.

139.   The Trust Assignors reasonably relied on the Lockton/Cred Statements when they signed the necessary documentation to enter the CredEarn program.

140. The Trust Assignors were fraudulently induced into making the crypto loans based on the Lockton/Cred Statements.

141. The Trust Assignors suffered damages as a proximate result of the Lockton/Cred Statements because the promised insurance coverage was not available to customers to recoup their losses when Cred was forced to file for bankruptcy protection.

142. The Trust Assignors' reliance on the Lockton/Cred Statements was a substantial factor in causing their damages because had the insurance coverage promised in the Lockton/Cred Statements been available, it would have covered their losses when Cred went into bankruptcy.

143. As a result of Lockton's inducing the Trust Assignors to enter into the CredEarn agreement/program, the Trust, acting through its Trustees, seeks compensatory, general and/or special damages in an amount to be determined at trial, but in no event less than $66 million.

**THIRD CLAIM FOR RELIEF**
**FOR NEGLIGENT MISREPRESENTATION**

144. The Trustees re-allege the allegations set forth in the above paragraphs.

145. Lockton, a crypto insurance broker expert, worked closely with Cred in drafting and revising Lockton/Cred Statements.

146. Lockton made the following false representations to the Trust Assignors in the published Lockton/Cred Statements, among others:

- Cred is on a mission to dramatically improve that by working hard to secure the crypto lending industry's most comprehensive set of risk management, information security and insurance protections available. If the worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole.
- Let's start with crypto insurance . . . . We wholeheartedly believe we have an obligation to take a leadership role to go beyond today's status quo to obtain as many insurance and risk management protections as possible.
- As a result, we are proud of the fact that Cred has some of the most comprehensive insurance coverage spanning errors and omissions (E&O), Cyber and Regulatory claim coverage.
- Why was Cred selected by underwriters for insurance coverage? Cred was evaluated against several criteria, including: Cred's licensed and well documented business activities have helped underwriters become comfortable offering coverage. . . . Cred has had the opportunity to share best practices with its partners and grow quickly as a crypto financial platform.
- Errors and Omissions Insurance. Errors and Omission or "E&O" refers to the financial services industry's version of professional liability insurance. This insurance comes in the event a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not

have the promised results. These services include the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement and the granting of business or consumer lines of credit against crypto assets.

- Cred's insurance policies cover product failure, meaning the inability of customers to access or otherwise utilize Cred's intended service.

- This comprehensive insurance coverage provided to Cred is a testament to the confidence Cred's underwriters have in Cred's ability to demonstrate to financial regulators that has sound policies and procedures and adequate supervision. Underwriters review personnel experience, independent third-party reports and conduct specific due diligence to make the policies available to Cred.

147.   The Trust Assignors read the Lockton/Cred Statements as directed by Cred's website and through Medium.com. Portions of the Lockton/Cred Statements or their substantive equivalent were repeated to the Trust Assignors in emails, and telephone conversations as cited in Section F. above, Customers Relied on the False Statements. The representations in the Lockton/Cred Statements were also repeated in blogs, articles and by other means reviewed by the Trust Assignors.

148.   Lockton made the Lockton/Cred Statements which falsely represented the scope of insurance coverage available to CredEarn customers in the event that their loan crypto loans suffered a loss.

149.   Lockton had no reasonable grounds to believe that the Lockton/Cred Statements were true when they were made and disseminated to the public.

150.   Lockton intended the Trust Assignors to rely upon the Lockton/Cred Statements when deciding whether to enter into CredEarn program.

151.   The Trust Assignors reasonably relied on the Lockton/Cred Statements when they decided to enter the CredEarn program.

152.   The Trust Assignors suffered damages as a proximate result of the Lockton/Cred Statements because the promised insurance coverage was not available to customers to recoup their losses when Cred was forced to file for bankruptcy protection.

153.   The Trust Assignors' reliance on the Lockton/Cred Statements was a substantial factor in causing their damages because had the insurance coverage promised in the Lockton/Cred Statements been available, it would have covered their losses when Cred went into bankruptcy.

154.    As a result of Lockton's misrepresentation against the Trust Assignors, the Trust seeks compensatory, general and/or special damages in an amount to be determined at trial, but in no event less than $66 million.

**FOURTH CLAIM FOR RELIEF**
**FOR INTENTIONAL CONCEALMENT**

155.    The Trustees re-allege the allegations set forth in the above paragraphs.

156.    Lockton, a crypto insurance broker expert, worked closely with Cred in drafting and revising Lockton/Cred Statements.

157.    Lockton omitted material facts from the Lockton/Cred Statements:

- Lockton/Cred concealed the fact that Cred had far from the most comprehensive set of risk management, information security and insurance protections available. Cred hid the fact that its asset safeguards were severely deficient.
- Lockton/Cred concealed the fact that CredEarn customers, including the Trust Assignors, could not be made whole through the insurance protection or any other protections of Cred.
- Lockton/Cred concealed the fact that Cred did not have as many insurance and risk management protections as possible. Its insurance was minimal, and Cred had no crime insurance (like Gemini and Coinbase), and the other insurance it acquired was full of gaps in insurance due to exclusions.
- Lockton/Cred concealed glaring exceptions to errors and omissions (E&O), Directors and Officers (D&O), Cyber and Regulatory claim coverage together with the minimal coverage amounts, and that Cred's insurance coverage was not comprehensive since it only insured a tiny fraction of losses.
- Lockton/Cred concealed the fact that one carrier had rejected Cred for its poor practices, and Cred had avoided the crime insurance process which rigorously scrutinized internal procedures.
- Lockton/Cred concealed the fact that CredEarn customers' losses, including those of the Trust Assignors, were not covered by E&O insurance even though they resulted from Cred's failure to provide results from the borrowing of crypto.
- Lockton/Cred concealed the fact that CredEarn customers losses, including those of the Trust Assignors, were not insured even if Cred did not return their crypto-a service Cred was intended to provide.
- Lockton/Cred concealed the fact that Cred's D&O insurance did not cover crypto and losses relating to actions of D&Os in which they personally benefitted.

158.    Lockton concealed the fact that Cred's insurance was far from comprehensive insurance and was not a testament to its sounds business practices, policies and procedures. Lockton concealed the fact that Creds and its customers' losses would not be insured by the policies that Cred in reality had.

159.    The Trust Assignors did not know about the facts that Lockton concealed. The Trust Assignors read the Lockton/Cred Statements as directed by Cred's website and through Medium.com which omitted critical information. Portions of the Lockton/Cred Statements or their substantive equivalent were repeated to the Trust Assignors in emails, and telephone conversations as cited in Section F. above, Customers Relied on the False Statements. The information conveyed likewise omitted critical information.

160.    Lockton intended to defraud the Trust Assignors through its omissions.

161.    These omissions by Lockton are material because the Trust Assignors would not have transacted with Cred through the CredEarn program had they known the true nature and extent of Cred's insurance coverage.

162.    Lockton facilitated Cred's marketing and selling of the CredEarn program through its participation in the drafting and dissemination of the Lockton/Cred Statements to the Trust Assignors, even though Lockton knew the true nature of Cred's insurance coverage.

163.    Lockton intended that customers such as the Trust Assignors would rely on Lockton/Cred Statements regarding the safety of their crypto loans to Cred through CredEarn.

164.    The Trust Assignors reasonably relied on the material omissions in the Lockton/Cred Statements when they decided to enter the CredEarn program.

165.    Lockton had an affirmative duty to disclose the true nature of Cred's insurance coverage to the CredEarn customers such as the Trust Assignors, because (i) Lockton had a legal duty to correct false statements in the Lockton/Cred Statements that Lockton helped publish under Lockton's logo, and (ii) as one of the world's leading insurance brokers who worked with Cred in purchasing insurance coverage for Cred, in a superior position to know the true nature of Cred's insurance coverage and it was foreseeable that the Trust Assignors would rely on the Lockton/Cred Statements.

166.    Lockton fraudulently concealed the nature of Cred's insurance coverage, prompting the Trust Assignors to participate in CredEarn and causing damages to Trust Assignors.

167.    The Trust Assignors' reliance on the Lockton/Cred Statements was a substantial factor in causing their damages because had the insurance coverage promised in the Lockton/Cred Statements been available, it would have covered their losses when Cred went into bankruptcy.

168.    As a result of Lockton's knowing participation in Cred's fraud, Trust Assignors have suffered damages in an amount to be determined at trial, but in no event less than $66 million.

### FIFTH CLAIM FOR RELIEF
### FOR AIDING AND ABETTING FRAUDULENT MISREPRESENTATION

169.    The Trustees re-allege the allegations set forth in the above paragraphs.

170.    Lockton, a crypto insurance broker expert, worked closely with Cred in drafting and revising Lockton/Cred Statements.

171.    Cred made the following false representations to the Trust Assignors, among others in the Lockton/Cred Statements:

- Cred is on a mission to dramatically improve that by working hard to secure the crypto lending industry's most comprehensive set of risk management, information security and insurance protections available. If the worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole.
- Let's start with crypto insurance . . . . We wholeheartedly believe we have an obligation to take a leadership role to go beyond today's status quo to obtain as many insurance and risk management protections as possible.
- As a result, we are proud of the fact that Cred has some of the most comprehensive insurance coverage spanning errors and omissions (E&O), Cyber and Regulatory claim coverage.
- Why was Cred selected by underwriters for insurance coverage?  Cred was evaluated against several criteria, including:  Cred's licensed and well documented business activities have helped underwriters become comfortable offering coverage. . . . Cred has had the opportunity to share best practices with its partners and grow quickly as a crypto financial platform.
- Errors and Omissions Insurance. Errors and Omission or "E&O" refers to the financial services industry's version of professional liability insurance. This insurance comes in the event a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not have the promised results. These services include the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement and the granting of business or consumer lines of credit against crypto assets.
- Cred's insurance policies cover product failure, meaning the inability of customers to access or otherwise utilize Cred's intended service.
- This comprehensive insurance coverage provided to Cred is a testament to the confidence Cred's underwriters have in Cred's ability to demonstrate to financial regulators that has sound policies and procedures and adequate supervision. Underwriters review personnel experience, independent third-party reports and conduct specific due diligence to make the policies available to Cred.

172.    The Trust Assignors read the Lockton/Cred Statements as directed by Cred's website and through Medium.com, which bore the Lockton name and logo. Portions of the Lockton/Cred

Statements or their substantive equivalent were repeated to the Trust Assignors in emails, and telephone conversations as cited in Section F. above, Customers Relied on the False Statements. The representations in the Lockton/Cred Statements were also repeated in blogs, articles and by other means reviewed by the Trust Assignors. Cred knew the Lockton/Cred Statements were intended to be read by CredEarn customers, including the Trust Assignors.

173.    Cred made the Lockton/Cred Statements, which falsely represented the scope of insurance coverage available to Trust Assignors in the event that their crypto loans suffered a loss.

174.    Cred knew that the Lockton/Cred Statement was false when it was made and disseminated to the public. Alternatively, Cred made the Lockton/Cred Statement recklessly and without regard for their truth.

175.    Lockton knew that Cred made the false Lockton/Cred Statements were false when it was made and disseminated to the public.

176.    Cred intended the Trust Assignors to rely upon the Lockton/Cred Statements when deciding whether to enter into CredEarn program.

177.    Lockton intended the Trust Assignors to rely upon the Lockton/Cred Statements when deciding whether to enter into CredEarn program.

178.    Cred knew the Lockton/Cred Statements would be and was in fact used to convince the Trust Assignors to participate in CredEarn.

179.    Lockton knew the Lockton/Cred Statements would be and was in fact used to convince the Trust Assignors to participate in CredEarn.

180.    The Trust Assignors reasonably relied on the Lockton/Cred Statements when they decided to enter the CredEarn program.

181.    The Trust Assignors suffered damages as a proximate result of the Lockton/Cred Statements because the promised insurance coverage was not available to customers to recoup their losses when Cred was forced to file for bankruptcy protection.

182.     Lockton substantially assisted and/or encouraged Cred's fraud by drafting the Lockton/Cred Statements and by permitting the prestige of its name as a leader in the insurance industry to be associated with the Lockton/Cred Statements.

183.     The Trust Assignors' reliance on the Lockton/Cred Statements was a substantial factor in causing their damages because had the insurance coverage promised in the Lockton/Cred Statements been available, it would have covered their losses when Cred went into bankruptcy.

184.     As a result of Lockton's knowing participation in Cred's fraud, the Trust Assignors suffered damages in an amount to be determined at trial, but in no event less than $66 million.

**SIXTH CLAIM FOR RELIEF**
**FOR AIDING AND ABETTING NEGLIGENT MISREPRESENTATION**

185.     The Trustees re-allege the allegations set forth in the above paragraphs.

186.     Lockton, a crypto insurance broker expert, worked closely with Cred in drafting and revising Lockton/Cred Statements.

187.     Cred made the following false representations to the Trust Assignors, among others in the Lockton/Cred Statements:

- Cred is on a mission to dramatically improve that by working hard to secure the crypto lending industry's most comprehensive set of risk management, information security and insurance protections available. If the worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole.
- Let's start with crypto insurance . . . . We wholeheartedly believe we have an obligation to take a leadership role to go beyond today's status quo to obtain as many insurance and risk management protections as possible.
- As a result, we are proud of the fact that Cred has some of the most comprehensive insurance coverage spanning errors and omissions (E&O), Cyber and Regulatory claim coverage.
- Why was Cred selected by underwriters for insurance coverage?  Cred was evaluated against several criteria, including:  Cred's licensed and well documented business activities have helped underwriters become comfortable offering coverage. . . . Cred has had the opportunity to share best practices with its partners and grow quickly as a crypto financial platform.
- Errors and Omissions Insurance. Errors and Omission or "E&O" refers to the financial services industry's version of professional liability insurance. This insurance comes in the event a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not have the promised results. These services include the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement and the granting of business or consumer lines of credit against crypto assets.
- Cred's insurance policies cover product failure, meaning the inability of customers to access or otherwise utilize Cred's intended service.

40
ORIGINAL COMPLAINT

- This comprehensive insurance coverage provided to Cred is a testament to the confidence Cred's underwriters have in Cred's ability to demonstrate to financial regulators that has sound policies and procedures and adequate supervision. Underwriters review personnel experience, independent third-party reports and conduct specific due diligence to make the policies available to Cred.

188.    The Trust Assignors read the Lockton/Cred Statements as directed by Cred's website and through Medium.com, which bore the Lockton name and logo. Portions of the Lockton/Cred Statements or their substantive equivalent were repeated to the Trust Assignors in emails, and telephone conversations as cited in Section F. above, Customers Relied on the False Statements. The representations in the Lockton/Cred Statements were also repeated in blogs, articles and by other means reviewed by the Trust Assignors. Cred knew the Lockton/Cred Statements were intended to be read by CredEarn customers, including the Trust Assignors.

189.    Cred made the Lockton/Cred Statements, which falsely represented the scope of insurance coverage available to Trust Assignors if their crypto loans suffered a loss.

190.    Cred had no reasonable grounds to believe that the Lockton/Cred Statement was true when it was made and disseminated to the public.

191.    Cred intended the Trust Assignors to rely upon the Lockton/Cred Statements when deciding whether to enter into CredEarn program.

192.    Lockton intended the Trust Assignors to rely upon the Lockton/Cred Statements when deciding whether to enter into CredEarn program.

193.    Cred knew the Lockton/Cred Statements would be and was in fact used to convince the Trust Assignors to participate in CredEarn.

194.    Lockton knew the Lockton/Cred Statements would be and was in fact used to convince the Trust Assignors to participate in CredEarn.

195.    The Trust Assignors reasonably relied on the Lockton/Cred Statements when they decided to enter the CredEarn program.

196.    The Trust Assignors suffered damages as a proximate result of the Lockton/Cred Statements because the promised insurance coverage was not available to customers to recoup their losses when Cred was forced to file for bankruptcy protection.

197.     Lockton substantially assisted and/or encouraged Cred's misrepresentation by drafting the Lockton/Cred Statements and by permitting the prestige of its name as a leader in the insurance industry to be associated with the Lockton/Cred Statements.

198.     The Trust Assignors' reliance on the Lockton/Cred Statements was a substantial factor in causing their damages because had the insurance coverage promised in the Lockton/Cred Statements been available, it would have covered their losses when Cred went into bankruptcy.

199.     As a result of Lockton's knowing participation in Cred's misrepresentation, the Trust Assignors suffered damages in an amount to be determined at trial, but in no event less than $66 million.

**SEVENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. AND PROFESSIONS CODE, § 17200 ET. SEQ**

200.     The Trustees re-allege the allegations set forth in the above paragraphs.

201.     California's Unfair Competition Law ("UCL") prohibits and creates a right of action arising from any unlawful, unfair, or deceptive business practice. Cred's creation and dissemination of the Lockton/Cred Statements, as alleged herein, in connection with the sale and marketing of the CredEarn program, with a false and/or deceptive representation concerning the scope of insurance coverage available to Cred customers, amounts to an unlawful business practice and, hence, violated the UCL. In the alternative, it amounts to a deceptive business practice and hence violated the UCL. As a second alternative, it amounts to an unfair practice and thus violated the UCL.

202.     Moreover, because of Cred's unlawful, fraudulently deceptive, and unfair business practices, CredEarn customers, including the Trust Assignors, conveyed money and benefits to Cred.

203.     Lockton knew that Cred's conduct violated the UCL.

204.     Lockton substantially assisted and/or encouraged Cred's unlawful and deceptive business practice by writing the Lockton/Cred Statements and by permitting the prestige of its name as a leader in the insurance industry to be associated with the Lockton/Cred Statements. The Trustees are entitled to and do seek an order of restitution compelling Lockton to turn over to the Trust Assignors the amount of the crypto transferred to Cred or its value of no less than $66 million.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **DEMAND FOR A JURY TRIAL**

205.    The Trustees hereby demand a jury trial as to all claims so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, the Trustees request judgment against Lockton as follows:

(i)     Awarding monetary damages in the amount of crypto the Trust Assignors were induced to loan based on false statements or omissions proven at trial;

(ii)    Awarding pre-judgment interest in accordance with the Trust Assignors' CredEarn agreement or at the maximum rate allowable by law and/or equity;

(iii)   Awarding statutory, exemplary, treble, and/or punitive damages and/or penalties to the extent permissible by applicable law; and

(iv)    Awarding reasonable attorney's fees and costs to the extent permissible by applicable law.

Dated: December 19, 2022

**GLUCK DANIEL ATKINSON LLP**

By: _Craig C. Daniel_
Craig C. Daniel (State Bar No. 212588)
GLUCK DANIEL ATKINSON LLP
201 Mission Street, Ste. 1330
San Francisco, CA 94105
Telephone:  (415) 510-2114
Facsimile:  (415) 510-2208
Email: cdaniel@gluckdaniel.com

and

Angela J. Somers
Jeffrey Gross
Minyao Wang
REID COLLINS & TSAI LLP
420 Lexington Avenue, Suite 2731
New York, NY 10170
(212) 344-5200
asomers@reidcollins.com
jgross@reidcollins.com
mwang@reidcollins.com

*Special Litigation Counsel to Trustees of
the Cred Inc Liquidation Trust*

**<u>VERIFICATION</u>**

I have read the forgoing complaint and know its contents.

I am a party to this action (solely in my capacity as a trustee of the Cred Liquidation Trust). The matters stated in the complaint are true to the best of my knowledge except as to those matters which are stated upon information and belief, and to those matters I believe them to be true.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

_____
Cedric de Lisser

Executed on December __16__, 2022, at __Pattaya, Thailand__

# EXHIBIT 1

**Going Above and Beyond**
Dan Schatt, Co-Founder and President of
Cred

At Cred, we love to geek out on the dry stuff -- security, compliance, risk management, regulatory matters. We also care immensely about the company we keep -- the partners and vendors we work with to keep our customers safe. Our customers, employees, friends and family members trust their digital assets with Cred and everyone who works for Cred feels an enormous sense of accountability and responsibility to ensure customer assets are well protected during the entire lending and borrowing lifecycle. Many of us worked together at PayPal and felt the same enormous sense of responsibility to mensure we built a product that our own families would use.

Crypto is still the wild west when it comes to many of the fundamental safeguards most of us have come to expect when it comes to safeguarding your assets. Cred is on a mission to change that by working to provide the industry's most comprehensive set of risk management, information security and insurance protections available. If the worst happens mand Cred loses customer funds, customers deserve certainty that they will be made whole.

Let's start with crypto insurance. Cred works with custodial partners that extend insurance to client assets, but we believe it is not enough to simply leverage the insurance of custodial partners. We are serious about protecting client assets and wholeheartedly believe we have an obligation to take a leadership role to go beyond today's status quo to obtain as many insurance and risk management protections as possible for our crypto community. We hope this will spur more crypto lenders and borrowers to dedicate the time and resources to do the same.

Cred's search for comprehensive insurance started with a review of the very best insurance brokers that have significant experience with Crypto and financial services underwriting. How does one choose the very best crypto insurance? It starts with the very best insurance broker. Cred narrowed its selection criteria to the top 10 insurance brokers in the world, and chose Lockton, the world's largest privately owned, independent insurance brokerage firm in the world with 52,000 clients and ranked #1 in Client satisfaction for commercial insurance by J.D. Power.

We selected Lockton in part due to their competency in crypto, cybercrime and financial services. Through Lockton, Cred narrowed its selection to 'A' rated insurance companies, known for strong financial reserves, claims payment history, business focus, and company structure. We reviewed ratings from AM Best, a global credit rating agency with a unique focus on the insurance industry. Best's Ratings, which are issued through A.M. Best Rating Services, Inc., are a recognized indicator of insurer financial strength and creditworthiness. Cred ultimately selected one of the largest underwriters in the world, with over 100 years of experience and active in about

half the countries around the globe, and received a minimum coverage of two million dollars. As a result, we are proud of the fact that Cred has some of the most comprehensive insurance policies of any crypto financial services platform, spanning errors and omissions (E&O), Directors and Officers (D&O), Cyber and Regulatory claim coverage -- even Cred's LBA token has coverage.

First, it's important to know that insurance is a two-way street. It's just as difficult to be selected for coverage, as it is to select an underwriter. Why was Cred selected by underwriters for insurance coverage?  Cred was evaluated against several criteria, including:

- **Financial Condition**. Underwriters typically require a company's audited financial statements in order to determine its financial health. Cred has secured hundreds of millions of dollars of lending capital, and is supported by the largest crypto exchanges in the world. Underwriters also evaluated Cred's strong financial statements, resulting from making its product and utility tokens available to thousands of customers across over a hundred countries.

- **Business activities.**  Insurance underwriters have historically viewed crypto financial services as a nascentand highly risky industry full of bad actors. Cred's licensed and well documented business activities have helped underwriters become comfortable offering coverage. Cred activities include association with a list of highly reputable strategic partners that range from traditional fortune 500 companies to leading digital money platforms and stablecoin providers. As a founding member of an Alliance of top tier blockchain companies including Brave, Bittrex, Blockchain at Berkeley, CertiK, Cred has had the the opportunity to share best practices with its partners and grow quickly as a crypto financial platform. Cred's business practices have also received high praise from Uphold and Cred is now working with the California Assembly to support the introduction of new blockchain legislation.

- **Quality of management and industry experience**. Insurers care immensely about the qualifications and professional experience of a company's executive team. Cred's team has been reviewed by underwriters, regulators, auditors and partners and we believe our executive team stands out for its depth of experience in blockchain, financial technology, lending and capital markets.  Cred's executives come from PayPal, Blockchain at Berkeley, Goldman Sachs, Prosper, Tradeshift and several companies known for having a high bar for talent and deep experience handling customer funds. Cred has been cited for its management expertise by Binance Labs, Tron, Bitcoin.com to name a few.

- **Regulatory and Compliance history**. Underwriters look for evidence of good compliance policy, as do regulators, and as a California based company, Cred is a licensed lender, operating in a majority of US states. Cred has never run afoul of any regulatory requirement and frequently engages with regulators proactively.

**Cyber Insurance**

One of Cred's priority areas of insurance has been cyber insurance, since security and protection of client funds is and will remain priority #1. Cred's cyber policy insures against theft of digital currency that results from a security breach or hack, employee theft, or fraudulent transfer. Cred's comprehensive cyber policy coverage areas include breach of its network security, various network controls, cyber extortion, data recovery costs, ransomware, foresensics, reputational harm, and business interruption resulting from security breaches or system failures. In addition, Cred's coverage extends to denial of service attacks which prevent authorized third parties from accessing its website, unauthorized access or unauthorized use of Cred's Network systems. This also covers fraud resulting from security breaches resulting from social engineering fraud. Every coverage area is important and we believe it is particularly critical to focus on cultural awareness training related to privacy, data security and social engineering. In fact,believe this so much, we've financially supported our employees to pursue advanced degrees at prominent institutions offering cyber security degrees.

**Regulatory Insurance**

Cred also has coverage associated with liability to third parties for privacy breaches and computer system security breaches. System security liability coverage is important as it supports Cred's ability address cyber attacks on Cred's computer system or the computer system of a third party operated on behalf of Cred. Cred also has coverage associated with the costs to investigate and respond to such breach events. These include things like forensic investigation costs and costs to notify affected individuals. Cred also devotes significant time and resources to support user advocacy with proactive notifications.

Cred's underwriters also extended coverage to cover the costs of data privacy notification which also includes coverage of PCI fines, expenses and costs and claims brought by any regulatory or administrative agency or bureau or any other quasi governmental or self regulatory entity. Cred's partners take comfort in these policies, knowing that those claims are generally brought by individuals and companies whose information has been compromised, by regulators and sometimes law enforcement entities.

**Errors and Omissions Insurance**

Errors and Omission or "E&O" refers to the financial services industry's version of professional liability insurance. This insurance comes in the event a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not have the promised results. These services include the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement and the granting of business or consumer lines of credit against crypto assets.

Cred's insurance policies cover product failure, meaning the inability of customers to access or otherwise utilize Cred's intended service. The coverage also extends to the LBA token, fiat currencies, viruses or any malicious code, script, worm, Trojan horse or similar software intentionally designed to enter or insert itself into a computer memory or storage media and spread itself from one computer to another. The policy also extends to any wrongful act or product failure in the rendering of Cred's professional services.

This comprehensive insurance coverage provided to Cred is a testament to the confidence Cred's underwriters have in Cred's ability to demonstrate to financial regulators that it can demonstrate sound policies and procedures and adequate supervision. Underwriters review personnel experience, independent third party reports and conduct specific due diligence to determine if they will make these policies available to companies such as Cred.

**Directors and Officers Insurance**

D&O Insurance came about in the 1930's following the Wall Street crash of 1929 and the introduction of US securities laws in 1933 and 1934. The purpose of this insurance is to cover claims that may arise from actual or alleged "wrongful acts" when acting in the scope of their managerial duties. Cred's D&O Insurance coverage is a testament to the level of comfort that its underwriters have with the appropriate actions that the management takes in the course of executing Cred's business.

**Cred avoids risky lending segments**

Cred lends on a fully collateralized and guaranteed basis and Cred does not lend to short sellers. Lenders supplying crypto to shorts are undercollateralized and always have credit exposure to potentially volatile investment managers. All companies receiving loans from Cred have strong, well-established track records and proven cash flows. All crypto participation in Cred is fully hedged.

**Protection Does Not Stop Here**

Cred's interest in protecting its customers extends to how its encrypts its data, the compliance and security vendors we choose to work with and how we architect our systems. If you have any questions about Cred and its commitment to security, compliance and insurance, please do not hesitate to connect with Cred at info@mycred.io or support@mycred.io and we will be happy to discuss Cred.

Thank you for your trust in Cred. We intend to earn your trust everyday.

# EXHIBIT 2



# EXHIBIT 3

# Crypto Insurance: Going Above and Beyond

web.archive.org/web/20201001082401/https://mycred.io/blog/crypto-insurance/

October 16, 2019



At Cred, we love to geek out on the dry stuff security, compliance, risk management, legal, and regulatory matters. We also care immensely about the company we keep the partners and vendors we work with to keep our customers safe. Many of us worked together at PayPal and felt the same responsibility to ensure we built a product that our own families would use.

Crypto is still in many ways the wild west when it comes to the fundamental safeguards most of us have come to expect when ensuring the protection of financial assets. Cred is on a mission to dramatically improve that by working hard to secure a comprehensive set of risk management, information security and insurance protections available. If the worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole.

## Let's start with crypto insurance.

Cred works with custodial partners that extend insurance, but we believe it is not enough to simply leverage the insurance of custodial partners. We wholeheartedly believe we have an obligation to take a leadership role to go beyond today's status quo to obtain as many insurance and risk management protections as possible. We hope this will spur more crypto lenders and borrowers to dedicate the time and resources to do the same.

Cred's search for comprehensive insurance started with a review of the reputable insurance brokers that have significant experience with crypto and financial services underwriting. How does one choose crypto-insurance? It starts with the insurance broker. Cred narrowed its selection criteria to the top 10 insurance brokers in the world, and chose Lockton, the world's largest privately-owned, independent insurance brokerage firm in the world with 52,000 clients and ranked #1 in Client satisfaction for commercial insurance by J.D. Power.

We selected Lockton in part due to their competency in <u>crypto, cybercrime and financial services.</u> Through Lockton, Cred narrowed its selection to '<u>A' rated insurance companies</u>, known for strong financial reserves, claims payment history, business focus, and company structure. We reviewed ratings from AM Best, a global credit rating agency with a unique focus on the insurance industry. Best's Ratings, which are issued through A.M. Best Rating Services, Inc., are a recognized indicator of insurer financial strength and creditworthiness. Cred ultimately selected one of the largest underwriters in the world, with over 100 years of experience and active in about half the countries around the globe. As a result, we are proud of the fact that Cred has comprehensive insurance coverage, spanning errors and omissions (E&O), Cyber and Regulatory claim coverage.

## How did Cred secure asset insurance?

First, it's important to know that it's just as difficult to be selected for coverage as it is to select an insurance underwriter. Why was Cred selected by underwriters for insurance coverage?

Cred was evaluated against several criteria, including:

- **Business activities.** Insurance underwriters have historically viewed crypto financial services as a nascent and highly risky industry full of bad actors. Cred's licensed and well-documented business activities have helped underwriters become comfortable offering coverage. Cred activities include association with a list of highly reputable strategic partners that range from traditional fortune 500 companies to leading digital money platforms, crypto exchanges, and stablecoin providers. As a founding member of an Alliance of top tier blockchain companies including Brave, Bittrex, Blockchain at Berkeley, and CertiK, Cred has had the opportunity to share best practices with its partners and grow quickly as a crypto-financial platform. Cred's business practices have also received high praise from Uphold and Cred is now working with the California Assembly to support the introduction of new blockchain legislation.

- **Quality of management and industry experience.** Insurers care immensely about the qualifications and professional experience of a company's executive team. Cred's team has been reviewed by underwriters, regulators, auditors, and partners. Our executive team stands out for its depth of experience in blockchain, financial technology, lending, and capital markets. Cred's leaders come from PayPal, Blockchain at Berkeley, Goldman Sachs, Prosper, Tradeshift and several companies who are known for having a high bar for talent and deep experience handling customer funds. Cred has been cited for its management expertise by Binance Labs, Tron, Bitcoin.com to name a few.

  Regulatory and Compliance history. Underwriters look for evidence of good compliance policy, as do regulators, and as a California based company, Cred is a licensed lender, operating in a majority of US states. Cred has never run afoul of any regulatory requirement and frequently engages with regulators proactively.

## Cyber Insurance

One of Cred's priority areas is cyber insurance. Security and protection of client funds will remain our top priority. Cred's comprehensive cyber policy covers network security failure, cyber extortion, data recovery costs, ransomware, forensics, reputational harm, business interruption, and system failure. We believe it is particularly critical to focus on employee training related to privacy and data security and we've financially supported our employees to pursue advanced degrees in Cybersecurity Strategy and Information Management, the same content offered to homeland security officials and private sector security specialists.

Cred's insurance coverage extends to privacy breaches and computer system security breaches. Cred also devotes significant time and resources to support user education. Cred's policy also covers privacy notifications and claims brought by any regulatory or administrative agency.

Cred's underwriters also extended coverage to cover the costs of data privacy notification which also includes coverage of PCI fines, expenses, and costs and claims brought by any regulatory or administrative agency or bureau or any other quasi-governmental or self-regulatory entity. Cred's partners take comfort in these policies, knowing that those claims are generally brought by individuals and companies whose information has been compromised, by regulators and sometimes law enforcement entities.

## Errors and Omissions Insurance

Errors and Omission or E&O refers to the financial services industry's version of professional liability insurance. This insurance comes in the event a customer or stakeholder holds Cred responsible for a service that it failed to provide or did not have the promised results. These

services include the borrowing of crypto from a client related to the terms and conditions of a Cred Agreement and the granting of business or consumer lines of credit against crypto assets.

Cred's insurance policies cover product failure, meaning the inability of customers to access or otherwise utilize Cred's intended service. The coverage also extends to the LBA token, fiat currencies, viruses or any malicious code, script, worm, Trojan horse or similar software intentionally designed to enter or insert itself into computer memory or storage media and spread itself from one computer to another. The policy also extends to any wrongful act or product failure in the rendering of Cred's professional services.

This comprehensive insurance coverage provided to Cred is a testament to the confidence Cred's underwriters have in Cred's ability to demonstrate to financial regulators that it has sound policies and procedures and adequate supervision. Underwriters reviewed personnel experience, independent third-party reports and conducted specific due diligence to make the policies available to Cred.

## Cred avoids risky lending segments

All companies receiving loans from Cred have strong, well-established track records and proven cash flows. Cred's lending portfolio is diversified across the US, Europe, and Asia and crypto assets are hedged to manage market volatility. Cred does not lend to short sellers. We believe this an important point since short-sellers work against the interests of Cred's Earn customers, who are holding their crypto assets with the expectation of long-term appreciation. In addition, crypto short-sellers tend to be under-collateralized and generally have significant credit exposure.

## Protection Does Not Stop Here

Cred's interest in protecting its customers extends to how it encrypts its data, the compliance and security vendors Cred chooses to work with and the architecture of our systems. If you have any questions about Cred and its commitment to security, compliance and risk management, please do not hesitate to connect with Cred at [email protected] and a member of Cred will be happy to discuss.

Thank you for your trust in Cred. We intend to earn your trust every day.

Disclaimer: CredEarn is the trade name for a service offered to non-US persons by Cred LLC, which is an entity distinct and separate from Cred (US) LLC. CredEarn allows you to extend a loan to Cred LLC. The purpose of the loan is to allow you to earn an enhanced yield on your crypto assets, such as Bitcoin. Cred LLC is not a bank and CredEarn services are not insured by the FDIC. CredBorrow and C-LOC™ are trade names for lending products of Cred (US) LLC, a licensed lender and a wholly-owned subsidiary of Cred LLC. Loans, loan

amounts, terms, and rates are not available in every jurisdiction, or for every collateral type. The availability of rates, crypto types, loan amounts, and other terms are subject to change. Loan applicants are subject to AML and KYC screening. Terms, conditions, and restrictions apply. Loans made or arranged pursuant to California Finance Lenders Law License 60DBO - 91480.

# EXHIBIT B

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Craig C. Daniel (212588) - GLUCK DANIEL ATKINSON LLP<br>201 Mission Street, Suite 1330, San Francisco, CA 94105 | ELECTRONICALLY<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br>**12/22/2022**<br>**Clerk of the Court**<br>BY: JEFFREY FLORES<br>Deputy Clerk |

TELEPHONE NO.:415-510-2114     FAX NO. *(Optional)*:415-510-2208
E-MAIL ADDRESS:litigation@gluckdaniel.com
ATTORNEY FOR *(Name)*:Trustees of THE CRED INC. LIQUIDATION TRUST

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS:400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE:San Francisco, CA 94102
BRANCH NAME:CIVIC CENTER COURTHOUSE

CASE NAME:
CEDRIC DE LISSER, ET AL. v. LOCKTON INSURANCE COMPANY LLC, ET AL.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: CGC-22-603638 |
|---|---|---|---|---|
| [x] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter | [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

   **Auto Tort**
   [ ] Auto (22)
   [ ] Uninsured motorist (46)
   **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
   [ ] Asbestos (04)
   [ ] Product liability (24)
   [ ] Medical malpractice (45)
   [ ] Other PI/PD/WD (23)
   **Non-PI/PD/WD (Other) Tort**
   [ ] Business tort/unfair business practice (07)
   [ ] Civil rights (08)
   [ ] Defamation (13)
   [x] Fraud (16)
   [ ] Intellectual property (19)
   [ ] Professional negligence (25)
   [ ] Other non-PI/PD/WD tort (35)
   **Employment**
   [ ] Wrongful termination (36)
   [ ] Other employment (15)

   **Contract**
   [ ] Breach of contract/warranty (06)
   [ ] Rule 3.740 collections (09)
   [ ] Other collections (09)
   [ ] Insurance coverage (18)
   [ ] Other contract (37)
   **Real Property**
   [ ] Eminent domain/Inverse condemnation (14)
   [ ] Wrongful eviction (33)
   [ ] Other real property (26)
   **Unlawful Detainer**
   [ ] Commercial (31)
   [ ] Residential (32)
   [ ] Drugs (38)
   **Judicial Review**
   [ ] Asset forfeiture (05)
   [ ] Petition re: arbitration award (11)
   [ ] Writ of mandate (02)
   [ ] Other judicial review (39)

   **Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
   [ ] Antitrust/Trade regulation (03)
   [ ] Construction defect (10)
   [ ] Mass tort (40)
   [ ] Securities litigation (28)
   [ ] Environmental/Toxic tort (30)
   [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
   **Enforcement of Judgment**
   [ ] Enforcement of judgment (20)
   **Miscellaneous Civil Complaint**
   [ ] RICO (27)
   [ ] Other complaint *(not specified above)* (42)
   **Miscellaneous Civil Petition**
   [ ] Partnership and corporate governance (21)
   [ ] Other petition *(not specified above)* (43)

2. This case [x] is [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [x] Substantial amount of documentary evidence
   d. [x] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [x] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [ ] punitive
4. Number of causes of action *(specify)*: 7
5. This case [ ] is [x] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: December 19, 2022

Craig C. Daniel
(TYPE OR PRINT NAME)     ► *C. C. D.* (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

# EXHIBIT C

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:**    **MAY 24, 2023**

**TIME:**    **10:30 am**

**PLACE:**    **Department 610**
**400 McAllister Street**
**San Francisco, CA  94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.  However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.  **This case is eligible for electronic filing and service per Local Rule 2.11.  For more information, please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

## ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION,  AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

(SEE LOCAL RULE 4)

Plaintiff  **must**  serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint.  (CRC 3.221.) The ADR package may be accessed at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution or you may request a paper copy from the filing clerk.  All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400  McAllister Street, Room 103-A**
**San Francisco, CA  94102**
**(415) 551-3869**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

# EXHIBIT D

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
LOCKTON INSURANCE COMPANY LLC, d/b/a LOCKTON INSURANCE BROKERS LLC, a
Missouri limited liability company (SEE ADDITIONAL PARTIES ATTACHMENT)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
CEDRIC DE LISSER, CHRISTOPHER MOSER, and MICHAEL MICHELIN, in their capacity as the
Trustees of Cred Liquidation Trust

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

  You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

  There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO!* Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

  *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

  *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* SAN FRANCISCO SUPERIOR COURT

400 McAllister Street, San Francisco, CA 94102

| CASE NUMBER: *(Número del Caso):* |
|---|
| CGC-22-603638      **CGC-22-603638** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Craig C. Daniel, GLUCK DANIEL ATKINSON LLP, 201 Mission Street, Suite 1330, San Francisco, CA 94105, 415-510-2114

DATE:
*(Fecha)* **12/28/2022**

Clerk, by
*(Secretario)* **SANDRA SCHIRO**
, Deputy
*(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

[Print this form] [Save this form] [Clear this form]

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| CEDRIC DE LISSER, ET AL. v. LOCKTON INSURANCE COMPANY LLC, ET AL. | CGC-22-603638 |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff  ☒ Defendant  ☐ Cross-Complainant  ☐ Cross-Defendant

LOCKTON COMPANIES, LLC - PACIFIC SERIES, d/b/a LOCKTON INSURANCE BROKERS LLC, a Missouri limited liability company; and DOES 1-10, inclusive.

Page __2__ of __2__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

privacy, please press the Clear This Form button after y⋯

| Print this form | Save this form | | Clear this form |

# EXHIBIT E

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| **CRAIG DANIEL SBN 212588**<br>**GLUCK DANIEL ATKINSON LLP**<br>**201 Mission Street, Suite 1330**<br>**San Francisco, CA 94105**<br>TELEPHONE NO.:   **415-510-2114**          FAX NO. *(Optional)*:<br><br>E-MAIL ADDRESS *(Optional)*: **cdaniel@gluckdaniel.com**<br>ATTORNEY FOR *(Name)*:      **Plaintiff** | **ELECTRONICALLY**<br>**FILED**<br>*Superior Court of California,*<br>*County of San Francisco* |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO - CENTRAL
   STREET ADDRESS: 400 McAllister St
   MAILING ADDRESS: 400 McAllister St
   CITY AND ZIP CODE: San Francisco, CA 94102
   BRANCH NAME: SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO - CENTRAL

**01/10/2023**
**Clerk of the Court**
**BY: YOLANDA TABO-RAMIREZ**
**Deputy Clerk**

| PLAINTIFF/PETITIONER: CEDRIC DE LISSER | CASE NUMBER:<br>CGC-22-603638 |
|---|---|
| DEFENDANT/RESPONDENT: LOCKTON COMPANIES, LLC - PACIFIC SERIES | |
| **PROOF OF SERVICE SUMMONS** | Ref. No. or File No.:<br>CRED, INC. |

(Separate proof of service is required for each party served.)

1.  At the time of service I was at least 18 years of age and not a party to this action.

2.  I served copies of: ***Civil Case Cover Sheet; Summons; Complaint; Notice to Plaintiff; ADR Information Packet***

3.  a.  Party served *(specify name of party as shown on documents served)*: *LOCKTON COMPANIES, LLC- PACIFIC SERIES, d/b/a LOCKTON INSURANCE BROKERS LLC, a Missouri limited liability company*

   b.  [✗]  Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*: **Mellissa Lewis, authorized to accept, Client Coordinator**

4.  Address where the party was served: *12747 Olive Blvd Ste 300, Saint Louis, MO 63141*

5.  I served the party *(check proper box)*
   a.  [✗]  **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on: **1/9/2023** (2) at: **09:05 AM**
   b.  [ ]  **by substituted service.** On:   at:   I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:

     (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

     (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

     (3) [ ] **(physical address unknown)** a person of at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

     (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents:
        on:       from:       **or** [ ] a declaration of mailing is attached.

Page 1 of 2

Invoice # 6938866

| PLAINTIFF/PETITIONER:     CEDRIC DE LISSER | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT:     LOCKTON COMPANIES, LLC - PACIFIC SERIES | CGC-22-603638 |

(5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

5.   c.   ☐   **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

     (1) on:                         (2) from:

     (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. (*Attach completed* Notice and Acknowledgment of Receipt.) (Code Civ. Proc., § 415.30.)

     (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d.   ☐   **by other means** *(specify means of service and authorizing code section):*

     ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
  a.   ☐   as an individual defendant.
  b.   ☐   as the person sued under the fictitious name of *(specify):*
  c.   ☐   as occupant.
  d.   ☒   On behalf of *(specify):* LOCKTON COMPANIES, LLC- PACIFIC SERIES, d/b/a LOCKTON INSURANCE BROKERS LLC, a Missouri limited liability company under the following Code of Civil Procedure section:

     ☐ 416.10 (corporation)               ☐ 415.95 (business organization, form unknown)
     ☐ 416.20 (defunct corporation)         ☐ 416.60 (minor)
     ☐ 416.30 (joint stock company/association)    ☐ 416.70 (ward or conservatee)
     ☒ 416.40 (association or partnership)      ☐ 416.90 (authorized person)
     ☐ 416.50 (public entity)                ☐ 415.46 (occupant)
                                           ☐ other:

7. **Person who served papers**
  a. Name: **Brianna R. Anderson**
  b. Address: **507 Polk Street Suite 320, San Francisco, CA 94102**
  c. Telephone number: **415-546-6000**
  d. The fee for service was: **$186.75**
  e. I am:
     (1) ☐ not a registered California process server.
     (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
     (3) ☒ a registered California process server:
         (i) ☐ owner      ☐ employee      ☒ independent contractor.
         (ii) Registration No.: **#680**
         (iii) County: **0**

8. ☒ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**WHEELS of JUSTICE**
*happiness is serving you*

▶ Brianna R. Anderson     #680    1/9/23
**Brianna R. Anderson**        Date: **01/09/2023**

     **PROOF OF SERVICE OF SUMMONS**     

# EXHIBIT F

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

## ORDER CONFIRMING AND APPROVING ON A FINAL BASIS MODIFIED FIRST AMENDED COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT OF CRED INC. AND ITS SUBSIDIARIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Cred Inc. ("Cred") and its debtor affiliates, as debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "Debtors"), having proposed and filed the *Modified First Amended Combined Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code* [Docket No. 619] (as it may be modified, amended, or supplemented from time to time, the "Combined Plan and Disclosure Statement") with the United States Bankruptcy Court for the District of Delaware (the "Court") and the *Debtors' Motion for Entry of Order (I) Approving, on an Interim Basis, the Debtors' Disclosure Statement; (II) Establishing Voting Record Date; (III) Approving Solicitation Packages and Distribution Procedures; (IV) Approving Forms of Ballots and Establishing Procedures for Voting on Combined Plan of Liquidation; (V) Approving Forms of Notices to Non-Voting Classes Under Plan; (VI) Establishing Voting Deadline to Accept or Reject Plan; (VII) Approving Procedures for Vote Tabulations; and (VIII) Establishing Hearing Date for Final Approval of Disclosure Statement and Confirmation of Combined Plan of Liquidation and Related Notice and Objection Procedures* [Docket No. 303] (the "Disclosure Statement and

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital Inc. (4064), Cred

Solicitation Motion"), and the Court having entered, after due notice and a hearing, the *Order (I) Approving, on an Interim Basis, the Debtors' Disclosure Statement; (II) Establishing Voting Record Date; (III) Approving Solicitation Packages and Distribution Procedures; (IV) Approving Forms of Ballots and Establishing Procedures for Voting on Combined Plan and Disclosure Statement of Liquidation; (V) Approving Forms of Notices to Non-Voting Classes Under Plan; (VI) Establishing Voting Deadline to Accept or Reject Plan; (VII) Approving Procedures for Vote Tabulations; and (VIII) Establishing Hearing Date for Final Approval of Disclosure Statement and Confirmation of Combined Plan of Liquidation and Related Notice and Objection Procedures*, dated January 21, 2021 [Docket No. 399] (the "Interim Disclosure Statement Order") approving (i) on an interim basis, the Disclosure Statement (as that term is defined in the Interim Disclosure Statement Order), and (ii) Disclosure Statement and Solicitation Motion and, as found and ordered *infra*, the Combined Plan and Disclosure Statement and the Solicitation Packages (defined *infra*) having been duly transmitted to holders of Claims[2] entitled to vote thereon as provided in the Interim Disclosure Statement Order; and due notice of (i) entry of the Interim Disclosure Statement Order, (ii) the Confirmation Hearing (defined *infra*), and (iii) the deadline for voting on, and/or objecting to the Combined Plan and Disclosure Statement having been provided to holders of Claims against and Equity Interests in the Debtors and other parties in interest in accordance with the Interim Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules of the Bankruptcy Court for the District of Delaware (the "Local Rules"); and such notice being sufficient under the circumstances and no other or further notice being required; and objections

---

Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Combined Plan and Disclosure Statement.

(the "Objections") to the Combined Plan and Disclosure Statement, having been interposed by various parties; and the Court having entered that *Order Pursuant to Bankruptcy Code Sections 363(b) and 105(a) Authorizing Debtors to Enter Into and Perform Under a Plan Support Agreement Term Sheet* [Docket No. 480] (the "Amended PSA Order") approving the Amended PSA (as defined in the Amended PSA Order and filed as Docket No. 480-1); and the Debtors having entered into the Amended PSA with the Committee; and the Debtors having filed the Plan Supplement on February 19, 2021 [Docket No. 533], in accordance with the provisions of the Combined Plan and Disclosure Statement and such filing and notice thereof being sufficient under the circumstances and no further notice being required; and upon consideration of (i) the *Debtors' Memorandum of Law (I) In Support of (A) Final Approval of the Adequacy of the Disclosure Statement Under Section 1125 of the Bankruptcy Code and (B) Confirmation of the Modified First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code and (II) In Response to Objections to Approval of, and Confirmation of Combined Plan and Disclosure Statement* [Docket No. 595] (the "Confirmation Brief"), (ii) the *Declaration of Matthew K. Foster* [Docket No. 595-1] (the "Foster Declaration"), (iii) the *Declaration of Grant Lyon In Support of Confirmation of the First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code* [Docket No. 595-2] (the "Lyon Declaration") (iv) the *Affidavit of Donlin, Recano & Company, Inc. Regarding Service of Solicitation Packages with Respect to the First Amended Combined Joint Plan of Liquidation and Disclosure Statement Cred Inc and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code* [Docket No. 491] (the "Solicitation Declaration"), (v) the *Supplemental Affidavit of Donlin, Recano and Company, Inc. Regarding Service of Solicitation Pacakges with*

3

*Respect to the First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code* [Docket No. 497] (the "<u>Supplemental Solicitation Declaration</u>", and together with the Solicitation Declaration, the "<u>Solicitation Declarations</u>"), and the (vi) *Amended Declaration of John Burlacu of Donlin Recano & Company, Inc. Regarding the Solicitation and Tabulation of Votes Cast on the First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code* [Docket No. 606] (the "<u>Ballot Report</u>" and, together with the Foster Declaration, the Lyon Declaration, and the Solicitation Declarations, the "<u>Declarations</u>"); and the hearing to consider final approval and confirmation of the Combined Plan and Disclosure Statement having been held before the Court on March 9, 2021 (the "<u>Confirmation Hearing</u>"); and the Court having reviewed and considered the Combined Plan and Disclosure Statement, the Plan Supplement, the Interim Disclosure Statement Order, the Confirmation Brief, the Declarations, each of the Objections which has not been withdrawn or otherwise resolved, and all related documents; and the appearance of all interested parties having been duly noted in the record of the Confirmation Hearing, including the Declarations filed and testimony therein and the exhibits admitted into evidence; and upon all of the proceedings had before the Court and upon the entire record of the Confirmation Hearing; and the Court having determined based upon all of the foregoing that the Disclosure Statement should be approved and that the Combined Plan and Disclosure Statement should be confirmed, as reflected by the Court's rulings made herein and on the record of the Confirmation Hearing; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY FOUND, DETERMINED, ORDERED, ADJUDGED, AND DECREED, AS FOLLOWS:

# **FINDINGS OF FACT**

A.  Findings and Conclusions.  The findings and conclusions set forth in this Order

and on the record of the Confirmation Hearing constitute the Court's findings of fact and

conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made

applicable by Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of

fact constitute conclusions of law, they are adopted as such. To the extent any of the following

conclusions of law constitute findings of fact, they are adopted as such.

B.  Jurisdiction.  The Court has jurisdiction over the Debtors' Chapter 11 Cases,

confirmation of the Combined Plan and Disclosure Statement, and the Objections pursuant to 28

U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States

District Court for the District of Delaware, dated as of February 29, 2012.  Confirmation of the

Combined Plan and Disclosure Statement is a core proceeding pursuant to 28 U.S.C. § 157(b),

and this Court has jurisdiction to enter a final order confirming the Combined Plan and

Disclosure Statement. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.  Commencement and Joint Administration of the Debtors' Chapter 11 Cases.  On

November 7, 2020 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases.  The

Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015 and the

*Order Granting Motion of Debtors and Debtors in Possession for Order Directing Joint*

*Administration of Their Chapter 11 Cases* [Docket No. 27].  The Debtors have managed their

properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No

trustee has been appointed in these Chapter 11 Cases.

D.  Official Committee of Unsecured Creditors.  On December 3, 2020, the Office of

the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official

committee of unsecured creditors pursuant to Bankruptcy Code section 1102 (the "Committee").
[Docket No. 120].

E.    Appointment of Examiner. On January 8, 2021, the Court appointed Robert J.

Stark as the Examiner [Docket No. 338].

F.    Judicial Notice.  The Court takes judicial notice of the docket of the Chapter 11

Cases maintained by the Clerk of the Court, including, without limitation, all pleadings and other

documents filed, all orders entered, and all evidence and arguments made, proffered or adduced

at the hearings held before the Court during the pendency of the Chapter 11 Cases.

G.    Burden of Proof.  The Debtors, as proponents of the Combined Plan and

Disclosure Statement, have met their burden of proving the elements of Bankruptcy Code

sections 1129(a) and (b) by a preponderance of the evidence.

H.    Resolution of Objections.  As provided in this Order and on the record at the

Confirmation Hearing, the consensual resolutions of certain Objections satisfy all applicable

requirements of the Bankruptcy Code and the Bankruptcy Rules and are in the best interests of

the Debtors and are hereby approved.  All Objections that were not resolved are hereby

overruled.

I.    Adequacy of the Disclosure Statement.  The Combined Plan and Disclosure

Statement provided adequate information within the meaning of Bankruptcy Code section 1125

and comply with the requirements set forth in Local Rule 3017-2.

J.    Solicitation and Notice.  On January 21, 2021, the Court entered the Interim

Disclosure Statement Order, which, among other things: (i) approved, on an interim basis, the

Debtors' Disclosure Statement; (ii) established a voting record date; (iii) approved Solicitation

Packages (as defined in the Interim Disclosure Statement Order) and distribution procedures; (iv)

approved forms of ballots (the "Ballots") and established procedures for voting on the Combined Plan and Disclosure Statement; (v) approved forms of notices to non-voting classes under the plan; (vi) approved the Opt-Out Election Form; (vii) established voting deadline to accept or reject the Combined Plan and Disclosure Statement; (viii) approved procedures for vote tabulations; and (ix) established a hearing date for final approval and confirmation of the Combined Disclosure Statement and Plan and related notice and objection procedures thereof. The Debtors have substantially complied with the Interim Disclosure Statement Order and properly served and noticed the Solicitation Packages and required materials, and (a) (i) the appropriate form of Ballot; (ii) the Combined Plan and Disclosure Statement; (iv) the Combined Hearing Notice; (v) the Committee Support Letter, to creditors in the Voting Classes; and (b) (i) the Combined Hearing Notice, (ii) the appropriate Notice of Non-Voting Status, and (iii) the Opt-Out Election Form to holders of claims and interests in Non-Voting Classes, in compliance with the Bankruptcy Code, the Bankruptcy Rules, and the Interim Disclosure Statement Order (the "Solicitation").  As described and approved in the Interim Disclosure Statement Order, and as set forth in the Ballot Report and the Solicitation Declarations establish, (i) the service of the Solicitation Packages was adequate and sufficient under the circumstances of these Chapter 11 Cases, and (ii) adequate and sufficient notice of the Confirmation Hearing and other requirements, deadlines, hearings, and matters described in the Interim Disclosure Statement Order were provided in compliance with the Bankruptcy Rules and the Interim Disclosure Statement Order and provided due process to all parties in interest.  No other or further notice is required.

K.      Voting.  Votes on the Combined Plan and Disclosure Statement were solicited after disclosure of "adequate information" as defined in Bankruptcy Code section 1125.  As

evidenced by the Ballot Report, the votes to accept or reject the Combined Plan and Disclosure Statement have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Interim Disclosure Statement Order, the Bankruptcy Code, and the Bankruptcy Rules.

L.      <u>Plan Supplement</u>.  On February 19, 2021, the Debtors filed the Plan Supplement [Docket No. 533] that includes the following: (i) the identity of the Liquidation Trustees; (ii) the identity of the Trust Advisory Board; (iii) a list of the Executory Contracts and Unexpired Leases of Debtors to Be Assumed and Assigned and Proposed Cure Amounts; and (iv) a proposed Notice of Effective Date.  On March 4, 2021, the Debtors filed the amended Plan Supplement [Docket No. 589] that amends the membership of the Trust Advisory Board.  All such materials and documents comply with the terms of the Combined Plan and Disclosure Statement, and the filing and notice of such materials and documents is due and sufficient in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Interim Disclosure Statement Order, and no other or further notice is or shall be required.

M.      <u>Liquidation Trust Agreement</u>.  On March 2, 2021, the Debtors filed the Liquidation Trust Agreement [Docket No. 579].  The Liquidation Trust Agreement complies with the terms of the Combined Plan and Disclosure Statement, and the filing and notice of the Liquidation Trust Agreement is due and sufficient in accordance with the Bankruptcy Code and the Bankruptcy Rules, and no other or further notice is or shall be required.

## **MODIFICATIONS TO THE COMBINED PLAN AND DISCLOSURE STATEMENT**

N.      <u>Modification</u>.  Subsequent to Solicitation, on March 10, 2021, the Debtors filed an amendment to the Combined Plan and Disclosure Statement, *Modified First Amended Combined Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code* [Docket No. 619], which includes certain modifications to the

Combined Plan and Disclosure Statement filed on January 21, 2021 [Docket No. 399] to, among other things, address objections raised by various parties (the "Modifications"). Pursuant to Bankruptcy Code section 1127(a), the Modifications are made a part of the Combined Plan and Disclosure Statement.

O.    Notice of Modifications. The filing of the Modifications to the Combined Plan and Disclosure Statement and the description of the Modifications on the record at the Confirmation Hearing provided due and sufficient notice to all parties in interest under the circumstances of these Chapter 11 Cases.

P.    Deemed Acceptance of Plan as Modified. The Modifications to the Combined Plan and Disclosure Statement are either (i) immaterial or do not adversely affect the treatment of any Claim against or Equity Interest in the Debtors under the Combined Plan and Disclosure Statement, or (ii) the adversely affected parties have consented to the Modifications. Therefore, in accordance with Bankruptcy Code section 1127 and Bankruptcy Rule 3019, all holders of Claims who voted to accept the Combined Plan and Disclosure Statement or who are conclusively presumed to have accepted the Combined Plan and Disclosure Statement are deemed to have accepted the Combined Plan and Disclosure Statement, as modified by the Modifications. No holder of a Claim or Equity Interest that has voted to accept the Combined Plan and Disclosure Statement shall be permitted to change its acceptance to a rejection as a consequence of the Modifications. The Modifications neither require additional disclosure under Bankruptcy Code section 1125 nor re-solicitation of votes on the Combined Plan and Disclosure Statement under Bankruptcy Code section 1126.

Q.  <u>Compliance with Bankruptcy Code Section 1127</u>.  The Modifications incorporated into the Combined Plan and Disclosure Statement comply with Bankruptcy Code section 1127 and Bankruptcy Rule 3019.

## COMPLIANCE WITH BANKRUPTCY CODE SECTION 1129

R.  <u>Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>.  The Combined Plan and Disclosure Statement complies with the applicable provisions of the Bankruptcy Code, thus satisfying Bankruptcy Code section 1129(a)(1).

S.  <u>Proper Classification (11 U.S.C. §§ 1122 and 1123(a)(1))</u>.  In addition to Administrative Expense Claims, Professional Fee Claims, and Priority Tax Claims, which need not be classified, Article X of the Combined Plan and Disclosure Statement designates the following six (6) Classes of Claims and one Class of Equity Interests: Class 1 (Other Priority Claims), Class 2 (Secured Tax Claims), Class 3 (Other Secured Claims), Class 4 (General Unsecured Claims), Class 5 (Convenience Claims), Class 6 (Subordinated Securities Claims), and Class 7 (Equity Interests in Debtors).  Each of the Claims or Equity Interests, as the case may be, in each particular Class is substantially similar to the other Claims or Equity Interests in such Class.  Valid business, legal, and factual reasons exist for separately classifying the various Claims and Equity Interests pursuant to the Combined Plan and Disclosure Statement, and such Classes do not unfairly discriminate between holders of Claims and Equity Interests.  The Combined Plan and Disclosure Statement therefore satisfies Bankruptcy Code sections 1122 and 1123(a)(1).

T.  <u>Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>.  Article X of the Combined Plan and Disclosure Statement specifies that Class 1 (Other Priority Claims), Class 2 (Secured Tax Claims), and Class 3 (Other Secured Claims) are unimpaired under the Combined

Plan and Disclosure Statement.  The Combined Plan and Disclosure Statement therefore satisfies Bankruptcy Code section 1123(a)(2).

U.      Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).  Article X of the Combined Plan and Disclosure Statement designates Class 4 (General Unsecured Claims), Class 5 (Convenience Claims), Class 6 (Subordinated Securities Claims), and Class 7 (Equity Interests in Debtors) as impaired, and Sections 10.4-10.7 of the Combined Plan and Disclosure Statement specify the treatment of Claims and Equity Interests in such Classes.  The Combined Plan and Disclosure Statement therefore satisfies Bankruptcy Code section 1123(a)(3).

V.      No Discrimination (11 U.S.C. § 1123(a)(4)).  The Combined Plan and Disclosure Statement provides for the same treatment for each Claim or Equity Interest in each respective Class unless the holder of a particular Claim or Equity Interest has agreed to a less favorable treatment on account of such Claim or Equity Interest.  The Combined Plan and Disclosure Statement therefore satisfies Bankruptcy Code section 1123(a)(4).

W.      Implementation of the Combined Plan and Disclosure Statement (11 U.S.C. § 1123(a)(5)).  The Combined Plan and Disclosure Statement and the various documents set forth in the Plan Supplement provide adequate and proper means for the implementation of the Combined Plan and Disclosure Statement as required by Bankruptcy Code section 1123(a)(5).  The Combined Plan and Disclosure Statement therefore satisfies Bankruptcy Code section 1123(a)(5).

X.      Non-Voting Equity Securities/Allocation of Voting Power (11 U.S.C. § 1123(a)(6)).  The Debtors are liquidating, and as such, will transfer all of their Assets to the Liquidation Trust and each Debtor will ultimately be dissolved.  Accordingly, the Combined

Plan and Disclosure Statement does not provide for the issuance of nonvoting equity securities, and the Combined Plan and Disclosure Statement satisfies Bankruptcy Code section 1123(a)(6).

Y.    Designation of Directors and Officers (11 U.S.C. § 1123(a)(7)).  Section 12.3 of the Combined Plan and Disclosure Statement provides that the Liquidation Trustees will have all power and authority that may be or could have been exercised, with respect to the Liquidation Trust Assets, by any officer, director, or other party acting in the name of the Debtors or their estates with like effect as if duly authorized, exercised, and taken by action of such officers, directors, or other party.  The identity of the Liquidation Trustees has been disclosed in the Plan Supplement.  Each of the Liquidation Trustees is not affiliated with the Debtors.  As such, the Combined Plan and Disclosure Statement satisfies Bankruptcy Code section 1123(a)(7).

Z.    Additional Plan Provisions (11 U.S.C. § 1123(b)).  The other provisions of the Combined Plan and Disclosure Statement are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying Bankruptcy Code section 1123(b).  The failure to specifically address a provision of the Bankruptcy Code in this Order shall not diminish or impair the effectiveness of this Order.

AA.    Impairment/Unimpairment of Classes of Claims and Equity Interests (11 U.S.C. § 1123(b)(1)).  As contemplated by Bankruptcy Code section 1123(b)(1), Class 4 (General Unsecured Claims), Class 5 (Convenience Claims), Class 6 (Subordinated Securities Claims), and Class 7 (Equity Interests in Debtors) are impaired by the Combined Plan and Disclosure Statement. Class 1 (Other Priority Claims), Class 2 (Secured Tax Claims), and Class 3 (Other Secured Claims) are unimpaired by the Combined Plan and Disclosure Statement.  Accordingly, the Combined Plan and Disclosure Statement satisfies the requirements of Bankruptcy Code section 1123(b)(1).

BB.    Assumption and Rejection of Executory Contracts (11 U.S.C. § 1123(b)(2)).  In

accordance with Bankruptcy Code section 1123(b)(2), Sections 15.1 and 15.2 of the Combined

Plan and Disclosure Statement provide that, in accordance with, and subject to, the provisions

and requirements of Bankruptcy Code sections 365 and 1123, all of the Debtors' executory

contracts and unexpired leases will be deemed rejected as of the Effective Date, except to the

extent (a) the Debtors previously have assumed, assumed and assigned, or rejected such

Executory Contract or Unexpired Lease, (b) prior to the Effective Date, the Debtors have filed a

motion to assume, assume and assign, or reject an Executory Contract or Unexpired Lease on

which the Court has not ruled, (c) an Executory Contract and Unexpired Lease is identified in the

Plan Supplement as an Executory Contract or Unexpired Lease to be assumed or assumed and

assigned pursuant to the Combined Plan and Disclosure Statement, or (d) Executory Contracts

and Unexpired Leases under which the counterparty has consented to the extension of the time

by which the Debtors must assume or reject to a date beyond the Effective Date.  Accordingly,

the Combined Plan and Disclosure Statement satisfies the requirements of Bankruptcy Code

section 1123(b)(2).

CC.    Settlement of Claims and Causes of Action (11 U.S.C. § 1123(b)(3)).  Pursuant to

Bankruptcy Code section 1123 and Bankruptcy Rule 9019, the Combined Plan and Disclosure

Statement incorporates a global compromise and settlement, (the "Global Settlement"), of

numerous inter-Debtor, Debtor-Creditor, and inter-Creditor issues designed to achieve an

economic settlement of Claims against the Debtors and an efficient resolution of the Chapter 11

Cases.  The Global Settlement is fair, equitable, reasonable, and in the best interests of the

Debtors, their Estates, their creditors, and other parties in interest.  The Global Settlement will be

implemented through the substantive consolidation of the Debtors' Estates solely for purposes of

13

voting on, and Distributions under the Global Plan and Disclosure Statement. Absent the approval of the Global Settlement, the potential costs to each of the Debtors' Estates of untangling the Debtors' financial affairs so as to allow the pursuit of five (5) separate liquidating plans would be significant.

DD.    Sale of All or Substantially All Assets (11 U.S.C. § 1123(b)(4)). In accordance with Bankruptcy Code section 1123(b)(4), the Combined Plan and Disclosure Statement establishes a Liquidation Trust (which, for the avoidance of doubt, is also the "Cred Liquidation Trust" referred to in the Combined Plan and Disclosure Statement) and the Amended PSA provide for the orderly liquidation of all of the Estates' Assets and the distribution of the proceeds thereof to Holders of Allowed Class 4 General Unsecured Claims. Accordingly, the Combined Plan and Disclosure Statement is consistent with Bankruptcy Code section 1123(b)(4).

EE.    Modification of Creditor Rights (11 U.S.C. § 1123(b)(5)). In accordance with Bankruptcy Code section 1123(b)(5), Article X of the Combined Plan and Disclosure Statement modifies the rights of holders of Claims and Equity Interests in Classes 4, 5, and 7. The Combined Plan and Disclosure Statement also provides for the payment in full of Allowed Claims in Classes 1, 2, and 3. Accordingly, the Combined Plan and Disclosure Statement is consistent with Bankruptcy Code section 1123(b)(5).

FF.    Debtors Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2)). The Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules and the Interim Disclosure Statement Order, including having complied with Bankruptcy Code section 1125 with respect to the Disclosure Statement and the Combined Plan and Disclosure Statement.

14

GG.    <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)).</u>  The Debtors are the

proponents of the Combined Plan and Disclosure Statement.  The Debtors have proposed the

Combined Plan and Disclosure Statement (including all documents necessary to effectuate the

Combined Plan and Disclosure Statement) in good faith and not by any means forbidden by law,

thereby complying with Bankruptcy Code section 1129(a)(3).  The Debtors' good faith is evident

from the record of these Chapter 11 Cases, including the Declarations, the record of the

Confirmation Hearing, and the record of all hearings and proceedings in these Chapter 11 Cases.

The Combined Plan and Disclosure Statement is based upon extensive, arm's-length negotiations

between and among the Debtors, the Committee, and other parties-in-interest, and represents the

culmination of intensive negotiations and discussions among all parties in interest.  Moreover,

the Combined Plan and Disclosure Statement was proposed with the legitimate and honest

purpose of maximizing the value of the Debtors' estates and effectuating a successful liquidation

of the Debtors.  The Combined Plan and Disclosure Statement accomplishes maximization of the

value of the Debtors' estates and equitable distribution of the Debtors' through the establishment

of the Liquidation Trust and the Class 5 Convenience Class to make distributions to the holders

of Allowed General Unsecured Claims and Allowed Convenience Claims.  The Committee

supports the Combined Plan and Disclosure Statement.  Further, the exculpation, release, and

injunction provisions of the Combined Plan and Disclosure Statement have been negotiated in

good faith and at arm's-length with, among other persons, representatives of the Debtors and the

Committee, are consistent with Bankruptcy Code sections 105, 362, 1122, 1123(b)(3)(A),

1123(b)(6), 1129, and 1142, and are each necessary and appropriate to the successful winding

down of the Debtors' Estates.  Accordingly, the Combined Plan and Disclosure Statement and

the related documents have been filed in good faith and the Debtors have satisfied their obligations under section 1129(a)(3).

HH.     Payment for Services or Cost and Expenses (11 U.S.C. § 1129(a)(4)). Pursuant to the interim compensation procedures previously approved by this Court and established in these Chapter 11 Cases pursuant to Bankruptcy Code section 331, all payments made or to be made by the Debtors for services or for costs and expenses in connection with the Chapter 11 Cases, or in connection with the Combined Plan and Disclosure Statement and incident to the Chapter 11 cases, have been approved by, or are subject to the approval of, the Court as reasonable, thus satisfying Bankruptcy Code section 1129(a)(4).

II.     Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)). The Debtors have complied with Bankruptcy Code section 1129(a)(5). The Plan Supplement, as amended, identifies the Liquidation Trustees and the Trust Advisory Board. From and after the Effective Date, the Liquidation Trustees will have all power and authority that may be or could have been exercised, with respect to the Liquidation Trust Assets, by any officer, director, shareholder, or other party acting in the name of the Debtors or their estates with like effect as if duly authorized, exercised, and taken by action of such officers, directors, shareholders, or other party. As such, the Combined Plan and Disclosure Statement satisfies Bankruptcy Code section 1129(a)(5).

JJ.     No Rate Changes (11 U.S.C. § 1129(a)(6)). No governmental regulatory commission has jurisdiction, after confirmation of the Combined Plan and Disclosure Statement, over the rates of the Debtors. Thus, Bankruptcy Code section 1129(a)(6) is not applicable in these Chapter 11 Cases.

KK.   <u>Best Interest of Creditors (11 U.S.C. § 1129(a)(7))</u>.  As demonstrated by the

Foster Declaration, the Liquidation Analysis annexed to the Foster Declaration, and the

Combined Plan and Disclosure Statement, with respect to each impaired class of Claims against

or Equity Interests in the Debtors, each holder of a Claim or Equity Interest in such Class has

accepted the Combined Plan and Disclosure Statement or will receive or retain pursuant to the

Combined Plan and Disclosure Statement on account of such Claim or Equity Interest property

of a value, as of the Effective Date, that is not less than the amount that such holder would so

receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the

Effective Date.  Accordingly, the Combined Plan and Disclosure Statement satisfies Bankruptcy

Code section 1129(a)(7).

LL.   <u>Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8))</u>.  Class 1 (Other Priority

Claims), Class 2 (Secured Tax Claims), and Class 3 (Other Secured Claims) are unimpaired

under the Combined Plan and Disclosure Statement and are, therefore, conclusively deemed to

have accepted the Combined Plan and Disclosure Statement pursuant to Bankruptcy Code

section 1126(f).  Class 4 (General Unsecured Claims) and Class 5 (Convenience Claims) have

voted to accept the Plan.  As such, Bankruptcy Code section 1129(a)(8) is satisfied with respect

to these Classes of Claims.  Class 6 (Subordinated Securities Claims) and Class 7 (Equity

Interests) are deemed to reject the Combined Plan and Disclosure Statement pursuant to

Bankruptcy Code section 1126(g), because holders of Subordinated Security Claims and Equity

Interests will not receive or retain any property on account of their interests in the Debtors.  The

Combined Plan and Disclosure Statement may nevertheless be confirmed because the Combined

Plan and Disclosure Statement satisfies Bankruptcy Code section 1129(b) with respect to Classes

6 and 7.

MM.     Treatment of Administrative Expense Claims and Priority Tax Claims (11 U.S.C. § 1129(a)(9)).  The treatment of Administrative Expense Claims and Priority Tax Claims pursuant to Article IX of the Combined Plan and Disclosure Statement satisfies the requirements of Bankruptcy Code sections 1129(a)(9)(A), (B), (C) and (D).

NN.     Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(10)).  Classes 4 and 5, each of which is impaired under the Combined Plan and Disclosure Statement and entitled to vote, voted to accept the Combined Plan and Disclosure Statement by the requisite majorities, determined without including any acceptance of the Combined Plan and Disclosure Statement by any insider, thereby satisfying the requirements of Bankruptcy Code section 1129(a)(10). Specifically, as set forth in the Ballot Report, (i) creditors holding 93.97% in number and 79.91% in dollar amount of Class 4 Claims voted to accept the Combined Plan and Disclosure Statement, and (ii) creditors holding 92.29% in number and 95.07% in dollar amount of Class 5 Claims voted to accept the Combined Plan and Disclosure Statement.  Therefore, the requirements of Bankruptcy Code section 1129(a)(10) have been satisfied.

OO.     Feasibility (11 U.S.C. § 1129(a)(11)).  The information in the Combined Plan and Disclosure Statement and the evidence proffered or adduced at the Confirmation Hearing and in the Foster Declaration: (i) is persuasive and credible; (ii) has not been controverted by other evidence; (iii) establishes that the Combined Plan and Disclosure Statement is feasible; (iv) provides that there is a reasonable likelihood that the Liquidation Trust will meet its financial obligations under the Combined Plan and Disclosure Statement in the ordinary course of business; and (v) confirmation of the Combined Plan and Disclosure Statement is not likely to be followed by conversion to chapter 7 or the financial restructuring of the Liquidation Trust.  Thus, the requirements of Bankruptcy Code section 1129(a)(11) are satisfied.

PP.    <u>Payment of Fees (11 U.S.C. § 1129(a)(12))</u>.  As required pursuant to Section 20.8 of the Combined Plan and Disclosure Statement, all fees payable under section 1930 of title 28 of the United States Code have been or will be paid on or before the Effective Date, thus satisfying the requirements of Bankruptcy Code section 1129(a)(12).

QQ.    <u>Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13))</u>. The Debtors do not and have never provided retiree benefits within the meaning of Bankruptcy Code section 1114. Accordingly, Bankruptcy Code section 1129(a)(13) is inapplicable in these Chapter 11 Cases.

RR.    <u>No Domestic Support Obligations (11 U.S.C. § 1129(a)(14))</u>.  The Debtors are not required by a judicial or administrative order, or by statute, to pay a domestic support obligation. Accordingly, Bankruptcy Code section 1129(a)(14) is inapplicable in these Chapter 11 Cases.

SS.    <u>Debtors Are Not Individuals (11 U.S.C. § 1129(a)(15))</u>.  The Debtors are not individuals, and accordingly, Bankruptcy Code section 1129(a)(15) is inapplicable in these Chapter 11 Cases.

TT.    <u>No Applicable Nonbankruptcy Law Regarding Transfers (11 U.S.C. § 1129(a)(16))</u>.  The Debtors are moneyed, business, or commercial corporations, and/or partnerships, as the case may be, and, accordingly, Bankruptcy Code section 1129(a)(16) is inapplicable in these Chapter 11 Cases.

UU.    <u>No Unfair Discrimination; Fair and Equitable (11 U.S.C. § 1129(b))</u>.  The Debtors have satisfied the requirements of Bankruptcy Code sections 1129(b)(1) and (b)(2) with respect to Class 6 (Subordinated Securities Claims) and Class 7 (Equity Interests) (the "<u>Rejecting Classes</u>").  Based on the evidence proffered or adduced at the Confirmation Hearing and in the Foster Declaration, the Combined Plan and Disclosure Statement does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes, as required by Bankruptcy Code

sections 1129(b)(1) and (b)(2).  First, the Combined Plan and Disclosure Statement does not

discriminate unfairly, except with respect to Class 4 (General Unsecured Claims) and Class 5

(Convenience Claims), no class of Claims or Equity Interests having similar legal rights to the

Claims and Equity Interests in the Rejecting Classes is receiving different treatment under the

Combined Plan and Disclosure Statement.  Second, the creation of Class 5 (Convenience

Claims) is reasonable and necessary for the administrative convenience of the Debtors, and, thus,

the difference in the treatment of Class 4 (General Unsecured Claims) and Class 5 (Convenience

Claims) is not unfair.  Third, the Combined Plan and Disclosure Statement is "fair and equitable"

as to the Rejecting Classes because no holder of a Claim senior to Classes 6 and 7 will receive

more than full value on account of its Claim.  Based on the foregoing, the requirements of

Bankruptcy Code section 1129(b) are met with respect to the Rejecting Classes, and the

Combined Plan and Disclosure Statement may be confirmed notwithstanding the deemed

rejection by the Rejecting Class.

     VV.   Only One Plan (11 U.S.C. § 1129(c)).  The Combined Plan and Disclosure

Statement is the only plan filed in these cases, and accordingly, Bankruptcy Code section

1129(c) is inapplicable in these Chapter 11 Cases.

     WW.   Principal Purpose of the Combined Plan and Disclosure Statement (11 U.S.C. §

1129(d)).  The principal purpose of the Combined Plan and Disclosure Statement is not the

avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.

Accordingly, the Combined Plan and Disclosure Statement satisfies the requirements of

Bankruptcy Code section 1129(d).

XX.     <u>Small Business Case (11 U.S.C. § 1129(e))</u>. None of these Chapter 11 Cases are "small business case[s]," as that term is defined in the Bankruptcy Code, and accordingly, Bankruptcy Code section 1129(e) is inapplicable.

**Additional Findings**

YY.     <u>Good-Faith Solicitation (11 U.S.C. § 1125(e))</u>.  Based on the record before the Court in these Chapter 11 Cases and the Ballot Report, the Debtors have solicited acceptances of the Combined Plan and Disclosure Statement in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, Bankruptcy Code sections 1125(a) and (e), and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

ZZ.     <u>Satisfaction of Confirmation and Disclosure Requirements</u>.  Based upon the foregoing, the Combined Plan and Disclosure Statement satisfies the requirements for confirmation set forth in Bankruptcy Code section 1129 and for disclosure under Bankruptcy Code section 1125.

AAA.     <u>Implementation</u>.  All documents necessary to implement the Combined Plan and Disclosure Statement, including, without limitation, those contained in the Plan Supplement, as amended and all other relevant and necessary documents have been negotiated in good faith and at arm's-length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.

BBB.     <u>Good Faith of the Debtors</u>.  The Debtors, and all of their current respective members, officers, directors, agents, financial advisers, attorneys, employees, partners, affiliates, and representatives (i) have acted in good faith in negotiating, formulating, and proposing the Combined Plan and Disclosure Statement and agreements, compromises, settlements,

21

transactions, and transfers contemplated thereby, and (ii) will be acting in good faith in proceeding to (a) consummate the Combined Plan and Disclosure Statement and the agreements, compromises, settlements, transactions, and transfers contemplated thereby and (b) take the actions authorized and directed or contemplated by this Order.

CCC.   <u>Executory Contracts and Unexpired Leases</u>.  The Debtors have satisfied the provisions of Bankruptcy Code section 365 with respect to the assumption, assignment, and rejection of executory contracts and unexpired leases pursuant to Sections 15.1 and 15.2 of the Combined Plan and Disclosure Statement.

DDD.   <u>Vesting of Assets</u>.  Except as provided in the Combined Plan and Disclosure Statement, including to (a) pay claims or fees having priority over Class 4 (General Unsecured Claims) and (b) make distributions to Holders of Allowed Class 5 Claims (Convenience Claims), and subject to the Liquidation Trust Agreement, on the Effective Date all property of the Debtors shall vest in the Liquidation Trust free and clear of all Claims, Liens, Liabilities, encumbrances, charges, and other interests, including, without limitation, any and all claims, liens, encumbrances and any and all right, title, and interests related thereto of governmental entities relating to any tax liabilities or similar liabilities.  Such vesting does not constitute a voidable transfer under the Bankruptcy Code or applicable nonbankruptcy law.

EEE.   <u>Injunction, Exculpation, and Releases</u>.  The Court has jurisdiction under sections 1334(a) and (b) of title 28 of the United States Code to approve the injunction, exculpation, and releases set forth in Article XVIII of the Combined Plan and Disclosure Statement, because, *inter alia*, these provisions are an integral part of the Debtors' Plan and are necessary and appropriate for the Combined Plan and Disclosure Statement's implementation.  Bankruptcy Code section 105(a) permits issuance of the injunction and approval of the releases set forth in Article XVIII

of the Combined Plan and Disclosure Statement if, as has been established here based upon the record in these Chapter 11 Cases, the Foster and Lyon Declarations, and the evidence presented at the Confirmation Hearing, such provisions (i) were integral to the agreement among the various parties in interest and are important and necessary to the formulation and implementation of the Combined Plan and Disclosure Statement, as provided in Bankruptcy Code section 1123, (ii) confer substantial benefits on the Debtors' estates and creditors, (iii) are fair and reasonable, and (iv) are in the best interests of the Debtors, their estates, and parties in interest.  Further, the release and exculpation provisions in the Combined Plan and Disclosure Statement do not relieve any party of liability for an act or omission to the extent such act or omission is determined by a final order by a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence or the other exceptions set forth therein.  Based upon the record of these Chapter 11 Cases, the Foster and Lyon Declarations, and the evidence proffered or adduced at the Confirmation Hearing, this Court finds that the injunction, exculpation, and releases set forth in Article XVIII of the Combined Plan and Disclosure Statement are consistent with the Bankruptcy Code and applicable law.

FFF.  Pursuant to Bankruptcy Code section 1123(b)(3) and Bankruptcy Rule 9019(a), the releases, exculpations, and injunctions set forth in Article XVIII of the Combined Plan and Disclosure Statement and implemented by this Order are fair, equitable, reasonable, and in the best interests of the Debtors and the Debtors' Estates, creditors, and equity holders.  The failure to include such provisions would seriously impair the Debtors' ability to confirm a consensual Plan in these Chapter 11 Cases.  Accordingly, this Court finds that the releases, exculpations, and injunctions set forth in Article XVIII of the Combined Plan and Disclosure Statement are consistent with the Bankruptcy Code and applicable law.

GGG.  Compromise and Settlement.  Pursuant to Bankruptcy Rule 9019, in consideration of the distributions and other benefits provided under the Combined Plan and Disclosure Statement, the provisions of the Combined Plan and Disclosure Statement shall constitute a good faith compromise and settlement of all Claims or controversies resolved pursuant to the Combined Plan and Disclosure Statement.  All Plan distributions made to creditors holding Allowed Claims in any Class are intended to be, and shall be, final.

HHH.  Findings with Respect to Substantive Consolidation.  As set forth in the Combined Plan and Disclosure Statement, the Debtors' books and records did not accurately reflect the Assets and Liabilities attributable to each individual Debtor.

III.    As set forth in the Foster Declaration, it would be prohibitively costly, difficult, and time-consuming to administer the claims reconciliation with respect to each Debtor entity, especially as to Crytocurrencies.  The Debtors are unable to ascertain which specific Debtor entity owns remaining Cryptocurrencies, as there was significant movement and co-mingling between the Debtors of Cryptocurrencies, and tracing Cryptocurrency transfers is painstaking difficult and often impossible.

JJJ.    The deemed substantive consolidation is projected to increase recoveries to holders of General Unsecured Claims when compared to the distributions under five separate chapter 11 plans for each of the Debtors (assuming that the assets and liabilities could even be appropriately disentangled).  Moreover, pursuing separate chapter 11 plans for each of the Debtor entities would mean abandoning the Global Settlement, which would result in costly litigation concerning substantive consolidation, the validity and enforceability of Intercompany Claims, and the allocation of Assets among the Estates, all of which would reduce recoveries to holders of Allowed General Unsecured Claims and would likely not result in any clear factual or

legal resolution, given the nature of these Chapter 11 Cases.  The deemed substantive

consolidation that the Debtors seek in the Combined Plan and Disclosure Statement is proper and

in the best interests of creditors.

KKK.   Liquidation Trust.  Entry into the Liquidation Trust Agreement is in the best

interests of the Debtors, the Debtors' Estates, and Holders of General Unsecured Claims against

the Debtors.  The establishment of the Liquidation Trust, the selection of Cedric de Lisser,

Michael Michelin, and Christopher Moser to serve as the Liquidation Trustees, and the form of

the proposed Liquidation Trust Agreement (as it may be modified or amended), are appropriate

and in the best interests of the Debtors and the Debtors' Estates, and Class 4 creditors.  The

Liquidation Trust Agreement shall, upon the Effective Date, be valid, binding, and enforceable

in accordance with its terms.

LLL.   Exemption from Securities Law.  Bankruptcy Code section 1145 exempts from

registration under section 5 of the Securities Act or other applicable securities laws the offer or

sale, under a chapter 11 plan of reorganization, of a security of a debtor, of any affiliate

participating in a Combined Plan and Disclosure Statement with the debtor, or of a successor to a

debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an

equity interest in, such debtor or affiliate.  Such securities may be resold without registration

under the Securities Act, unless the holder is an "underwriter" with respect to such securities, as

that term is defined in Bankruptcy Code section 1145(b).  To the extent the Liquidation Trust

Beneficiaries' interest in the Liquidation Trust is deemed to be a security, Bankruptcy Code

section 1145 applies to the distribution under the Combined Plan and Disclosure Statement of

interests in the Liquidation Trust.  In addition, to the extent persons deemed to be "underwriters"

receive interests in the Liquidation Trust pursuant to the Combined Plan and Disclosure

Statement, which interests are otherwise exempt from registration pursuant to Bankruptcy Code section 1145, resales of such interests in the Liquidation Trust would not be exempted by Bankruptcy Code section 1145 from registration under the Securities Act or other applicable law.

MMM. Liquidation Trust Assets. It is in the best interests of the Debtors, the Debtors' Estates, creditors, and equity holders that the Liquidation Trust Assets be transferred to and vested in the Liquidation Trust, as set forth in Sections 12.3(c) and 12.3(d) of the Combined Plan and Disclosure Statement.

NNN. Liquidation Trust Is Not A Successor of the Debtors. The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Combined Plan and Disclosure Statement or in the Liquidation Trust Agreement.

## CONCLUSIONS OF LAW

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1. Final Approval of the Disclosure Statement and Solicitation Motion. The (i) Combined Plan and Disclosure Statement and (ii) Solicitation Motion are approved in full and in a final basis. The findings and conclusions of law contained in the Interim Disclosure Statement Order, to the extent made on an interim basis, are now made on a final basis herein, and are incorporated by reference herein. The Combined Plan and Disclosure Statement is APPROVED on a final basis as containing adequate information within the meaning of Bankruptcy Code section 1125, and any Objections to the adequacy of the information contained in the Combined Disclosure Statement and Plan not otherwise consensually resolved are overruled.

2.      Confirmation.  All requirements for confirmation of the Combined Plan and

Disclosure Statement have been satisfied.  Accordingly, the Combined Plan and Disclosure

Statement in its entirety is CONFIRMED pursuant to Bankruptcy Code section 1129.  A copy of

the confirmed Combined Plan and Disclosure Statement is attached as "Exhibit A" to this Order.

The terms of the Combined Plan and Disclosure Statement, and the Plan Supplement are

incorporated by reference into, and are an integral part of, this Order.

3.      Objections.  All parties have had a full and fair opportunity to litigate all issues

raised by the Objections, or which might have been raised, and the Objections have been fully

and fairly litigated.  All Objections, responses, statements, and comments in opposition to the

Combined Plan and Disclosure Statement, other than those withdrawn with prejudice in their

entirety prior to the Confirmation Hearing or otherwise resolved on the record of the

Confirmation Hearing and/or herein are overruled for the reasons stated on the record.

4.      Findings of Fact and Conclusions of Law.  The findings of fact and the

conclusions of law stated in this Order shall constitute findings of fact and conclusions of law

pursuant to Bankruptcy Rule 7052, made applicable to the proceeding by Bankruptcy Rule 9014.

To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so

deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it

shall be so deemed.

5.      Plan Supplement.  The documents contained in the Plan Supplement, and any

amendments, modifications, and supplements thereto, and all documents and agreements

introduced into evidence by the Debtors at the Confirmation Hearing, including all exhibits and

attachments thereto and documents referred to therein, and the execution, delivery, and

performance thereof by the Debtors, are authorized and approved when they are finalized,

executed and delivered, and are integral to, part of and are incorporated by reference into the Combined Plan and Disclosure Statement.  Without further order or authorization of this Court, the documents included in the Plan Supplement may be amended and supplemented, prior to execution, so long as such amendment or supplement does not materially and adversely change the treatment of holders of Claims.  Execution versions of the documents comprising the Plan Supplement shall constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms.  The documents contained in the Plan Supplement, including, as applicable, as forms to be substantially adhered to, are sufficient to comply with applicable requirements of the laws, rules, and regulations of any state or other governmental authority, and all such state and other governmental authorities are directed to accept such documents for filing and implementation.

6.     <u>Solicitation and Notice</u>.  Notice of the Confirmation Hearing complied with the terms of the Interim Disclosure Statement Order, was appropriate and satisfactory based on the circumstances of these Chapter 11 Cases, and was in substantial compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.  The Solicitation of votes on the Combined Plan and Disclosure Statement and the Solicitation Materials substantially complied with the solicitation procedures in the Interim Disclosure Statement Order, was appropriate and satisfactory based upon the circumstances of these Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, and to the extent that the Debtors did not comply with the Interim Disclosure Statement Order, because holders of Claims against and interests in the Debtors received adequate due process, the need for such compliance is hereby waived.  Notice of the Plan Supplement, and all related documents, was appropriate and satisfactory based upon

the circumstances of these Chapter 11 Cases, and was in compliance with the provisions of the
Interim Disclosure Statement Order, Bankruptcy Code, the Bankruptcy Rules, and the Local
Bankruptcy Rules.

7.     <u>Omission of Reference to Particular Plan Provisions</u>.  The failure to specifically
describe or include any particular provision of the Combined Plan and Disclosure Statement in
this Order shall not diminish or impair the effectiveness of such provision, it being the intent of
this Court that the Combined Plan and Disclosure Statement be approved and confirmed in its
entirety.

8.     <u>Plan Classification Controlling</u>.  The classifications of Claims and Equity
Interests for purposes of the distributions to be made under the Combined Plan and Disclosure
Statement shall be governed solely by the terms of the Combined Plan and Disclosure Statement.
The classification set forth on the Ballots tendered or returned by the Debtors' creditors in
connection with voting on the Combined Plan and Disclosure Statement: (a) were set forth on the
Ballots solely for purposes of voting to accept or reject the Combined Plan and Disclosure
Statement; (b) do not necessarily represent, and in no event shall be deemed to modify or
otherwise affect, the actual classification of such Claims and Equity Interests under the
Combined Plan and Disclosure Statement for distribution purposes; and (c) shall not be binding
on the Debtors, the Liquidation Trust, creditors, or equity holders for purposes other than voting
on the Combined Plan and Disclosure Statement; <u>provided</u>, <u>however,</u> a Convenience Class
Election on a properly executed Ballot made by a holder of an otherwise General Unsecured
Claim shall be conclusive, final, and binding on the holder of such Claim.

9.     <u>Binding Effect</u>.  Subject to the occurrence of the Effective Date, on and after the
Confirmation Date, the provisions of the Combined Plan and Disclosure Statement, the Plan

Supplement, and this Order shall bind (a) any holder of a Claim against, or Equity Interest in, the

Debtors and such holder's respective successors and assigns (whether or not the Claim or Equity

Interests are Impaired under the Combined Plan and Disclosure Statement, whether or not such

holder has voted to accept the Combined Plan and Disclosure Statement, and whether or not such

holder is entitled to a Distribution under the Combined Plan and Disclosure Statement), (b) all

Entities that are parties to or are subject to the settlements, compromises, releases, and

injunctions described in the Combined Plan and Disclosure Statement, (c) each Person acquiring

property under the Combined Plan and Disclosure Statement or this Order, and (d) any and all

non-Debtor parties to executory contracts and unexpired leases with the Debtors.

10.     <u>Corporate Existence and Dissolution of Debtors</u>.  Immediately after the Effective

Date, and subject to the Combined Plan and Disclosure Statement, the Liquidation Trustees shall

be authorized to take, in their sole and absolute discretion, all actions reasonably necessary to

dissolve one or more of the Debtors under applicable laws, including under the laws of the

jurisdictions in which they may be organized or registered, and to pay all reasonable costs and

expenses in connection with such dissolutions, including the costs of preparing or filing any

necessary paperwork or documentation.  Upon the final Distributions, any Debtors that have not

been previously dissolved shall be deemed dissolved for all purposes without the necessity for

other or further actions to be taken by or on behalf of the Debtors, and the Liquidation Trustees

shall be authorized to file any certificate of cancellation or other documents as may be necessary

or desirable to terminate the legal existence of these Debtors.

11.     <u>Cancellation of Instruments and Stock</u>.  On the Effective Date, all instruments

evidencing or creating any indebtedness or obligation of the Debtors, except such instruments

that are authorized or issued under the Combined Plan and Disclosure Statement, shall be

canceled and extinguished.  Additionally, as of the Effective Date, all Equity Interests in all of

the Debtors, and any and all warrants, options, rights, or interests with respect to such Equity

Interests that have been issued, could be issued, or that have been authorized to be issued but that

have not been issued, shall be deemed cancelled and extinguished without any further action of

any party.  The Liquidation Trustees shall have all power and authority that may be or could

have been exercised, with respect to the Liquidation Trust Assets, by any officer, director, or

other party acting in the name of the Debtors or their estates with like effect as if duly

authorized, exercised and taken by action of such officers, directors, or other party.  The holders

of, or parties to, the cancelled notes, membership interests, share certificates, and other

agreements and instruments shall have no rights arising from or relating to such notes, share

certificates, and other agreements and instruments or the cancellation thereof, except the rights

provided pursuant to the Combined Plan and Disclosure Statement.

      12.    <u>Liquidation Trust Agreement</u>.  The Debtors are authorized and approved to enter

into the Liquidation Trust Agreement and this Order shall be deemed approval of the Liquidation

Trust Agreement.

      13.    <u>Vesting of Liquidation Trust Assets</u>.  Any and all of the Estates' Assets shall

remain assets of the Estates pursuant to Bankruptcy Code section 1123(b)(3)(B) and on the

Effective Date shall, subject to the Combined Plan and Disclosure Statement and the Liquidation

Trust Agreement, be transferred to and vest in the Liquidation Trust free and clear of all Claims,

Liens, Liabilities, encumbrances, charges, and other interests, including, without limitation, any

and all claims, liens, encumbrances and any and all right, title, and interests related thereto of

governmental entities relating to any tax liabilities or similar liabilities.  Pursuant to Bankruptcy

Code section 1123(b)(3)(B), only the Liquidation Trustees shall have the right to pursue or not to

pursue, or, subject to the terms of the Combined Plan and Disclosure Statement and the

Liquidation Trust Agreement, compromise, or settle any Liquidation Trust Assets.  From and

after the Effective Date, the Liquidation Trustees may commence, litigate, and settle any Causes

of Action or Claims relating to the Liquidation Trust Assets or rights to payment or Claims that

belong to the Debtors as of the Effective Date or are instituted by the Liquidation Trustees on or

after the Effective Date, except as otherwise expressly provided in the Combined Plan and

Disclosure Statement and the Liquidation Trust Agreement.  The Liquidation Trustees shall be

entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and

their Estates, including setoff, recoupment and any rights under Bankruptcy Code section 502(d).

14.     Limited Substantive Consolidation.  Entry of this Order shall constitute approval,

pursuant to Bankruptcy Code sections 105(a), 541, 1123(a)(5), 1129, effective as of the Effective

Date, of the limited substantive consolidation of the Estates of Debtors, and the Assets and

Liabilities of the Debtors are treated as the Assets and Liabilities of a single substantively

consolidated entity for the purposes of voting and creditor distributions under the Combined Plan

and Disclosure Statement.  Under this limited substantive consolidation: (i) all Assets and

Liabilities of the Debtors will, solely for Distribution purposes, be treated as if they were

merged, (ii) all Intercompany Claims will be eliminated, (iii) each Claim Filed or to be Filed

against the Debtors will be deemed a single nonaggregated Claim against, and a single non-

aggregated obligation of, the Debtors, (iv) all guarantees of any Debtor of the payment,

performance, or collection of obligations of another Debtor shall be eliminated and canceled;

(v) all transfers, disbursements and Distributions on account of Claims made by or on behalf of

any of the Debtors' Estates hereunder will be deemed to be made by or on behalf of all of the

Debtors' Estates, and (vi) Holders of Allowed Claims entitled to Distributions under the

Combined Plan and Disclosure Statement shall be entitled to their Distribution Pro Rata Share on account of such Claim without regard to which Debtor was originally liable for such Claim.  The limited substantive consolidation called for in the Combined Plan and Disclosure Statement shall not (other than for the purposes of voting and creditor distributions under the Combined Plan and Disclosure Statement) affect (i) the legal and organizational structure of the Debtors, (ii) executory contracts or unexpired leases that were entered into during these Chapter 11 Cases or that have been or will be assumed or rejected, (iii) any agreements entered into by the Liquidation Trustees on or after the Effective Date, and (d) the Debtors' or the Liquidation Trustees' ability to subordinate or otherwise challenge Claims on an entity-by-entity basis. Notwithstanding the limited substantive consolidation called for in the Combined Plan and Disclosure Statement, each and every Debtor shall remain responsible for the payment of U.S. Trustee Fees until its particular case is closed, dismissed, or converted.

15. _Liquidation Trustees._  Cedric de Lisser, Michael Michelin, and Christopher Moser are appointed as the Liquidation Trustees.  Absent authorization of the Court pursuant to a Final Order, no judicial, administrative, arbitral, or other action or proceeding shall be commenced in any forum other than this Court against the Liquidation Trustees, in their official capacities, with respect to their status, duties, powers, acts, or omissions as Liquidation Trustees.

16. _Distributions Under the Combined Plan and Disclosure Statement._  All distributions under the Combined Plan and Disclosure Statement shall be made in accordance with Article XIII of the Combined Plan and Disclosure Statement and such methods of distribution are approved.

17.     <u>Disputed Claims</u>.  The provisions of Article XIV of the Combined Plan and Disclosure Statement, including, without limitation, the provisions governing procedures for resolving Disputed Claims, are found to be fair and reasonable and are approved.

18.     <u>Treatment is in Full Satisfaction</u>.  All distributions under the Combined Plan and Disclosure Statement shall be made in accordance with the Combined Plan and Disclosure Statement.  The treatment set forth in the Combined Plan and Disclosure Statement is in full satisfaction of the legal, contractual, and equitable rights (including any liens) that each entity holding a Claim or Equity Interest may have in or against the Debtors, the Estates, or their respective property.  This treatment supersedes and replaces any agreements or rights those entities may have in or against the Debtors, the Estates, or their respective property.

19.     <u>Supplemental Administrative Expense Bar Date</u>.  Subject to Article 9.1(b) of the Combined Plan and Disclosure Statement, Holders of Administrative Expense Claims (other than Professional Fee Claims) arising during the period from November 7, 2020 through the Effective Date must file requests for payment of Administrative Expense Claims so as to be **actually received** on or before **4:00 p.m. (prevailing Eastern Time) on the day that is thirty (30) calendar days after the Effective Date** by the Claims Agent at the following address:

> If by first-class mail:
>
> > Cred Inc. Claims Processing Center
> > c/o Donlin, Recano & Company, Inc.
> > P.O. Box 199043 Blythebourne Station
> > Brooklyn, NY 11219
>
> If by hand delivery or overnight:
>
> > Cred Inc. Claims Processing Center
> > c/o Donlin, Recano & Company, Inc.
> > 6201 15th Avenue
> > Brooklyn, NY 11219

20.     All such requests for payment must: (i) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant; (ii) be written in the English language; (iii) denominate the claim in lawful currency of the United States as of the Administrative Expense Claims Bar Date; (iv) indicate the particular Debtor against which the claim is asserted; and (v) include supporting documentation (or, if such documentation is voluminous, include a summary of such documentation) or an explanation as to why such documentation is not available.  The notice of the Effective Date delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f), substantially in the form included in the Plan Supplement, shall set forth the Administrative Expense Claims Bar Date and shall constitute notice of such bar date. Nothing in this Order shall extend or otherwise modify any deadline or requirement for filing claims set forth in previous Orders of this Court.

21.     Any Person that is required to file a request for payment of an Administrative Expense Claim (other than Professional Fee Claims) under the Combined Plan and Disclosure Statement and that fails to do so by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claim, and such Administrative Expense Claim shall not be enforceable against the Liquidation Trust, the Liquidation Trustees, the Debtors, the Estates, and their respective properties, and the Liquidation Trust, the Liquidation Trustees, Debtors, the Estates, and their respective properties shall be forever discharged from any and all Liability with respect to such Administrative Expense Claim unless otherwise ordered by the Court or as otherwise provided herein.  All such Administrative Expense Claims shall, as of the Effective Date, be subject to the permanent injunction pursuant to Section 18.5 of the Combined Plan and Disclosure Statement and this Order.

35

22.     <u>Assumption and Rejection of Executory Contracts and Unexpired Leases (11</u>

<u>U.S.C. § 1123(b)(2))</u>.  All of the Debtors' executory contracts and unexpired leases are deemed

rejected as of the Effective Date, except to the extent (a) the Debtors previously have assumed,

assumed and assigned, or rejected such Executory Contract or Unexpired Lease, (b) prior to the

Effective Date, the Debtors have filed a motion to assume, assume and assign, or reject an

Executory Contract or Unexpired Lease on which the Court has not ruled, (c) an Executory

Contract and Unexpired Lease is identified in the Plan Supplement as an Executory Contract or

Unexpired Lease to be assumed or assumed and assigned pursuant to the Combined Plan and

Disclosure Statement, or (d) Executory Contracts and Unexpired Leases under which the

counterparty has consented to the extension of the time by which the Debtors must assume or

reject to a date beyond the Effective Date.  Entry of this Order shall constitute approval of all

rejections of Executory Contracts and Unexpired Leases pursuant to Section 15.1 of the

Combined Plan and Disclosure Statement and Bankruptcy Code sections 365(a) and 1123.  Entry

of this Order shall, subject to and upon the occurrence of the Effective Date, constitute the

approval, pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2), of the rejection of the

Executory Contracts and Unexpired Leases pursuant to Section 15.1 of the Combined Plan and

Disclosure Statement.  The assumption of the contracts and leases identified in Exhibit C of the

Plan Supplement (the "<u>Assumed Contracts</u>") is hereby approved, and the requirements of

Bankruptcy Code section 365 with respect thereto are hereby deemed satisfied.  The cure

amounts with respect to the Assumed Contracts specified in Exhibit C of the Plan Supplement

are hereby approved.

23.     <u>Bar Date for Rejection Damages</u>.  If the rejection by the Debtors of an executory

contract or an unexpired lease pursuant to Section 15.1 of the Combined Plan and Disclosure

Statement results in damages to the non-Debtor counterparty to such Executory Contract or Unexpired Lease, a Claim for such damages arising from such rejection shall not be enforceable against the Debtors or their Estates or agents, successors, or assigns, unless a proof of Claim is filed with the Claims Agent **so as to actually be received on or before** the Rejection Bar Date, *i.e.*, the date that is thirty (30) calendar days after the Effective Date. Any Person that is required to file a proof of Claim arising from the rejection of an Executory Contract or Unexpired Lease under the Combined Plan and Disclosure Statement and that fails to timely do so shall be forever barred, estopped, and enjoined from asserting such Claim, and such Claim shall not be enforceable against the Liquidation Trust, the Liquidation Trustees, the Debtors, the Estates, and their respective properties, and the Liquidation Trust, the Liquidation Trustees, Debtors, the Estates, and their respective properties shall be forever discharged from any and all Liability with respect to such Claim unless otherwise ordered by the Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction pursuant to Section 18.5 of the Combined Plan and Disclosure Statement and this Order.

24. **Exculpation. None of the Debtors-in-Possession, and the current or former directors, officers, employees, Affiliates, agents, accountants, financial advisors, investment bankers, restructuring advisors, attorneys, representatives, and other Professionals of or to the Debtors and the Debtors-in-Possession who served or were employed in such capacities after the Petition Date, and each of their respective agents and representatives, the Released Parties, the Committee, the members of the Committee and the Professionals retained by the Committee shall have or incur any Liability for any Claim, Cause of Action, or other assertion of Liability for any act taken or omitted to be taken in connection with or arising out of these Chapter 11 Cases, the sale of the Debtors' Assets,**

the formulation, dissemination, implementation, approval, confirmation, consummation, or administration of the Combined Plan and Disclosure Statement, property to be distributed under the Combined Plan and Disclosure Statement, or any other act or omission in connection with or arising out of these Chapter 11 Cases, the Combined Plan and Disclosure Statement, or any contract, instrument, document or other agreement related thereto; **provided**, **however** (i) that the foregoing shall not affect the Liability of any Entity resulting from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, fraud, or gross negligence; and (ii) no Insider that is not a Released Party, including, without limitation, James Alexander, Lu Hua, Dan Schatt, Joseph Podulka, and Daniyal Inamullah, will receive a release or exculpation of any kind under the Combined Plan and Disclosure Statement or this Order, whether from the Debtors or otherwise (the "**Insider Carve-Out**").  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, discharges, and any other applicable law or rules protecting such Persons from liability.

      25.    **Liquidation Trustees Exculpation and Indemnification.**  The Liquidation Trustees shall not have or incur any liability for any act or omission taken or omitted to be taken (a) in their capacities as Liquidation Trustees or (b) to otherwise implement or effectuate the terms and provisions of the Combined Plan and Disclosure Statement, or (c) in the exercise of the power and authority that may be or could have been exercised by any officer, director, shareholder or other party acting in the name of the Debtors or their estates; **provided**, **however**, that the foregoing shall not affect the liability of a Liquidation Trustees resulting from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, fraud, or gross

negligence.  The Liquidation Trust shall indemnify and hold harmless the Liquidation Trustees, from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) which the Liquidation Trustees may incur or become subject in connection with any action, suit, proceeding, or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidation Trust or the Combined Plan and Disclosure Statement or the discharge of their  duties thereunder, and the Liquidation Trustees shall be entitled to payment or reimbursement from the assets of the Liquidation Trust for any and all such liabilities, losses, damages, claims, costs and expenses; **provided**, **however**, that no such indemnification, payment or reimbursement will be made to a Liquidation Trustees for actions or omissions as a result of willful misconduct, gross negligence, or fraud.  This exculpation and indemnification shall be in addition to, and not in limitation of, all other releases, indemnities, discharges, and any other applicable law or rules protecting the Liquidation Trustees from liability.

26.     **Releases by Debtors, the Estates, the Liquidation Trust, and the Liquidation Trustees**.  Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and also subject to the Insider Carve-Out, and in consideration of the services of the Released Parties, (a) the Debtors, (b) their respective Estates, (c) the Liquidation Trust, and (d) the Liquidation Trustees shall release, waive, and discharge unconditionally and forever each of the Released Parties from any and all Claims, Causes of Action, and Liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law,

equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: (i) taking place before the Petition Date in connection with the Debtors; and (ii) in connection with or arising out of the Debtors' Chapter 11 Cases, the pursuit of confirmation of the Combined Plan and Disclosure Statement and Disclosure Statement, the Consummation thereof, the administration thereof or the property to be distributed thereunder; **provided**, **that** the foregoing shall not operate as a waiver of or release from any Causes of Action resulting from the willful misconduct, actual fraud, or gross negligence of any Released Party arising under chapter 5 of the Bankruptcy Code.

27.      In addition, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date and the Insider Carve-Out, and in consideration of the services of the Released Parties, the settlements and compromises contained in the Combined Plan and Disclosure Statement and this Order, and the Distributions to be made pursuant to the Combined Plan and Disclosure Statement, (a) each of the Debtors and (b) all Holders of Claims or Equity Interests, who (1) vote in favor of the Combined Plan and Disclosure Statement or (2) (A) abstain from voting, are not entitled to vote, or vote to reject the Combined Plan and Disclosure Statement and (B) do not opt out of the release by timely submitting a Ballot or the Opt-Out Election Form shall be deemed to have released and discharged each Released Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' prepetition operations and activities, existing or hereinafter arising in law, equity,

or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence taking place before the Effective Date.

28.  **Injunction.**  Except as otherwise provided in the Combined Plan and Disclosure Statement, including, without limitation, as to the Insider Carve-Out, all Persons that have held, hold, or may hold Claims against or Equity Interests in the Debtors or their Estates that arose prior to the Effective Date are permanently enjoined, solely with respect to any such Claims or Equity Interests, from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustees; (b) enforcing, attaching, collecting, or recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustees; (c) creating, perfecting, or enforcing, in any manner, directly or indirectly, any Lien or encumbrance against the Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustees; (d) except to the extent permitted by Bankruptcy Code sections 362(b), 553, 559, 560, or 561, asserting any right of setoff, subrogation, or recoupment against the Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustees; (e) pursuing any Claim or Cause of Action released pursuant to the Combined Plan and Disclosure Statement; or (f) taking any actions which interfere with the implementation or consummation of the Combined Plan and Disclosure Statement.  The rights afforded in the Combined Plan and Disclosure Statement and the treatment of all Claims and Equity Interests therein shall be in exchange for and in complete satisfaction of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the

Debtors or any of their respective assets, properties, or Estates.  Nothing in this paragraph
or Section 18.5 of the Combined Plan and Disclosure Statement shall (i) preclude the
United States Securities and Exchange Commission (the "SEC") from enforcing its police
or regulatory powers or (ii) enjoin, limit, impair or delay the SEC from commencing or
continuing any claims, causes of action, proceeding, or investigations against any Entity
other than the Debtors.

29.     **Terms of Stays and Injunctions**.  Notwithstanding anything to the contrary in the
Combined Plan and Disclosure Statement, the automatic stay arising under Bankruptcy Code
section 362(a) shall remain in full force and effect until the earlier of (i) closure of each of the
Debtors' Chapter 11 Cases, (ii) dismissal of each of the Debtors' Chapter 11 Cases or (iii) order of
the Court.  The injunctions set forth in Section 18.4 of the Combined Plan and Disclosure
Statement shall permanently remain in full force and effect.

30.     Retention of Causes of Action/Reservation of Rights.  Except with respect to the
exculpation in Section 18.1 of the Combined Plan and Disclosure Statement and the release in
Section 18.2 of the Combined Plan and Disclosure Statement, nothing contained in the
Combined Plan and Disclosure Statement or this Order shall be deemed to be a waiver or the
relinquishment of any rights or causes of action that the Debtors or the Liquidation Trust may
have or which the Liquidation Trust may choose to assert on behalf of the Debtors' Estates under
any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without
limitation, (i) any and all claims against any person or entity, to the extent such person or entity
asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against
the Debtors, their officers, directors, managers or representatives and (ii) the turnover of any
property of the Debtors' Estates.  Except as otherwise explicitly provided in the Combined Plan
and Disclosure Statement, nothing shall affect either the Debtors' or the Liquidation Trustees'

rights and defenses, both legal and equitable, with respect to any Claims or Equity Interests, including all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

31.    Effectuating Documents; Further Transactions.  The appropriate officer and/or director of the Debtors or the Liquidation Trustees, as applicable, shall be, and hereby are, authorized to execute, deliver, file, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Plan and Disclosure Statement.

32.    Conditions to Effective Date.  The Combined Plan and Disclosure Statement shall not become Effective unless and until the conditions set forth in Section 16.2 of the Combined Plan and Disclosure Statement have been satisfied or waived pursuant to Section 16.3 of the Combined Plan and Disclosure Statement.

33.    Retention of Jurisdiction.  Pursuant to Article XIX of the Combined Plan and Disclosure Statement, and except as otherwise provided in this Order, this Court shall retain and have exclusive jurisdiction of all matters in connection with, arising out of, or related to the Chapter 11 Cases and the Combined Plan and Disclosure Statement pursuant to, and for the purposes of, Bankruptcy Code sections 105(a) and 1142.

34.    Modifications.  Pursuant to Section 20.5 of the Combined Plan and Disclosure Statement, the Combined Plan and Disclosure Statement may be altered, amended, or modified at any time after the Confirmation Date and before substantial consummation; provided, that the Combined Plan and Disclosure Statement, as altered, amended, or modified, satisfies the requirements of Bankruptcy Code sections 1122 and 1123, and the Court, after notice and a

hearing, confirms the Combined Plan and Disclosure Statement, as altered, amended, or

modified, under Bankruptcy Code section 1129 and the circumstances warrant such alterations,

amendments, or modifications.  A holder of a Claim that has accepted the Combined Plan and

Disclosure Statement prior to any alteration, amendment, or modification will be deemed to have

accepted the Combined Plan and Disclosure Statement, as altered, amended, or modified, if the

proposed alteration, amendment, or modification does not materially and adversely change the

treatment of the holders of the Claims.  Prior to the Effective Date, the Debtors, after

consultation with the Committee, may make appropriate technical adjustments and modifications

to the Combined Plan and Disclosure Statement without further order or approval of the Court,

provided that such technical adjustments and modifications do not materially change the

treatment of holders of Claims or Equity Interests.

35.     Payment of Statutory Fees.  On or before the Effective Date, all fees payable

under section 1930 of chapter 123 of title 28 of the United States Code shall be paid in Cash.

Following the Effective Date, all such fees shall be paid by the Liquidation Trustees from the

Liquidation Trust Assets until the earlier of the conversion or dismissal of the applicable Chapter

11 Case under Bankruptcy Code section 1112, or the closing of the applicable Chapter 11 Case

pursuant to Bankruptcy Code section 350(a).  For the avoidance of doubt, the U.S. Trustee Fees

shall be deemed part of the Liquidation Trust Expenses.

36.     Exemption from Transfer Taxes.  Pursuant to Bankruptcy Code section 1146(a),

the issuance, transfer, or exchange of notes or equity securities under or in connection with the

Combined Plan and Disclosure Statement, the creation of any mortgage, deed of trust, or other

security interest, the making or assignment of any lease or sublease or the making or delivery of

any deed or other instrument of transfer under, in furtherance of, or in connection with the

Combined Plan and Disclosure Statement, including the issuance of any stock, any merger agreements, or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Combined Plan and Disclosure Statement shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

37.     Dissolution of the Committee.  On the Effective Date, except as provided in Section 20.9 of the Combined Plan and Disclosure Statement, the Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to, arising from, or in connection with these Chapter 11 Cases, and the retention or employment of the Debtors' and Committee's attorneys, accountants, and other agents, if any, shall terminate, except for purposes of Filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith, or any appeal of this Order.

38.     Securities Laws Exemption.  To the extent the Liquidation Trust Beneficiaries' interest in the Liquidation Trust is deemed to be a security, the distribution under the Combined Plan and Disclosure Statement of interests in the Liquidation Trust, shall be exempt from registration under applicable securities laws pursuant to Bankruptcy Code section 1145(a), as amended.

39.     Professional Fee Claims.  Pursuant and subject to Section 9.2 of the Combined Plan and Disclosure Statement, all Persons seeking awards by the Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under Bankruptcy Code sections 330, 331, 363, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) shall (a) file, on or before the date that is sixty (60) days after the Effective Date, their

45

respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Court in accordance with the order relating to or allowing any such compensation and reimbursement of expenses, upon providing notice of the order's entry to Matthew K. Foster, Sonoran Capital Advisors, 1733 N. Greenfield Road, Suite 10, Mesa, Arizona 85205 (mfoster@sonorancap.com). The Liquidation Trustees are authorized to pay reasonable compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Court approval in accordance with the Liquidation Trust Agreement.

40. _Professional Fee Escrow_. The Debtors shall deposit, in an account maintained at East West Bank, Cash equal to the Professional Fee Reserve Amount. East West Bank and Matthew Foster, as custodian of the Professional Fee Escrow, may rely upon the representations of Professionals with respect to whether any request for payment of an Allowed Professional Fee Claim should be honored and shall not be held liable for actions taken (a) at the direction of a Professional or (b) in a good-faith belief that the Court has authorized such action. Notwithstanding any other language in the Combined Plan and Disclosure Statement or the this Order, the Professional Fee Escrow and the funds therein shall be used for the sole purpose of paying the Allowed Professional Fee Claims and shall not constitute property of the Debtors, their Estates, or the Liquidation Trust; _provided_, _that_ the Liquidation Trust shall hold a residual interest in the Professional Fee Escrow and, upon the satisfaction of all Allowed Professional Fee Claims, any funds remaining in the Professional Fee Escrow shall vest in the Liquidation Trust. Further, if the amount in the Professional Fee Escrow is insufficient to pay in full all Allowed

Professional Fee Claims, the deficiency shall be promptly paid by the Liquidation Trustees from the Liquidation Trust Assets, without any further action or order of the Court.

41.     Notice of Effective Date.  As soon as practicable after the occurrence of the Effective Date, the Debtors shall file and serve, pursuant to Bankruptcy Rules 2002(f)(7), 2002(k), and 3020(c), notice of entry of this Order and the occurrence of the Effective Date in substantially the form included as Exhibit D to the Plan Supplement (the "Notice of Effective Date") on all creditors and interest holders, the U.S. Trustee, the attorneys for the Committee, and other parties in interest, by causing the Notice of Effective Date to be delivered to such parties by first-Class mail, postage prepaid.  The Notice of Effective Date shall also be posted on the website of the Debtors' Court-appointed voting and tabulation agent, Donlin Recano at https://www.donlinrecano.com/Clients/cred/Index.  Such notice is adequate under the particular circumstances and no other or further notice is necessary.  The form of Notice of Effective Date substantially in the form included as Exhibit D to the Plan Supplement is approved.

42.     Reserves.  In accordance with the terms of the Combined Plan and Disclosure Statement, on the Effective Date, and after making all Distributions required to be made on the Effective Date hereunder, the Liquidation Trustees shall establish and maintain a separate reserve (each, a "Reserve" and, as plural and collectively, as applicable, the "Reserves") for the estimated amount of the Liquidation Trust Expenses, as well as for payment of Class 4 General Unsecured Claims, which Reserve shall be administered by the Liquidation Trustees.  To the extent that Reserves are established and maintained for the benefit of any Holder of a Disputed Claim, such Reserves shall include a combination of Cryptocurrency and Cash equal to the Distributions that would have been made to the Holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (a) the amount of the Disputed Claim, (b) the

amount in which the Disputed Claim shall be estimated by the Court pursuant to Bankruptcy Code section 502 for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim ultimately may become an Allowed Claim, or (c) such other amount as may be agreed upon by the Holder of such Disputed Claim and the Liquidation Trustees.

43.   <u>Value of Allowed General Unsecured Claims</u>.  Notwithstanding Sections 1.8, 1.63, 1.68, and 10.4 or any other provisions of the Combined Plan and Disclosure Statement or this Order to the contrary, the Combined Plan and Disclosure Statement shall not constitute a determination that the amount of an Allowed General Unsecured Claim shall be calculated based on the value of such claim, as denominated in United States dollar, as of the Petition Date.  The rights of Holders of Allowed General Unsecured Claims to assert that their Claims should be valued as of a date other than the Petition Date for purposes of calculating the Dollar Denominated Value, including, without limitation, the Effective Date, whether under 11 U.S.C. § 562 or any other applicable law, are hereby preserved and may be asserted in the claims administration process.  This right shall apply to Holders of Allowed General Unsecured Claims irrespective of the amounts included in Section 7 of a Proof of Claim based upon an exchange rate tied to the Petition Date.

44.   <u>Cryptocurrency Elections</u>.  Notwithstanding Sections 10.4(b), 13.3, 13.6, 14.6, or any other provisions of the Combined Plan and Disclosure Statement or this Order to the contrary, the Liquidation Trustees shall use commercially best efforts to honor the Cryptocurrency Elections.  To the extent the Liquidation Trustees plan on making any Equivalent Cryptocurrency Distribution that does not honor the Cryptocurrency Election of Holders of an Allowed General Unsecured Claim in Class 4, the Liquidation Trustees shall

consult, in good faith, with certain members of the Ad Hoc Committee of Bitcoin Lenders [Docket No. 546] (the "Ad Hoc Committee") who represent the interest of overseas creditors, before making such distribution.

45.     Clarification of Releases & Injunction.  Notwithstanding anything to the contrary in this Order or in the Combined Plan and Disclosure Statement, including Sections 18.2, 18.4 and 18.5 thereof, nothing in this Order or in the Combined Plan and Disclosure Statement shall constitute a release of, or injunction against, individual direct claims or causes of action that a Creditor may possess against any Person or Entity other than the Debtors, unless such Creditor is deemed to release such individual direct claim or causes of action against a Released Party pursuant to Section 18.2 of the Plan.  For the avoidance of doubt, no Creditor may pursue claims or causes of action that were property of the estate as of the Petition Date. Notwithstanding anything to the contrary in this Order or the Plan, including, but not limited to, Section 18.2 thereof, the Ad Hoc Committee members shall be deemed to have accepted the Plan but shall not be deemed a releasing party for purposes of Section 18.2 of the Plan.

46.     United States.  Notwithstanding any provision to the contrary in the Plan, the Plan Supplement, the Definitive Documents, this Order or any implementing Plan documents (collectively, "Documents"):

i.     Nothing in the Documents shall: (1) discharge, release, enjoin, impair or otherwise preclude (a) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code ("claim"), (b) any claim of the United States arising after the Confirmation Date, or (c) any liability of any entity or person under police or  regulatory statutes or regulations to any Governmental Unit (as defined by section 101(27) of the

Bankruptcy Code) as the owner, lessor, lessee or operator of property or rights to property that such entity owns, operates or leases after the Confirmation Date; (2) release, nullify, preclude or enjoin the enforcement of any police or regulatory power; (3) modify the scope of Bankruptcy Code Section 1141; (4) confer exclusive jurisdiction to the Bankruptcy Court with respect to the claims, liabilities, Causes of Action or interests of the United States, except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code); (5) pursuant to Article 13.12 of the Plan, cause a claim of a Governmental Unit (as defined by section 101(27) of the Bankruptcy Code) to be deemed as allowed on the Effective Date unless such claim is actually allowed on the Effective Date;  (6) cause claims filed or amended by a Governmental Unit (as defined by section 101(27) of the Bankruptcy Code) after the Effective Date to be deemed automatically disallowed pursuant to Article 14.8 of the Plan and such claims will be treated in accordance with the Bankruptcy Code and applicable law; (7) release, exculpate, enjoin, impair or discharge any non-Debtor from any claim, liability, suit, right or Cause of Action of the United States; (8) affect any setoff or recoupment rights of the United States and such rights are preserved; (9) require the United States to file an administrative claim in order to receive payment for any liability described in Section 503(b)(1)(B) and (C) pursuant to Section 503(b)(1)(D) of the Bankruptcy Code; (10) constitute an approval or consent by the United States without compliance with all applicable legal requirements and approvals under non-bankruptcy law; or (11) be construed

as a compromise or settlement of any liability, claim, Cause of Action or interest of the United States.

ii.    Liens securing claims of the United States shall be retained until the claim, with interest, is paid in full.  Administrative expense claims of the United States allowed pursuant to the Plan or the Bankruptcy Code shall accrue interest and penalties as provided by non-bankruptcy law until paid in full. Priority Tax Claims of the United States allowed pursuant to the Plan or the Bankruptcy Code will be paid in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent allowed Priority Tax Claims (including any penalties, interest or additions to tax entitled to priority under the Bankruptcy Code) are not paid in full in cash on the Effective Date, then such Priority Tax Claims shall accrue interest commencing on the Effective Date at the rate set forth in Section 511 of the Bankruptcy Code.  Moreover, nothing shall effect a release, injunction or otherwise preclude any claim whatsoever against any Debtor or any of the Debtors' Estates by or on behalf of the United States for any liability arising a) out of pre-petition or post-petition tax periods for which a return has not been filed or b) as a result of a pending audit or audit that may be performed with respect to any pre-petition or post-petition tax period. Further, nothing shall enjoin the United States from amending any claim against any Debtor or any of the Debtors' Estates with respect to any tax liability a) arising out of pre-petition or post-petition tax periods for which a tax return has not been filed or b) from a pending audit or audit that may be performed with respect to any pre-petition or post-petition tax period.  Any

Administrative Expense Claim or Priority Tax Claim of the United States

arising a) out of pre-petition or post-petition tax periods for which a return has

not been filed or b) as a result of a pending audit or audit which may be

performed with respect to any pre-petition or post-petition tax period shall be

paid in accordance with 1129(a)(9)(A) and (C) of the Bankruptcy Code.

Without limiting the foregoing but for the avoidance of doubt, nothing

contained in the Documents shall be deemed to bind the United States to any

characterization of any transaction for tax purposes or to determine the tax

liability of any person or entity, including, but not limited to, the Debtors and

the Debtors' estates, nor shall the Documents be deemed to have determined

the federal tax treatment of any item, distribution, or entity, including the

federal tax consequences of this Plan, nor shall anything in the Documents be

deemed to have conferred jurisdiction upon the Bankruptcy Court to make

determinations as to federal tax liability and federal tax treatment except as

provided under Section 505 of the Bankruptcy Code.

47.     <u>Substantial Consummation</u>.  On the Effective Date, the Combined Plan and

Disclosure Statement shall be deemed to be substantially consummated under Bankruptcy Code

sections 1101 and 1127.

48.     <u>Reversal</u>. If any of the provisions of this Order are hereafter reversed, modified,

or vacated by a subsequent order of the Court or any other court, such reversal, modification, or

vacatur shall not affect the validity of the acts or obligations incurred or undertaken under, or in

connection with, the Combined Plan and Disclosure Statement prior to receipt of written notice

of such order by the Debtors.  Notwithstanding any such reversal, modification or vacatur of this

Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this

Order prior to the effective date of such reversal, modification or vacatur shall be governed in all

respects by the provisions of this Order, the Combined Plan and Disclosure Statement, all

documents relating to the Combined Plan and Disclosure Statement and any amendments or

modifications to any of the foregoing.

49.     <u>Conflicts Between Order and Combined Plan and Disclosure Statement</u>.  The

provisions of the Combined Plan and Disclosure Statement, the Liquidation Trust Agreement,

and this Order shall be construed in a manner consistent with each other so as to effect the

purpose of each; <u>provided</u>, <u>however</u>, that if there is determined to be any inconsistency between

any provision in the Combined Plan and Disclosure Statement and any provision of this Order

that cannot be so reconciled, then solely to the extent of such inconsistency, the provisions of this

Order shall govern and any such provision of this Order shall be deemed a modification of the

Combined Plan and Disclosure Statement and shall control and take precedence; <u>provided</u>

<u>further</u>, <u>however</u>, that if there is determined to be any inconsistency between any provision of the

Liquidation Trust Agreement and any provision of this Order that cannot be so reconciled, then

solely to the extent of such inconsistency, the provisions of this Order shall govern and any such

provision of this Order shall be deemed a modification of the Liquidation Trust Agreement and

shall control and take precedence.  The provisions of this Order are integrated with each other

and are non-severable and mutually dependent.

50.     <u>Closing of Chapter 11</u>.  Upon or as soon as practicable after the Effective Date,

the Liquidation Trustees shall file and submit separate orders closing each of the Debtors'

Chapter 11 Cases, other than Case No. 20-12836, under certification of counsel.  The Court also

finds that as a result of the substantive consolidation as contemplated by the Combined Plan and

Disclosure Statement, the closure of the Debtors' cases other than Case No. 20-12386 shall not trigger the statute of limitations provided in section 546(a)(2) and all Avoidance Actions of any of the Debtors may be asserted under Case No. 20-12386 until the earlier of 2 years after the Petition Date or the closing of Case No. 20-12386.

51.     <u>Final Order; Waiver of Stay</u>.  This Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.  Any stay of this Order provided by any Bankruptcy Rule (including Bankruptcy Rule 3020(e)) is hereby waived, and this Order shall be effective and enforceable immediately upon its entry by the Court.

**Dated: March 11th, 2021**
**Wilmington, Delaware**

**JOHN T. DORSEY**
**UNITED STATES BANKRUPTCY JUDGE**

**<u>EXHIBIT A</u>**

**Combined Plan**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

## MODIFIED FIRST AMENDED COMBINED JOINT PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT OF CRED INC. AND ITS SUBSIDIARIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**PAUL HASTINGS LLP**
James T. Grogan (admitted *pro hac vice*)
Mack Wilson (admitted *pro hac vice*)
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
Telephone: (713) 860-7300
Facsimile: (713) 353-3100
Email: jamesgrogan@paulhastings.com
mackwilson@paulhastings.com

- and -

**PAUL HASTINGS LLP**
G. Alexander Bongartz (admitted *pro hac vice*)
Derek Cash (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Email: alexbongartz@paulhastings.com
derekcash@paulhastings.com

**COUSINS LAW LLC**
Scott D. Cousins (No. 3079)
Brandywine Plaza West 1521 Concord
Pike, Suite 301 Wilmington, Delaware
19803 Telephone: (302) 824-7081
Facsimile: (302) 295-0331
Email: scott.cousins@cousins-law.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: March 10, 2021

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

## TABLE OF CONTENTS

PAGE

Article  I. DEFINED TERMS ........................................................................1

Article  II. INTERPRETATION OF COMBINED PLAN AND DISCLOSURE
STATEMENT .........................................................................13

2.1    Application of Definitions; Rules of Construction; Computation of
Time......................................................................................13
2.2    Relief Sought by Filing the Combined Plan and Disclosure Statement ..........13

Article  III. BACKGROUND – THE DEBTORS' CORPORATE HISTORY,
STRUCTURE, AND BUSINESS OVERVIEW .............................14

3.1    General Background – Overview of the Debtors .................................14
3.2    The Debtors' Prepetition Capital Structure......................................15
3.3    Events Leading to the Chapter 11 Cases .........................................15
3.4    The Chapter 11 Cases ...........................................................19

Article  IV. TAX CONSEQUENCES ...............................................................25

4.1    Tax Consequences................................................................25

Article  V. CERTAIN RISK FACTORS TO BE CONSIDERED ...........................26

5.1    Risk Factors to Be Considered...................................................26
5.2    Alternatives to this Combined Plan and Disclosure Statement ......................31

Article  VI. BEST INTERESTS AND FEASIBILITY ......................................31

6.1    Best Interests Test ...............................................................31
6.2    Feasibility........................................................................31

Article  VII. SUMMARY OF ASSETS AND TREATMENT OF CLAIMS AND
INTERESTS...........................................................................32

7.1    Summary of Assets...............................................................32
7.2    Summary of Treatment of Claims and Equity Interests .............................33

Article  VIII. CONFIRMATION AND VOTING PROCEDURES ..........................35

8.1    Combined Hearing................................................................35
8.2    Procedure for Objections .........................................................35
8.3    Voting Procedures................................................................35

**Article IX. PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS, AND OTHER UNCLASSIFIED CLAIMS**.......................38

    9.1    Administrative Expense Claims........................................................38
    9.2    Professional Fee Claims..................................................................40
    9.3    Priority Tax Claims ........................................................................41

**Article X. TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS**.........41

    10.1    Class 1: Other Priority Claims .....................................................41
    10.2    Class 2: Secured Tax Claims .........................................................41
    10.3    Class 3: Other Secured Claims .....................................................42
    10.4    Class 4: General Unsecured Claims..............................................42
    10.5    Class 5: Convenience Claims. .......................................................43
    10.6    Class 6: Subordinated Securities Claims .....................................43
    10.7    Class 7: Equity Interests in Debtors.............................................43
    10.8    Reservation of Rights Regarding Claims and Equity Interests.......................44

**Article XI. ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT** ...............................................44

    11.1    Voting of Claims.............................................................................44
    11.2    Elimination of Vacant Classes .....................................................44
    11.3    Nonconsensual Confirmation........................................................45
    11.4    Revocation of the Combined Plan and Disclosure Statement.......................45

**Article XII. MEANS OF IMPLEMENTATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT** ...............................................45

    12.1    Limited Substantive Consolidation .............................................45
    12.2    Global Settlement...........................................................................46
    12.3    Liquidation of the Debtors ............................................................46
    12.4    Effectuating Documents; Further Transactions ..........................53
    12.5    Cancellation of Instruments and Stock .......................................53
    12.6    Disposition of Books and Records ...............................................53
    12.7    Corporate Existence and Dissolution of Debtors ........................54
    12.8    Closing the Chapter 11 Cases .......................................................54

**Article XIII. DISTRIBUTIONS UNDER THE COMBINED PLAN AND DISCLOSURE STATEMENT** ...............................................54

    13.1    Distributions on Allowed General Unsecured Claims.................54
    13.2    Timing of Distributions ................................................................54
    13.3    Delivery of Distributions ..............................................................55
    13.4    Undeliverable and Unclaimed Distributions ..............................56
    13.5    Transfer of Claims ........................................................................56
    13.6    Manner of Payment ......................................................................57
    13.7    Time Bar to Cash Payments by Check .........................................57

| | | |
|---|---|---|
| 13.8 | No Fractional Cents | 57 |
| 13.9 | Setoffs and Recoupment | 57 |
| 13.10 | Allocation of Plan Distributions Between Principal and Interest | 57 |
| 13.11 | Distributions After Effective Date | 58 |
| 13.12 | Interest on Claims | 58 |
| 13.13 | No Distribution in Excess of Allowed Amount of Claim | 58 |
| 13.14 | Payment of Taxes on Distributions Received Pursuant to the Combined Plan and Disclosure Statement | 58 |
| 13.15 | Reserves | 58 |
| 13.16 | Withholdings | Error! Bookmark not defined. |
| 13.17 | De Minimis Distributions | 59 |

Article XIV. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ....... 59

| | | |
|---|---|---|
| 14.1 | Claims Administration Responsibilities | 59 |
| 14.2 | Claims Objections | 59 |
| 14.3 | Estimation of Claims | 60 |
| 14.4 | Adjustment to Claims Without Objection | 60 |
| 14.5 | No Distributions Pending Allowance | 61 |
| 14.6 | Distributions After Allowance | 61 |
| 14.7 | Disallowance of Certain Claims | 61 |
| 14.8 | Amendments to Claims | 61 |
| 14.9 | Claims Paid and Payable by Third Parties | 61 |

Article XV. EXECUTORY CONTRACTS AND LEASES ....... 62

| | | |
|---|---|---|
| 15.1 | Executory Contracts and Unexpired Leases Deemed Rejected | 62 |
| 15.2 | Bar Date For Rejection Damages | 62 |

Article XVI. CONDITIONS PRECEDENT TO THE CONFIRMATION AND THE EFFECTIVE DATE ....... 63

| | | |
|---|---|---|
| 16.1 | Conditions Precedent to Confirmation of the Combined Plan and Disclosure Statement | 63 |
| 16.2 | Conditions Precedent to the Effective Date | 63 |
| 16.3 | Waiver of Conditions Precedent to the Effective Date | 64 |
| 16.4 | Satisfaction of Conditions | 64 |

Article XVII. EFFECT OF CONFIRMATION ....... 65

| | | |
|---|---|---|
| 17.1 | Compromise and Settlement of Claims, Equity Interests, and Controversies | 65 |
| 17.2 | Binding Effect | 65 |
| 17.3 | Reservation of Causes of Action/Reservation of Rights | 65 |

**Article XVIII. EXCULPATION, INJUNCTION, AND RELATED PROVISIONS** .......... 66

   **18.1**    **Exculpation** ........................................................................ 66
   **18.2**    **Releases by Debtors, the Estates, the Liquidation Trust, and the Liquidation Trustee; Third Party Releases** ................... 66
   **18.3**    **Avoidance Actions/Objections** ....................................... 67
   **18.4**    **Injunction** ........................................................................ 67
   **18.5**    **Terms of Stays and Injunctions** ................................... 68

**Article XIX. RETENTION OF JURISDICTION** ............................................. 68

**Article XX. MISCELLANEOUS PROVISIONS** ............................................. 70

   **20.1**    **Effectuating Documents and Further Transactions** ......... 70
   **20.2**    **Date of Distributions and Other Actions** ....................... 70
   **20.3**    **Withholding and Reporting Requirements** ..................... 70
   **20.4**    **Corporate Action** ........................................................... 70
   **20.5**    **Modification of the Combined Plan and Disclosure Statement** ...... 70
   **20.6**    **Revocation or Withdrawal of the Combined Plan and Disclosure Statement** ............................................ 71
   **20.7**    **Plan Supplement** ............................................................ 71
   **20.8**    **Payment of Statutory Fees** ........................................... 71
   **20.9**    **Dissolution of the Committee** ....................................... 72
   **20.10**   **Continued Confidentiality Obligations** ......................... 72
   **20.11**   **Exemption from Transfer Taxes** ................................... 72
   **20.12**   **Expedited Tax Determination** ....................................... 72
   **20.13**   **Exhibits/Schedules** ....................................................... 72
   **20.14**   **Substantial Consummation** ........................................... 72
   **20.15**   **Severability of Combined Plan and Disclosure Statement Provisions** .......... 73
   **20.16**   **Governing Law** ............................................................... 73
   **20.17**   **Reservation of Rights** ................................................... 73
   **20.18**   **Computation of Time** ..................................................... 73
   **20.19**   **Post-Confirmation Reporting** ....................................... 73
   **20.20**   **Notices** ........................................................................... 74

<u>NOTICE</u>

THE INFORMATION CONTAINED HEREIN IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE COMBINED JOINT PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT OF CRED INC. AND ITS SUBSIDIARIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT, REGARDING THE COMBINED PLAN AND DISCLOSURE STATEMENT OR THE SOLICITATION OF ACCEPTANCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT.  THIS COMBINED PLAN AND DISCLOSURE STATEMENT WAS SUBSTANTIALLY COMPILED FROM THE DEBTORS' BOOKS AND RECORDS TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF.

UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF.  THE DELIVERY OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS COMBINED PLAN AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER RULES GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11 OF THE BANKRUPTCY CODE.  NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN.

**THIS COMBINED PLAN AND DISCLOSURE STATEMENT PROVIDES FOR THE SUBSTANTIVE CONSOLIDATION OF THE ASSETS AND LIABILITIES OF THE DEBTORS FOR CERTAIN PURPOSES AND CONTEMPLATES THE APPOINTMENT OF LIQUIDATION TRUSTEES TO WIND-DOWN THE DEBTORS' ESTATES.**

NO REPRESENTATION CONCERNING THE DEBTORS OR THE VALUE OF THE DEBTORS' ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS ARE NOT RESPONSIBLE FOR ANY INFORMATION,

REPRESENTATION OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN OR INCONSISTENT WITH INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

**FOR EASE OF REFERENCE ONLY, AND WITH CERTAIN EXCEPTIONS, ARTICLE I THROUGH ARTICLE VI HEREIN GENERALLY CONTAIN THE DISCLOSURE STATEMENT PROVISIONS AND ARTICLE VII THROUGH ARTICLE XX HEREIN GENERALLY CONTAIN THE PLAN PROVISIONS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

# INTRODUCTION

The Debtors in these Chapter 11 Cases hereby propose their Combined Plan and Disclosure Statement pursuant to sections 1125 and 1129 of the Bankruptcy Code. The Debtors are the proponents of the Combined Plan and Disclosure Statement within the meaning of section 1129 of the Bankruptcy Code. Capitalized terms used and not otherwise defined herein have the meanings ascribed to such terms in Article I hereof.

The Combined Plan and Disclosure Statement constitutes a liquidating Chapter 11 plan for the Debtors and provides for Distribution of the Debtors' Assets already liquidated or to be liquidated over time to Holders of Allowed Claims in accordance with the terms of the Combined Plan and Disclosure Statement and the priority provisions of the Bankruptcy Code. The Combined Plan and Disclosure Statement contemplates the appointment of Liquidation Trustees to implement the terms of the Combined Plan and Disclosure Statement and make Distributions in accordance with its terms. Except as otherwise provided by Order of the Bankruptcy Court, Distributions will occur at various intervals after the Effective Date as determined by the Liquidation Trustees.

Since the Petition Date, the Debtors and their professionals have worked tirelessly to develop a plan that would maximize the value of the Debtors' Estates for the benefit of creditors and minimize the amount of time spent in chapter 11. After a thorough analysis of potential restructuring alternatives and extensive negotiation with the Committee, the Debtors reached a global settlement with the Committee that is embodied in the Combined Plan and Disclosure Statement.

The Debtors believe that the Combined Plan and Disclosure Statement presents the best path forward and is in the best interests of the Debtors, their Creditors, and all parties in interest. The Combined Plan and Disclosure Statement is premised on the creation of the Liquidation Trust, which will succeed to all rights, interests and property of the Debtors, and to which the Debtors will transfer their Assets, including proceeds from any pre-Effective Date sales, the Debtors' Cryptocurrency, and Causes of Action of the Debtors' Estates (other than Causes of Action that are being released under the Combined Plan and Disclosure Statement). The Liquidation Trustees, who will be selected by members of the Committee, will be tasked with, among other things, monetizing the Debtors' remaining Assets and making Distributions to Holders of Allowed General Unsecured Claims in Class 4 and Holders of Convenience Claims in Class 5. **The Debtors believe that the Plan is in the best interest of the Debtors' Estates and all stakeholders, and recommend that all Holders of Claims entitled to vote, vote in favor of the Plan.**

**The Combined Plan and Disclosure Statement provides for limited substantive consolidation of the Assets and Liabilities of the Debtors. Accordingly, for purposes of the Combined Plan and Disclosure Statement only, the Assets and Liabilities of the Debtors are treated as the Assets and Liabilities of a single substantively consolidated entity. Claims filed against multiple Debtors seeking recovery of the same debt shall be treated as a single, non-aggregated Claim against the consolidated Estates to the extent that such Claim is an Allowed Claim.**

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors expressly reserve the right to alter, amend or modify the Combined Plan and Disclosure Statement one or more times before substantial consummation thereof.

# ARTICLE I.
# DEFINED TERMS

**1.1** **"A/P/S Claim"** means any Claim that is an Administrative Expense Claim, Other Priority Claim, Priority Tax Claim, or Secured Claim.

**1.2** **"Administrative Expense Claim"** means any claim (including, but not limited to, Professional Fee Claims) for costs and expenses of administration of the Chapter 11 Cases that is entitled to priority pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code; provided, however, that any fees or charges assessed against the Debtors' Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930 are excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section 20.8 hereof.

**1.3** **"Administrative Expense Claims Bar Date"** means the date as set forth in Section 9.1(b) hereof.

**1.4** **"Affiliate"** has the meaning set forth in section 101(2) of the Bankruptcy Code.

**1.5** **"Allowed"** means, with reference to any Claim against the Debtors (including any Administrative Expense Claim) or portion thereof, (a) any Claim that has been listed by the Debtors in the Schedules (as such Schedules may be amended by the Debtors or the Liquidation Trustee from time to time in accordance with Bankruptcy Rule 1009) as liquidated in amount other than zero or unknown and not Disputed or Contingent, and for which no Proof of Claim has been filed, (b) any timely filed Proof of Claim or request for payment of Administrative Expense Claim, as to which no objection to the allowance thereof, or action to subordinate, avoid, classify, reclassify, expunge, estimate, or otherwise limit recovery with respect thereto, has been filed within the applicable period of limitation fixed by the Combined Plan and Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, and which applicable period of limitations has expired, (c) any Claim expressly allowed by a Final Order or under the Combined Plan and Disclosure Statement, or (d) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to the Liquidation Trustees under Section 14.1 hereof and the Liquidation Trust Agreement; provided, however, that Claims temporarily allowed solely for the purpose of voting to accept or reject the Combined Plan and Disclosure Statement pursuant to an order of the Bankruptcy Court shall not be considered Allowed Claims; provided, further, that any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code shall not be considered an Allowed Claim.

**1.6** **"Applicable Cryptocurrency"** means, with respect to any Holder of a Customer Claim, the Cryptocurrency or Cryptocurrencies used by such Holder in its Cryptocurrency Transactions with each applicable Debtor. To the extent a Customer engaged in Cryptocurrency Transactions involving more than one form of Cryptocurrency, the amount and denomination of Applicable Cryptocurrency for each Equivalent Cryptocurrency Distribution shall be determined based on the Applicable Cryptocurrency Ratio.

**1.7** **"Applicable Cryptocurrency Ratio"** means, with respect to a denomination of Cryptocurrency used by a Holder of a Customer Claim in a Cryptocurrency Transaction, the

ratio, expressed as a percentage, of (x) the Dollar Denominated Value of such Cryptocurrency to (y) the Dollar Denominated Value of all Cryptocurrencies used by such Holder in all of its Cryptocurrency Transactions.  For example, if a Holder of a Customer Claim engaged in Cryptocurrency Transactions involving Peercoin valued at $1,000 as of the Petition Date and Vertcoin valued at $4,000 as of the Petition Date, the Applicable Cryptocurrency Ratio for Peercoin would be 20%, and the Applicable Cryptocurrency Ratio for Vertcoin would be 80%.

**1.8** **"Assets"** means the assets of each of the Debtors, of any nature whatsoever, including all property of the Estates under and pursuant to section 541 of the Bankruptcy Code, Cash, Causes of Action, rights, interests and property, real and personal, tangible and intangible, including all files, books and records of the Estates.

**1.9** "**Auction**" means the competitive bidding process in relation to the sale of the Debtors' assets, conducted pursuant to the Bid Procedures Order.

**1.10** **"Avoidance Actions"** means any and all avoidance, recovery, subordination, or other actions or remedies that may be brought on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502(d), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, and/or 553 of the Bankruptcy Code.

**1.11** **"Ballot"** means the form distributed to each Holder of an Impaired Claim or Equity Interest that is entitled to vote to accept or reject the Combined Plan and Disclosure Statement on which is to be indicated an acceptance or rejection of the Combined Plan and Disclosure Statement.

**1.12** **"Bankruptcy Code"** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**1.13** **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware.

**1.14** **"Bankruptcy Rules"** means (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and the Local Bankruptcy Rules, as amended from time, (ii) the applicable Federal Rules of Civil Procedure, as amended and promulgated under section 2072 of title 28 of the United States Code, (iii) the applicable Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, and (iv) any standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case or proceedings therein, as the case may be.

**1.15** **"Bar Date"** means (i) February 10, 2021, at 5:00 p.m. (prevailing Eastern Time) and (ii) such other date(s) fixed by order(s) of the Bankruptcy Court, by which all Entities, including Governmental Units, asserting a Claim against any Debtor must have filed a Proof of Claim against such Debtor or be forever barred from asserting such Claim in the Chapter 11 Cases.

**1.16** "**Bid Procedures Order**" means the order of the Bankruptcy Court, dated December 21, 2020 [Docket No. 270], setting forth the procedures for competitive bidding for the Sale Transaction, as amended or supplemented from time to time.

**1.17** "**Business Day**" means any day, other than a Saturday, Sunday, or a legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

**1.18** "**Cash**" or "**$**" means the legal tender of the United States of America, including any wire transfer or instrument negotiable for legal tender of the United States of America.

**1.19** "**Causes of Action**" means all claims, actions, causes of action, third-party claims, counterclaims, crossclaims, third-party claims, contribution claims, or any other claims whatsoever (including any Causes of Action described herein) of the Debtors and/or their Estates that may be pending on the Effective Date (including all such Causes of Action brought by the Committee pursuant to the Plan Support Agreement) or instituted after the Effective Date against any Entity based in law, equity, or otherwise, including under the Bankruptcy Code, whether known or unknown, whether direct, indirect, derivative, or otherwise, and whether asserted or unasserted as of the date of entry of the Confirmation Order, including Avoidance Actions.

**1.20** "**Causes of Action List**" means the non-exclusive list of Causes of Action attached hereto as **Exhibit A**.

**1.21** "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court and jointly administered under Case No. 20-12836 (JTD).

**1.22** "**Claim**" means any right to payment from the Debtors, from property of the Debtors or from the Debtors' Estates, whether or not such right is reduced to judgment, liquidated, Unliquidated, fixed, Contingent, matured, unmatured, Disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown, or asserted; or any right to an equitable remedy for breach of performance by the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, Contingent, matured, unmatured, Disputed, undisputed, secured, or unsecured.

**1.23** "**Claim Objection**" means any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate, or estimate any Claim (including the resolution of any request for payment of any Administrative Expense Claim).

**1.24** "**Claims Agent**" means the Debtors' claims agent, Donlin, Recano & Company, Inc., or its successors and assigns.

**1.25** "**Claims Register**" means the official register of Claims maintained by the Claims Agent.

**1.26** "**Class**" means a category of Holders of Claims or Equity Interests set forth in Section 7.2 hereof.

**1.27** **"Clerk"** means the clerk of the Bankruptcy Court.

**1.28** **"Collateral"** means any property or interest in property of the Debtors' Estates subject to a Lien, charge, right of setoff, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

**1.29** **"Combined Hearing"** means the hearing held by the Bankruptcy Court to consider (i) final approval of the Combined Plan and Disclosure Statement as providing information pursuant to section 1125 of the Bankruptcy Code and (ii) pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Combined Plan and Disclosure Statement, as such hearing may be adjourned or continued from time to time.

**1.30** **"Combined Hearing Notice"** has the meaning set forth in Section 8.3(d).

**1.31** **"Combined Plan and Disclosure Statement"** means this combined disclosure statement and chapter 11 plan of liquidation, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

**1.32** **"Committee"** means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

**1.33** **"Confirmation Date"** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the Docket.

**1.34** **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code.

**1.35** **"Consummation"** means the occurrence of the Effective Date.

**1.36** **"Contingent"** means, with reference to a Claim, a Claim the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened, or been triggered as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the Holder of such Claim and whether or not a relationship between the Holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

**1.37** **"Convenience Claim"** means a Claim, subject to Section 13.1 hereof, against one or more of the Debtors that would otherwise be a General Unsecured Claim that (a) was scheduled or filed on or prior to the Bar Date in an amount less than or equal to $1,000 or (b) is in an amount that has been reduced to $1,000 pursuant to a Convenience Class Election made by the Holder of such Claim; provided, however, that: (i) where any portion(s) of a Claim has been transferred on or after the Petition Date, any transferred portion(s) shall continue to be treated together with such Claim as a single Claim for purposes of determining whether such Claim qualifies as a Convenience Claim; and (ii) any General Unsecured Claim that was originally

Allowed in excess of $1,000 may not be subdivided into multiple General Unsecured Claims of $1,000 or less for purposes of receiving treatment as a Convenience Claim.

**1.38** **"Convenience Class Election"** means an irrevocable election made on the Ballot by the Holder of a Claim against the Debtors that would otherwise be a General Unsecured Claim in an amount greater than $1,000 to reduce such Claim to $1,000 in order to be treated as a Convenience Claim.  Subject to the occurrence of the Effective Date, such election shall be deemed to amend such General Unsecured Claim to reduce the amount of such Claim to $1,000.

**1.39** **"Convertible Notes"** means those certain convertible notes issued by Cred in August and September 2020 in the amount of approximately $2.6 million, bearing interest at a rate of 3% per annum and that were scheduled to mature 48 months after issuance.

**1.40** **"Cred"** means Cred Inc.

**1.41** **"Cred Capital"** means Cred Capital, Inc.

**1.42** **"Creditor"** means any Entity that is the Holder of a Claim against a Debtor.

**1.43** **"Cryptocurrency"** means any digital asset that is not backed by a government.  The term "cryptocurrency" is to be interpreted broadly to include all forms of digital assets, virtual currency, cryptocurrency, tokens, security tokens, utility tokens and stablecoins.  This includes bitcoin, ether, LBA tokens, Peercoin, Vertcoin, any ERC-20 compliant token, any altcoin, and any other cryptocurrency.

**1.44** **"Cryptocurrency Election"** means the election of any Holder of a Customer Claim to receive its Distribution in the Cryptocurrency utilized by such Holder in its Cryptocurrency Transaction(s) with the Debtors, which election was made on a Proof of Claim timely submitted by such Holder.

**1.45** **"Cryptocurrency Election E-Wallet Address"** means the E-Wallet alphanumerical sequence provided by Holders of Claims that make a Cryptocurrency Election.

**1.46** **"Cryptocurrency Transaction"** means a prepetition transaction involving any transfer by an Entity of Cryptocurrency to the Debtors, whether directly or indirectly.

**1.47** **"Customer"** means an Entity that engaged in a Cryptocurrency Transaction with one or more of the Debtors.

**1.48** **"Customer Claim"** means a General Unsecured Claim and/or an Other Secured Claim of a Customer arising from a Cryptocurrency Transaction.

**1.49** **"De Minimis Distribution"** means a Distribution to be made in accordance with the terms of this Combined Plan and Disclosure Statement that is $25.00 or less.

**1.50** **"Debtors"** means each of Cred, Cred (US) LLC, Cred Capital, Cred Merchant Solutions LLC, and Cred (Puerto Rico) LLC.

**1.51**    **"Debtors-in-Possession"** means the Debtors in their capacity as debtors-in-possession in the Chapter 11 Cases under sections 1107(a) and 1108 of the Bankruptcy Code.

**1.52**    **"Definitive Documents"** means the documents (including any related orders, agreements, instruments, schedules, or exhibits) that are necessary or desirable to implement or otherwise relate to the restructuring transaction, including, but not limited to: (a) the motion to approve the Debtors' entry into the Plan Support Agreement [Docket No. 279], (b) the order approving the Debtors' entry into the Plan Support Agreement [Docket No. 480], (c) the Combined Plan and Disclosure Statement (and all exhibits thereto), (d) the solicitation materials for the Combined Plan and Disclosure Statement; (e) the Disclosure Statement Order, (f) the Confirmation Order, (g) the Liquidation Trust Agreement; and (h) any other documents or exhibits related to or contemplated in the foregoing clauses (a) through (g), in each case in form and substance consistent with the Plan Support Agreement and reasonably acceptable to the Committee.

**1.53**    **"DIP Financing Agreement"** means any future Senior Secured Super-Priority Debtor in Possession Credit Agreement, by and among the Debtors and any future lender, as amended, restated, modified, supplemented, or replaced from time to time.

**1.54**    **"DIP Financing Claim"** means a claim arising under the DIP Financing Agreement and the DIP Orders.

**1.55**    **"DIP Orders"** means any Interim and/or Final Order approving the DIP Financing Agreement.

**1.56**    **"Disallowed"** means, with reference to any Claim, (a) a Claim, or any portion thereof, that has been disallowed by a Final Order, (b) a Claim, or any portion thereof, that is expressly disallowed under the Combined Plan and Disclosure Statement, (c) a Claim listed in the Schedules as zero or as Disputed, Contingent, or unliquidated and in respect of which a Proof of Claim has not been timely filed or deemed timely filed pursuant to the Combined Plan and Disclosure Statement, the Bankruptcy Code, or any Final Order, notwithstanding anything in section 506(d) of the Bankruptcy Code to the contrary, (d) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code, (e) where the holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such Property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code, or (f) is for reimbursement or contribution that is contingent as of the time of allowance or disallowance of such claim.

**1.57**    **"Disclosure Statement Order"** means the order of the Bankruptcy Court approving, among other things, on an interim basis, the adequacy of the disclosures contained herein pursuant to section 1125 of the Bankruptcy Code and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Combined Plan and Disclosure Statement, entered by the Bankruptcy Court on January 21, 2021.

**1.58** **"Disputed"** means, with reference to any Claim, a Claim, or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim.

**1.59** **"Distribution"** means a delivery of Cash and/or Cryptocurrency, as the case may be, by the Liquidation Trustee to the Holders of Allowed Claims pursuant to the Combined Plan and Disclosure Statement.

**1.60** **"Distribution Pro Rata Share"** means the ratio (expressed as a percentage) of (x) the amount of an Allowed General Unsecured Claim against the Debtors to (y) the aggregate amount of all (A) Allowed General Unsecured Claims against the Debtors on the date of a Distribution *plus* (B) the aggregate Disputed Claim amount of all remaining Disputed General Unsecured Claims against the Debtors.

**1.61** **"Docket"** means the docket in the Chapter 11 Cases maintained by the Clerk.

**1.62** **"Dollar Denominated Value"** means, with reference to any form of Cryptocurrency, the value of such Cryptocurrency determined in lawful currency of the United States as of the Petition Date.

**1.63** **"E-Wallet"** means digital Cryptocurrency storage platforms that allow end-users to manage and store Cryptocurrency.

**1.64** **"Effective Date"** means a Business Day selected by the Debtors, after consultation with the Committee, on or after the Confirmation Date, on which (a) no stay of the Confirmation Order is in effect and (b) the conditions precedent to the effectiveness of the Combined Plan and Disclosure Statement specified in Section 16.2 hereof shall have been satisfied or waived as provided in Section 16.3 hereof.

**1.65** **"Entity"** has the meaning set forth in section 101(15) of the Bankruptcy Code.

**1.66** **"Equity Interest"** means, as of the Petition Date, any capital stock or other ownership interest in the Debtors, whether or not transferable, and any option, call, warrant or right to purchase, sell or subscribe for an ownership interest or other equity security in any of the Debtors.

**1.67** "**Equivalent Cryptocurrency Distribution**" means, with respect to any Holder of a Customer Claim that has made a Cryptocurrency Election, a Distribution in the Applicable Cryptocurrency equal in value (as of the applicable Distribution date) to such Holder's Distribution Pro Rata Share, reduced by the actual transaction costs and fees associated with making such Distribution in the Applicable Cryptocurrency. To the extent a Customer engaged in Cryptocurrency Transactions involving more than one Cryptocurrency, the amount and denomination of Applicable Cryptocurrency for each Equivalent Cryptocurrency Distribution shall be determined by multiplying the value (as of the applicable Distribution date) of such Holder's Distribution Pro Rata Share by the Applicable Cryptocurrency Ratios.

**1.68** **"Estate"** means the estate of the Debtors in the Chapter 11 Cases that was created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

**1.69** **"Examiner"** means the examiner appointed by the U.S. Trustee on January 7, 2021, pursuant to the *Order Approving Appointment of Examiner* [Docket No. 338], and in accordance with that certain *Order Denying in Part, and Granting in Part, the Trustee/Examiner Motions* [Docket No. 281].

**1.70** **"Executory Contract"** means a contract to which one or more of the Debtors are party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

**1.71** **"File, Filed, or Filing"** means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Cases.

**1.72** **"Final Order"** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending or, (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 9024 of the Federal Rules of Bankruptcy Procedure, or any applicable analogous rule, may be (but has not been) filed relating to such order shall not prevent such order from being a Final Order.

**1.73** **"General Unsecured Claim"** means any Claim other than an Administrative Expense Claim, Convenience Claim, Intercompany Claim, Other Priority Claim, Other Secured Claim, Priority Tax Claim, Professional Fee Claim, Secured Tax Claim, Subordinated Securities Claim, or Equity Interest. For the avoidance of doubt, (a) any Customer Claim is a General Unsecured Claim to the extent that is not secured by a valid and enforceable right of setoff under section 553 of the Bankruptcy Code or for any portion that is in excess of any such right of setoff and (b) a claim for principal and accrued interest on account of the Convertible Notes is a General Unsecured Claim.

**1.74** **"Governmental Unit"** has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

**1.75** **"Holder"** means an Entity holding a Claim or an Equity Interest, as applicable. "Hold" and "Held" shall have the correlative meanings.

**1.76** **"Impaired"** means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

**1.77** **"Imposter"** has the meaning set forth in Section 3.3(d) hereof.

**1.78** **"Insider"** has the meaning set forth in section 101(31) of the Bankruptcy Code.

**1.79** **"Intercompany Claim"** means any Claim by a Debtor against another Debtor, subject to the limitations set forth in Section 12.1 hereof.

**1.80** **"IRS"** means the Internal Revenue Service.

**1.81** **"JST"** means JST Capital, LLC.

**1.82** **"Liabilities"** mean any and all costs, expenses, damages, losses, penalties, fines, judgments, Claims, Liens, obligations, demands, injuries, settlements, awards, fines, taxes, fees, indebtedness, or other liabilities of any nature, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, liquidated or Unliquidated, matured or not matured, Contingent or direct, whether arising at common law, in equity, or under any statute, based in whole or in part on any act or omission or other occurrence arising or taking place prior to the Effective Date.

**1.83** **"Lien"** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.84** **"Liquidation Trust"** means the liquidation trust established by the Combined Plan and Disclosure Statement and described in Section 12.3 hereof and in the Liquidation Trust Agreement.

**1.85** **"Liquidation Trust Agreement"** means the agreement establishing and delineating the terms and conditions of the Liquidation Trust and filed prior to the Combined Hearing.

**1.86** **"Liquidation Trust Assets"** means all of the Estates' Assets transferred to the Liquidation Trust pursuant to Section 12.3(c) hereof.

**1.87** **"Liquidation Trust Beneficiaries"** means the Holders of Allowed Claims that are entitled to receive Distributions pursuant to the terms of the Combined Plan and Disclosure Statement, whether or not such Claims are Allowed as of the Effective Date.

**1.88** **"Liquidation Trust Expenses"** means all actual and necessary costs and expenses incurred by the Liquidation Trust in connection with carrying out the obligations of the Liquidation Trust pursuant to the terms of the Combined Plan and Disclosure Statement and the Liquidation Trust Agreement.

**1.89** **"Liquidation Trust Parties"** has the meaning set forth in Section 12.3(k) hereof.

**1.90** **"Liquidation Trustee"** means one of the three Persons who will be appointed to act as trustee of the Liquidation Trust in accordance with the terms of the Combined Plan and Disclosure Statement, the Confirmation Order, and the Liquidation Trust Agreement, or any successor appointed in accordance with the terms of the Combined Plan and Disclosure Statement and the Liquidation Trust Agreement. The identity of each of the Liquidation Trustees, as well as the terms of the compensation paid to the Liquidation Trustees, will be disclosed prior to the Combined Hearing.

**1.91**   **"Litigation Proceeds"** means the proceeds from all Causes of Action pursued by or for the benefit of the Liquidation Trust (including any proceeds recovered by the Liquidation Trust from Avoidance Actions).

**1.92**   **"Local Bankruptcy Rules"** means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

**1.93**   **"moKredit"** means the Hong Kong-based entity founded by Lu Hua, which provides micro-loans to online gaming publisher sites through the provision of credit (in the form of gaming tokens) to video game enthusiasts.

**1.94**   **"Net Distributable Assets"** means (a) the gross amount available from the liquidation of the Assets (including any Litigation Proceeds) minus (b) (i) the amount of all Allowed A/P/S Claims Allowed against the Debtors, (ii) U.S. Trustee Fees, (iii) the Liquidation Trust Expenses, and (iv) Distributions to Holders of Allowed Convenience Claims.

**1.95**   **"Opt-Out Election Form"** is the opt-out form, as approved in the Disclosure Statement Order, pursuant to which holders of claims or interests may elect to opt out of the third party release in accordance with Section 18.2 hereof.

**1.96**   **"Other Priority Claim"** means any claim, other than an Administrative Expense Claim, Professional Fee Claim, or Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

**1.97**   **"Other Secured Claim"** means any Secured Claim other than a Secured Tax Claim.  For the avoidance of doubt, to the extent a Customer Claim is secured by a valid and enforceable right of setoff under section 553 of the Bankruptcy Code, such Customer Claim shall be an Other Secured Claim; *provided*, *however*, that any portion of a Customer Claim in excess of the amount secured by such a right of setoff shall be a General Unsecured Claim.

**1.98**   **"Person"** shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

**1.99**   **"Petition Date"** means November 7, 2020, the date on which the Debtors commenced the Chapter 11 Cases.

**1.100**   **"Plan Supplement"** means the supplement or supplements to the Combined Plan and Disclosure Statement containing certain documents relevant to the implementation of the Combined Plan and Disclosure Statement, including the list of Executory Contracts and Unexpired Leases to be assumed pursuant to Section 15.1 hereof

**1.101**   "**Plan Support Agreement**" means the binding term sheet executed by the Debtors and the Committee setting forth the material terms of a plan support agreement among such parties.

**1.102**   **"Priority Tax Claim"** means any Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.103**   **"Professional"** means any professional Person employed in the Chapter 11 Cases pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code pursuant to an Order of the

Bankruptcy Court and to be compensated for services rendered pursuant to sections 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code.

**1.104** **"Professional Fee Claim"** means any claim of a Professional approved by the Bankruptcy Court for compensation, indemnification, or reimbursement of costs and expenses incurred on or before the Effective Date pursuant to sections 327, 328, 330, 331, 503(b), or 1103(a) of the Bankruptcy Code, plus any fees and expenses related to the final fee application of a Professional.

**1.105** **"Professional Fee Escrow"** means an escrow account to be established and funded on the Effective Date in an amount equal to the Professional Fee Reserve Amount in accordance with Section 9.2 hereof.

**1.106** **"Professional Fee Reserve Amount"** means the total amount of unpaid compensation and unreimbursed expenses incurred by Professionals retained by the Debtors or the Committee through and including the Effective Date, in ease case as determined in good faith by the applicable Professional.

**1.107** **"Proof of Claim"** means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

**1.108** **"Rejection Bar Date"** means the deadline by which a counterparty to an Executory Contract or an Unexpired Lease of the Debtors rejected under the Combined Plan and Disclosure Statement must file a Proof of Claim for damages arising from such rejection by the Debtors of such Executory Contract or Unexpired Lease, which shall be thirty (30) calendar days after the Effective Date or such other deadline established for filing a Rejection Claim by a Final Order of the Bankruptcy Court; provided, however, that if an earlier rejection bar date was established by order of the Bankruptcy Court with respect to a rejected Executory Contract or Unexpired Lease, then such earlier rejection bar date shall apply.

**1.109** **"Rejection Claim"** means any Claim for damages as a result of the rejection under the Combined Plan and Disclosure Statement of any Executory Contract or Unexpired Lease. All Rejection Claims shall be treated as General Unsecured Claims under the Combined Plan and Disclosure Statement.

**1.110** **"Released Parties"** means the Professionals retained by the Debtors, Grant Lyon as the Debtors' independent director, Matthew Foster as the Debtors' chief restructuring officer, any other staff supplied by Sonoran Capital Advisors, LLC, the Professionals retained by the Committee, and the respective agents and representatives of each of the foregoing.

**1.111** **"Reserve"** has the meaning given to such term in Section 13.15 hereof.

**1.112** **"Sale Motion"** means the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing and Approving Form and Manner of Notice Thereof, and (C) Approving Assumption and Assignment Procedures and Form and Manner of Notice Thereof; and (II) Authorizing (A) The Sale(s), Free and Clear of All Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. 65].

**1.113** **"Sale Transaction"** means any sale of Assets of the Debtors prior to the Effective Date under section 363 of the Bankruptcy Code.

**1.114** **"Schedules"** means, collectively, the schedules of Assets and Liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the official bankruptcy forms in the Chapter 11 Cases, as the same may have been amended or supplemented through the Confirmation Date pursuant to Bankruptcy Rules 1007 and 1009.  For the avoidance of doubt, Schedules do not include any schedules or exhibits to the Combined Plan and Disclosure Statement or the Plan Supplement.

**1.115** **"Secured Claim"** means any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

**1.116** **"Secured Tax Claim"** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein and including any related Secured Claim for penalties).

**1.117** "**Solicitation Package**" has the meaning set forth in Section 8.3(d) hereof.

**1.118** **"Subordinated Securities Claim"** means any Claim arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such security, or for reimbursement or contribution Allowed under section 502 of the Bankruptcy Code on account of such a Claim.

**1.119** **"Trust Advisory Board"** means the committee appointed pursuant to Section 12.3 hereof to oversee the activities of the Liquidation Trust and the Liquidation Trustees, consisting of those parties identified in the Plan Supplement, and at no time greater than four members.

**1.120** **"U.S. Trustee"** means the Office of the United States Trustee for the District of Delaware.

**1.121** **"U.S. Trustee Fees"** means fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

**1.122** **"Unclassified Claim"** means any Claim that is an Administrative Expense Claim or a Priority Tax Claim.

**1.123** **"Unexpired Lease"** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

**1.124** **"Unimpaired**" means, with respect to a Claim or Equity Interest, that such Claim or Equity Interest is not Impaired as a result of being paid in full in Cash under the Combined Plan and Disclosure Statement.

**1.125** **"Unliquidated"** means with reference to a Claim, a Claim, the amount of Liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is asserted or sought to be estimated.

**1.126** **"Voting Agent"** has the meaning set forth in Section 8.3(c) hereof.

**1.127** **"Voting Deadline"** means March 1, 2021, at 4:00 p.m. (prevailing Eastern Time).

**1.128** **"Voting Record Date"** has the meaning set forth in Section 8.3(b) hereof.

**1.129** **"Voting Report"** has the meaning set forth in Section 8.3(g) hereof.

## ARTICLE II.
## INTERPRETATION OF COMBINED PLAN AND DISCLOSURE STATEMENT

**2.1** **Application of Definitions; Rules of Construction; Computation of Time**

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender. For purposes of the Combined Plan and Disclosure Statement, (a) any reference in the Combined Plan and Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (b) any reference in the Combined Plan and Disclosure Statement to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented and (c) unless otherwise specified, all references in the Combined Plan and Disclosure Statement to Sections, Articles, Schedules, and Exhibits are references to Sections, Articles, Schedules and Exhibits of or to the Combined Plan and Disclosure Statement. The words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to the Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection or clause contained in the Combined Plan and Disclosure Statement. A capitalized term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code or in the Exhibits hereto. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Combined Plan and Disclosure Statement. The headings in the Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions of the Combined Plan and Disclosure Statement. Unless otherwise indicated herein, all references to dollars means United States dollars. In computing any period of time prescribed or allowed by the Combined Plan and Disclosure Statement, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006 shall apply.

**2.2** **Relief Sought by Filing the Combined Plan and Disclosure Statement**

The filing of the Combined Plan and Disclosure Statement constitutes, among other things, a motion by the Debtors pursuant to Bankruptcy Rules 9019 to approve the settlements and comprises set forth in Section 12.2 hereof, and for limited substantive consolidation of the Debtors' Estates, as set forth in Section 12.1 hereof.

## ARTICLE III.
## BACKGROUND – THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### 3.1    General Background – Overview of the Debtors

The Debtors were founded in 2018 by Lu Hua and Dan Schatt.  Prior to the Petition Date, the Debtors operated a global financial services platform serving retail and institutional clients in 183 countries.  The Debtors, which are lenders, utilized financial technology to provide business and retail credit and to allow Customers to earn a yield on more than 15 Cryptocurrencies and fiat currencies through the Debtors' partner network.  As of the Petition Date, the Debtors employed a staff of approximately 20 employees, consisting primarily of software and technology engineers.

As part of the Debtors' businesses, Customers transferred Cryptocurrency to the Debtors, generally pursuant to a loan agreement or a financing agreement.[2]  The Debtors then utilized the Cryptocurrency in a variety of investment strategies involving third-party asset managers.  The Debtors earned revenue through the returns generated by their investments, as well as through interest on lines of credit extended to certain of the Debtors' Customers in connection with the loans and financings referenced above.

The Debtors' business consisted of two key components: (a) the transfer of Cryptocurrency or other assets by Customers to the Debtors and the investment of those assets in order to earn returns ("CredEarn"); and (b) lending by the Debtors to certain Customers ("CredBorrow").

The Debtors' CredEarn business involved the transfer of Cryptocurrency from Customers to the Debtors, generally pursuant to a loan or financing agreement.  The Debtors then invested the Cryptocurrency with third-party asset managers or lenders to generate returns.  Such investments could take the form of (a) the Debtors directly providing Cryptocurrencies to asset managers or (b) the Debtors converting Cryptocurrencies into other Cryptocurrencies or fiat currencies and providing the proceeds thereof to asset managers or lenders.  The Debtors earned revenue through the returns generated by these investments.

The Debtors' obligations to Customers were repaid, with interest, as set forth in the relevant Customer's contract.  Generally, Customers who transferred Cryptocurrency to the Debtors were entitled to receive their principal and interest back in the type of Cryptocurrency the Customers transferred to the Debtors.  Because the Debtors' business model was premised on generating a return for Customers by investing the deposited Cryptocurrencies with asset managers, the Debtors generally did not themselves hold significant amounts of Cryptocurrency.  When Customers terminated accounts with the Debtors, the Debtors generally had to withdraw Cryptocurrency from asset managers to purchase new Cryptocurrency in the open market at then-prevailing prices in order to repay Customers

---

[2]    Shortly before the Petition Date, the Debtors began using contracts to "rent" Cryptocurrency from Customers. As of the Petition Date, rental contracts accounted for less than 1% of the Debtors' Customer contracts.

Generally, the CredBorrow program was only available to the Debtors' domestic Customers. Under the CredBorrow program, Customers were generally permitted to borrow against Cryptocurrency or other assets that they transferred to the Debtors, and were obligated to make periodic repayments as specified in the relevant Customer's contract. The Debtors earned revenue on CredBorrow contracts through interest and fees assessed on Customers' borrowings.

## 3.2    The Debtors' Prepetition Capital Structure

As of the Petition Date, the former book value of the Debtors' total Assets was approximately $69 million. Book value is generally computed in accordance with various accounting pronouncements and may not (and in the case of the Debtors, likely does not) correlate to fair value of any Asset or the enterprise value of the Debtors as a whole. Moreover, the Debtors have not conducted the impairment analysis which would be required under GAAP for such former book value to be considered a current and reliable book value. Such impairment analysis would likely result in a book value significantly less than the former book value referred to above.

The Debtors have not issued any secured debt. In August and September 2020, Cred issued the Convertible Notes. As of the Petition Date, approximately $2.6 million (which includes accrued interest) remained outstanding on the Convertible Notes. Other than the Convertible Notes, the Debtors do not have any outstanding funded indebtedness.

As of the Petition Date, the Debtors' Liabilities to Customers were in excess of $160 million.

## 3.3    Events Leading to the Chapter 11 Cases

(a)    <u>JST Transactions</u>

The Debtors maintained accounts with JST. Through JST, the Debtors held substantial "long" futures positions on bitcoin and other Cryptocurrencies, which included margin holdings. In addition, the Debtors' contracts with JST included certain "stop positions," whereby when the price of a Cryptocurrency dropped below a certain threshold, JST sold the Cryptocurrency. These stop positions are referred to as "stop loss sale orders."

In March 2020, the drop in bitcoin prices (and other Cryptocurrency prices) triggered the Debtors' stop loss sale orders, which had the effect of: (i) "locking in" losses on the sale of bitcoin; and (ii) eliminated the Debtors' margin on bitcoin and other Cryptocurrencies. As a result, the Debtors acquired new Cryptocurrencies at substantially higher prices, which had a material negative effect on the Debtors' liquidity.

As described in greater detail below, following the losses with JST, the Debtors sought and obtained a 300 bitcoin capital contribution from Lu Hua.

(b)    <u>Over-Exposure on Loans Made to moKredit</u>

In late 2018, Cred started making loans to moKredit – an entity founded by Cred co-founder Lu Hua – under that certain Loan and Security Agreement dated December 27, 2018,

by and between moKredit Technology (Hong Kong) Company Limited, a Hong Kong company, and moKredit, Inc., an exempted company incorporated in the Cayman Islands with limited liability, as borrowers, and Cred, as lender. It is the Debtors understanding that under the Loan and Security Agreement, Cred extended moKredit a $100 million line of credit. The Debtors believe that as security for the line of credit, Cred received a security interest in substantially all of moKredit's personal property.[3] Cred has not taken any affirmative steps to perfects its security interest in this collateral.

By 2019, the Debtors' primary revenue generator was its relationship with moKredit. At one point, moKredit had drawn approximately $70 million on the line of credit. As of the Petition Date, the amount of the Debtors' outstanding loans with moKredit was approximately $39 million.

As a result of the Debtors' JST losses in March 2020, the Debtors undertook an effort to recover principal from moKredit and reestablish their hedging positions to protect against Cryptocurrency price fluctuations. That effort failed because of the restrictions imposed by the Chinese government in response to the COVID-19 pandemic. Due to the restrictions, moKredit could not meet its obligations under the Loan and Security Agreement, and was only able to return $300,000 of principal to the Debtors over the course of March and April, 2020. In May 2020, moKredit renegotiated its repayment schedule, whereby it would continue making approximately $582,000 per month in interest payments.

(c)     Cred Capital Problems

In March 2020, the Debtors directed the then-Chief Capital Officer, James Alexander, to incorporate Cred Capital as a Delaware entity to be controlled by Cred for the purposes of: (a) creating a vehicle to assist the Debtors with arranging bond offerings for companies in need of capital; and (b) overseeing the Debtors' asset management strategies. Cred also transferred the 300 bitcoin capital contribution made by Lu Hua to Cred Capital to provide the Debtors with a natural hedge against rising bitcoin prices.

Based on the Debtors' understanding, these plans were derailed, however, when Mr. Alexander attempted to take control of Cred Capital away from its corporate parent, Cred, and used Cred Capital's assets for his personal benefit. Mr. Alexander attempted to take control of Cred Capital by: (i) installing himself as its sole director; (ii) assigning only Class B, non-voting shares to Cred (instead of voting shares); and (iii) assigning Class A voting shares to a purported

---

[3]     Cred's security interest covered "[a]ll accounts, chattel paper, instruments, deposit accounts, letter of credit rights, and general intangibles related thereto; and all returned or repossessed goods which, on sale or lease, resulted in an account, including all Customer Loans and [moKredit's] rights related thereto", "[a]ll inventory", "[a]ll equipment and fixtures now owned or hereafter acquired by [moKredit]", "[a]ll of [moKredit's] deposit accounts with Cred", "[a]ll instruments, chattel paper, documents, certificates of deposit, securities (including equity interests) and investment property of every type", "[a]ll general intangibles" including "all goodwill connected with or symbolized by any of such intangibles", "[a]ll negotiable or nonnegotiable documents of title covering any Collateral", "[a]ll accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral", "[a]ll substitutes or replacements for any Collateral, all cash or non-cash proceeds (including insurance proceeds), products, rents and profits of the Collateral, and all income, benefits and property receivable on account of the Collateral, and all supporting obligations covering any Collateral", "[a]ll books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm, or electronic media, including but not limited to any computer-readable memory and any computer software necessary to process such memory".

third-party "investor" who Mr. Alexander contends gave him a proxy to control the voting shares.

Neither Cred nor Cred Capital ever received any capital contribution from this so-called "investor." In addition, Mr. Alexander did not use the 300 bitcoin to establish hedging positions as he had been instructed to do, but instead used a portion of these funds to make a series of vendor payments.

When Cred became aware of Mr. Alexander's actions, Cred terminated his employment and took corrective action under Delaware law to re-file Cred Capital's charter and appoint a board of directors.

Thereafter, Cred discovered that Mr. Alexander absconded with 225 of the 300 bitcoin (valued at approximately $6 million as of December 31, 2020). Despite the Debtors' demands, Mr. Alexander has refused to return the bitcoin to the Debtors.

The foregoing events spawned significant litigation against Mr. Alexander, including, California state court litigation seeking, among other things, injunctive relief, compensatory and punitive damages, breaches of contract, and breach of the implied covenant of good faith and fair dealing.[4] Moreover, as described in greater detail below, after the Petition Date, certain of the Debtors initiated an adversary proceeding against Mr. Alexander seeking turnover of the misappropriated and improperly retained Assets.[5]

After the Petition Date, the Debtors also filed a notice of removal with the California state court. The Debtors are in the process of transferring the California state court litigation to the Bankruptcy Court.

(d)     Theft of Bitcoin by an Imposter

In August 2020, the Debtors discovered that they had been the victims of a social engineering scheme that resulted in the theft of 800 bitcoin (valued at approximately $10 million as of October 2020).

In February 2020, Mr. Alexander informed the Debtors' of a potential investment opportunity with an entity that purported to be Quantcoin (the "Imposter"). Based on Mr. Alexander's representations and purported due diligence, Mr. Alexander was given permission to hire the Imposter to manage a portion of the Debtors' bitcoin.

In a series of transactions in February and April 2020, Mr. Alexander directed the transfer of a total of 800 bitcoin to the Imposter. After transferring the bitcoin, an administrator purporting to be Scott Foster with Kingdom Trust Company, a Cryptocurrency custodian ("Kingdom Trust"), was in contact with the Debtors regarding their 800 bitcoin. Initially, the

---

[4]     Case No. 20-CIV-02915, Superior Court of the State of California; County of San Mateo, Southern Branch.

[5]     Adv. Pro. No. 20-51006.

alleged Mr. Foster provided what appeared to be performance updates to the Debtors on a monthly basis.

It is the Debtors' understanding that the fraudulent scheme came to light when the Debtors requested a withdrawal of $2 million from their account with the Imposter and the Imposter ceased responding to e-mails. The Debtors then contacted Kingdom Trust directly to inquire as to a monthly statement and learned that the Debtors not only did not have accounts at Kingdom Trust, but the e-mail address associated with Mr. Foster was fake.

Upon learning of the deception, the Debtors promptly contacted the pertinent law enforcement agency, which initiated an investigation into the matter. However, as of [December 31, 2020], the Debtors have yet to recover any of the stolen bitcoin.

In addition, in late November 2020, the Debtors served notices to more than 20 Cryptocurrency exchanges advising them of the theft or conversion of the Debtors' Cryptocurrency Assets. In such notices, the Debtors identified the relevant E-Wallets (both with respect to the theft by the Imposter and the misappropriation by Mr. Alexander) and requested that the exchanges freeze any accounts that may contain property of the Debtors.

(e)     Claims Against Mr. Inamullah

Several of the foregoing events are also attributable to, or were facilitated by, the Debtors' former Vice President of Capital Markets, Mr. Daniyal Inamullah, who was hired by the Debtors in December 2019. Mr. Inamullah was the primary person responsible for identifying potential investment opportunities, performing due diligence with respect to such opportunities, and producing reports and proposals to the Debtors with respect to potential investments. Accordingly, Mr. Inamullah's duties necessarily included verifying the accuracy of information provided to the Debtors with respect to their investment portfolio.

The Debtors believe that Mr. Inamullah failed at his responsibilities. For example: (i) Mr. Inamullah admitted in sworn testimony that he never conducted any due diligence with respect to the Imposter transactions; (ii) Mr. Inamullah contributed to Mr. Alexander's misappropriation of bitcoin by both initiating and authorizing the transfer of bitcoin into Mr. Alexander's personal E-Wallets; and (iii) violating the Debtors' security protocols, which were instituted by Mr. Inamullah.

Accordingly, the Debtors believe that they have multiple claims and causes of action against Mr. Inamullah, including, without limitation, breach of the duty of care, breach of the duty of loyalty, and civil conspiracy.

(f)     Customer Loss and Adverse Market Conditions

Negative press in connection with the Imposter transactions, Mr. Alexander's conduct, and the Debtors' worsening financial condition resulted in (i) certain of the Debtors' core partners to close their accounts with the Debtors and (ii) potential investments of outside capital failing to materialize during the third fiscal quarter of 2020. In particular, the Debtors' former management was exploring business expansion opportunities with other financial services companies that were looking at opportunities in the Cryptocurrency space.

As of the Petition Date, the Debtors' balance sheet reflected an approximately 1:2.2 asset to liability ratio.  A lack of liquidity and reduced prospects for attracting new business diminished the Debtors' prospects for reducing this asset-liability gap and for staking out new positions to hedge against fluctuations in the price of Cryptocurrency.

The asset-liability gap was in part due to a rapid 30% increase in the price of bitcoin in October 2020, which exacerbated the Debtors' distressed financial position.  By late October, 2020, the Debtors determined to cease the inflow and outflow of all Cryptocurrency Assets to assess their financial position.  Unable to remedy the situation, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on the Petition Date, initiating the Chapter 11 Cases.

Although the Debtors remain committed to working with other constituents in the capital structure on the terms of superior restructuring transactions, the Debtors believe that the Combined Plan and Disclosure Statement, which now incorporates the global settlement with the Committee outlined in the Plan Support Agreement, represents the best available alternative to maximize value for all stakeholders.

## 3.4    The Chapter 11 Cases

The following is a brief description of certain major events that occurred during the Chapter 11 Cases.

(a)    First Day Relief

On or shortly after the Petition Date, the Debtors filed a number of motions and applications seeking certain "first day" relief, including the following:

i.    Pursuant to the *Motion of Debtors and Debtors in Possession for Order Directing Joint Administration of their Chapter 11 Cases* [Docket No. 3], the Debtors sought entry of an order directing the joint administration of the Chapter 11 Cases and consolidation thereof for procedural purposes only.  On November 11, 2020, the Bankruptcy Court entered an order granting this relief [Docket No. 27].

ii.    Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to File a Consolidated List of Debtors' 30 Largest Unsecured Creditors (II) Authorizing Debtors to Serve Certain Parties by E-mail, (III) Authorizing Debtors to Redact or Withhold Publication of Certain Personal Identification Information, and (IV) Granting Related Relief* [Docket No. 6], the Debtors sought entry of interim and final orders authorizing the Debtors to: (i) file a consolidated list of the Debtors' 30 largest unsecured creditors; (ii) serve certain documents on parties-in-interest via email; and (iii) redact certain Customer information.  The Bankruptcy Court granted the relief on an interim basis on November 10, 2020 [Docket No. 34] and on a final basis on December 21, 2020 [Docket No. 264].

     iii.    Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions; (II) Granting Administrative Expense Status to Postpetition Intercompany Balances; (III) Waiving the Requirements of Section 345(b) of Bankruptcy Code; and (IV) Granting Related Relief* [Docket No. 7], the Debtors sought entry of interim and final orders authorizing the Debtors to, among other things: (i) continue use of their cash management system; (ii) honor certain fees and charges associated therewith in the ordinary course of business; and (iii) maintain existing business forms. The Bankruptcy Court granted the relief on an interim basis on November 10, 2020 [Docket No. 29] and on a final basis on December 21, 2020 [Docket No. 268].

     iv.    Pursuant to the *Debtors' Motion for Entry of Order (I) Restating and Enforcing Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of Bankruptcy Code, (II) Permitting Debtors to Modify Automatic Stay, (III) Approving Form and Manner of Notice, and (IV) Granting Related Relief* [Docket No. 8], the Debtors sought relief to advise parties outside the United States of the existence, reach, and effects of the protections of the Bankruptcy Code, including the worldwide application of the automatic stay. The Bankruptcy Court granted the motion on November 10, 2020 [Docket No. 32].

     v.    Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Insurance Policies, (B) Pay All Related Obligations, and (II) Granting Related Relief* [Docket No. 10], he Debtors sought authorization to maintain insurance policies, which included: (i) directors and officers; (ii) errors and omissions; (iii) cyber; (iv) property; (v) damage, general commercial; (vi) commercial automobile; and (vii) general umbrella liability. The Bankruptcy Court granted the relief on an interim basis on November 10, 2020 [Docket No. 31] and on a final basis on December 18, 2020 [Docket No. 248].

     vi.    Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs and (II) Granting Related Relief* [Docket No. 11], the Debtors sought authorization to: (i) pay and honor certain prepetition employee claims and obligations; and (ii) continue certain employee programs and obligations. The Bankruptcy Court granted the relief on an interim basis on November 30, 2020 [Docket No. 30] and on a final basis on December 21, 2020 [Docket No. 263].

    (b)    <u>Appointment of Committee</u>

On December 3, 2020, the U.S. Trustee appointed the Committee pursuant to section 1102(a) of the Bankruptcy Code. Additional information regarding the members of the Committee is included in the Notice of Appointment of the Committee [Docket No. 120].

(c)     Retention of Professionals

Paul Hastings LLP ("Paul Hastings") has served as the Debtors' restructuring counsel since it was engaged in late October, and the Debtors applied to retain Paul Hastings as their counsel shortly after the commencement of these chapter 11 cases.  *See Debtors' Application for Entry of an Order Authorizing and Approving Retention and Employment of Paul Hastings LLP as Counsel to Debtors, Effective as of the Petition Date* [Docket No. 64].  On December 6, 2020, the U.S. Trustee objected to Paul Hastings' retention on several bases, including that Paul Hastings' initial disclosures were inadequate and that Paul Hastings had an adverse interest to the Debtors because it provided prepetition services to the Debtors, represents a creditor of the Debtors in unrelated matters, and allegedly received a preferential transfer from the Debtors.  *See Objection of the United States Trustee to the Debtors' Application for Entry of an Order Authorizing and Approving Retention of Paul Hastings LLP as Counsel to Debtors, Effective as of the Petition Date* [Docket No. 139].

At the hearing on January 6, 2021, the Bankruptcy Court approved Paul Hastings' retention and overruled the U.S. Trustee's objection.  In doing so, the Bankruptcy Court held that Paul Hastings' initial disclosures were adequate and that Paul Hastings did not hold any interest adverse to the Debtors in violation of section 327(a) of the Bankruptcy Code.  Specifically, the Bankruptcy Court found there was nothing in the record that Paul Hastings's prepetition advice to the Debtors and its representation of a creditor on matters unrelated to the Chapter 11 Cases rendered it adverse to the Debtors.[6]  Moreover, the Bankruptcy Court found Paul Hastings had resolved the issues regarding the alleged preferential transfer by returning approximately $313,000 to Paul Hastings' client trust account for the Debtors and waiving prepetition fee claims in the same amount.  On January 7, 2021, the Bankruptcy Court entered an order approving the Debtors' retention of Paul Hastings [Docket No. 327].

On November 11, 2020 and December 18, 2020, the Bankruptcy Court also entered orders authorizing the Debtors to retain Donlin, Recano & Company, Inc. as claims agent [Docket No. 28] and as administrative agent [Docket No. 246], respectively.  On December 18, 2020, the Bankruptcy Court entered an order authorizing the Debtors to retain Cousins Law LLC, as Delaware bankruptcy counsel [Docket No. 245].  On December 21, 2020, the Bankruptcy Court entered orders authorizing the Debtors to retain Teneo Capital Group LLC as the Debtors' investment banker [Docket No. 261], MACCO Restructuring Group LLC, as the Debtors' financial advisor [Docket No. 272], and Sonoran Capital Advisors, LLC to provide the Debtors with Matthew Foster, as Chief Restructuring Officer, and related personnel.

In addition, to assist the Committee in carrying out its duties, the Committee has sought Bankruptcy Court approval authorizing the retention and employment of McDermott Will & Emery LLP to serve as its bankruptcy counsel [Docket No. 282] and Dundon Advisors, LLC to serve as financial advisor [Docket No. 305].

---

[6]     Matters related to such creditor are being handled by Cousins Law, the Debtors' Delaware bankruptcy counsel and conflicts counsel.

(d)    <u>Plan Support Agreement</u>

Promptly after its appointment, the Committee engaged in negotiations with the Debtors regarding a consensual path forward that would maximize the value of the Debtors' Estates for the benefit of all Creditors. Such negotiations culminated in the execution of the Plan Support Agreement, which contemplates a chapter 11 plan of liquidation centered on an expeditious liquidation of the Debtors' Assets, first through the Debtors' Sale Transaction, and, irrespective of whether the Sales Transaction comes to fruition, the transfer of all of the Debtors' Assets into a liquidation trust. The Debtors and the Committee believe that the restructuring process set forth in the Plan Support Agreement is in the best interests of the Debtors' Estates and all stakeholders.

On December 23, 2020, the Debtors filed the *Motion Pursuant to Bankruptcy Code Sections 363(b) and 105(a) for Authorization to Enter Into and Perform Under a Plan Support Agreement Term Sheet* [Docket No. 279], which is scheduled to be heard on February 3, 2021.

(e)    <u>Sale Process</u>

On November 18, 2020, the Debtors filed the Sale Motion. Pursuant to the Sale Motion, the Debtors sought to establish certain deadlines and bidding procedures by which the Debtors could obtain proposals for the purchase of the Debtors' businesses as a going concern or, alternatively, for the purchase of the Debtors' Assets, to be sold at the Auction. On December 21, 2020, the Bankruptcy Court entered the Bid Procedures Order approving such relief [Docket No. 270].

The Bid Procedures Order provided, among other thing, that the selection of a stalking-horse bidder was subject to consent of the Committee. To date, the Debtors have not received a bid acceptable to the Committee. The Debtors are continuing to entertain offers from prospective buyers of various assets.

(f)    <u>Post-Petition Litigation</u>

(i)    *Motions to Convert or Dismiss the Chapter 11 Cases or Appoint a Trustee/Examiner*

On November 11, 2020, certain of the Debtors' creditors filed the *Motion of Krzysztof Majdak and Philippe Godineau for Entry of an Order Pursuant to 11 U.S.C. § 1112(b) (I) Dismissing the Cases; (II) Converting the Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 11 Trustee* [Docket No. 62] (the "<u>Creditor Motion</u>"). On December 4, 2020, the U.S. Trustee filed the *Motion of the United States Trustee for Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases* [Docket No. 133] (the "<u>U.S. Trustee Motion</u>" and, together with the Creditor Motion, the "<u>Motions to Convert</u>"). The Motions to Convert both seek entry of an order dismissing the Chapter 11 Cases, converting the Chapter 11 Cases to liquidating cases under chapter 7 of the Bankruptcy Code, or appointing a chapter 11 trustee.[7]

---

[7]    Certain creditors and parties-in-interest joined or partially joined in the Motion to Convert. *See Response of James Alexander to the Motion of Kryszyof Majdak and Philippe Godinea for Entry of an Order Pursuant to 11*

Moreover, the U.S. Trustee Motion seeks, in the alternative, the appointment of an independent Examiner.

The Debtors and the Committee objected to the relief sought in the Motions to Convert. *See* Docket Nos. 109, 191, and 195.

Following a two-day evidentiary hearing on the Motions to Convert, the Bankruptcy Court: (i) denied the Creditor Motion; and (ii) denied in part and granted in part the U.S. Trustee Motion. As a result, the U.S. Trustee was directed to appoint an examiner. *See* Docket No. 281.

On January 7, 2021, the U.S. Trustee appointed Robert J. Stark as the Examiner in the Chapter 11 Cases [Docket No. 338]. In his role as the Examiner, and pursuant to section 1106(a)(3) and (4) of the Bankruptcy Code, Mr. Stark is investigating allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the Debtors' management, and will, as soon as practicable, file a written report that will be made available on the Docket in these Chapter 11 Cases, which can be viewed at the following link: https://www.donlinrecano.com/Clients/cred/Dockets.

> (ii) *Motion of UpgradeYa Investments, LLC for Relief from Stay Under Bankruptcy Code Section 362* ("Lift Stay Motion")

On November 25, 2020, UpgradeYa Investments, LLC ("UpgradeYa"), filed the Lift Stay Motion, seeking relief from the automatic stay to permit it to pursue remedies in connection with certain bitcoin it transferred to the Debtors. The Debtors and the Committee filed objections to the Lift Stay Motion. *See* Docket Nos. 116 and 190. On January 6, 2021, the Bankruptcy Court held an evidentiary hearing on the Lift Stay Motion. At the conclusion of the January 6, 2021 hearing, the Bankruptcy Court took the matter under advisement and ordered UpgradeYa to file further briefing regarding whether the remedy it seeks – authority to bring potential litigation claims against third parties – implicates property of the Debtors' estates on or before January 21, 2021, with reply briefs due on or before February 4, 2021, and responses to any reply briefing due on or before February 11, 2021.

> (iii) *Motion of James Alexander to Dismiss the Cred Capital, Inc. Case* ("Cred Capital Motion")

On December 8, 2020, Mr. Alexander filed the Cred Capital Motion seeking the dismissal of Cred Capital's Chapter 11 Case. *See* Docket No. 152. The Cred Capital Motion alleges Mr. Alexander is the sole rightful officer and director of Cred Capital and that Cred's

---

*U.S.C. § 1112(b) (I) Dismissing the Cases; or (II) Converting the Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 11 Trustee [Docket No. 103]; Partial Joinder of Jamie Shiller, Takashi Yanagi, Wu Chi King, Joseph Richardson, Thomas Calvert, Clint Cowen, Robin Houck, Todd Wiseman, Mathew Dion, Jonatan Ashurov, Daniel Becker, Teppei Miyauchi, Jean Vacca, Xian Su, and Eric Schurman to Motion to Dismiss the Bankruptcy Cases, Convert Cases to Chapter 7, or Appoint a Chapter 11 Trustee [Docket No. 107]; UpgradeYa Investments, LLC's (I) Reply to Objection of the Debtors to Motion of UpgradeYa Investments, LLC for Relief from Stay Under Bankruptcy Code Section 362 and (II) Limited Joinder in the Motion for an Order Converting the Chapter 11 Cases to Chapter 7 [Docket No. 126].*

corrective action to re-take control of Cred Capital in June 2020 was invalid and of no effect. Mr. Alexander thus believes that Cred Capital's Chapter 11 Case should be dismissed because only he had the power to authorize it, and he did not.  The Debtors filed an objection to the Cred Capital Motion and the Committee joined in the Debtors' objection.  *See* Docket Nos. 296 and 297.  The Cred Capital Motion is scheduled to be heard on February 3, 2021.

(g)     Section 341(a) Meeting of Creditors

The section 341 meeting is scheduled to take place on February 2, 2021.

(h)     Schedules and Statements

The Debtors Filed their Schedules on January 7, 2021 [Docket Nos. 331-335, as amended by Docket Nos. 343, 346, and 350], which, among other things, set forth the Claims of known Creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records. The Debtors retain the right to amend the Schedules during the pendency of the Chapter 11 Cases.

(i)     Claims Process and Bar Dates

Pursuant to the *Order (I) Fixing Deadlines for Filing Proofs of Claim and (II) Approving Form and Manner of Notice Thereof* dated December 21, 2020 [Docket No. 271] (the "Bar Date Order"), the Bankruptcy Court established, among others, the following bar dates for filing Proofs of Claim:

- General Bar Date: February 10, 2021 at 5:00 p.m. (prevailing Eastern Time) as the deadline for all Persons or Entities (other than Governmental Units) holding or wishing to assert pre-petition Claims to file Proofs of Claims in the Chapter 11 Cases.

- Government Bar Date: May 6, 2021 at 5:00 p.m. (prevailing Eastern Time) as the deadline for all Governmental Units (as defined in section 101(27) of the Bankruptcy Code) holding or wishing to assert pre-petition Claims to file Proofs of Claim in the Chapter 11 Cases.

- Amended Schedules Bar Date: With respect to Holders of Claims affected, as described in the Bar Date Order, by the Debtors' amendment or supplement of their Schedules, such Holders shall have until the later of (i) the General Bar Date or, if the creditor is a Governmental Unit, the Government Bar Date, and (ii) twenty-one (21) days from the date of service of notice of the amendment or supplement to the Schedules.

- Rejection Damages Bar Date: With respect to counterparties to an Executory Contract or an Unexpired Lease of the Debtors, which has been rejected under this Combined Plan and Disclosure Statement, such counterparty must file a Proof of Claim for damages arising from such rejection by the later of (i) the General Bar Date or thirty-days after service of an order by the Bankruptcy Court authorizing such rejection,

and (ii) such other date, if any, as the Bankruptcy Court may fix in the order authorizing such rejection.

    (j)    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>

Pursuant to the *Motion of Debtors for Entry of Order Authorizing Debtors to (I) Reject Unexpired Leases of Nonresidential Real Property and (II) Abandon Property in Connection Therewith* [Docket No. 4], the Debtors sought entry of an order permitting the Debtors to reject leases in connection with their office space in San Mateo and Sherman Oaks, California. On December 18, 2020, the Bankruptcy Court entered an order granting this relief [Docket No. 243].

    (k)    <u>DIP Financing</u>

The Debtors are currently in negotiations with potential lenders to provide debtor in possession financing to the Debtors. The Debtors are also negotiating for the right to convert such debtor-in-possession financing into an exit financing that would be available to fund expenses of the Liquidation Trust to the extent it is not repaid on the Effective Date of the Combined Plan and Disclosure Statement.

To the extent that the Debtors obtain debtor in possession financing, the terms of such financing, including the treatment of any DIP Financing Claims, will be included in the Plan Supplement. Parties interested in learning more about any such debtor in possession financing should monitor the Docket in these Chapter 11 Cases, which can be viewed at the following link: https://www.donlinrecano.com/Clients/cred/Dockets.

## ARTICLE IV.
## TAX CONSEQUENCES

**4.1**    **Tax Consequences.**

The confirmation and execution of the Combined Plan and Disclosure Statement may have tax consequences to Holders of Claims and Equity Interests. The Debtors do not offer an opinion as to any federal, state, local or other tax consequences to Holders of Claims and Equity Interests as a result of the confirmation of the Combined Plan and Disclosure Statement.

Under certain circumstances, an individual may be entitled to claim a theft-loss dependent on its individual circumstances. Such losses that arise out of property used in a trade or business or a transaction entered into for profit are deductible in the year in which the loss is sustained and in an amount not to exceed the adjusted tax basis of the property involved. Individuals should consult with their own tax advisors to determine if a theft loss deduction is permissible, as well as the timing, amount, and applicable limitations for any such theft loss deduction.

**All Holders of Claims and Equity Interests are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of this Combined Plan and Disclosure Statement. The Combined Plan and Disclosure Statement is not intended, and should not be construed, as legal or tax advice to any Creditor, Equity Interest Holder or other party in interest.**

# ARTICLE V.
## CERTAIN RISK FACTORS TO BE CONSIDERED

**5.1   Risk Factors to Be Considered**

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Combined Plan and Disclosure Statement.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Combined Plan and Disclosure Statement and its implementation.

(a)     Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect Distributions available to Holders of Allowed Claims under the Combined Plan and Disclosure Statement, but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Combined Plan and Disclosure Statement or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

(i)     Parties in Interest May Object to the Combined Plan and Disclosure Statement's Classification of Claims and Interests.  Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Equity Interest under the Combined Plan and Disclosure Statement complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Equity Interest, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(ii)     The Conditions Precedent to the Effective Date May Not Occur.  As more fully set forth in Article XVI hereof, the Confirmation Date and the Effective Date are subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Confirmation Date or the Effective Date will not take place.

(iii)     The Debtors May Fail to Satisfy Voting Requirements.  If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Combined Plan and Disclosure Statement, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Combined Plan and Disclosure Statement.  In the event that sufficient votes are not received, the Debtors, with the consent of the Committee, may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Combined Plan and Disclosure Statement.

(iv)     The Debtors May Not Be Able to Secure Confirmation of the Combined Plan and Disclosure Statement.  There can be no assurance that the requisite acceptances to confirm the Combined Plan and Disclosure Statement will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Combined Plan and Disclosure Statement.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of the Combined Plan and Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that the Combined Plan and Disclosure Statement, the balloting procedures, and the voting results are appropriate, the Bankruptcy Court could still decline to confirm the Combined Plan and Disclosure Statement if it finds that any of the statutory requirements for confirmation are not met.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of Distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of Distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Confirmation of the Combined Plan and Disclosure Statement is also subject to certain conditions as described in Article IX hereof.  If the Combined Plan and Disclosure Statement is not confirmed, it is unclear what Distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Combined Plan and Disclosure Statement, reserve the right, upon reasonable prior notice to and with the consent of the Committee, to modify the terms and conditions of the Combined Plan and Disclosure Statement as necessary for confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Combined Plan and Disclosure Statement.  Such a less favorable treatment could include a Distribution of property with a lesser value than currently provided in the Combined Plan and Disclosure Statement or no Distribution whatsoever under the Combined Plan and Disclosure Statement.

(v)     Nonconsensual Confirmation.  In the event that any Impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any Insider in such class), and, as to each Impaired class that has not accepted the

plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired class(es). The Debtors believe that the Combined Plan and Disclosure Statement satisfies these requirements, and the Debtors may request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual confirmation or Consummation of the Combined Plan and Disclosure Statement may result in, among other things, increased expenses relating to professional compensation.

(vi)    <u>The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code</u>. If the Bankruptcy Court finds that it would be in the best interests of Creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller Distributions being made to Creditors than those provided for in the Combined Plan and Disclosure Statement because of the (a) likelihood that the Assets, including any Cryptocurrency, would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and Executory Contracts.

(vii)    <u>The Debtors May Object to the Amount or Classification of a Claim</u>. Except as otherwise provided in the Combined Plan and Disclosure Statement, the Debtors reserve the right to object to the amount or classification of any Claim under the Combined Plan and Disclosure Statement. The estimates set forth in the Combined Plan and Disclosure Statement cannot be relied upon by any Holder of a Claim, as the Debtors or the Liquidation Trustee may seek to investigate, File, and prosecute Claims and may object to Claims after confirmation of the Combined Plan and Disclosure Statement.

(viii)    <u>Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Combined Plan and Disclosure Statement</u>. The Distributions available to Holders of Allowed Claims under the Combined Plan and Disclosure Statement can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect Distributions available to Holders of Allowed Claims under the Combined Plan and Disclosure Statement, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Combined Plan and Disclosure Statement or require any sort of revote by the Impaired Classes.

The estimated Claims and Creditor recoveries set forth in the Combined Plan and Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained herein. Moreover, Creditor recoveries will depend on the outcome of litigation that may be brought by the Liquidation Trust for the benefit of Creditors. Litigation outcomes are inherently uncertain and, if the litigation pursued by the Liquidation Trust is unsuccessful, may materially and adversely impact Creditor recoveries. Furthermore, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that ultimately will be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Combined Plan and Disclosure Statement.

(ix)     <u>Releases, Injunctions, and Exculpations Provisions May Not Be Approved</u>. Article XVIII hereof provides for certain releases, injunctions, and exculpations, including a release of Liens and third party releases that may otherwise be asserted against the Debtors or the Released Parties. The releases, injunctions, and exculpations provided herein are subject to objection by parties in interest and may not be approved.

(x)     <u>Risk of Non-Occurrence of the Effective Date</u>. Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. If the Effective Date does not occur, the Combined Plan and Disclosure Statement shall be null and void in all respects and nothing contained herein shall: (a) constitute a waiver or release of any Claims by or Claims against or Equity Interest in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holder of a Claim or Equity Interest, or any other Entity; (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Equity Interest, or any other Entity in any respect; or (d) be used by the Debtors or any Entity as evidence (or otherwise) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

(xi)     <u>Risk of Loss of Exclusive Right to Propose a Plan</u>. At the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose a plan and prohibits creditors and others from proposing a plan. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Combined Plan and Disclosure Statement in order to achieve the Debtors' stated goals.

      (b)    <u>Risks Related to Recoveries Provided Under the Combined Plan and Disclosure Statement</u>.

          (i)    <u>Timing and Amount of Distributions</u>.  Various factors will impact the amount of recoveries that Holders of Allowed Claims receive, including, without limitation, the degree to which objections to Claims are successful.  Further, due to the nature of litigation, it may take years to fully adjudicate, decide, or resolve objections to Claims.  As a result, Holders of Allowed Claims may not receive final Distributions in accordance herewith for a prolonged period of time following the Effective Date.

          (ii)    <u>Uncertainty of Distribution</u>.  No assurances can be made that Holders of Allowed Claims will receive a Distribution as it is possible the Liquidation Trust Expenses will exceed the realizable value of the Liquidation Trust Assets.  In such a scenario, there would be no recovery to Holders of Allowed Claims.

          (iii)    <u>Cryptocurrency Distributions</u>.  The Liquidation Trustee shall make good faith efforts to make Equivalent Cryptocurrency Distributions; however, there can be no assurance that the ability to make such Equivalent Cryptocurrency Distributions is guaranteed.  If the Liquidation Trustee cannot make Equivalent Cryptocurrency Distributions for any reason, Distributions will be made to Holders of Customer Claims that made a Cryptocurrency Election in Cash consistent with this Combined Plan and Disclosure Statement.

          (iv)    <u>Certain Tax Implications of the Combined Plan and Disclosure Statement</u>.  Consummation may result in significant tax implications for the Debtors and Holders of Claims.  Holders of Allowed Claims should abide by Article IV hereof to determine how the tax implications of the Combined Plan and Disclosure Statement and the Chapter 11 Cases may adversely affect the Holders of Claims.

      (c)    <u>The Debtors May Not Be Able to Generate Sufficient Cash to Continue in Chapter 11</u>.

      The Debtors may not be able to generate sufficient Cash to continue operating in chapter 11 for a prolonged period of time.  It is also unclear whether the Debtors will be able to obtain postpetition financing to fund administrative expenses through confirmation of an alternative chapter 11 plan.

      (d)    <u>The Debtors May Be Adversely Affected by Litigation</u>.

      The Debtors may become parties to litigation, and litigation in which the Debtors are already a party may not be resolved in their favor.  In general, litigation can be expensive and time consuming to bring or defend.  Litigation could result in settlements or damages that could significantly affect the Debtors' financial positions.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Combined Plan and Disclosure Statement.  It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of any litigation.  The impact of any such litigation on the Debtors' business and financial stability, however, could be material.

## 5.2 Alternatives to this Combined Plan and Disclosure Statement

In the event the Debtors are unable to obtain sufficient votes or are unable to satisfy the legal requirements to confirm the Combined Plan and Disclosure Statement, the Debtors, with the consent of the Committee, may seek to confirm an alternative chapter 11 plan or convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Combined Plan and Disclosure Statement. As set forth in Article VI hereof, the Debtors believe it is unlikely that conversion of the Chapter 11 Cases to cases under chapter 7 will result in greater Distributions to stakeholders.

## ARTICLE VI.
## BEST INTERESTS AND FEASIBILITY

## 6.1 Best Interests Test

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Equity Interest either (a) accept the plan or (b) receive or retain under the plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Because of the increased expenses that would be incurred in the event of a conversion of the Chapter 11 Cases to cases under chapter 7, the value of any Distributions to Holders of Claims or Equity Interests if the Chapter 11 Cases were converted to cases under chapter 7 would be less than the value of Distributions hereunder. This is because conversion of the Chapter 11 Cases to chapter 7 would require the appointment of a chapter 7 trustee, and in turn, such chapter 7 trustee's likely retention of new professionals.

The "learning curve" that the chapter 7 trustee and new professionals would be faced with comes with additional costs to the Estates and delay compared to the time of Distributions under the Combined Plan and Disclosure Statement. As a result, the Debtors believe that their Estates would have fewer funds available for Distribution in a hypothetical chapter 7 liquidation than they would if the Combined Plan and Disclosure Statement is confirmed, and, therefore, Holders of Allowed Claims will recover less in the hypothetical chapter 7 cases.[8] Accordingly, the Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

## 6.2 Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Combined Plan and Disclosure Statement is not likely to be followed by liquidation, or the need for further financial reorganization, of the Debtors or any successors to the Debtors, unless such liquidation or reorganization is proposed in the Combined Plan and Disclosure Statement. As set forth herein, the Debtors commenced the Chapter 11 Cases to allow for an efficient and orderly sale of their Assets, followed by a wind-down process, which the Combined Plan and Disclosure

---

[8]   A hypothetical chapter 7 liquidation analysis is attached hereto as **Exhibit B**.

Statement accomplishes. The Debtors will not be conducting any business operations after the Effective Date. As such, provided that the Combined Plan and Disclosure Statement is Consummated, the Debtors' Estates will not be subject to future reorganization or liquidation. Accordingly, the Debtors believe that the Combined Plan and Disclosure Statement is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

## ARTICLE VII.
## SUMMARY OF ASSETS AND TREATMENT OF CLAIMS AND INTERESTS

### 7.1    Summary of Assets

As of the Petition Date, the former book value of the Debtors' Assets was approximately $69 million. Book value is generally computed in accordance with various accounting pronouncements and may not correlate with the fair value of an individual Asset or of the enterprise value of the Debtors as a whole. Moreover, the Debtors have not conducted the impairment analysis which would be required under GAAP for such former book value to be considered a current and reliable book value. Such impairment analysis would likely result in a book value significantly less than the former book value referred to above. The Debtors' Assets broadly consist of Cash and Cash equivalents, Cryptocurrency, technological platforms, loan obligations, and certain other Assets under management.

As of December 31, 2020, the Debtors held approximately $970,000 in Cash. In addition, the Debtors hold a variety of Cryptocurrencies. Certain of these Cryptocurrencies are "liquid" and can be readily converted to Cash. As of December 31, 2020, the Debtors held approximately $5.3 million in liquid Cryptocurrencies. A portion of the Cryptocurrency held by the Debtors is considered "illiquid," the value of which is difficult to determine with any level of certainty and which require the Debtors to overcome additional barriers (which may require additional marketing efforts and/or liquidation in smaller quantities) to convert these "illiquid" Cryptocurrencies into Cash.

The Debtors' Assets also include obligations under customer loans and loans issued by the Debtors. Of note, moKredit is obligated to repay the Debtors approximately $39 million. However, as discussed above, moKredit is currently not making payments on the outstanding principal, and thus the account balance may be partially or completely uncollectible.

The Debtors are owed approximately $8 million for loans issued under the CredBorrow program. However, these creditors may argue that obligations would only be collected if Collateral was returned, and thus the account balance may be partially or completely uncollectible. For the purposes of this Plan, the Debtors cannot ascribe value to the moKredit loan obligation as there is no market for any fair valuation purposes nor have the Debtors been able to conduct an impairment analysis which would be necessary to present a book value for the loan.

The Debtors also have certain "assets under management" valued at approximately $3.6 million, as of December 31, 2020, to be returned by certain third-party asset managers.

Additionally, the Debtors own a proprietary technological platform and various Causes of Action, which may be of significant value.

## 7.2 Summary of Treatment of Claims and Equity Interests

The following table (a) designates the Classes of Claims against, and Equity Interests in, the Debtors, (b) specifies the Classes of Claims and Equity Interests that are Impaired by the Combined Plan and Disclosure Statement and therefore are deemed to reject the Combined Plan and Disclosure Statement or are entitled to vote to accept or reject the Combined Plan and Disclosure Statement in accordance with section 1126 of the Bankruptcy Code, and (c) specifies the Classes of Claims and Equity Interests that are Unimpaired by the Combined Plan and Disclosure Statement and therefore are deemed to accept the Combined Plan and Disclosure Statement in accordance with section 1126 of the Bankruptcy Code.

| Class | Description | Impairment | Entitled to Vote | Estimated Allowed Claim Amounts | Estimated Recovery Percentage |
|-------|-------------|------------|------------------|-------------------------------|-------------------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | $0 | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | $0 | 100% |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) | Unknown | 100% |
| 4 | General Unsecured Claims | Impaired | Yes | $170.9 million | Unknown |
| 5 | Convenience Claims | Impaired | Yes | $0.5 million | 30%[9] |
| 6 | Subordinated Securities Claims | Impaired | No (deemed to reject) | $0 | 0% |
| 7 | Equity Interests in Debtors | Impaired | No (deemed to reject) | Not applicable | 0% |

## 7.3 Deemed Consolidation

The Combined Plan and Disclosure Statement provides for deemed consolidation of the Debtors' Estates solely for the purposes hereof, including making any Distributions to Holders of

---

[9] The estimated recovery percentage for General Unsecured Claims that exercise the Convenience Class Election is less than 30%.

Allowed Claims. Deemed consolidation is a type of substantive consolidation, "under which a consolidation is deemed to exist for purposes of voting and satisfying creditor claims, voting for or against the Plan, and making distributions for allowed claims under it." *In re Owens Corning*, 419 F.3d 195, 202 (3d Cir. 2005); *see also In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 423-24 (3d Cir. 2005). It is an equitable remedy that bankruptcy courts may apply in appropriate circumstances. *See In re Owens Corning*, 419 F.3d 195, 216 (3d Cir. 2005).

Substantive consolidation is appropriate where (i) prepetition the debtors disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) postpetition the debtors' assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. *In re Owens Corning*, 419 F.3d at 211.; *see also In re Augie/Restivo Baking Co., Ltd.,* 860 F.2d 515, 518 (2d Cir. 1988) (noting that decisions approving substantive consolidation emphasize whether creditors dealt with the entities as a single economic unit or whether the affairs of the debtors are so entangled that consolidation will benefit all creditors).

The Debtors submit that deemed consolidation is appropriate under the law and the facts present here. Prior to the Petition Date, the Debtors' books and records did not precisely record Assets and Liabilities attributable to each of the Debtors individually. As a result, it would be a painstaking and costly endeavor to try to unwind the Debtors' business affairs and allocate assets and Liabilities on a Debtor by Debtor basis, to the extent such unwinding and allocation is even possible. To the extent it is possible, such an allocation would be extremely time consuming and costly, and would greatly diminish the pool of assets available for Distribution to Creditors.

For example, without substantial costs and efforts, including a review of all contracts of the more than 6,500 Customers, the Debtors cannot verify which Customers are creditors of Cred Inc. or Cred (US) LLC. Based on an initial analysis, several Customer contracts appear to be with Cred Inc., but used a Cred (US) LLC signature block. The Debtors believe it will be difficult if not impossible to properly allocate the assets and liabilities associated with such contracts on a Debtor by Debtor basis. Furthermore, a detailed forensic analysis would be needed to identify and reconcile all intercompany transfers, including transfers of Cash and transfers of Cryptocurrencies through Fireblocks. Moreover, the Debtors are unable to identify the specific Debtor entity that owns the remaining bitcoin, as there was significant movement in bitcoin between the Debtors during normal operations, including commingling of such assets, making tracing of bitcoin to any particular Debtor entity practically impossible. Finally, the Debtors' platform was used by all operating Debtor entities, and it is practically impossible to allocate the value of that platform to these Debtor entities.

Deemed consolidation for voting and Distribution purposes will avoid these delays and expenses, without causing prejudice to any group of creditors. Under the Combined Plan and Disclosure Statement, each Creditor within a Class will be treated equally.

## 7.4    Third Party Releases

It is the Debtors' position that the consideration for the third party releases set forth in Section 18.2 hereof and the mechanism by which Holders of Claims who are impaired under the Plan to consent to such releases meet the requirements for third party releases and are consistent

with recent chapter 11 cases. All Impaired Holders of Claims, irrespective of whether they are entitled to vote on the Plan, will receive a Solicitation Package which will include materials allowing such Holders to opt out of the third party release via their Ballot or an Opt-Out Election Form that can mailed or hand-delivered to the Voting Agent. In addition, the Debtors believe the third party releases are entirely consensual under the established case law in the United States Bankruptcy Court for the District of Delaware. *See, e.g.*, *In re Indianapolis Downs, LLC, 486 B.R. 286, 304-06* (Bankr. D. Del. 2013). The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each of the Released Parties as part of confirmation of the Combined Plan and Disclosure Statement.

## ARTICLE  VIII.
## CONFIRMATION AND VOTING PROCEDURES

### 8.1 Combined Hearing

A hearing before the Honorable John T. Dorsey has been scheduled for **March 9, 2021 at 2:00 p.m. (prevailing Eastern Time)**, at the Bankruptcy Court, 824 North Market Street, 5th Floor, Courtroom No. 5, Wilmington, Delaware 19081, to consider (i) final approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (ii) confirmation of the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code. The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Combined Hearing or by Filing a notice with the Bankruptcy Court.

### 8.2 Procedure for Objections

Any objection to approval or confirmation of this Combined Plan and Disclosure Statement must: (a) be in writing, (b) conform to the Bankruptcy Rules and Local Bankruptcy Rules, and (c) be filed with the Bankruptcy Court and served so as to be **actually received on or before March 1, 2021 at 4:00 p.m. (prevailing Eastern Time)**, by: (i) counsel to the Debtors, Paul Hastings LLP, 600 Travis Street, 58th Floor, Houston, Texas 77002, Attn: James T. Grogan, Esq., and Cousins Law LLC, Brandywine Plaza West, 1521 Concord Pike, Suite 301, Wilmington, Delaware 19803, Attn: Scott D. Cousins; and (ii) counsel to the Committee, McDermott Will & Emery LLP, 340 Madison Avenue, New York, NY 10173, Attn: Timothy W. Walsh and Darren Azman, and 1007 North Orange Street, 4th Floor, Wilmington, DE 19801, Attn: David R. Hurst.

### 8.3 Voting Procedures

(a) Who May Vote on the Combined Plan and Disclosure Statement

Each Holder of a Class 4 or Class 5 Claim that is not a Disallowed Claim and for which no objection to the allowance thereof, motion to estimate, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed and remains unresolved, or the Holder of a Class 4 or Class 5 Claim that has been temporarily allowed for voting purposes only under Bankruptcy Rule 3018(a) shall be entitled to vote separately to accept or reject the

Combined Plan and Disclosure Statement, subject to the procedures set forth in the Disclosure Statement Order or any other applicable order of the Bankruptcy Court.  An Impaired Class of Claims shall have accepted the Combined Plan and Disclosure Statement if: (i) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Combined Plan and Disclosure Statement, and (ii) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Combined Plan and Disclosure Statement.

Classes 1, 2, and 3 are Unimpaired under the Combined Plan and Disclosure Statement, are each deemed to accept the Combined Plan and Disclosure Statement by operation of law, and are not entitled to vote on the Combined Plan and Disclosure Statement.

Classes 6 and 7 are Impaired under the Combined Plan and Disclosure Statement and are deemed to reject the Combined Plan and Disclosure Statement by operation of law, and are not entitled to vote on the Combined Plan and Disclosure Statement.

Without limiting the foregoing, in the event that any Class of Claims entitled to vote on the Combined Plan and Disclosure Statement fails to accept the Combined Plan and Disclosure Statement as required by section 1129(a) of the Bankruptcy Code, the Combined Plan and Disclosure Statement may be amended or modified in accordance with the terms herein and, in any event, the Debtors, subject to any consent that may be required herein or under the Plan Support Agreement, reserve the right to seek confirmation hereof over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

(b)     Voting Record Date

The Bankruptcy Court has approved the close of business on January 14, 2021 as the voting record date (the "Voting Record Date").  The Voting Record Date is the date for determining (1) which Holders of Claims are entitled to vote to accept or reject the Combined Plan and Disclosure Statement and receive the Solicitation Package and (2) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of a Claim. The Voting Record Date shall apply to all of the Debtors' creditors and other parties in interest.

(c)     Voting Agent

The Debtors have retained Donlin, Recano & Company, Inc. (the "Voting Agent") to, among other things, act as claims and solicitation agent in connection with the solicitation of votes to accept or reject the Combined Plan and Disclosure Statement.  Inquiries relating to the solicitation process, voting instructions, related procedures and copies of the solicitation materials may be directed to the Voting Agent at no charge by: (a) accessing the Debtors' restructuring website at https://www.donlinrecano.com/Clients/cred/Dockets; (b) calling the Voting Agent at (877) 739-9988 (toll free); or (c) emailing DRCvote@DonlinRecano.com.  The

Voting Agent, however, is not authorized to provide, and will not provide, legal or financial advice.

(d)     Solicitation Package, Ballots and Notices

The following materials constitute the solicitation package with respect to the Combined Plan and Disclosure Statement enclosed herewith (the "Solicitation Package"):

i.      The appropriate form of Ballot and instructions for completing the Ballot;

ii.     The voting instructions and solicitation procedures approved by the Bankruptcy Court (the "Voting Procedures");

iii.    The Combined Plan and Disclosure Statement with all exhibits;

iv.     A notice of the Combined Hearing approved by the Bankruptcy Court for transmission to Holders of Claims and other parties in interest (the "Combined Hearing Notice");

v.      A copy of the Disclosure Statement Order;

vi.     a letter from the Committee urging creditors to vote to accept the Combined Joint Plan and Disclosure Statement; and

vii.    Such other materials as the Bankruptcy Court may direct.

Only Holders of General Unsecured Claims (Class 4) and Holders of Convenience Claims (Class 5) are entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

(e)     Notices of Non-Voting Status

As set forth above, certain Holders of Claims and Equity Interests are not entitled to vote on the Combined Plan and Disclosure Statement.  As a result, such parties will not receive Solicitation Packages but, instead, will receive the Combined Hearing Notice that explains, among other things, (i) that Classes 1, 2, and 3 are Unimpaired under the Combined Plan and Disclosure Statement and, therefore, are presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code; (ii) that Classes 6 and 7 are Impaired under the Combined Plan and Disclosure Statement and are presumed to have rejected the Combined Plan and Disclosure Statement pursuant to section 1126(g) of the Bankruptcy Code; (iii) instructions for how such Holders of Claims and Equity Interests may obtain a copy of the Combined Plan and Disclosure Statement; (iv) the deadline by which to object to confirmation of the Combined Plan and Disclosure Statement; and (v) the Combined Hearing date and time.  In addition, such parties will receive a Notice of Non-Voting Status and an Opt-Out Election Form.

(f)     Contract and Lease Counterparties

Parties to certain of the Debtors' Executory Contracts and Unexpired Leases may not have Claims pending the disposition of their Executory Contracts and Unexpired Leases by assumption or rejection under the Combined Plan and Disclosure Statement. Such parties nevertheless will receive the Combined Hearing Notice.

(g)     Submission of Ballots and Opt-Out Election Forms

To be counted as a vote to accept or reject the Combined Plan and Disclosure Statement, such Holder's properly completed and executed Ballot must be received by the Voting Agent by the Voting Deadline and in accordance with the voting instructions attached to each Ballot. The Voting Agent will process and tabulate received Ballots and will File a voting report (the "Voting Report") as soon as practicable on or after the Voting Deadline but prior to the Combined Hearing. The Voting Report will include (a) a list of all Ballots received but not counted and the reason for not counting such Ballots and (b) a list of all non-compliant, deficient Ballots for which the Debtors have waived such non-compliance or deficiency. Parties may contact the Voting Agent with any questions related to the Voting Procedures applicable to their Claims.

In addition, Opt-Out Election Forms must also be received by the Voting Agent on or before the Voting Deadline.

## ARTICLE IX.
## PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS, AND OTHER UNCLASSIFIED CLAIMS

**9.1     Administrative Expense Claims**

(a)     Treatment of Non-Professional Fee Administrative Expense Claims

Except to the extent that a Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Administrative Expense Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on the latest of: (i) on or as soon as practicable after the Effective Date if such Administrative Expense Claim is Allowed as of the Effective Date; (ii) on or as soon as reasonably practicable after the date such Administrative Expense Claim is Allowed; and (iii) on the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is practicable.

(b)     Administrative Expense Claims Bar Date

Holders of Administrative Expense Claims (other than Professional Fee Claims) arising during the period from November 7, 2020 through the Effective Date must File requests for payment of Administrative Expense Claims **on or before 4:00 p.m. (prevailing Eastern Time) on the day that is thirty (30) calendar days after the Effective Date** (the "Administrative

Expense Claims Bar Date") and serve such Administrative Expense Claims on the Claims Agent so as to be **actually received on or before the Administrative Expense Claims Bar Date** at the following addresses (the "Claims Agent Service Addresses"):

> If by first-class mail:
>
>> Cred Inc. Claims Processing Center
>> c/o Donlin, Recano & Company, Inc.
>> P.O. Box 199043 Blythebourne Station
>> Brooklyn, NY 11219
>
> If by hand delivery or overnight:
>
>> Cred Inc. Claims Processing Center
>> c/o Donlin, Recano & Company, Inc.
>> 6201 15th Avenue
>> Brooklyn, NY 11219

All such requests for payment must: (i) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant; (ii) be written in the English language; (iii) denominate the claim in lawful currency of the United States as of the Administrative Expense Claims Bar Date; (iv) indicate the particular Debtor against which the claim is asserted; and (v) include supporting documentation (or, if such documentation is voluminous, include a summary of such documentation) or an explanation as to why such documentation is not available. The notice of the Effective Date delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f), substantially in the form included in the Plan Supplement, shall set forth the Administrative Expense Claims Bar Date and shall constitute notice of such bar date.

The following claims are **not** required to be filed on or before the Administrative Expense Claims Bar Date:

(a)     Professional Fee Claims;

(b)     Any Administrative Expense Claims that (i) have been previously paid by the Debtors in the ordinary course of business or otherwise or (ii) have otherwise been satisfied;

(c)     Any Administrative Expense Claim that has been Allowed by prior order of the Bankruptcy Court;

(d)     Any claims by any current officer, manager, or director of the Debtors immediately prior to the Effective Date;

(e)     Any claims for fees payable to the Clerk;

(f)     Any U.S. Trustee Fees; and

(g)     Any claim by a Governmental Unit for a tax or penalty described in

section 503(b)(1)(B) and (C) of the Bankruptcy Code, as provided for in section 503(b)(1)(D).

Any Entity that is required to file a request for payment of an Administrative Expense Claim (other than Professional Fee Claims) under the Combined Plan and Disclosure Statement and that fails to do so by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claim, and such Administrative Expense Claim shall not be enforceable against the Liquidation Trust, the Liquidation Trustees, the Debtors, the Estates, and their respective properties, and the Liquidation Trust, the Liquidation Trustees, Debtors, the Estates, and their respective properties shall be forever discharged from any and all Liability with respect to such Administrative Expense Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Administrative Expense Claims shall, as of the Effective Date, be subject to the permanent injunction pursuant to Section 18.4 hereof and the Confirmation Order.

**9.2    Professional Fee Claims**

All Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 363, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is sixty (60) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such compensation and reimbursement of expenses. The Liquidation Trustees are authorized to pay reasonable compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval in accordance with the Liquidation Trust Agreement.

All Allowed Professional Fee Claims shall be paid in full in Cash in such amounts as may be Allowed by the Bankruptcy Court (a) as soon as practicable after the later of the Effective Date and the date on which the Bankruptcy Court enters a final order allowing any such Professional Fee Claim, (b) as otherwise provided in the Bankruptcy Code or approved by the Bankruptcy Court, or (c) as may be agreed upon between the Holder of any such Professional Fee Claim and the Debtors. Professional Fee Claims shall be satisfied from the Professional Fee Escrow. If the amount in the Professional Fee Escrow is insufficient to pay in full all Allowed Professional Fee Claims, the deficiency shall be promptly paid by the Liquidation Trustees from the Liquidation Trust Assets, without any further action or order of the Bankruptcy Court.

Professionals shall reasonably estimate their unpaid Professional Fee Claims as of the Effective Date, and shall deliver such estimates to the Debtors no later than five days before the Effective Date; *provided*, *however*, that such estimates shall not be deemed to limit the amount of the Professional Fee Claims that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

On or before the Effective Date, the Debtors shall establish the Professional Fee Escrow and shall fund such reserve with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow and the funds therein shall be used for the sole purpose of paying the Allowed Professional Fee Claims and shall not constitute property of the Debtors, their Estates, or the Liquidation Trust; *provided*, that the Liquidation Trust shall hold a residual interest in the Professional Fee Escrow and, upon the satisfaction of all Allowed Professional Fee Claims, any funds remaining in the Professional Fee Escrow shall vest in the Liquidation Trust.

**9.3     Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, either (a) payment in full in Cash on the Effective Date, (b) payment in regular installment payments within five (5) years of the Petition Date, or (c) such other less favorable treatment to the Holder of an Allowed Priority Tax Claim as to which the Debtor and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

## ARTICLE X.
## TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

**10.1     Class 1: Other Priority Claims**

(a)     <u>Classification</u>: Class 1 shall consist of the Other Priority Claims.

(b)     <u>Treatment</u>: Except to the extent that a Holder of an Other Priority Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed Other Priority Claim shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, Cash in the amount equal to such Allowed Claim, without interest, on or as soon as practicable after the later of (x) the Effective Date and (y) the date that such Claim becomes an Allowed Claim.

(c)     <u>Voting</u>: Class 1 is Unimpaired under the Combined Plan and Disclosure Statement. Holders of Claims in Class 1 are conclusively deemed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code. Holders of Claims in Class 1 are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

**10.2     Class 2: Secured Tax Claims**

(a)     <u>Classification</u>: Class 2 shall consist of the Secured Tax Claims.

(b)     <u>Treatment</u>: Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed Secured Tax Claim shall

receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Secured Tax Claim and any Liens securing such Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, Cash in the amount of such Allowed Secured Tax Claim (a) on, or as soon as practicable after, the latest of: (i) the Effective Date and (ii) the date such Allowed Secured Tax Claim becomes an Allowed Claim; or (b) in regular payments over a period of time not to exceed five (5) years after the Petition Date with interest at a rate determined in accordance with section 511 of the Bankruptcy Code; provided, that the first such regular payment shall represent a percentage recovery at least equal to that expected to be received by the most favored Holders of Allowed General Unsecured Claims; provided further, that the Liquidation Trustees may prepay the entire amount of the Allowed Secured Tax Claim at any time in its sole discretion.

(c)     Voting: Class 2 is Unimpaired under the Combined Plan and Disclosure Statement.  Holders of Claims in Class 2 are conclusively deemed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Claims in Class 2 are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

**10.3    Class 3: Other Secured Claims**

(a)     Classification: Class 3 shall consist of the Other Secured Claims.

(b)     Treatment: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Other Secured Claim and any Liens securing such Claim, at the sole option of the Debtors or the Liquidation Trustees, as applicable, (i) Cash in an amount equal to such Allowed Other Secured Claim on or as soon as practicable after the Effective Date, or (ii) the Collateral securing its Allowed Other Secured Claim, in full and complete satisfaction of such Allowed Other Secured Claim on or as soon as practicable after the Effective Date.

(c)     Voting: Class 3 is Unimpaired under the Combined Plan and Disclosure Statement.  Holders of Claims in Class 3 are conclusively deemed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Claims in Class 3 are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

**10.4    Class 4: General Unsecured Claims.**

(a)     Classification: Class 4 shall consist of the General Unsecured Claims.

(b)     Treatment: Except to the extent that a Holder of an Allowed General Unsecured Claim in Class 4 agrees to a less favorable treatment or has been paid by any of the Debtors prior to the Effective Date, each Holder of an Allowed General

42

Unsecured Claim in Class 4 shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim either: (i) a Cash payment equal to such Holder's Distribution Pro Rata Share of Net Distributable Assets; or, if permitted, (ii) with respect to any such Holder that makes a Cryptocurrency Election, a good faith effort shall be made to make distributions in an Equivalent Cryptocurrency Distribution.

(c) <u>Voting</u>:  Class 4 is Impaired under the Combined Plan and Disclosure Statement. Holders of Claims in Class 4 are entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

**10.5    Class 5: Convenience Claims.**

(a) <u>Classification</u>: Class 5 shall consist of the Convenience Claims.

(b) <u>Treatment</u>:  Except to the extent that a Holder of an Allowed Convenience Claim in Class 5 agrees to a less favorable treatment or has been paid by any of the Debtors prior to the Effective Date, each Holder of an Allowed Convenience Claim in Class 5 shall receive, in full and final satisfaction, settlement, and release of such Allowed Convenience Claim, Cash in an amount equal to 30.0% of the amount of such Allowed Convenience Claim on or as reasonably practicable after the later of (i) the Effective Date or (ii) thirty (30) days after the date on which such Claim becomes Allowed.

(c) <u>Voting</u>:  Class 5 is Impaired under the Combined Plan and Disclosure Statement. Holders of Claims in Class 5 are entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

**10.6    Class 6: Subordinated Securities Claims**

(a) <u>Classification</u>: Class 6 shall consist of all Subordinated Securities Claims.

(b) <u>Treatment</u>: Each Holder of an Allowed Subordinated Securities Claim will not receive or retain any property under the Combined Plan and Disclosure Statement on account of such Allowed Subordinated Securities Claim.  The treatment of Subordinated Securities Claims under the Combined Plan and Disclosure Statement is in accordance with and gives effect to the provisions of section 510(b) of the Bankruptcy Code.

(c) <u>Voting</u>: Class 6 is Impaired, and Holders of Class 6 Claims are conclusively presumed to have rejected the Combined Plan and Disclosure Statement under section 1126(g) of the Bankruptcy Code.

**10.7    Class 7: Equity Interests in Debtors**

(a) <u>Classification</u>: Class 7 shall consist of the Equity Interests in the Debtors.

(b) <u>Treatment</u>: On the Effective Date, the Equity Interests in the Debtors shall be

cancelled and the Holders of the Equity Interests shall not be entitled to, and shall not receive or retain, any property on account of such Equity Interests under the Combined Plan and Disclosure Statement.

(c)    Voting: Class 7 is Impaired, and such Holders of Class 7 Claims are conclusively presumed to have rejected the Combined Plan and Disclosure Statement under section 1126(g) of the Bankruptcy Code.

**10.8    Reservation of Rights Regarding Claims and Equity Interests**

Except as otherwise explicitly provided herein, nothing shall affect either the Debtors' or the Liquidation Trustees' rights and defenses, both legal and equitable, with respect to any Claims or Equity Interests, including all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## ARTICLE  XI.
## ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT

**11.1    Voting of Claims**

(a)    Classes Entitled to Vote

Each Holder of a Claim, that is not a Disallowed Claim and for which no objection to the allowance thereof, motion to estimate, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed and remains unresolved, in Classes 4 and 5, or the Holder of a Claim that has been temporarily allowed for voting purposes only under Bankruptcy Rule 3018(a) in such Classes, shall be entitled to vote separately to accept or reject the Combined Plan and Disclosure Statement, as provided in the Disclosure Statement Order or any other applicable order of the Bankruptcy Court.

(b)    Classes Deemed to Accept

Each of Classes 1, 2, and 3 are Unimpaired under the Combined Plan and Disclosure Statement, and each such Class is conclusively presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code.

(c)    Classes Deemed to Reject

Subordinated Securities Claims in Class 6 and Equity Interests in Class 7 will not receive or retain any property on account of such Claims or Equity Interests under the Combined Plan and Disclosure Statement.  In accordance with section 1126(g) of the Bankruptcy Code, Classes 6 and 7 are conclusively presumed to have rejected the Combined Plan and Disclosure Statement.

**11.2    Elimination of Vacant Classes**

44

Any Class of Claims or Equity Interests that does not contain, as of the date of the Confirmation Hearing, a Holder of an Allowed Claim or Allowed Equity Interest, or a Holder of a Claim temporarily Allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Combined Plan and Disclosure Statement for all purposes, including for purposes of determining acceptance of the Combined Plan and Disclosure Statement by such Class under section 1129(a)(8) of the Bankruptcy Code.

## 11.3   Nonconsensual Confirmation

If any Impaired Class of Claims entitled to vote shall not accept the Combined Plan and Disclosure Statement by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Combined Plan and Disclosure Statement in accordance with Section 20.5 hereof or undertake to have the Bankruptcy Court confirm the Combined Plan and Disclosure Statement under section 1129(b) of the Bankruptcy Code, or both.  With respect to Impaired Classes of Claims that are deemed to reject the Combined Plan and Disclosure Statement, the Debtors shall request that the Bankruptcy Court confirm the Combined Plan and Disclosure Statement pursuant to section 1129(b) of the Bankruptcy Code.

## 11.4   Revocation of the Combined Plan and Disclosure Statement

Subject to Section 20.6 hereof, the Debtors, after consultation with the Committee, may revoke and withdraw the Combined Plan and Disclosure Statement in its entirety at any time prior to entry of the Confirmation Order.  If the Combined Plan and Disclosure Statement is so revoked or withdrawn, then it shall be deemed null and void.

## ARTICLE  XII.
## MEANS OF IMPLEMENTATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT

In addition to the provisions set forth elsewhere in the Combined Plan and Disclosure Statement, the following shall constitute the means for implementation of the Combined Plan and Disclosure Statement:

## 12.1   Limited Substantive Consolidation

The Combined Plan and Disclosure Statement provides for substantive consolidation of the Debtors' Estates, but solely for the purposes hereof, including making any Distributions to Holders of Allowed Claims.

On the Effective Date, (i) all Assets and Liabilities of the Debtors will, solely for Distribution purposes, be treated as if they were merged, (ii) all Intercompany Claims will be eliminated, (iii) each Claim Filed or to be Filed against the Debtors will be deemed a single nonaggregated Claim against, and a single non-aggregated obligation of, the Debtors, (iv) all guarantees of any Debtor of the payment, performance, or collection of obligations of another Debtor shall be eliminated and canceled; and (v) all transfers, disbursements and Distributions on account of Claims made by or on behalf of any of the Debtors' Estates hereunder will be deemed to be made by or on behalf of all of the Debtors' Estates.  Holders of Allowed Claims entitled to

Distributions under this Combined Plan and Disclosure Statement shall be entitled to their Distribution Pro Rata Share on account of such Claim without regard to which Debtor was originally liable for such Claim. Except as set forth herein, such limited substantive consolidation shall not (other than for purposes related to this Combined Plan and Disclosure Statement) affect the legal and corporate structures of the Debtors.

## 12.2 Global Settlement

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Combined Plan and Disclosure Statement incorporates a compromise and settlement of numerous inter-Debtor, Debtor-Creditor, and inter-Creditor issues designed to achieve an economic settlement of Claims against the Debtors and an efficient resolution of the Chapter 11 Cases. This global settlement constitutes a settlement of Claims as provided herein, including the validity and enforceability of Intercompany Claims, and the allocation of Assets among the Estates. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromises and settlements underlying the substantive consolidation of the Debtors' Estates and all other compromises and settlements provided herein. The Bankruptcy Court's findings shall constitute its determination that such compromises and settlements, and the substantive consolidation of the Debtors' Estates, are in the best interests of the Debtors, their Estates, their Creditors, and other parties-in-interest, and are fair, equitable, and within the range of reasonableness. Each provision of the global settlement shall be deemed non-severable from each other and from the remaining terms hereof. As set forth in detail below, the global settlement will be implemented as set forth herein, through the substantive consolidation of the Debtors' Estates, solely for purposes of voting on, and Distributions hereunder.

## 12.3 Liquidation of the Debtors

On the Effective Date, the Debtors will transfer all of their Assets to the Liquidation Trust, for Distribution in accordance herewith. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Combined Plan and Disclosure Statement.

    (a)    <u>Appointment of Liquidation Trustees</u>

The Liquidation Trustees shall be selected by the members of the Committee and shall be identified in the Liquidation Trust Agreement. The appointment of the Liquidation Trustees shall be approved in the Confirmation Order, and the Liquidation Trustees' duties shall commence as of the Effective Date. The Liquidation Trustees shall administer the Combined Plan and Disclosure Statement and the Liquidation Trust and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Causes of Action belonging to the Estates.

In accordance with the Liquidation Trust Agreement, the Liquidation Trustees shall serve in such capacity through the earlier of (i) the date on which the Liquidation Trust is dissolved in accordance with Section 12.3(j) hereof and (ii) the date on which a Liquidation Trustee resigns, is terminated, or is otherwise unable to serve; <u>provided</u>, <u>however</u>, that, in the event that a

Liquidation Trustee resigns, is terminated, or is otherwise unable to serve, the Trust Advisory Board shall appoint a successor to serve as a Liquidation Trustee in accordance with the Liquidation Trust Agreement. If the Trust Advisory Board does not appoint a successor within the time periods specified in the Liquidation Trust Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Liquidation Trust, shall approve a successor to serve as a Liquidation Trustee. Any such successor Liquidation Trustee shall serve in such capacity until the Liquidation Trust is dissolved.

      (b)    <u>Responsibilities of Liquidation Trustees</u>

Responsibilities of the Liquidation Trustees, subject to a Trust Advisory Board consisting of those parties identified in the Plan Supplement, and at no time greater than four members, shall include, but are not limited to:

    (i)    Administering the implementation hereof, including the making of the Distributions contemplated herein;

    (ii)    Marshalling, marketing for sale, and liquidating the Estates' Assets;

    (iii)    Conducting an analysis of any and all Claims and Equity Interests and prosecuting objections thereto or settling or otherwise compromising such Claims and Equity Interests, if necessary and appropriate, in accordance with Article XIV hereof;

    (iv)    Maintaining and administering the Reserves in accordance with the terms hereof;

    (v)    Commencing, prosecuting, or settling claims and Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges in accordance herewith and paying all associated costs;

    (vi)    Recovering and compelling turnover of the Debtors' property;

    (vii)    Adjudicating third-party claims assigned, purchased, or otherwise transferred to the Liquidation Trust;

    (viii)    Paying Liquidation Trust Expenses;

    (ix)    Abandoning any property constituting the Estates' Assets that cannot be sold or otherwise disposed of for value and whose Distribution to Holders of Allowed Claims would not be feasible or cost-effective in the Liquidation Trustees' reasonable judgment;

    (x)    Preparing and filing post-Effective Date operating reports;

    (xi)    Filing appropriate tax returns in the exercise of the Liquidation Trustees' fiduciary obligations;

(xii)    Retaining such Professionals as are necessary and appropriate in furtherance of the Liquidation Trustees' fiduciary obligations; and

(xiii)    Taking such actions as are necessary and reasonable to carry out the purposes of the Liquidation Trust, including winding down the Debtors' business affairs.

    (c)    <u>Establishment of a Liquidation Trust</u>

Pursuant to the Confirmation Order, the Liquidation Trust, which may be referred to as the "Cred Liquidation Trust," will be established. The Liquidation Trust will be intended to qualify as a "liquidating trust" as described in Treasury Regulations Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-2 C.B. 684, and will be treated for federal income tax purposes as a "grantor trust" under Internal Revenue Code sections 671-677. The Liquidation Trust shall be managed by the Liquidation Trustees, who shall be selected by the Committee in its sole discretion, and subject to a Trust Advisory Board consisting of each member of the Committee who wishes to continue in such role, and such additional members nominated by the Committee, if any. The Liquidation Trust shall be administered in accordance with the terms of the Liquidation Trust Agreement.

Prior to the Effective Date, any and all of the Estates' Assets shall remain Assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date shall, subject to the Liquidation Trust Agreement, be transferred to and vest in the Liquidation Trust. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, assigned or sold pursuant to a prior Order or the Combined Plan and Disclosure Statement, the Liquidation Trustees specifically retain and reserve the right to assert, after the Effective Date, any and all of the claims, Causes of Action (including but not limited to those Causes of Action listed on the Causes of Action List) and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Liquidation Trust and the Liquidation Trustees shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Liquidation Trust Agreement, compromise or settle any Liquidation Trust Assets. From and after the Effective Date, the Liquidation Trust and the Liquidation Trustees may commence, litigate, and settle any Causes of Action or Claims relating to the Liquidation Trust Assets or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Liquidation Trust and Liquidation Trustees on or after the Effective Date, except as otherwise expressly provided herein and in the Liquidation Trust Agreement. The Liquidation Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

Other than as set forth herein, no other Entity may pursue such Liquidation Trust Assets on or after the Effective Date. The Liquidation Trustees shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Liquidation Trust Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Liquidation Trustees shall execute the Liquidation Trust Agreement and shall have established

the Liquidation Trust pursuant hereto. In the event of any conflict between the terms of this Article XII and the terms of the Liquidation Trust Agreement, the terms of the Liquidation Trust Agreement shall control.

(d)     <u>Liquidation Trust Assets</u>

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Liquidation Trust Assets become available, the Debtors shall be deemed, subject to the Liquidation Trust Agreement, to have automatically transferred to the Liquidation Trust all of their right, title, and interest in and to all of the Liquidation Trust Assets, in accordance with section 1141 of the Bankruptcy Code, including the Debtors' attorney-client privilege. All such Assets shall automatically vest in the Liquidation Trust free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims as set forth herein and the expenses of the Liquidation Trust as set forth herein and in the Liquidation Trust Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.

(e)     <u>Treatment of Liquidation Trust for Federal Income Tax Purposes; No Successor-in-Interest</u>

The Liquidation Trust shall be established for the primary purpose of liquidating and distributing the Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. Accordingly, the Liquidation Trustees may, in an expeditious but orderly manner, liquidate the Liquidation Trust Assets, make timely Distributions to the Liquidation Trust Beneficiaries and not unduly prolong its duration. The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidation Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Liquidation Trustees expressly for such purpose.

The Liquidation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidation Trust Beneficiaries treated as grantors and owners of the Liquidation Trust. For all federal income tax purposes, all parties (including the Debtors, the Liquidation Trustees, and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets by the Debtors to the Liquidation Trust, as set forth in the Liquidation Trust Agreement, as a transfer of such Assets by the Debtors to the Holders of Allowed General Unsecured Claims entitled to Distributions from the Liquidation Trust Assets, followed by a transfer by such Holders to the Liquidation Trust. Thus, the Liquidation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

As soon as practicable after the Effective Date, the Liquidation Trustees shall make a good faith determination of the fair market value of the Estates' Assets as of the Effective Date, <u>provided</u>, <u>however</u>, that the Liquidation Trustees shall not be required to hire an expert to make such a valuation. This valuation shall be used consistently by all parties (including the Debtors, the Liquidation Trustees, and the Holders of General Unsecured Claims) for all federal income

tax purposes.  The Bankruptcy Court shall resolve any dispute regarding the valuation of the Liquidation Trust Assets.

The right and power of the Liquidation Trustees to invest the Liquidation Trust Assets, the proceeds thereof, or any income earned by the Liquidation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of Section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings or other IRS pronouncements.  The Liquidation Trustees may expend the Cash of the Liquidation Trust (i) as reasonably necessary to meet Contingent Liabilities and to maintain the value of the respective Assets of the Liquidation Trust during liquidation, (ii) to pay the respective reasonable administrative expenses (including any taxes imposed on the Liquidation Trust) and (iii) to satisfy other respective Liabilities incurred by the Liquidation Trust in accordance herewith and with the Liquidation Trust Agreement (including the payment of any taxes).

(f)     The Trust Advisory Board.

The Trust Advisory Board shall consist of those parties identified in the Plan Supplement, and at no time greater than four members.  To the extent any act of the Trust Advisory Board requires a majority vote of the Trust Advisory Board and such vote ends in a tie, then such act shall be subject to the approval of the Bankruptcy Court by the motion of the Liquidation Trustees.

The Trust Advisory Board shall have the responsibility to review and advise the Liquidation Trustees with respect to the liquidation and Distribution of the Estates' Assets in accordance herewith and the Liquidation Trust Agreement.  For the avoidance of doubt, in advising the Liquidation Trustees the Trust Advisory Board shall maintain the same fiduciary responsibilities as the Liquidation Trustee delineated in Article 12.3(b)(i)-(xiii) herein.  The Debtors or the Committee shall File a notice identifying the final members of the Trust Advisory Board no later than the date of the Combined Hearing.  Vacancies on the Trust Advisory Board shall be filled by a Person designated by the remaining member or members of the Trust Advisory Board from among the Holders of General Unsecured Claims, and the Trust Advisory Board shall use reasonable efforts to maintain such composition of the members of the Trust Advisory Board as existed prior to the resignation of such member.  The Liquidation Trustees shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Trust Advisory Board for cause.  Any successor appointed pursuant to this Section 12.3(f) shall become fully vested with all of the rights, powers, duties and obligations of his or her predecessor.  For the avoidance of doubt, no member of the Trust Advisory Board shall be compensated for serving as a member of the Trust Advisory Board; provided, however, that such members may be reimbursed from the Liquidation Trust for reasonable out of pocket expenses.

The Liquidation Trustees will need the consent of the Trust Advisory Board, or approval of the Bankruptcy Court, before pursuing any potential Avoidance Actions under 11 U.S.C. § 547.

(g)     Expenses of Liquidation Trustees

The Liquidation Trust Expenses shall be paid from the Liquidation Trust Assets.

(h)     Insurance; Bond

The Liquidation Trustees, in their sole discretion, may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the Liabilities and obligations of the Liquidation Trustees and the Trust Advisory Board under the Liquidation Trust Agreement.  Unless otherwise agreed to by the Trust Advisory Board, the Liquidation Trustees shall serve with a bond, the terms of which shall be agreed to by the Trust Advisory Board, and the cost and expense of which shall be paid by the Liquidation Trust.

(i)     Fiduciary Duties of the Liquidation Trustees

Pursuant hereto and the Liquidation Trust Agreement, the Liquidation Trustees shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims that will receive Distributions pursuant to the terms hereof.

(j)     Termination of the Liquidation Trust

The Liquidation Trust will terminate on the earlier of: (a) final liquidation, administration and Distribution of the Liquidation Trust Assets in accordance with the terms of the Liquidation Trust Agreement and the Combined Plan and Disclosure Statement, and its full performance of all other duties and functions as set forth herein or in the Liquidation Trust Agreement; and (b) the fifth (5th) anniversary of the Effective Date.  Notwithstanding the foregoing, multiple fixed term extensions can be obtained so long as Bankruptcy Court approval is obtained within six (6) months before the expiration of the term of the Liquidation Trust and each extended term provided that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust within the meaning of Section 301.7701-4(d) of the Treasury Regulations for federal income tax purposes.  After (a) the final Distributions pursuant hereto, (b) the Filing by or on behalf of the Liquidation Trust of a certification of dissolution with the Bankruptcy Court, and (c) any other action deemed appropriate by the Liquidation Trustees, the Liquidation Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

(k)     Liability of Liquidation Trustees; Indemnification

Neither the Liquidation Trustees, the Trust Advisory Board, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "Liquidation Trust Party" and collectively, the "Liquidation Trust Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Liquidation Trust or for the act or omission of any other Liquidation Trust Party, nor shall the Liquidation Trust Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Liquidation Trust Agreement or the Combined Plan and Disclosure Statement other than for specific acts or omissions resulting from such Liquidation Trust Party's willful misconduct, gross negligence or actual fraud.  Subject to the Liquidation Trust Agreement, the Liquidation Trustees shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Trust Advisory Board shall be entitled to enjoy all of

the rights, powers, immunities and privileges of an official committee of unsecured creditors. The Liquidation Trustees, or the Trust Advisory Board, may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Liquidation Trustees nor the Trust Advisory Board shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Liquidation Trustees or Trust Advisory Board or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud. The Liquidation Trust shall indemnify and hold harmless the Liquidation Trust Parties (in their capacity as such), from and against and in respect of all Liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidation Trust or the Combined Plan and Disclosure Statement or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud. Persons dealing or having any relationship with the Liquidation Trustees shall have recourse only to the Liquidation Trust Assets and shall look only to the Liquidation Trust Assets to satisfy any liability or other obligations incurred by the Liquidation Trustees or the Trust Advisory Board to such Person in carrying out the terms of the Liquidation Trust Agreement, and neither the Liquidation Trustees nor the Trust Advisory Board shall have any personal obligation to satisfy any such liability. The Liquidation Trustees and/or the Trust Advisory Board members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Liquidation Trust Agreement against any of them. The Liquidation Trust shall promptly pay expenses reasonably incurred by any Liquidation Trust Party in defending, participating in, or settling any action, proceeding or investigation in which such Liquidation Trust Party is a party or is threatened to be made a party or otherwise is participating in connection with the Liquidation Trust Agreement or the duties, acts or omissions of the Liquidation Trustees or otherwise in connection with the affairs of the Liquidation Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Liquidation Trust Party hereby undertakes, and the Liquidation Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Exculpated Party is not entitled to be indemnified therefor under the Liquidation Trust Agreement. The foregoing indemnity in respect of any Liquidation Trust Party shall survive the termination of such Liquidation Trust Party from the capacity for which they are indemnified.

(l)      <u>Full and Final Satisfaction Against Liquidation Trust</u>

On and after the Effective Date, the Liquidation Trust shall have no liability on account of any Claims or Equity Interests except as set forth herein and in the Liquidation Trust Agreement. All payments and all Distributions made by the Liquidation Trustees hereunder

shall be in full and final satisfaction, settlement, and release of and in exchange for all Claims or Equity Interests against the Debtors.

## 12.4    Effectuating Documents; Further Transactions

The appropriate officer(s) and/or director(s) of the Debtors or the Liquidation Trustees, as applicable, shall be, and hereby are, authorized to execute, deliver, file, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## 12.5    Cancellation of Instruments and Stock

On the Effective Date, except to the extent otherwise provided herein, all notes, instruments, certificates, and other documents evidencing debt or Equity Interests in the Debtors shall be cancelled and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged, including any and all warrants, options, rights, or interests with respect to such Equity Interests that have been issued, could be issued, or that have been authorized to be issued but that have not been issued; provided, however, that Cred shall: (i) maintain one (1) share of common stock of each Debtor subsidiary; and (ii) issue one (1) share of common stock to the Liquidation Trust.  After the Effective Date, the Liquidation Trustees shall serve as the officers, directors, or managers of each of the Debtors, as applicable, under applicable state law, and shall be authorized to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements and to take such actions on behalf of the Debtors as may be necessary or appropriate subject to the terms and conditions of the Combined Plan and Disclosure Statement.

The Holders of, or parties to, the cancelled notes, membership interests, share certificates, and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, and other agreements and instruments or the cancellation thereof, except the rights provided pursuant hereto.

## 12.6    Disposition of Books and Records

After the Effective Date, the Debtors shall transfer the Debtors' books and records in the Debtors' possession to the Liquidation Trust.  From and after the Effective Date, the Liquidation Trustees shall continue to preserve and maintain all documents and electronic data transferred to the Liquidation Trust by the Debtors, and the Liquidation Trustees, subject to Section 12.8 hereof, shall not destroy or otherwise abandon any such documents and records (in electronic or paper format) absent further order of the Bankruptcy Court after a hearing upon notice to parties-in-interest; provided, however, that the Liquidation Trustees may destroy or abandon such books and records upon entry of a Final Order closing the last Chapter 11 Case.  Subject to further order of the Court, the Examiner and his Professionals shall retain all documents, files and

records pertaining to the Debtors in their possession, custody or control and may not share, produce or transmit such documents, files and records to any other Entity.

## 12.7 Corporate Existence and Dissolution of Debtors

Immediately after the Effective Date, the Liquidation Trustees shall be authorized to take, in their sole and absolute discretion, all actions reasonably necessary to dissolve one or more of the Debtors under applicable laws, including under the laws of the jurisdictions in which they may be organized or registered, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation. Upon the final Distributions, any Debtors that have not been previously dissolved shall be deemed dissolved for all purposes without the necessity for other or further actions to be taken by or on behalf of the Debtors, and the Liquidation Trustees shall be authorized to file any certificate of cancellation or other documents as may be necessary or desirable to terminate the legal existence of the Debtors.

## 12.8 Closing the Chapter 11 Cases

Upon the Effective Date, the Chapter 11 Cases for the Debtors, except for Cred, shall be deemed closed, and the Liquidation Trustees shall submit separate orders to the Bankruptcy Court under certification of counsel closing each such Chapter 11 Case. After all Causes of Action and Disputed Claims have been resolved, the U.S. Trustee Fees have been paid, all of the Estates' Assets have been distributed in accordance herewith, or at such earlier time as the Liquidation Trustees deem appropriate, the Liquidation Trustees shall seek authority from the Bankruptcy Court to close the Chapter 11 Case for Cred, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

## ARTICLE XIII.
## DISTRIBUTIONS UNDER THE COMBINED PLAN AND DISCLOSURE STATEMENT

## 13.1 Distributions on Allowed General Unsecured Claims

All Allowed General Unsecured Claims held by a single creditor against one or more Debtors shall be aggregated and treated as a single Claim. At the written request of the Liquidation Trustees, any Creditor holding multiple Allowed General Unsecured Claims shall provide to the Liquidation Trustees a single address to which any Distributions shall be sent.

## 13.2 Timing of Distributions

(a)     Distributions on Account of Allowed A/P/S Claims. The Liquidation Trustees shall pay any Allowed A/P/S Claim against the Debtors, as soon as practicable after the later of (a) the Effective Date and (b) the date upon which any such Claim becomes an Allowed Claim.

(b)     Interim Distributions on Account of Allowed General Unsecured Claims. Subject to approval of the Trust Advisory Board as set forth in the Liquidation Trust Agreement, (a) the Liquidation Trustees may make an interim Distribution to Holders of Allowed General Unsecured Claims at least semi-annually provided that any such Distribution is not unduly burdensome to the Liquidation Trust, and (b) may make more frequent interim Distributions if

the Liquidation Trustees determine that such interim Distributions are warranted and economical; provided, however, that any such Distribution shall only be made if the Liquidation Trustees retain amounts reasonably necessary to meet Contingent Liabilities, to maintain the value of the Liquidation Trust Assets during liquidation, and to satisfy other Liabilities or expenses incurred by the Liquidation Trust in accordance herewith or with the Liquidation Trust Agreement.

(c)     Final Distributions on Allowed General Unsecured Claims. Notwithstanding anything else herein, upon the settlement and satisfaction of all A/P/S Claims, the completion of the prosecution and/or settlement of all Claims Objections and Causes of Action, and the completion of the sale and/or liquidation of all Assets, the Liquidation Trustees shall distribute, as soon as practicable, all remaining Liquidation Trust Assets to Holders of Allowed General Unsecured Claims.

## 13.3    Delivery of Distributions

Except as set forth herein, all Distributions to any Holder of an Allowed Claim shall be made: (i) by wire transfer; (ii) at the address of such Holder as set forth on the Schedules Filed with the Bankruptcy Court or on the books and records of the Debtors or its agents, as applicable, unless the Debtors or the Liquidation Trustees have been notified in writing of a change of address, including by the filing of a Proof of Claim by such Holder that contains an address for such Holder different than the address of such Holder as set forth on the Schedules, if being paid in Cash; or, if applicable (iii) with respect to any Holder of a Customer Claim entitled to an Equivalent Cryptocurrency Distribution at the Cryptocurrency Election E-Wallet Address; provided, however, that to receive an Equivalent Cryptocurrency Distribution, Holders of Customer Claims that made a Cryptocurrency Election shall provide their Cryptocurrency Election E-Wallet Address to the Liquidation Trustees.  Nothing herein shall require the Debtors or the Liquidation Trustees to attempt to locate any Holder of an Allowed Claim.

The Liquidation Trustees shall require any Holders of Allowed Claims or other distributee to furnish to the Liquidation Trustees in writing: (i) an Employer Identification Number or Taxpayer Identification Number as assigned by the IRS; (ii) if applicable, bank account and routing numbers; and (iii) if applicable, a Cryptocurrency Election E-Wallet Address, and the Liquidation Trustees may condition any Distribution to any Holders of Allowed Claims or other distributee upon receipt of such identification number and, if applicable, the Cryptocurrency Election E-Wallet Address.  If the Employer Identification Number, Taxpayer Identification Number, if necessary, bank account or routing number, or, if applicable, Cryptocurrency Election E-Wallet Address are not provided by the required deadline established by the Liquidation Trustees, the Claim of any Holders of Allowed Claims or other distributee may be expunged and no Distribution will be made by the Liquidation Trustees to such Holders of Allowed Claims or other distributee.  The Liquidation Trustees may withhold from distributions any withholding tax it determines in its reasonable discretion must be so withheld, including, without limitation, to foreign creditors who have not provided instruments supporting exemption from withholding tax reasonably satisfactory to the Liquidation Trustees.

**13.4    Undeliverable and Unclaimed Distributions**

    (a)    <u>Holding Undeliverable and Unclaimed Distributions</u>

        If the Distribution to any Holder of an Allowed Claim is returned as undeliverable or is otherwise unclaimed, no additional Distributions shall be made to such Holder unless and until the Liquidation Trustees are notified in writing of such Holder's then-current address.  Nothing contained herein shall require the Liquidation Trustees to attempt to locate any Holder of an Allowed Claim.

        The Liquidation Trustees shall make all Distributions that have become deliverable as soon as reasonably practicable after such Distribution has become deliverable or has been claimed.

    (b)    <u>Failure to Claim Unclaimed/Undeliverable Distributions</u>

        Subject to Section 13.7 hereof, any Holder of an Allowed Claim that does not assert a Claim pursuant hereto for an undeliverable or unclaimed Distribution within six (6) months after the Distribution is made shall be deemed to have its Claim expunged and shall have forfeited its right to such undeliverable or unclaimed Distribution and any subsequent Distribution on account of its Allowed Claim and shall be forever barred and enjoined from asserting any such Claim for an undeliverable or unclaimed Distribution or any subsequent Distribution on account of its Allowed Claims against the Debtors, their Estates, their property or the Assets.  In such cases, such unclaimed/undeliverable Distributions shall be redistributed and paid to Holders of Allowed Claims in accordance herewith, free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.

    (c)    <u>Charitable Donations</u>

        On or about the time that a final Distribution is made and upon the Liquidation Trustees determining that there are insufficient funds remaining to warrant a further Distribution to Holders of Claims hereunder, the Liquidation Trustees, with the approval of the Trust Advisory Board, may donate any undistributed funds to one or more charities selected by the Liquidation Trustees, provided that any charity selected shall not be affiliated with or connected to the Debtors or the Liquidation Trustees.

**13.5    Transfer of Claims**

        The Claims Register shall remain open after the Effective Date, and the Liquidation Trustees shall recognize any transfer of Claims in accordance with Bankruptcy Rule 3001(e) at any time thereafter, provided that for purposes of each Distribution, the Liquidation Trustees will not recognize any transfer during the period commencing thirty (30) calendar days prior to making any Distribution.  Except as otherwise provided herein, any transfer of a Claim, whether occurring prior to or after the Confirmation Date, shall not affect or alter the classification and treatment of such Claim hereunder, and any such transferred Claim shall be subject to classification and treatment hereunder as if such Claim was held by the transferor who held such Claim on the Petition Date.

### 13.6    Manner of Payment

At the option of the Liquidation Trustees, any Cash payment to be made hereunder may be made by a check, wire transfer, E-Wallet to E-Wallet transfer of Cryptocurrencies, if applicable, or as otherwise required or provided in applicable agreements.

### 13.7    Distributions to Cryptocurrency Election E-Wallet Addresses

The Liquidation Trustees shall maintain records of all distributions made to Cryptocurrency Election E-Wallet Addresses, including confirmations of E-Wallet to E-Wallet transfers.  The Liquidation Trustees are only required to initiate such E-Wallet to E-Wallet transactions.  The Liquidation Trustees are not responsible, and shall not be held liable, for any actions involving transferred Cryptocurrency after the initiation of such E-Wallet to E-Wallet transfers.

### 13.8    Time Bar to Cash Payments by Check

Checks issued by, or on behalf of, the Debtors or the Liquidation Trust on account of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof.  Requests for reissuance of any check shall be made in writing directly to the Liquidation Trustees by the Holder of the Allowed Claim with respect to which such check originally was issued on or before the later of (a) the first anniversary of the Effective Date, (b) the first anniversary of the date on which the Claim at issue became an Allowed Claim, and (c) nine (9) months after the date the check was issued.  After such dates, all Claims in respect of void checks shall be expunged, extinguished, discharged, and forever barred, and the proceeds of such checks shall revest in the Liquidation Trust.

### 13.9    No Fractional Cents

Notwithstanding any other provision hereof to the contrary, no payment of fractional cents shall be made pursuant hereto. Whenever any payment of a fraction of a cent hereunder would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down) with half cents or more being rounded up and fractions less than half of a cent being rounded down.

### 13.10    Setoffs and Recoupment

The Liquidation Trustees may, but shall not be required to, set off against or recoup from any Claim and the payments to be made pursuant hereto in respect of such Claim any Claims of any nature whatsoever that the Debtors may have against the claimant; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Liquidation Trust of any such claim they may have against such claimant.

### 13.11    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution hereunder consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution

shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## 13.12   Distributions After Effective Date

Distributions made after the Effective Date shall be deemed to have been made on the Effective Date.

## 13.13   Interest on Claims

Except as specifically provided for herein or in the Confirmation Order, interest shall not accrue on Claims, and no Holders of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date through the date such Claim becomes an Allowed Claim.  Except as expressly provided herein, no Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

## 13.14   No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution in excess of the Allowed amount of such Claim.

## 13.15   Payment of Taxes on Distributions Received Pursuant to the Combined Plan and Disclosure Statement

All Entities that receive Distributions hereunder shall be responsible for reporting and paying, as applicable, all appropriate federal, state and local taxes on account of such Distributions.  This includes, but is not limited, any amount of tax due to be withheld from Distributions which the Liquidation Trustees did not withhold.

## 13.16   Reserves

On the Effective Date, and after making all Distributions required to be made on the Effective Date hereunder, the Liquidation Trustees shall establish and maintain a separate reserve (each, a "Reserve") for the estimated amount of the Liquidation Trust Expenses, as well as each Class of Claims and Unclassified Claims, which Reserve shall be administered by the Liquidation Trustees.  To the extent that Reserves are established and maintained for the benefit of any Holder of a Disputed Claim, such Reserves shall include a combination of Cryptocurrency and Cash equal to the Distributions that would have been made to the Holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (a) the amount of the Disputed Claim, (b) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim ultimately may become an Allowed Claim, or (c) such other amount as may be agreed upon by the Holder of such Disputed Claim and the Liquidation Trustees.

**13.17** *De Minimis* **Distributions**

All De Minimis Distributions will be held by the Liquidation Trustees for the benefit of the Holders of Allowed Claims entitled to such De Minimis Distributions. When the aggregate amount of De Minimis Distributions held by the Liquidation Trustees for the benefit of a Holder of a Claim exceeds $25.00, the Liquidation Trustees will distribute such De Minimis Distributions to such Holder. If, at the time that the final Distribution hereunder is to be made, the De Minimis Distributions held by the Liquidation Trustees for the benefit of a Holder of a Claim total less than $25.00, such funds shall not be distributed to such Holder, but rather, such Claims shall be deemed expunged and such Distribution shall vest in the Liquidation Trust and be distributed to other Holders of Allowed Claims in accordance with the terms hereof.

**ARTICLE XIV.**
**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED,**
**AND DISPUTED CLAIMS**

**14.1** **Claims Administration Responsibilities**

Except as otherwise specifically provided herein and in the Liquidation Trust Agreement, after the Effective Date, the Liquidation Trustees shall have the sole authority, including assumption of the authority of the Debtors with respect to any dispute in respect of a Claim or Equity Interest initiated prior to the Effective Date, (a) to File, withdraw, or litigate to judgment objections to Claims or Equity Interests, (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, (c) to amend the Schedules in accordance with the Bankruptcy Code, and (d) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

**14.2** **Claims Objections**

Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Combined Plan and Disclosure Statement, or otherwise becomes an Allowed Claim prior to the Effective Date, upon the Effective Date, the Liquidation Trustees shall be deemed to have a reservation of any and all objections of the Estates to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, priority, secured or unsecured, including any and all objections to the validity or amount of any and all alleged Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, Secured Claims, Convenience Claims, General Unsecured Claims, Subordinated Securities Claims, Equity Interests, Liens and security interests, whether under the Bankruptcy Code or other applicable law or contract. The Debtors' or the Liquidation Trustees' failure to object to any Claim in the Chapter 11 Cases shall be without prejudice to the Liquidation Trustees' rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the Holder of such Claim.

Unless otherwise provided herein or by order of the Bankruptcy Court, any objections to Claims (including Administrative Expense Claims but excluding Professional Fee Claims) by the Liquidation Trustees shall be filed and served not later than 180 days after the later of (i) the

Effective Date or (ii) the date such Claim is filed (the "Claims Objection Deadline"); provided that the Liquidation Trustees may request (and the Bankruptcy Court may grant) an extension of such deadline by filing a motion with the Bankruptcy Court, based upon a reasonable exercise of the Liquidation Trustees' business judgment; provided further that with respect to Claims that, as of the Claims Objection Deadline, are subject to a pending objection (an "Initial Objection") wherein the objection to such Claim is ultimately denied, the Claims Objection Deadline shall be extended to the later of sixty (60) calendar days from the date on which (a) the Bankruptcy Court enters an order denying such Initial Objection or (b) any appellate court enters a Final Order reversing or vacating an order of the Bankruptcy Court granting such Initial Objection. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment hereto.

## 14.3 Estimation of Claims

The Liquidation Trustees may (but are not required to) at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidation Trustees, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidation Trustees may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## 14.4 Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Claims Agent at the direction of the Liquidation Trustees without the Liquidation Trustees having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 14.5 No Distributions Pending Allowance

Notwithstanding any other provision hereof, if any portion of a Claim is Disputed, no payment or Distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes Allowed.

### 14.6 Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions hereof.

### 14.7 Disallowance of Certain Claims

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or by an Entity that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and such Entities may not receive any Distributions on account of their Claims until such time as such Causes of Action against such Entities have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by such Entity have been turned over or paid to the Liquidation Trust; provided, however that no claim of UpgradeYa shall be deemed Disallowed pursuant to Bankruptcy Code section 502(d) unless and until the Liquidating Trust obtains a judgment and Final Order from the Bankruptcy Court determining that estate property is recoverable from UpgradeYa pursuant to Bankruptcy Code sections 542, 543, 550, or 553 or that a transfer made to UpgradeYa is avoidable under Bankruptcy Code sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a).

The Liquidation Trustees may, in their sole discretion, deem that any Claim is a Disputed Claim unless otherwise provided in a Final Order of the Bankruptcy Court, agreed to by the Liquidation Trustees or until expiration of the Claims Objection Deadline as set forth in section 14.2.  To the extent that there is no claim objection pending on the Claims Objection Deadline and a Claim has not otherwise been Disallowed pursuant to the terms of the Combined Plan and Disclosure Statement, such claim shall then be deemed an Allowed Claim.

### 14.8 Amendments to Claims

On or after the Effective Date, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Liquidation Trustees, and any such new or amended Claim filed without prior authorization shall be deemed Disallowed in full and expunged without any further action.

### 14.9 Claims Paid and Payable by Third Parties

A Claim shall be Disallowed without an Objection thereto having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors, the Liquidation Trust, or the Liquidation Trustees.  Distributions under the

Combined Plan and Disclosure Statement shall be made on account of any Allowed Claim that is payable pursuant to one of the Debtors' insurance policies solely up to the amount of, and in full and complete satisfaction of, the portion of such Allowed Claim that is within the deductible or self-insured retention under such insurance policy. Except as provided in this Section 14.9, no Entity shall have any other recourse against the Debtors, the Estates, the Liquidation Trust, or any of their respective properties or assets on account of such deductible or self-insured retention under an insurance policy.

## ARTICLE XV.
## EXECUTORY CONTRACTS AND LEASES

### 15.1     Executory Contracts and Unexpired Leases Deemed Rejected

On the Effective Date, all of the Debtors' Executory Contracts and Unexpired Leases will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except to the extent (a) the Debtors previously have assumed, assumed and assigned, or rejected such Executory Contract or Unexpired Lease, (b) prior to the Effective Date, the Debtors have filed a motion to assume, assume and assign, or reject an Executory Contract or Unexpired Lease on which the Bankruptcy Court has not ruled, (c) an Executory Contract and Unexpired Lease is identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant hereto, or (d) Executory Contracts and Unexpired Leases under which the counterparty has consented to the extension of the time by which the Debtors must assume or reject to a date beyond the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all assumptions, assignments, and rejections of Executory Contracts and Unexpired Leases pursuant to this Section 15.1, the Plan Supplement, and sections 365(a) and 1123 of the Bankruptcy Code. Assumptions, assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. If certain, but not all, of a contract counterparty's Executory Contracts and Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order will be a determination that such counterparty's Executory Contracts and Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and Unexpired Leases that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection by the Confirmation Objection Deadline on the grounds that their agreements are integrated and not severable.

### 15.2     Bar Date For Rejection Damages

If the rejection by the Debtors of an Executory Contract or an Unexpired Lease pursuant to Section 15.1 hereof results in damages to the other party or parties to such Executory Contract or Unexpired Lease, a Claim for such damages arising from such rejection shall not be enforceable against the Debtors or their Estates or agents, successors, or assigns, unless a Proof of Claim is filed with the Claims Agent **so as to actually be received on or before** the Rejection Bar Date.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or Unexpired Lease hereunder and that fails to timely do so shall be forever barred, estopped, and enjoined from asserting such Claim, and such Claim shall not be enforceable against the Liquidation Trust, the Liquidation Trustees, the Debtors, the Estates, and their respective properties, and the Liquidation Trust, the Liquidation Trustees, Debtors, the Estates, and their respective properties shall be forever discharged from any and all Liabilities with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction pursuant to Section 18.4 hereof and the Confirmation Order.

**ARTICLE  XVI.**
**CONDITIONS PRECEDENT TO THE CONFIRMATION AND THE EFFECTIVE DATE**

**16.1    Conditions Precedent to Confirmation of the Combined Plan and Disclosure Statement**

The following are conditions precedent to confirmation of the Combined Plan and Disclosure Statement:

(a)    The Plan Support Agreement shall not have been terminated;

(b)    The Bankruptcy Court shall have entered the Confirmation Order, in a form and substance reasonably acceptable to the Committee, and the Confirmation Order shall have become a Final Order;

(c)    The final version of all of the schedules, documents, and exhibits, including the Plan Supplement, shall have been filed in form and substance acceptable to the Committee in its reasonable discretion; and

(d)    No breach or failure to comply with the terms of the Definitive Documents, the Confirmation Order or any other material Final Order of the Bankruptcy Court shall have occurred and be continuing.

**16.2    Conditions Precedent to the Effective Date**

The Effective Date shall not occur, and the Combined Plan and Disclosure Statement shall not become effective with respect to the Debtors, unless and until the following conditions are satisfied in full or waived in accordance with Section 16.3 hereof:

(a)    The Plan Support Agreement shall not have been terminated;

(b)    No breach or failure to comply with the terms of the Definitive Documents, the Confirmation Order, or any other material Final Order of the Bankruptcy Court shall have occurred and be continuing;

(c)    The conditions to confirmation delineated in Section 11.1 hereof shall have either been satisfied or waived in accordance herewith;

(d)     All documents required hereunder shall have been delivered'

(e)     The Confirmation Order in form and substance reasonably satisfactory to the Committee shall have been entered by the Bankruptcy Court, and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto;

(f)     The Debtors and the Liquidation Trustees shall have executed the Liquidation Trust Agreement;

(g)     All actions and all agreements, instruments, or other documents necessary to implement the terms and provisions hereof are effected or executed and delivered, as applicable;

(h)     The Professional Fee Escrow shall have been established and fully funded in the amount of the Professional Fee Reserve Amount; and

(i)     All authorizations, consents, and regulatory approvals, rulings, letters, no-action letters, opinions, or documents, if any, that are necessary to implement the Combined Plan and Disclosure Statement or that are required by the applicable Debtor entity or applicable law, regulation, or order, in connection with the Consummation of the Combined Plan and Disclosure Statement shall have been obtained and not revoked.

## 16.3    Waiver of Conditions Precedent to the Effective Date

Each of the conditions precedent in Section 16.2 hereof may be waived, in whole or in part, by the Debtors, with the consent of the Committee, without leave or order of the Bankruptcy Court and without any formal action on the part of the Bankruptcy Court. The Debtors and the Liquidation Trustees reserve the right to assert that any appeal from the Confirmation Order shall be moot after the Effective Date.

## 16.4    Satisfaction of Conditions

Except as expressly provided or permitted herein, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. In the event that one or more of the conditions specified in Section 16.2 hereof shall not have occurred or otherwise been waived pursuant to Section 16.3 hereof, (a) the Confirmation Order shall be vacated, (b) the Debtors and all Holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (c) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

# ARTICLE XVII.
## EFFECT OF CONFIRMATION

**17.1 Compromise and Settlement of Claims, Equity Interests, and Controversies**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant hereto, the provisions hereof shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Allowed Equity Interest or any Distribution to be made on account of such Allowed Claim or Allowed Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests, and is fair, equitable, and reasonable. In accordance with the provisions hereof, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Liquidation Trustees may compromise and settle Claims against the Liquidation Trust and Causes of Action against other Entities.

**17.2 Binding Effect**

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Combined Plan and Disclosure Statement, the Plan Supplement, and the Confirmation Order shall bind (a) any Holder of a Claim against, or Equity Interest in, the Debtors and such Holder's respective successors and assigns (whether or not the Claim or Equity Interests are Impaired hereunder, whether or not such Holder has voted to accept the Combined Plan and Disclosure Statement, and whether or not such Holder is entitled to a Distribution hereunder), (b) all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described herein, (c) each Entity acquiring property hereunder or under the Confirmation Order, and (d) any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant hereto regardless of whether any Holder of a Claim or debt has voted hereon.

**17.3 Reservation of Causes of Action/Reservation of Rights**

Except with respect to the exculpation in Section 18.1 hereof, nothing contained herein shall be deemed to be a waiver or the relinquishment of any Causes of Action that the Debtors or the Liquidation Trust, as applicable, may have or may choose to assert against any Entity, and such Causes of Action are hereby preserved pursuant to section 1123 of the Bankruptcy Code, including, without limitation, any and all avoidance or equitable subordination actions, recovery Causes of Action and Objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code, as well as all Causes of Action based upon fraud, theft, conversion, unfair competition, tortious interference, breach of fiduciary duty, common law tort, and similar and related legal theories and Causes of Action.

## ARTICLE XVIII.
## EXCULPATION, INJUNCTION, AND RELATED PROVISIONS

**18.1    Exculpation**

      **None of the Debtors-in-Possession and the current or former directors, officers, employees, Affiliates, agents, accountants, financial advisors, investment bankers, restructuring advisors, attorneys, representatives, and other Professionals of or to the Debtors and the Debtors-in-Possession who served or were employed in such capacities after the Petition Date, and each of their respective agents and representatives, the Released Parties, the Committee, the members of the Committee and the Professionals retained by the Committee shall have or incur any Liability for any Claim, Cause of Action, or other assertion of Liability for any act taken or omitted to be taken in connection with or arising out of the Chapter 11 Cases, the sale of the Debtors' Assets, the formulation, dissemination, implementation, approval, confirmation, consummation, or administration hereof, property to be distributed hereunder, or any other act or omission in connection with or arising out of the Chapter 11 Cases, the Combined Plan and Disclosure Statement, or any contract, instrument, document or other agreement related thereto; provided, however, that the foregoing shall not affect the Liability of any Entity resulting from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, actual fraud, or gross negligence. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, discharges, and any other applicable law or rules protecting such Entities from liability.**

**18.2    Releases by Debtors, the Estates, the Liquidation Trust, and the Liquidation Trustees; Third Party Releases**

      **Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services of the Released Parties, (a) the Debtors, (b) their respective Estates, (c) the Liquidation Trust, and (d) the Liquidation Trustees shall release, waive, and discharge unconditionally and forever each of the Released Parties from any and all Claims, Causes of Action, and Liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: (i) taking place before the Petition Date in connection with the Debtors; and (ii) in connection with or arising out of the Debtors' Chapter 11 Cases, the pursuit of confirmation of the Combined Plan and Disclosure Statement, the Consummation thereof, the administration thereof or the property to be distributed thereunder; provided, that the foregoing shall not operate as a waiver of or release from any Causes of Action resulting from the willful misconduct, actual fraud, or gross negligence of any Released Party arising under chapter 5 of the Bankruptcy Code.**

      **In addition, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services of the Released Parties, the settlements and compromises contained herein, and the Distributions to be made pursuant to the Combined Plan and Disclosure Statement, (a) each of the Debtors and (b) all Holders**

of Claims or Equity Interests, who (1) vote in favor of the Combined Plan and Disclosure Statement or (2) (A) abstain from voting, are not entitled to vote, or vote to reject the Combined Plan and Disclosure Statement and (B) do not opt out of the this release on a timely submitted Ballot or the Opt-Out Election Form shall be deemed to have released and discharged each Released Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' prepetition operations and activities, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence taking place before the Effective Date.

For the avoidance of doubt, no Insider that is not a Released Party, including, without limitation, James Alexander, Lu Hua, Dan Schatt, Joseph Podulka, and Daniyal Inamullah, will receive a release or exculpation of any kind hereunder, whether from the Debtors or otherwise.

## 18.3    Avoidance Actions/Objections

Except with respect to the exculpation in Section 18.1 hereof and the releases in Section 18.2 hereof, in the Confirmation Order, or by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the Liquidation Trustees shall have the right to prosecute any and all avoidance or equitable subordination actions, recovery Causes of Action, and Objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or a Debtor-in-Possession, as well as all Causes of Action, including, without limitation, all Causes of Action based upon fraud, theft, conversion, unfair competition, tortious interference, common law tort, breach of fiduciary duty and similar and related legal theories and Causes of Action.

## 18.4    Injunction

Except as otherwise provided herein, all Entities that have held, hold, or may hold Claims against or Equity Interests in the Debtors or their Estates that arose prior to the Effective Date are permanently enjoined, solely with respect to any such Claims or Equity Interests, from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustees; (b) enforcing, attaching, collecting, or recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustees; (c) creating, perfecting, or enforcing, in any manner, directly or indirectly, any Lien or encumbrance against the Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustees; (d) except to the extent permitted by sections 362(b), 553, 559, 560, or 561 of the Bankruptcy Code, asserting any right of setoff, subrogation, or recoupment against the Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustees; (e) pursuing any Claim or Cause of Action released pursuant to the Combined Plan and

67

Disclosure Statement; or (f) taking any actions which interfere with the implementation or Consummation hereof.

The rights afforded herein and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtors, any of their respective Assets, properties, or Estates, or the Liquidation Trust.

Notwithstanding any language to the contrary contained herein and/or the Plan Confirmation Order, no provision of this Plan or the Plan Confirmation Order shall (i) preclude the United States Securities and Exchange Commission ("SEC") from enforcing its police or regulatory powers or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any Entity other than the Debtors.

**18.5    Terms of Stays and Injunctions**

The stay arising under section 362(a) of the Bankruptcy Code and the injunctions set forth in Section 18.4 hereof or provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall permanently remain in full force and effect.

**ARTICLE  XIX.**
**RETENTION OF JURISDICTION**

The Bankruptcy Court shall have exclusive jurisdiction of all matters in connection with, arising out of or related to the Chapter 11 Cases and the Combined Plan and Disclosure Statement pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including to:

(a)    Hear and determine pending applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance of cure amounts and Claims resulting therefrom;

(b)    Determine any and all adversary proceedings, applications and contested matters;

(c)    Hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(d)    Hear and determine any Claim Objections (including requests for estimation) in respect of Disputed Claims, in whole or in part;

(e)    Enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f)    Issue such orders in aid of execution hereof, to the extent authorized by section 1142 of the Bankruptcy Code;

(g)     Consider any amendments to or modifications hereof or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including the Confirmation Order;

(h)     Hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Combined Plan and Disclosure Statement, the Confirmation Order, the Liquidation Trust Agreement, any transactions or payments contemplated hereby or thereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(i)     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any request by the Debtors), prior to the Effective Date or request by the Liquidation Trustees after the Effective Date for an expedited determination of tax issues under section 505(b) of the Bankruptcy Code;

(j)     Hear and determine all disputes involving the existence, scope, and nature of the discharges granted under the Combined Plan and Disclosure Statement, the Confirmation Order or the Bankruptcy Code;

(k)     Issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any Entity with the Consummation, implementation, or enforcement of the Combined Plan and Disclosure Statement, the Confirmation Order or any other order of the Bankruptcy Court;

(l)     Determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     Hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(n)     Recover all Assets of the Debtors and property of the Debtors' Estates, wherever located;

(o)     Enforce the terms of the Liquidation Trust Agreement and to decide any claims or disputes which may arise or result from, or be connected with, the Liquidation Trust Agreement, any breach or default under the Liquidation Trust Agreement, or the transactions contemplated by the Liquidation Trust Agreement;

(p)     Enforce the exculpation granted and injunctions issued pursuant to the Combined Plan and Disclosure Statement and the Confirmation Order;

(q)     Enter a final decree closing the Chapter 11 Cases; and

(r)     Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XX.
## MISCELLANEOUS PROVISIONS

**20.1   Effectuating Documents and Further Transactions**

On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Plan and Disclosure Statement.  The Liquidation Trustees are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of Combined Plan and Disclosure Statement and any securities issued pursuant to the Combined Plan and Disclosure Statement.

**20.2   Date of Distributions and Other Actions**

In the event that any payment or act hereunder is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**20.3   Withholding and Reporting Requirements**

In connection with the Combined Plan and Disclosure Statement and all Distributions hereunder, the Liquidation Trustees shall comply with all applicable withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding, payment, and reporting requirements.  Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution. The Liquidation Trustees have the right, but not the obligation, to refrain from making a Distribution until such Holder has made arrangements satisfactory to the Liquidation Trustees for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Liquidation Trust in connection with such Distribution.

**20.4   Corporate Action**

On the Effective Date, all matters provided for hereunder that would otherwise require approval of shareholders, directors or managers of one or more of the Debtors shall be in effect from and after the Effective Date pursuant to the applicable general business law of the states in which the Debtors are incorporated or organized, without any requirement of further action by the shareholders, directors or managers of the Debtors.

**20.5   Modification of the Combined Plan and Disclosure Statement**

Alterations, amendments, or modifications hereof or hereto may be proposed in writing by the Debtors, with the consent of the Committee, at any time prior to the Confirmation Date;

provided, that the Combined Plan and Disclosure Statement, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and the Debtors have complied with section 1125 of the Bankruptcy Code. The Combined Plan and Disclosure Statement may be altered, amended, or modified at any time after the Confirmation Date and before substantial consummation; provided, that the Combined Plan and Disclosure Statement, as altered, amended, or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Combined Plan and Disclosure Statement, as altered, amended, or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments, or modifications. A Holder of a Claim that has accepted the Combined Plan and Disclosure Statement prior to any alteration, amendment, or modification will be deemed to have accepted the Combined Plan and Disclosure Statement, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Holders of the Claims.

Prior to the Effective Date, the Debtors, with the consent of the Committee, may make appropriate technical adjustments and modifications hereto without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not materially change the treatment of Holders of Claims or Equity Interests.

**20.6    Revocation or Withdrawal of the Combined Plan and Disclosure Statement**

The Debtors-in-Possession reserve the right to revoke or withdraw the Combined Plan and Disclosure Statement, with the consent of the Committee, prior to the Confirmation Date. Subject to the foregoing sentence, if the Debtors revoke or withdraw the Combined Plan and Disclosure Statement prior to the Confirmation Date, then the Combined Plan and Disclosure Statement shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

**20.7    Plan Supplement**

The Plan Supplement and the documents contained therein shall be filed with the Bankruptcy Court no later than ten (10) calendar days before the deadline for voting to accept or reject the Combined Plan and Disclosure Statement; provided, that the documents included therein may thereafter be amended and supplemented, prior to execution, so long as such amendment or supplement does not materially and adversely change the treatment of Holders of Claims. The Plan Supplement and the documents contained therein are incorporated into and made a part hereof as if set forth in full herein.

**20.8    Payment of Statutory Fees**

On or before the Effective Date, all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Combined Hearing, shall be paid in Cash. Following the Effective Date, all such fees shall be paid by the Liquidation Trustees from the Liquidation Trust Assets until the earlier of the conversion or dismissal of the

applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code. For the avoidance of doubt, the U.S. Trustee Fees shall be deemed part of the Liquidation Trust Expenses.

**20.9    Dissolution of the Committee**

On the Effective Date, except as provided in this Section 20.9, the Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to, arising from or in connection with the Chapter 11 Cases, and the retention or employment of the Debtors' and Committee's attorneys, accountants, and other agents, if any, shall terminate, except for purposes of Filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith, or any appeal of the Confirmation Order.

**20.10    Continued Confidentiality Obligations**

Pursuant to the terms thereof, members of and advisors to the Debtors and the Committee, any other holder of a Claim or Interest and their respective predecessors, successors and assigns shall continue to be obligated and bound by the terms of any confidentiality agreement executed by them in connection with this Chapter 11 Case or the Debtor, to the extent that such agreement, by its terms, may continue in effect after the Confirmation Date.

**20.11    Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection herewith, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection herewith, including the issuance of any stock, any merger agreements, or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated hereunder shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

**20.12    Expedited Tax Determination**

The Debtors and the Liquidation Trustees are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Petition Date through and including the Effective Date.

**20.13    Exhibits/Schedules**

All exhibits and schedules hereto, including the Plan Supplement, are incorporated into and are a part of the Combined Plan and Disclosure Statement as if set forth in full herein.

**20.14    Substantial Consummation**

On the Effective Date, the Combined Plan and Disclosure Statement shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**20.15  Severability of Combined Plan and Disclosure Statement Provisions**

In the event that, prior to the Confirmation Date, any term or provision hereof is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall, at the request of the Debtors have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, Impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

**20.16  Governing Law**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or Plan Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without giving effect to its principles of conflict of law that would require application of the law of another jurisdiction.

**20.17  Reservation of Rights**

If the Combined Plan and Disclosure Statement is not confirmed by a Final Order, or is confirmed and does not become effective, the rights of all parties in interest in the Chapter 11 Cases are and will be reserved in full.  Any concessions or settlements reflected herein, if any, are made for purposes of the Combined Plan and Disclosure Statement only, and if the Combined Plan and Disclosure Statement does not become effective, no party in interest in the Chapter 11 Cases shall be bound or deemed prejudiced by any such concession or settlement.

**20.18  Computation of Time**

In computing any period of time prescribed or allowed by the Combined Plan and Disclosure Statement, the provisions of Rule 9006(a) of the Bankruptcy Rules shall apply.

**20.19  Post-Confirmation Reporting**

Following confirmation of the Combined Plan and Disclosure Statement, the Liquidation Trustees shall file reports of its activities and financial affairs with the Bankruptcy Court, on a quarterly basis, within thirty (30) calendar days after the conclusion of each such period; provided that the Liquidation Trustees' obligation to file such reports with the Bankruptcy Court shall terminate automatically upon the closing of the Chapter 11 Cases.  Any such reports shall

be prepared substantially consistent with (both in terms of content and format) the applicable Bankruptcy Court and U.S. Trustee guidelines on such matters.

**20.20  Notices**

All notices, requests and demands to or upon the Debtors or the Liquidation Trustees must be in writing (including by facsimile transmission) to be effective and, unless otherwise expressly provided hereunder, will be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received during the normal business hours of the Liquidation Trustees (otherwise any such notice shall be deemed to have been received on the next Business Day) and telephonically confirmed, addressed as follows:

If to the Debtors:

> Cred Inc.
> Attn:   Matthew K. Foster, Chief Restructuring Officer
> Sonoran Capital Advisors, LLC
> 1733 N Greenfield Road, Suite 10
> Mesa, Arizona 85205
>
> *with a copy to:*
>
> PAUL HASTINGS LLP
> 200 Park Avenue
> New York, New York 10136
> Attn:   G. Alexander Bongartz, Esq.
>
> *and*
>
> PAUL HASTINGS LLP
> 600 Travis Street, 58th Floor
> Houston, Texas 77002
> Attn:   James T. Grogan, Esq.
>
> *and*
>
> COUSINS LAW LLC
> Brandywine Plaza West
> 1521 Concord Pike, Suite 301
> Wilmington, Delaware 19803
> Attn:   Scott D. Cousins, Esq.

If to the Liquidation Trustees:

> Cedric de Lisser
> Michael Michelin
> Christopher Moser

74

c/o MCDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, New York 10173
Attn:   Tim Walsh, Esq.
        Darren Azman, Esq.

After the Effective Date, the Liquidation Trustees may, in their sole discretion, notify Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Liquidation Trustees are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

*[Remainder of page intentionally left blank.]*

Dated: March 10, 2021
       Wilmington, Delaware


                                  Respectfully submitted,

                                  **CRED INC.**

                                  (on behalf of itself and the other Debtors and
                                  Debtors-in-Possession)


                                  By:     */s/ Matthew K. Foster*
                                  Name:  Matthew K. Foster
                                  Title:   Chief Restructuring Officer

**Exhibit A**

**Causes of Action List**

# Causes of Action List

- All actual or potential Avoidance Actions pursuant to any applicable section of the Bankruptcy Code including, without limitation, sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code, arising from any transaction involving or concerning the Debtors;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against Customers, vendors, suppliers or contract counterparties, including without limitation, any and all claims relating to breach of contract, deposits, overpayments, accounts receivable, improper setoff, warranty, indemnity, retention of double payments, retention of misdirected wires, deductions owing or improper deductions taken, or any other claim concerning or arising out of the Customer, vendor, supplier or contractual relationship;

- All actual or potential actions, whether legal, equitable or statutory in nature, against landlords, lessees, sublessees, or assignees arising from various leases, subleases and assignment agreements relating thereto, including, without limitation, any and all claims for unpaid rent, overcharges relating to taxes, common area maintenance and other similar charges;

- All actual or potential actions, whether legal, equitable or statutory in nature, against the Debtors' current or former insurance carriers including, without limitation, any and all claims relating to unpaid reimbursements and claims, overpayment of premiums and fees, breach of contract, indemnity obligations or coverage;

- Any and all rights to payment against any taxing authority or other Governmental Unit including, without limitation, any and all claims for any tax refunds, credits, overpayments, recoupments or offsets that may be due and owing to the Debtors for taxes that the Debtors paid or may have paid to any such taxing authority or other Governmental Unit;

- All actions or potential actions, whether legal, equitable or statutory in nature, relating to deposits or other amounts owed by any Creditor, lessor utility, supplier, vendor, landlord, sub-lessee, assignee or other Person or Entity;

- All actions or potential actions, whether legal, equitable or statutory in nature, arising out of, or relating to, the Debtors' intellectual property rights;

- All actual or potential actions against any of the prepetition directors, officers, employees, attorneys, financial advisors, accountants, investment bankers, agents and representatives of the Debtors, except actions expressly released under the Combined Plan and Disclosure Statement, including, without limitation, any and all claims for breaches of fiduciary duty, breaches of loyalty, breaches of the duty of good faith, negligent mismanagement, wasting of corporate assets, and diversion of corporate opportunity, including, without limitation any and all claims against the Debtors current or former management, directors, and officers.

- All actual or potential actions, whether legal, equitable or statutory in nature, against all Entities, except actions expressly released under the Combined Plan and Disclosure Statement, arising out of, or in connection with, without limitation, any of the Debtors' prepetition management, conduct, marketing, businesses, operations and/or reporting of financial or other information;

- All actions or potential actions, whether legal, equitable or statutory in nature, against any of the Debtors' current or former Professionals, except actions expressly released or exculpated under the Combined Plan and Disclosure Statement, including without limitation any and all claims for breach of fiduciary duty, breach of contract, negligence or professional misconduct malpractice, or other tortious conduct;

- All rights against any Entity, including any shareholder or prepetition member of the Debtors' board of directors, members, and/or officers, for subordination of their Claims pursuant to section 510 of the Bankruptcy Code or against any Entity that has agreed to subordination of their claim pursuant to section 510 of the Bankruptcy Code;

- All actions or potential actions against the prepetition members of the Debtors' board of directors and/or officers, except actions expressly released or exculpated under the Combined Plan and Disclosure Statement;

- All actual or potential actions, whether legal, equitable or statutory in nature, to recover amounts awarded to employees (except for amounts authorized by order of the Bankruptcy Court or required by applicable non-bankruptcy law, or related to an action expressly released under the Combined Plan and Disclosure Statement) under the terms of any prepetition employment, severance agreement, change-in-control agreement, bonus arrangement or other agreement governing, arising out of or related to the employment relationship;

- All actual or potential contract and tort actions that may exist or may subsequently arise, except actions expressly released under the Combined Plan and Disclosure Statement;

- All actual or potential actions whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses or operations, except actions expressly released under the Combined Plan and Disclosure Statement;

- All actual or potential actions, whether legal, equitable or statutory in nature, against any of the (i) Debtors' Insiders, including without limitation Mr. Dan Schatt, Mr. Joseph Podulka, Mr. James Alexander, Mr. Daniyal Inamullah, Mr. Dan Wheeler, Mr. Adnan Khakoo, Ms. Bethany De Lude, Ms. Sally Zhang, Mr. Ryan Ortega, Mr. Lu Hua moKredit, and Income Opportunities and (ii) affiliates (as such term is defined in section 101(2) of the Bankruptcy Code) of the Debtors' Insiders, including without limitation any and all claims for breach of fiduciary duty, breach of contract, negligence, unjust enrichment, fraudulent transfers, malpractice, common law fraud or any other tortious conduct. The foregoing claims include, without limitation, claims involving: (i) the Debtors' investments in MoKredit; (ii) hedging, borrowing, and trading strategies; (iii) the failure to obtain money transmitter licenses; (iv) violations of the Investment

Advisers Act of 1940; (v) the sale of unregistered securities; (vi) the Debtors' CredEarn and CredBorrow solicitations, disclosures, and programs; (vii) the formation of Cred Capital; (viii) the Quantcoin transaction; (ix) gross mismanagement (x) improper accounting; (xi) violating security protocols; and (xii) the Luxembourg Note;

- All actual or potential actions, whether legal, equitable or statutory in nature against Mr. Daniel Wheeler and Bryan Cave, including, without limitation, malpractice claims;

- All actual or potential actions, whether legal, equitable or statutory in nature against Mr. Christopher Spadafora, Mr. Silvia Giovanni, Mr. James Alexander, and Mr. Daniyal Inamullah, including, without limitation, the misappropriation of Debtor Assets;

- All actual or potential actions, whether legal, equitable or statutory in nature against Quantcoin, Quanta Capital Feeder Fund, L.P., Scott Foster, and Richard Chapman regarding the transfer of 800 Bitcoin from the Debtors to Quantcoin;

- All actual or potential actions, whether legal, equitable or statutory in nature against the following entities, including, without limitation, (i) JST Capital; (ii) Uphold; (iii) Sarson Funds; (iv) AX Momentum LP; (v) Reliz Ltd. (Blockfill); (vi) Fifth Khagan LP; (vii) Future Set LLC; (viii) 100 Acre Cred Opportunities Fund Limited; (ix) 1AV; (x) Galois Capital; (xi) CryptoLab Capital LLC; (xii) Cyber Quantum PTD Ltd.; (xiii) Fireblocks; (xiv) Kingdom Trust; (xv) Bitgo; (xvi) Bittrex; (xvii) Lockton Brokers; (xviii) InnReg LLC; (xix) Elevar LLC; (xx) Cambrian Systematic Strategies, LP; and (xxi) Drawbridge Lending; including, without limitation, any and all claims for breach of fiduciary duty, negligence, breach of contract, unjust enrichment, fraudulent transfers, common law fraud, professional malpractice, or any tortious conduct; and

- All actual or potential actions, whether legal, equitable or statutory in nature, against UpgradeYa, and any related Entity, including, without limitation, Avoidance Actions and related causes of action under chapter 5 of the Bankruptcy Code, any and all claims relating to breach of contract, deposits, overpayments, accounts receivable, improper setoff, warranty, indemnity, retention of double payments, retention of misdirected wires, deductions owing or improper deductions taken, any and all claims of or relating to tort, any and all claims related to subordination of UpgradeYa's Claim, including under section 510 of the Bankruptcy Code, any and all causes of action for violation of any state or federal statutes that give rise to a private cause of action, and conspiracy to violate any and all of the foregoing.

**Exhibit B**

**Liquidation Analysis**

Cred Inc. & Subsidiaries
Chapter 7 Liquidation Analysis

| Assets | Notes | Proposed Plan of Liquidation | | | Chapter 7 Liquidation | | |
|---|---|---|---|---|---|---|---|
| **Unrestricted Cash as of Effective Date** | A | | | $2,444,168 | | | $2,444,168 |
| Liquidation of Cryptocurrency Holdings | B | | | 20,248,214 | | | 20,248,214 |
| MoKredit Note | C | | | 32,192,681 | | | 32,192,681 |
| Additional Liquid Assets | C | | | 664,165 | | | 664,165 |
| **Total estimated proceeds available** | | | | 55,549,227 | | | 55,549,227 |
| **Reserves Budgeted for Administration expenses** | | | | | | | |
| Estimated Operating Liabilities | D | | | (50,000) | | | (50,000) |
| Estimated UST fees | E | | | (125,000) | | | (125,000) |
| **Total estimated for distribution** | | | | 55,374,227 | | | 55,374,227 |
| **Administrative Fees** | | | | | | | |
| Chapter 7 Professionals | F | 100% | - | | 100% | 2,000,000 | (2,000,000) |
| Chapter 7 Trustee Commissions | G | 100% | - | | 100% | 1,661,227 | (1,661,227) |
| Chapter 11 Professionals | H | 100% | 2,319,420 | (2,319,420) | 100% | 2,319,420 | (2,319,420) |
| Liquidating Trust Budget | I | 100% | 1,500,000 | (1,500,000) | 100% | - | - |
| Estimated UST fees | J | 100% | 553,742 | (553,742) | 100% | 553,742 | (553,742) |
| **Net estimated proceeds available after distribution** | | | | 51,001,065 | | | 48,839,838 |
| **Administrative Claims** | | | | | | | |
| Administrative Claims | | 100% | - | | 100% | - | - |
| **Net estimated proceeds available after distribution** | | | | 51,001,065 | | | 48,839,838 |
| **Priority & Secured Claims** | | | | | | | |
| Other Priority Claims (Class 1) | | 100% | - | - | 100% | - | - |
| Secured Tax Claims (Class 2) | | 100% | - | - | 100% | - | - |
| Other Secured Claims (Class 3) | | 100% | - | - | 100% | - | - |
| **Net estimated proceeds available after distribution** | | | | 51,001,065 | | | 48,839,838 |
| **Unsecured Claims & Equity Interest** | | | | | | | |
| General Unsecured Claims (Class 4) | K | 30% | 170,138,236 | (50,851,065) | 29% | 170,138,236 | (48,696,729) |
| Convenience Claims (Class 5) | L | 30% | 500,000 | (150,000) | 29% | 500,000 | (143,109) |
| Subordinated Securities Claims (Class 6) | | 100% | - | | 0% | | - |
| Equity Interests in Debtors (Class 7) | | 100% | - | | 0% | | - |
| **Net estimated proceeds available after distribution** | | | | - | | | (0) |

Notes:
A) Based on updated budget as of 2/26/21 and assumes Effective Date of 4/2/21. Does not include funds held in professional fee escrow account.
B) Cryptocurrency value based on rollowing four week historical average as of 2/26/21: assumes illiquid cryptocurrency is liquidated at a discount to that value.
C) Assumes collection of accounts and notes receivable as well as liquidation of certain physical assets over time. Discounts are applied to these assets based on Debtors' estimate of collectibility.
D) The Debtors don't anticipate additional operating liabilities due to the cessation of operations but are keeping a $50k reserve.
E) Estimated UST fees through Effective Date.
G) 3% of distributions.
H) Estimated outstanding professional fees that would need to be paid prior to plan going effective.
I) Estimated budget for Liquidating Trust to liquidate cryptocurrency and prosecute collections actions regarding Additional Liquid Assets.
J) Estimated UST fees for the remainder of the case.
K) A liquidating trust would make interim distributions to Class 4 claimants whereas a Chapter 7 trustee would make distributions at the end of the case; which is potentially several years.The Debtors did not complete an analysis to incorporate the time value of money but the present value of the Chapter 7 recovery would be negatively impacted by any discount rate that is applied.
L) Debtors' estimate of creditors that elect to participate as a Convenience Class Claim. This analysis does not assume any creditors with claims greater than $1k make the Convenience Class Election.

# EXHIBIT G

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |

## MODIFIED FIRST AMENDED COMBINED JOINT PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT OF CRED INC. AND ITS SUBSIDIARIES <u>UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>

**PAUL HASTINGS LLP**
James T. Grogan (admitted *pro hac vice*)
Mack Wilson (admitted *pro hac vice*)
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
Telephone: (713) 860-7300
Facsimile: (713) 353-3100
Email: jamesgrogan@paulhastings.com
mackwilson@paulhastings.com

- and -

**PAUL HASTINGS LLP**
G. Alexander Bongartz (admitted *pro hac vice*)
Derek Cash (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Email: alexbongartz@paulhastings.com
derekcash@paulhastings.com

**COUSINS LAW LLC**
Scott D. Cousins (No. 3079)
Brandywine Plaza West 1521 Concord
Pike, Suite 301 Wilmington, Delaware
19803 Telephone: (302) 824-7081
Facsimile: (302) 295-0331
Email: scott.cousins@cousins-law.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: March 10, 2021

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

## TABLE OF CONTENTS

**PAGE**

**Article I. DEFINED TERMS** ...................................................................1

**Article II. INTERPRETATION OF COMBINED PLAN AND DISCLOSURE STATEMENT** ......................................................................13

    **2.1**     Application of Definitions; Rules of Construction; Computation of Time...............................................................................13

    **2.2**     Relief Sought by Filing the Combined Plan and Disclosure Statement ..........13

**Article III. BACKGROUND – THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW** ...........................................14

    **3.1**     General Background – Overview of the Debtors ................................14
    **3.2**     The Debtors' Prepetition Capital Structure....................................15
    **3.3**     Events Leading to the Chapter 11 Cases ........................................15
    **3.4**     The Chapter 11 Cases ...............................................................19

**Article IV. TAX CONSEQUENCES** .........................................................25

    **4.1**     Tax Consequences.....................................................................25

**Article V. CERTAIN RISK FACTORS TO BE CONSIDERED** .............................26

    **5.1**     Risk Factors to Be Considered....................................................26
    **5.2**     Alternatives to this Combined Plan and Disclosure Statement ..................31

**Article VI. BEST INTERESTS AND FEASIBILITY** ....................................31

    **6.1**     Best Interests Test ...................................................................31
    **6.2**     Feasibility..............................................................................31

**Article VII. SUMMARY OF ASSETS AND TREATMENT OF CLAIMS AND INTERESTS**.............................................................................32

    **7.1**     Summary of Assets...................................................................32
    **7.2**     Summary of Treatment of Claims and Equity Interests .........................33

**Article VIII. CONFIRMATION AND VOTING PROCEDURES** .........................35

    **8.1**     Combined Hearing....................................................................35
    **8.2**     Procedure for Objections ...........................................................35
    **8.3**     Voting Procedures....................................................................35

**Article IX. PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS, AND OTHER UNCLASSIFIED CLAIMS .......................38**

9.1    Administrative Expense Claims .................................................................38
9.2    Professional Fee Claims............................................................................40
9.3    Priority Tax Claims ..................................................................................41

**Article X. TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS.........41**

10.1    Class 1: Other Priority Claims ................................................................41
10.2    Class 2: Secured Tax Claims ...................................................................41
10.3    Class 3: Other Secured Claims ................................................................42
10.4    Class 4: General Unsecured Claims. ........................................................42
10.5    Class 5: Convenience Claims. ..................................................................43
10.6    Class 6: Subordinated Securities Claims ..................................................43
10.7    Class 7: Equity Interests in Debtors ........................................................43
10.8    Reservation of Rights Regarding Claims and Equity Interests.......................44

**Article XI. ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT .............................................................44**

11.1    Voting of Claims.....................................................................................44
11.2    Elimination of Vacant Classes .................................................................44
11.3    Nonconsensual Confirmation ...................................................................45
11.4    Revocation of the Combined Plan and Disclosure Statement.........................45

**Article XII. MEANS OF IMPLEMENTATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT .............................................................45**

12.1    Limited Substantive Consolidation ..........................................................45
12.2    Global Settlement....................................................................................46
12.3    Liquidation of the Debtors ......................................................................46
12.4    Effectuating Documents; Further Transactions ..........................................53
12.5    Cancellation of Instruments and Stock .....................................................53
12.6    Disposition of Books and Records ...........................................................53
12.7    Corporate Existence and Dissolution of Debtors ........................................54
12.8    Closing the Chapter 11 Cases ..................................................................54

**Article XIII. DISTRIBUTIONS UNDER THE COMBINED PLAN AND DISCLOSURE STATEMENT .............................................................54**

13.1    Distributions on Allowed General Unsecured Claims ..................................54
13.2    Timing of Distributions ..........................................................................54
13.3    Delivery of Distributions ........................................................................55
13.4    Undeliverable and Unclaimed Distributions ..............................................56
13.5    Transfer of Claims ..................................................................................56
13.6    Manner of Payment .................................................................................57
13.7    Time Bar to Cash Payments by Check ......................................................57

13.8    No Fractional Cents ...........................................................................57
13.9    Setoffs and Recoupment ...................................................................57
13.10   Allocation of Plan Distributions Between Principal and Interest ..................57
13.11   Distributions After Effective Date ...................................................58
13.12   Interest on Claims ...........................................................................58
13.13   No Distribution in Excess of Allowed Amount of Claim ....................58
13.14   Payment of Taxes on Distributions Received Pursuant to the
        Combined Plan and Disclosure Statement ......................................58
13.15   Reserves ........................................................................................58
13.16   Withholdings ..........................................Error! Bookmark not defined.
13.17   De Minimis Distributions ...............................................................59

Article XIV. PROCEDURES FOR RESOLVING CONTINGENT,
              UNLIQUIDATED, AND DISPUTED CLAIMS...........................................59

14.1    Claims Administration Responsibilities.............................................59
14.2    Claims Objections ...........................................................................59
14.3    Estimation of Claims .......................................................................60
14.4    Adjustment to Claims Without Objection..........................................60
14.5    No Distributions Pending Allowance ................................................61
14.6    Distributions After Allowance .........................................................61
14.7    Disallowance of Certain Claims .......................................................61
14.8    Amendments to Claims....................................................................61
14.9    Claims Paid and Payable by Third Parties ........................................61

Article XV. EXECUTORY CONTRACTS AND LEASES ...............................62

15.1    Executory Contracts and Unexpired Leases Deemed Rejected.....................62
15.2    Bar Date For Rejection Damages .....................................................62

Article XVI. CONDITIONS PRECEDENT TO THE CONFIRMATION AND THE
              EFFECTIVE DATE ..................................................................63

16.1    Conditions Precedent to Confirmation of the Combined Plan and
        Disclosure Statement ......................................................................63
16.2    Conditions Precedent to the Effective Date.......................................63
16.3    Waiver of Conditions Precedent to the Effective Date .......................64
16.4    Satisfaction of Conditions................................................................64

Article XVII. EFFECT OF CONFIRMATION ............................................65

17.1    Compromise and Settlement of Claims, Equity Interests, and
        Controversies .................................................................................65
17.2    Binding Effect.................................................................................65
17.3    Reservation of Causes of Action/Reservation of Rights .....................65

**Article XVIII. EXCULPATION, INJUNCTION, AND RELATED PROVISIONS**............**66**

    **18.1**    **Exculpation**................................................................**66**
    **18.2**    **Releases by Debtors, the Estates, the Liquidation Trust, and the Liquidation Trustee; Third Party Releases**.......................**66**
    **18.3**    **Avoidance Actions/Objections**....................................**67**
    **18.4**    **Injunction**...................................................................**67**
    **18.5**    **Terms of Stays and Injunctions**..................................**68**

**Article XIX. RETENTION OF JURISDICTION**...................................**68**

**Article XX. MISCELLANEOUS PROVISIONS**......................................**70**

    **20.1**    **Effectuating Documents and Further Transactions**.........**70**
    **20.2**    **Date of Distributions and Other Actions**....................**70**
    **20.3**    **Withholding and Reporting Requirements**.................**70**
    **20.4**    **Corporate Action**........................................................**70**
    **20.5**    **Modification of the Combined Plan and Disclosure Statement**.......**70**
    **20.6**    **Revocation or Withdrawal of the Combined Plan and Disclosure Statement**...........**71**
    **20.7**    **Plan Supplement**.........................................................**71**
    **20.8**    **Payment of Statutory Fees**..........................................**71**
    **20.9**    **Dissolution of the Committee**......................................**72**
    **20.10**  **Continued Confidentiality Obligations**.......................**72**
    **20.11**  **Exemption from Transfer Taxes**..................................**72**
    **20.12**  **Expedited Tax Determination**.....................................**72**
    **20.13**  **Exhibits/Schedules**.....................................................**72**
    **20.14**  **Substantial Consummation**.........................................**72**
    **20.15**  **Severability of Combined Plan and Disclosure Statement Provisions**...........**73**
    **20.16**  **Governing Law**...........................................................**73**
    **20.17**  **Reservation of Rights**.................................................**73**
    **20.18**  **Computation of Time**..................................................**73**
    **20.19**  **Post-Confirmation Reporting**.....................................**73**
    **20.20**  **Notices**.......................................................................**74**

## <u>NOTICE</u>

THE INFORMATION CONTAINED HEREIN IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE COMBINED JOINT PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT OF CRED INC. AND ITS SUBSIDIARIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT, REGARDING THE COMBINED PLAN AND DISCLOSURE STATEMENT OR THE SOLICITATION OF ACCEPTANCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT.  THIS COMBINED PLAN AND DISCLOSURE STATEMENT WAS SUBSTANTIALLY COMPILED FROM THE DEBTORS' BOOKS AND RECORDS TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF.

UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF.  THE DELIVERY OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS COMBINED PLAN AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER RULES GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11 OF THE BANKRUPTCY CODE.  NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN.

**THIS COMBINED PLAN AND DISCLOSURE STATEMENT PROVIDES FOR THE SUBSTANTIVE CONSOLIDATION OF THE ASSETS AND LIABILITIES OF THE DEBTORS FOR CERTAIN PURPOSES AND CONTEMPLATES THE APPOINTMENT OF LIQUIDATION TRUSTEES TO WIND-DOWN THE DEBTORS' ESTATES.**

NO REPRESENTATION CONCERNING THE DEBTORS OR THE VALUE OF THE DEBTORS' ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS ARE NOT RESPONSIBLE FOR ANY INFORMATION,

REPRESENTATION OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN OR INCONSISTENT WITH INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

**FOR EASE OF REFERENCE ONLY, AND WITH CERTAIN EXCEPTIONS, ARTICLE I THROUGH ARTICLE VI HEREIN GENERALLY CONTAIN THE DISCLOSURE STATEMENT PROVISIONS AND ARTICLE VII THROUGH ARTICLE XX HEREIN GENERALLY CONTAIN THE PLAN PROVISIONS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

## <u>INTRODUCTION</u>

The Debtors in these Chapter 11 Cases hereby propose their Combined Plan and Disclosure Statement pursuant to sections 1125 and 1129 of the Bankruptcy Code. The Debtors are the proponents of the Combined Plan and Disclosure Statement within the meaning of section 1129 of the Bankruptcy Code. Capitalized terms used and not otherwise defined herein have the meanings ascribed to such terms in Article I hereof.

The Combined Plan and Disclosure Statement constitutes a liquidating Chapter 11 plan for the Debtors and provides for Distribution of the Debtors' Assets already liquidated or to be liquidated over time to Holders of Allowed Claims in accordance with the terms of the Combined Plan and Disclosure Statement and the priority provisions of the Bankruptcy Code. The Combined Plan and Disclosure Statement contemplates the appointment of Liquidation Trustees to implement the terms of the Combined Plan and Disclosure Statement and make Distributions in accordance with its terms. Except as otherwise provided by Order of the Bankruptcy Court, Distributions will occur at various intervals after the Effective Date as determined by the Liquidation Trustees.

Since the Petition Date, the Debtors and their professionals have worked tirelessly to develop a plan that would maximize the value of the Debtors' Estates for the benefit of creditors and minimize the amount of time spent in chapter 11. After a thorough analysis of potential restructuring alternatives and extensive negotiation with the Committee, the Debtors reached a global settlement with the Committee that is embodied in the Combined Plan and Disclosure Statement.

The Debtors believe that the Combined Plan and Disclosure Statement presents the best path forward and is in the best interests of the Debtors, their Creditors, and all parties in interest. The Combined Plan and Disclosure Statement is premised on the creation of the Liquidation Trust, which will succeed to all rights, interests and property of the Debtors, and to which the Debtors will transfer their Assets, including proceeds from any pre-Effective Date sales, the Debtors' Cryptocurrency, and Causes of Action of the Debtors' Estates (other than Causes of Action that are being released under the Combined Plan and Disclosure Statement). The Liquidation Trustees, who will be selected by members of the Committee, will be tasked with, among other things, monetizing the Debtors' remaining Assets and making Distributions to Holders of Allowed General Unsecured Claims in Class 4 and Holders of Convenience Claims in Class 5. **The Debtors believe that the Plan is in the best interest of the Debtors' Estates and all stakeholders, and recommend that all Holders of Claims entitled to vote, vote in favor of the Plan.**

**The Combined Plan and Disclosure Statement provides for limited substantive consolidation of the Assets and Liabilities of the Debtors. Accordingly, for purposes of the Combined Plan and Disclosure Statement only, the Assets and Liabilities of the Debtors are treated as the Assets and Liabilities of a single substantively consolidated entity. Claims filed against multiple Debtors seeking recovery of the same debt shall be treated as a single, non-aggregated Claim against the consolidated Estates to the extent that such Claim is an Allowed Claim.**

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors expressly reserve the right to alter, amend or modify the Combined Plan and Disclosure Statement one or more times before substantial consummation thereof.

# ARTICLE I.
## DEFINED TERMS

**1.1** **"A/P/S Claim"** means any Claim that is an Administrative Expense Claim, Other Priority Claim, Priority Tax Claim, or Secured Claim.

**1.2** **"Administrative Expense Claim"** means any claim (including, but not limited to, Professional Fee Claims) for costs and expenses of administration of the Chapter 11 Cases that is entitled to priority pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code; provided, however, that any fees or charges assessed against the Debtors' Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930 are excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section 20.8 hereof.

**1.3** **"Administrative Expense Claims Bar Date"** means the date as set forth in Section 9.1(b) hereof.

**1.4** **"Affiliate"** has the meaning set forth in section 101(2) of the Bankruptcy Code.

**1.5** **"Allowed"** means, with reference to any Claim against the Debtors (including any Administrative Expense Claim) or portion thereof, (a) any Claim that has been listed by the Debtors in the Schedules (as such Schedules may be amended by the Debtors or the Liquidation Trustee from time to time in accordance with Bankruptcy Rule 1009) as liquidated in amount other than zero or unknown and not Disputed or Contingent, and for which no Proof of Claim has been filed, (b) any timely filed Proof of Claim or request for payment of Administrative Expense Claim, as to which no objection to the allowance thereof, or action to subordinate, avoid, classify, reclassify, expunge, estimate, or otherwise limit recovery with respect thereto, has been filed within the applicable period of limitation fixed by the Combined Plan and Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, and which applicable period of limitations has expired, (c) any Claim expressly allowed by a Final Order or under the Combined Plan and Disclosure Statement, or (d) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to the Liquidation Trustees under Section 14.1 hereof and the Liquidation Trust Agreement; provided, however, that Claims temporarily allowed solely for the purpose of voting to accept or reject the Combined Plan and Disclosure Statement pursuant to an order of the Bankruptcy Court shall not be considered Allowed Claims; provided, further, that any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code shall not be considered an Allowed Claim.

**1.6** **"Applicable Cryptocurrency"** means, with respect to any Holder of a Customer Claim, the Cryptocurrency or Cryptocurrencies used by such Holder in its Cryptocurrency Transactions with each applicable Debtor. To the extent a Customer engaged in Cryptocurrency Transactions involving more than one form of Cryptocurrency, the amount and denomination of Applicable Cryptocurrency for each Equivalent Cryptocurrency Distribution shall be determined based on the Applicable Cryptocurrency Ratio.

**1.7** **"Applicable Cryptocurrency Ratio"** means, with respect to a denomination of Cryptocurrency used by a Holder of a Customer Claim in a Cryptocurrency Transaction, the

ratio, expressed as a percentage, of (x) the Dollar Denominated Value of such Cryptocurrency to (y) the Dollar Denominated Value of all Cryptocurrencies used by such Holder in all of its Cryptocurrency Transactions.  For example, if a Holder of a Customer Claim engaged in Cryptocurrency Transactions involving Peercoin valued at $1,000 as of the Petition Date and Vertcoin valued at $4,000 as of the Petition Date, the Applicable Cryptocurrency Ratio for Peercoin would be 20%, and the Applicable Cryptocurrency Ratio for Vertcoin would be 80%.

**1.8**    **"Assets"** means the assets of each of the Debtors, of any nature whatsoever, including all property of the Estates under and pursuant to section 541 of the Bankruptcy Code, Cash, Causes of Action, rights, interests and property, real and personal, tangible and intangible, including all files, books and records of the Estates.

**1.9**    "**Auction**" means the competitive bidding process in relation to the sale of the Debtors' assets, conducted pursuant to the Bid Procedures Order.

**1.10**    **"Avoidance Actions"** means any and all avoidance, recovery, subordination, or other actions or remedies that may be brought on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502(d), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, and/or 553 of the Bankruptcy Code.

**1.11**    **"Ballot"** means the form distributed to each Holder of an Impaired Claim or Equity Interest that is entitled to vote to accept or reject the Combined Plan and Disclosure Statement on which is to be indicated an acceptance or rejection of the Combined Plan and Disclosure Statement.

**1.12**    **"Bankruptcy Code"** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**1.13**    **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware.

**1.14**    **"Bankruptcy Rules"** means (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and the Local Bankruptcy Rules, as amended from time, (ii) the applicable Federal Rules of Civil Procedure, as amended and promulgated under section 2072 of title 28 of the United States Code, (iii) the applicable Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, and (iv) any standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case or proceedings therein, as the case may be.

**1.15**    **"Bar Date"** means (i) February 10, 2021, at 5:00 p.m. (prevailing Eastern Time) and (ii) such other date(s) fixed by order(s) of the Bankruptcy Court, by which all Entities, including Governmental Units, asserting a Claim against any Debtor must have filed a Proof of Claim against such Debtor or be forever barred from asserting such Claim in the Chapter 11 Cases.

**1.16**    "**Bid Procedures Order**" means the order of the Bankruptcy Court, dated December 21, 2020 [Docket No. 270], setting forth the procedures for competitive bidding for the Sale Transaction, as amended or supplemented from time to time.

**1.17**    "**Business Day**" means any day, other than a Saturday, Sunday, or a legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

**1.18**    "**Cash**" or "**$**" means the legal tender of the United States of America, including any wire transfer or instrument negotiable for legal tender of the United States of America.

**1.19**    "**Causes of Action**" means all claims, actions, causes of action, third-party claims, counterclaims, crossclaims, third-party claims, contribution claims, or any other claims whatsoever (including any Causes of Action described herein) of the Debtors and/or their Estates that may be pending on the Effective Date (including all such Causes of Action brought by the Committee pursuant to the Plan Support Agreement) or instituted after the Effective Date against any Entity based in law, equity, or otherwise, including under the Bankruptcy Code, whether known or unknown, whether direct, indirect, derivative, or otherwise, and whether asserted or unasserted as of the date of entry of the Confirmation Order, including Avoidance Actions.

**1.20**    "**Causes of Action List**" means the non-exclusive list of Causes of Action attached hereto as **Exhibit A**.

**1.21**    "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court and jointly administered under Case No. 20-12836 (JTD).

**1.22**    "**Claim**" means any right to payment from the Debtors, from property of the Debtors or from the Debtors' Estates, whether or not such right is reduced to judgment, liquidated, Unliquidated, fixed, Contingent, matured, unmatured, Disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown, or asserted; or any right to an equitable remedy for breach of performance by the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, Contingent, matured, unmatured, Disputed, undisputed, secured, or unsecured.

**1.23**    "**Claim Objection**" means any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate, or estimate any Claim (including the resolution of any request for payment of any Administrative Expense Claim).

**1.24**    "**Claims Agent**" means the Debtors' claims agent, Donlin, Recano & Company, Inc., or its successors and assigns.

**1.25**    "**Claims Register**" means the official register of Claims maintained by the Claims Agent.

**1.26**    "**Class**" means a category of Holders of Claims or Equity Interests set forth in Section 7.2 hereof.

**1.27** **"Clerk"** means the clerk of the Bankruptcy Court.

**1.28** **"Collateral"** means any property or interest in property of the Debtors' Estates subject to a Lien, charge, right of setoff, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

**1.29** **"Combined Hearing"** means the hearing held by the Bankruptcy Court to consider (i) final approval of the Combined Plan and Disclosure Statement as providing information pursuant to section 1125 of the Bankruptcy Code and (ii) pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Combined Plan and Disclosure Statement, as such hearing may be adjourned or continued from time to time.

**1.30** **"Combined Hearing Notice"** has the meaning set forth in Section 8.3(d).

**1.31** **"Combined Plan and Disclosure Statement"** means this combined disclosure statement and chapter 11 plan of liquidation, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

**1.32** **"Committee"** means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

**1.33** **"Confirmation Date"** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the Docket.

**1.34** **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code.

**1.35** **"Consummation"** means the occurrence of the Effective Date.

**1.36** **"Contingent"** means, with reference to a Claim, a Claim the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened, or been triggered as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the Holder of such Claim and whether or not a relationship between the Holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

**1.37** **"Convenience Claim"** means a Claim, subject to Section 13.1 hereof, against one or more of the Debtors that would otherwise be a General Unsecured Claim that (a) was scheduled or filed on or prior to the Bar Date in an amount less than or equal to $1,000 or (b) is in an amount that has been reduced to $1,000 pursuant to a Convenience Class Election made by the Holder of such Claim; provided, however, that: (i) where any portion(s) of a Claim has been transferred on or after the Petition Date, any transferred portion(s) shall continue to be treated together with such Claim as a single Claim for purposes of determining whether such Claim qualifies as a Convenience Claim; and (ii) any General Unsecured Claim that was originally

Allowed in excess of $1,000 may not be subdivided into multiple General Unsecured Claims of $1,000 or less for purposes of receiving treatment as a Convenience Claim.

**1.38** **"Convenience Class Election"** means an irrevocable election made on the Ballot by the Holder of a Claim against the Debtors that would otherwise be a General Unsecured Claim in an amount greater than $1,000 to reduce such Claim to $1,000 in order to be treated as a Convenience Claim. Subject to the occurrence of the Effective Date, such election shall be deemed to amend such General Unsecured Claim to reduce the amount of such Claim to $1,000.

**1.39** **"Convertible Notes"** means those certain convertible notes issued by Cred in August and September 2020 in the amount of approximately $2.6 million, bearing interest at a rate of 3% per annum and that were scheduled to mature 48 months after issuance.

**1.40** **"Cred"** means Cred Inc.

**1.41** **"Cred Capital"** means Cred Capital, Inc.

**1.42** **"Creditor"** means any Entity that is the Holder of a Claim against a Debtor.

**1.43** **"Cryptocurrency"** means any digital asset that is not backed by a government. The term "cryptocurrency" is to be interpreted broadly to include all forms of digital assets, virtual currency, cryptocurrency, tokens, security tokens, utility tokens and stablecoins. This includes bitcoin, ether, LBA tokens, Peercoin, Vertcoin, any ERC-20 compliant token, any altcoin, and any other cryptocurrency.

**1.44** **"Cryptocurrency Election"** means the election of any Holder of a Customer Claim to receive its Distribution in the Cryptocurrency utilized by such Holder in its Cryptocurrency Transaction(s) with the Debtors, which election was made on a Proof of Claim timely submitted by such Holder.

**1.45** **"Cryptocurrency Election E-Wallet Address"** means the E-Wallet alphanumerical sequence provided by Holders of Claims that make a Cryptocurrency Election.

**1.46** **"Cryptocurrency Transaction"** means a prepetition transaction involving any transfer by an Entity of Cryptocurrency to the Debtors, whether directly or indirectly.

**1.47** **"Customer"** means an Entity that engaged in a Cryptocurrency Transaction with one or more of the Debtors.

**1.48** **"Customer Claim"** means a General Unsecured Claim and/or an Other Secured Claim of a Customer arising from a Cryptocurrency Transaction.

**1.49** **"De Minimis Distribution"** means a Distribution to be made in accordance with the terms of this Combined Plan and Disclosure Statement that is $25.00 or less.

**1.50** **"Debtors"** means each of Cred, Cred (US) LLC, Cred Capital, Cred Merchant Solutions LLC, and Cred (Puerto Rico) LLC.

**1.51**  **"Debtors-in-Possession"** means the Debtors in their capacity as debtors-in-possession in the Chapter 11 Cases under sections 1107(a) and 1108 of the Bankruptcy Code.

**1.52**  **"Definitive Documents"** means the documents (including any related orders, agreements, instruments, schedules, or exhibits) that are necessary or desirable to implement or otherwise relate to the restructuring transaction, including, but not limited to: (a) the motion to approve the Debtors' entry into the Plan Support Agreement [Docket No. 279], (b) the order approving the Debtors' entry into the Plan Support Agreement [Docket No. 480], (c) the Combined Plan and Disclosure Statement (and all exhibits thereto), (d) the solicitation materials for the Combined Plan and Disclosure Statement; (e) the Disclosure Statement Order, (f) the Confirmation Order, (g) the Liquidation Trust Agreement; and (h) any other documents or exhibits related to or contemplated in the foregoing clauses (a) through (g), in each case in form and substance consistent with the Plan Support Agreement and reasonably acceptable to the Committee.

**1.53**  **"DIP Financing Agreement"** means any future Senior Secured Super-Priority Debtor in Possession Credit Agreement, by and among the Debtors and any future lender, as amended, restated, modified, supplemented, or replaced from time to time.

**1.54**  **"DIP Financing Claim"** means a claim arising under the DIP Financing Agreement and the DIP Orders.

**1.55**  **"DIP Orders"** means any Interim and/or Final Order approving the DIP Financing Agreement.

**1.56**  **"Disallowed"** means, with reference to any Claim, (a) a Claim, or any portion thereof, that has been disallowed by a Final Order, (b) a Claim, or any portion thereof, that is expressly disallowed under the Combined Plan and Disclosure Statement, (c) a Claim listed in the Schedules as zero or as Disputed, Contingent, or unliquidated and in respect of which a Proof of Claim has not been timely filed or deemed timely filed pursuant to the Combined Plan and Disclosure Statement, the Bankruptcy Code, or any Final Order, notwithstanding anything in section 506(d) of the Bankruptcy Code to the contrary, (d) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code, (e) where the holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such Property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code, or (f) is for reimbursement or contribution that is contingent as of the time of allowance or disallowance of such claim.

**1.57**  **"Disclosure Statement Order"** means the order of the Bankruptcy Court approving, among other things, on an interim basis, the adequacy of the disclosures contained herein pursuant to section 1125 of the Bankruptcy Code and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Combined Plan and Disclosure Statement, entered by the Bankruptcy Court on January 21, 2021.

**1.58** **"Disputed"** means, with reference to any Claim, a Claim, or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim.

**1.59** **"Distribution"** means a delivery of Cash and/or Cryptocurrency, as the case may be, by the Liquidation Trustee to the Holders of Allowed Claims pursuant to the Combined Plan and Disclosure Statement.

**1.60** **"Distribution Pro Rata Share"** means the ratio (expressed as a percentage) of (x) the amount of an Allowed General Unsecured Claim against the Debtors to (y) the aggregate amount of all (A) Allowed General Unsecured Claims against the Debtors on the date of a Distribution *plus* (B) the aggregate Disputed Claim amount of all remaining Disputed General Unsecured Claims against the Debtors.

**1.61** **"Docket"** means the docket in the Chapter 11 Cases maintained by the Clerk.

**1.62** **"Dollar Denominated Value"** means, with reference to any form of Cryptocurrency, the value of such Cryptocurrency determined in lawful currency of the United States as of the Petition Date.

**1.63** **"E-Wallet"** means digital Cryptocurrency storage platforms that allow end-users to manage and store Cryptocurrency.

**1.64** **"Effective Date"** means a Business Day selected by the Debtors, after consultation with the Committee, on or after the Confirmation Date, on which (a) no stay of the Confirmation Order is in effect and (b) the conditions precedent to the effectiveness of the Combined Plan and Disclosure Statement specified in Section 16.2 hereof shall have been satisfied or waived as provided in Section 16.3 hereof.

**1.65** **"Entity"** has the meaning set forth in section 101(15) of the Bankruptcy Code.

**1.66** **"Equity Interest"** means, as of the Petition Date, any capital stock or other ownership interest in the Debtors, whether or not transferable, and any option, call, warrant or right to purchase, sell or subscribe for an ownership interest or other equity security in any of the Debtors.

**1.67** "**Equivalent Cryptocurrency Distribution**" means, with respect to any Holder of a Customer Claim that has made a Cryptocurrency Election, a Distribution in the Applicable Cryptocurrency equal in value (as of the applicable Distribution date) to such Holder's Distribution Pro Rata Share, reduced by the actual transaction costs and fees associated with making such Distribution in the Applicable Cryptocurrency.  To the extent a Customer engaged in Cryptocurrency Transactions involving more than one Cryptocurrency, the amount and denomination of Applicable Cryptocurrency for each Equivalent Cryptocurrency Distribution shall be determined by multiplying the value (as of the applicable Distribution date) of such Holder's Distribution Pro Rata Share by the Applicable Cryptocurrency Ratios.

**1.68** **"Estate"** means the estate of the Debtors in the Chapter 11 Cases that was created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

**1.69**    **"Examiner"** means the examiner appointed by the U.S. Trustee on January 7, 2021, pursuant to the *Order Approving Appointment of Examiner* [Docket No. 338], and in accordance with that certain *Order Denying in Part, and Granting in Part, the Trustee/Examiner Motions* [Docket No. 281].

**1.70**    **"Executory Contract"** means a contract to which one or more of the Debtors are party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

**1.71**    **"File, Filed, or Filing"** means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Cases.

**1.72**    **"Final Order"** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending or, (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; <u>provided</u>, <u>however</u>, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 9024 of the Federal Rules of Bankruptcy Procedure, or any applicable analogous rule, may be (but has not been) filed relating to such order shall not prevent such order from being a Final Order.

**1.73**    **"General Unsecured Claim"** means any Claim other than an Administrative Expense Claim, Convenience Claim, Intercompany Claim, Other Priority Claim, Other Secured Claim, Priority Tax Claim, Professional Fee Claim, Secured Tax Claim, Subordinated Securities Claim, or Equity Interest.  For the avoidance of doubt, (a) any Customer Claim is a General Unsecured Claim to the extent that is not secured by a valid and enforceable right of setoff under section 553 of the Bankruptcy Code or for any portion that is in excess of any such right of setoff and (b) a claim for principal and accrued interest on account of the Convertible Notes is a General Unsecured Claim.

**1.74**    **"Governmental Unit"** has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

**1.75**    **"Holder"** means an Entity holding a Claim or an Equity Interest, as applicable. "Hold" and "Held" shall have the correlative meanings.

**1.76**    **"Impaired"** means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

**1.77**    **"Imposter"** has the meaning set forth in Section 3.3(d) hereof.

**1.78**    **"Insider"** has the meaning set forth in section 101(31) of the Bankruptcy Code.

8

**1.79** **"Intercompany Claim"** means any Claim by a Debtor against another Debtor, subject to the limitations set forth in Section 12.1 hereof.

**1.80** **"IRS"** means the Internal Revenue Service.

**1.81** **"JST"** means JST Capital, LLC.

**1.82** **"Liabilities"** mean any and all costs, expenses, damages, losses, penalties, fines, judgments, Claims, Liens, obligations, demands, injuries, settlements, awards, fines, taxes, fees, indebtedness, or other liabilities of any nature, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, liquidated or Unliquidated, matured or not matured, Contingent or direct, whether arising at common law, in equity, or under any statute, based in whole or in part on any act or omission or other occurrence arising or taking place prior to the Effective Date.

**1.83** **"Lien"** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.84** **"Liquidation Trust"** means the liquidation trust established by the Combined Plan and Disclosure Statement and described in Section 12.3 hereof and in the Liquidation Trust Agreement.

**1.85** **"Liquidation Trust Agreement"** means the agreement establishing and delineating the terms and conditions of the Liquidation Trust and filed prior to the Combined Hearing.

**1.86** **"Liquidation Trust Assets"** means all of the Estates' Assets transferred to the Liquidation Trust pursuant to Section 12.3(c) hereof.

**1.87** **"Liquidation Trust Beneficiaries"** means the Holders of Allowed Claims that are entitled to receive Distributions pursuant to the terms of the Combined Plan and Disclosure Statement, whether or not such Claims are Allowed as of the Effective Date.

**1.88** **"Liquidation Trust Expenses"** means all actual and necessary costs and expenses incurred by the Liquidation Trust in connection with carrying out the obligations of the Liquidation Trust pursuant to the terms of the Combined Plan and Disclosure Statement and the Liquidation Trust Agreement.

**1.89** **"Liquidation Trust Parties"** has the meaning set forth in Section 12.3(k) hereof.

**1.90** **"Liquidation Trustee"** means one of the three Persons who will be appointed to act as trustee of the Liquidation Trust in accordance with the terms of the Combined Plan and Disclosure Statement, the Confirmation Order, and the Liquidation Trust Agreement, or any successor appointed in accordance with the terms of the Combined Plan and Disclosure Statement and the Liquidation Trust Agreement. The identity of each of the Liquidation Trustees, as well as the terms of the compensation paid to the Liquidation Trustees, will be disclosed prior to the Combined Hearing.

**1.91** **"Litigation Proceeds"** means the proceeds from all Causes of Action pursued by or for the benefit of the Liquidation Trust (including any proceeds recovered by the Liquidation Trust from Avoidance Actions).

**1.92** **"Local Bankruptcy Rules"** means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

**1.93** **"moKredit"** means the Hong Kong-based entity founded by Lu Hua, which provides micro-loans to online gaming publisher sites through the provision of credit (in the form of gaming tokens) to video game enthusiasts.

**1.94** **"Net Distributable Assets"** means (a) the gross amount available from the liquidation of the Assets (including any Litigation Proceeds) minus (b) (i) the amount of all Allowed A/P/S Claims Allowed against the Debtors, (ii) U.S. Trustee Fees, (iii) the Liquidation Trust Expenses, and (iv) Distributions to Holders of Allowed Convenience Claims.

**1.95** **"Opt-Out Election Form"** is the opt-out form, as approved in the Disclosure Statement Order, pursuant to which holders of claims or interests may elect to opt out of the third party release in accordance with Section 18.2 hereof.

**1.96** **"Other Priority Claim"** means any claim, other than an Administrative Expense Claim, Professional Fee Claim, or Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

**1.97** **"Other Secured Claim"** means any Secured Claim other than a Secured Tax Claim.  For the avoidance of doubt, to the extent a Customer Claim is secured by a valid and enforceable right of setoff under section 553 of the Bankruptcy Code, such Customer Claim shall be an Other Secured Claim; *provided*, *however*, that any portion of a Customer Claim in excess of the amount secured by such a right of setoff shall be a General Unsecured Claim.

**1.98** **"Person"** shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

**1.99** **"Petition Date"** means November 7, 2020, the date on which the Debtors commenced the Chapter 11 Cases.

**1.100** **"Plan Supplement"** means the supplement or supplements to the Combined Plan and Disclosure Statement containing certain documents relevant to the implementation of the Combined Plan and Disclosure Statement, including the list of Executory Contracts and Unexpired Leases to be assumed pursuant to Section 15.1 hereof

**1.101** "**Plan Support Agreement**" means the binding term sheet executed by the Debtors and the Committee setting forth the material terms of a plan support agreement among such parties.

**1.102** **"Priority Tax Claim"** means any Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.103** **"Professional"** means any professional Person employed in the Chapter 11 Cases pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code pursuant to an Order of the

Bankruptcy Court and to be compensated for services rendered pursuant to sections 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code.

**1.104 "Professional Fee Claim"** means any claim of a Professional approved by the Bankruptcy Court for compensation, indemnification, or reimbursement of costs and expenses incurred on or before the Effective Date pursuant to sections 327, 328, 330, 331, 503(b), or 1103(a) of the Bankruptcy Code, plus any fees and expenses related to the final fee application of a Professional.

**1.105 "Professional Fee Escrow"** means an escrow account to be established and funded on the Effective Date in an amount equal to the Professional Fee Reserve Amount in accordance with Section 9.2 hereof.

**1.106 "Professional Fee Reserve Amount"** means the total amount of unpaid compensation and unreimbursed expenses incurred by Professionals retained by the Debtors or the Committee through and including the Effective Date, in ease case as determined in good faith by the applicable Professional.

**1.107 "Proof of Claim"** means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

**1.108 "Rejection Bar Date"** means the deadline by which a counterparty to an Executory Contract or an Unexpired Lease of the Debtors rejected under the Combined Plan and Disclosure Statement must file a Proof of Claim for damages arising from such rejection by the Debtors of such Executory Contract or Unexpired Lease, which shall be thirty (30) calendar days after the Effective Date or such other deadline established for filing a Rejection Claim by a Final Order of the Bankruptcy Court; provided, however, that if an earlier rejection bar date was established by order of the Bankruptcy Court with respect to a rejected Executory Contract or Unexpired Lease, then such earlier rejection bar date shall apply.

**1.109 "Rejection Claim"** means any Claim for damages as a result of the rejection under the Combined Plan and Disclosure Statement of any Executory Contract or Unexpired Lease. All Rejection Claims shall be treated as General Unsecured Claims under the Combined Plan and Disclosure Statement.

**1.110 "Released Parties"** means the Professionals retained by the Debtors, Grant Lyon as the Debtors' independent director, Matthew Foster as the Debtors' chief restructuring officer, any other staff supplied by Sonoran Capital Advisors, LLC, the Professionals retained by the Committee, and the respective agents and representatives of each of the foregoing.

**1.111 "Reserve"** has the meaning given to such term in Section 13.15 hereof.

**1.112 "Sale Motion"** means the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing and Approving Form and Manner of Notice Thereof, and (C) Approving Assumption and Assignment Procedures and Form and Manner of Notice Thereof; and (II) Authorizing (A) The Sale(s), Free and Clear of All Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. 65].

**1.113**  **"Sale Transaction"** means any sale of Assets of the Debtors prior to the Effective Date under section 363 of the Bankruptcy Code.

**1.114**  **"Schedules"** means, collectively, the schedules of Assets and Liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the official bankruptcy forms in the Chapter 11 Cases, as the same may have been amended or supplemented through the Confirmation Date pursuant to Bankruptcy Rules 1007 and 1009.  For the avoidance of doubt, Schedules do not include any schedules or exhibits to the Combined Plan and Disclosure Statement or the Plan Supplement.

**1.115**  **"Secured Claim"** means any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

**1.116**  **"Secured Tax Claim"** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein and including any related Secured Claim for penalties).

**1.117**  **"Solicitation Package"** has the meaning set forth in Section 8.3(d) hereof.

**1.118**  **"Subordinated Securities Claim"** means any Claim arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such security, or for reimbursement or contribution Allowed under section 502 of the Bankruptcy Code on account of such a Claim.

**1.119**  **"Trust Advisory Board"** means the committee appointed pursuant to Section 12.3 hereof to oversee the activities of the Liquidation Trust and the Liquidation Trustees, consisting of those parties identified in the Plan Supplement, and at no time greater than four members.

**1.120**  **"U.S. Trustee"** means the Office of the United States Trustee for the District of Delaware.

**1.121**  **"U.S. Trustee Fees"** means fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

**1.122**  **"Unclassified Claim"** means any Claim that is an Administrative Expense Claim or a Priority Tax Claim.

**1.123**  **"Unexpired Lease"** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

**1.124**  **"Unimpaired"** means, with respect to a Claim or Equity Interest, that such Claim or Equity Interest is not Impaired as a result of being paid in full in Cash under the Combined Plan and Disclosure Statement.

**1.125** **"Unliquidated"** means with reference to a Claim, a Claim, the amount of Liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is asserted or sought to be estimated.

**1.126** **"Voting Agent"** has the meaning set forth in Section 8.3(c) hereof.

**1.127** **"Voting Deadline"** means March 1, 2021, at 4:00 p.m. (prevailing Eastern Time).

**1.128** **"Voting Record Date"** has the meaning set forth in Section 8.3(b) hereof.

**1.129** **"Voting Report"** has the meaning set forth in Section 8.3(g) hereof.

## ARTICLE II.
## INTERPRETATION OF COMBINED PLAN AND DISCLOSURE STATEMENT

**2.1** **Application of Definitions; Rules of Construction; Computation of Time**

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender. For purposes of the Combined Plan and Disclosure Statement, (a) any reference in the Combined Plan and Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (b) any reference in the Combined Plan and Disclosure Statement to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented and (c) unless otherwise specified, all references in the Combined Plan and Disclosure Statement to Sections, Articles, Schedules, and Exhibits are references to Sections, Articles, Schedules and Exhibits of or to the Combined Plan and Disclosure Statement. The words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to the Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection or clause contained in the Combined Plan and Disclosure Statement. A capitalized term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code or in the Exhibits hereto. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Combined Plan and Disclosure Statement. The headings in the Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions of the Combined Plan and Disclosure Statement. Unless otherwise indicated herein, all references to dollars means United States dollars.  In computing any period of time prescribed or allowed by the Combined Plan and Disclosure Statement, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006 shall apply.

**2.2** **Relief Sought by Filing the Combined Plan and Disclosure Statement**

The filing of the Combined Plan and Disclosure Statement constitutes, among other things, a motion by the Debtors pursuant to Bankruptcy Rules 9019 to approve the settlements and comprises set forth in Section 12.2 hereof, and for limited substantive consolidation of the Debtors' Estates, as set forth in Section 12.1 hereof.

# ARTICLE III.
# BACKGROUND – THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

## 3.1    General Background – Overview of the Debtors

The Debtors were founded in 2018 by Lu Hua and Dan Schatt.  Prior to the Petition Date, the Debtors operated a global financial services platform serving retail and institutional clients in 183 countries.  The Debtors, which are lenders, utilized financial technology to provide business and retail credit and to allow Customers to earn a yield on more than 15 Cryptocurrencies and fiat currencies through the Debtors' partner network.  As of the Petition Date, the Debtors employed a staff of approximately 20 employees, consisting primarily of software and technology engineers.

As part of the Debtors' businesses, Customers transferred Cryptocurrency to the Debtors, generally pursuant to a loan agreement or a financing agreement.[2]  The Debtors then utilized the Cryptocurrency in a variety of investment strategies involving third-party asset managers.  The Debtors earned revenue through the returns generated by their investments, as well as through interest on lines of credit extended to certain of the Debtors' Customers in connection with the loans and financings referenced above.

The Debtors' business consisted of two key components: (a) the transfer of Cryptocurrency or other assets by Customers to the Debtors and the investment of those assets in order to earn returns ("CredEarn"); and (b) lending by the Debtors to certain Customers ("CredBorrow").

The Debtors' CredEarn business involved the transfer of Cryptocurrency from Customers to the Debtors, generally pursuant to a loan or financing agreement.  The Debtors then invested the Cryptocurrency with third-party asset managers or lenders to generate returns.  Such investments could take the form of (a) the Debtors directly providing Cryptocurrencies to asset managers or (b) the Debtors converting Cryptocurrencies into other Cryptocurrencies or fiat currencies and providing the proceeds thereof to asset managers or lenders.  The Debtors earned revenue through the returns generated by these investments.

The Debtors' obligations to Customers were repaid, with interest, as set forth in the relevant Customer's contract.  Generally, Customers who transferred Cryptocurrency to the Debtors were entitled to receive their principal and interest back in the type of Cryptocurrency the Customers transferred to the Debtors.  Because the Debtors' business model was premised on generating a return for Customers by investing the deposited Cryptocurrencies with asset managers, the Debtors generally did not themselves hold significant amounts of Cryptocurrency.  When Customers terminated accounts with the Debtors, the Debtors generally had to withdraw Cryptocurrency from asset managers to purchase new Cryptocurrency in the open market at then-prevailing prices in order to repay Customers

---

[2]    Shortly before the Petition Date, the Debtors began using contracts to "rent" Cryptocurrency from Customers.  As of the Petition Date, rental contracts accounted for less than 1% of the Debtors' Customer contracts.

Generally, the CredBorrow program was only available to the Debtors' domestic Customers. Under the CredBorrow program, Customers were generally permitted to borrow against Cryptocurrency or other assets that they transferred to the Debtors, and were obligated to make periodic repayments as specified in the relevant Customer's contract. The Debtors earned revenue on CredBorrow contracts through interest and fees assessed on Customers' borrowings.

## 3.2 The Debtors' Prepetition Capital Structure

As of the Petition Date, the former book value of the Debtors' total Assets was approximately $69 million. Book value is generally computed in accordance with various accounting pronouncements and may not (and in the case of the Debtors, likely does not) correlate to fair value of any Asset or the enterprise value of the Debtors as a whole. Moreover, the Debtors have not conducted the impairment analysis which would be required under GAAP for such former book value to be considered a current and reliable book value. Such impairment analysis would likely result in a book value significantly less than the former book value referred to above.

The Debtors have not issued any secured debt. In August and September 2020, Cred issued the Convertible Notes. As of the Petition Date, approximately $2.6 million (which includes accrued interest) remained outstanding on the Convertible Notes. Other than the Convertible Notes, the Debtors do not have any outstanding funded indebtedness.

As of the Petition Date, the Debtors' Liabilities to Customers were in excess of $160 million.

## 3.3 Events Leading to the Chapter 11 Cases

(a)     <u>JST Transactions</u>

The Debtors maintained accounts with JST. Through JST, the Debtors held substantial "long" futures positions on bitcoin and other Cryptocurrencies, which included margin holdings. In addition, the Debtors' contracts with JST included certain "stop positions," whereby when the price of a Cryptocurrency dropped below a certain threshold, JST sold the Cryptocurrency. These stop positions are referred to as "stop loss sale orders."

In March 2020, the drop in bitcoin prices (and other Cryptocurrency prices) triggered the Debtors' stop loss sale orders, which had the effect of: (i) "locking in" losses on the sale of bitcoin; and (ii) eliminated the Debtors' margin on bitcoin and other Cryptocurrencies. As a result, the Debtors acquired new Cryptocurrencies at substantially higher prices, which had a material negative effect on the Debtors' liquidity.

As described in greater detail below, following the losses with JST, the Debtors sought and obtained a 300 bitcoin capital contribution from Lu Hua.

(b)     <u>Over-Exposure on Loans Made to moKredit</u>

In late 2018, Cred started making loans to moKredit – an entity founded by Cred co-founder Lu Hua – under that certain Loan and Security Agreement dated December 27, 2018,

by and between moKredit Technology (Hong Kong) Company Limited, a Hong Kong company, and moKredit, Inc., an exempted company incorporated in the Cayman Islands with limited liability, as borrowers, and Cred, as lender. It is the Debtors understanding that under the Loan and Security Agreement, Cred extended moKredit a $100 million line of credit. The Debtors believe that as security for the line of credit, Cred received a security interest in substantially all of moKredit's personal property.[3] Cred has not taken any affirmative steps to perfects its security interest in this collateral.

By 2019, the Debtors' primary revenue generator was its relationship with moKredit. At one point, moKredit had drawn approximately $70 million on the line of credit. As of the Petition Date, the amount of the Debtors' outstanding loans with moKredit was approximately $39 million.

As a result of the Debtors' JST losses in March 2020, the Debtors undertook an effort to recover principal from moKredit and reestablish their hedging positions to protect against Cryptocurrency price fluctuations. That effort failed because of the restrictions imposed by the Chinese government in response to the COVID-19 pandemic. Due to the restrictions, moKredit could not meet its obligations under the Loan and Security Agreement, and was only able to return $300,000 of principal to the Debtors over the course of March and April, 2020. In May 2020, moKredit renegotiated its repayment schedule, whereby it would continue making approximately $582,000 per month in interest payments.

(c)    Cred Capital Problems

In March 2020, the Debtors directed the then-Chief Capital Officer, James Alexander, to incorporate Cred Capital as a Delaware entity to be controlled by Cred for the purposes of: (a) creating a vehicle to assist the Debtors with arranging bond offerings for companies in need of capital; and (b) overseeing the Debtors' asset management strategies. Cred also transferred the 300 bitcoin capital contribution made by Lu Hua to Cred Capital to provide the Debtors with a natural hedge against rising bitcoin prices.

Based on the Debtors' understanding, these plans were derailed, however, when Mr. Alexander attempted to take control of Cred Capital away from its corporate parent, Cred, and used Cred Capital's assets for his personal benefit. Mr. Alexander attempted to take control of Cred Capital by: (i) installing himself as its sole director; (ii) assigning only Class B, non-voting shares to Cred (instead of voting shares); and (iii) assigning Class A voting shares to a purported

---

[3]    Cred's security interest covered "[a]ll accounts, chattel paper, instruments, deposit accounts, letter of credit rights, and general intangibles related thereto; and all returned or repossessed goods which, on sale or lease, resulted in an account, including all Customer Loans and [moKredit's] rights related thereto", "[a]ll inventory", "[a]ll equipment and fixtures now owned or hereafter acquired by [moKredit]", "[a]ll of [moKredit's] deposit accounts with Cred", "[a]ll instruments, chattel paper, documents, certificates of deposit, securities (including equity interests) and investment property of every type", "[a]ll general intangibles" including "all goodwill connected with or symbolized by any of such intangibles", "[a]ll negotiable or nonnegotiable documents of title covering any Collateral", "[a]ll accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral", "[a]ll substitutes or replacements for any Collateral, all cash or non-cash proceeds (including insurance proceeds), products, rents and profits of the Collateral, and all income, benefits and property receivable on account of the Collateral, and all supporting obligations covering any Collateral", "[a]ll books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm, or electronic media, including but not limited to any computer-readable memory and any computer software necessary to process such memory".

third-party "investor" who Mr. Alexander contends gave him a proxy to control the voting shares.

Neither Cred nor Cred Capital ever received any capital contribution from this so-called "investor." In addition, Mr. Alexander did not use the 300 bitcoin to establish hedging positions as he had been instructed to do, but instead used a portion of these funds to make a series of vendor payments.

When Cred became aware of Mr. Alexander's actions, Cred terminated his employment and took corrective action under Delaware law to re-file Cred Capital's charter and appoint a board of directors.

Thereafter, Cred discovered that Mr. Alexander absconded with 225 of the 300 bitcoin (valued at approximately $6 million as of December 31, 2020). Despite the Debtors' demands, Mr. Alexander has refused to return the bitcoin to the Debtors.

The foregoing events spawned significant litigation against Mr. Alexander, including, California state court litigation seeking, among other things, injunctive relief, compensatory and punitive damages, breaches of contract, and breach of the implied covenant of good faith and fair dealing.[4] Moreover, as described in greater detail below, after the Petition Date, certain of the Debtors initiated an adversary proceeding against Mr. Alexander seeking turnover of the misappropriated and improperly retained Assets.[5]

After the Petition Date, the Debtors also filed a notice of removal with the California state court. The Debtors are in the process of transferring the California state court litigation to the Bankruptcy Court.

(d)    Theft of Bitcoin by an Imposter

In August 2020, the Debtors discovered that they had been the victims of a social engineering scheme that resulted in the theft of 800 bitcoin (valued at approximately $10 million as of October 2020).

In February 2020, Mr. Alexander informed the Debtors' of a potential investment opportunity with an entity that purported to be Quantcoin (the "Imposter"). Based on Mr. Alexander's representations and purported due diligence, Mr. Alexander was given permission to hire the Imposter to manage a portion of the Debtors' bitcoin.

In a series of transactions in February and April 2020, Mr. Alexander directed the transfer of a total of 800 bitcoin to the Imposter. After transferring the bitcoin, an administrator purporting to be Scott Foster with Kingdom Trust Company, a Cryptocurrency custodian ("Kingdom Trust"), was in contact with the Debtors regarding their 800 bitcoin. Initially, the

---

[4]    Case No. 20-CIV-02915, Superior Court of the State of California; County of San Mateo, Southern Branch.

[5]    Adv. Pro. No. 20-51006.

alleged Mr. Foster provided what appeared to be performance updates to the Debtors on a monthly basis.

It is the Debtors' understanding that the fraudulent scheme came to light when the Debtors requested a withdrawal of $2 million from their account with the Imposter and the Imposter ceased responding to e-mails.  The Debtors then contacted Kingdom Trust directly to inquire as to a monthly statement and learned that the Debtors not only did not have accounts at Kingdom Trust, but the e-mail address associated with Mr. Foster was fake.

Upon learning of the deception, the Debtors promptly contacted the pertinent law enforcement agency, which initiated an investigation into the matter.  However, as of [December 31, 2020], the Debtors have yet to recover any of the stolen bitcoin.

In addition, in late November 2020, the Debtors served notices to more than 20 Cryptocurrency exchanges advising them of the theft or conversion of the Debtors' Cryptocurrency Assets.  In such notices, the Debtors identified the relevant E-Wallets (both with respect to the theft by the Imposter and the misappropriation by Mr. Alexander) and requested that the exchanges freeze any accounts that may contain property of the Debtors.

(e)    Claims Against Mr. Inamullah

Several of the foregoing events are also attributable to, or were facilitated by, the Debtors' former Vice President of Capital Markets, Mr. Daniyal Inamullah, who was hired by the Debtors in December 2019.  Mr. Inamullah was the primary person responsible for identifying potential investment opportunities, performing due diligence with respect to such opportunities, and producing reports and proposals to the Debtors with respect to potential investments.  Accordingly, Mr. Inamullah's duties necessarily included verifying the accuracy of information provided to the Debtors with respect to their investment portfolio.

The Debtors believe that Mr. Inamullah failed at his responsibilities.  For example: (i) Mr. Inamullah admitted in sworn testimony that he never conducted any due diligence with respect to the Imposter transactions; (ii) Mr. Inamullah contributed to Mr. Alexander's misappropriation of bitcoin by both initiating and authorizing the transfer of bitcoin into Mr. Alexander's personal E-Wallets; and (iii) violating the Debtors' security protocols, which were instituted by Mr. Inamullah.

Accordingly, the Debtors believe that they have multiple claims and causes of action against Mr. Inamullah, including, without limitation, breach of the duty of care, breach of the duty of loyalty, and civil conspiracy.

(f)    Customer Loss and Adverse Market Conditions

Negative press in connection with the Imposter transactions, Mr. Alexander's conduct, and the Debtors' worsening financial condition resulted in (i) certain of the Debtors' core partners to close their accounts with the Debtors and (ii) potential investments of outside capital failing to materialize during the third fiscal quarter of 2020.  In particular, the Debtors' former management was exploring business expansion opportunities with other financial services companies that were looking at opportunities in the Cryptocurrency space.

As of the Petition Date, the Debtors' balance sheet reflected an approximately 1:2.2 asset to liability ratio. A lack of liquidity and reduced prospects for attracting new business diminished the Debtors' prospects for reducing this asset-liability gap and for staking out new positions to hedge against fluctuations in the price of Cryptocurrency.

The asset-liability gap was in part due to a rapid 30% increase in the price of bitcoin in October 2020, which exacerbated the Debtors' distressed financial position. By late October, 2020, the Debtors determined to cease the inflow and outflow of all Cryptocurrency Assets to assess their financial position. Unable to remedy the situation, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on the Petition Date, initiating the Chapter 11 Cases.

Although the Debtors remain committed to working with other constituents in the capital structure on the terms of superior restructuring transactions, the Debtors believe that the Combined Plan and Disclosure Statement, which now incorporates the global settlement with the Committee outlined in the Plan Support Agreement, represents the best available alternative to maximize value for all stakeholders.

## 3.4    The Chapter 11 Cases

The following is a brief description of certain major events that occurred during the Chapter 11 Cases.

(a)    First Day Relief

On or shortly after the Petition Date, the Debtors filed a number of motions and applications seeking certain "first day" relief, including the following:

i.    Pursuant to the *Motion of Debtors and Debtors in Possession for Order Directing Joint Administration of their Chapter 11 Cases* [Docket No. 3], the Debtors sought entry of an order directing the joint administration of the Chapter 11 Cases and consolidation thereof for procedural purposes only. On November 11, 2020, the Bankruptcy Court entered an order granting this relief [Docket No. 27].

ii.    Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to File a Consolidated List of Debtors' 30 Largest Unsecured Creditors (II) Authorizing Debtors to Serve Certain Parties by E-mail, (III) Authorizing Debtors to Redact or Withhold Publication of Certain Personal Identification Information, and (IV) Granting Related Relief* [Docket No. 6], the Debtors sought entry of interim and final orders authorizing the Debtors to: (i) file a consolidated list of the Debtors' 30 largest unsecured creditors; (ii) serve certain documents on parties-in-interest via email; and (iii) redact certain Customer information. The Bankruptcy Court granted the relief on an interim basis on November 10, 2020 [Docket No. 34] and on a final basis on December 21, 2020 [Docket No. 264].

      iii.     Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions; (II) Granting Administrative Expense Status to Postpetition Intercompany Balances; (III) Waiving the Requirements of Section 345(b) of Bankruptcy Code; and (IV) Granting Related Relief* [Docket No. 7], the Debtors sought entry of interim and final orders authorizing the Debtors to, among other things: (i) continue use of their cash management system; (ii) honor certain fees and charges associated therewith in the ordinary course of business; and (iii) maintain existing business forms.  The Bankruptcy Court granted the relief on an interim basis on November 10, 2020 [Docket No. 29] and on a final basis on December 21, 2020 [Docket No. 268].

      iv.     Pursuant to the *Debtors' Motion for Entry of Order (I) Restating and Enforcing Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of Bankruptcy Code, (II) Permitting Debtors to Modify Automatic Stay, (III) Approving Form and Manner of Notice, and (IV) Granting Related Relief* [Docket No. 8], the Debtors sought relief to advise parties outside the United States of the existence, reach, and effects of the protections of the Bankruptcy Code, including the worldwide application of the automatic stay.  The Bankruptcy Court granted the motion on November 10, 2020 [Docket No. 32].

      v.     Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Insurance Policies, (B) Pay All Related Obligations, and (II) Granting Related Relief* [Docket No. 10], he Debtors sought authorization to maintain insurance policies, which included: (i) directors and officers; (ii) errors and omissions; (iii) cyber; (iv) property; (v) damage, general commercial; (vi) commercial automobile; and (vii) general umbrella liability.  The Bankruptcy Court granted the relief on an interim basis on November 10, 2020 [Docket No. 31] and on a final basis on December 18, 2020 [Docket No. 248].

      vi.     Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs and (II) Granting Related Relief* [Docket No. 11], the Debtors sought authorization to: (i) pay and honor certain prepetition employee claims and obligations; and (ii) continue certain employee programs and obligations.  The Bankruptcy Court granted the relief on an interim basis on November 30, 2020 [Docket No. 30] and on a final basis on December 21, 2020 [Docket No. 263].

    (b)    <u>Appointment of Committee</u>

On December 3, 2020, the U.S. Trustee appointed the Committee pursuant to section 1102(a) of the Bankruptcy Code.  Additional information regarding the members of the Committee is included in the Notice of Appointment of the Committee [Docket No. 120].

     (c)    Retention of Professionals

Paul Hastings LLP ("Paul Hastings") has served as the Debtors' restructuring counsel since it was engaged in late October, and the Debtors applied to retain Paul Hastings as their counsel shortly after the commencement of these chapter 11 cases. *See Debtors' Application for Entry of an Order Authorizing and Approving Retention and Employment of Paul Hastings LLP as Counsel to Debtors, Effective as of the Petition Date* [Docket No. 64]. On December 6, 2020, the U.S. Trustee objected to Paul Hastings' retention on several bases, including that Paul Hastings' initial disclosures were inadequate and that Paul Hastings had an adverse interest to the Debtors because it provided prepetition services to the Debtors, represents a creditor of the Debtors in unrelated matters, and allegedly received a preferential transfer from the Debtors. *See Objection of the United States Trustee to the Debtors' Application for Entry of an Order Authorizing and Approving Retention of Paul Hastings LLP as Counsel to Debtors, Effective as of the Petition Date* [Docket No. 139].

At the hearing on January 6, 2021, the Bankruptcy Court approved Paul Hastings' retention and overruled the U.S. Trustee's objection. In doing so, the Bankruptcy Court held that Paul Hastings' initial disclosures were adequate and that Paul Hastings did not hold any interest adverse to the Debtors in violation of section 327(a) of the Bankruptcy Code. Specifically, the Bankruptcy Court found there was nothing in the record that Paul Hastings's prepetition advice to the Debtors and its representation of a creditor on matters unrelated to the Chapter 11 Cases rendered it adverse to the Debtors.[6] Moreover, the Bankruptcy Court found Paul Hastings had resolved the issues regarding the alleged preferential transfer by returning approximately $313,000 to Paul Hastings' client trust account for the Debtors and waiving prepetition fee claims in the same amount. On January 7, 2021, the Bankruptcy Court entered an order approving the Debtors' retention of Paul Hastings [Docket No. 327].

On November 11, 2020 and December 18, 2020, the Bankruptcy Court also entered orders authorizing the Debtors to retain Donlin, Recano & Company, Inc. as claims agent [Docket No. 28] and as administrative agent [Docket No. 246], respectively. On December 18, 2020, the Bankruptcy Court entered an order authorizing the Debtors to retain Cousins Law LLC, as Delaware bankruptcy counsel [Docket No. 245]. On December 21, 2020, the Bankruptcy Court entered orders authorizing the Debtors to retain Teneo Capital Group LLC as the Debtors' investment banker [Docket No. 261], MACCO Restructuring Group LLC, as the Debtors' financial advisor [Docket No. 272], and Sonoran Capital Advisors, LLC to provide the Debtors with Matthew Foster, as Chief Restructuring Officer, and related personnel.

In addition, to assist the Committee in carrying out its duties, the Committee has sought Bankruptcy Court approval authorizing the retention and employment of McDermott Will & Emery LLP to serve as its bankruptcy counsel [Docket No. 282] and Dundon Advisors, LLC to serve as financial advisor [Docket No. 305].

---

[6]    Matters related to such creditor are being handled by Cousins Law, the Debtors' Delaware bankruptcy counsel and conflicts counsel.

(d)    <u>Plan Support Agreement</u>

Promptly after its appointment, the Committee engaged in negotiations with the Debtors regarding a consensual path forward that would maximize the value of the Debtors' Estates for the benefit of all Creditors. Such negotiations culminated in the execution of the Plan Support Agreement, which contemplates a chapter 11 plan of liquidation centered on an expeditious liquidation of the Debtors' Assets, first through the Debtors' Sale Transaction, and, irrespective of whether the Sales Transaction comes to fruition, the transfer of all of the Debtors' Assets into a liquidation trust. The Debtors and the Committee believe that the restructuring process set forth in the Plan Support Agreement is in the best interests of the Debtors' Estates and all stakeholders.

On December 23, 2020, the Debtors filed the *Motion Pursuant to Bankruptcy Code Sections 363(b) and 105(a) for Authorization to Enter Into and Perform Under a Plan Support Agreement Term Sheet* [Docket No. 279], which is scheduled to be heard on February 3, 2021.

(e)    <u>Sale Process</u>

On November 18, 2020, the Debtors filed the Sale Motion. Pursuant to the Sale Motion, the Debtors sought to establish certain deadlines and bidding procedures by which the Debtors could obtain proposals for the purchase of the Debtors' businesses as a going concern or, alternatively, for the purchase of the Debtors' Assets, to be sold at the Auction. On December 21, 2020, the Bankruptcy Court entered the Bid Procedures Order approving such relief [Docket No. 270].

The Bid Procedures Order provided, among other thing, that the selection of a stalking-horse bidder was subject to consent of the Committee. To date, the Debtors have not received a bid acceptable to the Committee. The Debtors are continuing to entertain offers from prospective buyers of various assets.

(f)    <u>Post-Petition Litigation</u>

(i)    *Motions to Convert or Dismiss the Chapter 11 Cases or Appoint a Trustee/Examiner*

On November 11, 2020, certain of the Debtors' creditors filed the *Motion of Krzysztof Majdak and Philippe Godineau for Entry of an Order Pursuant to 11 U.S.C. § 1112(b) (I) Dismissing the Cases; (II) Converting the Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 11 Trustee* [Docket No. 62] (the "<u>Creditor Motion</u>"). On December 4, 2020, the U.S. Trustee filed the *Motion of the United States Trustee for Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases* [Docket No. 133] (the "<u>U.S. Trustee Motion</u>" and, together with the Creditor Motion, the "<u>Motions to Convert</u>"). The Motions to Convert both seek entry of an order dismissing the Chapter 11 Cases, converting the Chapter 11 Cases to liquidating cases under chapter 7 of the Bankruptcy Code, or appointing a chapter 11 trustee.[7]

---

[7]    Certain creditors and parties-in-interest joined or partially joined in the Motion to Convert. *See Response of James Alexander to the Motion of Kryszyof Majdak and Philippe Godinea for Entry of an Order Pursuant to 11*

Moreover, the U.S. Trustee Motion seeks, in the alternative, the appointment of an independent Examiner.

The Debtors and the Committee objected to the relief sought in the Motions to Convert. *See* Docket Nos. 109, 191, and 195.

Following a two-day evidentiary hearing on the Motions to Convert, the Bankruptcy Court: (i) denied the Creditor Motion; and (ii) denied in part and granted in part the U.S. Trustee Motion. As a result, the U.S. Trustee was directed to appoint an examiner. *See* Docket No. 281.

On January 7, 2021, the U.S. Trustee appointed Robert J. Stark as the Examiner in the Chapter 11 Cases [Docket No. 338]. In his role as the Examiner, and pursuant to section 1106(a)(3) and (4) of the Bankruptcy Code, Mr. Stark is investigating allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the Debtors' management, and will, as soon as practicable, file a written report that will be made available on the Docket in these Chapter 11 Cases, which can be viewed at the following link: https://www.donlinrecano.com/Clients/cred/Dockets.

> (ii) *Motion of UpgradeYa Investments, LLC for Relief from Stay Under Bankruptcy Code Section 362* ("Lift Stay Motion")

On November 25, 2020, UpgradeYa Investments, LLC ("UpgradeYa"), filed the Lift Stay Motion, seeking relief from the automatic stay to permit it to pursue remedies in connection with certain bitcoin it transferred to the Debtors. The Debtors and the Committee filed objections to the Lift Stay Motion. *See* Docket Nos. 116 and 190. On January 6, 2021, the Bankruptcy Court held an evidentiary hearing on the Lift Stay Motion. At the conclusion of the January 6, 2021 hearing, the Bankruptcy Court took the matter under advisement and ordered UpgradeYa to file further briefing regarding whether the remedy it seeks – authority to bring potential litigation claims against third parties – implicates property of the Debtors' estates on or before January 21, 2021, with reply briefs due on or before February 4, 2021, and responses to any reply briefing due on or before February 11, 2021.

> (iii) *Motion of James Alexander to Dismiss the Cred Capital, Inc. Case* ("Cred Capital Motion")

On December 8, 2020, Mr. Alexander filed the Cred Capital Motion seeking the dismissal of Cred Capital's Chapter 11 Case. *See* Docket No. 152. The Cred Capital Motion alleges Mr. Alexander is the sole rightful officer and director of Cred Capital and that Cred's

---

*U.S.C. § 1112(b) (I) Dismissing the Cases; or (II) Converting the Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 11 Trustee* [Docket No. 103]; *Partial Joinder of Jamie Shiller, Takashi Yanagi, Wu Chi King, Joseph Richardson, Thomas Calvert, Clint Cowen, Robin Houck, Todd Wiseman, Mathew Dion, Jonatan Ashurov, Daniel Becker, Teppei Miyauchi, Jean Vacca, Xian Su, and Eric Schurman to Motion to Dismiss the Bankruptcy Cases, Convert Cases to Chapter 7, or Appoint a Chapter 11 Trustee* [Docket No. 107]; *UpgradeYa Investments, LLC's (I) Reply to Objection of the Debtors to Motion of UpgradeYa Investments, LLC for Relief from Stay Under Bankruptcy Code Section 362 and (II) Limited Joinder in the Motion for an Order Converting the Chapter 11 Cases to Chapter 7* [Docket No. 126].

23

corrective action to re-take control of Cred Capital in June 2020 was invalid and of no effect. Mr. Alexander thus believes that Cred Capital's Chapter 11 Case should be dismissed because only he had the power to authorize it, and he did not. The Debtors filed an objection to the Cred Capital Motion and the Committee joined in the Debtors' objection. *See* Docket Nos. 296 and 297. The Cred Capital Motion is scheduled to be heard on February 3, 2021.

(g)    <u>Section 341(a) Meeting of Creditors</u>

The section 341 meeting is scheduled to take place on February 2, 2021.

(h)    <u>Schedules and Statements</u>

The Debtors Filed their Schedules on January 7, 2021 [Docket Nos. 331-335, as amended by Docket Nos. 343, 346, and 350], which, among other things, set forth the Claims of known Creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records. The Debtors retain the right to amend the Schedules during the pendency of the Chapter 11 Cases.

(i)    <u>Claims Process and Bar Dates</u>

Pursuant to the *Order (I) Fixing Deadlines for Filing Proofs of Claim and (II) Approving Form and Manner of Notice Thereof* dated December 21, 2020 [Docket No. 271] (the "<u>Bar Date Order</u>"), the Bankruptcy Court established, among others, the following bar dates for filing Proofs of Claim:

- <u>General Bar Date</u>: February 10, 2021 at 5:00 p.m. (prevailing Eastern Time) as the deadline for all Persons or Entities (other than Governmental Units) holding or wishing to assert pre-petition Claims to file Proofs of Claims in the Chapter 11 Cases.

- <u>Government Bar Date</u>: May 6, 2021 at 5:00 p.m. (prevailing Eastern Time) as the deadline for all Governmental Units (as defined in section 101(27) of the Bankruptcy Code) holding or wishing to assert pre-petition Claims to file Proofs of Claim in the Chapter 11 Cases.

- <u>Amended Schedules Bar Date</u>: With respect to Holders of Claims affected, as described in the Bar Date Order, by the Debtors' amendment or supplement of their Schedules, such Holders shall have until the later of (i) the General Bar Date or, if the creditor is a Governmental Unit, the Government Bar Date, and (ii) twenty-one (21) days from the date of service of notice of the amendment or supplement to the Schedules.

- <u>Rejection Damages Bar Date</u>: With respect to counterparties to an Executory Contract or an Unexpired Lease of the Debtors, which has been rejected under this Combined Plan and Disclosure Statement, such counterparty must file a Proof of Claim for damages arising from such rejection by the later of (i) the General Bar Date or thirty-days after service of an order by the Bankruptcy Court authorizing such rejection,

and (ii) such other date, if any, as the Bankruptcy Court may fix in the order authorizing such rejection.

    (j)    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>

Pursuant to the *Motion of Debtors for Entry of Order Authorizing Debtors to (I) Reject Unexpired Leases of Nonresidential Real Property and (II) Abandon Property in Connection Therewith* [Docket No. 4], the Debtors sought entry of an order permitting the Debtors to reject leases in connection with their office space in San Mateo and Sherman Oaks, California. On December 18, 2020, the Bankruptcy Court entered an order granting this relief [Docket No. 243].

    (k)    <u>DIP Financing</u>

The Debtors are currently in negotiations with potential lenders to provide debtor in possession financing to the Debtors. The Debtors are also negotiating for the right to convert such debtor-in-possession financing into an exit financing that would be available to fund expenses of the Liquidation Trust to the extent it is not repaid on the Effective Date of the Combined Plan and Disclosure Statement.

To the extent that the Debtors obtain debtor in possession financing, the terms of such financing, including the treatment of any DIP Financing Claims, will be included in the Plan Supplement. Parties interested in learning more about any such debtor in possession financing should monitor the Docket in these Chapter 11 Cases, which can be viewed at the following link: https://www.donlinrecano.com/Clients/cred/Dockets.

# ARTICLE IV.
# TAX CONSEQUENCES

**4.1**    **Tax Consequences.**

The confirmation and execution of the Combined Plan and Disclosure Statement may have tax consequences to Holders of Claims and Equity Interests. The Debtors do not offer an opinion as to any federal, state, local or other tax consequences to Holders of Claims and Equity Interests as a result of the confirmation of the Combined Plan and Disclosure Statement.

Under certain circumstances, an individual may be entitled to claim a theft-loss dependent on its individual circumstances. Such losses that arise out of property used in a trade or business or a transaction entered into for profit are deductible in the year in which the loss is sustained and in an amount not to exceed the adjusted tax basis of the property involved. Individuals should consult with their own tax advisors to determine if a theft loss deduction is permissible, as well as the timing, amount, and applicable limitations for any such theft loss deduction.

**All Holders of Claims and Equity Interests are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of this Combined Plan and Disclosure Statement. The Combined Plan and Disclosure Statement is not intended, and should not be construed, as legal or tax advice to any Creditor, Equity Interest Holder or other party in interest.**

# ARTICLE V.
## CERTAIN RISK FACTORS TO BE CONSIDERED

### 5.1    Risk Factors to Be Considered

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Combined Plan and Disclosure Statement.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Combined Plan and Disclosure Statement and its implementation.

     (a)    <u>Bankruptcy Law Considerations</u>

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect Distributions available to Holders of Allowed Claims under the Combined Plan and Disclosure Statement, but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Combined Plan and Disclosure Statement or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

        (i)    <u>Parties in Interest May Object to the Combined Plan and Disclosure Statement's Classification of Claims and Interests</u>.  Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Equity Interest under the Combined Plan and Disclosure Statement complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Equity Interest, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

        (ii)    <u>The Conditions Precedent to the Effective Date May Not Occur</u>.  As more fully set forth in Article XVI hereof, the Confirmation Date and the Effective Date are subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Confirmation Date or the Effective Date will not take place.

        (iii)    <u>The Debtors May Fail to Satisfy Voting Requirements</u>.  If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Combined Plan and Disclosure Statement, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Combined Plan and Disclosure Statement.  In the event that sufficient votes are not received, the Debtors, with the consent of the Committee, may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Combined Plan and Disclosure Statement.

(iv) <u>The Debtors May Not Be Able to Secure Confirmation of the Combined Plan and Disclosure Statement.</u>  There can be no assurance that the requisite acceptances to confirm the Combined Plan and Disclosure Statement will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Combined Plan and Disclosure Statement.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of the Combined Plan and Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that the Combined Plan and Disclosure Statement, the balloting procedures, and the voting results are appropriate, the Bankruptcy Court could still decline to confirm the Combined Plan and Disclosure Statement if it finds that any of the statutory requirements for confirmation are not met.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of Distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of Distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Confirmation of the Combined Plan and Disclosure Statement is also subject to certain conditions as described in Article IX hereof.  If the Combined Plan and Disclosure Statement is not confirmed, it is unclear what Distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Combined Plan and Disclosure Statement, reserve the right, upon reasonable prior notice to and with the consent of the Committee, to modify the terms and conditions of the Combined Plan and Disclosure Statement as necessary for confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Combined Plan and Disclosure Statement.  Such a less favorable treatment could include a Distribution of property with a lesser value than currently provided in the Combined Plan and Disclosure Statement or no Distribution whatsoever under the Combined Plan and Disclosure Statement.

(v) <u>Nonconsensual Confirmation.</u>  In the event that any Impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any Insider in such class), and, as to each Impaired class that has not accepted the

plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired class(es). The Debtors believe that the Combined Plan and Disclosure Statement satisfies these requirements, and the Debtors may request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual confirmation or Consummation of the Combined Plan and Disclosure Statement may result in, among other things, increased expenses relating to professional compensation.

(vi) The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code. If the Bankruptcy Court finds that it would be in the best interests of Creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller Distributions being made to Creditors than those provided for in the Combined Plan and Disclosure Statement because of the (a) likelihood that the Assets, including any Cryptocurrency, would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and Executory Contracts.

(vii) The Debtors May Object to the Amount or Classification of a Claim. Except as otherwise provided in the Combined Plan and Disclosure Statement, the Debtors reserve the right to object to the amount or classification of any Claim under the Combined Plan and Disclosure Statement. The estimates set forth in the Combined Plan and Disclosure Statement cannot be relied upon by any Holder of a Claim, as the Debtors or the Liquidation Trustee may seek to investigate, File, and prosecute Claims and may object to Claims after confirmation of the Combined Plan and Disclosure Statement.

(viii) Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Combined Plan and Disclosure Statement. The Distributions available to Holders of Allowed Claims under the Combined Plan and Disclosure Statement can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect Distributions available to Holders of Allowed Claims under the Combined Plan and Disclosure Statement, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Combined Plan and Disclosure Statement or require any sort of revote by the Impaired Classes.

The estimated Claims and Creditor recoveries set forth in the Combined Plan and Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained herein. Moreover, Creditor recoveries will depend on the outcome of litigation that may be brought by the Liquidation Trust for the benefit of Creditors. Litigation outcomes are inherently uncertain and, if the litigation pursued by the Liquidation Trust is unsuccessful, may materially and adversely impact Creditor recoveries. Furthermore, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that ultimately will be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Combined Plan and Disclosure Statement.

(ix)     <u>Releases, Injunctions, and Exculpations Provisions May Not Be Approved</u>. Article XVIII hereof provides for certain releases, injunctions, and exculpations, including a release of Liens and third party releases that may otherwise be asserted against the Debtors or the Released Parties. The releases, injunctions, and exculpations provided herein are subject to objection by parties in interest and may not be approved.

(x)     <u>Risk of Non-Occurrence of the Effective Date</u>. Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. If the Effective Date does not occur, the Combined Plan and Disclosure Statement shall be null and void in all respects and nothing contained herein shall: (a) constitute a waiver or release of any Claims by or Claims against or Equity Interest in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holder of a Claim or Equity Interest, or any other Entity; (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Equity Interest, or any other Entity in any respect; or (d) be used by the Debtors or any Entity as evidence (or otherwise) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

(xi)     <u>Risk of Loss of Exclusive Right to Propose a Plan</u>. At the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose a plan and prohibits creditors and others from proposing a plan. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Combined Plan and Disclosure Statement in order to achieve the Debtors' stated goals.

    (b)    <u>Risks Related to Recoveries Provided Under the Combined Plan and Disclosure Statement</u>.

        (i)    <u>Timing and Amount of Distributions</u>. Various factors will impact the amount of recoveries that Holders of Allowed Claims receive, including, without limitation, the degree to which objections to Claims are successful. Further, due to the nature of litigation, it may take years to fully adjudicate, decide, or resolve objections to Claims. As a result, Holders of Allowed Claims may not receive final Distributions in accordance herewith for a prolonged period of time following the Effective Date.

        (ii)    <u>Uncertainty of Distribution</u>. No assurances can be made that Holders of Allowed Claims will receive a Distribution as it is possible the Liquidation Trust Expenses will exceed the realizable value of the Liquidation Trust Assets. In such a scenario, there would be no recovery to Holders of Allowed Claims.

        (iii)    <u>Cryptocurrency Distributions</u>. The Liquidation Trustee shall make good faith efforts to make Equivalent Cryptocurrency Distributions; however, there can be no assurance that the ability to make such Equivalent Cryptocurrency Distributions is guaranteed. If the Liquidation Trustee cannot make Equivalent Cryptocurrency Distributions for any reason, Distributions will be made to Holders of Customer Claims that made a Cryptocurrency Election in Cash consistent with this Combined Plan and Disclosure Statement.

        (iv)    <u>Certain Tax Implications of the Combined Plan and Disclosure Statement</u>. Consummation may result in significant tax implications for the Debtors and Holders of Claims. Holders of Allowed Claims should abide by Article IV hereof to determine how the tax implications of the Combined Plan and Disclosure Statement and the Chapter 11 Cases may adversely affect the Holders of Claims.

    (c)    <u>The Debtors May Not Be Able to Generate Sufficient Cash to Continue in Chapter 11</u>.

The Debtors may not be able to generate sufficient Cash to continue operating in chapter 11 for a prolonged period of time. It is also unclear whether the Debtors will be able to obtain postpetition financing to fund administrative expenses through confirmation of an alternative chapter 11 plan.

    (d)    <u>The Debtors May Be Adversely Affected by Litigation</u>.

The Debtors may become parties to litigation, and litigation in which the Debtors are already a party may not be resolved in their favor. In general, litigation can be expensive and time consuming to bring or defend. Litigation could result in settlements or damages that could significantly affect the Debtors' financial positions. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Combined Plan and Disclosure Statement. It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of any litigation. The impact of any such litigation on the Debtors' business and financial stability, however, could be material.

## 5.2    Alternatives to this Combined Plan and Disclosure Statement

In the event the Debtors are unable to obtain sufficient votes or are unable to satisfy the legal requirements to confirm the Combined Plan and Disclosure Statement, the Debtors, with the consent of the Committee, may seek to confirm an alternative chapter 11 plan or convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Combined Plan and Disclosure Statement.  As set forth in Article VI hereof, the Debtors believe it is unlikely that conversion of the Chapter 11 Cases to cases under chapter 7 will result in greater Distributions to stakeholders.

## ARTICLE  VI.
## BEST INTERESTS AND FEASIBILITY

## 6.1    Best Interests Test

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Equity Interest either (a) accept the plan or (b) receive or retain under the plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Because of the increased expenses that would be incurred in the event of a conversion of the Chapter 11 Cases to cases under chapter 7, the value of any Distributions to Holders of Claims or Equity Interests if the Chapter 11 Cases were converted to cases under chapter 7 would be less than the value of Distributions hereunder.  This is because conversion of the Chapter 11 Cases to chapter 7 would require the appointment of a chapter 7 trustee, and in turn, such chapter 7 trustee's likely retention of new professionals.

The "learning curve" that the chapter 7 trustee and new professionals would be faced with comes with additional costs to the Estates and delay compared to the time of Distributions under the Combined Plan and Disclosure Statement.  As a result, the Debtors believe that their Estates would have fewer funds available for Distribution in a hypothetical chapter 7 liquidation than they would if the Combined Plan and Disclosure Statement is confirmed, and, therefore, Holders of Allowed Claims will recover less in the hypothetical chapter 7 cases.[8]  Accordingly, the Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

## 6.2    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Combined Plan and Disclosure Statement is not likely to be followed by liquidation, or the need for further financial reorganization, of the Debtors or any successors to the Debtors, unless such liquidation or reorganization is proposed in the Combined Plan and Disclosure Statement.  As set forth herein, the Debtors commenced the Chapter 11 Cases to allow for an efficient and orderly sale of their Assets, followed by a wind-down process, which the Combined Plan and Disclosure

---

[8]    A hypothetical chapter 7 liquidation analysis is attached hereto as **Exhibit B**.

Statement accomplishes. The Debtors will not be conducting any business operations after the Effective Date. As such, provided that the Combined Plan and Disclosure Statement is Consummated, the Debtors' Estates will not be subject to future reorganization or liquidation. Accordingly, the Debtors believe that the Combined Plan and Disclosure Statement is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

## ARTICLE VII.
## SUMMARY OF ASSETS AND TREATMENT OF CLAIMS AND INTERESTS

**7.1    Summary of Assets**

As of the Petition Date, the former book value of the Debtors' Assets was approximately $69 million. Book value is generally computed in accordance with various accounting pronouncements and may not correlate with the fair value of an individual Asset or of the enterprise value of the Debtors as a whole. Moreover, the Debtors have not conducted the impairment analysis which would be required under GAAP for such former book value to be considered a current and reliable book value. Such impairment analysis would likely result in a book value significantly less than the former book value referred to above. The Debtors' Assets broadly consist of Cash and Cash equivalents, Cryptocurrency, technological platforms, loan obligations, and certain other Assets under management.

As of December 31, 2020, the Debtors held approximately $970,000 in Cash. In addition, the Debtors hold a variety of Cryptocurrencies. Certain of these Cryptocurrencies are "liquid" and can be readily converted to Cash. As of December 31, 2020, the Debtors held approximately $5.3 million in liquid Cryptocurrencies. A portion of the Cryptocurrency held by the Debtors is considered "illiquid," the value of which is difficult to determine with any level of certainty and which require the Debtors to overcome additional barriers (which may require additional marketing efforts and/or liquidation in smaller quantities) to convert these "illiquid" Cryptocurrencies into Cash.

The Debtors' Assets also include obligations under customer loans and loans issued by the Debtors. Of note, moKredit is obligated to repay the Debtors approximately $39 million. However, as discussed above, moKredit is currently not making payments on the outstanding principal, and thus the account balance may be partially or completely uncollectible.

The Debtors are owed approximately $8 million for loans issued under the CredBorrow program. However, these creditors may argue that obligations would only be collected if Collateral was returned, and thus the account balance may be partially or completely uncollectible. For the purposes of this Plan, the Debtors cannot ascribe value to the moKredit loan obligation as there is no market for any fair valuation purposes nor have the Debtors been able to conduct an impairment analysis which would be necessary to present a book value for the loan.

The Debtors also have certain "assets under management" valued at approximately $3.6 million, as of December 31, 2020, to be returned by certain third-party asset managers.

Additionally, the Debtors own a proprietary technological platform and various Causes of Action, which may be of significant value.

## 7.2 Summary of Treatment of Claims and Equity Interests

The following table (a) designates the Classes of Claims against, and Equity Interests in, the Debtors, (b) specifies the Classes of Claims and Equity Interests that are Impaired by the Combined Plan and Disclosure Statement and therefore are deemed to reject the Combined Plan and Disclosure Statement or are entitled to vote to accept or reject the Combined Plan and Disclosure Statement in accordance with section 1126 of the Bankruptcy Code, and (c) specifies the Classes of Claims and Equity Interests that are Unimpaired by the Combined Plan and Disclosure Statement and therefore are deemed to accept the Combined Plan and Disclosure Statement in accordance with section 1126 of the Bankruptcy Code.

| Class | Description | Impairment | Entitled to Vote | Estimated Allowed Claim Amounts | Estimated Recovery Percentage |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | $0 | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | $0 | 100% |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) | Unknown | 100% |
| 4 | General Unsecured Claims | Impaired | Yes | $170.9 million | Unknown |
| 5 | Convenience Claims | Impaired | Yes | $0.5 million | 30%[9] |
| 6 | Subordinated Securities Claims | Impaired | No (deemed to reject) | $0 | 0% |
| 7 | Equity Interests in Debtors | Impaired | No (deemed to reject) | Not applicable | 0% |

## 7.3 Deemed Consolidation

The Combined Plan and Disclosure Statement provides for deemed consolidation of the Debtors' Estates solely for the purposes hereof, including making any Distributions to Holders of

---

[9] The estimated recovery percentage for General Unsecured Claims that exercise the Convenience Class Election is less than 30%.

Allowed Claims.  Deemed consolidation is a type of substantive consolidation, "under which a consolidation is deemed to exist for purposes of voting and satisfying creditor claims, voting for or against the Plan, and making distributions for allowed claims under it."  *In re Owens Corning*, 419 F.3d 195, 202 (3d Cir. 2005); *see also In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 423-24 (3d Cir. 2005).  It is an equitable remedy that bankruptcy courts may apply in appropriate circumstances.  *See In re Owens Corning*, 419 F.3d 195, 216 (3d Cir. 2005).

Substantive consolidation is appropriate where (i) prepetition the debtors disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) postpetition the debtors' assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.  *In re Owens Corning*, 419 F.3d at 211.; *see also In re Augie/Restivo Baking Co., Ltd.,* 860 F.2d 515, 518 (2d Cir. 1988) (noting that decisions approving substantive consolidation emphasize whether creditors dealt with the entities as a single economic unit or whether the affairs of the debtors are so entangled that consolidation will benefit all creditors).

The Debtors submit that deemed consolidation is appropriate under the law and the facts present here.  Prior to the Petition Date, the Debtors' books and records did not precisely record Assets and Liabilities attributable to each of the Debtors individually.  As a result, it would be a painstaking and costly endeavor to try to unwind the Debtors' business affairs and allocate assets and Liabilities on a Debtor by Debtor basis, to the extent such unwinding and allocation is even possible.  To the extent it is possible, such an allocation would be extremely time consuming and costly, and would greatly diminish the pool of assets available for Distribution to Creditors.

For example, without substantial costs and efforts, including a review of all contracts of the more than 6,500 Customers, the Debtors cannot verify which Customers are creditors of Cred Inc. or Cred (US) LLC.  Based on an initial analysis, several Customer contracts appear to be with Cred Inc., but used a Cred (US) LLC signature block.  The Debtors believe it will be difficult if not impossible to properly allocate the assets and liabilities associated with such contracts on a Debtor by Debtor basis.  Furthermore, a detailed forensic analysis would be needed to identify and reconcile all intercompany transfers, including transfers of Cash and transfers of Cryptocurrencies through Fireblocks.  Moreover, the Debtors are unable to identify the specific Debtor entity that owns the remaining bitcoin, as there was significant movement in bitcoin between the Debtors during normal operations, including commingling of such assets, making tracing of bitcoin to any particular Debtor entity practically impossible.  Finally, the Debtors' platform was used by all operating Debtor entities, and it is practically impossible to allocate the value of that platform to these Debtor entities.

Deemed consolidation for voting and Distribution purposes will avoid these delays and expenses, without causing prejudice to any group of creditors.  Under the Combined Plan and Disclosure Statement, each Creditor within a Class will be treated equally.

## 7.4     Third Party Releases

It is the Debtors' position that the consideration for the third party releases set forth in Section 18.2 hereof and the mechanism by which Holders of Claims who are impaired under the Plan to consent to such releases meet the requirements for third party releases and are consistent

with recent chapter 11 cases. All Impaired Holders of Claims, irrespective of whether they are entitled to vote on the Plan, will receive a Solicitation Package which will include materials allowing such Holders to opt out of the third party release via their Ballot or an Opt-Out Election Form that can mailed or hand-delivered to the Voting Agent. In addition, the Debtors believe the third party releases are entirely consensual under the established case law in the United States Bankruptcy Court for the District of Delaware. *See*, *e.g.*, *In re Indianapolis Downs, LLC, 486 B.R. 286, 304-06* (Bankr. D. Del. 2013). The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each of the Released Parties as part of confirmation of the Combined Plan and Disclosure Statement.

## ARTICLE VIII.
## CONFIRMATION AND VOTING PROCEDURES

### 8.1 Combined Hearing

A hearing before the Honorable John T. Dorsey has been scheduled for **March 9, 2021 at 2:00 p.m. (prevailing Eastern Time)**, at the Bankruptcy Court, 824 North Market Street, 5th Floor, Courtroom No. 5, Wilmington, Delaware 19081, to consider (i) final approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (ii) confirmation of the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code. The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Combined Hearing or by Filing a notice with the Bankruptcy Court.

### 8.2 Procedure for Objections

Any objection to approval or confirmation of this Combined Plan and Disclosure Statement must: (a) be in writing, (b) conform to the Bankruptcy Rules and Local Bankruptcy Rules, and (c) be filed with the Bankruptcy Court and served so as to be **actually received on or before March 1, 2021 at 4:00 p.m. (prevailing Eastern Time)**, by: (i) counsel to the Debtors, Paul Hastings LLP, 600 Travis Street, 58th Floor, Houston, Texas 77002, Attn: James T. Grogan, Esq., and Cousins Law LLC, Brandywine Plaza West, 1521 Concord Pike, Suite 301, Wilmington, Delaware 19803, Attn: Scott D. Cousins; and (ii) counsel to the Committee, McDermott Will & Emery LLP, 340 Madison Avenue, New York, NY 10173, Attn: Timothy W. Walsh and Darren Azman, and 1007 North Orange Street, 4th Floor, Wilmington, DE 19801, Attn: David R. Hurst.

### 8.3 Voting Procedures

(a)     Who May Vote on the Combined Plan and Disclosure Statement

Each Holder of a Class 4 or Class 5 Claim that is not a Disallowed Claim and for which no objection to the allowance thereof, motion to estimate, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed and remains unresolved, or the Holder of a Class 4 or Class 5 Claim that has been temporarily allowed for voting purposes only under Bankruptcy Rule 3018(a) shall be entitled to vote separately to accept or reject the

Combined Plan and Disclosure Statement, subject to the procedures set forth in the Disclosure Statement Order or any other applicable order of the Bankruptcy Court.  An Impaired Class of Claims shall have accepted the Combined Plan and Disclosure Statement if: (i) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Combined Plan and Disclosure Statement, and (ii) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Combined Plan and Disclosure Statement.

Classes 1, 2, and 3 are Unimpaired under the Combined Plan and Disclosure Statement, are each deemed to accept the Combined Plan and Disclosure Statement by operation of law, and are not entitled to vote on the Combined Plan and Disclosure Statement.

Classes 6 and 7 are Impaired under the Combined Plan and Disclosure Statement and are deemed to reject the Combined Plan and Disclosure Statement by operation of law, and are not entitled to vote on the Combined Plan and Disclosure Statement.

Without limiting the foregoing, in the event that any Class of Claims entitled to vote on the Combined Plan and Disclosure Statement fails to accept the Combined Plan and Disclosure Statement as required by section 1129(a) of the Bankruptcy Code, the Combined Plan and Disclosure Statement may be amended or modified in accordance with the terms herein and, in any event, the Debtors, subject to any consent that may be required herein or under the Plan Support Agreement, reserve the right to seek confirmation hereof over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

(b)    Voting Record Date

The Bankruptcy Court has approved the close of business on January 14, 2021 as the voting record date (the "Voting Record Date").  The Voting Record Date is the date for determining (1) which Holders of Claims are entitled to vote to accept or reject the Combined Plan and Disclosure Statement and receive the Solicitation Package and (2) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of a Claim. The Voting Record Date shall apply to all of the Debtors' creditors and other parties in interest.

(c)    Voting Agent

The Debtors have retained Donlin, Recano & Company, Inc. (the "Voting Agent") to, among other things, act as claims and solicitation agent in connection with the solicitation of votes to accept or reject the Combined Plan and Disclosure Statement.  Inquiries relating to the solicitation process, voting instructions, related procedures and copies of the solicitation materials may be directed to the Voting Agent at no charge by: (a) accessing the Debtors' restructuring website at https://www.donlinrecano.com/Clients/cred/Dockets; (b) calling the Voting Agent at (877) 739-9988 (toll free); or (c) emailing DRCvote@DonlinRecano.com.  The

Voting Agent, however, is not authorized to provide, and will not provide, legal or financial advice.

    (d)    <u>Solicitation Package, Ballots and Notices</u>

The following materials constitute the solicitation package with respect to the Combined Plan and Disclosure Statement enclosed herewith (the "<u>Solicitation Package</u>"):

    i.    The appropriate form of Ballot and instructions for completing the Ballot;

    ii.    The voting instructions and solicitation procedures approved by the Bankruptcy Court (the "<u>Voting Procedures</u>");

    iii.    The Combined Plan and Disclosure Statement with all exhibits;

    iv.    A notice of the Combined Hearing approved by the Bankruptcy Court for transmission to Holders of Claims and other parties in interest (the "<u>Combined Hearing Notice</u>");

    v.    A copy of the Disclosure Statement Order;

    vi.    a letter from the Committee urging creditors to vote to accept the Combined Joint Plan and Disclosure Statement; and

    vii.    Such other materials as the Bankruptcy Court may direct.

Only Holders of General Unsecured Claims (Class 4) and Holders of Convenience Claims (Class 5) are entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

    (e)    <u>Notices of Non-Voting Status</u>

As set forth above, certain Holders of Claims and Equity Interests are not entitled to vote on the Combined Plan and Disclosure Statement. As a result, such parties will not receive Solicitation Packages but, instead, will receive the Combined Hearing Notice that explains, among other things, (i) that Classes 1, 2, and 3 are Unimpaired under the Combined Plan and Disclosure Statement and, therefore, are presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code; (ii) that Classes 6 and 7 are Impaired under the Combined Plan and Disclosure Statement and are presumed to have rejected the Combined Plan and Disclosure Statement pursuant to section 1126(g) of the Bankruptcy Code; (iii) instructions for how such Holders of Claims and Equity Interests may obtain a copy of the Combined Plan and Disclosure Statement; (iv) the deadline by which to object to confirmation of the Combined Plan and Disclosure Statement; and (v) the Combined Hearing date and time. In addition, such parties will receive a Notice of Non-Voting Status and an Opt-Out Election Form.

(f)     Contract and Lease Counterparties

Parties to certain of the Debtors' Executory Contracts and Unexpired Leases may not have Claims pending the disposition of their Executory Contracts and Unexpired Leases by assumption or rejection under the Combined Plan and Disclosure Statement. Such parties nevertheless will receive the Combined Hearing Notice.

(g)     Submission of Ballots and Opt-Out Election Forms

To be counted as a vote to accept or reject the Combined Plan and Disclosure Statement, such Holder's properly completed and executed Ballot must be received by the Voting Agent by the Voting Deadline and in accordance with the voting instructions attached to each Ballot. The Voting Agent will process and tabulate received Ballots and will File a voting report (the "Voting Report") as soon as practicable on or after the Voting Deadline but prior to the Combined Hearing. The Voting Report will include (a) a list of all Ballots received but not counted and the reason for not counting such Ballots and (b) a list of all non-compliant, deficient Ballots for which the Debtors have waived such non-compliance or deficiency. Parties may contact the Voting Agent with any questions related to the Voting Procedures applicable to their Claims.

In addition, Opt-Out Election Forms must also be received by the Voting Agent on or before the Voting Deadline.

## ARTICLE IX.
## PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS, AND OTHER UNCLASSIFIED CLAIMS

**9.1     Administrative Expense Claims**

(a)     Treatment of Non-Professional Fee Administrative Expense Claims

Except to the extent that a Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Administrative Expense Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on the latest of: (i) on or as soon as practicable after the Effective Date if such Administrative Expense Claim is Allowed as of the Effective Date; (ii) on or as soon as reasonably practicable after the date such Administrative Expense Claim is Allowed; and (iii) on the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is practicable.

(b)     Administrative Expense Claims Bar Date

Holders of Administrative Expense Claims (other than Professional Fee Claims) arising during the period from November 7, 2020 through the Effective Date must File requests for payment of Administrative Expense Claims **on or before 4:00 p.m. (prevailing Eastern Time) on the day that is thirty (30) calendar days after the Effective Date** (the "Administrative

Expense Claims Bar Date") and serve such Administrative Expense Claims on the Claims Agent so as to be **actually received on or before the Administrative Expense Claims Bar Date** at the following addresses (the "Claims Agent Service Addresses"):

> If by first-class mail:
>
>> Cred Inc. Claims Processing Center
>> c/o Donlin, Recano & Company, Inc.
>> P.O. Box 199043 Blythebourne Station
>> Brooklyn, NY 11219
>
> If by hand delivery or overnight:
>
>> Cred Inc. Claims Processing Center
>> c/o Donlin, Recano & Company, Inc.
>> 6201 15th Avenue
>> Brooklyn, NY 11219

All such requests for payment must: (i) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant; (ii) be written in the English language; (iii) denominate the claim in lawful currency of the United States as of the Administrative Expense Claims Bar Date; (iv) indicate the particular Debtor against which the claim is asserted; and (v) include supporting documentation (or, if such documentation is voluminous, include a summary of such documentation) or an explanation as to why such documentation is not available.  The notice of the Effective Date delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f), substantially in the form included in the Plan Supplement, shall set forth the Administrative Expense Claims Bar Date and shall constitute notice of such bar date.

The following claims are **not** required to be filed on or before the Administrative Expense Claims Bar Date:

> (a)    Professional Fee Claims;
>
> (b)    Any Administrative Expense Claims that (i) have been previously paid by the Debtors in the ordinary course of business or otherwise or (ii) have otherwise been satisfied;
>
> (c)    Any Administrative Expense Claim that has been Allowed by prior order of the Bankruptcy Court;
>
> (d)    Any claims by any current officer, manager, or director of the Debtors immediately prior to the Effective Date;
>
> (e)    Any claims for fees payable to the Clerk;
>
> (f)    Any U.S. Trustee Fees; and
>
> (g)    Any claim by a Governmental Unit for a tax or penalty described in

section 503(b)(1)(B) and (C) of the Bankruptcy Code, as provided for in section 503(b)(1)(D).

Any Entity that is required to file a request for payment of an Administrative Expense Claim (other than Professional Fee Claims) under the Combined Plan and Disclosure Statement and that fails to do so by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claim, and such Administrative Expense Claim shall not be enforceable against the Liquidation Trust, the Liquidation Trustees, the Debtors, the Estates, and their respective properties, and the Liquidation Trust, the Liquidation Trustees, Debtors, the Estates, and their respective properties shall be forever discharged from any and all Liability with respect to such Administrative Expense Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Administrative Expense Claims shall, as of the Effective Date, be subject to the permanent injunction pursuant to Section 18.4 hereof and the Confirmation Order.

## 9.2    Professional Fee Claims

All Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 363, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is sixty (60) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such compensation and reimbursement of expenses. The Liquidation Trustees are authorized to pay reasonable compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval in accordance with the Liquidation Trust Agreement.

All Allowed Professional Fee Claims shall be paid in full in Cash in such amounts as may be Allowed by the Bankruptcy Court (a) as soon as practicable after the later of the Effective Date and the date on which the Bankruptcy Court enters a final order allowing any such Professional Fee Claim, (b) as otherwise provided in the Bankruptcy Code or approved by the Bankruptcy Court, or (c) as may be agreed upon between the Holder of any such Professional Fee Claim and the Debtors. Professional Fee Claims shall be satisfied from the Professional Fee Escrow. If the amount in the Professional Fee Escrow is insufficient to pay in full all Allowed Professional Fee Claims, the deficiency shall be promptly paid by the Liquidation Trustees from the Liquidation Trust Assets, without any further action or order of the Bankruptcy Court.

Professionals shall reasonably estimate their unpaid Professional Fee Claims as of the Effective Date, and shall deliver such estimates to the Debtors no later than five days before the Effective Date; *provided*, *however*, that such estimates shall not be deemed to limit the amount of the Professional Fee Claims that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

On or before the Effective Date, the Debtors shall establish the Professional Fee Escrow and shall fund such reserve with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow and the funds therein shall be used for the sole purpose of paying the Allowed Professional Fee Claims and shall not constitute property of the Debtors, their Estates, or the Liquidation Trust; *provided*, that the Liquidation Trust shall hold a residual interest in the Professional Fee Escrow and, upon the satisfaction of all Allowed Professional Fee Claims, any funds remaining in the Professional Fee Escrow shall vest in the Liquidation Trust.

### 9.3    Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, either (a) payment in full in Cash on the Effective Date, (b) payment in regular installment payments within five (5) years of the Petition Date, or (c) such other less favorable treatment to the Holder of an Allowed Priority Tax Claim as to which the Debtor and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

## ARTICLE X.
## TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

### 10.1    Class 1: Other Priority Claims

(a)    <u>Classification</u>: Class 1 shall consist of the Other Priority Claims.

(b)    <u>Treatment</u>: Except to the extent that a Holder of an Other Priority Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed Other Priority Claim shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, Cash in the amount equal to such Allowed Claim, without interest, on or as soon as practicable after the later of (x) the Effective Date and (y) the date that such Claim becomes an Allowed Claim.

(c)    <u>Voting</u>: Class 1 is Unimpaired under the Combined Plan and Disclosure Statement. Holders of Claims in Class 1 are conclusively deemed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code. Holders of Claims in Class 1 are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### 10.2    Class 2: Secured Tax Claims

(a)    <u>Classification</u>: Class 2 shall consist of the Secured Tax Claims.

(b)    <u>Treatment</u>: Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed Secured Tax Claim shall

receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Secured Tax Claim and any Liens securing such Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, Cash in the amount of such Allowed Secured Tax Claim (a) on, or as soon as practicable after, the latest of: (i) the Effective Date and (ii) the date such Allowed Secured Tax Claim becomes an Allowed Claim; or (b) in regular payments over a period of time not to exceed five (5) years after the Petition Date with interest at a rate determined in accordance with section 511 of the Bankruptcy Code; provided, that the first such regular payment shall represent a percentage recovery at least equal to that expected to be received by the most favored Holders of Allowed General Unsecured Claims; provided further, that the Liquidation Trustees may prepay the entire amount of the Allowed Secured Tax Claim at any time in its sole discretion.

(c)     Voting: Class 2 is Unimpaired under the Combined Plan and Disclosure Statement.  Holders of Claims in Class 2 are conclusively deemed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Claims in Class 2 are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

**10.3     Class 3: Other Secured Claims**

(a)     Classification: Class 3 shall consist of the Other Secured Claims.

(b)     Treatment: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Other Secured Claim and any Liens securing such Claim, at the sole option of the Debtors or the Liquidation Trustees, as applicable, (i) Cash in an amount equal to such Allowed Other Secured Claim on or as soon as practicable after the Effective Date, or (ii) the Collateral securing its Allowed Other Secured Claim, in full and complete satisfaction of such Allowed Other Secured Claim on or as soon as practicable after the Effective Date.

(c)     Voting: Class 3 is Unimpaired under the Combined Plan and Disclosure Statement.  Holders of Claims in Class 3 are conclusively deemed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Claims in Class 3 are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

**10.4     Class 4: General Unsecured Claims.**

(a)     Classification: Class 4 shall consist of the General Unsecured Claims.

(b)     Treatment: Except to the extent that a Holder of an Allowed General Unsecured Claim in Class 4 agrees to a less favorable treatment or has been paid by any of the Debtors prior to the Effective Date, each Holder of an Allowed General

Unsecured Claim in Class 4 shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim either: (i) a Cash payment equal to such Holder's Distribution Pro Rata Share of Net Distributable Assets; or, if permitted, (ii) with respect to any such Holder that makes a Cryptocurrency Election, a good faith effort shall be made to make distributions in an Equivalent Cryptocurrency Distribution.

(c)     Voting:  Class 4 is Impaired under the Combined Plan and Disclosure Statement. Holders of Claims in Class 4 are entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

## 10.5    Class 5: Convenience Claims.

(a)     Classification: Class 5 shall consist of the Convenience Claims.

(b)     Treatment:  Except to the extent that a Holder of an Allowed Convenience Claim in Class 5 agrees to a less favorable treatment or has been paid by any of the Debtors prior to the Effective Date, each Holder of an Allowed Convenience Claim in Class 5 shall receive, in full and final satisfaction, settlement, and release of such Allowed Convenience Claim, Cash in an amount equal to 30.0% of the amount of such Allowed Convenience Claim on or as reasonably practicable after the later of (i) the Effective Date or (ii) thirty (30) days after the date on which such Claim becomes Allowed.

(c)     Voting:  Class 5 is Impaired under the Combined Plan and Disclosure Statement. Holders of Claims in Class 5 are entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

## 10.6    Class 6: Subordinated Securities Claims

(a)     Classification: Class 6 shall consist of all Subordinated Securities Claims.

(b)     Treatment: Each Holder of an Allowed Subordinated Securities Claim will not receive or retain any property under the Combined Plan and Disclosure Statement on account of such Allowed Subordinated Securities Claim.  The treatment of Subordinated Securities Claims under the Combined Plan and Disclosure Statement is in accordance with and gives effect to the provisions of section 510(b) of the Bankruptcy Code.

(c)     Voting: Class 6 is Impaired, and Holders of Class 6 Claims are conclusively presumed to have rejected the Combined Plan and Disclosure Statement under section 1126(g) of the Bankruptcy Code.

## 10.7    Class 7: Equity Interests in Debtors

(a)     Classification: Class 7 shall consist of the Equity Interests in the Debtors.

(b)     Treatment: On the Effective Date, the Equity Interests in the Debtors shall be

cancelled and the Holders of the Equity Interests shall not be entitled to, and shall not receive or retain, any property on account of such Equity Interests under the Combined Plan and Disclosure Statement.

(c)    <u>Voting</u>: Class 7 is Impaired, and such Holders of Class 7 Claims are conclusively presumed to have rejected the Combined Plan and Disclosure Statement under section 1126(g) of the Bankruptcy Code.

## 10.8    Reservation of Rights Regarding Claims and Equity Interests

Except as otherwise explicitly provided herein, nothing shall affect either the Debtors' or the Liquidation Trustees' rights and defenses, both legal and equitable, with respect to any Claims or Equity Interests, including all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## ARTICLE XI.
## ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT

### 11.1    Voting of Claims

(a)    <u>Classes Entitled to Vote</u>

Each Holder of a Claim, that is not a Disallowed Claim and for which no objection to the allowance thereof, motion to estimate, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed and remains unresolved, in Classes 4 and 5, or the Holder of a Claim that has been temporarily allowed for voting purposes only under Bankruptcy Rule 3018(a) in such Classes, shall be entitled to vote separately to accept or reject the Combined Plan and Disclosure Statement, as provided in the Disclosure Statement Order or any other applicable order of the Bankruptcy Court.

(b)    <u>Classes Deemed to Accept</u>

Each of Classes 1, 2, and 3 are Unimpaired under the Combined Plan and Disclosure Statement, and each such Class is conclusively presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code.

(c)    <u>Classes Deemed to Reject</u>

Subordinated Securities Claims in Class 6 and Equity Interests in Class 7 will not receive or retain any property on account of such Claims or Equity Interests under the Combined Plan and Disclosure Statement. In accordance with section 1126(g) of the Bankruptcy Code, Classes 6 and 7 are conclusively presumed to have rejected the Combined Plan and Disclosure Statement.

### 11.2    Elimination of Vacant Classes

Any Class of Claims or Equity Interests that does not contain, as of the date of the Confirmation Hearing, a Holder of an Allowed Claim or Allowed Equity Interest, or a Holder of a Claim temporarily Allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Combined Plan and Disclosure Statement for all purposes, including for purposes of determining acceptance of the Combined Plan and Disclosure Statement by such Class under section 1129(a)(8) of the Bankruptcy Code.

**11.3    Nonconsensual Confirmation**

If any Impaired Class of Claims entitled to vote shall not accept the Combined Plan and Disclosure Statement by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Combined Plan and Disclosure Statement in accordance with Section 20.5 hereof or undertake to have the Bankruptcy Court confirm the Combined Plan and Disclosure Statement under section 1129(b) of the Bankruptcy Code, or both.  With respect to Impaired Classes of Claims that are deemed to reject the Combined Plan and Disclosure Statement, the Debtors shall request that the Bankruptcy Court confirm the Combined Plan and Disclosure Statement pursuant to section 1129(b) of the Bankruptcy Code.

**11.4    Revocation of the Combined Plan and Disclosure Statement**

Subject to Section 20.6 hereof, the Debtors, after consultation with the Committee, may revoke and withdraw the Combined Plan and Disclosure Statement in its entirety at any time prior to entry of the Confirmation Order.  If the Combined Plan and Disclosure Statement is so revoked or withdrawn, then it shall be deemed null and void.

## ARTICLE  XII.
## MEANS OF IMPLEMENTATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT

In addition to the provisions set forth elsewhere in the Combined Plan and Disclosure Statement, the following shall constitute the means for implementation of the Combined Plan and Disclosure Statement:

**12.1    Limited Substantive Consolidation**

The Combined Plan and Disclosure Statement provides for substantive consolidation of the Debtors' Estates, but solely for the purposes hereof, including making any Distributions to Holders of Allowed Claims.

On the Effective Date, (i) all Assets and Liabilities of the Debtors will, solely for Distribution purposes, be treated as if they were merged, (ii) all Intercompany Claims will be eliminated, (iii) each Claim Filed or to be Filed against the Debtors will be deemed a single nonaggregated Claim against, and a single non-aggregated obligation of, the Debtors, (iv) all guarantees of any Debtor of the payment, performance, or collection of obligations of another Debtor shall be eliminated and canceled; and (v) all transfers, disbursements and Distributions on account of Claims made by or on behalf of any of the Debtors' Estates hereunder will be deemed to be made by or on behalf of all of the Debtors' Estates.  Holders of Allowed Claims entitled to

Distributions under this Combined Plan and Disclosure Statement shall be entitled to their Distribution Pro Rata Share on account of such Claim without regard to which Debtor was originally liable for such Claim. Except as set forth herein, such limited substantive consolidation shall not (other than for purposes related to this Combined Plan and Disclosure Statement) affect the legal and corporate structures of the Debtors.

## 12.2   Global Settlement

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Combined Plan and Disclosure Statement incorporates a compromise and settlement of numerous inter-Debtor, Debtor-Creditor, and inter-Creditor issues designed to achieve an economic settlement of Claims against the Debtors and an efficient resolution of the Chapter 11 Cases. This global settlement constitutes a settlement of Claims as provided herein, including the validity and enforceability of Intercompany Claims, and the allocation of Assets among the Estates. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromises and settlements underlying the substantive consolidation of the Debtors' Estates and all other compromises and settlements provided herein. The Bankruptcy Court's findings shall constitute its determination that such compromises and settlements, and the substantive consolidation of the Debtors' Estates, are in the best interests of the Debtors, their Estates, their Creditors, and other parties-in-interest, and are fair, equitable, and within the range of reasonableness. Each provision of the global settlement shall be deemed non-severable from each other and from the remaining terms hereof. As set forth in detail below, the global settlement will be implemented as set forth herein, through the substantive consolidation of the Debtors' Estates, solely for purposes of voting on, and Distributions hereunder.

## 12.3   Liquidation of the Debtors

On the Effective Date, the Debtors will transfer all of their Assets to the Liquidation Trust, for Distribution in accordance herewith. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Combined Plan and Disclosure Statement.

(a)   Appointment of Liquidation Trustees

The Liquidation Trustees shall be selected by the members of the Committee and shall be identified in the Liquidation Trust Agreement. The appointment of the Liquidation Trustees shall be approved in the Confirmation Order, and the Liquidation Trustees' duties shall commence as of the Effective Date. The Liquidation Trustees shall administer the Combined Plan and Disclosure Statement and the Liquidation Trust and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Causes of Action belonging to the Estates.

In accordance with the Liquidation Trust Agreement, the Liquidation Trustees shall serve in such capacity through the earlier of (i) the date on which the Liquidation Trust is dissolved in accordance with Section 12.3(j) hereof and (ii) the date on which a Liquidation Trustee resigns, is terminated, or is otherwise unable to serve; provided, however, that, in the event that a

Liquidation Trustee resigns, is terminated, or is otherwise unable to serve, the Trust Advisory Board shall appoint a successor to serve as a Liquidation Trustee in accordance with the Liquidation Trust Agreement.  If the Trust Advisory Board does not appoint a successor within the time periods specified in the Liquidation Trust Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Liquidation Trust, shall approve a successor to serve as a Liquidation Trustee.  Any such successor Liquidation Trustee shall serve in such capacity until the Liquidation Trust is dissolved.

(b)     Responsibilities of Liquidation Trustees

Responsibilities of the Liquidation Trustees, subject to a Trust Advisory Board consisting of those parties identified in the Plan Supplement, and at no time greater than four members, shall include, but are not limited to:

(i)     Administering the implementation hereof, including the making of the Distributions contemplated herein;

(ii)    Marshalling, marketing for sale, and liquidating the Estates' Assets;

(iii)   Conducting an analysis of any and all Claims and Equity Interests and prosecuting objections thereto or settling or otherwise compromising such Claims and Equity Interests, if necessary and appropriate, in accordance with Article XIV hereof;

(iv)    Maintaining and administering the Reserves in accordance with the terms hereof;

(v)     Commencing, prosecuting, or settling claims and Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges in accordance herewith and paying all associated costs;

(vi)    Recovering and compelling turnover of the Debtors' property;

(vii)   Adjudicating third-party claims assigned, purchased, or otherwise transferred to the Liquidation Trust;

(viii)  Paying Liquidation Trust Expenses;

(ix)    Abandoning any property constituting the Estates' Assets that cannot be sold or otherwise disposed of for value and whose Distribution to Holders of Allowed Claims would not be feasible or cost-effective in the Liquidation Trustees' reasonable judgment;

(x)     Preparing and filing post-Effective Date operating reports;

(xi)    Filing appropriate tax returns in the exercise of the Liquidation Trustees' fiduciary obligations;

(xii)    Retaining such Professionals as are necessary and appropriate in furtherance of the Liquidation Trustees' fiduciary obligations; and

(xiii)    Taking such actions as are necessary and reasonable to carry out the purposes of the Liquidation Trust, including winding down the Debtors' business affairs.

(c)    <u>Establishment of a Liquidation Trust</u>

Pursuant to the Confirmation Order, the Liquidation Trust, which may be referred to as the "Cred Inc. Liquidation Trust," will be established. The Liquidation Trust shall be the successor-in-interest to the Committee. The Liquidation Trust will be intended to qualify as a "liquidating trust" as described in Treasury Regulations Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-2 C.B. 684, and will be treated for federal income tax purposes as a "grantor trust" under Internal Revenue Code sections 671-677. The Liquidation Trust shall be managed by the Liquidation Trustees, who shall be selected by the Committee in its sole discretion, and subject to a Trust Advisory Board consisting of each member of the Committee who wishes to continue in such role, and such additional members nominated by the Committee, if any. The Liquidation Trust shall be administered in accordance with the terms of the Liquidation Trust Agreement.

Prior to the Effective Date, any and all of the Estates' Assets shall remain Assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date shall, subject to the Liquidation Trust Agreement, be transferred to and vest in the Liquidation Trust. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, assigned or sold pursuant to a prior Order or the Combined Plan and Disclosure Statement, the Liquidation Trustees specifically retain and reserve the right to assert, after the Effective Date, any and all of the claims, Causes of Action (including but not limited to those Causes of Action listed on the Causes of Action List) and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Liquidation Trust and the Liquidation Trustees shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Liquidation Trust Agreement, compromise or settle any Liquidation Trust Assets. From and after the Effective Date, the Liquidation Trust and the Liquidation Trustees may commence, litigate, and settle any Causes of Action or Claims relating to the Liquidation Trust Assets or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Liquidation Trust and Liquidation Trustees on or after the Effective Date, except as otherwise expressly provided herein and in the Liquidation Trust Agreement. The Liquidation Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

Other than as set forth herein, no other Entity may pursue such Liquidation Trust Assets on or after the Effective Date. The Liquidation Trustees shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Liquidation Trust Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the

Liquidation Trustees shall execute the Liquidation Trust Agreement and shall have established the Liquidation Trust pursuant hereto.  In the event of any conflict between the terms of this Article XII and the terms of the Liquidation Trust Agreement, the terms of the Liquidation Trust Agreement shall control.

(d)     Liquidation Trust Assets

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Liquidation Trust Assets become available, the Debtors shall be deemed, subject to the Liquidation Trust Agreement, to have automatically transferred to the Liquidation Trust all of their right, title, and interest in and to all of the Liquidation Trust Assets, in accordance with section 1141 of the Bankruptcy Code, including the Debtors' attorney-client privilege.  All such Assets shall automatically vest in the Liquidation Trust free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims as set forth herein and the expenses of the Liquidation Trust as set forth herein and in the Liquidation Trust Agreement.  Thereupon, the Debtors shall have no interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.

(e)     Treatment of Liquidation Trust for Federal Income Tax Purposes; No Successor-in-Interest

The Liquidation Trust shall be established for the primary purpose of liquidating and distributing the Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. Accordingly, the Liquidation Trustees may, in an expeditious but orderly manner, liquidate the Liquidation Trust Assets, make timely Distributions to the Liquidation Trust Beneficiaries and not unduly prolong its duration.  The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidation Trust Agreement.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Liquidation Trustees expressly for such purpose.

The Liquidation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidation Trust Beneficiaries treated as grantors and owners of the Liquidation Trust.  For all federal income tax purposes, all parties (including the Debtors, the Liquidation Trustees, and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets by the Debtors to the Liquidation Trust, as set forth in the Liquidation Trust Agreement, as a transfer of such Assets by the Debtors to the Holders of Allowed General Unsecured Claims entitled to Distributions from the Liquidation Trust Assets, followed by a transfer by such Holders to the Liquidation Trust.  Thus, the Liquidation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

As soon as practicable after the Effective Date, the Liquidation Trustees shall make a good faith determination of the fair market value of the Estates' Assets as of the Effective Date, provided, however, that the Liquidation Trustees shall not be required to hire an expert to make such a valuation.  This valuation shall be used consistently by all parties (including the Debtors, the Liquidation Trustees, and the Holders of General Unsecured Claims) for all federal income

49

tax purposes.  The Bankruptcy Court shall resolve any dispute regarding the valuation of the Liquidation Trust Assets.

The right and power of the Liquidation Trustees to invest the Liquidation Trust Assets, the proceeds thereof, or any income earned by the Liquidation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of Section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings or other IRS pronouncements.  The Liquidation Trustees may expend the Cash of the Liquidation Trust (i) as reasonably necessary to meet Contingent Liabilities and to maintain the value of the respective Assets of the Liquidation Trust during liquidation, (ii) to pay the respective reasonable administrative expenses (including any taxes imposed on the Liquidation Trust) and (iii) to satisfy other respective Liabilities incurred by the Liquidation Trust in accordance herewith and with the Liquidation Trust Agreement (including the payment of any taxes).

(f)     The Trust Advisory Board.

The Trust Advisory Board shall consist of those parties identified in the Plan Supplement, and at no time greater than four members.  To the extent any act of the Trust Advisory Board requires a majority vote of the Trust Advisory Board and such vote ends in a tie, then such act shall be subject to the approval of the Bankruptcy Court by the motion of the Liquidation Trustees.

The Trust Advisory Board shall have the responsibility to review and advise the Liquidation Trustees with respect to the liquidation and Distribution of the Estates' Assets in accordance herewith and the Liquidation Trust Agreement.  For the avoidance of doubt, in advising the Liquidation Trustees the Trust Advisory Board shall maintain the same fiduciary responsibilities as the Liquidation Trustee delineated in Article 12.3(b)(i)-(xiii) herein.  The Debtors or the Committee shall File a notice identifying the final members of the Trust Advisory Board no later than the date of the Combined Hearing.  Vacancies on the Trust Advisory Board shall be filled by a Person designated by the remaining member or members of the Trust Advisory Board from among the Holders of General Unsecured Claims, and the Trust Advisory Board shall use reasonable efforts to maintain such composition of the members of the Trust Advisory Board as existed prior to the resignation of such member.  The Liquidation Trustees shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Trust Advisory Board for cause.  Any successor appointed pursuant to this Section 12.3(f) shall become fully vested with all of the rights, powers, duties and obligations of his or her predecessor.  For the avoidance of doubt, no member of the Trust Advisory Board shall be compensated for serving as a member of the Trust Advisory Board; provided, however, that such members may be reimbursed from the Liquidation Trust for reasonable out of pocket expenses.

The Liquidation Trustees will need the consent of the Trust Advisory Board, or approval of the Bankruptcy Court, before pursuing any potential Avoidance Actions under 11 U.S.C. § 547.

(g)     Expenses of Liquidation Trustees

The Liquidation Trust Expenses shall be paid from the Liquidation Trust Assets.

(h)     Insurance; Bond

The Liquidation Trustees, in their sole discretion, may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the Liabilities and obligations of the Liquidation Trustees and the Trust Advisory Board under the Liquidation Trust Agreement.  Unless otherwise agreed to by the Trust Advisory Board, the Liquidation Trustees shall serve with a bond, the terms of which shall be agreed to by the Trust Advisory Board, and the cost and expense of which shall be paid by the Liquidation Trust.

(i)     Fiduciary Duties of the Liquidation Trustees

Pursuant hereto and the Liquidation Trust Agreement, the Liquidation Trustees shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims that will receive Distributions pursuant to the terms hereof.

(j)     Termination of the Liquidation Trust

The Liquidation Trust will terminate on the earlier of: (a) final liquidation, administration and Distribution of the Liquidation Trust Assets in accordance with the terms of the Liquidation Trust Agreement and the Combined Plan and Disclosure Statement, and its full performance of all other duties and functions as set forth herein or in the Liquidation Trust Agreement; and (b) the fifth (5th) anniversary of the Effective Date.  Notwithstanding the foregoing, multiple fixed term extensions can be obtained so long as Bankruptcy Court approval is obtained within six (6) months before the expiration of the term of the Liquidation Trust and each extended term provided that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust within the meaning of Section 301.7701-4(d) of the Treasury Regulations for federal income tax purposes.  After (a) the final Distributions pursuant hereto, (b) the Filing by or on behalf of the Liquidation Trust of a certification of dissolution with the Bankruptcy Court, and (c) any other action deemed appropriate by the Liquidation Trustees, the Liquidation Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

(k)     Liability of Liquidation Trustees; Indemnification

Neither the Liquidation Trustees, the Trust Advisory Board, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "Liquidation Trust Party" and collectively, the "Liquidation Trust Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Liquidation Trust or for the act or omission of any other Liquidation Trust Party, nor shall the Liquidation Trust Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Liquidation Trust Agreement or the Combined Plan and Disclosure Statement other than for specific acts or omissions resulting from such Liquidation Trust Party's willful misconduct, gross negligence or actual fraud.  Subject to the Liquidation Trust Agreement, the Liquidation Trustees shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Trust Advisory Board shall be entitled to enjoy all of

the rights, powers, immunities and privileges of an official committee of unsecured creditors. The Liquidation Trustees, or the Trust Advisory Board, may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, neither the Liquidation Trustees nor the Trust Advisory Board shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Liquidation Trustees or Trust Advisory Board or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud.  The Liquidation Trust shall indemnify and hold harmless the Liquidation Trust Parties (in their capacity as such), from and against and in respect of all Liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidation Trust or the Combined Plan and Disclosure Statement or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud.  Persons dealing or having any relationship with the Liquidation Trustees shall have recourse only to the Liquidation Trust Assets and shall look only to the Liquidation Trust Assets to satisfy any liability or other obligations incurred by the Liquidation Trustees or the Trust Advisory Board to such Person in carrying out the terms of the Liquidation Trust Agreement, and neither the Liquidation Trustees nor the Trust Advisory Board shall have any personal obligation to satisfy any such liability.  The Liquidation Trustees and/or the Trust Advisory Board members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Liquidation Trust Agreement against any of them.  The Liquidation Trust shall promptly pay expenses reasonably incurred by any Liquidation Trust Party in defending, participating in, or settling any action, proceeding or investigation in which such Liquidation Trust Party is a party or is threatened to be made a party or otherwise is participating in connection with the Liquidation Trust Agreement or the duties, acts or omissions of the Liquidation Trustees or otherwise in connection with the affairs of the Liquidation Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise.  Each Liquidation Trust Party hereby undertakes, and the Liquidation Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Exculpated Party is not entitled to be indemnified therefor under the Liquidation Trust Agreement.  The foregoing indemnity in respect of any Liquidation Trust Party shall survive the termination of such Liquidation Trust Party from the capacity for which they are indemnified.

(l)    Full and Final Satisfaction Against Liquidation Trust

On and after the Effective Date, the Liquidation Trust shall have no liability on account of any Claims or Equity Interests except as set forth herein and in the Liquidation Trust Agreement.  All payments and all Distributions made by the Liquidation Trustees hereunder

shall be in full and final satisfaction, settlement, and release of and in exchange for all Claims or Equity Interests against the Debtors.

## 12.4    Effectuating Documents; Further Transactions

The appropriate officer(s) and/or director(s) of the Debtors or the Liquidation Trustees, as applicable, shall be, and hereby are, authorized to execute, deliver, file, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## 12.5    Cancellation of Instruments and Stock

On the Effective Date, except to the extent otherwise provided herein, all notes, instruments, certificates, and other documents evidencing debt or Equity Interests in the Debtors shall be cancelled and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged, including any and all warrants, options, rights, or interests with respect to such Equity Interests that have been issued, could be issued, or that have been authorized to be issued but that have not been issued; provided, however, that Cred shall: (i) maintain one (1) share of common stock of each Debtor subsidiary; and (ii) issue one (1) share of common stock to the Liquidation Trust.  After the Effective Date, the Liquidation Trustees shall serve as the officers, directors, or managers of each of the Debtors, as applicable, under applicable state law, and shall be authorized to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements and to take such actions on behalf of the Debtors as may be necessary or appropriate subject to the terms and conditions of the Combined Plan and Disclosure Statement.

The Holders of, or parties to, the cancelled notes, membership interests, share certificates, and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, and other agreements and instruments or the cancellation thereof, except the rights provided pursuant hereto.

## 12.6    Disposition of Books and Records

After the Effective Date, the Debtors shall transfer the Debtors' books and records in the Debtors' possession to the Liquidation Trust.  From and after the Effective Date, the Liquidation Trustees shall continue to preserve and maintain all documents and electronic data transferred to the Liquidation Trust by the Debtors, and the Liquidation Trustees, subject to Section 12.8 hereof, shall not destroy or otherwise abandon any such documents and records (in electronic or paper format) absent further order of the Bankruptcy Court after a hearing upon notice to parties-in-interest; provided, however, that the Liquidation Trustees may destroy or abandon such books and records upon entry of a Final Order closing the last Chapter 11 Case.  Subject to further order of the Court, the Examiner and his Professionals shall retain all documents, files and

records pertaining to the Debtors in their possession, custody or control and may not share, produce or transmit such documents, files and records to any other Entity.

## 12.7    Corporate Existence and Dissolution of Debtors

Immediately after the Effective Date, the Liquidation Trustees shall be authorized to take, in their sole and absolute discretion, all actions reasonably necessary to dissolve one or more of the Debtors under applicable laws, including under the laws of the jurisdictions in which they may be organized or registered, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation.  Upon the final Distributions, any Debtors that have not been previously dissolved shall be deemed dissolved for all purposes without the necessity for other or further actions to be taken by or on behalf of the Debtors, and the Liquidation Trustees shall be authorized to file any certificate of cancellation or other documents as may be necessary or desirable to terminate the legal existence of the Debtors.

## 12.8    Closing the Chapter 11 Cases

Upon the Effective Date, the Chapter 11 Cases for the Debtors, except for Cred, shall be deemed closed, and the Liquidation Trustees shall submit separate orders to the Bankruptcy Court under certification of counsel closing each such Chapter 11 Case.  After all Causes of Action and Disputed Claims have been resolved, the U.S. Trustee Fees have been paid, all of the Estates' Assets have been distributed in accordance herewith, or at such earlier time as the Liquidation Trustees deem appropriate, the Liquidation Trustees shall seek authority from the Bankruptcy Court to close the Chapter 11 Case for Cred, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

## ARTICLE  XIII.
## DISTRIBUTIONS UNDER THE COMBINED PLAN AND DISCLOSURE STATEMENT

## 13.1    Distributions on Allowed General Unsecured Claims

All Allowed General Unsecured Claims held by a single creditor against one or more Debtors shall be aggregated and treated as a single Claim.  At the written request of the Liquidation Trustees, any Creditor holding multiple Allowed General Unsecured Claims shall provide to the Liquidation Trustees a single address to which any Distributions shall be sent.

## 13.2    Timing of Distributions

(a)    <u>Distributions on Account of Allowed A/P/S Claims</u>. The Liquidation Trustees shall pay any Allowed A/P/S Claim against the Debtors, as soon as practicable after the later of (a) the Effective Date and (b) the date upon which any such Claim becomes an Allowed Claim.

(b)    <u>Interim Distributions on Account of Allowed General Unsecured Claims</u>. Subject to approval of the Trust Advisory Board as set forth in the Liquidation Trust Agreement, (a) the Liquidation Trustees may make an interim Distribution to Holders of Allowed General Unsecured Claims at least semi-annually provided that any such Distribution is not unduly burdensome to the Liquidation Trust, and (b) may make more frequent interim Distributions if

the Liquidation Trustees determine that such interim Distributions are warranted and economical; provided, however, that any such Distribution shall only be made if the Liquidation Trustees retain amounts reasonably necessary to meet Contingent Liabilities, to maintain the value of the Liquidation Trust Assets during liquidation, and to satisfy other Liabilities or expenses incurred by the Liquidation Trust in accordance herewith or with the Liquidation Trust Agreement.

(c)     Final Distributions on Allowed General Unsecured Claims. Notwithstanding anything else herein, upon the settlement and satisfaction of all A/P/S Claims, the completion of the prosecution and/or settlement of all Claims Objections and Causes of Action, and the completion of the sale and/or liquidation of all Assets, the Liquidation Trustees shall distribute, as soon as practicable, all remaining Liquidation Trust Assets to Holders of Allowed General Unsecured Claims.

**13.3    Delivery of Distributions**

Except as set forth herein, all Distributions to any Holder of an Allowed Claim shall be made: (i) by wire transfer; (ii) at the address of such Holder as set forth on the Schedules Filed with the Bankruptcy Court or on the books and records of the Debtors or its agents, as applicable, unless the Debtors or the Liquidation Trustees have been notified in writing of a change of address, including by the filing of a Proof of Claim by such Holder that contains an address for such Holder different than the address of such Holder as set forth on the Schedules, if being paid in Cash; or, if applicable (iii) with respect to any Holder of a Customer Claim entitled to an Equivalent Cryptocurrency Distribution at the Cryptocurrency Election E-Wallet Address; provided, however, that to receive an Equivalent Cryptocurrency Distribution, Holders of Customer Claims that made a Cryptocurrency Election shall provide their Cryptocurrency Election E-Wallet Address to the Liquidation Trustees.  Nothing herein shall require the Debtors or the Liquidation Trustees to attempt to locate any Holder of an Allowed Claim.

The Liquidation Trustees shall require any Holders of Allowed Claims or other distributee to furnish to the Liquidation Trustees in writing: (i) an Employer Identification Number or Taxpayer Identification Number as assigned by the IRS; (ii) if applicable, bank account and routing numbers; and (iii) if applicable, a Cryptocurrency Election E-Wallet Address, and the Liquidation Trustees may condition any Distribution to any Holders of Allowed Claims or other distributee upon receipt of such identification number and, if applicable, the Cryptocurrency Election E-Wallet Address.  If the Employer Identification Number, Taxpayer Identification Number, if necessary, bank account or routing number, or, if applicable, Cryptocurrency Election E-Wallet Address are not provided by the required deadline established by the Liquidation Trustees, the Claim of any Holders of Allowed Claims or other distributee may be expunged and no Distribution will be made by the Liquidation Trustees to such Holders of Allowed Claims or other distributee.  The Liquidation Trustees may withhold from distributions any withholding tax it determines in its reasonable discretion must be so withheld, including, without limitation, to foreign creditors who have not provided instruments supporting exemption from withholding tax reasonably satisfactory to the Liquidation Trustees.

**13.4    Undeliverable and Unclaimed Distributions**

(a)    Holding Undeliverable and Unclaimed Distributions

If the Distribution to any Holder of an Allowed Claim is returned as undeliverable or is otherwise unclaimed, no additional Distributions shall be made to such Holder unless and until the Liquidation Trustees are notified in writing of such Holder's then-current address.  Nothing contained herein shall require the Liquidation Trustees to attempt to locate any Holder of an Allowed Claim.

The Liquidation Trustees shall make all Distributions that have become deliverable as soon as reasonably practicable after such Distribution has become deliverable or has been claimed.

(b)    Failure to Claim Unclaimed/Undeliverable Distributions

Subject to Section 13.7 hereof, any Holder of an Allowed Claim that does not assert a Claim pursuant hereto for an undeliverable or unclaimed Distribution within six (6) months after the Distribution is made shall be deemed to have its Claim expunged and shall have forfeited its right to such undeliverable or unclaimed Distribution and any subsequent Distribution on account of its Allowed Claim and shall be forever barred and enjoined from asserting any such Claim for an undeliverable or unclaimed Distribution or any subsequent Distribution on account of its Allowed Claims against the Debtors, their Estates, their property or the Assets.  In such cases, such unclaimed/undeliverable Distributions shall be redistributed and paid to Holders of Allowed Claims in accordance herewith, free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.

(c)    Charitable Donations

On or about the time that a final Distribution is made and upon the Liquidation Trustees determining that there are insufficient funds remaining to warrant a further Distribution to Holders of Claims hereunder, the Liquidation Trustees, with the approval of the Trust Advisory Board, may donate any undistributed funds to one or more charities selected by the Liquidation Trustees, provided that any charity selected shall not be affiliated with or connected to the Debtors or the Liquidation Trustees.

**13.5    Transfer of Claims**

The Claims Register shall remain open after the Effective Date, and the Liquidation Trustees shall recognize any transfer of Claims in accordance with Bankruptcy Rule 3001(e) at any time thereafter, provided that for purposes of each Distribution, the Liquidation Trustees will not recognize any transfer during the period commencing thirty (30) calendar days prior to making any Distribution.  Except as otherwise provided herein, any transfer of a Claim, whether occurring prior to or after the Confirmation Date, shall not affect or alter the classification and treatment of such Claim hereunder, and any such transferred Claim shall be subject to classification and treatment hereunder as if such Claim was held by the transferor who held such Claim on the Petition Date.

### 13.6    Manner of Payment

At the option of the Liquidation Trustees, any Cash payment to be made hereunder may be made by a check, wire transfer, E-Wallet to E-Wallet transfer of Cryptocurrencies, if applicable, or as otherwise required or provided in applicable agreements.

### 13.7    Distributions to Cryptocurrency Election E-Wallet Addresses

The Liquidation Trustees shall maintain records of all distributions made to Cryptocurrency Election E-Wallet Addresses, including confirmations of E-Wallet to E-Wallet transfers. The Liquidation Trustees are only required to initiate such E-Wallet to E-Wallet transactions. The Liquidation Trustees are not responsible, and shall not be held liable, for any actions involving transferred Cryptocurrency after the initiation of such E-Wallet to E-Wallet transfers.

### 13.8    Time Bar to Cash Payments by Check

Checks issued by, or on behalf of, the Debtors or the Liquidation Trust on account of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Requests for reissuance of any check shall be made in writing directly to the Liquidation Trustees by the Holder of the Allowed Claim with respect to which such check originally was issued on or before the later of (a) the first anniversary of the Effective Date, (b) the first anniversary of the date on which the Claim at issue became an Allowed Claim, and (c) nine (9) months after the date the check was issued. After such dates, all Claims in respect of void checks shall be expunged, extinguished, discharged, and forever barred, and the proceeds of such checks shall revest in the Liquidation Trust.

### 13.9    No Fractional Cents

Notwithstanding any other provision hereof to the contrary, no payment of fractional cents shall be made pursuant hereto. Whenever any payment of a fraction of a cent hereunder would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down) with half cents or more being rounded up and fractions less than half of a cent being rounded down.

### 13.10    Setoffs and Recoupment

The Liquidation Trustees may, but shall not be required to, set off against or recoup from any Claim and the payments to be made pursuant hereto in respect of such Claim any Claims of any nature whatsoever that the Debtors may have against the claimant; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Liquidation Trust of any such claim they may have against such claimant.

### 13.11    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution hereunder consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution

shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## 13.12  Distributions After Effective Date

Distributions made after the Effective Date shall be deemed to have been made on the Effective Date.

## 13.13  Interest on Claims

Except as specifically provided for herein or in the Confirmation Order, interest shall not accrue on Claims, and no Holders of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date through the date such Claim becomes an Allowed Claim.  Except as expressly provided herein, no Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

## 13.14  No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution in excess of the Allowed amount of such Claim.

## 13.15  Payment of Taxes on Distributions Received Pursuant to the Combined Plan and Disclosure Statement

All Entities that receive Distributions hereunder shall be responsible for reporting and paying, as applicable, all appropriate federal, state and local taxes on account of such Distributions.  This includes, but is not limited, any amount of tax due to be withheld from Distributions which the Liquidation Trustees did not withhold.

## 13.16  Reserves

On the Effective Date, and after making all Distributions required to be made on the Effective Date hereunder, the Liquidation Trustees shall establish and maintain a separate reserve (each, a "Reserve") for the estimated amount of the Liquidation Trust Expenses, as well as each Class of Claims and Unclassified Claims, which Reserve shall be administered by the Liquidation Trustees.  To the extent that Reserves are established and maintained for the benefit of any Holder of a Disputed Claim, such Reserves shall include a combination of Cryptocurrency and Cash equal to the Distributions that would have been made to the Holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (a) the amount of the Disputed Claim, (b) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim ultimately may become an Allowed Claim, or (c) such other amount as may be agreed upon by the Holder of such Disputed Claim and the Liquidation Trustees.

**13.17   *De Minimis* Distributions**

All De Minimis Distributions will be held by the Liquidation Trustees for the benefit of the Holders of Allowed Claims entitled to such De Minimis Distributions.  When the aggregate amount of De Minimis Distributions held by the Liquidation Trustees for the benefit of a Holder of a Claim exceeds $25.00, the Liquidation Trustees will distribute such De Minimis Distributions to such Holder.  If, at the time that the final Distribution hereunder is to be made, the De Minimis Distributions held by the Liquidation Trustees for the benefit of a Holder of a Claim total less than $25.00, such funds shall not be distributed to such Holder, but rather, such Claims shall be deemed expunged and such Distribution shall vest in the Liquidation Trust and be distributed to other Holders of Allowed Claims in accordance with the terms hereof.

## ARTICLE  XIV.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

**14.1   Claims Administration Responsibilities**

Except as otherwise specifically provided herein and in the Liquidation Trust Agreement, after the Effective Date, the Liquidation Trustees shall have the sole authority, including assumption of the authority of the Debtors with respect to any dispute in respect of a Claim or Equity Interest initiated prior to the Effective Date, (a) to File, withdraw, or litigate to judgment objections to Claims or Equity Interests, (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, (c) to amend the Schedules in accordance with the Bankruptcy Code, and (d) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

**14.2   Claims Objections**

Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Combined Plan and Disclosure Statement, or otherwise becomes an Allowed Claim prior to the Effective Date, upon the Effective Date, the Liquidation Trustees shall be deemed to have a reservation of any and all objections of the Estates to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, priority, secured or unsecured, including any and all objections to the validity or amount of any and all alleged Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, Secured Claims, Convenience Claims, General Unsecured Claims, Subordinated Securities Claims, Equity Interests, Liens and security interests, whether under the Bankruptcy Code or other applicable law or contract.  The Debtors' or the Liquidation Trustees' failure to object to any Claim in the Chapter 11 Cases shall be without prejudice to the Liquidation Trustees' rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the Holder of such Claim.

Unless otherwise provided herein or by order of the Bankruptcy Court, any objections to Claims (including Administrative Expense Claims but excluding Professional Fee Claims) by the Liquidation Trustees shall be filed and served not later than 180 days after the later of (i) the

Effective Date or (ii) the date such Claim is filed (the "Claims Objection Deadline"); provided that the Liquidation Trustees may request (and the Bankruptcy Court may grant) an extension of such deadline by filing a motion with the Bankruptcy Court, based upon a reasonable exercise of the Liquidation Trustees' business judgment; provided further that with respect to Claims that, as of the Claims Objection Deadline, are subject to a pending objection (an "Initial Objection") wherein the objection to such Claim is ultimately denied, the Claims Objection Deadline shall be extended to the later of sixty (60) calendar days from the date on which (a) the Bankruptcy Court enters an order denying such Initial Objection or (b) any appellate court enters a Final Order reversing or vacating an order of the Bankruptcy Court granting such Initial Objection.  A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment hereto.

## 14.3    Estimation of Claims

The Liquidation Trustees may (but are not required to) at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidation Trustees, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidation Trustees may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## 14.4    Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Claims Agent at the direction of the Liquidation Trustees without the Liquidation Trustees having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 14.5   No Distributions Pending Allowance

Notwithstanding any other provision hereof, if any portion of a Claim is Disputed, no payment or Distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes Allowed.

### 14.6   Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions hereof.

### 14.7   Disallowance of Certain Claims

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or by an Entity that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and such Entities may not receive any Distributions on account of their Claims until such time as such Causes of Action against such Entities have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by such Entity have been turned over or paid to the Liquidation Trust; provided, however that no claim of UpgradeYa shall be deemed Disallowed pursuant to Bankruptcy Code section 502(d) unless and until the Liquidating Trust obtains a judgment and Final Order from the Bankruptcy Court determining that estate property is recoverable from UpgradeYa pursuant to Bankruptcy Code sections 542, 543, 550, or 553 or that a transfer made to UpgradeYa is avoidable under Bankruptcy Code sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a).

The Liquidation Trustees may, in their sole discretion, deem that any Claim is a Disputed Claim unless otherwise provided in a Final Order of the Bankruptcy Court, agreed to by the Liquidation Trustees or until expiration of the Claims Objection Deadline as set forth in section 14.2.  To the extent that there is no claim objection pending on the Claims Objection Deadline and a Claim has not otherwise been Disallowed pursuant to the terms of the Combined Plan and Disclosure Statement, such claim shall then be deemed an Allowed Claim.

### 14.8   Amendments to Claims

On or after the Effective Date, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Liquidation Trustees, and any such new or amended Claim filed without prior authorization shall be deemed Disallowed in full and expunged without any further action.

### 14.9   Claims Paid and Payable by Third Parties

A Claim shall be Disallowed without an Objection thereto having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors, the Liquidation Trust, or the Liquidation Trustees.  Distributions under the

Combined Plan and Disclosure Statement shall be made on account of any Allowed Claim that is payable pursuant to one of the Debtors' insurance policies solely up to the amount of, and in full and complete satisfaction of, the portion of such Allowed Claim that is within the deductible or self-insured retention under such insurance policy. Except as provided in this Section 14.9, no Entity shall have any other recourse against the Debtors, the Estates, the Liquidation Trust, or any of their respective properties or assets on account of such deductible or self-insured retention under an insurance policy.

## ARTICLE XV.
## EXECUTORY CONTRACTS AND LEASES

### 15.1    Executory Contracts and Unexpired Leases Deemed Rejected

On the Effective Date, all of the Debtors' Executory Contracts and Unexpired Leases will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except to the extent (a) the Debtors previously have assumed, assumed and assigned, or rejected such Executory Contract or Unexpired Lease, (b) prior to the Effective Date, the Debtors have filed a motion to assume, assume and assign, or reject an Executory Contract or Unexpired Lease on which the Bankruptcy Court has not ruled, (c) an Executory Contract and Unexpired Lease is identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant hereto, or (d) Executory Contracts and Unexpired Leases under which the counterparty has consented to the extension of the time by which the Debtors must assume or reject to a date beyond the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all assumptions, assignments, and rejections of Executory Contracts and Unexpired Leases pursuant to this Section 15.1, the Plan Supplement, and sections 365(a) and 1123 of the Bankruptcy Code. Assumptions, assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. If certain, but not all, of a contract counterparty's Executory Contracts and Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order will be a determination that such counterparty's Executory Contracts and Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and Unexpired Leases that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection by the Confirmation Objection Deadline on the grounds that their agreements are integrated and not severable.

### 15.2    Bar Date For Rejection Damages

If the rejection by the Debtors of an Executory Contract or an Unexpired Lease pursuant to Section 15.1 hereof results in damages to the other party or parties to such Executory Contract or Unexpired Lease, a Claim for such damages arising from such rejection shall not be enforceable against the Debtors or their Estates or agents, successors, or assigns, unless a Proof of Claim is filed with the Claims Agent **so as to actually be received on or before** the Rejection Bar Date.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or Unexpired Lease hereunder and that fails to timely do so shall be forever barred, estopped, and enjoined from asserting such Claim, and such Claim shall not be enforceable against the Liquidation Trust, the Liquidation Trustees, the Debtors, the Estates, and their respective properties, and the Liquidation Trust, the Liquidation Trustees, Debtors, the Estates, and their respective properties shall be forever discharged from any and all Liabilities with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction pursuant to Section 18.4 hereof and the Confirmation Order.

# ARTICLE XVI.
## CONDITIONS PRECEDENT TO THE CONFIRMATION AND THE EFFECTIVE DATE

**16.1    Conditions Precedent to Confirmation of the Combined Plan and Disclosure Statement**

The following are conditions precedent to confirmation of the Combined Plan and Disclosure Statement:

(a)    The Plan Support Agreement shall not have been terminated;

(b)    The Bankruptcy Court shall have entered the Confirmation Order, in a form and substance reasonably acceptable to the Committee, and the Confirmation Order shall have become a Final Order;

(c)    The final version of all of the schedules, documents, and exhibits, including the Plan Supplement, shall have been filed in form and substance acceptable to the Committee in its reasonable discretion; and

(d)    No breach or failure to comply with the terms of the Definitive Documents, the Confirmation Order or any other material Final Order of the Bankruptcy Court shall have occurred and be continuing.

**16.2    Conditions Precedent to the Effective Date**

The Effective Date shall not occur, and the Combined Plan and Disclosure Statement shall not become effective with respect to the Debtors, unless and until the following conditions are satisfied in full or waived in accordance with Section 16.3 hereof:

(a)    The Plan Support Agreement shall not have been terminated;

(b)    No breach or failure to comply with the terms of the Definitive Documents, the Confirmation Order, or any other material Final Order of the Bankruptcy Court shall have occurred and be continuing;

(c)    The conditions to confirmation delineated in Section 11.1 hereof shall have either been satisfied or waived in accordance herewith;

(d)   All documents required hereunder shall have been delivered'

(e)   The Confirmation Order in form and substance reasonably satisfactory to the Committee shall have been entered by the Bankruptcy Court, and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto;

(f)   The Debtors and the Liquidation Trustees shall have executed the Liquidation Trust Agreement;

(g)   All actions and all agreements, instruments, or other documents necessary to implement the terms and provisions hereof are effected or executed and delivered, as applicable;

(h)   The Professional Fee Escrow shall have been established and fully funded in the amount of the Professional Fee Reserve Amount; and

(i)   All authorizations, consents, and regulatory approvals, rulings, letters, no-action letters, opinions, or documents, if any, that are necessary to implement the Combined Plan and Disclosure Statement or that are required by the applicable Debtor entity or applicable law, regulation, or order, in connection with the Consummation of the Combined Plan and Disclosure Statement shall have been obtained and not revoked.

## 16.3   Waiver of Conditions Precedent to the Effective Date

Each of the conditions precedent in Section 16.2 hereof may be waived, in whole or in part, by the Debtors, with the consent of the Committee, without leave or order of the Bankruptcy Court and without any formal action on the part of the Bankruptcy Court.  The Debtors and the Liquidation Trustees reserve the right to assert that any appeal from the Confirmation Order shall be moot after the Effective Date.

## 16.4   Satisfaction of Conditions

Except as expressly provided or permitted herein, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  In the event that one or more of the conditions specified in Section 16.2 hereof shall not have occurred or otherwise been waived pursuant to Section 16.3 hereof, (a) the Confirmation Order shall be vacated, (b) the Debtors and all Holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (c) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

# ARTICLE XVII.
# EFFECT OF CONFIRMATION

**17.1     Compromise and Settlement of Claims, Equity Interests, and Controversies**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant hereto, the provisions hereof shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Allowed Equity Interest or any Distribution to be made on account of such Allowed Claim or Allowed Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests, and is fair, equitable, and reasonable. In accordance with the provisions hereof, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Liquidation Trustees may compromise and settle Claims against the Liquidation Trust and Causes of Action against other Entities.

**17.2     Binding Effect**

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Combined Plan and Disclosure Statement, the Plan Supplement, and the Confirmation Order shall bind (a) any Holder of a Claim against, or Equity Interest in, the Debtors and such Holder's respective successors and assigns (whether or not the Claim or Equity Interests are Impaired hereunder, whether or not such Holder has voted to accept the Combined Plan and Disclosure Statement, and whether or not such Holder is entitled to a Distribution hereunder), (b) all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described herein, (c) each Entity acquiring property hereunder or under the Confirmation Order, and (d) any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant hereto regardless of whether any Holder of a Claim or debt has voted hereon.

**17.3     Reservation of Causes of Action/Reservation of Rights**

Except with respect to the exculpation in Section 18.1 hereof, nothing contained herein shall be deemed to be a waiver or the relinquishment of any Causes of Action that the Debtors or the Liquidation Trust, as applicable, may have or may choose to assert against any Entity, and such Causes of Action are hereby preserved pursuant to section 1123 of the Bankruptcy Code, including, without limitation, any and all avoidance or equitable subordination actions, recovery Causes of Action and Objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code, as well as all Causes of Action based upon fraud, theft, conversion, unfair competition, tortious interference, breach of fiduciary duty, common law tort, and similar and related legal theories and Causes of Action.

## ARTICLE XVIII.
## EXCULPATION, INJUNCTION, AND RELATED PROVISIONS

**18.1     Exculpation**

**None of the Debtors-in-Possession and the current or former directors, officers, employees, Affiliates, agents, accountants, financial advisors, investment bankers, restructuring advisors, attorneys, representatives, and other Professionals of or to the Debtors and the Debtors-in-Possession who served or were employed in such capacities after the Petition Date, and each of their respective agents and representatives, the Released Parties, the Committee, the members of the Committee and the Professionals retained by the Committee shall have or incur any Liability for any Claim, Cause of Action, or other assertion of Liability for any act taken or omitted to be taken in connection with or arising out of the Chapter 11 Cases, the sale of the Debtors' Assets, the formulation, dissemination, implementation, approval, confirmation, consummation, or administration hereof, property to be distributed hereunder, or any other act or omission in connection with or arising out of the Chapter 11 Cases, the Combined Plan and Disclosure Statement, or any contract, instrument, document or other agreement related thereto; provided, however, that the foregoing shall not affect the Liability of any Entity resulting from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, actual fraud, or gross negligence. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, discharges, and any other applicable law or rules protecting such Entities from liability.**

**18.2     Releases by Debtors, the Estates, the Liquidation Trust, and the Liquidation Trustees; Third Party Releases**

**Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services of the Released Parties, (a) the Debtors, (b) their respective Estates, (c) the Liquidation Trust, and (d) the Liquidation Trustees shall release, waive, and discharge unconditionally and forever each of the Released Parties from any and all Claims, Causes of Action, and Liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: (i) taking place before the Petition Date in connection with the Debtors; and (ii) in connection with or arising out of the Debtors' Chapter 11 Cases, the pursuit of confirmation of the Combined Plan and Disclosure Statement, the Consummation thereof, the administration thereof or the property to be distributed thereunder; provided, that the foregoing shall not operate as a waiver of or release from any Causes of Action resulting from the willful misconduct, actual fraud, or gross negligence of any Released Party arising under chapter 5 of the Bankruptcy Code.**

**In addition, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services of the Released Parties, the settlements and compromises contained herein, and the Distributions to be made pursuant to the Combined Plan and Disclosure Statement, (a) each of the Debtors and (b) all Holders**

of Claims or Equity Interests, who (1) vote in favor of the Combined Plan and Disclosure Statement or (2) (A) abstain from voting, are not entitled to vote, or vote to reject the Combined Plan and Disclosure Statement and (B) do not opt out of the this release on a timely submitted Ballot or the Opt-Out Election Form shall be deemed to have released and discharged each Released Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' prepetition operations and activities, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence taking place before the Effective Date.

For the avoidance of doubt, no Insider that is not a Released Party, including, without limitation, James Alexander, Lu Hua, Dan Schatt, Joseph Podulka, and Daniyal Inamullah, will receive a release or exculpation of any kind hereunder, whether from the Debtors or otherwise.

### 18.3    Avoidance Actions/Objections

Except with respect to the exculpation in Section 18.1 hereof and the releases in Section 18.2 hereof, in the Confirmation Order, or by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the Liquidation Trustees shall have the right to prosecute any and all avoidance or equitable subordination actions, recovery Causes of Action, and Objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or a Debtor-in-Possession, as well as all Causes of Action, including, without limitation, all Causes of Action based upon fraud, theft, conversion, unfair competition, tortious interference, common law tort, breach of fiduciary duty and similar and related legal theories and Causes of Action.

### 18.4    Injunction

Except as otherwise provided herein, all Entities that have held, hold, or may hold Claims against or Equity Interests in the Debtors or their Estates that arose prior to the Effective Date are permanently enjoined, solely with respect to any such Claims or Equity Interests, from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustees; (b) enforcing, attaching, collecting, or recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustees; (c) creating, perfecting, or enforcing, in any manner, directly or indirectly, any Lien or encumbrance against the Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustees; (d) except to the extent permitted by sections 362(b), 553, 559, 560, or 561 of the Bankruptcy Code, asserting any right of setoff, subrogation, or recoupment against the Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustees; (e) pursuing any Claim or Cause of Action released pursuant to the Combined Plan and

Disclosure Statement; or (f) taking any actions which interfere with the implementation or Consummation hereof.

The rights afforded herein and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtors, any of their respective Assets, properties, or Estates, or the Liquidation Trust.

Notwithstanding any language to the contrary contained herein and/or the Plan Confirmation Order, no provision of this Plan or the Plan Confirmation Order shall (i) preclude the United States Securities and Exchange Commission ("**SEC**") from enforcing its police or regulatory powers or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any Entity other than the Debtors.

**18.5    Terms of Stays and Injunctions**

The stay arising under section 362(a) of the Bankruptcy Code and the injunctions set forth in Section 18.4 hereof or provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall permanently remain in full force and effect.

**ARTICLE  XIX.**
**RETENTION OF JURISDICTION**

The Bankruptcy Court shall have exclusive jurisdiction of all matters in connection with, arising out of or related to the Chapter 11 Cases and the Combined Plan and Disclosure Statement pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including to:

(a)    Hear and determine pending applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance of cure amounts and Claims resulting therefrom;

(b)    Determine any and all adversary proceedings, applications and contested matters;

(c)    Hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(d)    Hear and determine any Claim Objections (including requests for estimation) in respect of Disputed Claims, in whole or in part;

(e)    Enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f)    Issue such orders in aid of execution hereof, to the extent authorized by section 1142 of the Bankruptcy Code;

(g) Consider any amendments to or modifications hereof or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including the Confirmation Order;

(h) Hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Combined Plan and Disclosure Statement, the Confirmation Order, the Liquidation Trust Agreement, any transactions or payments contemplated hereby or thereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(i) Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any request by the Debtors), prior to the Effective Date or request by the Liquidation Trustees after the Effective Date for an expedited determination of tax issues under section 505(b) of the Bankruptcy Code;

(j) Hear and determine all disputes involving the existence, scope, and nature of the discharges granted under the Combined Plan and Disclosure Statement, the Confirmation Order or the Bankruptcy Code;

(k) Issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any Entity with the Consummation, implementation, or enforcement of the Combined Plan and Disclosure Statement, the Confirmation Order or any other order of the Bankruptcy Court;

(l) Determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m) Hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(n) Recover all Assets of the Debtors and property of the Debtors' Estates, wherever located;

(o) Enforce the terms of the Liquidation Trust Agreement and to decide any claims or disputes which may arise or result from, or be connected with, the Liquidation Trust Agreement, any breach or default under the Liquidation Trust Agreement, or the transactions contemplated by the Liquidation Trust Agreement;

(p) Enforce the exculpation granted and injunctions issued pursuant to the Combined Plan and Disclosure Statement and the Confirmation Order;

(q) Enter a final decree closing the Chapter 11 Cases; and

(r) Hear any other matter not inconsistent with the Bankruptcy Code.

# ARTICLE XX.
## MISCELLANEOUS PROVISIONS

### 20.1    Effectuating Documents and Further Transactions

On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Plan and Disclosure Statement.  The Liquidation Trustees are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of Combined Plan and Disclosure Statement and any securities issued pursuant to the Combined Plan and Disclosure Statement.

### 20.2    Date of Distributions and Other Actions

In the event that any payment or act hereunder is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 20.3    Withholding and Reporting Requirements

In connection with the Combined Plan and Disclosure Statement and all Distributions hereunder, the Liquidation Trustees shall comply with all applicable withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding, payment, and reporting requirements.  Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution. The Liquidation Trustees have the right, but not the obligation, to refrain from making a Distribution until such Holder has made arrangements satisfactory to the Liquidation Trustees for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Liquidation Trust in connection with such Distribution.

### 20.4    Corporate Action

On the Effective Date, all matters provided for hereunder that would otherwise require approval of shareholders, directors or managers of one or more of the Debtors shall be in effect from and after the Effective Date pursuant to the applicable general business law of the states in which the Debtors are incorporated or organized, without any requirement of further action by the shareholders, directors or managers of the Debtors.

### 20.5    Modification of the Combined Plan and Disclosure Statement

Alterations, amendments, or modifications hereof or hereto may be proposed in writing by the Debtors, with the consent of the Committee, at any time prior to the Confirmation Date;

provided, that the Combined Plan and Disclosure Statement, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and the Debtors have complied with section 1125 of the Bankruptcy Code. The Combined Plan and Disclosure Statement may be altered, amended, or modified at any time after the Confirmation Date and before substantial consummation; provided, that the Combined Plan and Disclosure Statement, as altered, amended, or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Combined Plan and Disclosure Statement, as altered, amended, or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments, or modifications. A Holder of a Claim that has accepted the Combined Plan and Disclosure Statement prior to any alteration, amendment, or modification will be deemed to have accepted the Combined Plan and Disclosure Statement, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Holders of the Claims.

Prior to the Effective Date, the Debtors, with the consent of the Committee, may make appropriate technical adjustments and modifications hereto without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not materially change the treatment of Holders of Claims or Equity Interests.

## 20.6    Revocation or Withdrawal of the Combined Plan and Disclosure Statement

The Debtors-in-Possession reserve the right to revoke or withdraw the Combined Plan and Disclosure Statement, with the consent of the Committee, prior to the Confirmation Date. Subject to the foregoing sentence, if the Debtors revoke or withdraw the Combined Plan and Disclosure Statement prior to the Confirmation Date, then the Combined Plan and Disclosure Statement shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

## 20.7    Plan Supplement

The Plan Supplement and the documents contained therein shall be filed with the Bankruptcy Court no later than ten (10) calendar days before the deadline for voting to accept or reject the Combined Plan and Disclosure Statement; provided, that the documents included therein may thereafter be amended and supplemented, prior to execution, so long as such amendment or supplement does not materially and adversely change the treatment of Holders of Claims. The Plan Supplement and the documents contained therein are incorporated into and made a part hereof as if set forth in full herein.

## 20.8    Payment of Statutory Fees

On or before the Effective Date, all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Combined Hearing, shall be paid in Cash. Following the Effective Date, all such fees shall be paid by the Liquidation Trustees from the Liquidation Trust Assets until the earlier of the conversion or dismissal of the

applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.  For the avoidance of doubt, the U.S. Trustee Fees shall be deemed part of the Liquidation Trust Expenses.

## 20.9     Dissolution of the Committee

On the Effective Date, except as provided in this Section 20.9, the Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to, arising from or in connection with the Chapter 11 Cases, and the retention or employment of the Debtors' and Committee's attorneys, accountants, and other agents, if any, shall terminate, except for purposes of Filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith, or any appeal of the Confirmation Order.

## 20.10    Continued Confidentiality Obligations

Pursuant to the terms thereof, members of and advisors to the Debtors and the Committee, any other holder of a Claim or Interest and their respective predecessors, successors and assigns shall continue to be obligated and bound by the terms of any confidentiality agreement executed by them in connection with this Chapter 11 Case or the Debtor, to the extent that such agreement, by its terms, may continue in effect after the Confirmation Date.

## 20.11    Exemption from Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection herewith, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection herewith, including the issuance of any stock, any merger agreements, or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated hereunder shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

## 20.12    Expedited Tax Determination

The Debtors and the Liquidation Trustees are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Petition Date through and including the Effective Date.

## 20.13    Exhibits/Schedules

All exhibits and schedules hereto, including the Plan Supplement, are incorporated into and are a part of the Combined Plan and Disclosure Statement as if set forth in full herein.

## 20.14    Substantial Consummation

On the Effective Date, the Combined Plan and Disclosure Statement shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**20.15   Severability of Combined Plan and Disclosure Statement Provisions**

In the event that, prior to the Confirmation Date, any term or provision hereof is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall, at the request of the Debtors have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, Impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

**20.16   Governing Law**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or Plan Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without giving effect to its principles of conflict of law that would require application of the law of another jurisdiction.

**20.17   Reservation of Rights**

If the Combined Plan and Disclosure Statement is not confirmed by a Final Order, or is confirmed and does not become effective, the rights of all parties in interest in the Chapter 11 Cases are and will be reserved in full.  Any concessions or settlements reflected herein, if any, are made for purposes of the Combined Plan and Disclosure Statement only, and if the Combined Plan and Disclosure Statement does not become effective, no party in interest in the Chapter 11 Cases shall be bound or deemed prejudiced by any such concession or settlement.

**20.18   Computation of Time**

In computing any period of time prescribed or allowed by the Combined Plan and Disclosure Statement, the provisions of Rule 9006(a) of the Bankruptcy Rules shall apply.

**20.19   Post-Confirmation Reporting**

Following confirmation of the Combined Plan and Disclosure Statement, the Liquidation Trustees shall file reports of its activities and financial affairs with the Bankruptcy Court, on a quarterly basis, within thirty (30) calendar days after the conclusion of each such period; provided that the Liquidation Trustees' obligation to file such reports with the Bankruptcy Court shall terminate automatically upon the closing of the Chapter 11 Cases.  Any such reports shall

be prepared substantially consistent with (both in terms of content and format) the applicable Bankruptcy Court and U.S. Trustee guidelines on such matters.

## 20.20   Notices

All notices, requests and demands to or upon the Debtors or the Liquidation Trustees must be in writing (including by facsimile transmission) to be effective and, unless otherwise expressly provided hereunder, will be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received during the normal business hours of the Liquidation Trustees (otherwise any such notice shall be deemed to have been received on the next Business Day) and telephonically confirmed, addressed as follows:

If to the Debtors:

> Cred Inc.
> Attn:   Matthew K. Foster, Chief Restructuring Officer
> Sonoran Capital Advisors, LLC
> 1733 N Greenfield Road, Suite 10
> Mesa, Arizona 85205
>
> *with a copy to:*
>
> PAUL HASTINGS LLP
> 200 Park Avenue
> New York, New York 10136
> Attn:   G. Alexander Bongartz, Esq.
>
> *and*
>
> PAUL HASTINGS LLP
> 600 Travis Street, 58th Floor
> Houston, Texas 77002
> Attn:   James T. Grogan, Esq.
>
> *and*
>
> COUSINS LAW LLC
> Brandywine Plaza West
> 1521 Concord Pike, Suite 301
> Wilmington, Delaware 19803
> Attn:   Scott D. Cousins, Esq.

If to the Liquidation Trustees:

> Cedric de Lisser
> Michael Michelin
> Christopher Moser

74

c/o MCDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, New York 10173
Attn:   Tim Walsh, Esq.
        Darren Azman, Esq.

After the Effective Date, the Liquidation Trustees may, in their sole discretion, notify Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Liquidation Trustees are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

[*Remainder of page intentionally left blank.*]

Dated: March 10, 2021
         Wilmington, Delaware

Respectfully submitted,

**CRED INC.**

(on behalf of itself and the other Debtors and
Debtors-in-Possession)

By:     */s/ Matthew K. Foster*
Name:  Matthew K. Foster
Title:   Chief Restructuring Officer

# Exhibit A

## Causes of Action List

## Causes of Action List

- All actual or potential Avoidance Actions pursuant to any applicable section of the Bankruptcy Code including, without limitation, sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code, arising from any transaction involving or concerning the Debtors;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against Customers, vendors, suppliers or contract counterparties, including without limitation, any and all claims relating to breach of contract, deposits, overpayments, accounts receivable, improper setoff, warranty, indemnity, retention of double payments, retention of misdirected wires, deductions owing or improper deductions taken, or any other claim concerning or arising out of the Customer, vendor, supplier or contractual relationship;

- All actual or potential actions, whether legal, equitable or statutory in nature, against landlords, lessees, sublessees, or assignees arising from various leases, subleases and assignment agreements relating thereto, including, without limitation, any and all claims for unpaid rent, overcharges relating to taxes, common area maintenance and other similar charges;

- All actual or potential actions, whether legal, equitable or statutory in nature, against the Debtors' current or former insurance carriers including, without limitation, any and all claims relating to unpaid reimbursements and claims, overpayment of premiums and fees, breach of contract, indemnity obligations or coverage;

- Any and all rights to payment against any taxing authority or other Governmental Unit including, without limitation, any and all claims for any tax refunds, credits, overpayments, recoupments or offsets that may be due and owing to the Debtors for taxes that the Debtors paid or may have paid to any such taxing authority or other Governmental Unit;

- All actions or potential actions, whether legal, equitable or statutory in nature, relating to deposits or other amounts owed by any Creditor, lessor utility, supplier, vendor, landlord, sub-lessee, assignee or other Person or Entity;

- All actions or potential actions, whether legal, equitable or statutory in nature, arising out of, or relating to, the Debtors' intellectual property rights;

- All actual or potential actions against any of the prepetition directors, officers, employees, attorneys, financial advisors, accountants, investment bankers, agents and representatives of the Debtors, except actions expressly released under the Combined Plan and Disclosure Statement, including, without limitation, any and all claims for breaches of fiduciary duty, breaches of loyalty, breaches of the duty of good faith, negligent mismanagement, wasting of corporate assets, and diversion of corporate opportunity, including, without limitation any and all claims against the Debtors current or former management, directors, and officers.

- All actual or potential actions, whether legal, equitable or statutory in nature, against all Entities, except actions expressly released under the Combined Plan and Disclosure Statement, arising out of, or in connection with, without limitation, any of the Debtors' prepetition management, conduct, marketing, businesses, operations and/or reporting of financial or other information;

- All actions or potential actions, whether legal, equitable or statutory in nature, against any of the Debtors' current or former Professionals, except actions expressly released or exculpated under the Combined Plan and Disclosure Statement, including without limitation any and all claims for breach of fiduciary duty, breach of contract, negligence or professional misconduct malpractice, or other tortious conduct;

- All rights against any Entity, including any shareholder or prepetition member of the Debtors' board of directors, members, and/or officers, for subordination of their Claims pursuant to section 510 of the Bankruptcy Code or against any Entity that has agreed to subordination of their claim pursuant to section 510 of the Bankruptcy Code;

- All actions or potential actions against the prepetition members of the Debtors' board of directors and/or officers, except actions expressly released or exculpated under the Combined Plan and Disclosure Statement;

- All actual or potential actions, whether legal, equitable or statutory in nature, to recover amounts awarded to employees (except for amounts authorized by order of the Bankruptcy Court or required by applicable non-bankruptcy law, or related to an action expressly released under the Combined Plan and Disclosure Statement) under the terms of any prepetition employment, severance agreement, change-in-control agreement, bonus arrangement or other agreement governing, arising out of or related to the employment relationship;

- All actual or potential contract and tort actions that may exist or may subsequently arise, except actions expressly released under the Combined Plan and Disclosure Statement;

- All actual or potential actions whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses or operations, except actions expressly released under the Combined Plan and Disclosure Statement;

- All actual or potential actions, whether legal, equitable or statutory in nature, against any of the (i) Debtors' Insiders, including without limitation Mr. Dan Schatt, Mr. Joseph Podulka, Mr. James Alexander, Mr. Daniyal Inamullah, Mr. Dan Wheeler, Mr. Adnan Khakoo, Ms. Bethany De Lude, Ms. Sally Zhang, Mr. Ryan Ortega, Mr. Lu Hua moKredit, and Income Opportunities and (ii) affiliates (as such term is defined in section 101(2) of the Bankruptcy Code) of the Debtors' Insiders, including without limitation any and all claims for breach of fiduciary duty, breach of contract, negligence, unjust enrichment, fraudulent transfers, malpractice, common law fraud or any other tortious conduct.  The foregoing claims include, without limitation, claims involving: (i) the Debtors' investments in MoKredit; (ii) hedging, borrowing, and trading strategies; (iii) the failure to obtain money transmitter licenses; (iv) violations of the Investment

Advisers Act of 1940; (v) the sale of unregistered securities; (vi) the Debtors' CredEarn and CredBorrow solicitations, disclosures, and programs; (vii) the formation of Cred Capital; (viii) the Quantcoin transaction; (ix) gross mismanagement (x) improper accounting; (xi) violating security protocols; and (xii) the Luxembourg Note;

- All actual or potential actions, whether legal, equitable or statutory in nature against Mr. Daniel Wheeler and Bryan Cave, including, without limitation, malpractice claims;

- All actual or potential actions, whether legal, equitable or statutory in nature against Mr. Christopher Spadafora, Mr. Silvia Giovanni, Mr. James Alexander, and Mr. Daniyal Inamullah, including, without limitation, the misappropriation of Debtor Assets;

- All actual or potential actions, whether legal, equitable or statutory in nature against Quantcoin, Quanta Capital Feeder Fund, L.P., Scott Foster, and Richard Chapman regarding the transfer of 800 Bitcoin from the Debtors to Quantcoin;

- All actual or potential actions, whether legal, equitable or statutory in nature against the following entities, including, without limitation, (i) JST Capital; (ii) Uphold; (iii) Sarson Funds; (iv) AX Momentum LP; (v) Reliz Ltd. (Blockfill); (vi) Fifth Khagan LP; (vii) Future Set LLC; (viii) 100 Acre Cred Opportunities Fund Limited; (ix) 1AV; (x) Galois Capital; (xi) CryptoLab Capital LLC; (xii) Cyber Quantum PTD Ltd.; (xiii) Fireblocks; (xiv) Kingdom Trust; (xv) Bitgo; (xvi) Bittrex; (xvii) Lockton Brokers; (xviii) InnReg LLC; (xix) Elevar LLC; (xx) Cambrian Systematic Strategies, LP; and (xxi) Drawbridge Lending; including, without limitation, any and all claims for breach of fiduciary duty, negligence, breach of contract, unjust enrichment, fraudulent transfers, common law fraud, professional malpractice, or any tortious conduct; and

- All actual or potential actions, whether legal, equitable or statutory in nature, against UpgradeYa, and any related Entity, including, without limitation, Avoidance Actions and related causes of action under chapter 5 of the Bankruptcy Code, any and all claims relating to breach of contract, deposits, overpayments, accounts receivable, improper setoff, warranty, indemnity, retention of double payments, retention of misdirected wires, deductions owing or improper deductions taken, any and all claims of or relating to tort, any and all claims related to subordination of UpgradeYa's Claim, including under section 510 of the Bankruptcy Code, any and all causes of action for violation of any state or federal statutes that give rise to a private cause of action, and conspiracy to violate any and all of the foregoing.

**<u>Exhibit B</u>**

**Liquidation Analysis**

Cred Inc. & Subsidiaries
Chapter 7 Liquidation Analysis

| Assets | Notes | Proposed Plan of Liquidation | | Chapter 7 Liquidation | |
|---|---|---|---|---|---|
| Unrestricted Cash as of Effective Date | A | | $2,444,168 | | $2,444,168 |
| Liquidation of Cryptocurrency Holdings | B | | 20,248,214 | | 20,248,214 |
| MoKredit Note | C | | 32,192,681 | | 32,192,681 |
| Additional Liquid Assets | C | | 664,165 | | 664,165 |
| **Total estimated proceeds available** | | | 55,549,227 | | 55,549,227 |
| **Reserves Budgeted for Administration expenses** | | | | | |
| Estimated Operating Liabilities | D | | (50,000) | | (50,000) |
| Estimated UST fees | E | | (125,000) | | (125,000) |
| **Total estimated for distribution** | | | 55,374,227 | | 55,374,227 |
| **Administrative Fees** | | | | | |
| Chapter 7 Professionals | F | 100% | - | 100% | 2,000,000 | (2,000,000) |
| Chapter 7 Trustee Commissions | G | 100% | - | 100% | 1,661,227 | (1,661,227) |
| Chapter 11 Professionals | H | 100% | 2,319,420 | (2,319,420) | 100% | 2,319,420 | (2,319,420) |
| Liquidating Trust Budget | I | 100% | 1,500,000 | (1,500,000) | 100% | - | - |
| Estimated UST fees | J | 100% | 553,742 | (553,742) | 100% | 553,742 | (553,742) |
| **Net estimated proceeds available after distribution** | | | | 51,001,065 | | | 48,839,838 |
| **Administrative  Claims** | | | | | |
| Administrative  Claims | | 100% | - | 100% | - | - |
| **Net estimated proceeds available after distribution** | | | | 51,001,065 | | 48,839,838 |
| **Priority & Secured Claims** | | | | | |
| Other Priority Claims (Class 1) | | 100% | - | - | 100% | - | - |
| Secured Tax Claims (Class 2) | | 100% | - | - | 100% | - | - |
| Other Secured Claims (Class 3) | | 100% | - | - | 100% | - | - |
| **Net estimated proceeds available after distribution** | | | | 51,001,065 | | | 48,839,838 |
| **Unsecured Claims & Equity Interest** | | | | | |
| General Unsecured Claims (Class 4) | K | 30% | 170,138,236 | (50,851,065) | 29% | 170,138,236 | (48,696,729) |
| Convenience Claims (Class 5) | L | 30% | 500,000 | (150,000) | 29% | 500,000 | (143,109) |
| Subordinated Securities Claims (Class 6) | | 100% | - | | 0% | - | |
| Equity Interests in Debtors (Class 7) | | 100% | - | | 0% | - | |
| **Net estimated proceeds available after distribution** | | | | - | | | (0) |

Notes:
A)  Based on updated budget as of 2/26/21 and assumes Effective Date of 4/2/21. Does not include funds held in professional fee escrow account.
B)  Cryptocurrency value based on rolling four week historical average as of 2/26/21: assumes illiquid cryptocurrency is liquidated at a discount to that value.
C)  Assumes collection of accounts and notes receivable as well as liquidation of certain physical assets over time. Discounts are applied to these assets based on Debtors' estimate of collectibility.
D)  The Debtors don't anticipate additional operating liabilities due to the cessation of operations but are keeping a $50k reserve.
E)  Estimated UST fees through Effective Date.
G)  3% of distributions.
H)  Estimated outstanding professional fees that would need to be paid prior to plan going effective.
I)  Estimated budget for Liquidating Trust to liquidate cryptocurrency and prosecute collections actions regarding Additional Liquid Assets.
J)  Estimated UST fees for the remainder of the case.
K)  A liquidating trust would make interim distributions to Class 4 claimants whereas a Chapter 7 trustee would make distributions at the end of the case; which is potentially several years. The Debtors did not complete an analysis to incorporate the time value of money but the present value of the Chapter 7 recovery would be negatively impacted by any discount rate that is applied.
L)  Debtors' estimate of creditors that elect to participate as a Convenience Class Claim. This analysis does not assume any creditors with claims greater than $1k make the Convenience Class Election.

# EXHIBIT H

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF (A) ENTRY OF ORDER CONFIRMING THE FIRST AMENDED COMBINED JOINT PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT OF CRED INC. AND ITS SUBSIDIARIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND (B) THE OCCURRENCE OF THE EFFECTIVE DATE

**TO ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that on March 11, 2021, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered an order (the "Confirmation Order") confirming the *First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code* (the "Plan") [Docket No. 629] in the chapter 11 cases of the above-captioned debtors (collectively, the "Debtors"). Capitalized terms used herein and not otherwise defined have the meanings given to them in the Plan and the Confirmation Order. This Notice is intended solely to provide notice of the entry of the Confirmation Order and occurrence of the Effective Date under the Plan and it does not, and shall not be construed to, limit, modify, or interpret any of the provisions of the Plan or Confirmation Order. The following paragraphs identify some of the provisions of the Plan and Confirmation Order for the convenience of parties in interest; however, parties in interest should refer to the full text of the Confirmation Order and should not rely upon the summary provided below.

**PLEASE TAKE FURTHER NOTICE** that on April 16, 2021, the Debtors filed a revised version of the Plan [Docket No. 722].

**PLEASE TAKE FURTHER NOTICE** that on April 19, 2021, the Effective Date under the Plan occurred.

**PLEASE TAKE FURTHER NOTICE** that the terms of the Plan and Plan Supplement are effective and enforceable and deemed binding upon the Debtors, any and all Holders of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

Claims or Equity Interests (irrespective of whether such Claims or Equity Interests accepted or were deemed to have accepted the Plan), all Entities that received a Notice of Unimpaired Non-Voting Status, all Entities that received a Notice of Impaired Non-Voting Status, all Entities that are parties to or are subject to the settlements, releases, discharges, and injunctions described in the Plan, the agreements and other documents that comprise the Plan Supplement, and the Confirmation Order.  This includes the exculpations, releases, and injunction in Section 18 of the Plan, which provides that:

**18.1    EXCULPATION**

      **NONE OF THE DEBTORS-IN-POSSESSION AND THE CURRENT OR FORMER DIRECTORS, OFFICERS, EMPLOYEES, AFFILIATES, AGENTS, ACCOUNTANTS, FINANCIAL ADVISORS, INVESTMENT BANKERS, RESTRUCTURING ADVISORS, ATTORNEYS, REPRESENTATIVES, AND OTHER PROFESSIONALS OF OR TO THE DEBTORS AND THE DEBTORS-IN-POSSESSION WHO SERVED OR WERE EMPLOYED IN SUCH CAPACITIES AFTER THE PETITION DATE, AND EACH OF THEIR RESPECTIVE AGENTS AND REPRESENTATIVES, THE RELEASED PARTIES, THE COMMITTEE, THE MEMBERS OF THE COMMITTEE AND THE PROFESSIONALS RETAINED BY THE COMMITTEE SHALL HAVE OR INCUR ANY LIABILITY FOR ANY CLAIM, CAUSE OF ACTION, OR OTHER ASSERTION OF LIABILITY FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR ARISING OUT OF THE CHAPTER 11 CASES, THE SALE OF THE DEBTORS' ASSETS, THE FORMULATION, DISSEMINATION, IMPLEMENTATION, APPROVAL, CONFIRMATION, CONSUMMATION, OR ADMINISTRATION HEREOF, PROPERTY TO BE DISTRIBUTED HEREUNDER, OR ANY OTHER ACT OR OMISSION IN CONNECTION WITH OR ARISING OUT OF THE CHAPTER 11 CASES, THE COMBINED PLAN AND DISCLOSURE STATEMENT, OR ANY CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT RELATED THERETO; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT THE FOREGOING SHALL NOT AFFECT THE LIABILITY OF ANY ENTITY RESULTING FROM ANY SUCH ACT OR OMISSION TO THE EXTENT SUCH ACT OR OMISSION IS DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED WILLFUL MISCONDUCT, ACTUAL FRAUD, OR GROSS NEGLIGENCE.  THIS EXCULPATION SHALL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, DISCHARGES, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH ENTITIES FROM LIABILITY.**

**18.2    RELEASES BY DEBTORS, THE ESTATES, THE LIQUIDATION TRUST, AND THE LIQUIDATION TRUSTEES; THIRD PARTY RELEASES**

      **EFFECTIVE AS OF THE CONFIRMATION DATE, BUT SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, AND IN CONSIDERATION OF THE SERVICES OF THE RELEASED PARTIES, (A) THE DEBTORS, (B) THEIR RESPECTIVE ESTATES, (C) THE LIQUIDATION TRUST, AND (D)**

THE LIQUIDATION TRUSTEES SHALL RELEASE, WAIVE, AND DISCHARGE UNCONDITIONALLY AND FOREVER EACH OF THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER (INCLUDING THOSE ARISING UNDER THE BANKRUPTCY CODE), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING IN LAW, EQUITY, OR OTHERWISE, BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE: (I) TAKING PLACE BEFORE THE PETITION DATE IN CONNECTION WITH THE DEBTORS; AND (II) IN CONNECTION WITH OR ARISING OUT OF THE DEBTORS' CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE CONSUMMATION THEREOF, THE ADMINISTRATION THEREOF OR THE PROPERTY TO BE DISTRIBUTED THEREUNDER; PROVIDED, THAT THE FOREGOING SHALL NOT OPERATE AS A WAIVER OF OR RELEASE FROM ANY CAUSES OF ACTION RESULTING FROM THE WILLFUL MISCONDUCT, ACTUAL FRAUD, OR GROSS NEGLIGENCE OF ANY RELEASED PARTY ARISING UNDER CHAPTER 5 OF THE BANKRUPTCY CODE.

IN ADDITION, EFFECTIVE AS OF THE CONFIRMATION DATE, BUT SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, AND IN CONSIDERATION OF THE SERVICES OF THE RELEASED PARTIES, THE SETTLEMENTS AND COMPROMISES CONTAINED HEREIN, AND THE DISTRIBUTIONS TO BE MADE PURSUANT TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, (A) EACH OF THE DEBTORS AND (B) ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS, WHO (1) VOTE IN FAVOR OF THE COMBINED PLAN AND DISCLOSURE STATEMENT OR (2) (A) ABSTAIN FROM VOTING, ARE NOT ENTITLED TO VOTE, OR VOTE TO REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT AND (B) DO NOT OPT OUT OF THE THIS RELEASE ON A TIMELY SUBMITTED BALLOT OR THE OPT-OUT ELECTION FORM SHALL BE DEEMED TO HAVE RELEASED AND DISCHARGED EACH RELEASED PARTY FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' PREPETITION OPERATIONS AND ACTIVITIES, EXISTING OR HEREINAFTER ARISING IN LAW, EQUITY, OR OTHERWISE, BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE.

FOR THE AVOIDANCE OF DOUBT, NO INSIDER THAT IS NOT A RELEASED PARTY, INCLUDING, WITHOUT LIMITATION, JAMES ALEXANDER, LU HUA, DAN SCHATT, JOSEPH PODULKA, AND DANIYAL

INAMULLAH, WILL RECEIVE A RELEASE OR EXCULPATION OF ANY KIND HEREUNDER, WHETHER FROM THE DEBTORS OR OTHERWISE.

**18.4 INJUNCTION**

EXCEPT AS OTHERWISE PROVIDED HEREIN, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS OR THEIR ESTATES THAT AROSE PRIOR TO THE EFFECTIVE DATE ARE PERMANENTLY ENJOINED, SOLELY WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THEIR ESTATES, THE LIQUIDATION TRUST, OR THE LIQUIDATION TRUSTEES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING, BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THEIR ESTATES, THE LIQUIDATION TRUST, OR THE LIQUIDATION TRUSTEES; (C) CREATING, PERFECTING, OR ENFORCING, IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY LIEN OR ENCUMBRANCE AGAINST THE DEBTORS, THEIR ESTATES, THE LIQUIDATION TRUST, OR THE LIQUIDATION TRUSTEES; (D) EXCEPT TO THE EXTENT PERMITTED BY SECTIONS 362(B), 553, 559, 560, OR 561 OF THE BANKRUPTCY CODE, ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT AGAINST THE DEBTORS, THEIR ESTATES, THE LIQUIDATION TRUST, OR THE LIQUIDATION TRUSTEES; (E) PURSUING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE COMBINED PLAN AND DISCLOSURE STATEMENT; OR (F) TAKING ANY ACTIONS WHICH INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION HEREOF.

THE RIGHTS AFFORDED HEREIN AND THE TREATMENT OF ALL CLAIMS AND EQUITY INTERESTS SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND EQUITY INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS, ANY OF THEIR RESPECTIVE ASSETS, PROPERTIES, OR ESTATES, OR THE LIQUIDATION TRUST.

NOTWITHSTANDING ANY LANGUAGE TO THE CONTRARY CONTAINED HEREIN AND/OR THE PLAN CONFIRMATION ORDER, NO PROVISION OF THIS PLAN OR THE PLAN CONFIRMATION ORDER SHALL (I) PRECLUDE THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION ("SEC") FROM ENFORCING ITS POLICE OR REGULATORY POWERS OR (II) ENJOIN, LIMIT, IMPAIR OR DELAY THE SEC FROM COMMENCING OR CONTINUING ANY CLAIMS, CAUSES OF ACTION, PROCEEDING, OR INVESTIGATIONS AGAINST ANY ENTITY OTHER

THAN THE DEBTORS.

**"RELEASED PARTIES" IS DEFINED IN THE PLAN AS THE PROFESSIONALS RETAINED BY THE DEBTORS, GRANT LYON AS THE DEBTORS' INDEPENDENT DIRECTOR, MATTHEW FOSTER AS THE DEBTORS' CHIEF RESTRUCTURING OFFICER, ANY OTHER STAFF SUPPLIED BY SONORAN CAPITAL ADVISORS, LLC, THE PROFESSIONALS RETAINED BY THE COMMITTEE, AND THE RESPECTIVE AGENTS AND REPRESENTATIVES OF EACH OF THE FOREGOING.**

**PLEASE TAKE FURTHER NOTICE** that the Court has approved the following bar dates for filing of certain Claims against the Debtors, as well as related procedures for services of such Claims:

1.     *Administrative Expense Claims.*  Except as otherwise provided in the Plan, unless previously Filed or paid, requests for payment of Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code and Professional Fee Claims) must be filed and served upon the Liquidation Trustees and the Claims Agent in accordance with the service instructions below so as to be actually received **at or before 4:00 p.m. (prevailing Eastern Time) on** **May 17, 2021.**

2.     *Professional Fee Claims.*  All Persons requesting awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 363, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code must file such requests with the Bankruptcy Court and serve them upon the Liquidation Trustees in accordance with the service instructions below on or before **June 15, 2021**.

3.     *Contract Rejection Damages Claims.*  All Proofs of Claim with respect to Claims arising from the rejection of an Executory Contract or Unexpired Leases by the Plan or the Confirmation Order must be filed and served upon the Liquidation Trustees and the Claims Agent in accordance with the service instructions below so as to be actually received on or before **May 17, 2021.**

4.     *Service Instructions for Liquidation Trustee.*  Service on the Liquidation Trustees should be completed at the following address:

> Cedric de Lisser
> Michael Michelin
> Christopher Moser
> c/o MCDERMOTT WILL & EMERY LLP
> 340 Madison Avenue
> New York, New York 10173
> Attn:   Tim Walsh, Esq.
>             Darren Azman, Esq.

5. *Service Instruction for Claims Agent.* Service on the Claims Agent should be completed at the following address:

> Cred Claims Processing
> c/o Stretto
> 410 Exchange, Suite 100
> Irvine, CA 92602

**PLEASE TAKE FURTHER NOTICE** that the Confirmation Order, Plan, Plan Supplement, and related documents and materials filed in these Chapter 11 Cases may be obtained at no charge from Donlin Recano & Company, Inc., by visiting the Debtors' restructuring website at https://donlinrecano.com/Clients/cred/Index. You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via PACER at https://ecf.deb.uscourts.gov.

*[Remainder of Page Left Intentionally Blank]*

Dated: April 19, 2021
      Wilmington, Delaware

                */s/  Scott D. Cousins*

Scott D. Cousins
**COUSINS LAW LLC**
Brandywine Plaza West
1521 Concord Pike, Suite 301
Wilmington, Delaware 19803
Telephone:    (302) 824-7081
Facsimile: :    (302) 295-0331
Email:          scott.cousins@cousins-law.com

- and -

James T. Grogan (admitted *pro hac vice*)
Mack Wilson (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
Telephone:    (713) 860-7300
Facsimile:    (713) 353-3100
Email:          jamesgrogan@paulhastings.com
                   mackwilson@paulhastings.com

- and -

Pedro A. Jimenez (admitted *pro hac vice*)
G. Alexander Bongartz (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:    (212) 318-6000
Facsimile:    (212) 319-4090
Email:          pedrojimenez@paulhastings.com
                   alexbongartz@paulhastings.com

*Co-Counsel to the Debtors*

# EXHIBIT I

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF DREW MCMANIGLE, FOUNDER AND CHIEF EXECUTIVE OFFICER, MACCO RESTRUCTURING GROUP, LLC

I, Drew McManigle, hereby declare under penalty of perjury as follows:

## I.    INTRODUCTION

### A.    Scope of Engagement

1.    On November 7, 2020 (the "<u>Petition Date</u>"), the Debtors each commenced a voluntary case under chapter 11 of the Bankruptcy Code in this Court and I have been retained as financial advisor by the Debtors in the above captioned chapter 11 cases.

2.    I am hereby submitting this declaration containing my understanding of the most recently available financial information (the "<u>Declaration</u>") to the Court in order to facilitate its review of the condition of the Debtors.

### B.    Qualifications

3.    I am the Founder and Chief Executive Officer of MACCO Restructuring Group, LLC ("<u>MACCO</u>"), an interim management and financial advisory firm employing 17 professionals, based in Houston, Texas and having offices in New York, New York, Denver,

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

Colorado and Wilmington, Delaware and website with address of (www.macco.group). MACCO regularly provides interim executive leadership, financial advisory and fiduciary services to businesses across a vast array of industries who find themselves in financial and operational distress. MACCO also serves as a financial or restructuring advisor to lenders, creditors, and creditor groups.

4.     I have led numerous companies through both in and out-of-court restructurings. My experience extends across a variety of industries, including energy exploration, production and refining, healthcare, consumer products, defense, commercial construction, distribution, transportation, heavy equipment, and hospitality. During my 27-plus year career working with clients across the country, I have held leadership and fiduciary roles with titles such as operating chapter 11 trustee, chapter 11 plan, litigation or liquidating trustee, interim chief executive officer, chief restructuring officer, receiver and assignee.

5.     I have also served as an independent director to various international and domestic companies in chapter 11 proceedings. I have advised or led debtor or creditor constituencies in bankruptcy and state courts. I have participated in complex litigation and testified in Federal, Bankruptcy, state, and international courts.

6.     In February 2020, I was selected by the Office of The U.S. Trustee, Southern District of Texas, as one of six Subchapter V chapter 11 trustees under the recently enacted 11 U.S.C. Subchapter V (Small Business) statute. I also serve on the Houston Board of Directors of the Turnaround Management Association, am a member of the American Bankruptcy Institute, and the National Association of Bankruptcy Trustees.

7.      I have served at conferences on professionals' panels and have been quoted in multiple national publications including The Deal, Debtwire and The Houston Chronicle, among others.

8.      I attended Texas Tech University and received my bachelor's degree from the University of Houston – Downtown. Attached as Appendix A is my Curriculum Vitae.

9.      Based on my above experience, along with my education, training, and bankruptcy experience, I am qualified to offer this Declaration.

### C.      Statement of Compensation

10.     MACCO is being compensated for my work on this matter at my customary rate of $600 per hour. Professionals of MACCO rendering assistance are, likewise, being compensated at their normal hourly rates ranging from $100 to $600 per hour. All services and activities performed in connection with this engagement were either performed by me or under my supervision by employees of MACCO.

11.     This compensation is not dependent in any way on the contents of this Declaration, the substance of any further opinions or testimony that I may provide, or the ultimate outcome of this matter.

### D.      Report Qualifications and Materials Relied Upon

12.     In preparing this Declaration, I have relied upon preliminary key balance sheet data, available 2020 balance sheet data through September 30, 2020, and forecasted income statements through December 31, 2020, all provided by Debtors' executives. Financials are currently in process of being updated by Debtors and figures presented may be materially revised pending additional investigation by MACCO.

13.     The opinions and conclusions expressed herein are subject to change based on additional data, facts and information that may be received subsequent to the date of this report including, among other things, additional data, facts and information that becomes available in the public domain or that is made available by Debtors or other parties in interest during discovery or otherwise.  In addition, it is possible that I may be asked at a future date to review and respond to a report or declaration issued by other parties in interest related to the confirmation of the plan.

## II.     EXECUTIVE SUMMARY

### A.     Debtors' Operations

14.     The overall cryptocurrency market is projected to reach $1.40 billion dollars by 2024, at a CAGR of 6.18%. A cryptocurrency is a digital currency created and stored electronically in blockchain. It uses encryption techniques to control the creation of monetary units and to verify the transfer of funds, hence enhancing security and traceability. Cryptocurrency is a disruptive concept that is an alternative to fiat currency used in the present monetary system. It is expected that Cryptocurrency holders will increase their demand for access to liquidity services (lending and borrowing) wherever they hold their crypto assets. Gatekeepers will lose market share if the need is not satisfied and liquidity will is a key component. Hence, there is a need for a provider to build liquidity services between gatekeepers and alternative coin issuers.

15.     The Debtors' operations, founded in 2018, deliver lending and borrowing services that enable clients of gatekeepers and alternative coin issuers to leverage value from their digital assets. The Debtors are headquartered in San Mateo, CA and offer technology solutions for crypto assets, partnering with leading wallet and exchange providers to enable liquidity in the

form of borrowing or lending. One solution the Debtors offer is "Cred Earn", which is a financial product that allows owners of crypto assets to earn interest on their crypto holdings. The Debtors are able to leverage their own returns by lending digital assets to a variety of customer segments, including crypto miners, digital asset companies, crypto investment funds, and retail investors. To ensure assets are safe, Debtors works with various collateral agents and leading custody partners to provide for the safety and security of customer digital assets.

### B.    List of Key Accounts and Details



*Chart 1: Debtors' Flow of Funds*

16.     Chart 1, presented above, details the Debtors' flow of funds. Funds originate from electronic crypto-currency deposit accounts ("E-Wallets") owned by customers and are then transferred to E-Wallets controlled by the Debtors. Crypto-currency is then transferred to a centralized crypto-currency account from the Debtors' E-Wallets or, in the case of high net worth customers directly, which facilitates tracking, security and organization of all held assets. The centralized crypto-currency account then transacts directly with either i) a trading partner who facilitates the conversion to fiat currency or ii) with yielding investments and loans accepting crypto-currency. Once in fiat, funds are transferred to investments and loans requiring transactions in United States Dollar ("USD").

## III.    PRESENTATION OF PRO FORMA ASSETS AND LIABILITIES



Table 1: Debtors' Pro-Forma Assets and Liabilities

17.    Table 1, presented above, details the Debtors' Pro-Forma Assets and Liabilities and corresponding footnotes are provided in Appendix B. Financials are in the process of being updated by the Debtors and, therefore, a partial balance sheet lacking the Debtors' equity accounts is provided. All items presented herein have been subject to mark-to-market adjustments as of the Petition Date.

18.    Debtors' operations consist of utilizing pledged customer crypto-currency assets, denoted here as "Customer Deposits", in various yield-generating vehicles. Customer deposits form a liability of the Debtors which varies depending on market performance of the underlying crypto-currency.

19.    As demonstrated in Chart 2, below, since 2020's lowest closing price of $4,944.70 which occurred on March 16, 2020, Bitcoin has increased by nearly two-hundred

percent (200%) to a closing of $14,783.98 as of the Petition Date. This increase is unfavorable to the Debtors' financial position as they would owe more in Customer deposit liabilities. Since the Debtors' investments are dollar denominated, they do not share in the upside of crypto-currency and there arises an opportunity for a potential shortfall in asset coverage.



*Chart 2: Bitcoin (BTC) Closing Price in US Dollar (USD)*

20.     In addition to extraordinarily unfavorable market price movements, the Debtors suffered a hack of their crypto-currency assets which added to their financial strain. The Debtors have locked down their crypto-currency assets, are working with law enforcement and have initiated litigation in order to recover assets.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on November 9, 2020
Houston, TX

/s/ Drew McManigle

_____
Drew McManigle
Managing Director of MACCO Restructuring Group,
LLC

**APPENDIX A**

**Curriculum Vitae of Drew McManigle**

## **Drew McManigle**
Founder & Managing Director





**Drew McManigle** is the Founder and Managing Director of MACCO. He has led numerous companies through both in and out-of-court restructurings. Drew's global experience extends across a variety of industries, including energy exploration, production and refining, healthcare, consumer products, defense, food and pharmaceutical manufacturing, commercial construction, distribution, transportation, heavy equipment and hospitality where he has hands-on experience.

Across the country, Drew has held leadership and fiduciary roles with titles such as operating chapter 11 trustee, chapter 11 plan, litigation or liquidating trustee, interim CEO, CRO, receiver and assignee. He has also served as an independent director. He has represented company, debtor or creditor interests in bankruptcy and state courts across the country. His results-driven leadership style has led to successful outcomes in a variety of complex and distressed situations, including complex domestic and foreign litigation.

In February 2020, he was selected by the Department of Justice, Office of The U.S. Trustee, Southern District of Texas, Houston Division, as one of six, 11 U.S.C. Subchapter V small business chapter 11 trustees.

Prior to MACCO, Drew was a principal of his own firm for 22 years; he was employed by a Fortune 500 healthcare services provider leading its Baltimore operations: and, he established and led the SW region office for a west coast advisory firm. He attended Texas Tech University and received his bachelor's degree from the University of Houston. He has been quoted in multiple national publications including The Deal, Debtwire and The Houston Chronicle. Drew is a reputable panelist and public speaker on restructuring and related business topics.

Representative Examples of Engagements:

- ♦ Serve as Chief Restructuring Officer to a commodity brokerage company with annual revenues of $175 million found itself overleveraged and in covenant default with bank over-advances. In 2.5 months, MACCO successfully assessed the situation, modeled financial solutions and negotiated a forbearance agreement between the lender and borrower.

- ♦ Acted as Chief Restructuring Officer to a troubled, publicly traded Denver based, exploration and production company, prior to and subsequent to a chapter 11 filing.

- ♦ Chief Restructuring Officer - A Houston based exploration and production company and, its subsidiaries and affiliates, with significant holdings in North Texas filed 5 separate chapter 11 proceedings. Oversaw successful U.S.C. §363 (b) sales and development of a liquidating plan of reorganization.

- ♦ Acted as Chief Valuation Officer to lead the operational winddown and liquidation of an Oklahoma based drilling company that held international drilling contracts with

Pennzoil Place
700 Milam St. Suite 1300
Houston, TX 77002

www.MACCO.group



**Drew McManigle**
Founder & Managing Director

over $200MM in debt. Successfully completed the winddown of domestic operations, liquidation and resolution of litigation and asset recovery issues in under a year.

♦ Selected as Liquidating Trustee of a Liquidating Trust formed, pursuant to a confirmed plan of reorganization in a complex chapter 11 case, to prosecute complex litigation, avoidance and preference actions representing the unsecured creditors who held over $50 million in claims

♦ Selected as the independent director, collateral preservation agent and "sale czar" to a Chapter 11 debtor in the media and television industry. Oversaw the contentious negotiation and sale of a U.S.C. §363 (b) sale of 3 television stations.

♦ Acted as the independent director for a United Kingdom publicly traded exploration and production company with assets in the Delaware Basin of Colorado. Oversaw the chapter 11 filing and successful sale of the properties during its Delaware chapter 11 bankruptcy case.

♦ Acted as Interim President of a well-known Mid-Atlantic food manufacturer and fundraiser. Initiated an "emergency room triage", and in one year, successfully identified and mitigated financial risk due to substandard product costing, rebuilt a responsive management team and negotiated a comprehensive License Agreement that outsourced unsustainable fundraising operations.

♦ Serving as a Post-Chapter 11 Plan Administrator, successfully administered two post-confirmation estates, including making final creditor distributions. Conducted claim and preference litigation with both significant claim reductions and money recoveries.

♦ Selected as an independent Director to organic chemical manufacturer with operations in the U.S. and China, post chapter 11. Over saw the successful ale to a French chemical conglomerate.

♦ Served as Chief Restructuring Officer to a national leading value cosmetics brand in the food, drug, and mass channel markets. Assumed full authority for day to day operations and successfully prepared for, filed and managed a successful chapter 11 case that included leading a vibrant 11 U.S.C. 363(b) asset sale process that obtained court approval in 53 days from the petition date.

♦ Served as interim CEO to a highly troubled, money losing family office owned, hurricane shutter, custom architectural metal and metal roof manufacturer in South Florida. Stabilized operations, improved management and operating practices and returned to financial stability.

♦ Appointed Assignee in 12 separate Delaware Assignment for the Benefit of Creditors cases. Managed trusts, engaged professionals, reviewed creditor claims, initiated and successfully managed both litigation and resolution of complex disputes. Managed trust funds and multi-year payments, including multi-year distributions. In one case yielding an overall 40% return to creditors holding allowed claims.

## Drew McManigle
Founder & Managing Director



- ◆ Led as interim President a struggling home healthcare division of a $100 million organization. Stabilized operations, assured financing and within 13 months, divested 14 franchises (without litigation) and successfully sold operations at a $19.5 million profit.

- ◆ Served as Interim CEO and General Manager, in a contentious crisis situation, to a family office owned notable resort and spa. Replaced management, assured stable operations and transfer to new leadership.

- ◆ Functioned as President & Director in the negotiation and review of a competitive analysis in a highly successful $16 million cash sale of a non-bankrupt bulk lubricant and convenience store chain in Texas whose parent organization was in chapter 11.

- ◆ Principal Advisor-Provided strategic bankruptcy and acquisition advice to a Colorado-based multibillion-dollar meat producer and its financial sponsor in a proposed $225 million transaction. Served as primary strategist and spokesperson while coordinating all aspects of acquisition initiative.

- ◆ International Receiver-Conducted a worldwide forensic review of international corporations confirming an ongoing bank fraud. Named Receiver in U.S., British Virgin Islands, and Turks & Caicos Islands. Conducted domestic, offshore, and Swiss discovery/litigation. Recovered and sold operating Texas Corporation. Located and recovered previously unknown monies and accounts in Switzerland.

- ◆ As President, managed an energy production and investment Company in Houston, Texas with offshore mineral interests. Negotiated settlement with former stakeholders and guarantors. Successfully valued producing properties and sold business.

- ◆ Principal Advisor-Acted as a surrogate to redirect ineffective management actions during a critical period for multiple Chapter 11 debtors in Las Vegas, Nevada, in the home healthcare/durable medical goods business with subsidiaries in Arizona. Successfully managed, addressed, and resolved numerous complex legal, financial, and regulatory issues arising from the bankruptcy filing.

- ◆ Principal Advisor to a $50 million distressed building materials and tools distributor. Delivered critical strategic advice on business turnaround initiatives, lender negotiation, and exit strategies to principals. Obtained approval of exit plan, including satisfaction of lender claims from principals and lender.

- ◆ Acted as Managing Trustee over-seeing the post chapter 11 plan efforts of a Texas-based furniture retailer reorganized under Chapter 11. Undertook decisive action to secure inventory and assets after default on post-reorganization debt obligations, including authorizing and overseeing liquidation sale.

**Selection of Publications (not including interviews):**

   i.     "Why the Experts Are Wrong About the Oil Industry"
                 -The State Bar of Texas, Bankruptcy Law Newsletter, Volume 13, No. 2, May 2015

  ii.    "This is No Time for Scared Money"
                 -YoungUpstarts: Voice of a New Generation [www.youngupstarts.com]

 iii.   Issues in International Receiverships or "Good morning, Mr. Phelps. Your mission should you decide to accept it…."
                 -INSOL International

 iv.   Cracking the Code: Jurisdictional Issues in International Receiverships
                 -American Bankruptcy Institute

**Videos:**

  v.    Drew McManigle talks about Scared Money
[http://www.youtube.com/watch?v=GIJFpXm_4lk]

 vi.   Drew McManigle talks about the 2013 Business Forecast
[http://www.youtube.com/watch?v=wcFQrwZJuNo



**APPENDIX B**

**Debtors' Pro-Forma Assets and Liabilities**



Cred, Inc. and its affiliates
**Pro-Forma Assets and Liabilities (A)**
As of: November 7, 2020
*(in thousands)*
UNAUDITED

| FN# | ASSETS | | | FN# | LIABILITIES | |
|---|---|---|---|---|---|---|
| | **Cash & Cash Equivalents** | | | | **Borrowed capital** | |
| 1) | Cash | 47 | | 7) | Customer Deposits | 114,635 |
| 2) | Crypto-Currency | 14,709 | | 8) | Customer Collateral | 20,880 |
| 3) | Crypto-Currency (Frozen) | 489 | | | Total Borrowed capital | 135,515 |
| | Total Cash & Cash Equiv. | 15,245 | | | | |
| | | | | 9) | Agreements Payable | 983 |
| | **Loans & Assets Under Management** | | | | | |
| 4) | Assets Under Management | 3,712 | | | **TOTAL LIABILITIES** | 136,499 |
| 5) | Cred issued loans | 39,074 | | | | |
| 6) | Customer loans | 9,808 | | | | |
| | Total Loans & Inv. | 52,594 | | | | |
| 10) | **TOTAL ASSETS** | 67,839 | | | | |

**FOOTNOTES**

General: all items presented herein have been subject to mark-to-market adjustments as of the Petition Date (November 7, 2020).

A) Pro-Forma assets and liabilities were derived from preliminary key balance sheet data provided by Debtors' executives, available 2020 balance sheet data through 09/30/2020 and forecasted income statement through 12/31/2020. Financials are currently in process of being updated and figures presented may be materially revised pending additional investigation by financial advisors.

1) Delineates funds available for operating in United States dollar (USD).

2) Includes $964K of LibraToken, $8.5MM of TAP and $2.7MM of Universal Protocol Token which are considered illiquid crypto-currencies. For clarity, there is not enough volume traded daily to enable immediate monetization of amounts held.

3) Includes $226K of LibraToken and $94K of Universal Protocol Token deemed illiquid. Funds have been frozen by Uphold HQ Inc.

4) Estimate of funds to be returned by asset managers AX Momentum LP, Fifth Khagan LP and Reliz LTD (Blockfill).

5) Consists of $39MM to moKredit, an insider owned entity, which has not yet paid any outstanding principal. The account balance may be partially or completely uncollectible.

6) Consists of $9.8MM loans made to customers which would only be collected if collateral was returned. The account balance may be partially or completely uncollectible.

7) Debtors' operations consists of utilizing pledged customer crypto-currency assets, denoted here as "Customer Deposits", in various yield generating vehicles. Customers expect interest on their pledged assets as well as enough liquidity to be able to collect their pledged crypto-currency assets. Customer deposits form a liability of the Debtors which varies depending on market performance of the underlying crypto-currency.

8) Denotes underlying collateral for Customer loans asset. Total liability outstanding potentially set off by customer loans received.

9) Denotes amount payable outstanding to asset manager per formalized agreement.

10) Total assets does not include litigation claims, including, but not limited to, claims (a) against the Debtors' former employee Mr. James Alexander in the amount of approximately $3 million and (b) for the return of stolen bitcoin in the amount of more than $10 million. Total assets does not include potential value for furniture, computer or software of approximately $2.6MM.

# EXHIBIT J

***THIS COMBINED JOINT PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT FOR CIRCULATION TO ALL CREDITORS AND INTEREST HOLDERS OR FOR THE USE IN SOLICITATION OF VOTES***

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |

### FIRST AMENDED COMBINED JOINT PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT OF CRED INC. AND ITS SUBSIDIARIES <u>UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>

**PAUL HASTINGS LLP**
James T. Grogan (admitted *pro hac vice*)
Mack Wilson (admitted *pro hac vice*)
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
Telephone: (713) 860-7300
Facsimile: (713) 353-3100
Email: jamesgrogan@paulhastings.com
mackwilson@paulhastings.com

- and -

**PAUL HASTINGS LLP**
G. Alexander Bongartz (admitted *pro hac vice*)
Derek Cash (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Email: alexbongartz@paulhastings.com
derekcash@paulhastings.com

**COUSINS LAW LLC**
Scott D. Cousins (No. 3079)
Brandywine Plaza West 1521 Concord Pike, Suite 301 Wilmington, Delaware 19803 Telephone: (302) 824-7081
Facsimile: (302) 295-0331
Email: scott.cousins@cousins-law.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: January 21, 2021

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

**TABLE OF CONTENTS**

PAGE

Article  I. DEFINED TERMS .................................................................................1

Article  II. INTERPRETATION OF COMBINED PLAN AND DISCLOSURE
STATEMENT ............................................................................13

2.1      Application of Definitions; Rules of Construction; Computation of
Time........................................................................................13
2.2      Relief Sought by Filing the Combined Plan and Disclosure Statement ..........14

Article  III. BACKGROUND – THE DEBTORS' CORPORATE HISTORY,
STRUCTURE, AND BUSINESS OVERVIEW............................................14

3.1      General Background – Overview of the Debtors ........................................14
3.2      The Debtors' Prepetition Capital Structure ..............................................15
3.3      Events Leading to the Chapter 11 Cases .................................................15
3.4      The Chapter 11 Cases ..........................................................................19

Article  IV. TAX CONSEQUENCES ......................................................................25

4.1      Tax Consequences...............................................................................25

Article  V. CERTAIN RISK FACTORS TO BE CONSIDERED.........................................26

5.1      Risk Factors to Be Considered...............................................................26
5.2      Alternatives to this Combined Plan and Disclosure Statement ......................31

Article  VI. BEST INTERESTS AND FEASIBILITY ....................................................31

6.1      Best Interests Test ..............................................................................31
6.2      Feasibility..........................................................................................32

Article  VII. SUMMARY OF ASSETS AND TREATMENT OF CLAIMS AND
INTERESTS..............................................................................32

7.1      Summary of Assets .............................................................................32
7.2      Summary of Treatment of Claims and Equity Interests...............................33
7.3      Deemed Consolidation .........................................................................34
7.4      Third Party Releases............................................................................35

Article  VIII. CONFIRMATION AND VOTING PROCEDURES .........................................36

8.1      Combined Hearing...............................................................................36
8.2      Procedure for Objections......................................................................36
8.3      Voting Procedures...............................................................................36

**Article IX. PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS, AND OTHER UNCLASSIFIED CLAIMS**........................39

    9.1    Administrative Expense Claims ...............................................39
    9.2    Professional Fee Claims ...........................................................41
    9.3    Priority Tax Claims .................................................................41

**Article X. TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS**.........42

    10.1    Class 1: Other Priority Claims ..............................................42
    10.2    Class 2: Secured Tax Claims ..................................................42
    10.3    Class 3: Other Secured Claims ..............................................43
    10.4    Class 4: General Unsecured Claims. ......................................43
    10.5    Class 5: Convenience Claims. .................................................43
    10.6    Class 6: Subordinated Securities Claims ..............................44
    10.7    Class 7: Equity Interests in Debtors .....................................44
    10.8    Reservation of Rights Regarding Claims and Equity Interests.......................44

**Article XI. ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT** ....................................................45

    11.1    Voting of Claims .....................................................................45
    11.2    Elimination of Vacant Classes ...............................................45
    11.3    Nonconsensual Confirmation .................................................45
    11.4    Revocation of the Combined Plan and Disclosure Statement.........................46

**Article XII. MEANS OF IMPLEMENTATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT** ....................................................46

    12.1    Limited Substantive Consolidation .......................................46
    12.2    Global Settlement ....................................................................46
    12.3    Liquidation of the Debtors .....................................................47
    12.4    Effectuating Documents; Further Transactions ...................53
    12.5    Cancellation of Instruments and Stock .................................53
    12.6    Disposition of Books and Records .........................................54
    12.7    Corporate Existence and Dissolution of Debtors .................54
    12.8    Closing the Chapter 11 Cases .................................................54

**Article XIII. DISTRIBUTIONS UNDER THE COMBINED PLAN AND DISCLOSURE STATEMENT** ....................................................55

    13.1    Distributions on Allowed General Unsecured Claims ..........55
    13.2    Timing of Distributions .........................................................55
    13.3    Delivery of Distributions .......................................................55
    13.4    Undeliverable and Unclaimed Distributions .......................56
    13.5    Transfer of Claims .................................................................57
    13.6    Manner of Payment ................................................................57
    13.7    Distributions to Cryptocurrency Election E-Wallet Addresses.......................57

The Liquidation Trustee shall maintain records of all distributions made to Cryptocurrency Election E-Wallet Addresses, including confirmations of E-Wallet to E-Wallet transfers. The Liquidation Trustee is only required to initiate such E-Wallet to E-Wallet transactions. The Liquidation Trustee is not responsible, and shall not be held liable, for any actions involving transferred Cryptocurrency after the initiation of such E-Wallet to E-Wallet transfers. .............57

13.8   Time Bar to Cash Payments by Check ................................57

13.9   No Fractional Cents ................................................................57

13.10  Setoffs and Recoupment .......................................................58

13.11  Allocation of Plan Distributions Between Principal and Interest ..................58

13.12  Distributions After Effective Date ......................................58

13.13  Interest on Claims ................................................................58

13.14  No Distribution in Excess of Allowed Amount of Claim ..................58

13.15  Payment of Taxes on Distributions Received Pursuant to the Combined Plan and Disclosure Statement ......................58

13.16  Reserves ................................................................................59

13.17  De Minimis Distributions ...................................................59

**Article XIV. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS** ...................59

14.1   Claims Administration Responsibilities.............................59

14.2   Claims Objections ................................................................60

14.3   Estimation of Claims ...........................................................60

14.4   Adjustment to Claims Without Objection ..........................61

14.5   No Distributions Pending Allowance ..................................61

14.6   Distributions After Allowance ............................................61

14.7   Disallowance of Certain Claims..........................................61

14.8   Amendments to Claims........................................................61

14.9   Claims Paid and Payable by Third Parties..........................61

**Article XV. EXECUTORY CONTRACTS AND LEASES** ................62

15.1   Executory Contracts and Unexpired Leases Deemed Rejected..................62

15.2   Bar Date For Rejection Damages ........................................62

**Article XVI. CONDITIONS PRECEDENT TO THE CONFIRMATION AND THE EFFECTIVE DATE** ................................................63

16.1   Conditions Precedent to Confirmation of the Combined Plan and Disclosure Statement ......................................63

16.2   Conditions Precedent to the Effective Date ........................63

16.3   Waiver of Conditions Precedent to the Effective Date .......64

16.4   Satisfaction of Conditions ...................................................64

**Article XVII. EFFECT OF CONFIRMATION** .................................................................64

    17.1    Compromise and Settlement of Claims, Equity Interests, and
               Controversies .........................................................................................64
    17.2    Binding Effect .........................................................................................65
    17.3    Reservation of Causes of Action/Reservation of Rights ......................65

**Article XVIII. EXCULPATION, INJUNCTION, AND RELATED PROVISIONS** ...........65

    18.1    Exculpation .............................................................................................65
    18.2    Releases by Debtors, the Estates, the Liquidation Trust, and the
               Liquidation Trustee; Third Party Releases ..........................................66
    18.3    Avoidance Actions/Objections ...............................................................67
    18.4    Injunction ...............................................................................................67
    18.5    Terms of Stays and Injunctions .............................................................68

**Article XIX. RETENTION OF JURISDICTION** ...........................................................68

**Article XX. MISCELLANEOUS PROVISIONS** .............................................................69

    20.1    Effectuating Documents and Further Transactions .............................69
    20.2    Date of Distributions and Other Actions ...............................................70
    20.3    Withholding and Reporting Requirements ............................................70
    20.4    Corporate Action ...................................................................................70
    20.5    Modification of the Combined Plan and Disclosure Statement ............70
    20.6    Revocation or Withdrawal of the Combined Plan and Disclosure
               Statement ...............................................................................................71
    20.7    Plan Supplement ....................................................................................71
    20.8    Payment of Statutory Fees ....................................................................71
    20.9    Dissolution of the Committee .................................................................72
    20.10  Continued Confidentiality Obligations ..................................................72
    20.11  Exemption from Transfer Taxes ............................................................72
    20.12  Expedited Tax Determination ................................................................72
    20.13  Exhibits/Schedules .................................................................................72
    20.14  Substantial Consummation ...................................................................72
    20.15  Severability of Combined Plan and Disclosure Statement Provisions ...........73
    20.16  Governing Law .......................................................................................73
    20.17  Reservation of Rights .............................................................................73
    20.18  Computation of Time .............................................................................73
    20.19  Post-Confirmation Reporting ................................................................73
    20.20  Notices ....................................................................................................74

## NOTICE

THE INFORMATION CONTAINED HEREIN IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE COMBINED JOINT PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT OF CRED INC. AND ITS SUBSIDIARIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT, REGARDING THE COMBINED PLAN AND DISCLOSURE STATEMENT OR THE SOLICITATION OF ACCEPTANCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT.  THIS COMBINED PLAN AND DISCLOSURE STATEMENT WAS SUBSTANTIALLY COMPILED FROM THE DEBTORS' BOOKS AND RECORDS TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF.

UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF.  THE DELIVERY OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS COMBINED PLAN AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER RULES GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11 OF THE BANKRUPTCY CODE.  NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN.

**THIS COMBINED PLAN AND DISCLOSURE STATEMENT PROVIDES FOR THE SUBSTANTIVE CONSOLIDATION OF THE ASSETS AND LIABILITIES OF THE DEBTORS FOR CERTAIN PURPOSES AND CONTEMPLATES THE APPOINTMENT OF A LIQUIDATION TRUSTEE TO WIND-DOWN THE DEBTORS' ESTATES.**

NO REPRESENTATION CONCERNING THE DEBTORS OR THE VALUE OF THE DEBTORS' ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS ARE NOT RESPONSIBLE FOR ANY INFORMATION,

REPRESENTATION OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN OR INCONSISTENT WITH INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.  CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.  HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

**FOR EASE OF REFERENCE ONLY, AND WITH CERTAIN EXCEPTIONS, ARTICLE I THROUGH ARTICLE VI HEREIN GENERALLY CONTAIN THE DISCLOSURE STATEMENT PROVISIONS AND ARTICLE VII THROUGH ARTICLE XX HEREIN GENERALLY CONTAIN THE PLAN PROVISIONS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

# INTRODUCTION

The Debtors in these Chapter 11 Cases hereby propose their Combined Plan and Disclosure Statement pursuant to sections 1125 and 1129 of the Bankruptcy Code.  The Debtors are the proponents of the Combined Plan and Disclosure Statement within the meaning of section 1129 of the Bankruptcy Code.  Capitalized terms used and not otherwise defined herein have the meanings ascribed to such terms in Article I hereof.

The Combined Plan and Disclosure Statement constitutes a liquidating Chapter 11 plan for the Debtors and provides for Distribution of the Debtors' Assets already liquidated or to be liquidated over time to Holders of Allowed Claims in accordance with the terms of the Combined Plan and Disclosure Statement and the priority provisions of the Bankruptcy Code. The Combined Plan and Disclosure Statement contemplates the appointment of a Liquidation Trustee to implement the terms of the Combined Plan and Disclosure Statement and make Distributions in accordance with its terms.  Except as otherwise provided by Order of the Bankruptcy Court, Distributions will occur at various intervals after the Effective Date as determined by the Liquidation Trustee.

Since the Petition Date, the Debtors and their professionals have worked tirelessly to develop a plan that would maximize the value of the Debtors' Estates for the benefit of creditors and minimize the amount of time spent in chapter 11.  After a thorough analysis of potential restructuring alternatives and extensive negotiation with the Committee, the Debtors reached a global settlement with the Committee that is embodied in the Combined Plan and Disclosure Statement.

The Debtors believe that the Combined Plan and Disclosure Statement presents the best path forward and is in the best interests of the Debtors, their Creditors, and all parties in interest. The Combined Plan and Disclosure Statement is premised on the creation of the Liquidation Trust, which will succeed to all rights, interests and property of the Debtors, and to which the Debtors will transfer their Assets, including proceeds from any pre-Effective Date sales, the Debtors' Cryptocurrency, and Causes of Action of the Debtors' Estates (other than Causes of Action that are being released under the Combined Plan and Disclosure Statement).  The Liquidation Trustee, who will be selected by members of the Committee, will be tasked with, among other things, monetizing the Debtors' remaining Assets and making Distributions to Holders of Allowed General Unsecured Claims in Class 4 and Holders of Convenience Claims in Class 5.  **The Debtors believe that the Plan is in the best interest of the Debtors' Estates and all stakeholders, and recommend that all Holders of Claims entitled to vote, vote in favor of the Plan.**

**The Combined Plan and Disclosure Statement provides for limited substantive consolidation of the Assets and Liabilities of the Debtors.  Accordingly, for purposes of the Combined Plan and Disclosure Statement only, the Assets and Liabilities of the Debtors are treated as the Assets and Liabilities of a single substantively consolidated entity.  Claims filed against multiple Debtors seeking recovery of the same debt shall be treated as a single, non-aggregated Claim against the consolidated Estates to the extent that such Claim is an Allowed Claim.**

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors expressly reserve the right to alter, amend or modify the Combined Plan and Disclosure Statement one or more times before substantial consummation thereof.

# ARTICLE I.
# DEFINED TERMS

**1.1** **"A/P/S Claim"** means any Claim that is an Administrative Expense Claim, Other Priority Claim, Priority Tax Claim, or Secured Claim.

**1.2** "**Adequate Protection Claims**" means rights to adequate protection arising under sections 361, 363, and 364 of the Bankruptcy Code to the extent granted under the DIP Orders.

**1.3** **"Administrative Expense Claim"** means any claim (including, but not limited to, Professional Fee Claims) for costs and expenses of administration of the Chapter 11 Cases that is entitled to priority pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code; provided, however, that any fees or charges assessed against the Debtors' Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930 are excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section 20.8 hereof.

**1.4** **"Administrative Expense Claims Bar Date"** means the date as set forth in Section 9.1(b) hereof.

**1.5** **"Affiliate"** has the meaning set forth in section 101(2) of the Bankruptcy Code.

**1.6** **"Allowed"** means, with reference to any Claim against the Debtors (including any Administrative Expense Claim) or portion thereof, (a) any Claim that has been listed by the Debtors in the Schedules (as such Schedules may be amended by the Debtors or the Liquidation Trustee from time to time in accordance with Bankruptcy Rule 1009) as liquidated in amount other than zero or unknown and not Disputed or Contingent, and for which no Proof of Claim has been filed, (b) any timely filed Proof of Claim or request for payment of Administrative Expense Claim, as to which no objection to the allowance thereof, or action to subordinate, avoid, classify, reclassify, expunge, estimate, or otherwise limit recovery with respect thereto, has been filed within the applicable period of limitation fixed by the Combined Plan and Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, and which applicable period of limitations has expired, (c) any Claim expressly allowed by a Final Order or under the Combined Plan and Disclosure Statement, or (d) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to the Liquidation Trustee under Section 14.1 hereof and the Liquidation Trust Agreement; provided, however, that Claims temporarily allowed solely for the purpose of voting to accept or reject the Combined Plan and Disclosure Statement pursuant to an order of the Bankruptcy Court shall not be considered Allowed Claims; provided, further, that any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code shall not be considered an Allowed Claim.

**1.7** **"Applicable Cryptocurrency"** means, with respect to any Holder of a Customer Claim, the Cryptocurrency or Cryptocurrencies used by such Holder in its Cryptocurrency Transactions with each applicable Debtor. To the extent a Customer engaged in Cryptocurrency Transactions involving more than one form of Cryptocurrency, the amount and denomination of Applicable Cryptocurrency for each Equivalent Cryptocurrency Distribution shall be determined based on the Applicable Cryptocurrency Ratio.

**1.8** **"Applicable Cryptocurrency Ratio"** means, with respect to a denomination of Cryptocurrency used by a Holder of a Customer Claim in a Cryptocurrency Transaction, the ratio, expressed as a percentage, of (x) the Dollar Denominated Value of such Cryptocurrency to (y) the Dollar Denominated Value of all Cryptocurrencies used by such Holder in all of its Cryptocurrency Transactions.  For example, if a Holder of a Customer Claim engaged in Cryptocurrency Transactions involving Peercoin valued at $1,000 as of the Petition Date and Vertcoin valued at $4,000 as of the Petition Date, the Applicable Cryptocurrency Ratio for Peercoin would be 20%, and the Applicable Cryptocurrency Ratio for Vertcoin would be 80%.

**1.9** **"Assets"** means the assets of each of the Debtors, of any nature whatsoever, including all property of the Estates under and pursuant to section 541 of the Bankruptcy Code, Cash, Causes of Action, rights, interests and property, real and personal, tangible and intangible, including all files, books and records of the Estates.

**1.10** "**Auction**" means the competitive bidding process in relation to the sale of the Debtors' assets, conducted pursuant to the Bid Procedures Order.

**1.11** **"Avoidance Actions"** means any and all avoidance, recovery, subordination, or other actions or remedies that may be brought on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502(d), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, and/or 553 of the Bankruptcy Code.

**1.12** **"Ballot"** means the form distributed to each Holder of an Impaired Claim or Equity Interest that is entitled to vote to accept or reject the Combined Plan and Disclosure Statement on which is to be indicated an acceptance or rejection of the Combined Plan and Disclosure Statement.

**1.13** **"Bankruptcy Code"** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**1.14** **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware.

**1.15** **"Bankruptcy Rules"** means (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and the Local Bankruptcy Rules, as amended from time, (ii) the applicable Federal Rules of Civil Procedure, as amended and promulgated under section 2072 of title 28 of the United States Code, (iii) the applicable Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, and (iv) any standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case or proceedings therein, as the case may be.

**1.16** **"Bar Date"** means (i) February 10, 2021, at 5:00 p.m. (prevailing Eastern Time) and (ii) such other date(s) fixed by order(s) of the Bankruptcy Court, by which all Entities, including

Governmental Units, asserting a Claim against any Debtor must have filed a Proof of Claim against such Debtor or be forever barred from asserting such Claim in the Chapter 11 Cases.

**1.17** "**Bid Procedures Order**" means the order of the Bankruptcy Court, dated December 21, 2020 [Docket No. 270], setting forth the procedures for competitive bidding for the Sale Transaction, as amended or supplemented from time to time.

**1.18** "**Business Day**" means any day, other than a Saturday, Sunday, or a legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

**1.19** "**Cash" or "$**" means the legal tender of the United States of America, including any wire transfer or instrument negotiable for legal tender of the United States of America.

**1.20** "**Causes of Action**" means all claims, actions, causes of action, third-party claims, counterclaims, crossclaims, third-party claims, contribution claims, or any other claims whatsoever (including any Causes of Action described herein) of the Debtors and/or their Estates that may be pending on the Effective Date (including all such Causes of Action brought by the Committee pursuant to the Plan Support Agreement) or instituted after the Effective Date against any Entity based in law, equity, or otherwise, including under the Bankruptcy Code, whether known or unknown, whether direct, indirect, derivative, or otherwise, and whether asserted or unasserted as of the date of entry of the Confirmation Order, including Avoidance Actions.

**1.21** "**Causes of Action List**" means the non-exclusive list of Causes of Action attached hereto as **Exhibit A**.

**1.22** "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court and jointly administered under Case No. 20-12836 (JTD).

**1.23** "**Claim**" means any right to payment from the Debtors, from property of the Debtors or from the Debtors' Estates, whether or not such right is reduced to judgment, liquidated, Unliquidated, fixed, Contingent, matured, unmatured, Disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown, or asserted; or any right to an equitable remedy for breach of performance by the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, Contingent, matured, unmatured, Disputed, undisputed, secured, or unsecured.

**1.24** "**Claim Objection**" means any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate, or estimate any Claim (including the resolution of any request for payment of any Administrative Expense Claim).

**1.25** "**Claims Agent**" means the Debtors' claims agent, Donlin, Recano & Company, Inc., or its successors and assigns.

**1.26** "**Claims Register**" means the official register of Claims maintained by the Claims Agent.

**1.27** **"Class"** means a category of Holders of Claims or Equity Interests set forth in Section 7.2 hereof.

**1.28** **"Clerk"** means the clerk of the Bankruptcy Court.

**1.29** **"Collateral"** means any property or interest in property of the Debtors' Estates subject to a Lien, charge, right of setoff, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

**1.30** **"Combined Hearing"** means the hearing held by the Bankruptcy Court to consider (i) final approval of the Combined Plan and Disclosure Statement as providing information pursuant to section 1125 of the Bankruptcy Code and (ii) pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Combined Plan and Disclosure Statement, as such hearing may be adjourned or continued from time to time.

**1.31** **"Combined Hearing Notice"** has the meaning set forth in Section 8.3(d).

**1.32** **"Combined Plan and Disclosure Statement"** means this combined disclosure statement and chapter 11 plan of liquidation, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

**1.33** **"Committee"** means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

**1.34** **"Confirmation Date"** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the Docket.

**1.35** **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code.

**1.36** **"Consummation"** means the occurrence of the Effective Date.

**1.37** **"Contingent"** means, with reference to a Claim, a Claim the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened, or been triggered as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the Holder of such Claim and whether or not a relationship between the Holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

**1.38** **"Convenience Claim"** means a Claim, subject to Section 13.1 hereof, against one or more of the Debtors that would otherwise be a General Unsecured Claim that (a) was scheduled or filed on or prior to the Bar Date in an amount less than or equal to $1,000 or (b) is in an amount that has been reduced to $1,000 pursuant to a Convenience Class Election made by the Holder of such Claim; provided, however, that: (i) where any portion(s) of a Claim has been transferred on or after the Petition Date, any transferred portion(s) shall continue to be treated

together with such Claim as a single Claim for purposes of determining whether such Claim qualifies as a Convenience Claim; and (ii) any General Unsecured Claim that was originally Allowed in excess of $1,000 may not be subdivided into multiple General Unsecured Claims of $1,000 or less for purposes of receiving treatment as a Convenience Claim.

**1.39** **"Convenience Class Election"** means an irrevocable election made on the Ballot by the Holder of a Claim against the Debtors that would otherwise be a General Unsecured Claim in an amount greater than $1,000 to reduce such Claim to $1,000 in order to be treated as a Convenience Claim. Subject to the occurrence of the Effective Date, such election shall be deemed to amend such General Unsecured Claim to reduce the amount of such Claim to $1,000.

**1.40** **"Convertible Notes"** means those certain convertible notes issued by Cred in August and September 2020 in the amount of approximately $2.6 million, bearing interest at a rate of 3% per annum and that were scheduled to mature 48 months after issuance.

**1.41** **"Cred"** means Cred Inc.

**1.42** **"Cred Capital"** means Cred Capital, Inc.

**1.43** **"Creditor"** means any Entity that is the Holder of a Claim against a Debtor.

**1.44** **"Cryptocurrency"** means any digital asset that is not backed by a government. The term "cryptocurrency" is to be interpreted broadly to include all forms of digital assets, virtual currency, cryptocurrency, tokens, security tokens, utility tokens and stablecoins. This includes bitcoin, ether, LBA tokens, Peercoin, Vertcoin, any ERC-20 compliant token, any altcoin, and any other cryptocurrency.

**1.45** **"Cryptocurrency Election"** means the election of any Holder of a Customer Claim to receive its Distribution in the Cryptocurrency utilized by such Holder in its Cryptocurrency Transaction(s) with the Debtors, which election was made on a Proof of Claim timely submitted by such Holder.

**1.46** **"Cryptocurrency Election E-Wallet Address"** means the E-Wallet alphanumerical sequence provided by Holders of Claims that make a Cryptocurrency Election.

**1.47** **"Cryptocurrency Transaction"** means a prepetition transaction involving any transfer by an Entity of Cryptocurrency to the Debtors, whether directly or indirectly.

**1.48** **"Customer"** means an Entity that engaged in a Cryptocurrency Transaction with one or more of the Debtors.

**1.49** **"Customer Claim"** means a General Unsecured Claim and/or an Other Secured Claim of a Customer arising from a Cryptocurrency Transaction.

**1.50** **"De Minimis Distribution"** means a Distribution to be made in accordance with the terms of this Combined Plan and Disclosure Statement that is $25.00 or less.

**1.51** **"Debtors"** means each of Cred, Cred (US) LLC, Cred Capital, Cred Merchant Solutions LLC, and Cred (Puerto Rico) LLC.

**1.52** **"Debtors-in-Possession"** means the Debtors in their capacity as debtors-in-possession in the Chapter 11 Cases under sections 1107(a) and 1108 of the Bankruptcy Code.

**1.53** **"Definitive Documents"** means the documents (including any related orders, agreements, instruments, schedules, or exhibits) that are necessary or desirable to implement or otherwise relate to the restructuring transaction, including, but not limited to: (a) the motion to approve the Debtors' entry into the Plan Support Agreement [Docket No. 279], (b) the order approving the Debtors' entry into the Plan Support Agreement [Docket No. ___], (c) all documents in connection with the Sale Transaction (including, without limitation, the sale agreement and order approving the sale), (d) the Combined Plan and Disclosure Statement (and all exhibits thereto), (e) the solicitation materials for the Combined Plan and Disclosure Statement; (f) the Disclosure Statement Order, (g) the Confirmation Order, (h) the Liquidation Trust Agreement; and (i) any other documents or exhibits related to or contemplated in the foregoing clauses (a) through (i), in each case in form and substance consistent with the Plan Support Agreement and reasonably acceptable to the Committee.

**1.54** **"DIP Financing Agreement"** means any future Senior Secured Super-Priority Debtor in Possession Credit Agreement, by and among the Debtors and any future lender,, as amended, restated, modified, supplemented, or replaced from time to time.

**1.55** **"DIP Financing Claim"** means a claim arising under the DIP Financing Agreement and the DIP Orders.

**1.56** **"DIP Orders"** means any Interim and/or Final Order approving the DIP Financing Agreement.

**1.57** **"Disallowed"** means, with reference to any Claim, (a) a Claim, or any portion thereof, that has been disallowed by a Final Order, (b) a Claim, or any portion thereof, that is expressly disallowed under the Combined Plan and Disclosure Statement, (c) a Claim listed in the Schedules as zero or as Disputed, Contingent, or unliquidated and in respect of which a Proof of Claim has not been timely filed or deemed timely filed pursuant to the Combined Plan and Disclosure Statement, the Bankruptcy Code, or any Final Order, notwithstanding anything in section 506(d) of the Bankruptcy Code to the contrary, (d) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code, (e) where the holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such Property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code, or (f) is for reimbursement or contribution that is contingent as of the time of allowance or disallowance of such claim.

**1.58** **"Disclosure Statement Order"** means the order of the Bankruptcy Court approving, among other things, on an interim basis, the adequacy of the disclosures contained herein

pursuant to section 1125 of the Bankruptcy Code and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Combined Plan and Disclosure Statement, entered by the Bankruptcy Court on [_____].

**1.59** **"Disputed"** means, with reference to any Claim, a Claim, or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim.

**1.60** **"Distribution"** means a delivery of Cash and/or Cryptocurrency, as the case may be, by the Liquidation Trustee to the Holders of Allowed Claims pursuant to the Combined Plan and Disclosure Statement.

**1.61** **"Distribution Pro Rata Share"** means the ratio (expressed as a percentage) of (x) the amount of an Allowed General Unsecured Claim against the Debtors to (y) the aggregate amount of all (A) Allowed General Unsecured Claims against the Debtors on the date of a Distribution *plus* (B) the aggregate Disputed Claim amount of all remaining Disputed General Unsecured Claims against the Debtors.

**1.62** **"Docket"** means the docket in the Chapter 11 Cases maintained by the Clerk.

**1.63** **"Dollar Denominated Value"** means, with reference to any form of Cryptocurrency, the value of such Cryptocurrency determined in lawful currency of the United States as of the Petition Date.

**1.64** **"E-Wallet"** means digital Cryptocurrency storage platforms that allow end-users to manage and store Cryptocurrency.

**1.65** **"Effective Date"** means a Business Day selected by the Debtors, after consultation with the Committee, on or after the Confirmation Date, on which (a) no stay of the Confirmation Order is in effect and (b) the conditions precedent to the effectiveness of the Combined Plan and Disclosure Statement specified in Section 16.2 hereof shall have been satisfied or waived as provided in Section 16.3 hereof.

**1.66** **"Entity"** has the meaning set forth in section 101(15) of the Bankruptcy Code.

**1.67** **"Equity Interest"** means, as of the Petition Date, any capital stock or other ownership interest in the Debtors, whether or not transferable, and any option, call, warrant or right to purchase, sell or subscribe for an ownership interest or other equity security in any of the Debtors.

**1.68** "**Equivalent Cryptocurrency Distribution**" means, with respect to any Holder of a Customer Claim that has made a Cryptocurrency Election, a Distribution in the Applicable Cryptocurrency equal in value (as of the applicable Distribution date) to such Holder's Distribution Pro Rata Share, reduced by the actual transaction costs and fees associated with making such Distribution in the Applicable Cryptocurrency.  To the extent a Customer engaged in Cryptocurrency Transactions involving more than one Cryptocurrency, the amount and denomination of Applicable Cryptocurrency for each Equivalent Cryptocurrency Distribution shall be determined by multiplying the value (as of the applicable Distribution date) of such Holder's Distribution Pro Rata Share by the Applicable Cryptocurrency Ratios.

**1.69** **"Estate"** means the estate of the Debtors in the Chapter 11 Cases that was created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

**1.70** **"Examiner"** means the examiner appointed by the U.S. Trustee on January 7, 2021, pursuant to the *Order Approving Appointment of Examiner* [Docket No. 338], and in accordance with that certain *Order Denying in Part, and Granting in Part, the Trustee/Examiner Motions* [Docket No. 281].

**1.71** **"Excluded Assets"** means the Assets that were excluded from a Sale Transaction.

**1.72** **"Exculpation Parties"** has the meaning set forth in Section 12.3(k) hereof.

**1.73** **"Executory Contract"** means a contract to which one or more of the Debtors are party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

**1.74** **"File, Filed, or Filing"** means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Cases.

**1.75** **"Final Order"** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending or, (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 9024 of the Federal Rules of Bankruptcy Procedure, or any applicable analogous rule, may be (but has not been) filed relating to such order shall not prevent such order from being a Final Order.

**1.76** **"General Unsecured Claim"** means any Claim other than an Administrative Expense Claim, Convenience Claim, DIP Financing Claim, Intercompany Claim, Other Priority Claim, Other Secured Claim, Priority Tax Claim, Professional Fee Claim, Secured Tax Claim, Subordinated Securities Claim, or Equity Interest. For the avoidance of doubt, (a) any Customer Claim is a General Unsecured Claim to the extent that is not secured by a valid and enforceable right of setoff under section 553 of the Bankruptcy Code or for any portion that is in excess of any such right of setoff and (b) a claim for principal and accrued interest on account of the Convertible Notes is a General Unsecured Claim.

**1.77** **"Governmental Unit"** has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

**1.78** **"Holder"** means an Entity holding a Claim or an Equity Interest, as applicable. "Hold" and "Held" shall have the correlative meanings.

**1.79**   **"Impaired"** means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

**1.80**   **"Imposter"** has the meaning set forth in Section 3.3(d) hereof.

**1.81**   **"Insider"** has the meaning set forth in section 101(31) of the Bankruptcy Code.

**1.82**   **"Intercompany Claim"** means any Claim by a Debtor against another Debtor, subject to the limitations set forth in Section 12.1 hereof.

**1.83**   **"IRS"** means the Internal Revenue Service.

**1.84**   **"JST"** means JST Capital, LLC.

**1.85**   **"Liabilities"** mean any and all costs, expenses, damages, losses, penalties, fines, judgments, Claims, Liens, obligations, demands, injuries, settlements, awards, fines, taxes, fees, indebtedness, or other liabilities of any nature, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, liquidated or Unliquidated, matured or not matured, Contingent or direct, whether arising at common law, in equity, or under any statute, based in whole or in part on any act or omission or other occurrence arising or taking place prior to the Effective Date.

**1.86**   **"Lien"** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.87**   **"Liquidation Trust"** means the liquidation trust established by the Combined Plan and Disclosure Statement and described in Section 12.3 hereof and in the Liquidation Trust Agreement.

**1.88**   **"Liquidation Trust Agreement"** means the agreement establishing and delineating the terms and conditions of the Liquidation Trust and filed as part of the Plan Supplement.

**1.89**   **"Liquidation Trust Assets"** means all of the Estates' Assets transferred to the Liquidation Trust pursuant to Section 12.3(c) hereof.

**1.90**   **"Liquidation Trust Beneficiaries"** means the Holders of Allowed Claims that are entitled to receive Distributions pursuant to the terms of the Combined Plan and Disclosure Statement, whether or not such Claims are Allowed as of the Effective Date.

**1.91**   **"Liquidation Trust Expenses"** means all actual and necessary costs and expenses incurred by the Liquidation Trust in connection with carrying out the obligations of the Liquidation Trust pursuant to the terms of the Combined Plan and Disclosure Statement and the Liquidation Trust Agreement.

**1.92**   **"Liquidation Trustee"** means the Person who will be appointed to act as trustee of the Liquidation Trust in accordance with the terms of the Combined Plan and Disclosure Statement, the Confirmation Order, and the Liquidation Trust Agreement, or any successor appointed in accordance with the terms of the Combined Plan and Disclosure Statement and the Liquidation

Trust Agreement. The identity of the Liquidation Trustee, as well as the terms of the compensation paid to the Liquidation Trustee, will be disclosed in the Plan Supplement.

1.93   **"Litigation Proceeds"** means the proceeds from all Causes of Action pursued by or for the benefit of the Liquidation Trust (including any proceeds recovered by the Liquidation Trust from Avoidance Actions).

1.94   **"Local Bankruptcy Rules"** means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

1.95   **"moKredit"** means the Hong Kong-based entity founded by Lu Hua, which provides micro-loans to online gaming publisher sites through the provision of credit (in the form of gaming tokens) to video game enthusiasts.

1.96   **"Net Asset Sale Proceeds"** means the proceeds from any Sale Transaction, after taking into account any related expenses and any post-closing adjustments.

1.97   **"Net Distributable Assets"** means (a) the gross amount available from the liquidation of the Excluded Assets (including any Litigation Proceeds) plus (b) the amount of the Net Asset Sale Proceeds minus (c) (i) the amount of all Allowed A/P/S Claims Allowed against the Debtors, (ii) U.S. Trustee Fees, (iii) the Liquidation Trust Expenses, and (iv) Distributions to Holders of Allowed Convenience Claims.

1.98   **"Opt-Out Election Form"** is the opt-out form, as approved in the Disclosure Statement Order, pursuant to which holders of claims or interests may elect to opt out of the third party release in accordance with Section 18.2 hereof.

1.99   **"Other Priority Claim"** means any claim, other than an Administrative Expense Claim, Professional Fee Claim, or Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

1.100   **"Other Secured Claim"** means any Secured Claim other than a Secured Tax Claim. For the avoidance of doubt, to the extent a Customer Claim is secured by a valid and enforceable right of setoff under section 553 of the Bankruptcy Code, such Customer Claim shall be an Other Secured Claim; *provided*, *however*, that any portion of a Customer Claim in excess of the amount secured by such a right of setoff shall be a General Unsecured Claim.

1.101   **"Person"** shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

1.102   **"Petition Date"** means November 7, 2020, the date on which the Debtors commenced the Chapter 11 Cases.

1.103   **"Plan Supplement"** means the supplement or supplements to the Combined Plan and Disclosure Statement containing certain documents relevant to the implementation of the Combined Plan and Disclosure Statement, including the Liquidation Trust Agreement, the list of Executory Contracts and Unexpired Leases to be assumed pursuant to Section 15.1 hereof, and the DIP Financing Agreement, if any.

**1.104** "**Plan Support Agreement**" means the binding term sheet executed by the Debtors and the Committee setting forth the material terms of a plan support agreement among such parties.

**1.105** "**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.106** "**Professional**" means any professional Person employed in the Chapter 11 Cases pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code pursuant to an Order of the Bankruptcy Court and to be compensated for services rendered pursuant to sections 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code.

**1.107** "**Professional Fee Claim**" means any claim of a Professional approved by the Bankruptcy Court for compensation, indemnification, or reimbursement of costs and expenses incurred on or before the Effective Date pursuant to sections 327, 328, 330, 331, 503(b), or 1103(a) of the Bankruptcy Code, plus any fees and expenses related to the final fee application of a Professional.

**1.108** "**Professional Fee Escrow**" means an escrow account to be established and funded on the Effective Date in an amount equal to the Professional Fee Reserve Amount in accordance with Section 9.2 hereof.

**1.109** "**Professional Fee Reserve Amount**" means the total amount of unpaid compensation and unreimbursed expenses incurred by Professionals retained by the Debtors or the Committee through and including the Effective Date, in ease case as determined in good faith by the applicable Professional.

**1.110** "**Proof of Claim**" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

**1.111** "**Rejection Bar Date**" means the deadline by which a counterparty to an Executory Contract or an Unexpired Lease of the Debtors rejected under the Combined Plan and Disclosure Statement must file a Proof of Claim for damages arising from such rejection by the Debtors of such Executory Contract or Unexpired Lease, which shall be thirty (30) calendar days after the Effective Date or such other deadline established for filing a Rejection Claim by a Final Order of the Bankruptcy Court; provided, however, that if an earlier rejection bar date was established by order of the Bankruptcy Court with respect to a rejected Executory Contract or Unexpired Lease, then such earlier rejection bar date shall apply.

**1.112** "**Rejection Claim**" means any Claim for damages as a result of the rejection under the Combined Plan and Disclosure Statement of any Executory Contract or Unexpired Lease. All Rejection Claims shall be treated as General Unsecured Claims under the Combined Plan and Disclosure Statement.

**1.113** "**Released Parties**" means the Professionals retained by the Debtors, Grant Lyon as the Debtors' independent director, Matthew Foster as the Debtors' chief restructuring officer, any other staff supplied by Sonoran Capital Advisors, LLC, the Professionals retained by the Committee, and the respective agents and representatives of each of the foregoing.

**1.114** **"Reserve"** has the meaning given to such term in Section 13.15 hereof.

**1.115** **"Sale Motion"** means the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing and Approving Form and Manner of Notice Thereof, and (C) Approving Assumption and Assignment Procedures and Form and Manner of Notice Thereof; and (II) Authorizing (A) The Sale(s), Free and Clear of All Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. 65].

**1.116** **"Sale Transaction"** means any sale of Assets of the Debtors prior to the Effective Date under section 363 of the Bankruptcy Code.

**1.117** **"Schedules"** means, collectively, the schedules of Assets and Liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the official bankruptcy forms in the Chapter 11 Cases, as the same may have been amended or supplemented through the Confirmation Date pursuant to Bankruptcy Rules 1007 and 1009.  For the avoidance of doubt, Schedules do not include any schedules or exhibits to the Combined Plan and Disclosure Statement or the Plan Supplement.

**1.118** **"Secured Claim"** means any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

**1.119** **"Secured Tax Claim"** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein and including any related Secured Claim for penalties).

**1.120** **"Solicitation Package"** has the meaning set forth in Section 8.3(d) hereof.

**1.121** **"Subordinated Securities Claim"** means any Claim arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such security, or for reimbursement or contribution Allowed under section 502 of the Bankruptcy Code on account of such a Claim.

**1.122** **"Trust Advisory Board"** means the committee appointed pursuant to Section 12.3 hereof to oversee the activities of the Liquidation Trust and the Liquidation Trustee, consisting of each member of the Committee who wishes to continue in such role, and such additional members, if any, nominated by the Committee, as are required for the initial complement of the Trust Advisory Board to be an odd number greater than one.

**1.123** **"U.S. Trustee"** means the Office of the United States Trustee for the District of Delaware.

**1.124** **"U.S. Trustee Fees"** means fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

**1.125**   **"Unclassified Claim"** means any Claim that is an Administrative Expense Claim or a Priority Tax Claim.

**1.126**   **"Unexpired Lease"** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

**1.127**   **"Unimpaired"** means, with respect to a Claim or Equity Interest, that such Claim or Equity Interest is not Impaired as a result of being paid in full in Cash under the Combined Plan and Disclosure Statement.

**1.128**   **"Unliquidated"** means with reference to a Claim, a Claim, the amount of Liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is asserted or sought to be estimated.

**1.129**   **"Voting Agent"** has the meaning set forth in Section 8.3(c) hereof.

**1.130**   **"Voting Deadline"** means _____ at 5:00 p.m. (prevailing Eastern Time).

**1.131**   **"Voting Record Date"** has the meaning set forth in Section 8.3(b) hereof.

**1.132**   **"Voting Report"** has the meaning set forth in Section 8.3(g) hereof.

## ARTICLE  II.
## INTERPRETATION OF COMBINED PLAN AND DISCLOSURE STATEMENT

**2.1**   **Application of Definitions; Rules of Construction; Computation of Time**

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender.  For purposes of the Combined Plan and Disclosure Statement, (a) any reference in the Combined Plan and Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (b) any reference in the Combined Plan and Disclosure Statement to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented and (c) unless otherwise specified, all references in the Combined Plan and Disclosure Statement to Sections, Articles, Schedules, and Exhibits are references to Sections, Articles, Schedules and Exhibits of or to the Combined Plan and Disclosure Statement. The words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to the Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection or clause contained in the Combined Plan and Disclosure Statement.  A capitalized term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code or in the Exhibits hereto. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Combined Plan and Disclosure Statement.  The headings in the Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions of the Combined Plan and Disclosure Statement.  Unless otherwise indicated herein, all references to dollars means United

States dollars.   In computing any period of time prescribed or allowed by the Combined Plan and Disclosure Statement, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006 shall apply.

## 2.2    Relief Sought by Filing the Combined Plan and Disclosure Statement

The filing of the Combined Plan and Disclosure Statement constitutes, among other things, a motion by the Debtors pursuant to Bankruptcy Rules 9019 to approve the settlements and comprises set forth in Section 12.2 hereof, and for limited substantive consolidation of the Debtors' Estates, as set forth in Section 12.1 hereof.

**ARTICLE  III.**
**BACKGROUND – THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW**

## 3.1    General Background – Overview of the Debtors

The Debtors were founded in 2018 by Lu Hua and Dan Schatt.  Prior to the Petition Date, the Debtors operated a global financial services platform serving retail and institutional clients in 183 countries.  The Debtors, which are lenders, utilized financial technology to provide business and retail credit and to allow Customers to earn a yield on more than 15 Cryptocurrencies and fiat currencies through the Debtors' partner network.  As of the Petition Date, the Debtors employed a staff of approximately 20 employees, consisting primarily of software and technology engineers.

As part of the Debtors' businesses, Customers transferred Cryptocurrency to the Debtors, generally pursuant to a loan agreement or a financing agreement.[2]  The Debtors then utilized the Cryptocurrency in a variety of investment strategies involving third-party asset managers.  The Debtors earned revenue through the returns generated by their investments, as well as through interest on lines of credit extended to certain of the Debtors' Customers in connection with the loans and financings referenced above.

The Debtors' business consisted of two key components: (a) the transfer of Cryptocurrency or other assets by Customers to the Debtors and the investment of those assets in order to earn returns ("CredEarn"); and (b) lending by the Debtors to certain Customers ("CredBorrow").

The Debtors' CredEarn business involved the transfer of Cryptocurrency from Customers to the Debtors, generally pursuant to a loan or financing agreement.  The Debtors then invested the Cryptocurrency with third-party asset managers or lenders to generate returns.  Such investments could take the form of (a) the Debtors directly providing Cryptocurrencies to asset managers or (b) the Debtors converting Cryptocurrencies into other Cryptocurrencies or fiat currencies and providing the proceeds thereof to asset managers or lenders.  The Debtors earned revenue through the returns generated by these investments.

---

[2]    Shortly before the Petition Date, the Debtors began using contracts to "rent" Cryptocurrency from Customers. As of the Petition Date, rental contracts accounted for less than 1% of the Debtors' Customer contracts.

The Debtors' obligations to Customers were repaid, with interest, as set forth in the relevant Customer's contract. Generally, Customers who transferred Cryptocurrency to the Debtors were entitled to receive their principal and interest back in the type of Cryptocurrency the Customers transferred to the Debtors. Because the Debtors' business model was premised on generating a return for Customers by investing the deposited Cryptocurrencies with asset managers, the Debtors generally did not themselves hold significant amounts of Cryptocurrency. When Customers terminated accounts with the Debtors, the Debtors generally had to withdraw Cryptocurrency from asset managers to purchase new Cryptocurrency in the open market at then-prevailing prices in order to repay Customers

Generally, the CredBorrow program was only available to the Debtors' domestic Customers. Under the CredBorrow program, Customers were generally permitted to borrow against Cryptocurrency or other assets that they transferred to the Debtors, and were obligated to make periodic repayments as specified in the relevant Customer's contract. The Debtors earned revenue on CredBorrow contracts through interest and fees assessed on Customers' borrowings.

## 3.2    The Debtors' Prepetition Capital Structure

As of the Petition Date, the former book value of the Debtors' total Assets was approximately $69 million. Book value is generally computed in accordance with various accounting pronouncements and may not (and in the case of the Debtors, likely does not) correlate to fair value of any Asset or the enterprise value of the Debtors as a whole. Moreover, the Debtors have not conducted the impairment analysis which would be required under GAAP for such former book value to be considered a current and reliable book value. Such impairment analysis would likely result in a book value significantly less than the former book value referred to above.

The Debtors have not issued any secured debt. In August and September 2020, Cred issued the Convertible Notes. As of the Petition Date, approximately $2.6 million (which includes accrued interest) remained outstanding on the Convertible Notes. Other than the Convertible Notes, the Debtors do not have any outstanding funded indebtedness.

As of the Petition Date, the Debtors' Liabilities to Customers were in excess of $160 million.

## 3.3    Events Leading to the Chapter 11 Cases

(a)      JST Transactions

The Debtors maintained accounts with JST. Through JST, the Debtors held substantial "long" futures positions on bitcoin and other Cryptocurrencies, which included margin holdings. In addition, the Debtors' contracts with JST included certain "stop positions," whereby when the price of a Cryptocurrency dropped below a certain threshold, JST sold the Cryptocurrency. These stop positions are referred to as "stop loss sale orders."

In March 2020, the drop in bitcoin prices (and other Cryptocurrency prices) triggered the Debtors' stop loss sale orders, which had the effect of: (i) "locking in" losses on the sale of bitcoin; and (ii) eliminated the Debtors' margin on bitcoin and other Cryptocurrencies. As a

result, the Debtors acquired new Cryptocurrencies at substantially higher prices, which had a material negative effect on the Debtors' liquidity.

As described in greater detail below, following the losses with JST, the Debtors sought and obtained a 300 bitcoin capital contribution from Lu Hua.

(b)     Over-Exposure on Loans Made to moKredit

In late 2018, Cred started making loans to moKredit – an entity founded by Cred co-founder Lu Hua – under that certain Loan and Security Agreement dated December 27, 2018, by and between moKredit Technology (Hong Kong) Company Limited, a Hong Kong company, and moKredit, Inc., an exempted company incorporated in the Cayman Islands with limited liability, as borrowers, and Cred, as lender.  It is the Debtors understanding that under the Loan and Security Agreement, Cred extended moKredit a $100 million line of credit.  The Debtors believe that as security for the line of credit, Cred received a security interest in substantially all of moKredit's personal property.[3]  Cred has not taken any affirmative steps to perfects its security interest in this collateral.

By 2019, the Debtors' primary revenue generator was its relationship with moKredit.  At one point, moKredit had drawn approximately $70 million on the line of credit.  As of the Petition Date, the amount of the Debtors' outstanding loans with moKredit was approximately $39 million.

As a result of the Debtors' JST losses in March 2020, the Debtors undertook an effort to recover principal from moKredit and reestablish its hedging positions to protect against Cryptocurrency price fluctuations.  That effort failed because of the restrictions imposed by the Chinese government in response to the COVID-19 pandemic.  Due to the restrictions, moKredit could not meet its obligations under the Loan and Security Agreement, and was only able to return $300,000 of principal to the Debtors over the course of March and April, 2020.  In May 2020, moKredit renegotiated its repayment schedule, whereby it would continue making approximately $582,000 per month in interest payments.

(c)     Cred Capital Problems

In March 2020, the Debtors directed the then-Chief Capital Officer, James Alexander, to incorporate Cred Capital as a Delaware entity to be controlled by Cred for the purposes of: (a)

---

[3]     Cred's security interest covered "[a]ll accounts, chattel paper, instruments, deposit accounts, letter of credit rights, and general intangibles related thereto; and all returned or repossessed goods which, on sale or lease, resulted in an account, including all Customer Loans and [moKredit's] rights related thereto", "[a]ll inventory", "[a]ll equipment and fixtures now owned or hereafter acquired by [moKredit]", "[a]ll of [moKredit's] deposit accounts with Cred", "[a]ll instruments, chattel paper, documents, certificates of deposit, securities (including equity interests) and investment property of every type", "[a]ll general intangibles" including "all goodwill connected with or symbolized by any of such intangibles", "[a]ll negotiable or nonnegotiable documents of title covering any Collateral", "[a]ll accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral", "[a]ll substitutes or replacements for any Collateral, all cash or non-cash proceeds (including insurance proceeds), products, rents and profits of the Collateral, and all income, benefits and property receivable on account of the Collateral, and all supporting obligations covering any Collateral", "[a]ll books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm, or electronic media, including but not limited to any computer-readable memory and any computer software necessary to process such memory".

creating a vehicle to assist the Debtors with arranging bond offerings for companies in need of capital; and (b) overseeing the Debtors' asset management strategies.  Cred also transferred the 300 bitcoin capital contribution made by Lu Hua to Cred Capital to provide the Debtors with a natural hedge against rising bitcoin prices.

Based on the Debtors' understanding, these plans were derailed, however, when Mr. Alexander attempted to take control of Cred Capital away from its corporate parent, Cred, and used Cred Capital's assets for his personal benefit.  Mr. Alexander attempted to take control of Cred Capital by: (i) installing himself as its sole director; (ii) assigning only Class B, non-voting shares to Cred (instead of voting shares); and (iii) assigning Class A voting shares to a purported third-party "investor" who Mr. Alexander contends gave him a proxy to control the voting shares.

Neither Cred nor Cred Capital ever received any capital contribution from this so-called "investor."  In addition, Mr. Alexander did not use the 300 bitcoin to establish hedging positions as he had been instructed to do, but instead used a portion of these funds to make a series of vendor payments.

When Cred became aware of Mr. Alexander's actions, Cred terminated his employment and took corrective action under Delaware law to re-file Cred Capital's charter and appoint a board of directors.

Thereafter, Cred discovered that Mr. Alexander absconded with 225 of the 300 bitcoin (valued at approximately $6 million as of December 31, 2020).  Despite the Debtors' demands, Mr. Alexander has refused to return the bitcoin to the Debtors.

The foregoing events spawned significant litigation against Mr. Alexander, including, California state court litigation seeking, among other things, injunctive relief, compensatory and punitive damages, breaches of contract, and breach of the implied covenant of good faith and fair dealing.[4]  Moreover, as described in greater detail below, after the Petition Date, certain of the Debtors initiated an adversary proceeding against Mr. Alexander seeking turnover of the misappropriated and improperly retained Assets.[5]

After the Petition Date, the Debtors also filed a notice of removal with the California state court.  The Debtors are in the process of transferring the California state court litigation to the Bankruptcy Court.

(d)     Theft of Bitcoin by an Imposter

In August 2020, the Debtors discovered that they had been the victims of a social engineering scheme that resulted in the theft of 800 bitcoin (valued at approximately $10 million as of October 2020).

---

[4]     Case No. 20-CIV-02915, Superior Court of the State of California; County of San Mateo, Southern Branch.

[5]     Adv. Pro. No. 20-51006.

In February 2020, Mr. Alexander informed the Debtors' of a potential investment opportunity with an entity that purported to be Quantcoin (the "Imposter"). Based on Mr. Alexander's representations and purported due diligence, Mr. Alexander was given permission to hire the Imposter to manage a portion of the Debtors' bitcoin.

In a series of transactions in February and April 2020, Mr. Alexander directed the transfer of a total of 800 bitcoin to the Imposter. After transferring the bitcoin, an administrator purporting to be Scott Foster with Kingdom Trust Company, a Cryptocurrency custodian ("Kingdom Trust"), was in contact with the Debtors regarding their 800 bitcoin. Initially, the alleged Mr. Foster provided what appeared to be performance updates to the Debtors on a monthly basis.

It is the Debtors' understanding that the fraudulent scheme came to light when the Debtors requested a withdrawal of $2 million from their account with the Imposter and the Imposter ceased responding to e-mails. The Debtors then contacted Kingdom Trust directly to inquire as to a monthly statement and learned that the Debtors not only did not have accounts at Kingdom Trust, but the e-mail address associated with Mr. Foster was fake.

Upon learning of the deception, the Debtors promptly contacted the pertinent law enforcement agency, which initiated an investigation into the matter. However, as of [December 31, 2020], the Debtors have yet to recover any of the stolen bitcoin.

In addition, in late November 2020, the Debtors served notices to more than 20 Cryptocurrency exchanges advising them of the theft or conversion of the Debtors' Cryptocurrency Assets. In such notices, the Debtors identified the relevant E-Wallets (both with respect to the theft by the Imposter and the misappropriation by Mr. Alexander) and requested that the exchanges freeze any accounts that may contain property of the Debtors.

(e)   Claims Against Mr. Inamullah

Several of the foregoing events are also attributable to, or were facilitated by, the Debtors' former Vice President of Capital Markets, Mr. Daniyal Inamullah, who was hired by the Debtors in December 2019. Mr. Inamullah was the primary person responsible for identifying potential investment opportunities, performing due diligence with respect to such opportunities, and producing reports and proposals to the Debtors with respect to potential investments. Accordingly, Mr. Inamullah's duties necessarily included verifying the accuracy of information provided to the Debtors with respect to their investment portfolio.

The Debtors believe that Mr. Inamullah failed at his responsibilities. For example: (i) Mr. Inamullah admitted in sworn testimony that he never conducted any due diligence with respect to the Imposter transactions; (ii) Mr. Inamullah contributed to Mr. Alexander's misappropriation of bitcoin by both initiating and authorizing the transfer of bitcoin into Mr. Alexander's personal E-Wallets; and (iii) violating the Debtors' security protocols, which were instituted by Mr. Inamullah.

Accordingly, the Debtors believe that they have multiple claims and causes of action against Mr. Inamullah, including, without limitation, breach of the duty of care, breach of the duty of loyalty, and civil conspiracy.

(f)     Customer Loss and Adverse Market Conditions

Negative press in connection with the Imposter transactions, Mr. Alexander's conduct, and the Debtors' worsening financial condition resulted in (i) certain of the Debtors' core partners to close their accounts with the Debtors and (ii) potential investments of outside capital failing to materialize during the third fiscal quarter of 2020.  In particular, the Debtors' former management was exploring business expansion opportunities with other financial services companies that were looking at opportunities in the Cryptocurrency space.

As of the Petition Date, the Debtors' balance sheet reflected an approximately 1:2.2 asset to liability ratio.  A lack of liquidity and reduced prospects for attracting new business diminished the Debtors' prospects for reducing this asset-liability gap and for staking out new positions to hedge against fluctuations in the price of Cryptocurrency.

The asset-liability gap was in part due to a rapid 30% increase in the price of bitcoin in October 2020, which exacerbated the Debtors' distressed financial position.  By late October, 2020, the Debtors determined to cease the inflow and outflow of all Cryptocurrency Assets to assess their financial position.  Unable to remedy the situation, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on the Petition Date, initiating the Chapter 11 Cases.

Although the Debtors remain committed to working with other constituents in the capital structure on the terms of superior restructuring transactions, the Debtors believe that the Combined Plan and Disclosure Statement, which now incorporates the global settlement with the Committee outlined in the Plan Support Agreement, represents the best available alternative to maximize value for all stakeholders.

**3.4     The Chapter 11 Cases**

The following is a brief description of certain major events that occurred during the Chapter 11 Cases.

(a)     First Day Relief

On or shortly after the Petition Date, the Debtors filed a number of motions and applications seeking certain "first day" relief, including the following:

i.     Pursuant to the *Motion of Debtors and Debtors in Possession for Order Directing Joint Administration of their Chapter 11 Cases* [Docket No. 3], the Debtors sought entry of an order directing the joint administration of the Chapter 11 Cases and consolidation thereof for procedural purposes only.  On November 11, 2020, the Bankruptcy Court entered an order granting this relief [Docket No. 27].

ii.     Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to File a Consolidated List of Debtors' 30 Largest Unsecured Creditors (II) Authorizing Debtors to Serve Certain Parties by E-mail, (III) Authorizing Debtors to Redact or Withhold Publication of Certain Personal Identification Information, and (IV) Granting Related Relief* [Docket No. 6], the

Debtors sought entry of interim and final orders authorizing the Debtors to: (i) file a consolidated list of the Debtors' 30 largest unsecured creditors; (ii) serve certain documents on parties-in-interest via email; and (iii) redact certain Customer information.  The Bankruptcy Court granted the relief on an interim basis on November 10, 2020 [Docket No. 34] and on a final basis on December 21, 2020 [Docket No. 264].

iii.  Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions; (II) Granting Administrative Expense Status to Postpetition Intercompany Balances; (III) Waiving the Requirements of Section 345(b) of Bankruptcy Code; and (IV) Granting Related Relief* [Docket No. 7], the Debtors sought entry of interim and final orders authorizing the Debtors to, among other things: (i) continue use of their cash management system; (ii) honor certain fees and charges associated therewith in the ordinary course of business; and (iii) maintain existing business forms.  The Bankruptcy Court granted the relief on an interim basis on November 10, 2020 [Docket No. 29] and on a final basis on December 21, 2020 [Docket No. 268].

iv.  Pursuant to the *Debtors' Motion for Entry of Order (I) Restating and Enforcing Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of Bankruptcy Code, (II) Permitting Debtors to Modify Automatic Stay, (III) Approving Form and Manner of Notice, and (IV) Granting Related Relief* [Docket No. 8], the Debtors sought relief to advise parties outside the United States of the existence, reach, and effects of the protections of the Bankruptcy Code, including the worldwide application of the automatic stay.  The Bankruptcy Court granted the motion on November 10, 2020 [Docket No. 32].

v.  Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Insurance Policies, (B) Pay All Related Obligations, and (II) Granting Related Relief* [Docket No. 10], he Debtors sought authorization to maintain insurance policies, which included: (i) directors and officers; (ii) errors and omissions; (iii) cyber; (iv) property; (v) damage, general commercial; (vi) commercial automobile; and (vii) general umbrella liability. The Bankruptcy Court granted the relief on an interim basis on November 10, 2020 [Docket No. 31] and on a final basis on December 18, 2020 [Docket No. 248].

vi.  Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs and (II) Granting Related Relief* [Docket No. 11], the Debtors sought authorization to: (i) pay and honor certain prepetition employee claims and obligations; and (ii) continue certain employee programs and obligations.  The Bankruptcy Court granted the relief on an interim basis on

November 30, 2020 [Docket No. 30] and on a final basis on December 21, 2020 [Docket No. 263].

(b)  Appointment of Committee

On December 3, 2020, the U.S. Trustee appointed the Committee pursuant to section 1102(a) of the Bankruptcy Code.  Additional information regarding the members of the Committee is included in the Notice of Appointment of the Committee [Docket No. 120].

(c)  Retention of Professionals

Paul Hastings LLP ("Paul Hastings") has served as the Debtors' restructuring counsel since it was engaged in late October, and the Debtors applied to retain Paul Hastings as their counsel shortly after the commencement of these chapter 11 cases.  *See Debtors' Application for Entry of an Order Authorizing and Approving Retention and Employment of Paul Hastings LLP as Counsel to Debtors, Effective as of the Petition Date* [Docket No. 64].  On December 6, 2020, the U.S. Trustee objected to Paul Hastings' retention on several bases, including that Paul Hastings' initial disclosures were inadequate and that Paul Hastings had an adverse interest to the Debtors because it provided prepetition services to the Debtors, represents a creditor of the Debtors in unrelated matters, and allegedly received a preferential transfer from the Debtors.  *See Objection of the United States Trustee to the Debtors' Application for Entry of an Order Authorizing and Approving Retention of Paul Hastings LLP as Counsel to Debtors, Effective as of the Petition Date* [Docket No. 139].

At the hearing on January 6, 2021, the Bankruptcy Court approved Paul Hastings' retention and overruled the U.S. Trustee's objection.  In doing so, the Bankruptcy Court held that Paul Hastings' initial disclosures were adequate and that Paul Hastings did not hold any interest adverse to the Debtors in violation of section 327(a) of the Bankruptcy Code.  Specifically, the Bankruptcy Court found there was nothing in the record that Paul Hastings's prepetition advice to the Debtors and its representation of a creditor on matters unrelated to the Chapter 11 Cases rendered it adverse to the Debtors.[6]  Moreover, the Bankruptcy Court found Paul Hastings had resolved the issues regarding the alleged preferential transfer by returning approximately $313,000 to Paul Hastings' client trust account for the Debtors and waiving prepetition fee claims in the same amount.  On January 7, 2021, the Bankruptcy Court entered an order approving the Debtors' retention of Paul Hastings [Docket No. 327].

On November 11, 2020 and December 18, 2020, the Bankruptcy Court also entered orders authorizing the Debtors to retain Donlin, Recano & Company, Inc. as claims agent [Docket No. 28] and as administrative agent [Docket No. 246], respectively.  On December 18, 2020, the Bankruptcy Court entered an order authorizing the Debtors to retain Cousins Law LLC, as Delaware bankruptcy counsel [Docket No. 245].  On December 21, 2020, the Bankruptcy Court entered orders authorizing the Debtors to retain Teneo Capital Group LLC as the Debtors' investment banker [Docket No. 261], MACCO Restructuring Group LLC, as the

---

[6]  Matters related to such creditor are being handled by Cousins Law, the Debtors' Delaware bankruptcy counsel and conflicts counsel.

Debtors' financial advisor [Docket No. 272], and Sonoran Capital Advisors, LLC to provide the Debtors with Matthew Foster, as Chief Restructuring Officer, and related personnel.

In addition, to assist the Committee in carrying out its duties, the Committee has sought Bankruptcy Court approval authorizing the retention and employment of McDermott Will & Emery LLP to serve as its bankruptcy counsel [Docket No. 282] and Dundon Advisors, LLC to serve as financial advisor [Docket No. 305].

    (d)    <u>Plan Support Agreement</u>

Promptly after its appointment, the Committee engaged in negotiations with the Debtors regarding a consensual path forward that would maximize the value of the Debtors' Estates for the benefit of all Creditors. Such negotiations culminated in the execution of the Plan Support Agreement, which contemplates a chapter 11 plan of liquidation centered on an expeditious liquidation of the Debtors' Assets, first through the Debtors' Sale Transaction, and, irrespective of whether the Sales Transaction comes to fruition, the transfer of all of the Debtors' Assets into a liquidation trust. The Debtors and the Committee believe that the restructuring process set forth in the Plan Support Agreement is in the best interests of the Debtors' Estates and all stakeholders.

On December 23, 2020, the Debtors filed the *Motion Pursuant to Bankruptcy Code Sections 363(b) and 105(a) for Authorization to Enter Into and Perform Under a Plan Support Agreement Term Sheet* [Docket No. 279], which is scheduled to be heard on February 3, 2021.

    (e)    <u>Sale Process</u>

On November 18, 2020, the Debtors filed the Sale Motion. Pursuant to the Sale Motion, the Debtors sought to establish certain deadlines and bidding procedures by which the Debtors could obtain proposals for the purchase of the Debtors' businesses as a going concern or, alternatively, for the purchase of the Debtors' Assets, to be sold at the Auction. On December 21, 2020, the Bankruptcy Court entered the Bid Procedures Order approving such relief [Docket No. 270].

The Bid Procedures Order provided, among other thing, that the selection of a stalking-horse bidder was subject to consent of the Committee. To date, the Debtors have not received a bid acceptable to the Committee. The Debtors are continuing to entertain offers from prospective buyers of various assets.

    (f)    <u>Post-Petition Litigation</u>

        (i)    *Motions to Convert or Dismiss the Chapter 11 Cases or Appoint a Trustee/Examiner*

On November 11, 2020, certain of the Debtors' creditors filed the *Motion of Krzysztof Majdak and Philippe Godineau for Entry of an Order Pursuant to 11 U.S.C. § 1112(b) (I) Dismissing the Cases; (II) Converting the Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 11 Trustee* [Docket No. 62] (the "<u>Creditor Motion</u>"). On December 4, 2020, the U.S. Trustee filed the *Motion of the United States Trustee for Entry of an Order Directing the*

*Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases* [Docket No. 133] (the "U.S. Trustee Motion" and, together with the Creditor Motion, the "Motions to Convert"). The Motions to Convert both seek entry of an order dismissing the Chapter 11 Cases, converting the Chapter 11 Cases to liquidating cases under chapter 7 of the Bankruptcy Code, or appointing a chapter 11 trustee.[7] Moreover, the U.S. Trustee Motion seeks, in the alternative, the appointment of an independent Examiner.

The Debtors and the Committee objected to the relief sought in the Motions to Convert. *See* Docket Nos. 109, 191, and 195.

Following a two-day evidentiary hearing on the Motions to Convert, the Bankruptcy Court: (i) denied the Creditor Motion; and (ii) denied in part and granted in part the U.S. Trustee Motion. As a result, the U.S. Trustee was directed to appoint an examiner. *See* Docket No. 281.

On January 7, 2021, the U.S. Trustee appointed Robert J. Stark as the Examiner in the Chapter 11 Cases [Docket No. 338]. In his role as the Examiner, and pursuant to section 1106(a)(3) and (4) of the Bankruptcy Code, Mr. Stark is investigating allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the Debtors' management, and will, as soon as practicable, file a written report that will be made available on the Docket in these Chapter 11 Cases, which can be viewed at the following link: https://www.donlinrecano.com/Clients/cred/Dockets.

(ii)     *Motion of UpgradeYa Investments, LLC for Relief from Stay Under Bankruptcy Code Section 362* ("Lift Stay Motion")

On November 25, 2020, UpgradeYa Investments, LLC ("UpgradeYa"), filed the Lift Stay Motion, seeking relief from the automatic stay to permit it to pursue remedies in connection with certain bitcoin it transferred to the Debtors. The Debtors and the Committee filed objections to the Lift Stay Motion. *See* Docket Nos. 116 and 190. On January 6, 2021, the Bankruptcy Court held an evidentiary hearing on the Lift Stay Motion. At the conclusion of the January 6, 2021 hearing, the Bankruptcy Court took the matter under advisement and ordered UpgradeYa to file further briefing regarding whether the remedy it seeks – authority to bring potential litigation claims against third parties – implicates property of the Debtors' estates on or before January 21, 2021, with reply briefs due on or before February 4, 2021, and responses to any reply briefing due on or before February 11, 2021.

---

[7]     Certain creditors and parties-in-interest joined or partially joined in the Motion to Convert. *See Response of James Alexander to the Motion of Kryszyof Majdak and Philippe Godinea for Entry of an Order Pursuant to 11 U.S.C. § 1112(b) (I) Dismissing the Cases; or (II) Converting the Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 11 Trustee* [Docket No. 103]; *Partial Joinder of Jamie Shiller, Takashi Yanagi, Wu Chi King, Joseph Richardson, Thomas Calvert, Clint Cowen, Robin Houck, Todd Wiseman, Mathew Dion, Jonatan Ashurov, Daniel Becker, Teppei Miyauchi, Jean Vacca, Xian Su, and Eric Schurman to Motion to Dismiss the Bankruptcy Cases, Convert Cases to Chapter 7, or Appoint a Chapter 11 Trustee* [Docket No. 107]; *UpgradeYa Investments, LLC's (I) Reply to Objection of the Debtors to Motion of UpgradeYa Investments, LLC for Relief from Stay Under Bankruptcy Code Section 362 and (II) Limited Joinder in the Motion for an Order Converting the Chapter 11 Cases to Chapter 7* [Docket No. 126].

      (iii)    *Motion of James Alexander to Dismiss the Cred Capital, Inc. Case* ("Cred Capital Motion")

On December 8, 2020, Mr. Alexander filed the Cred Capital Motion seeking the dismissal of Cred Capital's Chapter 11 Case. *See* Docket No. 152. The Cred Capital Motion alleges Mr. Alexander is the sole rightful officer and director of Cred Capital and that Cred's corrective action to re-take control of Cred Capital in June 2020 was invalid and of no effect. Mr. Alexander thus believes that Cred Capital's Chapter 11 Case should be dismissed because only he had the power to authorize it, and he did not. The Debtors filed an objection to the Cred Capital Motion and the Committee joined in the Debtors' objection. *See* Docket Nos. 296 and 297. The Cred Capital Motion is scheduled to be heard on February 3, 2021.

    (g)    Section 341(a) Meeting of Creditors

The section 341 meeting is scheduled to take place on February 2, 2021.

    (h)    Schedules and Statements

The Debtors Filed their Schedules on January 7, 2021 [Docket Nos. 331-335, as amended by Docket Nos. 343, 346, and 350], which, among other things, set forth the Claims of known Creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records. The Debtors retain the right to amend the Schedules during the pendency of the Chapter 11 Cases.

    (i)    Claims Process and Bar Dates

Pursuant to the *Order (I) Fixing Deadlines for Filing Proofs of Claim and (II) Approving Form and Manner of Notice Thereof* dated December 21, 2020 [Docket No. 271] (the "Bar Date Order"), the Bankruptcy Court established, among others, the following bar dates for filing Proofs of Claim:

- General Bar Date: February 10, 2021 at 5:00 p.m. (prevailing Eastern Time) as the deadline for all Persons or Entities (other than Governmental Units) holding or wishing to assert pre-petition Claims to file Proofs of Claims in the Chapter 11 Cases.

- Government Bar Date: May 6, 2021 at 5:00 p.m. (prevailing Eastern Time) as the deadline for all Governmental Units (as defined in section 101(27) of the Bankruptcy Code) holding or wishing to assert pre-petition Claims to file Proofs of Claim in the Chapter 11 Cases.

- Amended Schedules Bar Date: With respect to Holders of Claims affected, as described in the Bar Date Order, by the Debtors' amendment or supplement of their Schedules, such Holders shall have until the later of (i) the General Bar Date or, if the creditor is a Governmental Unit, the

Government Bar Date, and (ii) twenty-one (21) days from the date of service of notice of the amendment or supplement to the Schedules.

- <u>Rejection Damages Bar Date</u>: With respect to counterparties to an Executory Contract or an Unexpired Lease of the Debtors, which has been rejected under this Combined Plan and Disclosure Statement, such counterparty must file a Proof of Claim for damages arising from such rejection by the later of (i) the General Bar Date or thirty-days after service of an order by the Bankruptcy Court authorizing such rejection, and (ii) such other date, if any, as the Bankruptcy Court may fix in the order authorizing such rejection.

(j)      <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>

Pursuant to the *Motion of Debtors for Entry of Order Authorizing Debtors to (I) Reject Unexpired Leases of Nonresidential Real Property and (II) Abandon Property in Connection Therewith* [Docket No. 4], the Debtors sought entry of an order permitting the Debtors to reject leases in connection with their office space in San Mateo and Sherman Oaks, California. On December 18, 2020, the Bankruptcy Court entered an order granting this relief [Docket No. 243].

(k)      <u>DIP Financing</u>

The Debtors are currently in negotiations with potential lenders to provide debtor in possession financing to the Debtors. The Debtors are also negotiating for the right to convert such debtor-in-possession financing into an exit financing that would be available to fund expenses of the Liquidation Trust to the extent it is not repaid on the Effective Date of the Combined Plan and Disclosure Statement.

To the extent that the Debtors obtain debtor in possession financing, the terms of such financing, including the treatment of any DIP Financing Claims, will be included in the Plan Supplement. Parties interested in learning more about any such debtor in possession financing should monitor the Docket in these Chapter 11 Cases, which can be viewed at the following link: https://www.donlinrecano.com/Clients/cred/Dockets.

# ARTICLE IV.
## TAX CONSEQUENCES

**4.1     Tax Consequences.**

The confirmation and execution of the Combined Plan and Disclosure Statement may have tax consequences to Holders of Claims and Equity Interests. The Debtors do not offer an opinion as to any federal, state, local or other tax consequences to Holders of Claims and Equity Interests as a result of the confirmation of the Combined Plan and Disclosure Statement.

Under certain circumstances, an individual may be entitled to claim a theft-loss dependent on its individual circumstances. Such losses that arise out of property used in a trade or business or a transaction entered into for profit are deductible in the year in which the loss is sustained and in an amount not to exceed the adjusted tax basis of the property

involved.  Individuals should consult with their own tax advisors to determine if a theft loss deduction is permissible, as well as the timing, amount, and applicable limitations for any such theft loss deduction.

**All Holders of Claims and Equity Interests are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of this Combined Plan and Disclosure Statement. The Combined Plan and Disclosure Statement is not intended, and should not be construed, as legal or tax advice to any Creditor, Equity Interest Holder or other party in interest.**

## ARTICLE V.
## CERTAIN RISK FACTORS TO BE CONSIDERED

**5.1     Risk Factors to Be Considered**

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Combined Plan and Disclosure Statement.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Combined Plan and Disclosure Statement and its implementation.

(a)     Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect Distributions available to Holders of Allowed Claims under the Combined Plan and Disclosure Statement, but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Combined Plan and Disclosure Statement or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

(i)     Parties in Interest May Object to the Combined Plan and Disclosure Statement's Classification of Claims and Interests.  Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Equity Interest under the Combined Plan and Disclosure Statement complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Equity Interest, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(ii)     The Conditions Precedent to the Effective Date May Not Occur.  As more fully set forth in Article XVI hereof, the Confirmation Date and the Effective Date are subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Confirmation Date or the Effective Date will not take place.

(iii)     The Debtors May Fail to Satisfy Voting Requirements.  If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Combined Plan and Disclosure Statement, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Combined Plan and Disclosure Statement.  In the event that sufficient votes are not received, the Debtors, with the consent of the Committee, may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Combined Plan and Disclosure Statement.

(iv)     The Debtors May Not Be Able to Secure Confirmation of the Combined Plan and Disclosure Statement.  There can be no assurance that the requisite acceptances to confirm the Combined Plan and Disclosure Statement will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Combined Plan and Disclosure Statement.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of the Combined Plan and Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that the Combined Plan and Disclosure Statement, the balloting procedures, and the voting results are appropriate, the Bankruptcy Court could still decline to confirm the Combined Plan and Disclosure Statement if it finds that any of the statutory requirements for confirmation are not met.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of Distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of Distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Confirmation of the Combined Plan and Disclosure Statement is also subject to certain conditions as described in Article IX hereof.  If the Combined Plan and Disclosure Statement is not confirmed, it is unclear what Distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Combined Plan and Disclosure Statement, reserve the right, upon reasonable prior notice to and with the consent of the Committee, to modify the terms and conditions of the Combined Plan and Disclosure Statement as necessary for confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Combined Plan and Disclosure Statement.  Such a less

favorable treatment could include a Distribution of property with a lesser value than currently provided in the Combined Plan and Disclosure Statement or no Distribution whatsoever under the Combined Plan and Disclosure Statement.

(v)     Nonconsensual Confirmation.  In the event that any Impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any Insider in such class), and, as to each Impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired class(es).  The Debtors believe that the Combined Plan and Disclosure Statement satisfies these requirements, and the Debtors may request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual confirmation or Consummation of the Combined Plan and Disclosure Statement may result in, among other things, increased expenses relating to professional compensation.

(vi)    The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.  If the Bankruptcy Court finds that it would be in the best interests of Creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller Distributions being made to Creditors than those provided for in the Combined Plan and Disclosure Statement because of the (a) likelihood that the Assets, including any Cryptocurrency, would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and Executory Contracts.

(vii)   The Debtors May Object to the Amount or Classification of a Claim. Except as otherwise provided in the Combined Plan and Disclosure Statement, the Debtors reserve the right to object to the amount or classification of any Claim under the Combined Plan and Disclosure Statement.  The estimates set forth in the Combined Plan and Disclosure Statement cannot be relied upon by any Holder of a Claim, as the Debtors or the Liquidation Trustee may seek to investigate, File, and prosecute Claims and may object to Claims after confirmation of the Combined Plan and Disclosure Statement.

(viii)   <u>Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Combined Plan and Disclosure Statement</u>.  The Distributions available to Holders of Allowed Claims under the Combined Plan and Disclosure Statement can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect Distributions available to Holders of Allowed Claims under the Combined Plan and Disclosure Statement, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Combined Plan and Disclosure Statement or require any sort of revote by the Impaired Classes.

The estimated Claims and Creditor recoveries set forth in the Combined Plan and Disclosure Statement are based on various assumptions.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained herein.  Moreover, Creditor recoveries will depend on the outcome of litigation that may be brought by the Liquidation Trust for the benefit of Creditors.  Litigation outcomes are inherently uncertain and, if the litigation pursued by the Liquidation Trust is unsuccessful, may materially and adversely impact Creditor recoveries.  Furthermore, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that ultimately will be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Combined Plan and Disclosure Statement.

(ix)   <u>Releases, Injunctions, and Exculpations Provisions May Not Be Approved</u>.  Article XVIII hereof provides for certain releases, injunctions, and exculpations, including a release of Liens and third party releases that may otherwise be asserted against the Debtors or the Released Parties.  The releases, injunctions, and exculpations provided herein are subject to objection by parties in interest and may not be approved.

(x)   <u>Risk of Non-Occurrence of the Effective Date</u>.  Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.  If the Effective Date does not occur, the Combined Plan and Disclosure Statement shall be null and void in all respects and nothing contained herein shall: (a) constitute a waiver or release of any Claims by or Claims against or Equity Interest in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holder of a Claim or Equity Interest, or any other Entity; (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Equity Interest, or any other Entity in any respect; or (d) be used by the Debtors or any Entity as evidence (or otherwise) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

(xi)     Risk of Loss of Exclusive Right to Propose a Plan.  At the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose a plan and prohibits creditors and others from proposing a plan. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Combined Plan and Disclosure Statement in order to achieve the Debtors' stated goals.

(b)     Risks Related to Recoveries Provided Under the Combined Plan and Disclosure Statement.

(i)     Timing and Amount of Distributions.  Various factors will impact the amount of recoveries that Holders of Allowed Claims receive, including, without limitation, the degree to which objections to Claims are successful.  Further, due to the nature of litigation, it may take years to fully adjudicate, decide, or resolve objections to Claims.  As a result, Holders of Allowed Claims may not receive final Distributions in accordance herewith for a prolonged period of time following the Effective Date.

(ii)     Uncertainty of Distribution.  No assurances can be made that Holders of Allowed Claims will receive a Distribution as it is possible the Liquidation Trust Expenses will exceed the realizable value of the Liquidation Trust Assets.  In such a scenario, there would be no recovery to Holders of Allowed Claims.

(iii)     Cryptocurrency Distributions.  The Liquidation Trustee shall make good faith efforts to make Equivalent Cryptocurrency Distributions; however, there can be no assurance that the ability to make such Equivalent Cryptocurrency Distributions is guaranteed.  If the Liquidation Trustee cannot make Equivalent Cryptocurrency Distributions for any reason, Distributions will be made to Holders of Customer Claims that made a Cryptocurrency Election in Cash consistent with this Combined Plan and Disclosure Statement.

(iv)     Certain Tax Implications of the Combined Plan and Disclosure Statement. Consummation may result in significant tax implications for the Debtors and Holders of Claims.  Holders of Allowed Claims should abide by Article IV hereof to determine how the tax implications of the Combined Plan and Disclosure Statement and the Chapter 11 Cases may adversely affect the Holders of Claims.

(c)     The Debtors May Not Be Able to Generate Sufficient Cash to Continue in Chapter 11.

The Debtors may not be able to generate sufficient Cash to continue operating in chapter 11 for a prolonged period of time.  It is also unclear whether the Debtors will be able to obtain postpetition financing to fund administrative expenses through confirmation of an alternative chapter 11 plan.

     (d)     <u>The Debtors May Be Adversely Affected by Litigation</u>.

The Debtors may become parties to litigation, and litigation in which the Debtors are already a party may not be resolved in their favor.  In general, litigation can be expensive and time consuming to bring or defend.  Litigation could result in settlements or damages that could significantly affect the Debtors' financial positions.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Combined Plan and Disclosure Statement.  It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of any litigation.  The impact of any such litigation on the Debtors' business and financial stability, however, could be material.

## 5.2    Alternatives to this Combined Plan and Disclosure Statement

In the event the Debtors are unable to obtain sufficient votes or are unable to satisfy the legal requirements to confirm the Combined Plan and Disclosure Statement, the Debtors, with the consent of the Committee, may seek to confirm an alternative chapter 11 plan or convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Combined Plan and Disclosure Statement.  As set forth in Article VI hereof, the Debtors believe it is unlikely that conversion of the Chapter 11 Cases to cases under chapter 7 will result in greater Distributions to stakeholders.

## ARTICLE  VI.
## BEST INTERESTS AND FEASIBILITY

## 6.1    Best Interests Test

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Equity Interest either (a) accept the plan or (b) receive or retain under the plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Because of the increased expenses that would be incurred in the event of a conversion of the Chapter 11 Cases to cases under chapter 7, the value of any Distributions to Holders of Claims or Equity Interests if the Chapter 11 Cases were converted to cases under chapter 7 would be less than the value of Distributions hereunder.  This is because conversion of the Chapter 11 Cases to chapter 7 would require the appointment of a chapter 7 trustee, and in turn, such chapter 7 trustee's likely retention of new professionals.

The "learning curve" that the chapter 7 trustee and new professionals would be faced with comes with additional costs to the Estates and delay compared to the time of Distributions under the Combined Plan and Disclosure Statement.  As a result, the Debtors believe that their Estates would have fewer funds available for Distribution in a hypothetical chapter 7 liquidation than they would if the Combined Plan and Disclosure Statement is confirmed, and, therefore, Holders of Allowed Claims will recover less in the hypothetical chapter 7 cases.[8]  Accordingly,

---

[8]    A hypothetical chapter 7 liquidation analysis is attached hereto as **Exhibit B**.

the Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

**6.2     Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Combined Plan and Disclosure Statement is not likely to be followed by liquidation, or the need for further financial reorganization, of the Debtors or any successors to the Debtors, unless such liquidation or reorganization is proposed in the Combined Plan and Disclosure Statement. As set forth herein, the Debtors commenced the Chapter 11 Cases to allow for an efficient and orderly sale of their Assets, followed by a wind-down process, which the Combined Plan and Disclosure Statement accomplishes. The Debtors will not be conducting any business operations after the Effective Date. As such, provided that the Combined Plan and Disclosure Statement is Consummated, the Debtors' Estates will not be subject to future reorganization or liquidation. Accordingly, the Debtors believe that the Combined Plan and Disclosure Statement is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

# ARTICLE  VII.
# SUMMARY OF ASSETS AND TREATMENT OF CLAIMS AND INTERESTS

**7.1     Summary of Assets**

As of the Petition Date, the former book value of the Debtors' Assets was approximately $69 million. Book value is generally computed in accordance with various accounting pronouncements and may not correlate with the fair value of an individual Asset or of the enterprise value of the Debtors as a whole. Moreover, the Debtors have not conducted the impairment analysis which would be required under GAAP for such former book value to be considered a current and reliable book value. Such impairment analysis would likely result in a book value significantly less than the former book value referred to above. The Debtors' Assets broadly consist of Cash and Cash equivalents, Cryptocurrency, technological platforms, loan obligations, and certain other Assets under management.

As of December 31, 2020, the Debtors held approximately $970,000 in Cash. In addition, the Debtors hold a variety of Cryptocurrencies. Certain of these Cryptocurrencies are "liquid" and can be readily converted to Cash. As of December 31, 2020, the Debtors held approximately $5.3 million in liquid Cryptocurrencies. A portion of the Cryptocurrency held by the Debtors is considered "illiquid," the value of which is difficult to determine with any level of certainty and which require the Debtors to overcome additional barriers (which may require additional marketing efforts and/or liquidation in smaller quantities) to convert these "illiquid" Cryptocurrencies into Cash.

The Debtors' Assets also include obligations under customer loans and loans issued by the Debtors. Of note, moKredit is obligated to repay the Debtors approximately $39 million. However, as discussed above, moKredit is currently not making payments on the outstanding principal, and thus the account balance may be partially or completely uncollectible.

The Debtors are owed approximately $8 million for loans issued under the CredBorrow program.  However, these creditors may argue that obligations would only be collected if Collateral was returned, and thus the account balance may be partially or completely uncollectible.  For the purposes of this Plan, the Debtors cannot ascribe value to the moKredit loan obligation as there is no market for any fair valuation purposes nor have the Debtors been able to conduct an impairment analysis which would be necessary to present a book value for the loan.

The Debtors also have certain "assets under management" valued at approximately $3.6 million, as of December 31, 2020, to be returned by certain third-party asset managers.

Additionally, the Debtors own a proprietary technological platform and various Causes of Action, which may be of significant value.

## 7.2    Summary of Treatment of Claims and Equity Interests

The following table (a) designates the Classes of Claims against, and Equity Interests in, the Debtors, (b) specifies the Classes of Claims and Equity Interests that are Impaired by the Combined Plan and Disclosure Statement and therefore are deemed to reject the Combined Plan and Disclosure Statement or are entitled to vote to accept or reject the Combined Plan and Disclosure Statement in accordance with section 1126 of the Bankruptcy Code, and (c) specifies the Classes of Claims and Equity Interests that are Unimpaired by the Combined Plan and Disclosure Statement and therefore are deemed to accept the Combined Plan and Disclosure Statement in accordance with section 1126 of the Bankruptcy Code.

| Class | Description | Impairment | Entitled to Vote | Estimated Allowed Claim Amounts | Estimated Recovery Percentage |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | $0 | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | $0 | 100% |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) | Unknown | 100% |
| 4 | General Unsecured Claims | Impaired | Yes | $170.9 million | Unknown |
| 5 | Convenience Claims | Impaired | Yes | $0.5 million | 20%[9] |
| 6 | Subordinated Securities Claims | Impaired | No (deemed to reject) | $0 | 0% |
| 7 | Equity Interests in Debtors | Impaired | No (deemed to reject) | Not applicable | 0% |

## 7.3    Deemed Consolidation

The Combined Plan and Disclosure Statement provides for deemed consolidation of the Debtors' Estates solely for the purposes hereof, including making any Distributions to Holders of Allowed Claims.  Deemed consolidation is a type of substantive consolidation, "under which a consolidation is deemed to exist for purposes of voting and satisfying creditor claims, voting for or against the Plan, and making distributions for allowed claims under it."   *In re Owens Corning*, 419 F.3d 195, 202 (3d Cir. 2005); *see also In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 423-24 (3d Cir. 2005).  It is an equitable remedy that bankruptcy courts may apply in appropriate circumstances.  *See In re Owens Corning*, 419 F.3d 195, 216 (3d Cir. 2005).

Substantive consolidation is appropriate where (i) prepetition the debtors disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) postpetition the debtors' assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.  *In re Owens Corning*, 419 F.3d at 211.; *see also In re Augie/Restivo Baking Co., Ltd.,* 860 F.2d 515, 518 (2d Cir. 1988) (noting that decisions approving substantive consolidation emphasize whether creditors dealt with the entities

---

[9]    The estimated recovery percentage for General Unsecured Claims that exercise the Convenience Class Election is less than 20%.

as a single economic unit or whether the affairs of the debtors are so entangled that consolidation will benefit all creditors).

The Debtors submit that deemed consolidation is appropriate under the law and the facts present here. Prior to the Petition Date, the Debtors' books and records did not precisely record Assets and Liabilities attributable to each of the Debtors individually. As a result, it would be a painstaking and costly endeavor to try to unwind the Debtors' business affairs and allocate assets and Liabilities on a Debtor by Debtor basis, to the extent such unwinding and allocation is even possible. To the extent it is possible, such an allocation would be extremely time consuming and costly, and would greatly diminish the pool of assets available for Distribution to Creditors.

For example, without substantial costs and efforts, including a review of all contracts of the more than 6,500 Customers, the Debtors cannot verify which Customers are creditors of Cred Inc. or Cred (US) LLC. Based on an initial analysis, several Customer contracts appear to be with Cred Inc., but used a Cred (US) LLC signature block. The Debtors believe it will be difficult if not impossible to properly allocate the assets and liabilities associated with such contracts on a Debtor by Debtor basis. Furthermore, a detailed forensic analysis would be needed to identify and reconcile all intercompany transfers, including transfers of Cash and transfers of Cryptocurrencies through Fireblocks. Moreover, the Debtors are unable to identify the specific Debtor entity that owns the remaining bitcoin, as there was significant movement in bitcoin between the Debtors during normal operations, including commingling of such assets, making tracing of bitcoin to any particular Debtor entity practically impossible. Finally, the Debtors' platform was used by all operating Debtor entities, and it is practically impossible to allocate the value of that platform to these Debtor entities.

Deemed consolidation for voting and Distribution purposes will avoid these delays and expenses, without causing prejudice to any group of creditors. Under the Combined Plan and Disclosure Statement, each Creditor within a Class will be treated equally.

## 7.4    Third Party Releases

It is the Debtors' position that the consideration for the third party releases set forth in Section 18.2 hereof and the mechanism by which Holders of Claims who are impaired under the Plan to consent to such releases meet the requirements for third party releases and are consistent with recent chapter 11 cases. All Impaired Holders of Claims, irrespective of whether they are entitled to vote on the Plan, will receive a Solicitation Package which will include materials allowing such Holders to opt out of the third party release via their Ballot or an Opt-Out Election Form that can mailed or hand-delivered to the Voting Agent. In addition, the Debtors believe the third party releases are entirely consensual under the established case law in the United States Bankruptcy Court for the District of Delaware. *See, e.g.*, *In re Indianapolis Downs, LLC, 486 B.R. 286, 304-06* (Bankr. D. Del. 2013). The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each of the Released Parties as part of confirmation of the Combined Plan and Disclosure Statement.

## ARTICLE VIII.
## CONFIRMATION AND VOTING PROCEDURES

**8.1     Combined Hearing**

A hearing before the Honorable John T. Dorsey has been scheduled for _____, 2021 at [_____ a/p.m.] (prevailing Eastern Time), at the Bankruptcy Court, 824 North Market Street, 5th Floor, Courtroom No. 5, Wilmington, Delaware 19081, to consider (i) final approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (ii) confirmation of the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code. The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Combined Hearing or by Filing a notice with the Bankruptcy Court.

**8.2     Procedure for Objections**

Any objection to approval or confirmation of this Combined Plan and Disclosure Statement must: (a) be in writing, (b) conform to the Bankruptcy Rules and Local Bankruptcy Rules, and (c) be filed with the Bankruptcy Court and served so as to be **actually received on or before _____, 2021 at 4:00 p.m. (prevailing Eastern Time)**, by: (i) counsel to the Debtors, Paul Hastings LLP, 600 Travis Street, 58th Floor, Houston, Texas 77002, Attn: James T. Grogan, Esq., and Cousins Law LLC, Brandywine Plaza West, 1521 Concord Pike, Suite 301, Wilmington, Delaware 19803, Attn: Scott D. Cousins; and (ii) counsel to the Committee, McDermott Will & Emery LLP, 340 Madison Avenue, New York, NY 10173, Attn: Timothy W. Walsh and Darren Azman, and 1007 North Orange Street, 4th Floor, Wilmington, DE 19801, Attn: David R. Hurst.

**8.3     Voting Procedures**

(a)     Who May Vote on the Combined Plan and Disclosure Statement

Each Holder of a Class 4 or Class 5 Claim that is not a Disallowed Claim and for which no objection to the allowance thereof, motion to estimate, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed and remains unresolved, or the Holder of a Class 4 or Class 5 Claim that has been temporarily allowed for voting purposes only under Bankruptcy Rule 3018(a) shall be entitled to vote separately to accept or reject the Combined Plan and Disclosure Statement, subject to the procedures set forth in the Disclosure Statement Order or any other applicable order of the Bankruptcy Court. An Impaired Class of Claims shall have accepted the Combined Plan and Disclosure Statement if: (i) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Combined Plan and Disclosure Statement, and (ii) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Combined Plan and Disclosure Statement.

Classes 1, 2, and 3 are Unimpaired under the Combined Plan and Disclosure Statement, are each deemed to accept the Combined Plan and Disclosure Statement by operation of law, and are not entitled to vote on the Combined Plan and Disclosure Statement.

Classes 6 and 7 are Impaired under the Combined Plan and Disclosure Statement and are deemed to reject the Combined Plan and Disclosure Statement by operation of law, and are not entitled to vote on the Combined Plan and Disclosure Statement.

Without limiting the foregoing, in the event that any Class of Claims entitled to vote on the Combined Plan and Disclosure Statement fails to accept the Combined Plan and Disclosure Statement as required by section 1129(a) of the Bankruptcy Code, the Combined Plan and Disclosure Statement may be amended or modified in accordance with the terms herein and, in any event, the Debtors, subject to any consent that may be required herein or under the Plan Support Agreement, reserve the right to seek confirmation hereof over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

(b)     Voting Record Date

The Bankruptcy Court has approved the close of business on [•], 2021 as the voting record date (the "Voting Record Date").  The Voting Record Date is the date for determining (1) which Holders of Claims are entitled to vote to accept or reject the Combined Plan and Disclosure Statement and receive the Solicitation Package and (2) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of a Claim. The Voting Record Date shall apply to all of the Debtors' creditors and other parties in interest.

(c)     Voting Agent

The Debtors have retained Donlin, Recano & Company, Inc. (the "Voting Agent") to, among other things, act as claims and solicitation agent in connection with the solicitation of votes to accept or reject the Combined Plan and Disclosure Statement.  Inquiries relating to the solicitation process, voting instructions, related procedures and copies of the solicitation materials may be directed to the Voting Agent at no charge by: (a) accessing the Debtors' restructuring website at https://www.donlinrecano.com/Clients/cred/Dockets; (b) calling the Voting Agent at (877) 739-9988 (toll free); or (c) emailing DRCvote@DonlinRecano.com.  The Voting Agent, however, is not authorized to provide, and will not provide, legal or financial advice.

(d)     Solicitation Package, Ballots and Notices

The following materials constitute the solicitation package with respect to the Combined Plan and Disclosure Statement enclosed herewith (the "Solicitation Package"):

i.     The appropriate form of Ballot and instructions for completing the Ballot;

ii.     The voting instructions and solicitation procedures approved by the Bankruptcy Court (the "Voting Procedures");

iii.     The Combined Plan and Disclosure Statement with all exhibits;

iv.    A notice of the Combined Hearing approved by the Bankruptcy Court for transmission to Holders of Claims and other parties in interest (the "Combined Hearing Notice");

v.    A copy of the Disclosure Statement Order;

vi.    a letter from the Committee urging creditors to vote to accept the Combined Joint Plan and Disclosure Statement; and

vii.    Such other materials as the Bankruptcy Court may direct.

Only Holders of General Unsecured Claims (Class 4) and Holders of Convenience Claims (Class 5) are entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

(e)    <u>Notices of Non-Voting Status</u>

As set forth above, certain Holders of Claims and Equity Interests are not entitled to vote on the Combined Plan and Disclosure Statement. As a result, such parties will not receive Solicitation Packages but, instead, will receive the Combined Hearing Notice that explains, among other things, (i) that Classes 1, 2, and 3 are Unimpaired under the Combined Plan and Disclosure Statement and, therefore, are presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code; (ii) that Classes 6 and 7 are Impaired under the Combined Plan and Disclosure Statement and are presumed to have rejected the Combined Plan and Disclosure Statement pursuant to section 1126(g) of the Bankruptcy Code; (iii) instructions for how such Holders of Claims and Equity Interests may obtain a copy of the Combined Plan and Disclosure Statement; (iv) the deadline by which to object to confirmation of the Combined Plan and Disclosure Statement; and (v) the Combined Hearing date and time. In addition, such parties will receive a Notice of Non-Voting Status and an Opt-Out Election Form.

(f)    <u>Contract and Lease Counterparties</u>

Parties to certain of the Debtors' Executory Contracts and Unexpired Leases may not have Claims pending the disposition of their Executory Contracts and Unexpired Leases by assumption or rejection under the Combined Plan and Disclosure Statement. Such parties nevertheless will receive the Combined Hearing Notice.

(g)    <u>Submission of Ballots and Opt-Out Election Forms</u>

To be counted as a vote to accept or reject the Combined Plan and Disclosure Statement, such Holder's properly completed and executed Ballot must be received by the Voting Agent by the Voting Deadline and in accordance with the voting instructions attached to each Ballot. The Voting Agent will process and tabulate received Ballots and will File a voting report (the "Voting Report") as soon as practicable on or after the Voting Deadline but prior to the Combined Hearing. The Voting Report will include (a) a list of all Ballots received but not

counted and the reason for not counting such Ballots and (b) a list of all non-compliant, deficient Ballots for which the Debtors have waived such non-compliance or deficiency.  Parties may contact the Voting Agent with any questions related to the Voting Procedures applicable to their Claims.

In addition, Opt-Out Election Forms must also be received by the Voting Agent on or before the Voting Deadline.

## ARTICLE IX.
## PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS, AND OTHER UNCLASSIFIED CLAIMS

**9.1     Administrative Expense Claims**

(a)     Treatment of Non-Professional Fee Administrative Expense Claims

Except to the extent that a Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Administrative Expense Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on the latest of: (i) on or as soon as practicable after the Effective Date if such Administrative Expense Claim is Allowed as of the Effective Date; (ii) on or as soon as reasonably practicable after the date such Administrative Expense Claim is Allowed; and (iii) on the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is practicable.

(b)     Administrative Expense Claims Bar Date

Holders of Administrative Expense Claims (other than Professional Fee Claims) arising during the period from November 7, 2020 through the Effective Date must File requests for payment of Administrative Expense Claims **on or before 4:00 p.m. (prevailing Eastern Time) on the day that is thirty (30) calendar days after the Effective Date** (the "Administrative Expense Claims Bar Date") and serve such Administrative Expense Claims on the Claims Agent so as to be **actually received on or before the Administrative Expense Claims Bar Date** at the following addresses (the "Claims Agent Service Addresses"):

If by first-class mail:

> Cred Inc. Claims Processing Center
> c/o Donlin, Recano & Company, Inc.
> P.O. Box 199043 Blythebourne Station
> Brooklyn, NY 11219

If by hand delivery or overnight:

> Cred Inc. Claims Processing Center
> c/o Donlin, Recano & Company, Inc.

6201 15th Avenue
Brooklyn, NY 11219

All such requests for payment must: (i) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant; (ii) be written in the English language; (iii) denominate the claim in lawful currency of the United States as of the Administrative Expense Claims Bar Date; (iv) indicate the particular Debtor against which the claim is asserted; and (v) include supporting documentation (or, if such documentation is voluminous, include a summary of such documentation) or an explanation as to why such documentation is not available.  The notice of the Effective Date delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f), substantially in the form included in the Plan Supplement, shall set forth the Administrative Expense Claims Bar Date and shall constitute notice of such bar date.

The following claims are **not** required to be filed on or before the Administrative Expense Claims Bar Date:

(a)     Professional Fee Claims;

(b)     Any Administrative Expense Claims that (i) have been previously paid by the Debtors in the ordinary course of business or otherwise or (ii) have otherwise been satisfied;

(c)     Any Administrative Expense Claim that has been Allowed by prior order of the Bankruptcy Court;

(d)     Any claims by any current officer, manager, or director of the Debtors immediately prior to the Effective Date;

(e)     Any claims for fees payable to the Clerk;

(f)     Any U.S. Trustee Fees; and

(g)     Any claim by a Governmental Unit for a tax or penalty described in section 503(b)(1)(B) and (C) of the Bankruptcy Code, as provided for in section 503(b)(1)(D).

Any Entity that is required to file a request for payment of an Administrative Expense Claim (other than Professional Fee Claims) under the Combined Plan and Disclosure Statement and that fails to do so by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claim, and such Administrative Expense Claim shall not be enforceable against the Liquidation Trust, the Liquidation Trustee, the Debtors, the Estates, and their respective properties, and the Liquidation Trust, the Liquidation Trustee, Debtors, the Estates, and their respective properties shall be forever discharged from any and all Liability with respect to such Administrative Expense Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  All such Administrative Expense Claims shall, as of the Effective Date, be subject to the permanent injunction pursuant to Section 18.4 hereof and the Confirmation Order.

## 9.2    Professional Fee Claims

All Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 363, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is sixty (60) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such claim. The Liquidation Trustee is authorized to pay reasonable compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval in accordance with the Liquidation Trust Agreement.

All Allowed Professional Fee Claims shall be paid in full in Cash in such amounts as may be Allowed by the Bankruptcy Court (a) as soon as practicable after the later of the Effective Date and the date on which the Bankruptcy Court enters a final order allowing any such Professional Fee Claim, (b) as otherwise provided in the Bankruptcy Code or approved by the Bankruptcy Court, or (c) as may be agreed upon between the Holder of any such Professional Fee Claim and the Debtors. Professional Fee Claims shall be satisfied from the Professional Fee Escrow. If the amount in the Professional Fee Escrow is insufficient to pay in full all Allowed Professional Fee Claims, the deficiency shall be promptly paid by the Liquidation Trustee from the Liquidation Trust Assets, without any further action or order of the Bankruptcy Court.

Professionals shall reasonably estimate their unpaid Professional Fee Claims as of the Effective Date, and shall deliver such estimates to the Debtors no later than five days before the Effective Date; *provided*, *however*, that such estimates shall not be deemed to limit the amount of the Professional Fee Claims that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

On or before the Effective Date, the Debtors shall establish the Professional Fee Escrow and shall fund such reserve with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow and the funds therein shall be used for the sole purpose of paying the Allowed Professional Fee Claims and shall not constitute property of the Debtors, their Estates, or the Liquidating Trust; *provided*, that the Liquidating Trust shall hold a residual interest in the Professional Fee Escrow and, upon the satisfaction of all Allowed Professional Fee Claims, any funds remaining in the Professional Fee Escrow shall vest in the Liquidating Trust.

## 9.3    Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, either (a) payment in full in Cash on the Effective Date, (b) payment in regular installment payments within five (5) years of the Petition Date, or (c) such other less favorable treatment to the Holder of an Allowed Priority Tax Claim as to which the Debtor and the Holder of such Allowed Priority Tax Claim shall have

agreed upon in writing. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

# ARTICLE X.
## TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

**10.1   Class 1: Other Priority Claims**

(a)   <u>Classification</u>: Class 1 shall consist of the Other Priority Claims.

(b)   <u>Treatment</u>: Except to the extent that a Holder of an Other Priority Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed Other Priority Claim shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, Cash in the amount equal to such Allowed Claim, without interest, on or as soon as practicable after the later of (x) the Effective Date and (y) the date that such Claim becomes an Allowed Claim.

(c)   <u>Voting</u>: Class 1 is Unimpaired under the Combined Plan and Disclosure Statement. Holders of Claims in Class 1 are conclusively deemed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code. Holders of Claims in Class 1 are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

**10.2   Class 2: Secured Tax Claims**

(a)   <u>Classification</u>: Class 2 shall consist of the Secured Tax Claims.

(b)   <u>Treatment</u>: Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed Secured Tax Claim shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Secured Tax Claim and any Liens securing such Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, Cash in the amount of such Allowed Secured Tax Claim (a) on, or as soon as practicable after, the latest of: (i) the Effective Date and (ii) the date such Allowed Secured Tax Claim becomes an Allowed Claim; or (b) in regular payments over a period of time not to exceed five (5) years after the Petition Date with interest at a rate determined in accordance with section 511 of the Bankruptcy Code; <u>provided</u>, that the first such regular payment shall represent a percentage recovery at least equal to that expected to be received by the most favored Holders of Allowed General Unsecured Claims; <u>provided further</u>, that the Liquidation Trustee may prepay the entire amount of the Allowed Secured Tax Claim at any time in its sole discretion.

(c)   <u>Voting</u>: Class 2 is Unimpaired under the Combined Plan and Disclosure Statement. Holders of Claims in Class 2 are conclusively deemed to have

accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Claims in Class 2 are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

**10.3    Class 3: Other Secured Claims**

(a)    <u>Classification</u>: Class 3 shall consist of the Other Secured Claims.

(b)    <u>Treatment</u>: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, in full, final, and complete satisfaction, settlement, release, and discharge of such Allowed Other Secured Claim and any Liens securing such Claim, at the sole option of the Debtors or the Liquidation Trustee, as applicable, (i) Cash in an amount equal to such Allowed Other Secured Claim on or as soon as practicable after the Effective Date, or (ii) the Collateral securing its Allowed Other Secured Claim, in full and complete satisfaction of such Allowed Other Secured Claim on or as soon as practicable after the Effective Date.

(c)    <u>Voting</u>*: Class 3 is Unimpaired under the Combined Plan and Disclosure Statement.  Holders of Claims in Class 3 are conclusively deemed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Claims in Class 3 are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

**10.4    Class 4: General Unsecured Claims.**

(a)    <u>Classification</u>: Class 4 shall consist of the General Unsecured Claims.

(b)    <u>Treatment</u>: Except to the extent that a Holder of an Allowed General Unsecured Claim in Class 4 agrees to a less favorable treatment or has been paid by any of the Debtors prior to the Effective Date, each Holder of an Allowed General Unsecured Claim in Class 4 shall receive, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim either: (i) a Cash payment equal to such Holder's Distribution Pro Rata Share of Net Distributable Assets; or, if permitted, (ii) with respect to any such Holder that makes a Cryptocurrency Election, a good faith effort shall be made to make distributions in an Equivalent Cryptocurrency Distribution.

(c)    <u>Voting</u>:  Class 4 is Impaired under the Combined Plan and Disclosure Statement. Holders of Claims in Class 4 are entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

**10.5    Class 5: Convenience Claims.**

(a)    <u>Classification</u>: Class 5 shall consist of the Convenience Claims.

    (b)   <u>Treatment</u>:  Except to the extent that a Holder of an Allowed Convenience Claim in Class 5 agrees to a less favorable treatment or has been paid by any of the Debtors prior to the Effective Date, each Holder of an Allowed Convenience Claim in Class 5 shall receive, in full and final satisfaction, settlement, and release of such Allowed Convenience Claim, Cash in an amount equal to 20.0% of the amount of such Allowed Convenience Claim on or as reasonably practicable after the later of (i) the Effective Date or (ii) thirty (30) days after the date on which such Claim becomes Allowed.

    (c)   <u>Voting</u>:  Class 5 is Impaired under the Combined Plan and Disclosure Statement. Holders of Claims in Class 5 are entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### 10.6    Class 6: Subordinated Securities Claims

    (a)   <u>Classification</u>: Class 6 shall consist of all Subordinated Securities Claims.

    (b)   <u>Treatment</u>: Each Holder of an Allowed Subordinated Securities Claim will not receive or retain any property under the Combined Plan and Disclosure Statement on account of such Allowed Subordinated Securities Claim.  The treatment of Subordinated Securities Claims under the Combined Plan and Disclosure Statement is in accordance with and gives effect to the provisions of section 510(b) of the Bankruptcy Code.

    (c)   <u>Voting</u>: Class 6 is Impaired, and Holders of Class 6 Claims are conclusively presumed to have rejected the Combined Plan and Disclosure Statement under section 1126(g) of the Bankruptcy Code.

### 10.7    Class 7: Equity Interests in Debtors

    (a)   <u>Classification</u>: Class 7 shall consist of the Equity Interests in the Debtors.

    (b)   <u>Treatment</u>: On the Effective Date, the Equity Interests in the Debtors shall be cancelled and the Holders of the Equity Interests shall not be entitled to, and shall not receive or retain, any property on account of such Equity Interests under the Combined Plan and Disclosure Statement.

    (c)   <u>Voting</u>: Class 7 is Impaired, and such Holders of Class 7 Claims are conclusively presumed to have rejected the Combined Plan and Disclosure Statement under section 1126(g) of the Bankruptcy Code.

### 10.8    Reservation of Rights Regarding Claims and Equity Interests

Except as otherwise explicitly provided herein, nothing shall affect either the Debtors' or the Liquidation Trustee's rights and defenses, both legal and equitable, with respect to any Claims or Equity Interests, including all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

# ARTICLE XI.
# ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT

**11.1     Voting of Claims**

    (a)    <u>Classes Entitled to Vote</u>

    Each Holder of a Claim, that is not a Disallowed Claim and for which no objection to the allowance thereof, motion to estimate, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed and remains unresolved, in Classes 4 and 5, or the Holder of a Claim that has been temporarily allowed for voting purposes only under Bankruptcy Rule 3018(a) in such Classes, shall be entitled to vote separately to accept or reject the Combined Plan and Disclosure Statement, as provided in the Disclosure Statement Order or any other applicable order of the Bankruptcy Court.

    (b)    <u>Classes Deemed to Accept</u>

    Each of Classes 1, 2, and 3 are Unimpaired under the Combined Plan and Disclosure Statement, and each such Class is conclusively presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code.

    (c)    <u>Classes Deemed to Reject</u>

    Subordinated Securities Claims in Class 6 and Equity Interests in Class 7 will not receive or retain any property on account of such Claims or Equity Interests under the Combined Plan and Disclosure Statement.  In accordance with section 1126(g) of the Bankruptcy Code, Classes 6 and 7 are conclusively presumed to have rejected the Combined Plan and Disclosure Statement.

**11.2     Elimination of Vacant Classes**

    Any Class of Claims or Equity Interests that does not contain, as of the date of the Confirmation Hearing, a Holder of an Allowed Claim or Allowed Equity Interest, or a Holder of a Claim temporarily Allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Combined Plan and Disclosure Statement for all purposes, including for purposes of determining acceptance of the Combined Plan and Disclosure Statement by such Class under section 1129(a)(8) of the Bankruptcy Code.

**11.3     Nonconsensual Confirmation**

    If any Impaired Class of Claims entitled to vote shall not accept the Combined Plan and Disclosure Statement by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Combined Plan and Disclosure Statement in accordance with Section 20.5 hereof or undertake to have the Bankruptcy Court confirm the Combined Plan and Disclosure Statement under section 1129(b) of the Bankruptcy Code, or both.  With respect to Impaired Classes of Claims that are deemed to reject the Combined Plan and Disclosure Statement, the Debtors shall request that the Bankruptcy Court

confirm the Combined Plan and Disclosure Statement pursuant to section 1129(b) of the Bankruptcy Code.

### 11.4 Revocation of the Combined Plan and Disclosure Statement

Subject to Section 20.6 hereof, the Debtors, after consultation with the Committee, may revoke and withdraw the Combined Plan and Disclosure Statement in its entirety at any time prior to entry of the Confirmation Order. If the Combined Plan and Disclosure Statement is so revoked or withdrawn, then it shall be deemed null and void.

## ARTICLE XII.
## MEANS OF IMPLEMENTATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT

In addition to the provisions set forth elsewhere in the Combined Plan and Disclosure Statement, the following shall constitute the means for implementation of the Combined Plan and Disclosure Statement:

### 12.1 Limited Substantive Consolidation

The Combined Plan and Disclosure Statement provides for substantive consolidation of the Debtors' Estates, but solely for the purposes hereof, including making any Distributions to Holders of Allowed Claims.

On the Effective Date, (i) all Assets and Liabilities of the Debtors will, solely for Distribution purposes, be treated as if they were merged, (ii) all Intercompany Claims will be eliminated, (iii) each Claim Filed or to be Filed against the Debtors will be deemed a single nonaggregated Claim against, and a single non-aggregated obligation of, the Debtors, (iv) all guarantees of any Debtor of the payment, performance, or collection of obligations of another Debtor shall be eliminated and canceled; and (v) all transfers, disbursements and Distributions on account of Claims made by or on behalf of any of the Debtors' Estates hereunder will be deemed to be made by or on behalf of all of the Debtors' Estates. Holders of Allowed Claims entitled to Distributions under this Combined Plan and Disclosure Statement shall be entitled to their Distribution Pro Rata Share on account of such Claim without regard to which Debtor was originally liable for such Claim. Except as set forth herein, such limited substantive consolidation shall not (other than for purposes related to this Combined Plan and Disclosure Statement) affect the legal and corporate structures of the Debtors.

### 12.2 Global Settlement

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Combined Plan and Disclosure Statement incorporates a compromise and settlement of numerous inter-Debtor, Debtor-Creditor, and inter-Creditor issues designed to achieve an economic settlement of Claims against the Debtors and an efficient resolution of the Chapter 11 Cases. This global settlement constitutes a settlement of Claims as provided herein, including the validity and enforceability of Intercompany Claims, and the allocation of Assets among the Estates. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of

the compromises and settlements underlying the substantive consolidation of the Debtors' Estates and all other compromises and settlements provided herein. The Bankruptcy Court's findings shall constitute its determination that such compromises and settlements, and the substantive consolidation of the Debtors' Estates, are in the best interests of the Debtors, their Estates, their Creditors, and other parties-in-interest, and are fair, equitable, and within the range of reasonableness. Each provision of the global settlement shall be deemed non-severable from each other and from the remaining terms hereof. As set forth in detail below, the global settlement will be implemented as set forth herein, through the substantive consolidation of the Debtors' Estates, solely for purposes of voting on, and Distributions hereunder.

**12.3    Liquidation of the Debtors**

On the Effective Date, the Debtors will transfer all of their Assets, including the Net Asset Sale Proceeds, if any, and any Excluded Assets, to the Liquidation Trust, for Distribution in accordance herewith. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Combined Plan and Disclosure Statement, including, to the extent not previously approved, a Sale Transaction.

(a)    Appointment of Liquidation Trustee

The Liquidation Trustee shall be selected by the members of the Committee and shall be identified in the Liquidation Trust Agreement to be filed with the Bankruptcy Court with the Plan Supplement. The appointment of the Liquidation Trustee shall be approved in the Confirmation Order, and the Liquidation Trustee's duties shall commence as of the Effective Date. The Liquidation Trustee shall administer the Combined Plan and Disclosure Statement and the Liquidation Trust and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Causes of Action belonging to the Estates.

In accordance with the Liquidation Trust Agreement, the Liquidation Trustee shall serve in such capacity through the earlier of (i) the date on which the Liquidation Trust is dissolved in accordance with Section 12.3(j) hereof and (ii) the date on which such Liquidation Trustee resigns, is terminated, or is otherwise unable to serve; provided, however, that, in the event that the Liquidation Trustee resigns, is terminated, or is otherwise unable to serve, the Trust Advisory Board shall appoint a successor to serve as the Liquidation Trustee in accordance with the Liquidation Trust Agreement. If the Trust Advisory Board does not appoint a successor within the time periods specified in the Liquidation Trust Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Liquidation Trust, shall approve a successor to serve as the Liquidation Trustee. Any such successor Liquidation Trustee shall serve in such capacity until the Liquidation Trust is dissolved.

(b)    Responsibilities of Liquidation Trustee

Responsibilities of the Liquidation Trustee shall include, but are not limited to:

(i)    Administering the implementation hereof, including the making of the Distributions contemplated herein;

47

(ii)   Marshalling, marketing for sale, and liquidating the Estates' Assets;

(iii)   Conducting an analysis of any and all Claims and Equity Interests and prosecuting objections thereto or settling or otherwise compromising such Claims and Equity Interests, if necessary and appropriate, in accordance with Article XIV hereof;

(iv)   Maintaining and administering the Reserves in accordance with the terms hereof;

(v)   Commencing, prosecuting, or settling claims and Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges in accordance herewith and paying all associated costs;

(vi)   Recovering and compelling turnover of the Debtors' property;

(vii)   Adjudicating third-party claims assigned, purchased, or otherwise transferred to the Liquidation Trust;

(viii)   Paying Liquidation Trust Expenses;

(ix)   Abandoning any property constituting the Estates' Assets that cannot be sold or otherwise disposed of for value and whose Distribution to Holders of Allowed Claims would not be feasible or cost-effective in the Liquidation Trustee's reasonable judgment;

(x)   Preparing and filing post-Effective Date operating reports;

(xi)   Filing appropriate tax returns in the exercise of the Liquidation Trustee's fiduciary obligations;

(xii)   Retaining such Professionals as are necessary and appropriate in furtherance of the Liquidation Trustee's fiduciary obligations; and

(xiii)   Taking such actions as are necessary and reasonable to carry out the purposes of the Liquidation Trust, including winding down the Debtors' business affairs.

(c)   Establishment of a Liquidation Trust

Pursuant to the Confirmation Order, the Debtors (not including Cred) will be dissolved and the Liquidation Trust, which may be referred to as the "Cred Liquidation Trust," will be established. The Liquidation Trust will be intended to qualify as a "liquidating trust" as described in Treasury Regulations Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-2 C.B. 684, and will be treated for federal income tax purposes as a "grantor trust" under Internal Revenue Code sections 671-677. The Liquidation Trust shall be managed by the Liquidation Trustee, who shall be selected by the Committee in its sole discretion, and subject to a Trust Advisory Board consisting of each member of the Committee who wishes to continue in such role, and such

48

additional members nominated by the Committee, if any, as are required for the initial complement of the Trust Advisory Board to be an odd number greater than one. The Liquidation Trust shall be administered in accordance with the terms of the Liquidation Trust Agreement.

Prior to the Effective Date, any and all of the Estates' Assets shall remain Assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date shall, subject to the Liquidation Trust Agreement, be transferred to and vest in the Liquidation Trust. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, assigned or sold pursuant to a prior Order or the Combined Plan and Disclosure Statement, the Liquidation Trustee specifically retains and reserves the right to assert, after the Effective Date, any and all of the claims, Causes of Action (including but not limited to those Causes of Action listed on the Causes of Action List) and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Liquidation Trust and the Liquidation Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Liquidation Trust Agreement, compromise or settle any Liquidation Trust Assets. From and after the Effective Date, the Liquidation Trust and the Liquidation Trustee may commence, litigate, and settle any Causes of Action or Claims relating to the Liquidation Trust Assets or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Liquidation Trust and Liquidation Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Liquidation Trust Agreement. The Liquidation Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

Other than as set forth herein, no other Entity may pursue such Liquidation Trust Assets on or after the Effective Date. The Liquidation Trustee shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Liquidation Trust Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Liquidation Trustee shall execute the Liquidation Trust Agreement and shall have established the Liquidation Trust pursuant hereto. In the event of any conflict between the terms of this Article XII and the terms of the Liquidation Trust Agreement, the terms of the Liquidation Trust Agreement shall control.

(d)     Liquidation Trust Assets

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Liquidation Trust Assets become available, the Debtors shall be deemed, subject to the Liquidation Trust Agreement, to have automatically transferred to the Liquidation Trust all of their right, title, and interest in and to all of the Liquidation Trust Assets, in accordance with section 1141 of the Bankruptcy Code, including the Debtors' attorney-client privilege. All such Assets shall automatically vest in the Liquidation Trust free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims as set forth herein and the expenses of the Liquidation Trust as set forth herein

and in the Liquidation Trust Agreement.  Thereupon, the Debtors shall have no interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.

      (e)      <u>Treatment of Liquidation Trust for Federal Income Tax Purposes; No Successor-in-Interest</u>

The Liquidation Trust shall be established for the primary purpose of liquidating and distributing the Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. Accordingly, the Liquidation Trustee may, in an expeditious but orderly manner, liquidate the Liquidation Trust Assets, make timely Distributions to the Liquidation Trust Beneficiaries and not unduly prolong its duration.  The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidation Trust Agreement.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Liquidation Trustee expressly for such purpose.

The Liquidation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidation Trust Beneficiaries treated as grantors and owners of the Liquidation Trust.  For all federal income tax purposes, all parties (including the Debtors, the Liquidation Trustee, and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets by the Debtors to the Liquidation Trust, as set forth in the Liquidation Trust Agreement, as a transfer of such Assets by the Debtors to the Holders of Allowed General Unsecured Claims entitled to Distributions from the Liquidation Trust Assets, followed by a transfer by such Holders to the Liquidation Trust.  Thus, the Liquidation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

As soon as practicable after the Effective Date, the Liquidation Trustee shall make a good faith determination of the fair market value of the Estates' Assets as of the Effective Date, <u>provided</u>, <u>however</u>, that the Liquidation Trustee shall not be required to hire an expert to make such a valuation.  This valuation shall be used consistently by all parties (including the Debtors, the Liquidation Trustee, and the Holders of General Unsecured Claims) for all federal income tax purposes.  The Bankruptcy Court shall resolve any dispute regarding the valuation of the Liquidation Trust Assets.

The right and power of the Liquidation Trustee to invest the Liquidation Trust Assets, the proceeds thereof, or any income earned by the Liquidation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of Section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings or other IRS pronouncements.  The Liquidation Trustee may expend the Cash of the Liquidation Trust (i) as reasonably necessary to meet Contingent Liabilities and to maintain the value of the respective Assets of the Liquidation Trust during liquidation, (ii) to pay the respective reasonable administrative expenses (including any taxes imposed on the Liquidation Trust) and (iii) to satisfy other respective Liabilities incurred by the Liquidation Trust in accordance herewith and with the Liquidation Trust Agreement (including the payment of any taxes).

(f)    The Trust Advisory Board.  The Trust Advisory Board shall consist of each member of the Committee who wishes to continue in such role, and such additional members nominated by the Committee, if any, as are required for the initial complement of the Trust Advisory Board to be an odd number greater than one.

The Trust Advisory Board shall have the responsibility to review and advise the Liquidation Trustee with respect to the liquidation and Distribution of the Estates' Assets in accordance herewith and the Liquidation Trust Agreement.  The Debtors or the Committee shall File a notice identifying the members of the Trust Advisory Board no later than five (5) days prior to the Voting Deadline.  Vacancies on the Trust Advisory Board shall be filled by a Person designated by the remaining member or members of the Trust Advisory Board from among the Holders of General Unsecured Claims, and the Trust Advisory Board shall use reasonable efforts to maintain such composition of the members of the Trust Advisory Board as existed prior to the resignation of such member.  The Liquidation Trustee shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Trust Advisory Board for cause.  Any successor appointed pursuant to this Section 12.3(f) shall become fully vested with all of the rights, powers, duties and obligations of his or her predecessor.  For the avoidance of doubt, no member of the Trust Advisory Board shall be compensated for serving as a member of the Trust Advisory Board; provided, however, that such members may be reimbursed from the Liquidation Trust for reasonable out of pocket expenses.

Pursuant to the Liquidation Trust Agreement, the Liquidation Trustee will need the consent of at least two (2) members of the Trust Advisory Board, or approval of the Bankruptcy Court, before pursuing any potential Avoidance Actions under 11 U.S.C. § 547.

(g)    Expenses of Liquidation Trustee

The Liquidation Trust Expenses shall be paid from the Liquidation Trust Assets.

(h)    Insurance; Bond

The Liquidation Trustee, in his or her sole discretion, may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the Liabilities and obligations of the Liquidation Trustee and the Trust Advisory Board under the Liquidation Trust Agreement.  Unless otherwise agreed to by the Trust Advisory Board, the Liquidation Trustee shall serve with a bond, the terms of which shall be agreed to by the Trust Advisory Board, and the cost and expense of which shall be paid by the Liquidation Trust.

(i)    Fiduciary Duties of the Liquidation Trustee

Pursuant hereto and the Liquidation Trust Agreement, the Liquidation Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims that will receive Distributions pursuant to the terms hereof.

(j)    Termination of the Liquidation Trust

The Liquidation Trust will terminate on the earlier of: (a) final liquidation, administration and Distribution of the Liquidation Trust Assets in accordance with the terms of the Liquidation

Trust Agreement and the Combined Plan and Disclosure Statement, and its full performance of all other duties and functions as set forth herein or in the Liquidation Trust Agreement; and (b) the fifth (5th) anniversary of the Effective Date.  Notwithstanding the foregoing, multiple fixed term extensions can be obtained so long as Bankruptcy Court approval is obtained within six (6) months before the expiration of the term of the Liquidation Trust and each extended term provided that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust within the meaning of Section 301.7701-4(d) of the Treasury Regulations for federal income tax purposes.  After (a) the final Distributions pursuant hereto, (b) the Filing by or on behalf of the Liquidation Trust of a certification of dissolution with the Bankruptcy Court, and (c) any other action deemed appropriate by the Liquidation Trustee, the Liquidation Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

       (k)    <u>Liability of Liquidation Trustee; Indemnification</u>

       Neither the Liquidation Trustee, the Trust Advisory Board, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, an "<u>Exculpation Party</u>" and collectively, the "<u>Exculpation Parties</u>") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Liquidation Trust or for the act or omission of any other Exculpation Party, nor shall the Exculpation Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Liquidation Trust Agreement or the Combined Plan and Disclosure Statement other than for specific acts or omissions resulting from such Exculpation Party's willful misconduct, gross negligence or actual fraud.  The Liquidation Trustee shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Trust Advisory Board shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors.  The Liquidation Trustee, or the Trust Advisory Board, may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, neither the Liquidation Trustee nor the Trust Advisory Board shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Liquidation Trustee or Trust Advisory Board or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud.  The Liquidation Trust shall indemnify and hold harmless the Exculpation Parties (in their capacity as such), from and against and in respect of all Liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidation Trust or the Combined Plan and Disclosure Statement or the discharge of their duties hereunder; <u>provided</u>, <u>however</u>, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud.  Persons dealing or having any relationship with

the Liquidation Trustee shall have recourse only to the Liquidation Trust Assets and shall look only to the Liquidation Trust Assets to satisfy any liability or other obligations incurred by the Liquidation Trustee or the Trust Advisory Board to such Person in carrying out the terms of the Liquidation Trust Agreement, and neither the Liquidation Trustee nor the Trust Advisory Board shall have any personal obligation to satisfy any such liability.  The Liquidation Trustee and/or the Trust Advisory Board members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Liquidation Trust Agreement against any of them.  The Liquidation Trust shall promptly pay expenses reasonably incurred by any Exculpation Party in defending, participating in, or settling any action, proceeding or investigation in which such Exculpation Party is a party or is threatened to be made a party or otherwise is participating in connection with the Liquidation Trust Agreement or the duties, acts or omissions of the Liquidation Trustee or otherwise in connection with the affairs of the Liquidation Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise.  Each Exculpation Party hereby undertakes, and the Liquidation Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Exculpated Party is not entitled to be indemnified therefor under the Liquidation Trust Agreement.  The foregoing indemnity in respect of any Exculpation Party shall survive the termination of such Exculpation Party from the capacity for which they are indemnified.

> (l)  Full and Final Satisfaction Against Liquidation Trust

On and after the Effective Date, the Liquidation Trust shall have no liability on account of any Claims or Equity Interests except as set forth herein and in the Liquidation Trust Agreement.  All payments and all Distributions made by the Liquidation Trustee hereunder shall be in full and final satisfaction, settlement, and release of and in exchange for all Claims or Equity Interests against the Debtors.

## 12.4  Effectuating Documents; Further Transactions

The appropriate officer(s) and/or director(s) of the Debtors or the Liquidation Trustee, as applicable, shall be, and hereby are, authorized to execute, deliver, file, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## 12.5  Cancellation of Instruments and Stock

On the Effective Date, except to the extent otherwise provided herein, all instruments, certificates, and other documents evidencing debt or Equity Interests in the Debtors shall be cancelled and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged, including any and all warrants, options, rights, or interests with respect to such Equity Interests that have been issued, could be issued, or that have been authorized to be issued but that have not been issued; provided, however, that Cred shall issue one (1) share of common stock to the Liquidation Trust.  The Liquidation Trustee shall have all power and authority that may be or could have been exercised, with respect to the Liquidation Trust Assets, by any

officer, director, shareholder or other party acting in the name of the Debtors or their Estates with like effect as if duly authorized, exercised and taken by action of such officers, directors, shareholders or other party.

The Holders of, or parties to, the cancelled notes, membership interests, share certificates, and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, and other agreements and instruments or the cancellation thereof, except the rights provided pursuant hereto.

## 12.6    Disposition of Books and Records

After the Effective Date, the Debtors shall transfer the Debtors' books and records in the Debtors' possession to the Liquidation Trust.  From and after the Effective Date, the Liquidation Trustee shall continue to preserve and maintain all documents and electronic data transferred to the Liquidation Trust by the Debtors, and the Liquidation Trustee, subject to Section 12.8 hereof, shall not destroy or otherwise abandon any such documents and records (in electronic or paper format) absent further order of the Bankruptcy Court after a hearing upon notice to parties-in-interest; provided, however, that the Liquidation Trustee may destroy or abandon such books and records upon entry of a Final Order closing the last Chapter 11 Case.

## 12.7    Corporate Existence and Dissolution of Debtors

Immediately after the Effective Date, the Liquidation Trustee shall be authorized to take, in his or her sole and absolute discretion, all actions reasonably necessary to dissolve one or more of the Debtors under applicable laws, including under the laws of the jurisdictions in which they may be organized or registered, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation.  Upon the final Distributions, any Debtors that have not been previously dissolved shall be deemed dissolved for all purposes without the necessity for other or further actions to be taken by or on behalf of the Debtors, and the Liquidation Trustee shall be authorized to file any certificate of cancellation or other documents as may be necessary or desirable to terminate the legal existence of the Debtors.

## 12.8    Closing the Chapter 11 Cases

Upon the Effective Date, the Chapter 11 Cases for the Debtors, except for Cred, shall be deemed closed, and the Liquidation Trustee shall submit separate orders to the Bankruptcy Court under certification of counsel closing each such Chapter 11 Case.  After all Causes of Action and Disputed Claims have been resolved, the U.S. Trustee Fees have been paid, all of the Estates' Assets have been distributed in accordance herewith, or at such earlier time as the Liquidation Trustee deems appropriate, the Liquidation Trustee shall seek authority from the Bankruptcy Court to close the Chapter 11 Case for Cred, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

## ARTICLE XIII.
## DISTRIBUTIONS UNDER THE COMBINED PLAN AND DISCLOSURE STATEMENT

**13.1    Distributions on Allowed General Unsecured Claims**

All Allowed General Unsecured Claims held by a single creditor against one or more Debtors shall be aggregated and treated as a single Claim.  At the written request of the Liquidation Trustee, any Creditor holding multiple Allowed General Unsecured Claims shall provide to the Liquidation Trustee a single address to which any Distributions shall be sent.

**13.2    Timing of Distributions**

(a)    <u>Distributions on Account of Allowed A/P/S Claims</u>. The Liquidation Trustee shall pay any Allowed A/P/S Claim against the Debtors, as soon as practicable after the later of (a) the Effective Date and (b) the date upon which any such Claim becomes an Allowed Claim.

(b)    <u>Interim Distributions on Account of Allowed General Unsecured Claims</u>. Subject to approval of the Trust Advisory Board as set forth in the Liquidation Trust Agreement, (a) the Liquidation Trustee may make an interim Distribution to Holders of Allowed General Unsecured Claims at least semi-annually provided that any such Distribution is not unduly burdensome to the Liquidation Trust, and (b) may make more frequent interim Distributions if the Liquidation Trustee determines that such interim Distributions are warranted and economical; <u>provided</u>, <u>however</u>, that any such Distribution shall only be made if the Liquidation Trustee retains amounts reasonably necessary to meet Contingent Liabilities, to maintain the value of the Liquidation Trust Assets during liquidation, and to satisfy other Liabilities or expenses incurred by the Liquidation Trust in accordance herewith or with the Liquidation Trust Agreement.

(c)    <u>Final Distributions on Allowed General Unsecured Claims</u>. Notwithstanding anything else herein, upon the settlement and satisfaction of all A/P/S Claims, the completion of the prosecution and/or settlement of all Claims Objections and Causes of Action, and the completion of the sale and/or liquidation of all Assets, the Liquidation Trustee shall distribute, as soon as practicable, all remaining Liquidation Trust Assets to Holders of Allowed General Unsecured Claims.

**13.3    Delivery of Distributions**

Except as set forth herein, all Distributions to any Holder of an Allowed Claim shall be made: (i) by wire transfer; (ii) at the address of such Holder as set forth on the Schedules Filed with the Bankruptcy Court or on the books and records of the Debtors or its agents, as applicable, unless the Debtors or the Liquidation Trustee have been notified in writing of a change of address, including by the filing of a Proof of Claim by such Holder that contains an address for such Holder different than the address of such Holder as set forth on the Schedules, if being paid in Cash; or, if applicable (iii) with respect to any Holder of a Customer Claim entitled to an Equivalent Cryptocurrency Distribution at the Cryptocurrency Election E-Wallet Address; <u>provided</u>, <u>however</u>, that to receive an Equivalent Cryptocurrency Distribution, Holders of Customer Claims that made a Cryptocurrency Election shall provide their Cryptocurrency Election E-Wallet Address to the Liquidation Trustee.  Nothing herein shall require the Debtors or the Liquidation Trustee to attempt to locate any Holder of an Allowed Claim.

The Liquidation Trustee shall require any Holders of Allowed Claims or other distributee to furnish to the Liquidation Trustee in writing: (i) an Employer Identification Number or Taxpayer Identification Number as assigned by the IRS; (ii) if applicable, bank account and routing numbers; and (iii) if applicable, a Cryptocurrency Election E-Wallet Address, and the Liquidation Trustee may condition any Distribution to any Holders of Allowed Claims or other distributee upon receipt of such identification number and, if applicable, the Cryptocurrency Election E-Wallet Address. If the Employer Identification Number, Taxpayer Identification Number, if necessary, bank account or routing number, or, if applicable, Cryptocurrency Election E-Wallet Address are not provided by the required deadline established by the Liquidation Trustee, the Claim of any Holders of Allowed Claims or other distributee may be expunged and no Distribution will be made by the Liquidation Trustee to such Holders of Allowed Claims or other distributee. The Liquidation Trustee may withhold from distributions any withholding tax it determines in its reasonable discretion must be so withheld, including, without limitation, to foreign creditors who have not provided instruments supporting exemption from withholding tax reasonably satisfactory to the Liquidation Trustee.

### 13.4    Undeliverable and Unclaimed Distributions

(a)    Holding Undeliverable and Unclaimed Distributions

If the Distribution to any Holder of an Allowed Claim is returned as undeliverable or is otherwise unclaimed, no additional Distributions shall be made to such Holder unless and until the Liquidation Trustee is notified in writing of such Holder's then-current address. Nothing contained herein shall require the Liquidation Trustee to attempt to locate any Holder of an Allowed Claim.

The Liquidation Trustee shall make all Distributions that have become deliverable as soon as reasonably practicable after such Distribution has become deliverable or has been claimed.

(b)    Failure to Claim Unclaimed/Undeliverable Distributions

Subject to Section 13.7 hereof, any Holder of an Allowed Claim that does not assert a Claim pursuant hereto for an undeliverable or unclaimed Distribution within six (6) months after the Distribution is made shall be deemed to have its Claim expunged and shall have forfeited its right to such undeliverable or unclaimed Distribution and any subsequent Distribution on account of its Allowed Claim and shall be forever barred and enjoined from asserting any such Claim for an undeliverable or unclaimed Distribution or any subsequent Distribution on account of its Allowed Claims against the Debtors, their Estates, their property or the Assets. In such cases, such unclaimed/undeliverable Distributions shall be redistributed and paid to Holders of Allowed Claims in accordance herewith, free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.

(c)    Charitable Donations

On or about the time that a final Distribution is made and upon the Liquidation Trustee determining that there are insufficient funds remaining to warrant a further Distribution to Holders of Claims hereunder, the Liquidation Trustee, with the approval of the Trust Advisory

Board, may donate any undistributed funds to one or more charities selected by the Liquidation Trustee, provided that any charity selected shall not be affiliated with or connected to the Debtors or the Liquidation Trustee.

**13.5     Transfer of Claims**

The Claims Register shall remain open after the Effective Date, and the Liquidation Trustee shall recognize any transfer of Claims in accordance with Bankruptcy Rule 3001(e) at any time thereafter, provided that for purposes of each Distribution, the Liquidation Trustee will not recognize any transfer during the period commencing thirty (30) calendar days prior to making any Distribution. Except as otherwise provided herein, any transfer of a Claim, whether occurring prior to or after the Confirmation Date, shall not affect or alter the classification and treatment of such Claim hereunder, and any such transferred Claim shall be subject to classification and treatment hereunder as if such Claim was held by the transferor who held such Claim on the Petition Date.

**13.6     Manner of Payment**

At the option of the Liquidation Trustee, any Cash payment to be made hereunder may be made by a check, wire transfer, E-Wallet to E-Wallet transfer of Cryptocurrencies, if applicable, or as otherwise required or provided in applicable agreements.

**13.7     Distributions to Cryptocurrency Election E-Wallet Addresses**

The Liquidation Trustee shall maintain records of all distributions made to Cryptocurrency Election E-Wallet Addresses, including confirmations of E-Wallet to E-Wallet transfers. The Liquidation Trustee is only required to initiate such E-Wallet to E-Wallet transactions. The Liquidation Trustee is not responsible, and shall not be held liable, for any actions involving transferred Cryptocurrency after the initiation of such E-Wallet to E-Wallet transfers.

**13.8     Time Bar to Cash Payments by Check**

Checks issued by, or on behalf of, the Debtors or the Liquidation Trust on account of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Requests for reissuance of any check shall be made in writing directly to the Liquidation Trustee by the Holder of the Allowed Claim with respect to which such check originally was issued on or before the later of (a) the first anniversary of the Effective Date, (b) the first anniversary of the date on which the Claim at issue became an Allowed Claim, and (c) nine (9) months after the date the check was issued. After such dates, all Claims in respect of void checks shall be expunged, extinguished, discharged, and forever barred, and the proceeds of such checks shall revest in the Liquidation Trust.

**13.9     No Fractional Cents**

Notwithstanding any other provision hereof to the contrary, no payment of fractional cents shall be made pursuant hereto. Whenever any payment of a fraction of a cent hereunder would otherwise be required, the actual Distribution made shall reflect a rounding of such

fraction to the nearest whole penny (up or down) with half cents or more being rounded up and fractions less than half of a cent being rounded down.

## 13.10   Setoffs and Recoupment

The Liquidation Trustee may, but shall not be required to, set off against or recoup from any Claim and the payments to be made pursuant hereto in respect of such Claim any Claims of any nature whatsoever that the Debtors may have against the claimant; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Liquidation Trust of any such claim they may have against such claimant.

## 13.11   Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution hereunder consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## 13.12   Distributions After Effective Date

Distributions made after the Effective Date shall be deemed to have been made on the Effective Date.

## 13.13   Interest on Claims

Except as specifically provided for herein or in the Confirmation Order, interest shall not accrue on Claims, and no Holders of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date through the date such Claim becomes an Allowed Claim.  Except as expressly provided herein, no Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

## 13.14   No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution in excess of the Allowed amount of such Claim.

## 13.15   Payment of Taxes on Distributions Received Pursuant to the Combined Plan and Disclosure Statement

All Entities that receive Distributions hereunder shall be responsible for reporting and paying, as applicable, all appropriate federal, state and local taxes on account of such Distributions.  This includes, but is not limited, any amount of tax due to be withheld from Distributions which the Liquidation Trustee did not withhold.

**13.16   Reserves**

On the Effective Date, and after making all Distributions required to be made on the Effective Date hereunder, the Liquidation Trustee shall establish and maintain a separate reserve (each, a "Reserve") for the estimated amount of the Liquidation Trust Expenses, as well as each Class of Claims and Unclassified Claims, which Reserve shall be administered by the Liquidation Trustee.  To the extent that Reserves are established and maintained for the benefit of any Holder of a Disputed Claim, such Reserves shall include a combination of Cryptocurrency and Cash equal to the Distributions that would have been made to the Holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (a) the amount of the Disputed Claim, (b) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim ultimately may become an Allowed Claim, or (c) such other amount as may be agreed upon by the Holder of such Disputed Claim and the Liquidation Trustee.

**13.17   *De Minimis* Distributions**

All De Minimis Distributions will be held by the Liquidation Trustee for the benefit of the Holders of Allowed Claims entitled to such De Minimis Distributions.  When the aggregate amount of De Minimis Distributions held by the Liquidation Trustee for the benefit of a Holder of a Claim exceeds $25.00, the Liquidation Trustee will distribute such De Minimis Distributions to such Holder.  If, at the time that the final Distribution hereunder is to be made, the De Minimis Distributions held by the Liquidation Trustee for the benefit of a Holder of a Claim total less than $25.00, such funds shall not be distributed to such Holder, but rather, such Claims shall be deemed expunged and such Distribution shall vest in the Liquidation Trust and be distributed to other Holders of Allowed Claims in accordance with the terms hereof.

# ARTICLE  XIV.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

**14.1   Claims Administration Responsibilities**

Except as otherwise specifically provided herein and in the Liquidation Trust Agreement, after the Effective Date, the Liquidation Trustee shall have the sole authority, including assumption of the authority of the Debtors with respect to any dispute in respect of a Claim or Equity Interest initiated prior to the Effective Date, (a) to File, withdraw, or litigate to judgment objections to Claims or Equity Interests, (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, (c) to amend the Schedules in accordance with the Bankruptcy Code, and (d) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

## 14.2   Claims Objections

Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Combined Plan and Disclosure Statement, or otherwise becomes an Allowed Claim prior to the Effective Date, upon the Effective Date, the Liquidation Trustee shall be deemed to have a reservation of any and all objections of the Estates to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, priority, secured or unsecured, including any and all objections to the validity or amount of any and all alleged Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, Secured Claims, Convenience Claims, General Unsecured Claims, Subordinated Securities Claims, Equity Interests, Liens and security interests, whether under the Bankruptcy Code or other applicable law or contract. The Debtors' or the Liquidation Trustee's failure to object to any Claim in the Chapter 11 Cases shall be without prejudice to the Liquidation Trustee's rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the Holder of such Claim.

Unless otherwise provided herein or by order of the Bankruptcy Court, any objections to Claims (including Administrative Expense Claims but excluding Professional Fee Claims) by the Liquidation Trustee shall be filed and served not later than 180 days after the later of (i) the Effective Date or (ii) the date such Claim is filed (the "Claims Objection Deadline"); provided that the Liquidation Trustee may request (and the Bankruptcy Court may grant) an extension of such deadline by filing a motion with the Bankruptcy Court, based upon a reasonable exercise of the Liquidation Trustee's business judgment; provided further that with respect to Claims that, as of the Claims Objection Deadline, are subject to a pending objection (an "Initial Objection") wherein the objection to such Claim is ultimately denied, the Claims Objection Deadline shall be extended to the later of sixty (60) calendar days from the date on which (a) the Bankruptcy Court enters an order denying such Initial Objection or (b) any appellate court enters a Final Order reversing or vacating an order of the Bankruptcy Court granting such Initial Objection. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment hereto.

## 14.3   Estimation of Claims

The Liquidation Trustee may (but is not required to) at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidation Trustee, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidation Trustee may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative

and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**14.4    Adjustment to Claims Without Objection**

Any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Claims Agent at the direction of the Liquidation Trustee without the Liquidation Trustee having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

**14.5    No Distributions Pending Allowance**

Notwithstanding any other provision hereof, if any portion of a Claim is Disputed, no payment or Distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes Allowed.

**14.6    Distributions After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions hereof.

**14.7    Disallowance of Certain Claims**

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or by an Entity that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and such Entities may not receive any Distributions on account of their Claims until such time as such Causes of Action against such Entities have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by such Entity have been turned over or paid to the Liquidation Trust.

**14.8    Amendments to Claims**

On or after the Effective Date, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Liquidation Trustee, and any such new or amended Claim filed without prior authorization shall be deemed Disallowed in full and expunged without any further action.

**14.9    Claims Paid and Payable by Third Parties**

A Claim shall be Disallowed without an Objection thereto having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors, the Liquidation Trust, or the Liquidation Trustee.  Distributions under the Combined Plan and Disclosure Statement shall be made on account of any Allowed Claim that is payable

pursuant to one of the Debtors' insurance policies solely up to the amount of, and in full and complete satisfaction of, the portion of such Allowed Claim that is within the deductible or self-insured retention under such insurance policy. Except as provided in this Section 14.9, no Entity shall have any other recourse against the Debtors, the Estates, the Liquidation Trust, or any of their respective properties or assets on account of such deductible or self-insured retention under an insurance policy.

## ARTICLE XV.
## EXECUTORY CONTRACTS AND LEASES

**15.1    Executory Contracts and Unexpired Leases Deemed Rejected**

On the Effective Date, all of the Debtors' Executory Contracts and Unexpired Leases will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except to the extent (a) the Debtors previously have assumed, assumed and assigned, or rejected such Executory Contract or Unexpired Lease, (b) prior to the Effective Date, the Debtors have filed a motion to assume, assume and assign, or reject an Executory Contract or Unexpired Lease on which the Bankruptcy Court has not ruled, (c) an Executory Contract and Unexpired Lease is identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant hereto, or (d) Executory Contracts and Unexpired Leases under which the counterparty has consented to the extension of the time by which the Debtors must assume or reject to a date beyond the Effective Date. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all rejections of Executory Contracts and Unexpired Leases pursuant to this Section 15.1 and sections 365(a) and 1123 of the Bankruptcy Code.

**15.2    Bar Date For Rejection Damages**

If the rejection by the Debtors of an Executory Contract or an Unexpired Lease pursuant to Section 15.1 hereof results in damages to the other party or parties to such Executory Contract or Unexpired Lease, a Claim for such damages arising from such rejection shall not be enforceable against the Debtors or their Estates or agents, successors, or assigns, unless a Proof of Claim is filed with the Claims Agent **so as to actually be received on or before** the Rejection Bar Date.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or Unexpired Lease hereunder and that fails to timely do so shall be forever barred, estopped, and enjoined from asserting such Claim, and such Claim shall not be enforceable against the Liquidation Trust, the Liquidation Trustee, the Debtors, the Estates, and their respective properties, and the Liquidation Trust, the Liquidation Trustee, Debtors, the Estates, and their respective properties shall be forever discharged from any and all Liabilities with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction pursuant to Section 18.4 hereof and the Confirmation Order.

## ARTICLE XVI.
## CONDITIONS PRECEDENT TO THE CONFIRMATION AND THE EFFECTIVE DATE

**16.1    Conditions Precedent to Confirmation of the Combined Plan and Disclosure Statement**

The following are conditions precedent to confirmation of the Combined Plan and Disclosure Statement:

(a)    The Plan Support Agreement shall not have been terminated;

(b)    The Bankruptcy Court shall have entered the Confirmation Order, in a form and substance reasonably acceptable to the Committee, and the Confirmation Order shall have become a Final Order;

(c)    The final version of all of the schedules, documents, and exhibits, including the Plan Supplement, shall have been filed in form and substance acceptable to the Committee in its reasonable discretion; and

(d)    No breach or failure to comply with the terms of the Definitive Documents, the Confirmation Order or any other material Final Order of the Bankruptcy Court shall have occurred and be continuing.

**16.2    Conditions Precedent to the Effective Date**

The Effective Date shall not occur, and the Combined Plan and Disclosure Statement shall not become effective with respect to the Debtors, unless and until the following conditions are satisfied in full or waived in accordance with Section 16.3 hereof:

(a)    The Plan Support Agreement shall not have been terminated;

(b)    No breach or failure to comply with the terms of the Definitive Documents, the Confirmation Order, or any other material Final Order of the Bankruptcy Court shall have occurred and be continuing;

(c)    The conditions to confirmation delineated in Section 11.1 hereof shall have either been satisfied or waived in accordance herewith;

(d)    All documents required hereunder shall have been delivered'

(e)    The Confirmation Order in form and substance reasonably satisfactory to the Committee shall have been entered by the Bankruptcy Court, and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto;

(f)    The Debtors and the Liquidation Trustee shall have executed the Liquidation Trust Agreement;

(g)    All actions and all agreements, instruments, or other documents necessary to implement the terms and provisions hereof are effected or executed and delivered, as applicable;

(h)    The Professional Fee Escrow shall have been established and fully funded in the amount of the Professional Fee Reserve Amount; and

(i)    All authorizations, consents, and regulatory approvals, rulings, letters, no-action letters, opinions, or documents, if any, that are necessary to implement the Combined Plan and Disclosure Statement or that are required by the applicable Debtor entity or applicable law, regulation, or order, in connection with the Consummation of the Combined Plan and Disclosure Statement shall have been obtained and not revoked.

## 16.3    Waiver of Conditions Precedent to the Effective Date

Each of the conditions precedent in Section 16.2 hereof may be waived, in whole or in part, by the Debtors, with the consent of the Committee, without leave or order of the Bankruptcy Court and without any formal action on the part of the Bankruptcy Court.  The Debtors and the Liquidation Trustee reserve the right to assert that any appeal from the Confirmation Order shall be moot after the Effective Date.

## 16.4    Satisfaction of Conditions

Except as expressly provided or permitted herein, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  In the event that one or more of the conditions specified in Section 16.2 hereof shall not have occurred or otherwise been waived pursuant to Section 16.3 hereof, (a) the Confirmation Order shall be vacated, (b) the Debtors and all Holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (c) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

## ARTICLE  XVII.
## EFFECT OF CONFIRMATION

## 17.1    Compromise and Settlement of Claims, Equity Interests, and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant hereto, the provisions hereof shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Allowed Equity Interest or any Distribution to be made on account of such Allowed Claim or Allowed Equity Interest.  The

entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests, and is fair, equitable, and reasonable.  In accordance with the provisions hereof, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Liquidation Trustee may compromise and settle Claims against the Liquidation Trust and Causes of Action against other Entities.

## 17.2   Binding Effect

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Combined Plan and Disclosure Statement, the Plan Supplement, and the Confirmation Order shall bind (a) any Holder of a Claim against, or Equity Interest in, the Debtors and such Holder's respective successors and assigns (whether or not the Claim or Equity Interests are Impaired hereunder, whether or not such Holder has voted to accept the Combined Plan and Disclosure Statement, and whether or not such Holder is entitled to a Distribution hereunder), (b) all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described herein, (c) each Entity acquiring property hereunder or under the Confirmation Order, and (d) any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant hereto regardless of whether any Holder of a Claim or debt has voted hereon.

## 17.3   Reservation of Causes of Action/Reservation of Rights

Except with respect to the exculpation in Section 18.1 hereof, nothing contained herein shall be deemed to be a waiver or the relinquishment of any Causes of Action that the Debtors or the Liquidation Trust, as applicable, may have or may choose to assert against any Entity, and such Causes of Action are hereby preserved pursuant to section 1123 of the Bankruptcy Code, including, without limitation, any and all avoidance or equitable subordination actions, recovery Causes of Action and Objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code, as well as all Causes of Action based upon fraud, theft, conversion, unfair competition, tortious interference, breach of fiduciary duty, common law tort, and similar and related legal theories and Causes of Action.

## ARTICLE  XVIII.
## EXCULPATION, INJUNCTION, AND RELATED PROVISIONS

## 18.1   Exculpation

**None of the Debtors-in-Possession and the current or former directors, officers, employees, Affiliates, agents, accountants, financial advisors, investment bankers, restructuring advisors, attorneys, representatives, and other Professionals of or to the Debtors and the Debtors-in-Possession who served or were employed in such capacities after the Petition Date, and each of their respective agents and representatives, the Released Parties, the Committee, the members of the Committee and the Professionals**

retained by the Committee shall have or incur any Liability for any Claim, Cause of Action, or other assertion of Liability for any act taken or omitted to be taken in connection with or arising out of the Chapter 11 Cases, the sale of the Debtors' Assets, the formulation, dissemination, implementation, approval, confirmation, consummation, or administration hereof, property to be distributed hereunder, or any other act or omission in connection with or arising out of the Chapter 11 Cases, the Combined Plan and Disclosure Statement, or any contract, instrument, document or other agreement related thereto; **provided**, **however**, that the foregoing shall not affect the Liability of any Entity resulting from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, actual fraud, or gross negligence. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, discharges, and any other applicable law or rules protecting such Entities from liability.

**18.2   Releases by Debtors, the Estates, the Liquidation Trust, and the Liquidation Trustee; Third Party Releases**

Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services of the Released Parties, (a) the Debtors, (b) their respective Estates, (c) the Liquidation Trust, and (d) the Liquidation Trustee shall release, waive, and discharge unconditionally and forever each of the Released Parties from any and all Claims, Causes of Action, and Liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: (i) taking place before the Petition Date in connection with the Debtors; and (ii) in connection with or arising out of the Debtors' Chapter 11 Cases, the pursuit of confirmation of the Combined Plan and Disclosure Statement, the Consummation thereof, the administration thereof or the property to be distributed thereunder; **provided**, that the foregoing shall not operate as a waiver of or release from any Causes of Action resulting from the willful misconduct, actual fraud, or gross negligence of any Released Party arising under chapter 5 of the Bankruptcy Code.

In addition, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services of the Released Parties, the settlements and compromises contained herein, and the Distributions to be made pursuant to the Combined Plan and Disclosure Statement, (a) each of the Debtors, (b) all Holders of Claims or Equity Interests, who (1) vote in favor of the Combined Plan and Disclosure Statement or (2) (A) abstain from voting, are not entitled to vote, or vote to reject the Combined Plan and Disclosure Statement and (B) do not opt out of the this release on a timely submitted Ballot or the Opt-Out Election Form, and (c) with respect to the foregoing subparagraph (b), the current and former Affiliates thereof, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals,

each in their capacity as such, shall be deemed to have released and discharged each Released Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' prepetition operations and activities, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence taking place before the Effective Date.

For the avoidance of doubt, no Insider that is not a Released Party, including, without limitation, James Alexander, Lu Hua, Dan Schatt, Joseph Podulka, and Daniyal Inamullah, will receive a release or exculpation of any kind hereunder, whether from the Debtors or otherwise.

### 18.3    Avoidance Actions/Objections

Except with respect to the exculpation in Section 18.1 hereof and the releases in Section 18.2 hereof, in the Confirmation Order, or by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the Liquidation Trustee shall have the right to prosecute any and all avoidance or equitable subordination actions, recovery Causes of Action, and Objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or a Debtor-in-Possession, as well as all Causes of Action, including, without limitation, all Causes of Action based upon fraud, theft, conversion, unfair competition, tortious interference, common law tort, breach of fiduciary duty and similar and related legal theories and Causes of Action.

### 18.4    Injunction

Except as otherwise provided herein, all Entities that have held, hold, or may hold Claims against or Equity Interests in the Debtors or their Estates that arose prior to the Effective Date are permanently enjoined, solely with respect to any such Claims or Equity Interests, from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustee; (b) enforcing, attaching, collecting, or recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustee; (c) creating, perfecting, or enforcing, in any manner, directly or indirectly, any Lien or encumbrance against the Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustee; (d) except to the extent permitted by sections 362(b), 553, 559, 560, or 561 of the Bankruptcy Code, asserting any right of setoff, subrogation, or recoupment against the Debtors, their Estates, the Liquidation Trust, or the Liquidation Trustee; (e) pursuing any Claim or Cause of Action released pursuant to the Combined Plan and Disclosure Statement; or (f) taking any actions which interfere with the implementation or Consummation hereof.

The rights afforded herein and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction of all Claims and Equity Interests of

any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtors, any of their respective Assets, properties, or Estates, or the Liquidation Trust.

Notwithstanding any language to the contrary contained herein and/or the Plan Confirmation Order, no provision of this Plan or the Plan Confirmation Order shall (i) preclude the United States Securities and Exchange Commission ("SEC") from enforcing its police or regulatory powers or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any Entity other than the Debtors.

## 18.5    Terms of Stays and Injunctions

The stay arising under section 362(a) of the Bankruptcy Code and the injunctions set forth in Section 18.4 hereof or provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Combined Plan and Disclosure Statement or the Confirmation Order), shall permanently remain in full force and effect.

## ARTICLE  XIX.
## RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction of all matters in connection with, arising out of or related to the Chapter 11 Cases and the Combined Plan and Disclosure Statement pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including to:

(a)    Hear and determine pending applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance of cure amounts and Claims resulting therefrom;

(b)    Determine any and all adversary proceedings, applications and contested matters;

(c)    Hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(d)    Hear and determine any Claim Objections (including requests for estimation) in respect of Disputed Claims, in whole or in part;

(e)    Enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f)    Issue such orders in aid of execution hereof, to the extent authorized by section 1142 of the Bankruptcy Code;

(g)    Consider any amendments to or modifications hereof or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including the Confirmation Order;

(h) Hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Combined Plan and Disclosure Statement, the Confirmation Order, the Liquidation Trust Agreement, any transactions or payments contemplated hereby or thereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(i) Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any request by the Debtors), prior to the Effective Date or request by the Liquidation Trustee after the Effective Date for an expedited determination of tax issues under section 505(b) of the Bankruptcy Code;

(j) Hear and determine all disputes involving the existence, scope, and nature of the discharges granted under the Combined Plan and Disclosure Statement, the Confirmation Order or the Bankruptcy Code;

(k) Issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any Entity with the Consummation, implementation, or enforcement of the Combined Plan and Disclosure Statement, the Confirmation Order or any other order of the Bankruptcy Court;

(l) Determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m) Hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(n) Recover all Assets of the Debtors and property of the Debtors' Estates, wherever located;

(o) Enforce the terms of the Liquidation Trust Agreement and to decide any claims or disputes which may arise or result from, or be connected with, the Liquidation Trust Agreement, any breach or default under the Liquidation Trust Agreement, or the transactions contemplated by the Liquidation Trust Agreement;

(p) Enforce the exculpation granted and injunctions issued pursuant to the Combined Plan and Disclosure Statement and the Confirmation Order;

(q) Enter a final decree closing the Chapter 11 Cases; and

(r) Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XX.
## MISCELLANEOUS PROVISIONS

**20.1   Effectuating Documents and Further Transactions**

On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Plan and Disclosure Statement.  The Liquidation Trustee is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of Combined Plan and Disclosure Statement and any securities issued pursuant to the Combined Plan and Disclosure Statement.

**20.2     Date of Distributions and Other Actions**

In the event that any payment or act hereunder is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**20.3     Withholding and Reporting Requirements**

In connection with the Combined Plan and Disclosure Statement and all Distributions hereunder, the Liquidation Trustee shall comply with all applicable withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding, payment, and reporting requirements.  Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution.  The Liquidation Trustee has the right, but not the obligation, to refrain from making a Distribution until such Holder has made arrangements satisfactory to the Liquidation Trustee for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Liquidation Trust in connection with such Distribution.

**20.4     Corporate Action**

On the Effective Date, all matters provided for hereunder that would otherwise require approval of shareholders, directors or managers of one or more of the Debtors shall be in effect from and after the Effective Date pursuant to the applicable general business law of the states in which the Debtors are incorporated or organized, without any requirement of further action by the shareholders, directors or managers of the Debtors.

**20.5     Modification of the Combined Plan and Disclosure Statement**

Alterations, amendments, or modifications hereof or hereto may be proposed in writing by the Debtors, with the consent of the Committee, at any time prior to the Confirmation Date; provided, that the Combined Plan and Disclosure Statement, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and the Debtors have complied with section 1125 of the Bankruptcy Code.  The Combined Plan and Disclosure Statement may be altered, amended, or modified at any time after the Confirmation Date and before substantial consummation; provided, that the Combined Plan and Disclosure Statement,

as altered, amended, or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Combined Plan and Disclosure Statement, as altered, amended, or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments, or modifications. A Holder of a Claim that has accepted the Combined Plan and Disclosure Statement prior to any alteration, amendment, or modification will be deemed to have accepted the Combined Plan and Disclosure Statement, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Holders of the Claims.

Prior to the Effective Date, the Debtors, with the consent of the Committee, may make appropriate technical adjustments and modifications hereto without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not materially change the treatment of Holders of Claims or Equity Interests.

## 20.6   Revocation or Withdrawal of the Combined Plan and Disclosure Statement

The Debtors-in-Possession reserve the right to revoke or withdraw the Combined Plan and Disclosure Statement, with the consent of the Committee, prior to the Confirmation Date. Subject to the foregoing sentence, if the Debtors revoke or withdraw the Combined Plan and Disclosure Statement prior to the Confirmation Date, then the Combined Plan and Disclosure Statement shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

## 20.7   Plan Supplement

The Plan Supplement and the documents contained therein shall be filed with the Bankruptcy Court no later than ten (10) calendar days before the deadline for voting to accept or reject the Combined Plan and Disclosure Statement; provided, that the documents included therein may thereafter be amended and supplemented, prior to execution, so long as such amendment or supplement does not materially and adversely change the treatment of Holders of Claims.  The Plan Supplement and the documents contained therein are incorporated into and made a part hereof as if set forth in full herein.

## 20.8   Payment of Statutory Fees

On or before the Effective Date, all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Combined Hearing, shall be paid in Cash.  Following the Effective Date, all such fees shall be paid by the Liquidation Trustee from the Liquidation Trust Assets until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.  For the avoidance of doubt, the U.S. Trustee Fees shall be deemed part of the Liquidation Trust Expenses.

**20.9    Dissolution of the Committee**

On the Effective Date, except as provided in this Section 20.9, the Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to, arising from or in connection with the Chapter 11 Cases, and the retention or employment of the Debtors' and Committee's attorneys, accountants, and other agents, if any, shall terminate, except for purposes of Filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith, or any appeal of the Confirmation Order.

**20.10    Continued Confidentiality Obligations**

Pursuant to the terms thereof, members of and advisors to the Debtors and the Committee, any other holder of a Claim or Interest and their respective predecessors, successors and assigns shall continue to be obligated and bound by the terms of any confidentiality agreement executed by them in connection with this Chapter 11 Case or the Debtor, to the extent that such agreement, by its terms, may continue in effect after the Confirmation Date.

**20.11    Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection herewith, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection herewith, including the issuance of any stock, any merger agreements, or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated hereunder shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

**20.12    Expedited Tax Determination**

The Debtors and the Liquidation Trustee are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Petition Date through and including the Effective Date.

**20.13    Exhibits/Schedules**

All exhibits and schedules hereto, including the Plan Supplement, are incorporated into and are a part of the Combined Plan and Disclosure Statement as if set forth in full herein.

**20.14    Substantial Consummation**

On the Effective Date, the Combined Plan and Disclosure Statement shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 20.15   Severability of Combined Plan and Disclosure Statement Provisions

In the event that, prior to the Confirmation Date, any term or provision hereof is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall, at the request of the Debtors have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, Impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

### 20.16   Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or Plan Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without giving effect to its principles of conflict of law that would require application of the law of another jurisdiction.

### 20.17   Reservation of Rights

If the Combined Plan and Disclosure Statement is not confirmed by a Final Order, or is confirmed and does not become effective, the rights of all parties in interest in the Chapter 11 Cases are and will be reserved in full.  Any concessions or settlements reflected herein, if any, are made for purposes of the Combined Plan and Disclosure Statement only, and if the Combined Plan and Disclosure Statement does not become effective, no party in interest in the Chapter 11 Cases shall be bound or deemed prejudiced by any such concession or settlement.

### 20.18   Computation of Time

In computing any period of time prescribed or allowed by the Combined Plan and Disclosure Statement, the provisions of Rule 9006(a) of the Bankruptcy Rules shall apply.

### 20.19   Post-Confirmation Reporting

Following confirmation of the Combined Plan and Disclosure Statement, the Liquidation Trustee shall file reports of its activities and financial affairs with the Bankruptcy Court, on a quarterly basis, within thirty (30) calendar days after the conclusion of each such period; provided that the Liquidation Trustee's obligation to file such reports with the Bankruptcy Court shall terminate automatically upon the closing of the Chapter 11 Cases.  Any such reports shall be prepared substantially consistent with (both in terms of content and format) the applicable Bankruptcy Court and U.S. Trustee guidelines on such matters.

**20.20   Notices**

All notices, requests and demands to or upon the Debtors or the Liquidation Trustee must be in writing (including by facsimile transmission) to be effective and, unless otherwise expressly provided hereunder, will be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received during the normal business hours of the Liquidation Trustee (otherwise any such notice shall be deemed to have been received on the next Business Day) and telephonically confirmed, addressed as follows:

If to the Debtors:

> Cred Inc.
> Attn:   Matthew K. Foster, Chief Restructuring Officer
> Sonoran Capital Advisors, LLC
> 1733 N Greenfield Road, Suite 10
> Mesa, Arizona 85205

> *with a copy to:*

> PAUL HASTINGS LLP
> 200 Park Avenue
> New York, New York 10136
> Attn:   G. Alexander Bongartz, Esq.

> *and*

> PAUL HASTINGS LLP
> 600 Travis Street, 58th Floor
> Houston, Texas 77002
> Attn:   James T. Grogan, Esq.

> *and*

> COUSINS LAW LLC
> Brandywine Plaza West
> 1521 Concord Pike, Suite 301
> Wilmington, Delaware 19803
> Attn:   Scott D. Cousins, Esq.

If to the Liquidation Trust or the Liquidation Trustee:

> Liquidation Trust
> [Attn: _____
> c/o firm name
> Street Address
> City, State, ZIP]

*With a copy to:*

[Counsel firm name
Attn:
Street Address
City, State, ZIP]

If to the Trust Advisory Board:

[Creditor 1
c/o counsel firm name
Attn: _____
Street address
City, state, ZIP]

[Creditor 2
c/o counsel firm name
Attn: _____
Street address
City, state, ZIP]

[Creditor 3
c/o counsel firm name
Attn: _____
Street address
City, state, ZIP]

    After the Effective Date, the Liquidation Trustee may, in its sole discretion, notify Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Liquidation Trustee is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

*[Remainder of page intentionally left blank.]*

Dated: January 21, 2021
         Wilmington, Delaware

                                          Respectfully submitted,

                                          **CRED INC.**

                                          (on behalf of itself and the other Debtors and
                                          Debtors-in-Possession)

                                          By:      */s/ Matthew K. Foster*
                                          Name: Matthew K. Foster
                                          Title:   Chief Restructuring Officer

**Exhibit A**

**Causes of Action List**

## Causes of Action List

- All actual or potential Avoidance Actions pursuant to any applicable section of the Bankruptcy Code including, without limitation, sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code, arising from any transaction involving or concerning the Debtors;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against Customers, vendors, suppliers or contract counterparties, including without limitation, any and all claims relating to breach of contract, deposits, overpayments, accounts receivable, improper setoff, warranty, indemnity, retention of double payments, retention of misdirected wires, deductions owing or improper deductions taken, or any other claim concerning or arising out of the Customer, vendor, supplier or contractual relationship;

- All actual or potential actions, whether legal, equitable or statutory in nature, against landlords, lessees, sublessees, or assignees arising from various leases, subleases and assignment agreements relating thereto, including, without limitation, any and all claims for unpaid rent, overcharges relating to taxes, common area maintenance and other similar charges;

- All actual or potential actions, whether legal, equitable or statutory in nature, against the Debtors' current or former insurance carriers including, without limitation, any and all claims relating to unpaid reimbursements and claims, overpayment of premiums and fees, breach of contract, indemnity obligations or coverage;

- Any and all rights to payment against any taxing authority or other Governmental Unit including, without limitation, any and all claims for any tax refunds, credits, overpayments, recoupments or offsets that may be due and owing to the Debtors for taxes that the Debtors paid or may have paid to any such taxing authority or other Governmental Unit;

- All actions or potential actions, whether legal, equitable or statutory in nature, relating to deposits or other amounts owed by any Creditor, lessor utility, supplier, vendor, landlord, sub-lessee, assignee or other Person or Entity;

- All actions or potential actions, whether legal, equitable or statutory in nature, arising out of, or relating to, the Debtors' intellectual property rights;

- All actual or potential actions against any of the prepetition directors, officers, employees, attorneys, financial advisors, accountants, investment bankers, agents and representatives of the Debtors, except actions expressly released under the Combined Plan and Disclosure Statement, including, without limitation, any and all claims for breaches of fiduciary duty, breaches of loyalty, breaches of the duty of good faith, negligent mismanagement, wasting of corporate assets, and diversion of corporate opportunity, including, without limitation any and all claims against the Debtors current or former management, directors, and officers.

- All actual or potential actions, whether legal, equitable or statutory in nature, against all Entities, except actions expressly released under the Combined Plan and Disclosure Statement, arising out of, or in connection with, without limitation, any of the Debtors' prepetition management, conduct, marketing, businesses, operations and/or reporting of financial or other information;

- All actions or potential actions, whether legal, equitable or statutory in nature, against any of the Debtors' current or former Professionals, except actions expressly released or exculpated under the Combined Plan and Disclosure Statement, including without limitation any and all claims for breach of fiduciary duty, breach of contract, negligence or professional misconduct malpractice, or other tortious conduct;

- All rights against any Entity, including any shareholder or prepetition member of the Debtors' board of directors, members, and/or officers, for subordination of their Claims pursuant to section 510 of the Bankruptcy Code or against any Entity that has agreed to subordination of their claim pursuant to section 510 of the Bankruptcy Code;

- All actions or potential actions against the prepetition members of the Debtors' board of directors and/or officers, except actions expressly released or exculpated under the Combined Plan and Disclosure Statement;

- All actual or potential actions, whether legal, equitable or statutory in nature, to recover amounts awarded to employees (except for amounts authorized by order of the Bankruptcy Court or required by applicable non-bankruptcy law, or related to an action expressly released under the Combined Plan and Disclosure Statement) under the terms of any prepetition employment, severance agreement, change-in-control agreement, bonus arrangement or other agreement governing, arising out of or related to the employment relationship;

- All actual or potential contract and tort actions that may exist or may subsequently arise, except actions expressly released under the Combined Plan and Disclosure Statement;

- All actual or potential actions whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses or operations, except actions expressly released under the Combined Plan and Disclosure Statement; and

- All actual or potential actions, whether legal, equitable or statutory in nature, against any of the (i) Debtors' Insiders, including without limitation Mr. Lu Hua and moKredit and (ii) affiliates (as such term is defined in section 101(2) of the Bankruptcy Code) of the Debtors' Insiders, including without limitation any and all claims for breach of fiduciary duty, breach of contract, negligence, unjust enrichment, fraudulent transfers, common law fraud or any other tortious conduct.

**Exhibit B**

**Liquidation Analysis**

Cred Inc. & Subsidiaries
Chapter 7 Liquidation Analysis

| Assets | Notes | Proposed Plan of Liquidation | | | Chapter 7 Liquidation | | |
|---|---|---|---|---|---|---|---|
| Unrestricted Cash as of Effective Date | A | | $1,409,814 | | | | $1,409,814 |
| Liquidation of Cryptocurrency Holdings | B | | 7,502,367 | | | | 7,502,367 |
| Additional Liquid Assets | C | | 32,856,845 | | | | 32,856,845 |
| Total estimated proceeds available | | | 41,769,026 | | | | 41,769,026 |
| **Reserves Budgeted for Administration expenses** | | | | | | | |
| Estimated Operating Liabilities | D | | (50,000) | | | | (50,000) |
| Estimated UST fees | E | | (125,000) | | | | (125,000) |
| Total estimated for distribution | | | 41,594,026 | | | | 41,594,026 |
| **Administrative Fees** | | | | | | | |
| Chapter 7 Professionals | F | 100% | - | | 100% | 2,000,000 | (2,000,000) |
| Chapter 7 Trustee Commissions | G | 100% | - | | 100% | 1,247,821 | (1,247,821) |
| Chapter 11 Professionals | H | 100% | 2,185,217 | (2,185,217) | 100% | 2,185,217 | (2,185,217) |
| Liquidating Trust Budget | I | 100% | 1,500,000 | (1,500,000) | 100% | - | - |
| Estimated UST fees | J | 100% | 415,940 | (415,940) | 100% | 415,940 | (415,940) |
| Net estimated proceeds available after distribution | | | | 37,492,869 | | | 35,745,048 |
| **Administrative Claims** | | | | | | | |
| Administrative Claims | | 100% | - | - | 100% | - | - |
| Net estimated proceeds available after distribution | | | | 37,492,869 | | | 35,745,048 |
| **Priority & Secured Claims** | | | | | | | |
| Other Priority Claims (Class 1) | | 100% | - | - | 100% | - | - |
| Secured Tax Claims (Class 2) | | 100% | - | - | 100% | - | - |
| Other Secured Claims (Class 3) | | 100% | - | - | 100% | - | - |
| Net estimated proceeds available after distribution | | | | 37,492,869 | | | 35,745,048 |
| **Unsecured Claims & Equity Interest** | | | | | | | |
| General Unsecured Claims (Class 4) | K | 22% | 170,138,236 | (37,242,869) | 21% | 170,138,236 | (35,640,309) |
| Convenience Claims (Class 5) | | 50% | 500,000 | (250,000) | 21% | 500,000 | (104,739) |
| Subordinated Securities Claims (Class 6) | | 100% | - | | 0% | | |
| Equity Interests in Debtors (Class 7) | | 100% | - | | 0% | | |
| Net estimated proceeds available after distribution | | | | - | | | 0 |

Notes:
A)  Assumes redemption/liquidation of investments held by asset managers prior to Effective Date.
B)  Cryptocurrency valued as of 1/8/21: assumes illiquid cryptocurrency is liquidated at a discount to that value.
C)  Assumes collection of accounts and notes receivable as well as liquidation of certain physical assets. Discounts are applied to these assets based on Debtors' estimate of collectibility.
D)  The Debtors don't anticipate additional operating liabilities due to the cessation of operations but are keeping a $50k reserve.
E)  Estimated UST fees through Effective Date.
F)  Estimated Chapter 7 professional fees to gather data, assist with liquidation of cryptocurrency, and prosecute collections actions regarding Additional Liquid Assets.
G)  3% of distributions.
H)  Estimated outstanding professional fees that would need to be paid prior to plan going effective.
I)  Estimated budget for Liquidating Trust to liquidate cryptocurrency and prosecute collections actions regarding Additional Liquid Assets.
J)  Estimated UST fees for the remainder of the case.
K)  Debtors' estimate of creditors that elect to participate as a Convenience Class Claim. This analysis does not assume any creditors with claims greater than $1k make the Convenience Class Election.

# EXHIBIT K

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CRED INC., *et al.*,[1] | Case No. 20-12836 (JTD) |
| Debtors. | (Jointly Administered) |

## <u>REPORT OF ROBERT J. STARK, EXAMINER</u>

**BROWN RUDNICK LLP**
Andrew M. Carty
Michael W. Reining
Tiffany B. Lietz
Seven Times Square
New York, NY 10036
212-209-4800
acarty@brownrudnick.com
mreining@brownrudnick.com
tlietz@brownrudnick.com

Stephen R. Cook
2211 Michelson Drive, 7th Floor
Irvine, CA 92612
949-752-7100
scook@brownrudnick.com

E. Patrick Gilman
601 Thirteenth Street NW, Suite 600
Washington, DC 20005
202-536-1730
pgilman@brownrudnick.com

**ASHBY & GEDDES, P.A.**
Gregory A. Taylor (DE Bar No. 4008)
Katharina Earle (DE Bar No. 6348)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
gtaylor@ashbygeddes.com
kearle@ashbygeddes.com

**ANKURA CONSULTING GROUP, LLC**
Vikram Kapoor
485 Lexington Avenue, 10th Floor
New York, NY 10017
212-818-1555
vikram.kapoor@ankura.com

**Dated: March 8, 2021**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

# TABLE OF CONTENTS

I.      EXECUTIVE SUMMARY ...........................................................................................1

    A.      Scope of the Investigation, In Brief. ...................................................... 1

    B.      What Was Cred and What Was It Supposed to Do?................................. 3

    C.      Why Did Cred Fail? ................................................................................ 3

        1.      Cred's Corporate Governance and Business Management......................... 4

        2.      Cred's Business Functions........................................................................ 4

        3.      The moKredit Relationship........................................................................ 6

        4.      Mr. James Alexander. ............................................................................... 6

        5.      Summary of the Events Giving Rise to Cred's Bankruptcy. ...................... 7

    D.      Additional Topics Included within the Investigation and this Report. ................. 10

II.     KEY ENTITIES AND INDIVIDUALS .......................................................................11

    A.      Debtor Entities. ..................................................................................... 11

    B.      Involved Entities. .................................................................................. 12

    C.      Relevant Individuals. ............................................................................ 15

III.    RELEVANT CASE BACKGROUND ........................................................................18

    A.      The Commencement of the Chapter 11 Cases and Appointment of Examiner. ... 18

    B.      The Examiner's Work Plan for the Investigation. ................................. 20

    C.      The Methods Employed to Conduct the Investigation. ........................ 21

IV.     GENERAL BACKGROUND REGARDING THE DEBTORS ......................................23

    A.      Corporate History and Organization...................................................... 23

    B.      Cred's Primary Products. ...................................................................... 25

i

V.    CRED'S OPERATIONS AND CIRCUMSTANCES LEADING TO THE FINANCIAL
COLLAPSE ....................................................................................................................28

    A.    Cred's Business Functionality. ........................................................................ 28

        1.    Cryptocurrency Asset Storage. ............................................................. 28

        2.    Diligence Process and Procedures. ....................................................... 33

        3.    Financial and Accounting Practices. ..................................................... 35

        4.    Insurance Coverage. .............................................................................. 37

        5.    Internal Compliance Function. .............................................................. 40

    B.    Cred's Relationship and Dealings with moKredit. .......................................... 41

        1.    moKredit, In General. ........................................................................... 41

        2.    Cred's Business Dealings with moKredit. ............................................. 43

        3.    Cred's Failed Attempts to Withdraw moKredit Investments. ................. 45

        4.    Potential Conflicts of Interest. .............................................................. 47

        5.    Diligence and Risk Management Respecting moKredit. ......................... 49

        6.    Disclosures to Customers Regarding moKredit Relationship. ................ 50

        7.    Luxembourg Bonds. .............................................................................. 52

    C.    Cred's Pre-Petition Losses and Liquidity Crisis. ............................................ 54

        1.    JST Capital. ........................................................................................... 54

        2.    Cred's Other Asset Managers. .............................................................. 69

        3.    Cred Develops, But Does Not Implement, the So-Called "All-Weather"
Strategy. ......................................................................................................... 76

    D.    Cred's Relationship with QuantCoin. .............................................................. 77

        1.    Inception of Relationship. ..................................................................... 77

          2.     Chronology of Material Events Involving Cred and QuantCoin. ............. 80

     E.   Lu Hua's Transfer of 300 Bitcoin to Cred. .......................................................... 86

     F.   Cred's Dealings with James Alexander. ............................................................... 89

          1.     General Background on James Alexander. ............................................... 89

          2.     Organization of Cred Capital. ................................................................. 91

          3.     James Alexander's Alleged Misappropriation of Assets. ........................ 91

VI.   INVESTIGATIVE CONCLUSIONS ................................................................................ 95

## I.    EXECUTIVE SUMMARY

### A.    Scope of the Investigation, In Brief.

On December 23, 2020, the United States Bankruptcy Court for the District of Delaware (the "**Court**") Ordered the appointment of an examiner in the Chapter 11 cases of Cred Inc., *et al.* ("**Cred**" or the "**Debtors**").  On January 7, 2021, the Office of the United States Trustee filed its notice of appointment of Robert J. Stark, as Examiner, and its motion seeking approval of such appointment.  On January 8, 2021, the Court entered its Order approving such appointment (the "**Examination Order**").  In the Examination Order, the Court directed the Examiner to investigate allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the Debtors of or by current or former management of the Debtors, and otherwise perform the duties of an examiner, as set forth in Bankruptcy Code Sections 1106(a)(3) and 1106(a)(4) (the "**Investigation**").

In organizing his Investigation, the Examiner was mindful that these bankruptcy cases have involved "dueling narratives."  Cred, on the one hand, pinned much of its troubles on its former Chief Capital Officer, failed investments in a Chinese entity named moKredit, and a failed investment in an entity named QuantCoin.  Other case constituents have put blame elsewhere, raising allegations of gross mismanagement and potentially fraud.  The Examiner viewed his charge as collecting and analyzing the available evidence, providing an objective view of the facts underlying these cases, and enabling the Court and all stakeholders to better understand why Cred failed and who might be responsible for such failure.

To conduct his Investigation, the Examiner obtained documents from the Debtors, the Official Committee of Unsecured Creditors (the "**Committee**"), and certain customers of the

Debtors.[2]   In total, approximately 13,000 documents were delivered and reviewed.   The Examiner's professionals interviewed 23 individuals, including Daniel Schatt (founder, co-owner, director, former CEO), Lu Hua (founder, co-owner, director, former CEO), James Alexander (former Chief Capital Officer), Matthew Foster (Chief Restructuring Officer), Scott Wiley (interim Chief Financial Officer), Joseph Podulka (former Chief Financial Officer), Daniel Wheeler (former General Counsel), and Daniyal Inamullah (former Vice President of Capital Markets).   Those interviews were conducted over a span of one month, and each lasted for several hours.   None of those interviews were conducted under oath, but the Examiner's professionals conducted the interviews in deposition style.   In general, the Examiner found the Debtors, Committee members, executives, and other interviewees responsive to the Examiner's information requests, willing to provide/volunteer information and, during the interviews, answer questions largely without interruption by counsel.   In sum, even though the Investigation was conducted in a very short time frame (i.e., approximately 8 weeks), the Examiner believes that he was able to conduct a sufficient Investigation[3] to acquit his charge under the Examination Order.[4]

---

[2] The Examiner wishes to particularly thank the Debtors' and the Committee's professionals for their assistance in connection with the Investigation.  The Examiner believes that the various case professionals were attentive to the Examiner's information needs, forthcoming and candid, and that their insights were critically important to the Investigation.

[3] It is important to note that this Investigation was conducted under very tight time constraints, under very pressured circumstances and, given those obstacles, was necessarily reliant on voluntary cooperation of the parties.  No assurances can be given that all relevant documents were produced or that no other relevant information/evidence would be revealed in formal discovery bearing on the matters discussed herein.

[4] An earlier draft Report was shared with the Debtors and the Committee, and their feedback was solicited.  The Examiner did not make any substantive revisions or modifications to the Report based on commentary from the Debtors or Committee after their review.

### B.  What Was Cred and What Was It Supposed to Do?

Cred was a cryptocurrency financial services platform that offered holders of cryptocurrencies the option of investing those assets with Cred (through the "CredEarn" program) or borrowing against those cryptocurrencies (through the "CredBorrow" program). Those participating in CredEarn agreed to invest their cryptocurrency with Cred for a finite period of time, during which Cred guaranteed those customers a predetermined rate of return. CredBorrow, on the other hand, allowed customers to deposit their cryptocurrency with Cred and obtain a loan against those assets, usually in an amount not to exceed 50% of the cryptocurrency value at the time of the deposit, for a fixed period and with a fixed interest rate.

Although the loan agreements reviewed by the Examiner (particularly under the CredEarn program) contained terms and conditions as to repayment and yield, they did not dictate precisely how cryptocurrency proceeds would be used or invested by Cred, or include any conditions/constraints with respect to such investments.  Based on interviews with certain Cred customers, it appears some believed, based on statements from Cred's website and blog posts (among other things), that Cred's investments were collateralized.  For the most part, this was not the case, and certain Cred employees expressed concern that such statements were potentially misleading.

### C.  Why Did Cred Fail?

The specific causative event was a "flash crash" in cryptocurrency trading value in March 2020, followed by a run-up in April and May 2020 resulting in a liquidity crisis.  The Examiner believes, however, that the firm's failure is more aptly attributed to dereliction in corporate responsibility.  Swings in cryptocurrency trading value were, after all, a foreseen aspect of the firm's business model.  But, Cred's corporate managers did not run the business to effectively

counterbalance such risk, as was promised to customers. This dereliction was grave. Noticeable failures include, among other things: (i) un-systemic, chaotic and, in some instances, non-existent diligence, accounting, and compliance functions; (ii) allowance for currency migration to non-Cred entities operating in mainland China (moKredit), without legal or practical capacity to repatriate capital as and when requested/needed by Cred; and (iii) allocation of important managerial and operating functions to an individual with an extremely worrisome past. Cred, it seems, excelled at its marketing objectives; but, its failures in the most basic of business functions portended its eventual demise.

### 1. Cred's Corporate Governance and Business Management.

Cred's Board consisted of only two directors (Messrs. Schatt and Hua), one of whom (Hua) was recused on all "big" operations issues, purportedly on advice of his counsel. The Board and senior management seemingly did not adopt clear and effective policies and procedures for virtually any day-to-day functions. There is little evidence that the Board (i.e., Mr. Schatt) ran the business to ensure operative systems/practices, consistent with customer expectations, and to effectively ward off risks inherent in the business.

### 2. Cred's Business Functions.

For much of its existence, Cred maintained only an informal and "ad hoc" diligence process with respect to material aspects of its business, from the hiring of key officers and employees to the deployment of its assets. Cred did not have formal diligence or oversight policies respecting investment decisions, including the selection of asset managers with whom to invest Cred's assets and customer deposits. Nor did it develop and maintain a standardized, formal process for decision-making pertaining to Cred's investment proposals, investment allocations, risk management strategies, or liquidity. Although certain employees indicated that

4

they employed informal diligence processes relating to investment decisions, no such processes were formally adopted by the company or implemented consistently.

Cred operated in a similarly undisciplined manner respecting asset management, storage, and transfers. Cred did not maintain records identifying or tracking assets between the CredEarn, CredBorrow, or other programs, and had no discernable method for identifying or tracking specific assets or transfers. Rather, customer assets were comingled and maintained together without a standardized method for distinguishing which assets were deposited by whom and from which program they were derived. Additionally, Cred did not develop and maintain a standardized, comprehensive protocol for tracking customer deposits and for initiating and authorizing transfers. Cred's method for initiating, authorizing, and executing transfers often came through informal channels of communication and all steps were often performed by a single individual without a defined, discernible method of approval or oversight. Moreover, Cred did not maintain reliable records for its trading accounts and did not adopt a regular practice of issuing transaction statements.

These deficiencies extended to the accounting and compliance functions. Cred did not have a centralized, integrated accounting function. Certain accounting information was maintained in offline Excel spreadsheets, but they were not regularly updated. By the time Cred filed for bankruptcy, it had not performed a comprehensive financial reconciliation of accounts in almost a year.

Cred did not implement a formal reporting or compliance policy concerning its investments (either internally, with respect to employees tasked with overseeing investments, or externally, with respect to asset managers overseeing Cred's investments). Again, certain Cred employees indicated that they had developed informal procedures for obtaining investment

5

information and updates from asset managers, but the Examiner is unaware of any formal Cred policy governing this process.

Given the foregoing, the Examiner endeavored to reconcile Cred's books and records to more accurately appreciate its financial posture and to determine whether funds were properly accounted for or, potentially, improperly diverted from the company.  However, given the disorganized and incomplete state of Cred's books and records, as well as the time constraints on the Investigation, the Examiner was not able to complete such reconciliation.

### 3.    The moKredit Relationship.

Throughout its history, Cred was tightly bound to the fortunes of moKredit – a Chinese microlender owned by Lu Hua, Cred's co-founder and 50% equity owner.  Cred's business primarily involved converting customer cryptocurrencies into fiat currency for moKredit to lend to its borrowers.  Converting cryptocurrencies into fiat currency exposed Cred to fluctuations in cryptocurrency trading prices, a risk that required constant hedging.  Even though Cred placed a significant portion of its asset-base with moKredit, it had little visibility as to moKredit's ability to return capital when/if needed to, among other things, maintain an effective hedging position. Cred had, in fact, almost no information respecting moKredit's loan portfolio at any given point in time.  When the "flash crash" caused a liquidity crisis for Cred, Cred had to repatriate substantial capital from moKredit, but moKredit was not positioned to return any capital.  Cred's hedge positions fell away, rendering it "naked" to future swings in cryptocurrency trading prices. Its fate was thereby sealed.

### 4.    Mr. James Alexander.

Considerable corporate authority was vested in James Alexander, Cred's Chief Capital Officer ("**CCO**").  Neither Cred's CEO, Dan Schatt, nor the Cred Board, nor any other employee

6

at Cred appears to have conducted any meaningful diligence (e.g., background search, credit check) with respect to Mr. Alexander either prior to his hiring or during his period of employment. It has come to the Examiner's attention that Mr. Alexander was convicted on December 3, 2007 in the United Kingdom for crimes related to illegal money transfers, for which he was sentenced to three years and four months in prison to be served at HMP Ford Prison in West Sussex, England. At the time of his incarceration, there was a prison break at this facility. Mr. Alexander has been identified by the UK government as a fugitive.[5]

Mr. Alexander is an important figure in the story of Cred's demise. Again, the Examiner attributes responsibility for the firm's demise largely to failures in corporate leadership, primarily Messrs. Schatt and Hua. But, Alexander's participation/involvement in poor decision-making is a recurring theme, especially when evaluating particularized errors in business oversight (e.g., undisciplined diligence and asset-allocation functions) and points of loss (e.g., QuantCoin and repayment of the Luxembourg Bonds, both discussed below). At the end of his tenure with the company, and at various times thereafter, Mr. Alexander engaged in behavior that may be charitably described as aberrant. His actions, described herein, only add to the aura of suspicion.

### 5. Summary of the Events Giving Rise to Cred's Bankruptcy.

Set forth below is a brief synopsis of the circumstances leading to Cred's bankruptcy filings:

---

[5] MN Form UCF-17-2, Order Granting Name Change, Aug. 18, 1994, (Exhibit 167); *see also* Letter from Andrew Selous MP, Parliamentary Under-Secretary of State for Justice, to Philip Davies MP, House of Commons (Nov. 7, 2014) (Exhibit 168); Rachel Millard, *Exposed: Inmates on the run from Ford Prison*, The Argus (Apr. 7, 2015), https://www.theargus.co.uk/news/12873674.exposed-inmates-on-the-run-from-ford-prison/. All "Exhibit" references in this Report refer to exhibits set forth in the *Compendium of Exhibits to Report of Robert J. Stark, Examiner*, a copy of which is being provided to the Court, the U.S. Trustee, the Debtors, and the Committee.

- Under Cred's initial business model, customers would deposit their cryptocurrency assets with Cred (through the CredEarn program) for a fixed term and return. Cred would convert these assets into other forms of currency (e.g., "USDT," which is a cryptocurrency backed by the U.S. dollar) and use the proceeds to make short-term loans to moKredit. moKredit would convert the assets to Yuan and make short-term, high-interest microloans, typically to Chinese consumers.

- Based on the evidence obtained by the Examiner, Cred's loans to moKredit were unsecured and not backed by any collateral. Cred appears to have performed minimal diligence before entering into the moKredit arrangement, and it does not appear that Cred had considered or developed an effective mechanism to ensure repayment of the loans.

- In an effort to manage the risk and volatility present in the cryptocurrency market, and Cred's exposure to such risk when it converted its cryptocurrency assets to more stable currency, Cred entered into a series of hedge positions (e.g., options, swaps, futures) that were, in theory, structured so as to insulate Cred from fluctuations in cryptocurrency prices. The hedges established under this program did not, however, protect Cred from a significant downturn in the market, and instead exposed Cred to exacerbated losses in such a downturn scenario.

- On March 12, 2020, the price of Bitcoin (Cred's most significant cryptocurrency asset) experienced a quick and precipitous decline (a "flash crash"), after which Cred encountered margin calls in connection with certain of its hedge positions. Cred was unable to satisfy the margin calls and, so, the hedges were terminated. Following the "flash crash," Cred had a cumulative net short position with respect to its hedges of approximately $27 million.

- With approximately 50% of its assets invested with moKredit, Cred did not have in its possession the assets (i.e., $9 million in Bitcoin) necessary to reconstitute its hedges. Failure to reconstitute the hedges left Cred exposed ("naked") to market fluctuations, and, if Bitcoin prices increased, would result in Cred's liabilities (i.e., the market price of the Bitcoin it owed its customers) increasing. In the ensuing weeks and months, the price of Bitcoin steadily rose and, because Cred did not reestablish its hedges (due to a lack of liquidity), so too did Cred's liabilities.

- On or about March 12, 2020, Cred attempted to recall $10 million of the approximately $38 million principal loan amount it had extended to moKredit in order to reconstitute its hedges. Notwithstanding the terms of moKredit's loan agreement, moKredit did not meet that recall request. Despite representations that it would be able to satisfy at least part of the redemption within 10 days, moKredit did not. moKredit's failure to satisfy the request may be attributed, at least in part, to the economic fallout from the COVID-19 pandemic. At this time,

8

moKredit's loan default rates rose to above 60%, making it difficult (if not impossible) for moKredit to collect on outstanding loans.

- moKredit's situation significantly and adversely impacted Cred's liquidity profile. But, it was not the only cause of Cred's deteriorating liquidity position. Beginning in February 2020, Cred transferred a total of 800 Bitcoin to an entity named QuantCoin, which Cred believed to be an asset management firm. Cred's relationship with QuantCoin seemingly began on the recommendation of James Alexander,[6] as did the execution of an initial 500 Bitcoin transfer. As discussed further herein, Cred ended up losing its entire 800 Bitcoin investment with QuantCoin, valued at approximately $9 million (August 2020). Based on the evidence reviewed by the Examiner, it appears that Cred did minimal diligence on QuantCoin before making its investment.[7]

- As the Chief Capital Officer of Cred, and head of Cred Capital, James Alexander was responsible for raising and deploying capital for Cred. Information delivered to the Examiner indicates that Alexander had "free reign" to choose asset managers and raise and deploy assets in his discretion, with little or no oversight from the Board, Schatt, or other management personnel. When Schatt discovered that Alexander and Dan Wheeler (Cred's former General Counsel) established Cred Capital in a manner contrary to his instructions, Alexander promptly transferred to his personal accounts $200,000 USD and 225 Bitcoin of Cred's assets (Cred Capital) with the assistance, wittingly or not, of Daniyal Inamullah.

- In January 2020, Cred sold $14 million of its moKredit loans through an independent entity in Luxembourg, Income Opportunities (the "**Luxembourg Bonds**"), to two investors. Alexander served as a director of Income Opportunities and was responsible for developing and proposing the investment. The Luxembourg Bonds matured on June 30, 2020, at which time it appears, based on the Examiner's review of relevant documents, only moKredit bore responsibility to Income Opportunities. By June 2020, it was evident that moKredit could not repay the loan balance. Cred purchased the Luxembourg Bonds (i.e., $14 million in exposure to moKredit) from the two investors, notwithstanding its own acute liquidity problems.[8]

---

[6] According to Alexander, he was introduced to QuantCoin through Schatt. The Examiner was not furnished with any information corroborating this statement.

[7] The Examiner was unable to fully investigate the QuantCoin transaction, given time and information constraints. The Examiner was unable to discern, for example, if anyone at the company (e.g., Alexander) received any payments from those involved with QuantCoin.

[8] The Examiner was unable to fully investigate the Luxembourg Bonds transaction, given time and information constraints. The Examiner was unable to discern, for example, if Alexander separately received any payments in connection with his involvement with Income Opportunities and the Luxembourg Bonds.

In the Examiner's opinion, the cumulative effect of these events, coupled with (and in some cases, a result of) Schatt's and the Board's failure to adequately oversee and manage the day-to-day operations of the company, led to Cred's decline and ultimate Chapter 11 filings.

### D.   Additional Topics Included within the Investigation and this Report.

The Investigation also included a review of Lu Hua's transfer of 300 Bitcoin to Cred in March 2020, which was prompted after Hua informed Cred that moKredit would not be able to repay $10 million of its principal loan balance as requested by Cred in March 2020.  Hua and Schatt characterize the 300 Bitcoin transfer as a loan.  Relevant documents indicate, however, that Hua made the transfer as an equity contribution in exchange for 5,000,000 shares of Class B common stock in Cred Capital.

Finally, the Examiner analyzed certain issues implicated by Cred's Chapter 11 plan of liquidation,[9] specifically, the estate release provisions contained therein.[10]  Based on his review of the definition of "Released Parties" under the Chapter 11 Plan, and discussions with professionals for the Debtors and Committee, the Examiner understands that the estate releases under the Chapter 11 Plan encompass only those professionals retained by the Debtors and the Committee in the Chapter 11 Cases (and certain related parties).[11]  During the course of his

---

[9] *See First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries under Chapter 11 of the Bankruptcy Code*, Jan. 21, 2021, ECF No. 380 (as amended, modified, or supplemented, the "**Chapter 11 Plan**") (Exhibit 169).

[10] *See id.* § 18.2.

[11] Under the Chapter 11 Plan, the term "Released Parties" is defined as "Professionals retained by the Debtors, Grant Lyon as the Debtors' independent director, Matthew Foster as the Debtors' chief restructuring officer, any other staff supplied by Sonoran Capital Advisors, LLC, the Professionals retained by the Committee, and the respective agents and representatives of each of the foregoing."  *See id.* § 1.113.  The term 'Professional' is, in turn, defined as "any professional Person employed in the Chapter 11 Cases pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code pursuant to an Order of the Bankruptcy Court and to be compensated for services rendered pursuant to sections 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code."  *See id.* § 1.106.

Investigation, the Examiner did not become aware of any facts that, in his opinion, would give rise to any viable estate claims or causes of action against any of the Released Parties.

In this respect, the Examiner notes that, following discussions with the U.S. Trustee's Office, the Committee, and the Debtors, the Examiner reviewed work performed by Cred's outside counsel, Paul Hastings LLP ("**Paul Hastings**"), prior to the Petition Date.  The Examiner received a list of matters on which Paul Hastings performed work for Cred (including a privilege log of purportedly privileged materials and information) and conducted an interview of a representative of Paul Hastings regarding such matters (and related issues, as deemed appropriate by the Examiner).   As with the other Released Parties, the Examiner did not become aware of any facts that would, in his opinion, give rise to any viable estate claims or causes of action against Paul Hastings.

## II.      KEY ENTITIES AND INDIVIDUALS

### A.      Debtor Entities.[12]

- **Cred, Inc.:** The parent company of the below subsidiaries. Cred, Inc. handled business with international customers.

- **Cred (US) LLC:** A wholly-owned subsidiary of Cred, Inc.  Cred (US) LLC handled borrowing and lending for domestic customers.

- **Cred Capital, Inc.:** A wholly-owned subsidiary of Cred, Inc.  Formed in March 2020, its stated purpose was to sell securities products.

- **Cred Merchant Solutions LLC:** A wholly-owned subsidiary of Cred Inc. Formed in October 2019, its stated purpose was to facilitate the purchase of cryptocurrency assets at the physical point of sale.  Cred Merchant Solutions had no business and no assets as of the Petition Date.

---

[12] Unless otherwise specified, the Debtors are collectively referred to herein as "Cred" or the "Debtors".

- **Cred (Puerto Rico) LLC:** A wholly-owned subsidiary of Cred. Inc. Formed in March 2020, its stated purpose was to facilitate transactions for customers in Puerto Rico.[13]

All Debtor entities are organized under Delaware law and have their principal place of business in California, except Cred (Puerto Rico) LLC, which was formed under the laws of Puerto Rico.[14]   Cred (US) LLC holds a California Finance Lender license.[15]

### B.    Involved Entities.

- **100 Acre Ventures ("100AV"):** Formed in Delaware and registered as a foreign LLC in California.   A technical investment firm focused on institutional investment and risk management in digital assets.[16]   Cred invested with 100AV beginning in April 2020, based on James Alexander's recommendation.[17]

- **Blockfills.com ("Blockfills"):** A DBA of Reliz Limited and registered in the Cayman Islands, is a digital asset liquidity provider.   It provides an off-exchange platform for customers to exchange cryptocurrency and fiat currency.[18]   Cred Capital initiated a relationship with Blockfills on the recommendation of Daniyal Inamullah, Cred's Vice President of Capital Markets, who oversaw due diligence on Blockfills.[19]

- **CryptoLab Capital LLC ("Cryptolab Capital"):** Based in California, a now-defunct hedge fund that used a data-heavy approach to invest cryptocurrency assets.[20]   Cred invested in Cryptolab Capital (also referred to as the "Martingale investment").   Cryptolab lost 100% of its assets

---

[13] *Decl. of Daniel Schatt in Supp. of Debtors' Chapter 11 Pet. and First Day Mot.* ¶ 12. (ECF No. 12) ("**Schatt Decl.**") (Exhibit 1).

[14] *Id.* ¶ 13.

[15] Base Prospectus, Jan. 30, 2020 at 2 (Exhibit 2); License Search, California Dept. of Fin. Protection and Innovation, https://docqnet.dfpi.ca.gov/LicenseSearch/LicenseDetails/ (last visited Mar. 7, 2021) (search for License No. 60DbO-91480).

[16] 100 Acre Ventures Form ADV, May 15, 2020 (Exhibit 20); 100 Acres Ventures Mission Page, https://www.100acreventures.com/mission (last visited Mar. 4, 2021).

[17] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

[18] Blockfills FAQ Page, https://www.blockfills.com/faq/ (last visited Mar. 4, 2021).

[19] Videotaped Dep. of Daniyal Inamullah, Dec. 8, 2020 ("**Inamullah Dep.**") 46:16–47:7 (Exhibit 9).

[20] Laurence Fletcher, *Crypto hedge funds struggle to recover from 'bloodbath'*, Fin. Times, May 20, 2020 (Exhibit 19).

when Bitcoin prices fell in March 2020, resulting in a 14% loss for Cred on its position.[21]

- **Cyber Quantum Pte. Ltd. ("Cyber Quantum"):** Founded by Daniel Schatt, Cyber Quantum is a Singapore entity registered by Hua in January 2018 used to raise funding for Cred through an Initial Coin Offering.[22]

- **JST Capital ("JST"):** Also known as JST Systems, a limited liability company organized under New Jersey law.[23] JST provides financial services to individuals in the digital asset market in two primary areas: trading and asset management, and risk and balance sheet management.[24] In late 2018, Cred hired JST as a consultant to assist Cred with a hedging platform.[25] JST created hedging positions against various cryptocurrencies for Cred, including Bitcoin (BTC), Ripple (XRP), Ethereum (ETH), Bitcoin Cash (BCH), Litecoin (LTC), XLMedia (XLM), OMG Network (OMG) and Cardano (ADA). Cred also used JST as its "paying agent" in connection with interest payments received from moKredit.[26] Under this arrangement, JST received interest payments from moKredit in cryptocurrency and transferred those payments to Cred in the form of USD.[27] In connection with this service, JST invoiced Cred for monthly "profit share" fees.[28]

- **Kingdom Trust:** Kingdom Trust is an escrow agent for and custodian of both fiat and alternative assets, including cryptocurrencies.[29] Cred did not

---

[21] Inamullah Dep. 104:9–16, 210:11–211:1 (Exhibit 9).

[22] Cyber Quantum Pte. Ltd. Unaudited Financial Statements, 2018 (Exhibit 7); Cyber Quantum Pte. Ltd. Directors' Resolutions, 2018 (Exhibit 8).

[23] Business Name Search, NJ Division of Revenue and Enterprise Services, https://www.njportal.com/DOR/BusinessNameSearch/Search/BusinessName (last visited Mar. 4, 2021) (search for JST Capital).

[24] Services, JST Capital, https://jstcap.com/#services (last visited Mar. 4, 2021).

[25] Inamullah Dep. 105:8–14; 110:4–17 (Exhibit 9) ("[W]e're essentially taking cryptocurrency liabilities in the form of CredEarn participations and translating that into a dollar asset, which is – in moKred. Now, if crypto starts to rise, we will not be able to return the same number of cryptocurrency units back to the customer if we do not hedge the upside exposure."); Emails exchanged between H. Ng, K. Wong, D. Schatt and InnReg representative regarding JST onboarding process, Dec. 7–20, 2018 (Exhibit 10).

[26] Email from J. Alexander to K. Wong, Jan. 22, 2019 (Exhibit 11).

[27] Email from D. Granet to L. Hua, copying in Messrs. J. Alexander, K. Wong, S. Zhang and S. Freeman, Jan. 14, 2019 (Exhibit 12).

[28] Exhibit 11; JST Systems Invoice, Jan. 22, 2019 (Exhibit 13).

[29] Qualified Custodian Executive Summary, Kingdom Trust, https://www.kingdomtrust.com/qualified-custodian/executive-summary (last visited Mar. 4, 2021).

transact with Kingdom Trust, but transferred 800 Bitcoin to a person or entity purporting to be a Kingdom Trust employee between February and April 2020.[30]

- **moKredit Inc. ("moKredit"):** Founded by Cred co-founder Lu Hua in 2012, moKredit Inc.[31] is a Chinese consumer lending platform that provides microcredit loans to Chinese borrowers.[32] moKredit is incorporated in the Cayman Islands and based in Shanghai, China.[33] Beginning in 2018, Cred lent funds obtained through its customers' investments – generally retail customers – to moKredit. Cred received 20% interest return on those loans.[34] Cred passed between 6-10% of that interest on to its customers, depending on the cryptocurrency invested (i.e., Bitcoin, Ethereum, XRP) and the amount of time those customers "locked up" their funds.[35] Cred allocated to itself the remaining 10% of the moKredit interest proceeds as revenue.[36]

- **Sarson Funds Inc. ("Sarson Funds"):** A cryptocurrency "marketing company" that advertises investment products ("sub-funds," organized as separate entities).[37] Cred invested in two Sarson Funds sub-funds in or around March 2020: (a) Fifth Khagan, a small coin/small token fund;[38] and (b) AX Momentum,[39] a "covered call options fund."[40]

- **UpgradeYa Investments, LLC ("UpgradeYa"):** A cryptocurrency investment firm and a customer of Cred's borrowing program,

---

[30] Inamullah Dep. 155:4–156:16 (Exhibit 9); Cred Inc. Update for the Creditors Committee, Dec. 14, 2020 at 23 (Exhibit 25).

[31] moKredit Inc. Overview Report at 2.1 Corporate History, Aug. 7, 2019 (Exhibit 3). At times, parties also refer to moKredit as "moKred," "mo9," and previously "GamaxPay, Inc."

[32] Videotaped Dep. of Dan Schatt 26:18–24, Dec. 14, 2020 ("**Schatt Dep.**") (Exhibit 4).

[33] Articles of Association of moKredit, Oct. 25, 2017 (Exhibit 170); Note Purchase Escrow Agreement, Jan. 28, 2020 (Exhibit 171).

[34] Schedule of Advances (Exhibit 46).

[35] Loan and Security Agreement between moKredit Inc., and Cred LLC, Dec. 27, 2018 (Exhibit 5).

[36] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[37] Sarson Funds, https://www.sarsonfunds.com/ (last visited Mar. 4, 2021).

[38] Sarson Funds Fact Card: Fifth Khagan (Exhibit 14).

[39] Sarson Funds Fact Card: AX Momentum (Exhibit 15).

[40] Inamullah Dep. 208:24–209:1 (Exhibit 9).

"CredBorrow."[41]  On April 20, 2020, UpgradeYa and Cred entered into a Loan and Security Agreement whereby Cred agreed to provide UpgradeYa with a $2 million revolving line of credit secured by Bitcoin pledged by UpgradeYa equal to an initial maximum loan-to-value ratio of 50%.[42]  UpgradeYa also participated in the CredEarn plan to earn interest on its cryptocurrency.[43]

- **Uphold:**  A cloud-based asset platform that enables users to store, buy, and convert classes of assets.[44]  At Cred's founding, Schatt served on Uphold's board of directors and later added Uphold as a partner for Cred in early 2019.[45]  For Cred, Uphold assisted with operations and acted as its customer wallet.[46]  Throughout 2019, Uphold was also one of Cred's primary sources for customer leads.[47]

## C.  Relevant Individuals.

- **Daniel ("Dan") Schatt:** Co-founder and former Chief Executive Officer ("**CEO**") of Cred.  Schatt has 20 years of experience in the finance and financial technology sectors.  Schatt met Cred's other co-founder, Lu Hua, while both worked at PayPal in 2009.  When Schatt and Hua founded Cred (then called Libra Credit), Schatt became the company's president and Hua the CEO.  Schatt stepped into the CEO role after Hua resigned in mid-to-late-2018.  Schatt resigned as CEO in December 2020.  Schatt and Hua each own 50% of Cred's equity.[48]

---

[41] *Suppl. Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362* ¶ 2 (ECF No. 128) (Exhibit 172); Nathan DiCamillo, *Here's What Happened at Crypto Lender Cred's Latest Bankruptcy Hearing*, CoinDesk, Dec. 18, 2020 (Exhibit 18).

[42] *Mot. of UpgradeYa Investment, LLC for Relief from Stay Under Bankruptcy Code Section 362* ¶ 8 (ECF No. 89) (Exhibit 17); UpgradeYa Loan and Security Agreement, Apr. 20, 2020 (Exhibit 176); Holdings Update, Oct. 11, 2020 (Exhibit 177).

[43] *Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362* ¶ 5 (ECF No. 91) (Exhibit 173); UpgradeYa Tranche 1 Closing Statement (Exhibit 178); Exhibit 177.

[44] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021); Uphold About Page, https://uphold.com/en/resources/about (last visited Mar. 4, 2021).

[45] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[46] *Id.*

[47] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[48] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

- **Lu Hua:** Founder of moKredit in 2012. In 2018, Hua also founded what is now Cred with Dan Schatt, his former PayPal colleague.[49] Hua owns a 50% equity stake in Cred and sat on its Board from its inception until the eve of its bankruptcy filing. Initially, Hua served as Cred's CEO before yielding the role to Schatt in mid-to-late 2018 as Cred shifted its operations from China to the United States.[50]

- **Joseph ("Joe") Podulka:** Cred's Chief Financial Officer from July 2019 to December 2020.[51] In that role, he oversaw Cred's corporate cash management and expenses incurred by Cred Capital.[52] On June 29, 2020, he became a member of Cred Capital's board of directors.[53] Podulka, also a former PayPal employee, was Head of Finance with PayPal Europe from 2010 to 2011 and Head of Finance at PayPal New Ventures from 2011 to 2014.[54]

- **Daniel ("Dan") Wheeler:** Joined Cred as its General Counsel in August 2019. Wheeler previously served as Cred's primary outside counsel while a partner at Bryan Cave Leighton Paisner LLP ("**Bryan Cave**") from May 2012 to August 2019.[55] In 2020, Wheeler oversaw the organization of Cred Capital,[56] and was appointed Cred Capital's Corporate Secretary and General Counsel on or about March 16, 2020.[57]

- **James Alexander:** Hired as Cred's Chief Capital Officer in August 2018.[58] Alexander's primary roles included soliciting cryptocurrency investments and allocating assets.[59] In March 2020, Cred directed

---

[49] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[50] *Id.*

[51] *Decl. of Joe Podulka in Supp. of Debtors' Obj. to Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case* (Jan. 29, 2021) ¶ 12 ("**Podulka Decl.**") (Exhibit 21).

[52] *Id.* at ¶ 6.

[53] *Id.* at ¶ 9–11.

[54] Podulka Decl. ¶ 2; LinkedIn Profile of Joe Podulka https://www.linkedin.com/in/Podulka/ (last visited Mar. 4, 2021).

[55] *Decl. of Daniel F. Wheeler RE Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case* ¶ 1 (ECF No. 386) ("**Wheeler Decl.**") (Exhibit 24); Schatt Dep. 43:8-14 (Exhibit 4).

[56] Wheeler Decl. ¶¶ 2–3 (Exhibit 24).

[57] *Id.* ¶ 1.

[58] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021).

[59] Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021).

Alexander to establish and manage Cred Capital as a subsidiary of Cred.[60] Instead, Alexander organized Cred Capital as a separate, independent, entity over which he had almost complete control.[61] On June 24, 2020, two days before Cred terminated him, Alexander directed Daniyal Inamullah to transfer 225 Bitcoin from a Cred Capital account to a blockchain address provided by Alexander.[62]

- **Daniyal Inamullah:** Served as Cred's Vice President of Capital Markets from January 2020 to April 2020.[63] In that role, Inamullah reported to James Alexander and was responsible for seeking investment opportunities, conducting due diligence, and proposing investments to Cred's "investment committee."[64] From April 2020 to July 2020, Inamullah served as Cred Capital's Vice President of Capital Markets, where he was responsible for underwriting and selling debt products and marketing bonds.[65] Amid a corporate shuffle, Cred Capital terminated Inamullah in July 2020 and Cred immediately re-hired him as Vice President of Capital Markets, where he reported to Schatt.[66] Inamullah left Cred in November 2020 and is now the Chief Investment Officer at Sarson Funds, one of Cred's asset managers.[67]

- **Grant Lyon:** The co-founder of Arete Capital Partners and has over 30 years' experience in financial restructuring.[68] On November 3, 2020, Cred appointed Lyon as an Independent Director, and he is now the sole remaining member of Cred's Board. In that capacity, Lyon effectively has sole decision-making authority over all matters requiring Board approval.[69]

---

[60] Schatt Decl. ¶ 22 (Exhibit 1); Podulka Decl. ¶ 5 (Exhibit 21); Exhibit C, Decl. of Daniel Schatt in Supp. Of Def.'s Opp. To Pl.'s Mot. for Prelim. Inj., *Alexander v. Schatt*, No. 20-CIV-02728 (Cal. Super. Ct. Aug. 27, 2020) (Exhibit 174).

[61] Schatt Decl. ¶ 22 (Exhibit 1).

[62] Podulka Decl. ¶ 2 (Exhibit 21).

[63] *Decl. of Daniyal Inamullah in Supp. of Mot. of the United States Trustee for Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases* (ECF No. 133) ¶ 1 ("**Inamullah Decl.**") (Exhibit 6).

[64] *Id.* at ¶ 2.

[65] Inamullah Dep. 30:23–31:3 (Exhibit 9).

[66] *Id.* at 31:24–32:2.

[67] Inamullah Decl. ¶ 1 (Exhibit 6).

[68] *Decl. of Grant Lyon in Supp. of Debtors' Obj. to Mot. of James Alexander to Dismiss the Cred Capital, Inc. Case* ¶ 2 (ECF No. 433) ("**Lyon Decl.**") (Exhibit 26).

[69] *Id.* ¶ 2.

- **Matthew ("Matt") Foster:** A managing director and founding partner of Sonoran Capital Advisors, a turnaround, crisis management, and financial advisory firm.[70]   Cred hired Foster as its Chief Restructuring Officer ("**CRO**") in November 2020.  Foster reports to Cred's Board and manages Cred's day-to-day operations.  He is also responsible for assessing and implementing the restructuring of Cred's businesses, including overseeing Cred's liquidity needs.  Foster has 15 years of restructuring experience and Cred is his fifth CRO appointment in the last 36 months.[71]

- **Scott Wiley:** Senior Advisor at Sonoran Capital Advisors, a turnaround, crisis management, and financial advisory firm.  Wiley is Cred's interim Chief Financial Officer, overseeing Cred's day-to-day accounting, finance, and cash management functions.[72]

- **Paul Maniscalco / Pablo Bonjour (MACCO):**  Paul Maniscalco is a senior managing director and Pablo Bonjour is a managing director at MACCO Restructuring Group, LLC ("**MACCO**").[73]  MACCO provides interim executive leadership, financial advisory services, and fiduciary services to businesses in financial and operational distress.  Bonjour and Maniscalco are financial advisors to Cred.  Bonjour has an investment banking and consulting background, having worked with more than 1,000 U.S. and international clients.[74]  Maniscalco has over 20 years' experience in corporate finance, capital markets, and business restructurings.[75]

## III.   RELEVANT CASE BACKGROUND[76]

### A.   The Commencement of the Chapter 11 Cases and Appointment of Examiner.

The Debtors filed for Chapter 11 relief on November 9, 2020, citing, among other things:

(i) material losses incurred in connection with or as a result of the alleged misconduct of its

former Chief Capital Officer, James Alexander; (ii) the purported theft of certain cryptocurrency

---

[70] Exhibit 25 at 34.

[71] *Id.* at 3.

[72] *Id.* at 35.

[73] *Id.* at 32–33.

[74] *Id.* at 32.

[75] *Id.* at 33.

[76] For this section, references made to affirmative actions taken by the "Examiner," necessarily include those actions taken by Examiner's counsel and experts.

assets in connection with a failed investment with QuantCoin; and (iii) the Debtors' deployment of significant assets with moKredit and the subsequent inability or unwillingness of moKredit to return those assets to Cred pursuant to the terms of the parties' agreement.[77]

Amid allegations of fraud, theft, and mismanagement, the Office of the United States Trustee, on December 4, 2020, filed its *Motion for Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases*.[78]   On December 18, 2020, the Court conducted a hearing with respect to this motion and, on December 23, 2020, the Court entered its *Order Denying in Part, and Granting in Part, the Trustee/Examiner Motions*, pursuant to which the Court granted the U.S. Trustee's request for the appointment of an examiner pursuant to Bankruptcy Code Section 1104(c).[79]   The Examination Order provides, in pertinent part, that the Examiner will investigate any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the Debtors of or by current or former management of the Debtors, and otherwise perform the duties of an examiner set forth in Bankruptcy Code Sections 1106(a)(3) and 1106(a)(4).

On January 7, 2021, the U.S. Trustee appointed Robert J. Stark as Examiner and filed a motion seeking Court approval of such appointment,[80] and on January 8, 2020, the Court entered an Order approving Mr. Stark's appointment as Examiner.[81]

---

[77] *See* Schatt Decl. ¶¶ 18–40 (Exhibit 1).

[78] *See United States Trustee Mot. For Entry of an Order Directing the Appointment of a Trustee, or in the Alternative, (I) Directing the Appointment of an Examiner, or (II) Converting the Cases to Chapter 7 Cases* (ECF No. 133) ("**UST Motion**") (Exhibit 27).

[79] *See Order Den. in Part, and Granting in Part, the Trustee/Examiner Mot.* (ECF No. 281) ("**Examination Order**") (Exhibit 28).

[80] *See App. of the United States Trustee for Order Approving Appointment of Examiner* (ECF No. 330) (Exhibit 29).

Promptly following his appointment, the Examiner and his counsel met and conferred with the U.S. Trustee, the Debtors, and the Committee regarding the scope, timeline, and budget with respect to the Investigation.   Thereafter, on January 20, 2021, the Examiner filed his *Proposed Scope, Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Stark, as Examiner*,[82] which the Court approved by order dated January 28, 2021.[83]   On February 24, 2021, the Examiner filed a proposed amendment to the work plan and budget.[84]

### B.      The Examiner's Work Plan for the Investigation.

Pursuant to his work plan, the Examiner identified the following specific topics of the Investigation:

    (i)      investigating the Debtors' business and operations including allegations of comingling corporate and client accounts and possible insider transactions;

    (ii)     examining the facts and circumstances surrounding the substantial losses the Debtors' endured as a result of the liquidation of certain hedge positions;

    (iii)    the Debtors' relationship with moKredit, including investments made by the Debtors, and outstanding debt owed by moKredit;

    (iv)    the facts and circumstances surrounding Lu Hua's transfer of 300 Bitcoin to the Debtors and the related controversy that ensued;

    (v)     the facts and circumstances surrounding the transfer of 800 Bitcoin to QuantCoin and the losses associated therewith; and,

    (vi)    the facts and circumstances involving certain dealings between the Debtors and James Alexander.

---

[81] *See Order Approving Appointment of Examiner* (ECF No. 338) (Exhibit 30).

[82] *Notice of Filing of Proposed Scope, Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Start, as Examiner* (ECF No. 376) ("**Examiner Work Plan**") (Exhibit 31).

[83] *Order Approving Examiner's Proposed Scope, Work Plan, and Budget for Investigation* (ECF No. 431) (Exhibit 32).

[84] *Notice of Filing of Proposed Amend. to Work Plan, and Budget for Investigation, Prepared and Submitted by Robert J. Stark, as Examiner* (ECF No. 552) (Exhibit 33).

Although completing an investigation and report of this scale in approximately 8 weeks was a large undertaking, the Examiner endeavored to complete and file his report in advance of the plan confirmation hearing, presently scheduled for March 9, 2021.

### C.       The Methods Employed to Conduct the Investigation.

Because of the complex nature of this Investigation and the specialization it demands, the Examiner engaged (a) Brown Rudnick LLP and Ashby & Geddes, P.A. to serve as his counsel, and (b) Ankura Consulting Group, LLC to assist with the digital asset market analysis. Additionally, and as provided in the Examination Order, the Examiner utilized and leveraged work performed by advisors to the Debtors and Creditors' Committee in conducting the Investigation, including Dundon Advisers, LLC and CipherTrace, Inc.

The Examiner obtained documents from the Debtors, the Committee, and other parties in interest. In total, the Examiner received and analyzed approximately 13,000 documents and over 55 gigabytes of information.

The Examiner conducted 23 witness interviews. Because of health and safety protocols, all witness interviews were conducted over video conference. All interviewees participated willingly. The majority of those interviewed were represented by counsel. The following is a list of the persons interviewed in connection with the Investigation and the dates of the interviews:

| Interviewee | Title | Date of Interview |
|---|---|---|
| **Tim Kuhman** | General Counsel, Kingdom Trust | February 3, 2021 |
| **Barbara J. Valliere** | Assistant United States Attorney, United States Attorney's Office for the Northern District of California | February 4, 2021 |
| **Alexandra E. Bryant** | Special Agent, Federal Bureau of Investigation | February 4, 2021 |

21

| Matthew Foster | Chief Restructuring Officer, Cred Inc.<br><br>Managing Director and Founding Partner, Sonoran Capital Advisors | February 8, 2021 |
|---|---|---|
| Scott Wiley | Interim Chief Financial Officer, Cred Inc.<br><br>Senior Advisor, Sonoran Capital Advisors | February 9, 2021 |
| Pablo Bonjour | Financial Advisor to Cred Inc.<br><br>Managing Director, MAACO Restructuring Group | February 10, 2021 |
| Paul Maniscalco | Financial Advisor to Cred Inc.<br><br>Senior Managing Director, MAACO Restructuring Group | February 10, 2021 |
| Daniyal Inamullah | Former Vice President of Capital Markets, Cred Inc.<br><br>Former Vice President of Capital Markets, Cred Capital Inc. | February 10, 2021<br><br>February 23, 2021 |
| Grant Lyon | Independent Director, Cred Inc.<br><br>Co-Founder and Managing Partner, Arete Capital Partners | February 11, 2021 |
| Daniel Wheeler | Former General Counsel, Cred Inc. | February 12, 2021 |
| Joseph Podulka | Former Chief Financial Officer, Cred. Inc | February 16, 2021 |
| Daniel Schatt | Co-Founder, Cred Inc.<br><br>Former Chief Executive Officer, Cred Inc. | February 17, 2021 |
| Mr. C.M. | Creditor and former customer, Cred Inc. | February 18, 2021 |
| Mr. M.M. | Creditor and former customer, Cred Inc. | February 18, 2021 |
| Lu Hua | Founder moKredit<br><br>Co-Founder, Cred Inc. | February 18, 2021 |
| Mr. C.dL. | Creditor and former customer, Cred Inc. | February 19, 2021 |
| Tonia Tautolo | Interim Chief Financial Officer, Cred Inc. | February 19, 2021 |
| Mr. D.F. | Creditor and former customer, Cred Inc. | February 24, 2021 |
| Mr. E.S. | Creditor and former customer, Cred Inc. | February 24, 2021 |
| Mr. J.S. | Creditor and former customer, Cred Inc. | February 24, 2021 |
| Mr. G.B. | Creditor and former customer, Cred Inc. | February 24, 2021 |
| James Grogan | Paul Hastings | March 2, 2021 |

| James Alexander | Former Chief Capital Officer, Cred Inc. | March 3, 2021 |
| | Former Director, Cred Capital Inc. | |

## IV. GENERAL BACKGROUND REGARDING THE DEBTORS

### A. Corporate History and Organization.

Daniel Schatt and Lu Hua formed Cred, Inc. and its affiliated Debtors in or around May 2018.[85]  At inception, Hua and Schatt each owned 50% of the equity in Cred.  Before forming Cred, Schatt and Hua worked together at PayPal, overlapping from 2007 until 2011.  Hua left PayPal in or around mid-2011 and subsequently formed moKredit, a microcredit lending company in Singapore and Shanghai.  Schatt and Hua stayed in contact following their time at PayPal.[86]

In January 2018, Schatt and Hua established an entity named Cyber Quantum in Singapore.  Cyber Quantum's stated purpose was to conduct an Initial Coin Offering ("**ICO**") in or around May 2018.  The proceeds of the Cyber Quantum ICO would be used to provide initial funding for a different and newly-formed entity, Cred.  Through the ICO, Schatt and Hua raised approximately $5 million.[87]

---

[85] The responsible parties originally organized Cred as an LLC in Delaware, which also was originally known as Libra Credit and also transacted through Cyber Quantum Pte. Ltd., a Singaporean entity.  Schatt Dep. 37:1–10 (Exhibit 4); Cred LLC and Subsidiary Financial Statements, 2018 (Exhibit 34).

[86] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021); Interview with Daniel Schatt, co-Founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[87] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021).  According to Alexander, Cyber Quantum raised $26 million in Ethereum during the ICO.  The Examiner has not seen any evidence to substantiate this assertion.

Schatt and Hua initially intended for Cred to operate out of China, with Hua (a resident of China) serving as CEO and Schatt (a resident of California) serving as president.[88]  At some point in 2018, Schatt and Hua decided to relocate the business to the U.S. in an apparent effort to increase scale.[89]  After relocating Cred to the U.S., Schatt assumed the CEO role and Hua resigned his position as an officer of Cred, although Hua remained a member of Cred's Board until November 2020.[90]

Cred brought in more than $135 million in "borrowed" capital from its CredBorrow and CredEarn programs (discussed further below) between December 2018 and October 2020.  It did so by offering guaranteed rates of return against investments (CredEarn) and providing loans to institutional and retail customers backed by their pledged cryptocurrency (CredBorrow).

CredEarn customers were told that regardless of the market trends, they would "receive the upside potential of [their] crypto."[91]  Cred advertised that customer cryptocurrency was used to lend and transact with a variety of customers including retail borrowers and money managers (but not short-sellers).[92]  CredBorrow customers received credit lines based on a loan-to-value ratio calculated on a monthly basis.[93]

Cred customers executed CredEarn or CredBorrow agreements memorializing the terms of the arrangements.  The Examiner was provided with copies of certain (but not all) of the agreements under the CredEarn and CredBorrow programs.  In those agreements, Cred did not

---

[88] Schatt Dep. at 20:22–21:12 (Exhibit 4); Interview with Daniel Schatt, co-Founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[89] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[90] Schatt Dep. 21:2–12; 22:4–6; 37:9–38:2 (Exhibit 4).

[91] CredEarn Page, https://mycred.io/earn/ (last visited Mar. 4, 2021).

[92] *Id.*

[93] Standard CredBorrow Multi-Tranche Credit Agreement at 2–3 (Exhibit 36).

make representations respecting or covenant as to how Cred would invest its customers' cryptocurrency.[94]   Further, none of the agreements reviewed by the Examiner spoke to whether customer funds or Cred's investments were to be collateralized.

### B.     Cred's Primary Products.

#### (a)     CredBorrow.

CredBorrow was Cred's first consumer product.  Cred launched the CredBorrow program in December 2018 as a mechanism to offer customers loans in U.S. dollars (USD) using a customer's cryptocurrency as collateral for the loan.[95]  Cred marketed the program to customers as "cash on your crypto without cashing out," meaning that a customer could lend its cryptocurrency to Cred and receive payment streams from Cred, without having to sell the cryptocurrency.[96]

Under the CredBorrow program, customers would transfer their cryptocurrency to Cred, which would hold such assets in a Cred account (typically with an entity named BitGo), and receive a loan in USD from Cred.  CredBorrow loans would typically bear interest at between 9% and 14% on an annual basis, depending on the length of the loan and the underlying collateral.[97]  Cred also typically charged a 3% "origination" fee.  The credit line was available to

---

[94] Exhibit 36; Email from J. Alexander to K. Wong, Feb. 12, 2019 (Exhibit 39) (James Alexander sending samples of Cred's Enhanced Yield Agreement and Multi-Tranche Credit Agreement when asked for sample contracts for CredEarn and CredBorrow customers); Enhanced Yield Agreement for CredEarn Customers (Exhibit 40).

[95] CredEarn CredBorrow Information Sheet (Exhibit 35); Interview with Lu Hua, Chief Executive Officer, moKredit, Inc. (Feb. 18, 2021).

[96] CredBorrow Page, https://mycred.io/borrow/ (last visited Mar. 4, 2021).

[97] Exhibit 35; Standard Cred Multi-Tranche Credit Agreement at 2–3 (Exhibit 36).

CredBorrow customers for three years, with payments due annually.  The loan-to-value ratio was calculated on a monthly basis.[98]

After Cred received cryptocurrency assets through the CredBorrow program, it often converted the assets to USD or Stablecoin (USDT) – a cryptocurrency with a market value pegged to a "stable asset," in this case U.S. dollars – and used the proceeds to make loans to moKredit for interest rates typically ranging from 18% to 24%.[99]  The loan agreements between Cred and moKredit provided that moKredit had to return principal on the sooner of the maturity date of the loan or upon 30 days' notice at Cred's discretion.[100]

### (b)     CredEarn.

Schatt and Hua recognized that the CredBorrow business model was susceptible to the volatility of underlying cryptocurrency prices, which directly impact the collateral value of the loans.[101]  Following a significant drop in Bitcoin prices in 2018, Schatt and Hua began developing another business line that could, in theory, compliment the CredBorrow business and off-set certain of the risk attendant to that business.[102]

In February 2019, Cred launched its CredEarn program.  Under CredEarn, customers were offered the opportunity to earn interest on their cryptocurrency assets by depositing them with Cred for a predetermined period of time at a set interest rate (similar to a certificate of

---

[98] CredBorrow Page, https://mycred.io/borrow/ (last visited Mar. 5, 2021).

[99] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021); Interview with Daniel Schatt, co-Founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[100] *See, e.g.,* Exhibit 36; moKredit Tranche Agreement No. 29, May 1, 2019 (Exhibit 37).

[101] Interview with Daniel Schatt, co-Founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[102] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

deposit).[103] Cred would then convert cryptocurrency assets deposited under the CredEarn program into fiat currency and use the proceeds to make loans.[104] According to Cred's investment thesis, Cred would generate profits based on the spread between the interest rate offered to customers and the rate charged by Cred under the relevant loans.[105]

Cred boasted that customers would "still receive the upside potential of [their] crypto in a bull market."[106] Cred advertised that customer loans were used to lend and transact with a variety of customers, including retail borrowers and money managers, but not to short-sellers.[107] CredEarn contracts did not detail precisely how Cred intended to invest customer assets and made no mention of converting digital assets to USD/Stablecoin (USDT) and loaning those assets to a company in China.[108] As discussed further in Section V(B), the vast majority of CredEarn assets were utilized to make loans to moKredit.

CredEarn enrollment occurred on the 1st and 15th of every month, after Cred conducted a Know Your Customer ("**KYC**") check and executed a yield agreement with the customer.[109] Cred advertised the program on their website as a 6 month program, after which cryptocurrency was returned to the customer. Customers also had the ability to opt for a 3 month auto-enroll.[110] Contracts obtained by the Examiner provided that the agreements between the customer and

---

[103] Interview with Dan Schatt, co-Founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[104] Crypto-to-Fiat Process Diagram (Exhibit 175).

[105] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[106] CredEarn Page, https://mycred.io/earn/ (last visited Mar. 4, 2021).

[107] *Id.*

[108] Interview with Mr. M.M., Creditor and former customer, Cred Inc. (Feb. 18, 2021).

[109] CredEarn Process and Asset Flow (Exhibit 38).

[110] CredEarn Page, https://mycred.io/earn/ (last visited Mar. 5, 2021).

Cred were structured as so-called "Enhanced Yield Agreements" – agreements that linked to the performance of foreign exchange rates, and thus the potential for a higher return.[111]

In an effort to mitigate the risks associated with converting digital assets to fiat currency Cred established hedge positions through JST.  As explained in greater detail below, Cred's positions were intended to protect Cred in the event cryptocurrency prices increased, but created a risk if they decreased.

## V.    CRED'S OPERATIONS AND CIRCUMSTANCES LEADING TO THE FINANCIAL COLLAPSE

### A.    Cred's Business Functionality.

#### 1.    Cryptocurrency Asset Storage.

Cred held very few assets itself and, instead, worked with certain firms to, among other things, store and initiate transfers of Cred's cryptocurrency assets, typically through a digital "wallet" maintained with the firm.[112]  A digital wallet acts as a bank that allows one to deposit, withdraw, and make transactions with cryptocurrencies.[113]  Given that cryptocurrencies are not physical, all transactions are recorded on a ledger referred to as a blockchain.[114]  By providing a wallet address (every cryptocurrency wallet has a distinct address) an individual can transfer funds to that wallet.[115]  Given that all transactions are recorded on the blockchain, it is easy to

---

[111] Email from J. Alexander to K. Wong, Feb. 12, 2019 (Exhibit 39) (James Alexander sending samples of Cred's Enhanced Yield Agreement and Multi-Tranche Credit Agreement when asked for sample contracts for CredEarn and CredBorrow customers); Enhanced Yield Agreement for CredEarn Customers (Exhibit 40); Exhibit 36.

[112] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021); Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[113] Digital Wallet, https://www.investopedia.com/terms/d/digital-wallet.asp (last visited Mar. 7, 2021).

[114] What is Blockchain Technology, https://www.coindesk.com/learn/blockchain-101/what-is-blockchain-technology (last visited Mar. 7, 2021).

[115] *Id.*

28

track the total amount of funds designated to a particular wallet.[116]  Furthermore, an individual can possess as many digital wallets as he or she wants.[117]

(a)  **JST Capital.**

JST Capital was Cred's initial wallet provider through March 2020.  During that time, CredEarn deposits were often transmitted directly to a JST wallet.[118]  JST converted those deposits into USD/Stablecoin and then executed transfers with moKredit pursuant to Cred's loan agreements with moKredit.[119]  Under its arrangement with JST, Cred was unable to confirm receipt of funds for customers until JST sent confirmation that funds had been received.[120]

(b)  **Fireblocks.**

In or around February 2020, Cred began to transition from an exclusive relationship with JST.  Cred was looking to diversify its investment portfolio and wanted to find a new over-the-counter ("**OTC**") asset custodian that could both hold and facilitate the transfer of Cred's cryptocurrency.  At Schatt's direction,[121] Cred partnered with Fireblocks, an asset custodian that both holds and facilitates the transfer of cryptocurrency, to fill the company's OTC need.[122]  Cred entered into a licensing agreement with Fireblocks on February 21, 2020.[123]

---

[116] What is a Distributed Ledger, https://www.coindesk.com/learn/blockchain-101/what-is-a-distributed-ledger (last visited Mar. 7, 2021).

[117] Digital Wallet, https://www.investopedia.com/terms/d/digital-wallet.asp (last visited Mar. 7, 2021).

[118] Interview with Scott Freeman, JST Capital (Mar. 2, 2021); Chat Log between S. Zhang and T. Perez, Aug. 28, 2019 (Exhibit 41).

[119] Chat Log between S. Zhang and T. Perez, Jul. 8, 2019 (Exhibit 182) (confirming investments did not always go through Cred).

[120] Chat Log between S. Zhang and T. Perez, Dec. 4, 2019 (Exhibit 183).

[121] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[122] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

[123] Fireblocks License Agreement, Feb. 21, 2020 (Exhibit 43).

The Fireblocks licensing agreement required Cred to put in place adequate controls to avoid so-called "collusion risk" (i.e., the risk of double-spending cryptocurrency), including enacting protocols and procedures to ensure that passwords and recovery passwords were appropriately stored and tracked.[124]  In this respect, Daniyal Inamullah (at the time, Cred's Vice President of Capital Markets) recommended that Cred adopt certain procedures (e.g., joint password managers) to avoid potential collusion and other risks.[125]

Joe Podulka was the Fireblocks "workspace owner," which gave him responsibility for Cred's policies and configuration as they related to Fireblocks, including the decision of who at Cred could access the platform.[126]  Although Podulka appeared to agree with Inamullah's suggestion regarding joint password managers, the Examiner found no evidence that this policy was adopted.  Ultimately, Podulka, Inamullah, Alexander and Adnan Khakoo (a former fund accountant) had access to Cred's Fireblocks accounts and each had the ability to individually initiate transactions and make transfers with little or no oversight.[127]

To transfer assets, Inamullah, among others with access, digitally submitted transfer requests that were then confirmed or denied by the authorizer.  As a matter of informal policy, the initiator of the transaction was not permitted to also authorize the transaction.[128]  The sender usually transferred a small test amount to ensure the receiving wallet address was correct.  Upon confirmation, the sender then completed the transaction.[129]

---

[124] Exhibit 43 at 5.2.

[125] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

[126] Exhibit 43 at 5.9.

[127] Inamullah Dep. 218:11–17 (Exhibit 9).

[128] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[129] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

When a user sent funds from Fireblocks, the Fireblocks ledger would create an outgoing entry, and Cred's NetSuite accounting platform would record the date of the transaction and where the assets were sent. Fireblocks' system only recorded the destination wallet address.[130] It was the user's responsibility to manually input identifying information regarding the transaction.[131] That rarely occurred such that, according to Scott Wiley (Cred's interim CFO), the information in Cred's journal entries was not particularly meaningful.[132]

Although Inamullah personally adopted an informal policy of requiring two persons to effect transfers (one to authorize and one to initiate) to ensure oversight,[133] that practice was not adopted prior to Cred's transition to Fireblocks.[134] Even then, however, it is unclear whether it was more widely implemented or an effective control.[135]

As a general practice, Cred did not (had no mechanism to) distinguish between its assets in its Fireblocks accounts: (i) customers would transfer assets to Cred's digital wallets; (ii) Cred would transfer those assets to a central concentration account where such assets would be comingled with all other customer deposits; and (iii) Cred would send assets from the concentration account to various asset managers. The Examiner saw no evidence that Cred

---

[130] Interview with Tonia Tautolo, Interim Controller, Cred Inc. (Feb. 19, 2021).

[131] *Id.*

[132] Interview with Scott Wiley, interim Chief Financial Officer, Cred Inc. (Feb. 9, 2021).

[133] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

[134] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[135] The Examiner received conflicting reports on this issue. *Compare* [135] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021) *with* Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021). Also, Cred's interim Controller, Tonia Tautolo, explained that wallets could be "whitelisted," i.e., pre-approved, on Fireblocks prior to a transfer. It was Tautolo's understanding that a wallet address needed to be whitelisted on Cred's Fireblocks system before it could receive a transfer. *See* Interview with Tonia Tautolo, interim Controller, Cred Inc. (Feb. 19, 2021). However, Inamullah indicated that, although wallets could be "whitelisted," it was not a requirement in order to effect an outgoing transfer from a Cred Fireblocks accounts to a particular wallet. Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

distinguished between assets deposited through the CredEarn or CredBorrow programs (or any other programs).

To further complicate matters, customer deposits in Fireblocks were intended to be tracked only manually in an Excel ledger, which was maintained offline and not updated regularly.[136] Cred maintained certain client folders that contained contracts indicating how much certain customers had deposited, but the Examiner has not seen any evidence that Cred kept records of what assets were received in which wallet and when.[137] In all, Cred's comingling of its assets and absence of meaningful financial records made it impracticable for the company to discern whose assets belonged to whom.

Due to the lack of available information for transactions, the Examiner has significant concerns regarding the reliability of Cred's books and records regarding pre-petition transfers sent from Cred's Fireblocks account.

(c)     **Uphold.**

Uphold is a cloud-based asset platform that enables users to store, buy, and convert classes of assets.[138] At Cred's founding, Schatt served on Uphold's board of directors and later added Uphold as a partner for Cred in early 2019.[139] For Cred, Uphold assisted with operations and acted as its customer wallet.[140] Throughout 2019, Uphold was also one of Cred's primary

---

[136] Interview with Tonia Tautolo, interim Controller, Cred Inc. (Feb. 19, 2021).

[137] *Id.*

[138] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021); Uphold About Page, https://uphold.com/en/resources/about (last visited Mar. 4, 2021).

[139] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[140] *Id.*

sources of customer leads.[141]   When a customer bought cryptocurrency on Uphold, Uphold would display an advertisement referencing its partnership with Cred and representing that Cred products allowed Uphold customers to earn interest on their assets.[142]

According to Matt Foster (Cred's CRO), Uphold customers could participate in the CredEarn program directly through Uphold's platform (its web application).[143]   Uphold was a customer generator for Cred and also operated a wallet service similar to Fireblocks.   Under the customer agreements furnished to the Examiner, Cred retained the discretion to invest funds obtained from Uphold customers as it saw fit (no differently than any other CredEarn customer).[144]

### 2.   Diligence Process and Procedures.

As Cred's Chief Capital Officer, James Alexander was tasked with primary responsibility for diligence respecting Cred's investment partners.[145]   Alexander delegated diligence responsibilities to Inamullah, Cred's former Vice President of Capital Markets, who stated that, as of his arrival in January 2020, Cred did not have an effective diligence process with respect to its investments, "at least on paper."[146]   Although in his sworn deposition Inamullah stated that he was responsible for conducting diligence on behalf of Cred, in his interview with the Examiner, Inamullah disclaimed any responsibility for Cred's diligence function.[147]

---

[141] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[142] *Id.*

[143] Interview with Matthew Foster, Chief Restructuring Officer, Cred Inc. (Feb. 9, 2021).

[144] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[145] Inamullah Dep. 34:15–35:2 (Exhibit 9).

[146] *Id.* at 52:2–14.

[147] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

According to his deposition testimony, Inamullah adopted what can best be described as an informal process for vetting potential investment partners. When evaluating a potential asset manager, Inamullah explained that he would first exchange general compliance information with the party, including beneficial ownership information, background on the business itself, and basic financial information.[148] He would then run the beneficial owner names through the relevant anti-money laundering or KYC software, and contact others in the industry for references.[149] To log information related to a potential investment, Cred used an internal Google form.[150]

Inamullah stated that he would question asset managers about experience, strategies, and points of risk,[151] then would compile his findings into a brief investment proposal (typically 3-5 pages) for consideration by an informal "investment committee," consisting of Schatt, Podulka, Inamullah, Wheeler, and Alexander.[152] In his deposition testimony, Inamullah stated that he developed a diligence checklist to vet investment managers but, in his subsequent interview with the Examiner, he stated that no such list existed.[153] In any event, even in his deposition testimony, Inamullah stated that he rarely used a diligence list during his tenure,[154] and that he took few steps to validate information provided by asset managers.[155]

---

[148] Inamullah Dep. 42:15–44:1 (Exhibit 9).

[149] *Id.* at 30:20–25, 35:9–14; 42:15–44:1.

[150] *Id.* at 45:20–46:5.

[151] *Id.* at 42:15–44:1, 53:18–24.

[152] *Id.* at 42:15–44:1. It also appears that Khakoo, Sally Zhang (Senior Accounting Manager), Heidi Ng (Director of Product and Partner Integrations), and Karen Wong (Cred's Head of Finance / CFO prior to Podulka) attended at least some "investment committee" meetings. *See* Cred Investment Committee Meeting Minutes (Exhibit 44).

[153] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

[154] Inamullah Dep. 47:23–50:7 (Exhibit 9).

[155] *Id.* at 53:25; 60:15–20.

In his deposition, Inamullah stated that he and Alexander would supplement their diligence efforts by contacting attorneys for counter-parties and other industry professionals, seeking to verify information provided by an asset manager (e.g., corporate documents, financial statements).[156]  In all, the diligence process described by Inamullah was, in the Examiner's opinion, informal and appeared, in places, to be cursory.

### 3.    Financial and Accounting Practices.

The Examiner reviewed extensive records and conducted several interviews with key financial personnel, all of whom described incomplete or inadequate accounting practices at Cred.[157]  The Examiner's review of Cred's financial documents and transaction history confirmed significant gaps in Cred's accounting and record keeping practices, gaps that were confirmed by the Debtors' advisors, MACCO and Sonoran Capital Advisors.[158]

Although Cred had access to Oracle's NetSuite accounting software to produce financial statements, Cred appears to have relied principally on Microsoft Excel and Google Sheets in place of an integrated accounting function.[159] According to Paul Maniscalco and Pablo Bonjour, MACCO was unable to readily identify Cred's beginning cash balance upon initiating its work

---

[156] *Id.* at 53:25–60:14.

[157] Interview with Matthew Foster, Chief Restructuring Officer, Cred Inc. (Feb. 8, 2021); Interview with Scott Wiley, interim Chief Financial Officer, Cred Inc. (Feb. 9, 2021); Interview with Pablo Bonjour and Paul Maniscalco, Financial Advisors, MACCO, (Feb. 10, 2021); Interview with Tonia Tautolo, interim Controller, Cred Inc. (Feb. 19, 2021).

[158] Interview with Matthew Foster, Chief Restructuring Officer, Cred Inc. (Feb. 8, 2021); Interview with Scott Wiley, interim Chief Financial Officer, Cred Inc. (Feb. 9, 2021); Interview with Pablo Bonjour and Paul Maniscalco, Financial Advisors, MACCO, (Feb. 10, 2021).

[159] Interview with Pablo Bonjour and Paul Maniscalco, Financial Advisors, MACCO, (Feb. 10, 2021); *see, e.g.*, Email from S. Hwang to J. Podulka, Nov. 12, 2020 (Exhibit 45) (referencing Google Sheets); Schedule of Advances (Exhibit 46) (tracking all of Cred's tranches with moKredit in Excel); Email from J. Podulka to F. Cottrell and A. Khakoo, Nov. 18, 2020 (Exhibit 47) (referencing NetSuite); *see also* Accounting Software, Netsuite, https://www.netsuite.com/portal/products/erp/financial-management/finance-accounting.shtml (last visited Mar. 4, 2020).

with Cred due to incomplete accounting records.[160]   MACCO representatives had to manually determine Cred's cash balance by obtaining and/or creating financial statements.[161]

Cred's interim Controller, Tonia Tautolo, confirmed that Cred's financial records were in a state of disarray when she arrived in December 2020.[162]   Very few transaction records existed, and, in the instances where a transaction record did exist from Uphold or Fireblocks, Cred did not consistently input the statement information into its accounting system, leaving Cred's records incomplete and/or out-of-date.[163]   Instead, Cred attempted to track liabilities in what was referred to as the "Cred Ledger" in Excel, which Tautolo described as falling short of any reasonable accounting standards.[164]   As just one example, Cred relied on a series of Excel spreadsheets to track tens of millions of dollars' worth of transactions with moKredit.  Based on the evidence obtained by the Examiner, these spreadsheets appear to be Cred's only records of when funds moved between Cred, moKredit, and JST.

Further, it appears that Cred did not perform a financial reconciliation of any accounts for the 2020 financial year.   The Examiner was able to obtain only unaudited 2019 financial statements for Cred.[165]   It bears noting that, although MACCO could not identify the last point at which Cred had a complete and accurate records reconciliation, Armanino LLP – an independent accounting and business consulting firm – produced a signed audit report dated December 31,

---

[160] Interview with Pablo Bonjour and Paul Maniscalco, Financial Advisors, MACCO, (Feb. 10, 2021).

[161] *Id.*

[162] Interview with Tonia Tautolo, interim Controller, Cred Inc. (Feb. 19, 2021).

[163] *Id.*

[164] Interview with Tonia Tautolo, interim Controller, Cred Inc. (Feb. 19, 2021); Cred LLC General Ledger, 2020 (Exhibit 48).

[165] Cred Financial Statements, 2019 (Exhibit 49).

2018.[166]  Cred engaged Armanino to audit Cred's financial statements for the year ending December 31, 2019, but work papers that MACCO examined suggest that the audit was still on-going as of Cred's bankruptcy filing.[167]

Cred did not appear to regularly mark-to-market or record unrealized gains in any system.[168]  MACCO informed the Examiner that it did not find profit and loss or mark-to-market account entries in Cred's general ledger.[169]  According to Foster, Cred did not complete monthly account reconciliations,[170] which is also inconsistent with financial industry standards.[171]

### 4.    Insurance Coverage.

In soliciting customers, Cred advised potential customers that the company had "one of the most comprehensive insurance policies available,"[172] and provided information about its policies through its website.[173]    In certain instances, Cred claimed that customers' cryptocurrency investments were insured up to $100 million through industry-leading custodians like BitGo.[174] In communicating with certain customers, Cred further represented that its asset custodians –namely, BitGo and Bittrex – provided an extra layer of security through their own

---

[166] Exhibit 34.

[167] Email from J. Podulka to H. Moore and E. Rye, May 21, 2020 (Exhibit 50).

[168] Interview with Pablo Bonjour and Paul Maniscalco, Financial Advisors, MACCO, (Feb. 10, 2021).

[169] *Id.*

[170] Interview with Matthew Foster, Chief Restructuring Officer, Cred Inc. (Feb. 8, 2021).

[171] *Id.*

[172] Email from M. Zhang to M. Parrish, June 24, 2020 (Exhibit 59).

[173] Screenshot of Cred website discussing insurance policies (Exhibit 60).

[174] Screenshot of Cred website discussing partnership with BitGo (Exhibit 61); Email chain between M. Zhang and T. Miyauchi, June 19, 2020 (Exhibit 62).

insurance policies.[175]   Additionally, Cred touted its cyber hacking coverage obtained through Lockton.[176]

Snapshots from Cred's website are excerpted below:[177]



**Backup plans**
The blockchain, buttoned-up

Cred has one of the most comprehensive insurance policies available, including cyber hacking, E&O and regulatory coverage.

**Security first**
Decentralized doesn't mean dangerous

Cred works with trusted security and insurance providers Fireblocks to ensure that our customers' digital assets have enterprise-grade security. We are proud to be fully vetted and partnered with BitGo, Ledger, and Xapo, with BitGo and Ledger fully supporting the LBA token

Cred also sent customers links to blog posts and webpages with insurance information that, according to certain customers, led them to believe that their investment was fully protected by Cred's insurance policies.[178]   One customer noted that he placed confidence in Cred due to its "advertised claim to have 'industry leading' insurance."[179]   When another customer asked whether Cred would compensate for losses resulting from customers' Bitcoin being hacked or stolen, he was assured that, once assets were in Cred's custody, Cred took "full responsibility for [their] safety and redelivery."[180]

---

[175] Exhibit 59; Email from T. Perez to C.D. Nov. 14, 2019 (Exhibit 63); Email chain between M. Zhang and J.S., Apr. 15, 2020 (Exhibit 64).

[176] Exhibit 59.

[177] Exhibit 60; Exhibit 61.

[178] Exhibit 59; Interview with Mr. M.M., Investor, Cred. Inc., (Feb. 18, 2021).

[179] Email from D.F. to T. Perez, Nov. 8, 2020 (Exhibit 66).

[180] Exhibit 62.

Based on the information obtained by the Examiner, it appears that Cred's assertions regarding the strength and scope of its insurance coverage were inaccurate and/or overstated. Cred maintained several insurance policies that it acquired through Lockton Insurance Brokers, LLC ("**Lockton**").[181]   The policies in effect during 2020 were the following:[182]

- Commercial package from The Hartford Financial Services Group, Inc. ("**The Hartford**").[183]   Cred's commercial package from The Hartford provides general liability, property, automotive, and umbrella liability for a total premium of $4,121.[184]   The Hartford policy provides $2 million in general liability insurance for each occurrence with a general aggregate limit of $4 million.[185]   Cred's umbrella policy provides an additional $1 million coverage limit.[186]   Cred renewed its policy from The Hartford in 2020 to extend coverage through November 6, 2021.[187]

- Cyber liability from AXIS Insurance, which provides Cred with cyber liability coverage up to a $5 million limit for a total premium of $29,314.[188]   Although the AXIS policy covered certain events, including crisis management, fraud response, and business interruptions up to the full $5 million policy limit, its coverage for "social engineering fraud loss" was subject to a $250,000 coverage limit.[189]

- Errors and omissions ("**E&O**") from Validus Specialty ("**Validus**"), which provides $1 million of coverage for a total premium of $270,000.[190]   This policy does not cover third-party losses and contains a "Crypto Currency, Token or Coin Exclusion."[191]   That policy exclusion, applies to

---

[181] Lockton Summary of Insurance, 2020–2021 (Exhibit 51).

[182] Policy terms ran from October 2019 to October 2020 or January 2020 to January 2021.  In any event, the coverage periods encompassed all relevant events for the purpose of the insurance claim discussion. *Id.*

[183] Hartford Business Owners Policy, Oct. 1, 2020 (Exhibit 52); Hartford Workers' Compensation and Employers' Liability Busines Insurance Policy, Nov. 30, 2020 (Exhibit 53).

[184] Exhibit 51; Exhibit 52; Exhibit 53.

[185] Exhibit 51.

[186] *Id.*

[187] Exhibit 53.

[188] Certificate of Liability Insurance, Nov. 11, 2020 (Exhibit 54); Axis Insurance Policy (Exhibit 55).

[189] Exhibit 54; Exhibit 55.

[190] Validus Errors and Omissions Policy Declarations (Exhibit 56).

[191] Email from T. Khuu to B. De Lude, D. Schatt, and J. Podulka, Oct. 30, 2020 (Exhibit 146); Exhibit 56 at 31–32.

any claim arising out of "any investment of any kind, whether or not a security, that is in the form of crypto currency, crypto token or coin, digital token or coin" or "any theft, misappropriation, or conversion of any crypto currency, crypto token or coin, digital token or coin."[192]

- Directors and officers insurance ("**D&O**") from Validus, which provides $1 million in coverage for a total premium of $40,000.[193] This policy does not cover third-party losses and contains a cryptocurrency exclusion, as explained above.[194]

- Excess D&O insurance from Euclid Insurance, which provides an additional $1 million in coverage for covered losses exceeding $1 million, for a total premium of $35,200.[195]

- Coverage for lawyers from One Beacon Insurance, which provides $1 million in coverage for Cred's employed lawyers for a total premium of $4,957.[196]

### 5. Internal Compliance Function.

In 2018, Cred hired InnReg LLC ("**InnReg**") to assist Cred in developing internal compliance protocols addressing, among other things, information security, privacy, credit risk, and marketing products. However, it appears that, as late as June 2020, no compliance program had been created, let alone implemented.[197] In connection with the Investigation, the Examiner requested that Cred produce all of its internal policies concerning trading risk management and leverage limits, but was advised by Cred's counsel that no such document exists. The only responsive document that the Examiner received was an advertising and marketing policy.[198]

---

[192] Exhibit 146 (ellipses omitted); Exhibit 56 at 31–32.

[193] Validus Directors and Officers Policy Declarations at 3 (Exhibit 57).

[194] Exhibit 57 at 30–31.

[195] Euclid Financial Excess Insurance Policy (Exhibit 58).

[196] Exhibit 51; Exhibit 54.

[197] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[198] Cred Advertising and Marketing Policy (Exhibit 67).

As noted in Sections V(A) and V(F)(3), it appears that Cred's compliance policies with respect to asset transfers were deficient.  Inamullah once observed that Cred did not "have robust (or for that matter, any) reporting from [its] primary lender (MoKred) which [made] up ~50% of [its] portfolio."[199]

In June 2020, Cred hired Bethany De Lude to be the company's Chief Information Security Officer.  After reviewing Cred's internal controls and procedures, De Lude promptly imposed background checks for all employees and vendors of Cred.  Up to that time, this was not a function Cred was performing.[200]

### B.      Cred's Relationship and Dealings with moKredit.

#### 1.      moKredit, In General.

After leaving PayPal in 2011, Lu Hua founded moKredit Inc. to facilitate payment systems for the emerging Chinese mobile gaming market.[201]  Hua recruited early PayPal co-workers to join his venture,[202] and the company raised money from angel investors and venture capitalists.[203]

Through moKredit, Hua sought to build a peer-to-peer payment application to connect mobile game customers with developers, while providing an alternative to credit cards for online payments.[204]  By initial design, moKredit served as an intermediary that collected a service fee

---

[199] Email from D. Inamullah to D. Kline, July 6, 2020 (Exhibit 68).

[200] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[201] Exhibit 3 at 3; Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[202] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[203] Exhibit 3 at 6–7.

[204] Exhibit 3 at 6–7.

from borrowers for each loan it originated.[205]  The premise for the company was that a customer could submit a short application online, which allowed moKredit to perform a quick credit check and then offer a credit line to mobile users based on the data output.[206]  While moKredit initially offered lines of credit ranging from $1.45 to $145, the company soon scaled up to offering loans from $20 to $1,000.[207]  Customers would use the credit line subject to a 7-, 14-, or 30-day repayment term.[208]

From 2013 to 2014, moKredit's mobile platform experienced rapid growth.[209]  However, the original intermediary concept appeared to reach a plateau after larger competitors entered the market.  In response, moKredit pivoted its business model to focus on microcredit lending.[210]  After ramping up in 2016, moKredit's business proved to be, at least initially, successful, generating 510 million RMB ($78 million) of revenue, 174 million RMB ($26.5 million) of gross profit, and 93 million RMB ($14 million) of net profit in 2017.[211]  Increased competition cut into moKredit's business by 2018, but the company remained profitable.[212]

By this time, moKredit sought to expand its operations, with funding organized through a pool of lenders led by credit unions and high net worth individuals.[213]  To access funds,

---

[205] *Id.* at 9.

[206] *Id.* at 7.

[207] Exhibit 3 at 7; Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[208] Exhibit 3 at 7–8.

[209] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[210] Exhibit 3 at 3.

[211] *Id.* at 12–13.

[212] *Id.*

[213] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

42

moKredit traditionally paid funding costs ranging from 10-15% to its lenders.[214]  moKredit capitalized on a significant spread between its borrowing costs and rates at which it loaned funds to customers, which were as high as 36%[215] on an annual basis.[216]

### 2.    Cred's Business Dealings with moKredit.

On December 27, 2018, Cred entered into its first loan and security agreement with moKredit.[217]  Pursuant to the agreement, Cred extended a $100 million line of credit to moKredit.[218]  JST was Cred's "paying agent" in connection with its lending arrangement with moKredit.[219]  JST received interest payments from moKredit in USDT and subsequently converted and transferred funds back to Cred in USD.[220]  JST was paid a percentage of the funds managed based on a monthly "profit share" fee agreement.[221]

In early 2019, Cred began "investing" converted fiat currency from its cryptocurrency assets with moKredit.[222]  As Schatt described the deal between the companies, Cred could allocate funds to moKredit at an agreed-upon interest rate – starting at 18-24% per annum and dropping to 12-18% per annum over time[223] – with a callable period within each tranche.[224]

---

[214] Id.

[215] Initially, moKredit lent against interest rates as high as 80% until the Chinese government capped consumer interest rates at 36%.  Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[216] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[217] Exhibit 5.

[218] Id.

[219] Exhibit 11.

[220] Exhibit 12.

[221] Exhibit 11; Exhibit 13.

[222] Schatt Decl. ¶ 19 (Exhibit 1); Exhibit 46.

[223] Schatt Decl. ¶ 19 (Exhibit 1); Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[224] Schatt Dep. 47:18–48:14 (Exhibit 4).

Cred controlled the allocations, which required moKredit to make monthly interest payments on the principal and send principal back upon Cred's request.[225]   Cred took cryptocurrency it received from its customers and converted it to fiat currency before transferring it through a series of entities – including JST as Cred's broker – to moKredit.  moKredit lent out fiat currency in China (typically through short-term, high interest rate microloans) before returning interest to Cred every 15 days.[226]



Transactions between Cred and moKredit initially reflected attributes of formal arm's-length dealing, with funds frequently sent back and forth, typically through JST as Cred's broker.[227]   Cred and moKredit soon shifted to a more casual style of business dealings, often without "proper controls" (e.g., transferring funds before receiving a signed tranche agreement;

---

[225] *Id.*

[226] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021); Exhibit 175.

[227] *See, e.g.*, January 2019 transaction documents: Email from K. Wong to L. Hua, Jan. 15, 2019 (Exhibit 70); Exhibit 12; Email from J. Alexander to L. Hua and K. Wong, Jan 22, 2019 (Exhibit 71); Exhibit 11.

not issuing monthly statements for moKredit's loan balance).[228]  This might be explained by the companies' connectivity through Hua, even though they were not otherwise legally affiliated. The lack of formality caused confusion about finances and how to account for different payments that the companies routinely sent back-and-forth.[229]  Nevertheless, Cred's book of loans to moKredit rapidly grew to approximately $20 million by May 2019 and $40 million by September 2019.[230]  As Cred's book of loans to moKredit grew, so too did Cred's risk.[231]

### 3. Cred's Failed Attempts to Withdraw moKredit Investments.

According to Schatt, by the fourth quarter of 2019, Cred had stopped allocating new funds to moKredit in a purported effort to diversify Cred's asset managers.[232]  However, based on the evidence obtained by the Examiner, it appears that allocations to moKredit did not end until the January 2020 timeframe.[233]  The majority of Cred's assets were already loaned to

---

[228] Email from K. Wong to S. Zhang and J. Alexander, Feb. 4, 2019 (Exhibit 72).

[229] Email from K. Wong to L. Hua and D. Schatt, Feb. 13, 2019 (Exhibit 73) (Wong asked, "are we accounting for the loan as a fixed $1.5M or a USD equivalent of an RMB amount?"); Email from K. Wong to H. Ng, J. Alexander, and S. Zhang, Feb. 14, 2019 (Exhibit 74) (Wong: "Although MoKredit will be signing another loan agreement for the amount of the funds, we will not be sending the funds to them this time around as they are paying down the principal on tranche 3."); Email from J. Alexander to K. Wong, Feb. 15, 2019 (Exhibit 75) (Alexander asked Wong: "How do you want to do the accounting for this tranche? Are we adding this as another loan to MoKredit? Or reducing the interest payable on others?" Wong replied, "We agreed to consider this a paydown of principal on tranche 3 (the $1.5M loan), but we also still need to consider it another loan to MoKredit in order for the numbers to foot, right?").

[230] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (February 18, 2021); Schedule of Advances (Exhibit 46).

[231] See Email from J. Alexander to K. Wong, May 21, 2019 (Exhibit 77) (Alexander raised inconsistencies or incomplete information in Cred's financial reports to Wong and Schatt: "I recall an initial advance to Cred of about $750k in March, which was to be repaid by the T3 $790k you reference. However, an additional $500k was advanced to Cred. We need to account for any advances to Cred within our loan book. Can you help reconcile the amount please?").

[232] Schatt Dep. 42:13–20 (Exhibit 4).

[233] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Exhibit 46 (last transaction logged is on Jan. 1, 2021).

moKredit.[234]  Thus, when Cred experienced a sudden and increased need for liquidity (discussed further in Section V(C)(1)), it was largely reliant on moKredit to make principal payments on loaned funds.[235]

On or about March 12, 2020, Cred attempted to recall $10 million in principal from moKredit, but Hua responded that it was not possible.[236]  moKredit's inability to repay the loan when requested was attributed in part to the economic fallout from the COVID-19 pandemic, including large default rates (e.g., 50% - 70%) among moKredit's microloans and the Chinese government's unwillingness to enforce consumer loan agreements.[237]

moKredit's failure to repay the requested principal when called by Cred had a significant and adverse impact on Cred's liquidity and cash flow position.[238]  Cred's executive team agreed to an updated plan with Hua for moKredit to repay principal about 10 days later, but moKredit failed to meet the updated plan's schedule.[239]  Instead, at Alexander's request, Hua offered personal assistance in the form of a transfer of 300 BTC (discussed further in Section V(E)).[240]  Hua alleges that this transfer "was intended as a loan," notwithstanding that Hua signed a Cred

---

[234] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[235] Schatt Dep. 70:17–72:24 (Exhibit 4).

[236] Email from J. Alexander to L. Hua, D. Inamullah, S. Zhang, and J. Podulka, Mar. 12, 2020 (Exhibit 79); Inamullah Decl. ¶ 14 (Exhibit 6).

[237] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021); Inamullah Dep. at 77:16–19 (Exhibit 9).

[238] Liquidity Analysis Post March 2020 Flash Crash and Recommended Steps, Apr. 5, 2020 (Exhibit 113); Inamullah Dep. at 113:25–114:7 (Exhibit 9).

[239] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021); Inamullah Decl. ¶ 10 (Exhibit 6).

[240] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

Capital equity contribution agreement in or around this time exchanging 300 Bitcoin for class B non-voting shares in Cred Capital.[241]

As Bitcoin prices plummeted in March 2020, Cred encountered substantial margin calls in connection with its hedge positions, further eroding Cred's liquidity profile. With a significant portion of its asset base invested with moKredit and, at the time, yielding no return, Cred did not have sufficient liquidity to satisfy the margin calls or reinstate its hedge positions. By June 2020, Cred recognized internally that its moKredit loans were "distressed."[242] As of the Petition Date, moKredit owed Cred no less than $38 million.[243]

### 4. Potential Conflicts of Interest.

As the founder of moKredit and co-founder of Cred, Hua consulted his personal counsel to determine whether a conflict of interest existed.[244] He purportedly received guidance that, so long as he was only a shareholder in Cred and stayed away from so-called "big" operations, there was no conflict.[245] The Examiner has not seen evidence of Board minutes or other customary documents reflecting the Board's decision-making process. The only "minutes" the Examiner received were those attributed to the "investment committee," which was not a Board committee.

---

[241] Schatt Dep. 73:22–23 (Exhibit 4); Contribution Agreement between L. Hua and Cred Capital, LLC, Mar. 31, 2020 (Exhibit 80). Hua claims that he did not read the relevant agreement with any level of scrutiny before signing. Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[242] Email from D. Schatt to D. Wheeler, June 16, 2020 (Exhibit 81); Email from D. Inamullah to D. Schatt, J. Podulka, and A. Khakoo, June 29, 2020 (Exhibit 82).

[243] Email from J. Podulka to D. Schatt, Dec. 1, 2020 (Exhibit 83); Cred Near Term Liquidity Analysis, Nov. 7, 2020 (Exhibit 84).

[244] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[245] *Id.*

Hua was, however, one of two members of Cred's Board from its inception until the eve of bankruptcy in November 2020.[246] The Examiner has not been furnished with any information explaining how a Board of two directors could function effectively when one director must be recused from "big" operational issues.

According to Hua, he delegated all decision-making regarding loan amounts and timing to Cred employees after advising them how much capacity he had to take on loans at moKredit.[247] Additionally, Hua states that he ensured that Cred would have the highest priority if it had to call back funds.[248]

The issue of a potential conflict of interest came to a head when moKredit became unable to repay principal.[249] Hua could not identify a serious recourse path for Cred to recall money from moKredit if moKredit was unwilling or unable to repay principal.[250] Schatt confirmed that discussions took place internally about retail customer funds being loaned to an insider-affiliate company that could not repay.[251] Schatt acknowledged that Cred never hired an independent financial advisor to review proposed transactions with moKredit, nor did it seek a fairness opinion.[252] However, Schatt advised the Examiner that he had a level of comfort based on

---

[246] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021); Email from L. Hua to D. Schatt, J. Grogan, and M. Zuppone, Nov. 4, 2020 (Exhibit 179).

[247] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[248] *Id.*

[249] *Id.*

[250] *Id.*

[251] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[252] Schatt Dep. 45:23–46:2 (Exhibit 4).

Cred's supposed long-term relationship with Hua,[253] and because Hua was purportedly not involved in Cred's day-to-day operations.[254]

### 5. Diligence and Risk Management Respecting moKredit.

Schatt informed the Examiner that he removed himself from the moKredit due diligence process due to his relationship with Hua, leaving Alexander to manage such efforts.[255] This, again, raises serious questions of Board functionality and business oversight. Schatt represented that, at an incipient stage of this relationship, he sought legal advice from external counsel on a number of issues regarding Cred's interaction with moKredit, including whether there were potential conflicts of interest and what disclosures Cred would need to provide customers.[256] According to Schatt, Cred relied on Wheeler to draft the company's disclosures to customers.[257] Schatt also claims that he consulted external counsel on whether the moKredit loan could be considered a security and whether a partner could be considered a loan broker and therefore subject to lending regulations.[258] moKredit did not have any financing licenses in China, but

---

[253] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[254] *Id.*

[255] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Schatt Dep. 44:23–47:17 (Exhibit 4) (Alexander "was responsible for the whole due diligence and formulation of the relationship and the contract and evaluating the terms" with moKredit); Schatt Dep. 55:1–7 (Exhibit 4) (confirming Alexander "was the only employee who performed the analysis of due diligence" of moKredit "in collaboration with counsel").

[256] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021). Based on the information provided to the Examiner, the external counsel referenced in this paragraph was not the Debtors' current bankruptcy counsel retained in these Chapter 11 cases.

[257] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[258] *Id.*

Cred and moKredit believed that moKredit did not need a license because, according to them, moKredit fell into China's largely unregulated peer-to-peer lending sector.[259]

Alexander appears to have performed minimal (if any) due diligence with respect to moKredit.[260]   The Examiner's review of records and interviews failed to reveal evidence of substantive due diligence in connection with the moKredit relationship, other than Alexander's representations of having done "exhaustive diligence."[261]   It does not appear that Cred's Board ever formally approved any moKredit agreements or business dealings.[262]

According to Schatt, Alexander's diligence of moKredit included reviewing financial statements and an investor presentation.[263]   Schatt stated that he tasked Alexander with setting up a data room and ensuring that Cred had an appropriate understanding of moKredit's risk profile and the people to whom it lent funds.   Schatt was, however, unaware whether Cred received documentation or information regarding moKredit's outstanding consumer loans, and the Examiner did not find evidence of any such records.

### 6.    Disclosures to Customers Regarding moKredit Relationship.

To raise capital for the moKredit loan, Cred needed to raise funds.   Cred, primarily through Alexander, spent the first quarter of 2019 marketing its business thesis to cryptocurrency

---

[259] Email chain between J. Alexander and A. Derar, Apr. 16, 2019 (Exhibit 85); Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[260] Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021); *see also* moKredit Diligence Checklist, Feb. 11, 2019 (Exhibit 180) (nearly blank due diligence checklist dated after Cred began loaning moKredit funds).

[261] Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021).

[262] Schatt Dep. 44:23–45:3 (Exhibit 4).

[263] *Id.* at 46:20–47:2.

holders.[264]   According to its pitch materials, Cred operated similar to a commercial bank –
offering something akin to certificates of deposit to cryptocurrency customers who lent their
assets to Cred through the CredEarn program.  Cred would then lend such assets to moKredit at a
higher rate (typically 20%) until Cred had to return the cryptocurrency "deposit" back to its
customer.[265]   Cred offered retail customers up to a 10% return on their cryptocurrency if they
agreed to lock up the funds with Cred for at least 6 months.[266]  Cred's return came in the form of
the spread between the 20% interest paid by moKredit to Cred, and the return paid by Cred to its
customers.[267]

The Investigation did not reveal evidence that Cred disclosed to retail customers that
funds would be going to China or to an entity founded by a Cred insider.[268]  Cred's culture, at
least at times, appeared to promote secrecy rather than transparency when potential customers
asked questions regarding their assets and the company's investments.[269]  One Cred employee
expressed concern that, "if I were reading [a statement on Cred's website that pledged assets
were loaned 'on a fully collateralized and guaranteed basis'] as a consumer, and I later learned

---

[264] *See, e.g.*, Email from J. Alexander to J. Bunting, Mar. 14, 2019 (Exhibit 86); Email chain between J. Alexander and R. Flowers, Mar. 15, 2019 (Exhibit 87); Email from J. Alexander to D. Davis, Mar. 14, 2019 (Exhibit 88); moKredit Investment Opportunity Slide Deck, Mar. 2019 (Exhibit 89).

[265] UST Motion (Exhibit 27) ¶ 10; *see also* Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[266] UST Motion (Exhibit 27) ¶ 10; *see also* Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[267] Inamullah Decl. ¶ 10.

[268] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[269] Cred Employee Chat Logs, Mar. 26, 2019 (Exhibit 90) (Meghan LNU writes: "We should not be disclosing to the public where exactly we are using the assets to generate interest rates." Rafael Cosman: "I have not disclosed anything from any conversations with James to the public and I do not intend on doing so. But I'm concerned because if I were reading that as a consumer, and I later learned all the details of Cred's business, I think I would feel like I was misled.").

all the details of Cred's business, I think I would feel like I was misled."[270]  Another employee cautioned not to disclose "public[ly] where exactly we are using the assets to generate interest rates."[271]  Alexander did disclose to certain potential customers that Cred was raising funds to send to moKredit in China, most notably in connection with placement of the Luxembourg Bonds.[272]

### 7.    Luxembourg Bonds.[273]

In late 2019, Alexander identified Income Opportunities (Luxembourg) S.A. ("**Income Opportunities**"), a Luxembourg company "acting through its compartment" Cred Global Notes 1,[274] as an entity that might issue bonds backed by moKredit loans.[275]  Alexander was a director on the Income Opportunities board of directors.[276]

The initiative culminated in the issuance of $14 million worth of bonds bearing interest at 8%.[277]  According to Inamullah, prior to the issuance, Cred's principal loan balance with moKredit was approximately $40 million.  Cred essentially securitized approximately $15 million of this exposure, selling $14 million of this receivable to investors through bonds issued by Income Opportunities.  Cred retained approximately 10% of the securitization (i.e., the "equity tranche").

---

[270] *Id.*

[271] *Id.*

[272] *See, e.g.*, Exhibit 86; Exhibit 87; Exhibit 88.

[273] The information contained in this section is based on a review of all relevant documentation available to the Examiner at the time of drafting.  To date, the Examiner has not received, nor reviewed, copies of the individual notes issued under this program.

[274] Income Opportunities Board Minutes, Feb. 4, 2020 (Exhibit 91).

[275] Schatt Dep. 58:19–62:8 (Exhibit 4).

[276] Exhibit 91.

[277] Schatt Dep. 58:19–62:8 (Exhibit 4).

Alexander and Cred's capital markets team were responsible for overseeing funds received in connection with the bond offering.[278]  At least two entities purchased the bonds from Cred: JST[279] and Winslow Strong, an individual investor.  JST purchased approximately $9 million worth of bonds in Bitcoin, and Strong purchased 500 BTC worth of bonds in January 2020.[280]

The issued bonds were structured as participation interests in moKredit loans, meaning Income Opportunities was responsible for collecting from moKredit upon redemption.  According to the Base Prospectus, Cred was not a guarantor or an obligor in any other way respecting the Luxembourg Bonds.[281]  By the maturity date (June 30, 2020), Cred was aware of moKredit's inability to pay any meaningful amount of its principal balance owed, let alone between $14 million and $15 million; but, according to the Base Prospectus, it bore no liability if the Luxembourg Bonds defaulted.  Regardless, Cred agreed to purchase the bonds at par,[282] thereby buying back more than $14 million dollars of debt it knew could not be repaid.[283]  As discussed in the next section, Cred was facing an acute liquidity crisis of its own at the time of this purchase.

---

[278] *Id.*

[279] JST may have functioned as a broker/dealer, i.e., holding the bonds while attempting to sell them to other investors.

[280] Spreadsheet concerning W. Strong's investment (Exhibit 92).

[281] *See* Exhibit 2.

[282] Email chain between A. Khakoo, H. Ha, D. Inamullah, and M. Zhang, June 30, 2020 (Exhibit 42).

[283] Based on the terms of the Prospectus and Participation Agreements, it appears that Income Opportunities was responsible for redeeming the bonds at the maturity date and failure to do so would result in Income Opportunities' default. *See* Exhibit 2.  However, the Examiner neither received nor reviewed the actual notes issued to investors, and therefore cannot say, with a reasonable degree of certainty, whether Cred had any obligation under the bonds.

C.    **Cred's Pre-Petition Losses and Liquidity Crisis.**

1.    **JST Capital.**

Notwithstanding representations to the market, Cred's actual business operations carried significant risks associated with the volatility of digital currency.  Converting digital currency to fiat currency compounded that risk.  Cred's practice was to do just that.  As part of CredEarn, Cred converted customers' cryptocurrency to fiat currency and then loaned the proceeds to moKredit, which would, in turn, extend microloans (presumably far and wide) in fiat currency. Cred sought to mitigate the risk inherent in this strategy by hiring JST as a consultant to assist Cred with a hedging platform.[284]  Illustration 1 below shows Cred's hedged investment strategy with respect to CredEarn.

**Illustration 1**



---

[284] Inamullah Dep. 105:8–14; 110:4–17 (Exhibit 9) ("[W]e're essentially taking cryptocurrency liabilities in the form of CredEarn participations and translating that into a dollar asset, which is – in moKred.  Now, if crypto starts to rise, we will not be able to return the same number of cryptocurrency units back to the customer if we do not hedge the upside exposure.").

Illustration 1 explains by way of hypothetical.  As part of the CredEarn program, Cred hypothetically received a 100 Bitcoin cryptocurrency investment from a customer.  Cred then took 60 Bitcoin from that investment and converted it into a USD Stablecoin, which it then loaned to moKredit.  moKredit, in turn, converted these funds to Yuan and loaned the proceeds to consumers through microfinance loans in China.

Not depicted in Illustration 1 are the payments from moKredit to Cred, which would be expected to come in the form of interest and principal repayments in USD Stablecoin.  These payments from moKredit would then be converted back into Bitcoin, which Cred would use to make payments to the customer in respect of the 100 Bitcoin that had been transferred to Cred.

In the hypothetical above, the 60 Bitcoin is converted into USD Stablecoin at an exchange rate of $8,700.  This yields $522,000 worth of USD Stablecoin.  If the price of Bitcoin was fixed against the U.S. dollar (and did not change at all between the time when the 100 Bitcoin investment was initially made by the customer, and when then investment was fully repaid by Cred), then all interest payments and principal repayments would take place at the same exchange rate.  In this scenario, Cred would not need any hedges because the exchange rate between Bitcoin and U.S. dollars remains constant.

However, the price of Bitcoin is not fixed against the U.S. dollar and can fluctuate, sometimes significantly, on a daily basis.  If the price of Bitcoin were to increase against the U.S. dollar, then Cred would have less principal and interest to repay the customer.  Conversely, if the

price of Bitcoin were to decrease against U.S. dollar, then Cred would have a surplus of Bitcoin and could repay the customer in full with an excess amount.[285]

Cred purported to minimize risks from fluctuations in the exchange rate. In an effort to achieve a fixed exchange rate, Cred purchased hedging contracts. The hedging contracts were intended to provide Cred with, in effect, a fixed exchange rate based on the time the customer deposited assets and the time Cred loaned the proceeds of such assets to moKredit.

Returning to Illustration 1, Cred used 20 Bitcoin out of the 100 Bitcoin investment to buy hedging contracts. These hedging contracts were generally in the form of futures, swaps, and options contracts. In the hypothetical, Cred used the 20 Bitcoin to buy futures and swaps contracts to fully hedge the 60 Bitcoin it had lent to moKredit. Because Cred was using 20 Bitcoin to hedge the 60 Bitcoin that it had lent out to moKredit, Cred was effectively using a leverage ratio of 3x to achieve this hedge. Illustration 2 below shows how the value of Cred's position would change with changes in the price of Bitcoin.

---

[285] This is similar to fluctuations in price a person who lives and works in the United States and earns in U.S. dollars would experience when trying to book a hotel in London. The price of the hotel in London would be quoted in British Pounds and therefore the price in U.S. dollars would fluctuate with changes in exchange rates between U.S. dollar and the British Pound. If the U.S. dollar went up in value against the British Pound, the hotel would be cheaper in U.S. dollar terms (i.e., it would take fewer U.S. dollars to book a night at the hotel). Conversely, if the U.S. dollar went down in value against the British pound, the hotel would be more expensive in U.S. dollar terms (i.e., it would take more U.S. dollars to book a night at the hotel). Staying with this example, if the exchange rate between the U.S. dollar and British Pound was 1:1 (meaning someone can purchase 1 British Pound using 1 U.S. dollar) and if one night at the hotel in London cost 100 British Pounds, the equivalent cost in U.S. dollars would be USD 100. However, if before the hotel room was booked the price of U.S. dollars went up by 5%, then the hotel room would be worth USD 95, even though the price in British Pounds was still 100 pounds. Similarly, if the price of U.S. dollars went down by 5%, then the hotel room would be worth USD 105, even though the price in British Pounds was still 100 pounds.

**Illustration 2**



Considering the first panel in Illustration 2, the 100 Bitcoin received by Cred is its liability since it has to pay this amount back to the customer at the end of the term of the loan. When the loan was made, Cred took 60 Bitcoin and converted it to USD Stablecoin at a rate of $8,700.  In doing so it received $522,000 in USD Stablecoin.  The first panel illustrates the change in value of the $522,000 as the value of Bitcoin changes.  Without any hedges, if the price of Bitcoin were to drop by 20% to $6,960, Cred would need only $417,600 in USD Stablecoin to repay the 100 Bitcoin that the customer invested.  Principal repayments from

57

moKredit would have been $522,000. Therefore, in this scenario, Cred would have a surplus. Conversely, if the price of Bitcoin were to increase by 20% to $10,440, Cred would need $626,400 in USD Stablecoin to pay the 100 Bitcoin. Since moKredit was paying only $522,000, in this scenario, Cred would have a loss.

The second panel illustrates the performance of the hedging contract. As the price of Bitcoin goes up or down, the value of the hedging contract also goes up or down proportionately.

The third panel illustrates the performance of both the 60 Bitcoin liability and the hedging contract. Because the hedge goes up in value on a dollar for dollar basis as the liability goes down, and similarly the hedge goes down in value on a dollar for dollar basis as the liability goes up, the net effect of both positions is that the value of the 60 Bitcoin when converted to USD Stablecoin, loaned to moKredit, returned back to Cred from moKredit and then converted back from USD Stablecoin into Bitcoin, does not change. The transaction is, in this example, considered effectively hedged.

Illustration 3 below demonstrates Cred's net profit and loss on the 100 Bitcoin investment from the customer in Illustration 2, after considering all hedges, interest payments received from moKredit, and interest payments made to the customer. As can be seen, Cred pays 10% to the customer on 100 Bitcoin, and receives 20% on the 60 Bitcoin from moKredit. Because the transaction is fully hedged, there are no profits or losses from any change in the price of Bitcoin. The net profit to Cred in this simplified example after paying interest and principal to the customer is 2 Bitcoin.

58

**Illustration 3**

| All amounts are in Bitcoin | Principal | Annual Interest Rate | Interest at end of 1-year | Total (at end of 1-year) |
|---|---|---|---|---|
| Investment received from Customer | 100 | | | |
| Total Funds paid to Customer | | 10% | 10 | 110 |
| | | | | |
| Funds sent to moKredit | 60 | | | |
| Funds received from moKredit net of hedges | | 20% | 12 | 72 |
| Reserve | 20 | 0% | 0 | 20 |
| Margin returned after closing hedge | 20 | | | 20 |
| Total Funds Received | | | | 112 |
| | | | | |
| **Profit/Loss** (ignoring hedging costs and other operating costs) | | | | **2** |

In the simplified example above, once Cred has established its hedging position using 20 Bitcoin to hedge the 60 Bitcoin it had converted to USD Stablecoin, it was fully protected irrespective of any price movements in Bitcoin.

In reality, however, the hedge positions implemented by Cred only protected Cred from a certain amount of decline in Bitcoin prices. This is because, as the price of Bitcoin would decrease, the value of the hedge would become more and more negative. And, because of the 3x leverage, the 20 Bitcoin that had been used as collateral (also known as "margin") to acquire the hedge position would not be sufficient to continue maintaining the hedging position. If the price of Bitcoin were to fall below a particular threshold, the exchange where the hedge had been established could either: (i) issue a "margin call" that would require Cred to post additional collateral; or (ii) in the absence of additional collateral being posted, liquidate the hedge position.

If a hedge position was liquidated, Cred would first experience a loss on the hedge position and, if it was not able to reestablish the hedge position, it would no longer be able to repurchase Bitcoin at the price at which it had originally borrowed funds from the customer. As a result, if Bitcoin prices were to rise above the price at which Cred had borrowed from the

59

customer ($8,700 in the hypothetical above), assuming the hedge position was liquidated and not subsequently reestablished, then Cred would suffer a loss and may not be able to return the funds. As discussed further below, between March 11, 2020 and March 12, 2020, Bitcoin prices experienced a sharp decline (i.e., a "flash crash"), which ultimately resulted in the termination of Cred's hedges.

At this point, it bears particular observation that none of the risks associated with exchange rates were contractually allocated to any of Cred's customers. Cred did not, for example, covenant to certain levels of hedging responsibility, leaving customers to "own" losses beyond those levels. Rather, to the best of the Examiner's knowledge,[286] Cred assumed all risks associated with currency fluctuations. During interviews with Cred customers, the Examiner was told repeatedly that this was an important attribute of Cred's marketing appeal; it was, essentially, a commitment to customers that Cred would alone "own" this kind of market exposure.

To help implement its hedging strategy, Cred retained JST in late 2018.[287] JST helped Cred establish its hedges using swaps, futures and option positions,[288] and sent daily "Risk

---

[286] *See* n.3.

[287] JST Consulting Agreement, Dec. 25, 2018 (Exhibit 93).

[288] A swaps position is generally a contract where two parties agree to exchange cash flows from two different financial instruments. For example, an investor may agree to exchange principal and interest payments on a loan in one currency for payments and interest on a loan in another currency. A swaps position typically requires parties to post margin. If the value of the swaps position falls/rises below a certain threshold, the party that has experienced losses may need to post additional margin, in the absence of which the position would likely be liquidated by the counterparty. A futures position is generally a standardized contract that allows the parties to buy or sell a particular asset or security at a predetermined price at a specified time in the future. Like the swaps position, a futures position also typically requires parties to post margin. And like the swaps positions, if the value of the futures position falls/rises below a certain threshold, the party that has experienced losses may need to post additional margin, in the absence of which the position would likely be liquidated by the counterparty. An options position gives the owner of the option the right to either buy (call option) or sell (put option) the underlying position at a fixed price within a certain amount of time. The buyer of the option pays the seller of the option a "premium" for that right. The price of a call option goes up in value as the price of the underlying instrument increases. The price of a put option

Reports" to Cred, detailing Cred's hedge positions and Cred's exposure to liabilities based on Cred's cryptocurrency holdings.[289]

As of February 28, 2020, Cred had transferred digital assets valued at between $71.6 million (market value) and $74.7 million (inception value) to JST.[290]   Once JST received the assets, they were allocated as follows:

- JST converted $44 million worth of cryptocurrency received from Cred into USD/Stablecoin (e.g., USDT), the majority of which was transferred to moKredit pursuant to loan arrangements with Cred;

- JST allocated/tracked funds to margin accounts of certain exchanges (including Bittrex, Huobi and Drawbridge) to allow JST to trade on behalf of Cred; and

- JST entered into options, futures and swap transactions for the purpose of hedging Cred's portfolios and generating cash for Cred.[291]

Based on the above allocation of funds, including the hedges established, Cred was essentially fully hedged on a $74.7 million loan book.   Therefore, excluding large price movements that would require the posting of additional collateral in its margin account, Cred was protected from Bitcoin price movements.

JST established hedge positions on various cryptocurrencies for Cred.[292]   Bitcoin, XRP, Ether and Bitcoin Cash were used to establish the majority of the positions.   By February 28, 2020, the market value of Cred's hedge positions was: negative $4,511,511 for swaps,

---

increases in value as the price of the underlying instrument decreases.  The maximum loss to the buyer of the call and the put options is limited to the premium amount paid by the buyer to the seller of the option.

[289] Interview with Scott Freeman, co-founder and Partner, JST Capital (Mar. 2, 2021); *see, e.g.*, Risk Report, Mar. 12, 2020 (Exhibit 164).

[290] JST Risk Report, Feb. 28, 2020 (Exhibit 117).

[291] Exhibit 117; Emails between JST and Cred regarding a February invoice, Mar. 3, 2020 (Exhibit 121).

[292] BTC, XRP, ETH, BCH, LTC, XLM, OMG and ADA.  *See e.g.,* Exhibit 117.

$12,664,998 for futures, and $61,760 for options.[293]  The hedge positions, at different exchanges like BitMEX and Huobi, were tracked on the monthly risk reports provided by JST.

The following contracts were reported by JST in its February 28, 2020 risk report for Bitcoin:

| SYMBOL | EXPOSURE | MARK PRICE | LEVERAGE | LIQUIDATION PRICE / MARGIN CALL PRICE | SPOT EQUIVALENT | BREAKEVEN PRICE* | LIQUIDATION / MARGIN CALL PROBABILITIES | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2 DAYS | 3 DAYS |
| BTC | 0.00 | $8,567 | | | | | | |
| XBTUSD | 177.16 | $8,569 | 13% | $5,795.13 | $5,793.13 | $5,795.13 | 0.00% | 0.00% |
| XBTM20 | 1602.57 | $8,814 | 34% | $6,176.44 | $5,927.44 | $5,816.28 | 0.00% | 0.00% |
| XBTH20 | 839.51 | $8,667 | 24% | $6,943.12 | $6,843.12 | $6,550.29 | 0.00% | 0.02% |
| XBT-MARGIN | 1188.61 | $8,567 | | | | | | |
| BTC-IMPLIED | (65.15) | $8,567 | | | | | | |
| BTC-Mar | 935.02 | $8,668 | | | | | | |
| HUOBI-MARGIN | 194.57 | $8,567 | 3.7% | $5,377.20 | $5,458.20 | $5,404.79 | 0.00% | 0.06% |
| swap4Z6 3/24 | 282.00 | $8,567 | | | | | | |
| 3/27 9250 Call | (112.53) | $8,567 | | | | | | |
| Drawbridge Margin | 300.00 | $8,567 | | | | | | |
| TOTAL | 4,801.74 | | | | | | | |

As of February 28, 2020, Cred's swaps contract XBTUSD, listed on the BitMex exchange, had a mark price of $8,569 and liquidation price of $5,795.13.[294]  XBTUSD is known as a "perpetual swaps" contract.  This contract closely tracks the price of Bitcoin in U.S. dollars and gains and losses are experienced based on the change in the price of Bitcoin relative to U.S. dollars.  This contract hedged Cred to a notional amount of 177.16 BTC ($1.5 million based on the Risk Report market price of $8,569) using a 3x leverage factor.  In other words, Cred had applied approximately 59 BTC in its margin account to enter into the XBTUSD contract amount of 177.16 BTC.  If Bitcoin dropped below $5,795.13, the hedge position would be liquidated which is exactly what occurred on March 12, 2020.

The other contracts for Bitcoin traded on the BitMex exchange identified in the JST risk report were "XBTM20" and "XBTH20."  These two positions are futures contracts that expire at different dates.  XBT-Margin of 1,188.61 Bitcoin reflected the total margin that was posted at the

---

[293] Exhibit 117.

[294] *Id.*

62

BitMex exchange.  "BTC-Mar" was a futures contract traded on the Huobi exchange.  "BTC-Implied" was a contract that referenced XRP (instead of U.S. dollars) and also traded on the Huobi exchange.  Huobi-Margin of 194.57 was the total Bitcoin in the Huobi margin account.

"Swap#24 3/24" was a bilateral repurchase obligation between Cred and JST.  In this contract Cred deposited 282 Bitcoin with JST and Cred loaned funds to JST on an over-collateralized basis in U.S. dollars.

The contract "3/27 9250 Call" was a call option that Cred had sold that was held with an asset manager (Drawbridge), but tracked by JST in its risk report.  The "Drawbridge-Margin of 300 Bitcoin" reflected the total Bitcoin that Cred had deposited with Drawbridge.

JST had similar hedging contracts for the other cryptocurrencies as well.  Each of these contracts had a price at which they would be liquidated or require additional collateral to be posted to their margin accounts.  Using Bitcoin as an example, the liquidation prices for these contracts varied by contract and was between $5,500 and $6,900.  This meant that, if the price of Bitcoin were to drop from the February 28, 2020 price of approximately $8,500 such that the contract prices were to decrease to their liquidation price (implying drops of more than 20%), then the contracts would be liquidated if no additional collateral was deposited into the margin accounts.  The charts below illustrate the price of Bitcoin in 2019 and 2020 as well as in March 2020:[295]

---

[295] BTC-USD prices from CoinDesk.



Between March 11 and March 12, 2020, the price of Bitcoin fell from $7,900 to $3,800 overnight. As a result of this price drop, the hedge contracts for all currencies were liquidated. JST's March 17, 2020 risk report illustrates the loss suffered by this dip in the market, with each exposure listed as "0" in the chart below.[296]

| SYMBOL | EXPOSURE | MARK PRICE | LEVERAGE | LIQUIDATION PRICE / MARGIN CALL PRICE | SPOT EQUIVALENT | BREAKEVEN PRICE* | LIQUIDATION / MARGIN CALL PROBABILITIES | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2 DAYS | 3 DAYS |
| BTC | 0.00 | $5,297 | | | | | | |
| XBTUSD | 0.00 | $5,298 | | | | | | |
| XBTH20 | 0.00 | $5,167 | | | | | | |
| XBTM20 | 0.00 | $5,224 | | | | | | |
| XBT-MARGIN | 95.44 | $5,297 | | | | | | |
| BTC-IMPLIED | (68.92) | $5,297 | | | | | | |
| BTC-Max | 0.00 | $5,160 | | | | | | |
| HUOBI-MARGIN | 0.00 | $5,297 | | | | | | |
| swapR24 3/24 12.5% | 282.00 | $5,297 | | | | | | |
| 3/27 9250 Call | (0.00) | $5,297 | | | | | | |
| Drawbridge-Margin | 300.00 | $5,297 | | | | | | |
| TOTAL | 610.51 | | | | | | | |

When the price of Bitcoin fell, Cred lacked sufficient reserves to maintain its hedging positions.[297] On March 12, 2020, JST informed Cred that a drastic overnight move in the markets resulted in the liquidation of all of Cred's Bitcoin futures positions, in addition to the

---

[296] JST Risk Report Mar. 17, 2020 (Exhibit 118).

[297] Schatt Decl. ¶ 21 (Exhibit 1).

liquidation of some of Cred's XRP futures.[298]  Cred's futures profit and loss went from a profit of $12.6 million as of February 28th to a loss of $5.8 million as of March 17th.[299]  Similarly, Cred's Swaps profit and loss went from a loss of $4.5 million on February 28, 2020 to a further loss of $10.5 million as of March 17, 2020.[300]  The total losses resulting from the "flash crash," as reflected in the change in values in its futures and swaps positions between February 28th and March 17th, was approximately $24 million.[301]

As discussed, Cred had placed margin in various accounts at JST and at exchanges to support its hedging positions.[302]  The rapid decline in cryptocurrency prices caused Cred to be overleveraged beyond what was supportable by its margin position, and its futures and swaps positions were, as a result, liquidated by the exchanges.[303]  Cred was left with a net short position equal to $27,483,181; for every $100 move in Bitcoin, Cred stood to make or lose approximately $400,000.[304]  Further, JST asked Cred to post an additional $3 million of collateral for the outstanding repos that Cred had with JST.[305]  At some point in March 2020, Cred ceased using accounts at JST.[306]

---

[298] Email from S. Freeman to J. Alexander, H. Ng, D. Schatt, J Podulka, S. Zhang, and D. Inamullah, Mar. 12, 2020 (Exhibit 119).

[299] *Compare* Exhibit 117 *with* JST Risk Report, Mar. 12, 2020 (Exhibit 164).

[300] *Compare* Exhibit 117 *with* JST Risk Report, Mar. 12, 2020 (Exhibit 164).

[301] *Compare* Exhibit 117 *with* JST Risk Report, Mar. 12, 2020 (Exhibit 164).

[302] Email from J. Alexander to D. Inamullah, Mar. 18, 2020 (Exhibit 120).

[303] Inamullah Dep. 105:15-20 (Exhibit 9).

[304] Exhibit 119.

[305] *Id.*

[306] Chat messages between S. Zhang, Han LNU and S. Hwang, Aug. 20, 2020 (Exhibit 165) (Zhang comments that Cred stopped using all JST accounts on March 31, 2020. There is a conversation regarding the disposition of the assets that were held at JST.  Han LNU notes that D (Inamullah's nickname) said: "we had some assets to go to FB [Fireblocks].  Most of what we had outstanding was liquidated (i.e., the swaps, futures, and options margin)."  There is some confusion as to whether Cred's relationship with JST ended on March 10 or March 31, 2020).

The table below summarizes the losses that Cred experienced from its hedge positions as a result of the March 2020 "flash crash." For example, as of March 11, 2020, the total margin at two of the three Bitcoin margin accounts at JST totaled 977 Bitcoin (excludes 300 Bitcoin at the Drawbridge margin account, which was used for a covered call strategy). After the "flash crash," only 90.4 Bitcoin remained on margin in these two margin accounts combined.[307] As a result, Cred lost 866 Bitcoin from these two margin accounts alone.[308] As illustrated below, based on the mark prices in the JST risk reports from March 11th and 12th, the total loss across all margin accounts at JST was 1,130 Bitcoin.[309]

**Calculation of Margin lost as a result of Flash Crash in March 2020**

| Currency | | 11-Mar-20 | 12-Mar-20 | Diff | Change in USD 3/11/2020 Prices | | Change in USD 3/12/2020 Prices | |
|---|---|---|---|---|---|---|---|---|
| BTC | Mark Price | 7,838 | 5,872 | 1,966 | | | | |
| BTC | XBT-Margin | 882 | 90.4 | 791 | $ | 6,201,112 | $ | 4,645,692 |
| BTC | Huobi-Margin | 95 | – | 95 | $ | 742,964 | $ | 556,607 |
| BTC | Drawbridge-Margin | 300 | 300 | – | | | | |
| XRP | Mark Price | 0.2069 | 0.1545 | 0.0524 | | | | |
| XRP | Huobi-Margin | 4,586,658 | – | 4,586,658 | $ | 948,980 | $ | 708,639 |
| ETH | Mark Price | 196.50 | 130.1 | 66.40 | | | | |
| ETH | ETH-Margin | 21,468 | 16,815 | 4,653 | $ | 914,342 | $ | 605,374 |
| BCH | Mark Price | 265 | 169 | 96 | | | | |
| BCH | BCH-Margin | 1,595 | 1,041 | 554 | $ | 146,979 | $ | 93,794 |
| LTC | Mark Price | 48.3 | 32.0 | 16.3 | | | | |
| LTC | LTC-Margin | 1,187 | 446 | 741 | $ | 35,774 | $ | 23,701 |
| XLM | Mark Price | 0.0505 | 0.0357 | 0.0148 | | | | |
| XLM | Options Margin | 16,000,000 | 16,000,000 | – | | | | |
| Total (USD) | | | | | $ | 8,990,150 | $ | 6,633,806 |
| Total (BTC) | | | | | | 1,147 | | 1,130 |

Sources: JST Risk Report, Mar. 11, 2020 (Exhibit 152); Exhibit 164.

---

[307] JST Risk Report, Mar. 17, 2020 Exhibit 118.

[308] *Id.*

[309] *Id.*

The table below summarizes the repo positions that Cred maintained with JST. As discussed above, JST issued margin calls and demanded that Cred post additional collateral on these repo positions. For the reasons discussed herein, Cred lacked the assets to satisfy JST's margin call and, as a result, JST liquidated these positions. The liquidation of these positions resulted in additional losses to Cred. The total amount due to JST from Cred after considering the repo positions and certain option positions net of the cryptocurrency margin Cred had deposited with JST (and which JST had liquidated) was approximately $3 million.[310]

| Currency | Repo Positions | Quantity | Price in USD (March 17, 2020) | USD |
|---|---|---|---|---|
| BTC | Swap #24 3/24 12.5% | 282 | 5,297 | $ 1,493,754 |
| XRP | Swap #21 4/13 7.5% | 14,187,651 | 0.15 | $ 2,099,772 |
| XRP | Swap #22 3/16 9.5% | 20,000,000 | 0.15 | $ 2,960,000 |
| ETH | Swap #9 open 11% | 14,367 | 117 | $ 1,675,192 |
| BCH | Swap #13 open 9.5% | 9,472 | 181 | $ 1,714,472 |
| **Total** | | | | **$ 9,943,190** |

Source: Exhibit 118.

On April 5, 2020, Inamullah circulated a Cred LLC liquidity analysis prepared by Cred Capital.[311] The report outlined a liquidity analysis and recommended steps following the March 2020 "flash crash." The futures and swaps positions had been a hedge to protect Cred from an increase in the prices of cryptocurrencies.[312] When Cred's futures and swaps positions were liquidated, however, Cred lost funds in its margin accounts at JST, as well as lost its hedging

---

[310] JST Cred Exposure Summary (Exhibit 181).

[311] Liquidity Analysis Post March 2020 Flash Crash and Recommended Steps, Apr. 5, 2020 (Exhibit 113).

[312] Email from J. Alexander to D. Inamullah, Mar. 18, 2020 (Exhibit 120).

positions (i.e., the right to purchase the underlying assets at the agreed price).[313]  Further exacerbating the problem, Cred lacked sufficient liquidity to reinstate the hedging positions at a reasonable market price.[314]  JST issued margin calls for outstanding repo positions, but Cred did not have sufficient liquidity to meet those demands.[315]

Cred intended to reinstate its hedge position by recalling $10 million from moKredit.[316]  As discussed further in Section V(B)(3), moKredit did not pay Cred the requested amount.  Hua, however, agreed to transfer 300 Bitcoin to Cred in multiple transactions (discussed further in Section V(E)).  The 300 Bitcoin was transferred from a Fireblocks wallet at Cred, Inc. to OKEx,[317] and purportedly used to re-appropriate certain hedges on the long side of Bitcoin in March, while Bitcoin prices were still at the bottom of the market.[318]  It appears, however, that Cred closed out these hedge position shortly thereafter (at a small profit) and, according to Inamullah, determined that, because they had terminated their relationship with JST, they no longer had the ability/skillset to apply hedges using the derivatives market, leaving Cred effectively "naked" against market fluctuations.

Cred being "naked" against market fluctuation was a significant factor in Cred's demise.  Though Cred lost approximately $10-$12 million when its positions were liquidated, Cred's liabilities effectively decreased two-fold as a result of the >50% drop in Bitcoin price.  This is because, instead of being able to buy one Bitcoin for $7,900 on March 11, 2020, Cred could buy

---

[313] Exhibit 120.

[314] Exhibit 113.

[315] *Id.*

[316] *Id.*

[317] Cred, Inc Fireblocks logs (Exhibit 124).

[318] Inamullah Dep. 167:3-19; 188:11-14 (Exhibit 9).

a bit more than two Bitcoin for $7,900 on March 12, 2020.  Had Cred had access to the $9 million it needed to establish new hedges at 3x leverage, Cred could have made significant profits on the new hedge positions, both because of establishing the new hedges after the drop in Bitcoin price and the increase that followed in the coming months.  These profits from the hedge positions could then have netted out against the losses on Cred's liability positions (Cred's liability position would also go up in U.S. dollar terms as the price of Bitcoin went up).  However, because so much of its liquidity was tied up in moKredit, and because Cred had a month earlier given 500 in Bitcoin to QuantCoin, Cred did not have the capital to establish new hedges.  Thus, with every increase in Bitcoin (and other cryptocurrency) above Cred's conversion price, Cred's liabilities increased proportionately against a class of assets – loans to moKredit – that Cred never realized.  In the months that followed, Bitcoin prices increased from approximately $4,000 in March 2020 to approximately $10,000 in June 2020.  Cred's inability to access moKredit capital disabled it from fending off its increasing liability load, until it finally collapsed into bankruptcy.

### 2. Cred's Other Asset Managers.

#### (a) Elevar.

Cred established a relationship with Elevar LLC ("**Elevar**"), a secondary lending company, in October/November 2019.[319]  In the summer of 2019, Schatt instructed Cred employees to seek other income-generating opportunities in order to diversify Cred's portfolio, and Elevar became Cred's first partner toward that end.[320]  Inamullah recalled that Alexander

---

[319] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

[320] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

69

and the founder of Elevar knew each other before Cred's relationship with Elevar began.[321]
Under its relationship with Elevar, Cred would lend Elevar cryptocurrency assets (and
occasionally fiat currency) at interest rates as high as 16% on an annual basis.[322]  Elevar would
utilize such assets in lending transactions with consumer lending and telecom receivable finance
companies.[323]  Inamullah stated that he did not know who at Cred, if anyone, conducted any
form of diligence on Elevar before Cred entered into its arrangement.[324]  By May 31, 2020, Cred
had an asset allocation worth $1,850,000 with Elevar.[325]  By September 2020, moKredit and
Elevar were described as Cred's only "sources" of finance.[326]  On November 12, 2020,
Cred attempted to recall its funds with Elevar.[327]  However, based on Cred's contract with
Elevar, it was not able to access such funds until February 2021.[328]

     (b)    **Cambrian**

Cambrian is an asset manager whose fund (Cambrian Systematic Strategies, LP) Cred
contributed or "subscribed" to.[329]  Cred entered into a subscription agreement with Cambrian on
July 29, 2019,[330] and wired a $500,000 investment to Cambrian on July 30, 2019.[331]  Cred

---

[321] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

[322] Interview with Pablo Bonjour and Paul Maniscalco, Managing Director and Senior Managing Director, MACCO Restructuring Group (Feb. 12, 2021).

[323] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

[324] *Id.*

[325] Email from J. Podulka to D. Schatt, July 24, 2020 (Exhibit 94).

[326] Email from D. Inamullah to D. Schatt, A. Khakoo, and J. Podulka, Sept. 16, 2020 (Exhibit 95).

[327] Email from D. Schatt to J. Podulka, Nov. 14, 2020 (Exhibit 96).

[328] Email from D. Inamullah to J. Podulka and D. Schatt, July 13, 2020 (Exhibit 97).

[329] Email chain between J. Podulka, H. Moore, G. Estrada, S. Hwang, H. Ha, Nov. 5, 2020 (Exhibit 98); Cred LLC Subscription Agreement with Cambrian Systematic Strategies LP, July 29, 2020 (Exhibit 99).

[330] Exhibit 99.

[331] Chat log between S. Zhang and J. Alexander, July 30, 2019 (Exhibit 100).

indicated that this figure constituted 1% of the Company's total assets at that time.[332]  Inamullah did not personally interface with Cambrian and believed that Alexander led the due diligence on the company.[333]  Cred received quarterly statements from Cambrian,[334] and withdrawals were subject to a 30-day notice period.[335]  Cred's full redemption of its investment in Cambrian Systematic Strategies, LP was confirmed on January 31, 2020.[336]  Cred recalled its assets from Cambrian because Alexander was purportedly unhappy with Cambrian's performance, and because Cred wanted to move assets to another asset manager, 100 Acre Ventures.[337]  On February 21, 2020, Cred withdrew 95% of its investment in Cambrian,[338] with the remaining 5% to be wired to Cred upon the finalization of Cambrian's 2020 audit.[339]  As of November 5, 2020, Podulka did not believe that Cred had received the remaining 5% of its investment from Cambrian.[340]

### (c)    100 Acre Ventures

Cred began investing with 100 Acre Ventures, a cryptocurrency investment firm, beginning in or around April 2020 on Alexander's recommendation.[341]  Inamullah stated that he oversaw the due diligence process for onboarding 100 Acre Ventures, which purportedly

---

[332] Exhibit 99.

[333] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

[334] Chat log between S. Zhang and J. Alexander, Feb. 14, 2020 (Exhibit 184); Cambrian Systematic Strategies LP Quarterly Statement, Sept. 30, 2019 (Exhibit 101).

[335] Email from S. Zhang to J. Alexander, Feb. 6, 2020 (Exhibit 102).

[336] Redemption Confirmation, Jan. 22, 2020 (Exhibit 103).

[337] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

[338] Metropolitan Commercial Bank Account Statement, Feb. 28, 2020 (Exhibit 104).

[339] Email from HC Global Fund Services to D. Schatt, Feb. 21, 2020 (Exhibit 105).

[340] *Id.*

[341] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021); 100 Acres Ventures Mission Page, https://www.100acreventures.com/mission (last visited Mar. 4, 2021).

included the exchange of standard corporate documents.[342]  Inamullah said that, when Bethany De Lude joined Cred as Chief Information Security Officer in the summer of 2020, she identified deficiencies in the firm's diligence responses and initiated a second round of diligence.[343]  Cred paid a 1-2% management fee and 10-20% incentive fee to 100 Acre Ventures for its asset management services.[344]  Cred's Adnan Khakoo emailed 100 Acre Ventures to request a full redemption of Cred's assets on June 29, 2020.[345]  However, as of October 2020, 100 Acre Ventures owed Cred approximately $1 million.[346]

### (d)    Sarson Funds

Sarson Funds LLC is a third-party marketing company that does not directly manage assets or provide investment advice; rather, the organization is structured in such a way that different entities carry out investing activities and Sarson Funds markets those entities' investment strategies.[347]  However, Cred considered Sarson Funds to be the functional equivalent of an asset manager.[348]  Sarson Funds also provided certain technical services to Cred.[349] Inamullah proposed Cred engage Sarson Funds to the "investment committee,"[350] and claimed

---

[342] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

[343] *Id.*

[344] *Id.*

[345] Email from A. Khakoo to P. Collins, June 29, 2020 (Exhibit 106).

[346] Email from D. Inamullah to D. Schatt, J. Podulka, D. Wheeler and A. Khakoo, Oct. 1, 2020 (Exhibit 112).

[347] Inamullah Dep. 207:9–208:10 (Exhibit 9).

[348] *Id.* at 205:17–22.

[349] *Id.* at 25:3–26:2; 205:17–21.

[350] *Id.* at 95:11–15.

that he conducted due diligence with respect to the firm.[351]   Inamullah now works for Sarson Funds as its Chief Investment Officer.[352]

In March 2020, Cred invested in two Sarson sub-funds: Fifth Khagan, LP,[353] a small coin/small token fund, and AX Momentum, LP, a covered call options fund.[354] Sarson Funds is the general partner of these funds.[355]   The premise of Fifth Khagan was to send Sarson Ethereum and invest in products that would outperform Ethereum in the long run.[356]   AX Momentum involved selling an out-of-the-money call against Bitcoin to make premium income and then permitting the call to expire or buying it back in accordance with specific parameters.[357] According to Matthew Foster, Cred represented a large portion of the investments in AX Momentum and Fifth Khagan, and profited from those investments.[358] Sarson used an administrator to provide Cred with daily reports on the performance of its investments.[359] Cred allegedly grew its assets by $4 million with Sarson and 100 Acre Ventures between April 2020 and August 2020.[360]

On November 14, 2020, Brittany Keels of Sarson contacted Sundrania—a cloud based fund administration service Sarson used to prepare statements and keep track of its funds—

---

[351] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

[352] Id.

[353] Exhibit 14.

[354] Inamullah Dep. 208:24–209:1 (Exhibit 9); Exhibit 14; Exhibit 15.

[355] Interview with Matthew Foster, Chief Restructuring Officer, Cred Inc. (Feb. 9, 2021).

[356] Inamullah Dep. 89:21–90:1 (Exhibit 9).

[357] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[358] Interview with Matthew Foster, Chief Restructuring Officer, Cred Inc. (Feb. 9, 2021).

[359] Inamullah Dep. 100:13–16 (Exhibit 9).

[360] Email from J. Podulka to D. Schatt, Aug. 8, 2020 (Exhibit 107); Email from J. Podulka to D. Schatt, Aug. 28, 2020 (Exhibit 108).

investor support seeking to withdraw 75 Bitcoin (approximately $1.2 million at that time) from Cred's AX Momentum account. A 30-day notice period was waived in order to provide Cred with a redemption of 75 Bitcoin on November 30, 2020, and a withdrawal of the remainder of Cred's assets at the end of 2020.[361]

On January 6, 2021, Foster emailed John Sarson giving formal notice that Cred wished to redeem its investments in both the AX Momentum and Fifth Khagan funds.[362] Foster explained that Cred's initial agreement with Sarson required the Company to give Sarson 120 days' notice before retrieving funds. According to Foster, Cred retrieved $4 million worth of Bitcoin in early February 2021, and expected additional returns of $1.5 million in Bitcoin by the end of February, the remainder at the end of March 2021.[363] The Examiner has been advised that Sarson Funds redeemed an additional $1.5 million of Bitcoin in early March 2021.

### (e)   Blockfills

Blockfills is an electronic, off exchange, digital liquidity provider. Blockfills utilizes a so-called "alpha strategy" with respect to its investments.[364] Under this strategy, Blockfills seeks to arbitrage the price difference of its digital currencies and derivatives based on these currencies across various exchanges. As such, the strategy did not rely on the market moving in a particular direction, but rather attempted to make an arbitrage profit independent of market conditions. The risk lay in the technology to be able to execute the arbitrage since, ideally, the arbitrage trades needed to be applied simultaneously across exchanges. Inamullah claims to have conducted

---

[361] Email from J. Sarson to D. Schatt, A. Khakoo, Nov. 17, 2020 (Exhibit 109).

[362] Email from M. Foster to J. Sarson, Jan 6, 2021 (Exhibit 110).

[363] Interview with Matthew Foster, Chief Restructuring Officer, Cred Inc. (Feb. 9, 2021).

[364] Inamullah Dep. 47:3–7 (Exhibit 9).

diligence regarding Blockfills consisting of a review of corporate organizational documents and information requests regarding beneficial owners.[365]  But, unlike most of Cred's asset managers, Blockfills was considered an "offshore" fund and, so, Cred (principally through Dan Wheeler) took additional steps in an effort to make sure it could enforce its agreements with Blockfills.[366] Cred profited from its investments with Blockfills, albeit at lower than originally estimated (8%-10% yield, rather than an estimated 20% yield).[367]

(f)     **Drawbridge Lending**

Cred entered into an investment arrangement with Drawbridge Lending in early 2020. Inamullah does not recall Cred having conducted any material diligence on Drawbridge prior to entering into its investment.  Drawbridge's model was to act as a fund to run covered calls against Cred's cryptocurrency, including Bitcoin.[368]  For example, under the strategy, if Bitcoin was trading at $10,000, Cred sold its covered call options at a strike price of $12,000 for a 3-month term and received a premium for the same (e.g., a premium of $1,500); the idea being that Cred would keep the full premium if the price of Bitcoin stayed below the strike price of $12,000 by the time the call option expired.[369]  Records reviewed by the Examiner indicate that Cred entered into only one transaction with Drawbridge, which was closed out by March 2020.[370]

---

[365] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 23, 2021).

[366] *Id.*

[367] *Id.*

[368] *Id.*

[369] *Id.*

[370] *Id.*

### 3. Cred Develops, But Does Not Implement, the So-Called "All-Weather" Strategy.

In November 2019, in an apparent response to Cred's significant reliance on (and thus exposure to) moKredit, Cred's "investment committee" developed a so-called "all-weather" investment strategy.[371] Under this strategy (purportedly modeled after a strategy developed by hedge fund manager Ray Dalio[372]), Cred would utilize a mixture of lending, hedging, and arbitrage strategies, with the goal of earning a profit regardless of whether cryptocurrency prices increased or decreased, as had been promised to customers. As part of this strategy, Cred was willing to trade expected yield by recalling principal from moKredit for liquidity – which would, in turn, reduce weighted average return of the loan portfolio for Cred – by allocating more assets to its investment managers.[373]

Although Cred's target allocation rates changed over time, the strategy emphasized diversification and a move away from direct lending and avoiding credit risk.[374] But, following moKredit's inability to repay principal in March 2020, Cred created an internal liquidity analysis dated April 5, 2020 that promoted a heavier reliance on the "all-weather" strategy (although by that time, as described in greater detail herein, a shift in strategy may have been too late) and Cred was unable to fully implement this strategy due to Cred's persisting liquidity issues.[375]

---

[371] Inamullah Dep. 117:4–16 (Exhibit 9) (describing the strategy as a "diversified allocation of four or five different types of allocations that Cred should diversify assets into").

[372] Inamullah Dep. 117:4–16 (Exhibit 9); Brett Arends, *Opinion: How did these 'All-Weather' portfolios weather 2020?* MarketWatch (Dec. 21, 2020) (Exhibit 111).

[373] Cred LLC Investment Committee: Liquidity Analysis, Apr. 5, 2020 (Exhibit 113)

[374] Email with attachments from D. Inamullah to D. Schatt, H. Ng, J. Podulka, S. Zhang, and J. Alexander, Feb. 12, 2020 (Exhibit 114); Cred Asset Management Overview at 3, Aug. 2020 (Exhibit 115).

[375] Exhibit 113.

## D. Cred's Relationship with QuantCoin.

### 1. Inception of Relationship.

Further exacerbating the liquidity crisis, Cred, beginning in February 2020, transferred (via a "lockup" agreement) 800 Bitcoin to an entity named QuantCoin, in what Cred alleges was a fraudulent scheme. Cred has, to date, lost the entirety of this investment.

Cred's initial contact with QuantCoin occurred at the Consensus Conference, an "annual gathering of the cryptocurrency and blockchain technology world," in May 2019.[376] There, James Alexander allegedly met Richard Chapman, QuantCoin's purported portfolio manager.[377] According to Joe Podulka, Alexander is the only person who ever met Chapman in person.[378] According to Cred, QuantCoin purported to use a derivatives-based strategy to provide investors with a return of 20-30% per year.[379]

Alexander first mentioned QuantCoin to Dan Schatt in December 2019.[380] According to Alexander, it was Schatt who brought QuantCoin to Alexander;[381] the Examiner is not aware of any evidence corroborating this assertion. At the time, QuantCoin was presented as a strong investment opportunity and, according to Schatt, Alexander indicated that he was performing diligence on the company.[382]

---

[376] Consensus: 2019, Coindesk, https://www.coindesk.com/events/consensus-2019 (last visited Mar. 4, 2021).

[377] The record does not reveal who else, if anyone, from Cred attended the conference. Inamullah Decl. ¶ 19 (Exhibit 6); Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[378] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[379] Inamullah Decl. ¶ 20 (Exhibit 6).

[380] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[381] Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021).

[382] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

According to Alexander, Schatt served as a reference for QuantCoin and insisted that Cred invest significantly and immediately.[383]  Available documents, however, do not support Alexander's version of events.  On February 2, 2020, Chapman sent Alexander an email stating, "[s]ince meeting you at the consensus, our performance here exceeded our expectations and the numbers are looking even better than they did when I shared them with you then," and requested a call to discuss "possible collaboration" with Cred.[384]  The email exchange indicates that Chapman and Alexander, who were both purportedly traveling in Europe at the time, met in Paris that week to discuss a potential investment by Cred in QuantCoin.[385]  Following the meeting, on February 3, 2020, Alexander told Chapman that Cred would move forward with a 500 Bitcoin investment and asked Chapman to provide the offering documents for a February subscription.[386]

In February 2020, Alexander informed Cred's "investment committee" of the potential opportunity with QuantCoin.  Based on Alexander's representations and purported due diligence, the "investment committee" approved QuantCoin to manage a portion of Cred's Bitcoin.[387]

The Examiner received conflicting accounts regarding the use of a third-party to conduct due diligence on QuantCoin.  It is unclear what, if any, diligence Cred performed on QuantCoin or Richard Chapman prior to making its investments.  Schatt claims that Alexander completed due diligence himself; Podulka could not confirm what, if any diligence, was conducted (other than indicating that Alexander did not typically conduct thorough background searches with

---

[383] Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021).

[384] Email chain between J. Alexander and R. Chapman, Feb. 2, 2020 (Exhibit 125).

[385] *Id.*

[386] Email from H. Ng to S. Foster, J. Alexander, S. Zhang, R. Chapman and L. Tabers, Feb. 5, 2020 (Exhibit 126).

[387] Schatt Decl. ¶ 32 (Exhibit 1).

respect to investment opportunities); Inamullah represented that Cred retained a third-party to perform diligence, but the Examiner has not been furnished with evidence corroborating this assertion.[388]

As detailed below, Cred made several investments with QuantCoin, totaling 800 Bitcoin in the aggregate, over several months. Although Cred's capital markets team (at the time, led by Inamullah) was typically responsible for periodically reviewing asset managers,[389] Inamullah did not conduct additional due diligence on QuantCoin following Cred's initial investment, indicating that "there [was] no reason not to believe the original diligence" because Cred's second placement with QuantCoin occurred only ten days after its first.[390] Inamullah stated that he had searched the email addresses provided for QuantCoin representatives on Google and found a "slash page" for at least one.[391]

After Cred's initial Bitcoin transfer to QuantCoin in early February, Alexander emailed Ryan Ortega, a consultant hired by Alexander, on February 11, 2020, seeking diligence support on three asset managers, including QuantCoin. Alexander stated that "we scrambled to make these initial allocation *[sic]* and I need to ensure we didn't miss anything."[392] Although Ortega

---

[388] Inamullah Decl. ¶ 19 (Exhibit 6). Ryan Ortega may have been the third-party diligence provider used by Alexander. *See* Email from R. Ortega J. Alexander, Mar. 10, 2020, (Exhibit 127) ("Thanks for your time and effort on sourcing and screening managers."); Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[389] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb 16, 2021); Inamullah Dep. 180:12–16 (Exhibit 9).

[390] Inamullah Dep. 152:6–10 (Exhibit 9).

[391] *Id.* at 152:22–153:5.

[392] Exhibit 127.

agreed to assist Alexander, the Examiner has not been furnished with any evidence that Ortega carried out any due diligence work for Alexander or Cred.[393]

Cred's server contained minimal documents regarding the QuantCoin investment and no evidence of material due diligence.[394]  Cred apparently did not create a written process governing transfers of funds to outside parties until a few months after the QuantCoin transfers.[395]  Further, Cred's General Counsel, Dan Wheeler, did not review the QuantCoin contract before Cred executed it.[396]  In fact, Wheeler stated he had never even heard of QuantCoin until after Cred uncovered the alleged fraud (discussed below).[397]

## 2. Chronology of Material Events Involving Cred and QuantCoin.

(a)    On February 4, 2020, Cred executed a subscription agreement with Quanta Capital Feeder Fund, L.P.[398]  Schatt signed the agreement authorizing a subscription of 500 Bitcoin in QuantCoin on behalf of Cred, which listed Joe Podulka, Sally Zhang, and James Alexander as additional relationship contacts.[399]  Alexander and Chapman subsequently agreed upon certain additional terms via email on February 5, 2020 to be contained in a side letter.[400]  The agreement provided that transfers to QuantCoin and interest payable by QuantCoin would be denominated in Bitcoin to avoid translation.[401]

(b)    On February 5, 2020, while setting up Cred's initial subscription with QuantCoin, Chapman emailed Alexander to loop in his "admin," a person whom Chapman

---

[393] *Id.*

[394] *See* Email from D. Inamullah to J. Podulka and D. Schatt, July 13, 2020 (Exhibit 128) (Inamullah told Podulka he cannot find the fee documents for QuantCoin.  It is unclear if these have ever been located); Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

[395] Inamullah Dep. 153:25-154:5 (Exhibit 9).

[396] Interview with Daniel Wheeler, former General Counsel, Cred Inc. (Feb. 12, 2021).

[397] *Id.*

[398] Quanta Capital Subscription Agreement, Feb. 4, 2020 (Exhibit 129)

[399] *Id.*

[400] *Id.*

[401] Email from J. Alexander to D. Inamullah and S. Zhang, Mar. 10, 2020 (Exhibit 130).

identified as Scott Foster of Kingdom Trust.[402]  Although Kingdom Trust's website lists a Scott Foster as a financial services professional with over 25 years of experience, the Examiner has not been furnished with any evidence indicating that this real Scott Foster was in any way involved with QuantCoin.  Chapman asserted that "Foster" would serve as the digital asset custodian and account administrator for the Cred account.[403]

(c)    On February 5, 2020, "Foster" sent Inamullah an email that included a wallet address and transfer instructions for the first Bitcoin transfer.[404]  Upon receiving the address and instructions, Alexander asked a Cred employee, Sally Zhang, to process the transaction.[405]  Another Cred employee, Heidi Ng, sent a test transaction of 0.01 Bitcoin and "Foster" confirmed receipt.  Ng then transferred the remaining 499.999 BTC via BITTREX to the wallet address provided by "Foster."[406]  Cred completed its initial transfer of 500 Bitcoin to QuantCoin on February 5, 2020,[407] valued at $4,806,710 at the time.[408]

(d)    On February 13, 2020, Inamullah sent an email to Chapman inquiring whether QuantCoin required additional paperwork for a further allocation of Bitcoin.[409]  Chapman replied that it did not.[410]  "Foster" once again provided the wallet address for the transaction, which Inamullah sent to Fireblocks to be "whitelisted," and sent a deposit address image to "Foster" as a security measure to "prevent swap attacks."[411]  After "Foster" confirmed the address and receipt of a test transaction for 0.01 Bitcoin, Inamullah executed a transfer of an additional 200 Bitcoin over two separate transactions: 80 Bitcoin on February 13, 2020 (valued at $817,150); and 120 Bitcoin on February 18, 2020 (valued at $1,217,040).[412]

---

[402] Exhibit 126.

[403] Id.

[404] Email from S. Foster to D. Inamullah, Feb. 13, 2020 (Exhibit 131).

[405] Id.

[406] Exhibit 126 (Wallet address: 1HhGiE2JgUqweztdjpd5prpSt3YSkMs5Gk); Transaction Log, Feb. 5, 2020 (Exhibit 132) (Source address: 17Nk1hu2VPRREuANREgASdVyF1HcbY1kJf).

[407] Exhibit 126.

[408] Exhibit 25 at 23.

[409] Exhibit 131.

[410] Id.

[411] Id.

[412] Exhibit 131; Exhibit 25 at 23.

(e)    Beginning in March 2020, "Foster" began providing Cred with monthly investor statements, all containing positive performance updates.[413] "Foster" subsequently provided Cred with status updates and investment reports, and answered questions regarding the QuantCoin relationship.[414] According to Inamullah, the positive performance reports motivated Cred to invest more with QuantCoin while it waited to on-board other asset management funds.[415]

(f)    On March 13, 2020, Inamullah asked Chapman if QuantCoin would be able to receive another 200 Bitcoin from Cred.[416] In response to this request, Chapman advised that he could receive 200 additional Bitcoin.[417] Inamullah recommended to the "investment committee" that Cred invest more assets with QuantCoin.[418] However, due to the crash in March, Cred did not send the additional 200 Bitcoin.

(g)    In or around April 14, 2020, Inamullah sought to increase Cred's allocation by 100 Bitcoin, after QuantCoin informed Cred that its account exceeded 6% profit in March.[419] Chapman instructed Inamullah to send the funds to the wallet already "whitelisted" on Cred's system. Inamullah sent the customary 0.01 Bitcoin test transaction.[420] Once receipt was confirmed, Inamullah sent the remaining of 99.99 Bitcoin (valued at $711,680).[421] As with prior transfers, the Fireblocks log shows that Inamullah sent this transaction to a wallet address under the name "QuantCoin."[422]

(h)    Thereafter, Cred continued to receive positive performance reports on its purported 800 Bitcoin investment.[423]

(i)    By May 3, 2020, the market value of Cred's purported Bitcoin investment with QuantCoin totaled $7,026,402.[424]

---

[413] Email from S. Foster to D. Inamullah, Mar. 23, 2020 (Exhibit 133); Kingdom Trust Investor Monthly Statement, Feb. 2020 (Exhibit 134); Cred Incident Investigation Report, Nov. 25, 2020 (Exhibit 135) ("The false Scott Foster provided regular performance updates (all positive) on a monthly basis.").

[414] *See e.g.,* Exhibit 135; Email chain between D. Inamullah and S. Foster, May 9, 2020 (Exhibit 137).

[415] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

[416] Email chain between D. Inamullah and R. Chapman, Mar. 15, 2020 (Exhibit 136).

[417] Exhibit 136.

[418] Email from D. Inamullah to J. Podulka, D. Schatt and J. Alexander, Apr. 4, 2020 (Exhibit 122).

[419] Exhibit 137.

[420] Exhibit 135; Exhibit 137.

[421] Exhibit 135; Exhibit 137; Exhibit 25 at 23.

[422] Exhibit 124 (wallet address: 1HhGiE2JgUqweztdjpd5prpSt3YSkMs5Gk).

[423] *See* Email with attachments from S. Foster to A. Khakoo, June 1, 2020 (Exhibit 138).

(j)   By June 2020, QuantCoin representatives had become increasingly difficult to contact. On June 1, 2020, "Foster" apologized for a delay in sending Cred the April report, stating that he "was out for the weekend with no internet access."[425]

(k)   At a July 9, 2020 meeting of Cred's Board, Cred identified its QuantCoin investments as its best source for obtaining much needed short-term liquidity despite QuantCoin's positive performance.[426]

(l)   On July 16, 2020, Inamullah asked Chapman to speak to prospective investors about Cred during its fundraising process, but Chapman replied that he was addressing some medical issues and could not assist.[427]

(m)   On July 28, 2020, Cred notified "Foster" by email that Cred wanted to rebalance its portfolio and inquired about a receiving a redemption in the first week of August.[428] "Foster" replied that redemptions generally required one months' notice and that any August redemption would affect other investors' positions, proving costly. "Foster," however, did indicate that he would agree to fulfill a redemption request in the first week of September to provide enough time to wind down the positions.[429]

(n)   On July 30, 2020, "Foster" confirmed Cred's request for a $2 million redemption during the first week of September 2020.[430]

(o)   After the redemption request, Cred's follow-up emails to Foster and Chapman were returned as "undelivered."[431]

(p)   In or around August, Joe Podulka requested that Inamullah obtain July financial statements for the account.

(q)   Eventually, Podulka contacted Kingdom Trust directly to verify the account statement.[432] Podulka contacted Kingdom Trust several times by telephone before receiving a response from Kingdom Trust's General Counsel, Tim

---

[424] Email from D. Inamullah to J. Podulka, May 3, 2020, (Exhibit 139).

[425] Exhibit 138.

[426] Exhibit 44 (July 9, 2020 meeting notes).

[427] Email from R. Chapman to D. Inamullah, July 16, 2020 (Exhibit 140).

[428] Email from S. Foster to A. Khakoo, July 29, 2020 (Exhibit 141).

[429] Exhibit 141; Inamullah Dep. 154:21-156:16 (Exhibit 9).

[430] Email from S. Foster to A. Khakoo, July 30, 2020 (Exhibit 142).

[431] Email from A. Khakoo to D. Inamullah, Aug. 21, 2020 (Exhibit 143).

[432] Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

Kuhman.[433]  On August 26, 2020, Kuhman informed Podulka that the emails from "Foster" were not authentic and that the real Kingdom Trust did not hold any of Cred's assets.[434]

(r)     On August 26, 2020, Kingdom Trust advised Cred to immediately report the matter to the FBI and other law enforcement in Cred's jurisdiction.[435]  On the same day, Cred's security team, Bethany De Lude (Chief Information Security Officer) and Marie Kacmarik (Director of Information Security) contacted the FBI's San Francisco Division.[436]  Over the following days, De Lude and Kacmarik coordinated with the FBI to provide relevant materials and information, and to discuss next steps.[437]

(s)     On August 31, 2020, the FBI informed De Lude that it would initiate a formal investigation along with Assistant U.S. Attorney Barbara Valliere.[438]  The FBI checked the QuantCoin wallet against law enforcement databases but the wallet came up empty, prompting the need to conduct additional tracing.[439]

(t)     On September 8, 2020, Dan Wheeler received an FBI subpoena and managed the information production and submission request with a target completion date of September 24, 2020.[440]  Wheeler collected the documents that the FBI requested and spoke to agents about the case.[441]

(u)     On September 14, 2020, De Lude recommended that Cred pursue an insurance claim related to QuantCoin, but Podulka did not act at that time.[442]

(v)     On October 14, 2020, Special Agent Bryant informed De Lude that it required no further information from Cred.[443]

(w)     On November 24, 2020, Cred notified the FBI about its plans to freeze the accounts relating to the transferred Bitcoin.[444]

---

[433] *Id.*

[434] Email from T. Kuhman to J. Podulka, Aug. 26, 2020 (Exhibit 144); Exhibit 135.

[435] *Id.*

[436] Exhibit 135.

[437] *Id.*

[438] *Id.*

[439] *Id.*

[440] Email from B. De Lude to D. Schatt, Dec. 8, 2020 (Exhibit 145).

[441] Interview with Daniel Wheeler, former General Counsel, Cred Inc. (Feb. 12, 2021).

[442] Exhibit 145; Email from T. Khuu to B. De Lude, D. Schatt, and J. Podulka, Oct. 30, 2020 (Exhibit 146).

[443] Exhibit 145.

Kingdom Trust operates, *inter alia*, as a custodian and escrow agent for digital and fiat currencies of individuals and institutions.[445] As noted above, Scott Foster is an employee at Kingdom Trust who, it appears, an unidentified individual impersonated while claiming to manage the QuantCoin account in his name. While the real Scott Foster has a company email address of "sfoster@kingdomtrust.com,"[446] all emails Cred received from the purported "Foster" came from "scott.foster@kingdom**s**trust.com" (emphasis added).[447]

As part of an internal investigation at Cred, Podulka and Inamullah researched key contacts and information about QuantCoin and found nothing online or on social media.[448] De Lude asked Inamullah who at Cred authorized the transfers to QuantCoin, but Inamullah suggested that he did not actually know how the authorization process worked.[449] Inamullah recalled that Alexander likely told him to "initiate on the phone or in person" because he could not find anything in email.[450]

As of August 28, 2020, when Cred removed the assets held at QuantCoin and CredBorrow from its asset calculation, Cred had short-term liabilities (using a 6 month redemption calculation) of $100 million compared to purported assets of $80 million.[451] Schatt

---

[444] Exhibit 135.

[445] Executive Summary, Kingdom Trust, https://www.kingdomtrust.com/qualified-custodian/executive-summary (last visited Mar. 4, 2021).

[446] Exhibit 135.

[447] Exhibit 126.

[448] Exhibit 135; Email from B. De Lude to D. Inamullah, Aug. 27, 2020 (Exhibit 147).

[449] Email from B. De Lude to D. Inamullah, Aug. 27, 2020 (Exhibit 148).

[450] Exhibit 147.

[451] Exhibit 107 ("Cred Earn liabilities today are about $110M v. assets of about $97M. That asset number includes the Quanta funds. Removing Quanta assets and those with Cred Borrow and the comparing to short-term liabilities, assets are $80M v. short-term (next 6 month redemptions) liabilities of $100M assuming full redemption. Expected

commented to Podulka that the loss of $9 million in assets was "unfortunate," but did not "impair the company's day-to-day operations or pose a significant risk to returning client funds."[452]

Cred continued to present confidence in its ability to grow assets, manage client redemptions, and close the asset gap created by the QuantCoin situation.[453]  On September 1, 2020, in response to questions on Cred's write-up of the QuantCoin incident, Podulka stated that the loss from the situation was approximately $7.4 million if recognized in February, but "because the funds didn't actually generate any return, it's not really a loss."[454]  As Podulka framed it to a customer, the QuantCoin loss is really "more of a reduction against the budget expectations."[455]

By September 16, 2020, the market value of the QuantCoin loss was $8,758,872.[456]  On October 28, 2020, Cred sent a notice to customers regarding the QuantCoin loss.[457]

### E.  Lu Hua's Transfer of 300 Bitcoin to Cred.

According to Schatt, after Bitcoin dropped in value in March 2020, Alexander sought to recall $10 million from moKredit to provide Cred with liquidity to reestablish its hedge

---

redemptions would only be about $30M, so we could frame it differently and compare current non-LBA assets of $84M v. expected redemptions of $30M.").

[452] Exhibit 108.  According to Podulka, he made comments to a draft Schatt had already written, which included the "unfortunate" comment.  Interview with Joseph Podulka, former Chief Financial Officer, Cred Inc. (Feb. 16, 2021).

[453] Exhibit 108.

[454] Email between J. Podulka and S. Ichimiya, Sept. 1, 2020 (Exhibit 149).

[455] *Id.*

[456] Exhibit 95.

[457] *Decl. of Marc Parrish in Supp. of the Mot. of UpgradeYa Investments, LLC for Relief from Stay under Bankruptcy Code Section 362*, Exhibit G (ECF No. 91) (Exhibit 150).

positions.[458]  As discussed in Section V(B)(3), Hua claimed that he was not in a position to satisfy Cred's demands.  Instead, Hua proposed a twofold solution:  a staggered repayment plan instead, and providing Cred with 300 Bitcoin to assist Cred with reestablishing hedges.[459]

According to Schatt, Alexander indicated that he could utilize the 300 Bitcoin to reestablish Cred's hedge positions, despite the fact that the market value of the 300 Bitcoin at the time totaled only approximately $1.5 million ($8.5 million less than the $10 million requested by Cred).[460]  After Cred's hedges were liquidated in March 2020, Cred had a net short cryptocurrency position of approximately $27 million.  Using Cred's traditional leverage of 3x, Cred would have needed approximately $9 million in Bitcoin to hedge itself against this short position.  Utilizing Cred's traditional leverage of 3x, Cred would only have been able to hedge approximately $4.5 million of its net short position using the 300 Bitcoin ($1.5 million leveraged 3x).

Hua transferred 300 Bitcoin to Cred over five separate transactions: on March 13, 2020, Hua made two transfers of .01 Bitcoin and 49.9 Bitcoin to Cred; on March 14, Hua made another two transfers of 50 Bitcoin and 100 Bitcoin to Cred; and on March 16, Hua transferred the final 100 Bitcoin to Cred.[461]

Hua and Schatt both characterize the Bitcoin transfers as a personal loan made by Hua to Cred.  Although the Examiner obtained emails from Hua and Schatt characterizing the transfer as

---

[458]  Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[459]  Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021); Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[460]  Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[461]  *Decl. of Matthew K. Foster in Support of Debtors' Objection to Motion of James Alexander to Dismiss the Cred Capital, Inc. Case* ¶ 6 (ECF No. 434) (Exhibit 153); *see also* Email from S. Hwang to P. Bonjour, H. Ng, and D. Hummer, Dec. 15, 2020 (Exhibit 154).

a loan, the Examiner found no contract, loan agreement, or other documentary evidence supporting this position. Hua did, however, execute a contribution agreement, effective as of March 31, 2020, in which Hua agreed to make a capital contribution of 300 Bitcoin to Cred Capital in exchange for an aggregate of 5,000,000 shares of Class B common stock.[462] Along with Hua, Alexander signed the agreement as President and CEO of Cred Capital.[463]

According to Hua, he signed the contribution agreement without reading it, two weeks after he transferred the Bitcoin to Cred, and had assumed the agreement was a routine Cred lending document.[464] Hua further states that he did not show the document to an attorney before signing it and did not learn that what he had signed was an equity agreement until several months later.[465]

According to Inamullah, the 300 Bitcoin was initially used to establish certain swaps and/or future hedges using Cred's traditional leverage ratio of 3x on the OKEx exchange.[466] Also according to Inamullah, it was determined that, without JST, Cred did not have the knowledge necessary to manage hedges in derivate form (i.e., as swaps or futures). At some point 300 Bitcoin was sent to OKEx; however, the Examiner has not seen any documents supporting any other hedge positions being reestablished. In any event, insofar as hedges existed, they were terminated shortly after they were established.[467]

---

[462] Exhibit 80.

[463] *Id.*

[464] Interview with Lu Hua, Chief Executive Officer, moKredit Inc. (Feb. 18, 2021).

[465] *Id.*

[466] Interview with Daniyal Inamullah, former Vice President of Capital Markets at Cred Inc. (Feb. 23, 2021); Inamullah Dep. 191:16–3:3 (Exhibit 9).

[467] Interview with Daniel Schatt, Chief Executive Officer, Cred Inc. (February 17, 2021).

Cred Capital liquidated 75 of Hua's 300 Bitcoin and utilized the proceeds to pay Cred Capital consultants, fund fees associated with the Luxembourg Bonds, and to satisfy minimal balance requirements for Cred Capital's bank account.[468]

### F. Cred's Dealings with James Alexander.

#### 1. General Background on James Alexander.

Schatt first met Alexander at a venture capital event in or around 2013.[469] The pair had limited contact over subsequent years, but remained connected via LinkedIn.[470] During Summer 2018, Schatt contacted Alexander and proposed that he provide consulting services for Cred.[471] After working for Cred in this advisory capacity for approximately a month, Alexander met with Hua, Wheeler, and other members of the Cred team in Shanghai.[472] At that point, Cred offered Alexander a permanent position as Chief Capital Officer, commencing in August 2018.[473]

It does not appear that Cred conducted any formal vetting of Alexander prior to making him an offer of employment, nor does it appear that Cred contacted any of Alexander's prior employers.[474]

On December 3, 2007, Alexander was convicted in the United Kingdom for crimes related to illegal money transfers. He was sentenced to three years and four months in prison to

---

[468] Chat logs between J. Alexander and D. Inamullah, June 24, 2020 (Exhibit 155); Interview with Daniyal Inamullah, former Vice President of Capital Markets at Cred Inc. (Feb 23, 2021).

[469] Interview with Daniel Schatt, Chief Executive Officer, Cred Inc. (February 17, 2021).

[470] *Id.*

[471] *Id.*

[472] *Id.*

[473] *Compare* First Amended Complaint ¶ 14, *Alexander v. Schatt*, No. 20-CIV-02728 (Cal. Super. Ct. Oct. 15, 2020) (Exhibit 22) (stating that Cred hired Alexander on Aug. 27, 2018), *with* Employment Offer Letter for J. Alexander (Exhibit 16) (Alexander's unsigned employment offer letter states that his role would commence on Aug. 1, 2018).

[474] Interview with Daniel Schatt, co-founder and Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

be served at HMP Ford Prison in West Sussex, England.  On October 15, 2008, while serving his sentence, there was a prison break at the HMP Ford Prison.  It appears that Alexander is a fugitive in the United Kingdom.[475]

In his role as Chief Capital Officer, Alexander was responsible for raising and deploying capital for Cred.[476]  In this role, Alexander was granted broad power and discretion over Cred's investment decisions and the control and ability to transfer Cred's assets with little oversight.[477]

Alexander received from Cred an annual salary of $240,000[478] and a $95,523.76 advance against a future profit share.[479]  He also received two different types of loans from Cred: a series of LBA token loans, and a cash loan.[480]  The precise amount of LBA tokens that Alexander obtained through the loan program is disputed (ranging from 5.2 million to 1.75 million tokens).[481]  Given time and information constraints, the Examiner was unable to ascertain if Alexander received additional payments from any other organizations or parties referenced in this Report.

---

[475] Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021); *see* MN Form UCF-17-2, Order Granting Name Change, Aug. 18, 1994 (Exhibit 167); s*ee also* Letter from Andrew Selous MP, Parliamentary Under-Secretary of State for Justice, to Philip Davies MP, House of Commons (Nov. 7, 2014) (Exhibit 168); Rachel Millard, *Exposed: inmates on the run from Ford Prison*, The Argus (Apr. 7, 2015), https://www.theargus.co.uk/news/12873674.exposed-inmates-on-the-run-from-ford-prison/.

[476] Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021).

[477] Interview with Daniel Schatt, co-founder and former Chief Executive Officer, Cred Inc. (Feb. 17, 2021).

[478] Exhibit 16.

[479] Exhibit 22 at ¶ 14.

[480] *Id.*

[481] *Compare* Exhibit 22 at ¶ 14 (5.2 million LBA tokens), *with* Employee Loan Agreement I, June 1, 2019 (Exhibit 156) (1,333,333 tokens), Employee Loan Agreement II, June 1, 2019 (Exhibit 157) (375,000 LBA tokens), and Employee Loan Agreement III, June 1, 2019 (Exhibit 158) (41,667 LBA tokens).

### 2.     Organization of Cred Capital.

Alexander was closely involved in the formulation and organization of Debtor Cred Capital.[482]  The Examiner notes that, pursuant to its Order entered February 5, 2021, the Court made certain factual findings regarding the organization of Cred Capital and related matters.[483] This Order followed extensive briefing on the matter by the Debtors, the Committee, and Alexander.  Specifically, the Court found that:

- the initial certificate of incorporation for Cred Capital, filed with the Delaware Secretary of State on March 10, 2020, was improperly filed; and

- upon discovering the improperly filed incorporation filings, Cred took steps to correct the improper filings and made Schatt and Podulka the directors of Cred Capital.[484]

The Examiner will, therefore, address the facts and circumstances surrounding Cred Capital's formation only as necessary to inform other aspects of this Report.

### 3.     James Alexander's Alleged Misappropriation of Assets.

On June 24, 2020, Alexander instructed Inamullah to transfer 225 Bitcoin and 200,000 USDC to wallet addresses that Alexander provided.[485]  Because of the poor state of Cred's books and records, the Examiner could not ascertain whether the 225 Bitcoin was among the same Bitcoin transferred to Cred by Lu Hua.

---

[482] Exhibit 22 ¶ 7.

[483] *See Order Denying Motion of James Alexander to Dismiss the Cred Capital, Inc. Case* (ECF. No. 487) ("Order Denying Alexander MTD") (Exhibit 159).

[484] *See Id.*

[485] Email from D. Inamullah to D. Schatt and J. Podulka, June 30, 2020 (Exhibit 160); Videotaped Deposition of James Alexander 72:13–15 ("Alexander Dep.") (Exhibit 161).

Inamullah represented that Alexander told him the transfers were being made to a Cred Capital account.[486] When asked how he confirmed this, Inamullah said that a separate entity was onboarded for Cred Capital on Cred's Fireblocks account, and this entity had a separate domain name.[487] In reality, the addresses that Alexander provided were for wallets belonging to an individual named Christopher Giovanni Silvio Spadafora, a consultant to Cred Capital since April 2020.[488] During his deposition, Alexander said he transferred these funds to Spadafora's wallets because Alexander did not have a wallet available to receive the funds at that time, and because he considered Spadafora a "trusted consultant and experienced crypto market participant."[489] However, during his interview with the Examiner, Alexander stated that he transferred the assets to Spadafora's asset management company "alwayshodl" but decided after a few days that "hodl didn't have the standing" to hold and manage the assets so he had them transferred to himself.[490] Further, Alexander stated that Inamullah understood what Alexander was attempting to accomplish through the transfer process.[491] According to Inamullah, he believed that he was, in fact, transferring the funds to a Cred Capital wallet.[492]

Inamullah represents that, when initially questioned about these transfers by Schatt, he believed that the address information had been transmitted by Alexander via Telegram

---

[486] Inamullah Dep. 158:24–159:4, 165:12–16 (Exhibit 9).

[487] *Id.* at 221:8–13.

[488] Alexander Dep. 72:17–25 (Exhibit 161).

[489] *Id.* 72:17–73:11.

[490] Interview with James Alexander, former Chief Capital Officer, Cred Inc. (Mar. 3, 2021).

[491] *Id.*

[492] Interview with Daniyal Inamullah, former Vice President of Capital Markets, Cred Inc. (Feb. 10, 2021).

messenger and confirmed by Alexander via telephone call.[493] Inamullah said he later remembered that Alexander provided all the necessary information in person because it is "much safer that way."[494] However, Inamullah subsequently advised the Examiner that Alexander sent the wallet addresses to Inamullah via WhatsApp messenger while they were both in the office, and Inamullah copied and pasted the addresses from WhatsApp into Fireblocks in order to complete the transfers.[495] Alexander informed the Examiner that he did not recall his communication with Inamullah regarding the transfer instructions.[496]

Alexander informed the Examiner that he directed the assets be transferred out of the Cred Capital account because he believed that he was the sole director of Cred Capital and that Schatt and Podulka were improperly attempting to take control of Cred Capital.[497] The following provides a chronology and factual observations regarding the relevant asset transfers:

- On July 1, 2020, Alexander received 224.899 Bitcoin from Spadafora.[498]

- On July 15, 2020, Cred filed a complaint against Alexander in California state court seeking, among other things, the recovery of 225 Bitcoin and other assets.[499]

- On July 16, 2020, Alexander liquated 65 of the approximately 225 Bitcoin that he had received by transferring those assets to his Coinbase wallet.[500]

---

[493] Inamullah Dep. 158:6–18 (Exhibit 9).

[494] *Id.* at 158:18; 160:13–17.

[495] Interview with Daniyal Inamullah, former Vice President of Capital Markets at Cred Inc. (Feb. 23, 2021).

[496] Alexander Dep. 71:14–19 (Exhibit 161).

[497] *Id.* at 69:4–11.

[498] *Id.* at 78:5–9.

[499] Verified First Amended Complaint, *Cred v. Alexander*, No. 20-CIV-02915 (Cal. Super. Ct. Aug. 14, 2020) (Exhibit 23).

[500] Alexander Dep. 83:16–85:2 (Exhibit 161).

- On July 17, 2020, a temporary restraining order and preliminary injunction enjoining Alexander from using or transferring any Cred or Cred Capital digital assets was issued by the California state court.[501]

- On January 16 and 17, 2021, Alexander transferred Bitcoin valued at approximately $1.832 million – in evident conflict with the terms of the California state court's TRO.[502] Specifically, Alexander transferred 50 Bitcoin on January 16th, and 50 additional Bitcoin on January 17th, into his Coinbase wallet to be liquidated into USD. Alexander acknowledged that the transfers did not comport with the TRO, but claimed that a purported medical emergency precipitated his actions.[503]

- At a bankruptcy hearing attended by Alexander on February 3, 2021, the Court determined that an emergency hearing would be held regarding the January 16th and 17th transfers completed by Alexander.[504]

- That same day, Alexander withdrew $10,000 in the form of a cashier's check from an account named "Alexander Custom Management." Alexander stated that this withdrawal was a salary payment to himself,[505] and said he deposited it into a personal account.[506]

- The following day, February 4, 2021, Alexander transferred $100,000 from a Wells Fargo bank account that he managed for Cred Capital to the "Alexander Custom Management" account, and then withdrew $60,000 in cash from that account.[507] Alexander stored this money in the trunk of his car, which, at the time of his deposition, was parked on Finely Avenue in Los Angeles, California, a street on which Alexander previously resided.[508] Alexander stated that he withdrew this cash to settle a purported tax liability, which he stated was a part of his 2020 compensation.[509] Alexander claimed that he had planned to deposit the cash into his personal account the day he withdrew it, but had not had the chance

---

[501] *Id.* at 85:11–86:11.

[502] Transcript of Zoom Hearing Re: Emergency Motions of the Official Committee of Unsecured Creditors 5:22–6:4, Feb. 5, 2021 (Exhibit 166).

[503] Alexander Dep. 105:20–108:7.

[504] *Id.* at 39:16–40:22.

[505] *Id.* at 47:21–48:18.

[506] *Id.* at 49:24–50:7.

[507] *Id.* at 42:12–45:18.

[508] *Id.* at 14:15–19, 46:15–18.

[509] *Id.* at 47:1–10.

to do so by the date of his deposition, five days later.[510] When asked how much cash was still in his car since withdrawing it over a week prior, Alexander stated that he did not recall and could not remember if he had spent any of the funds, since, as Alexander stated, "cash is fungible."[511]

- According to information that the Examiner received from the Committee's advisors, on February 5, 2021, Alexander returned 49.9980892 BTC and $2,773,489.24 USDC to the estates.[512]

- On February 7, 2021, Alexander returned to the estates an additional $35,000 from a JP Morgan Chase account and $50,355 from a Wells Fargo account.[513]

- The proceeds from the January 16th and 17th Bitcoin transactions totaled approximately $3,437,956.53 in the aggregate. As of the date of his February 9, 2021 deposition, Alexander had returned assets totaling, in the aggregate, approximately $2,773,488. When asked where the approximately $664,468 dollar difference in value between transferred and returned assets was, Alexander refused to answer, stating that the whereabouts of the funds was an "open question."[514]

- Thereafter, Alexander requested a break in the deposition, during which Alexander filed a personal Chapter 11 bankruptcy petition in the Central District of California. Upon return from break, Alexander ended his participation in the Court-ordered deposition.[515]

## VI.   INVESTIGATIVE CONCLUSIONS

The information that the Examiner was able to obtain and review within the constricted timeframe of the Investigation lends itself to the following conclusions:

### General Management/Oversight

1.     Lu Hua and Dan Schatt either failed to acknowledge or failed to realize the likely conflict of interest, both fiduciary and personal, that existed in their relationships with each other and between moKredit as a debtor and Cred as a lender.

---

[510] *Id.* at 52:1–11.

[511] *Id.* at 56:16–19.

[512] Email from J. Evans to E. Gilman, Feb. 28, 2021 (Exhibit 162).

[513] *Id.*

[514] Alexander Dep. 115:6–117:22 (Exhibit 161).

[515] Alexander Dep. 118:3–121:24 (Exhibit 161); Suggestion of Bankruptcy (ECF. No. 500) (Exhibit 163).

2.      Dan Schatt likely failed to make reasonable efforts to investigate James Alexander's background prior to hiring him as Cred's Chief Capital Officer.  Had Schatt done so, he likely would have learned that Alexander was convicted of a felony and sentenced to prison for acts amounting to fraud, and appears to be a current fugitive in the United Kingdom.

3.      Cred likely failed to develop and maintain a standardized and formal process for decision-making pertaining to Cred's liquidity situation, new investment proposals, investment allocations, and risk management strategies.

## Accounting Practices

1.      Cred failed to keep reliable, defensible records for its trading accounts and never adopted a regular practice of issuing transaction statements.

2.      Cred did not endeavor to complete account reconciliations.  At the time Cred filed for Chapter 11 relief, it had not reconciled its accounts for fiscal year 2020. The Examiner could not ascertain the last point at which Cred had a complete and accurate records reconciliation.

3.      Because of the lack of up-to-date books and records, the Examiner could not ascertain the reliability and efficacy of Cred's stated financial position at any time, up to and including the filing of its Chapter 11 petitions.

4.      Cred failed to develop and maintain a standardized, comprehensive protocol for tracking customer deposits and initiating and authorizing transfers.  Cred's method for initiating, authorizing, and executing transfers appears to have been informal, with all steps often performed by a single individual without a discernible method for approval or oversight.

5.      Cred did not keep consistent records of Fireblocks transactions, and the records it did keep were not comprehensive.

6.      Customer deposits derived from Uphold, CredEarn, and CredBorrow, were all maintained together without a standardized, repeatable method for distinguishing whose assets belonged to whom and from which offering they were derived.

## Risk/Due Diligence

1.      Cred failed to maintain a comprehensive, standardized process for performing due diligence on prospective or current asset managers.

2.      Cred failed to incorporate and maintain internal compliance policies, including due diligence policies.  It was not until Summer of 2020 that Cred began to initiate background checks on prospective employees and custodians and, even then, those checks do not appear to have been conducted retroactively.

96

3.      Cred's "investment committee" discussed, at least as early as November 2019, pursuing an "all-weather" strategy to diversify Cred's asset allocation and minimize risk. Cred, however, never fully implemented this strategy due to, among other things, continued liquidity issues beginning with the March 2020 crash, the inability to obtain repayment under the moKredit loan, the failed QuantCoin investment, and asset transfers involving Alexander.

## moKredit

1.      Cred did not receive or review written due diligence materials (e.g., moKredit's asset-to-liability ratio, customer transactions, customer default rate, or customer receivables) before entering into its loan agreement with moKredit.

2.      Prior to entering into the moKredit loan agreement, Cred did not take reasonable steps to ensure that it could enforce the loan agreement and effectuate repayment in the event that moKredit, a company located and doing business in China, defaulted or was otherwise unwilling or unable to satisfy its repayment obligations.

3.      Cred and moKredit appeared to operate without "proper controls." Cred transferred funds without signed tranche agreements and failed to issue periodic statements. As a result, Cred's informal accounting system – comprised of an Excel spreadsheet and a Google document – remained out-of-date and likely inadequate to track tens of millions of dollars of transactions between the companies.

## QuantCoin

1.      Cred did not conduct material due diligence prior to transferring 800 Bitcoin to QuantCoin. Cred management relied on statements made by James Alexander that QuantCoin due diligence was properly conducted without receiving any evidence substantiating such a claim.

2.      Dan Schatt signed the QuantCoin subscription agreement before it was reviewed by Cred's general counsel and adequate diligence was performed.

3.      Despite assertions made by Alexander, it does not appear that he conducted due diligence of QuantCoin on Cred's behalf.

4.      Daniyal Inamullah also did not conduct any due diligence of QuantCoin and, despite being the main contact on the account and initiating Cred's transfer of funds, Inamullah attempted to distance himself from the relationship thereafter by blaming the lack of diligence on the absence of a written process.

5.      After the series of Bitcoin transfers to QuantCoin, Cred, with reasonable diligence, could have discovered that, contrary to QuantCoin's assertions, Kingdom Trust did not have a relationship with QuantCoin and the real Scott Foster was not managing the Cred account.

97

**Hedge Positions**

1.    Cred hired outside consultant JST Capital to assist Cred in operating a cryptocurrency hedging program.

2.    Certain hedges established under this program failed to protect Cred from a downturn in the market and, instead, likely caused Cred to incur significant losses when the price of Bitcoin dropped significantly overnight on March 11, 2020.

3.    The decision not to reestablish its hedge positions after the March 2020 "flash crash" left Cred exposed ("naked") to market fluctuations.  As the price of Bitcoin increased towards the end of March and beyond, so too did Cred's liabilities.

**Luxembourg Bonds**

1.    At the time that Cred purchased the Luxembourg Bonds, it knew that moKredit would be unable to make the payments necessary to repay them.

2.    Cred's decision to purchase the Luxembourg Bonds in June 2020 (at par) significantly and adversely impacted Cred's already tenuous liquidity position.

**300 Lu Hua Bitcoin**

1.    After moKredit failed to repay $10 million of its principal balance, Hua sent 300 Bitcoin to Cred.  In or around this time, Hua executed an equity contribution agreement under which Hua agreed to transfer 300 Bitcoin in exchange for equity in Cred Capital.  Thus, despite Hua and Schatt's characterization of the Bitcoin transfer as a loan, the documentary evidence suggests an equity placement.

2.    Although Cred appears to have indicated that it intended to use the 300 Bitcoin to reestablish hedges liquidated by JST in the March 2020 crash, it does not appear that 300 Bitcoin would have been sufficient to reestablish such hedges.

**Certain Representations Made by or Attributed to Cred**

1.    It appears that, in certain instances, Cred mischaracterized the nature of its collateralization.  The funds Cred lent to moKredit and other asset managers after converting CredBorrow and CredEarn deposits to fiat currency were largely not collateralized.

2.    It appears that, in certain instances, Cred mischaracterized the nature of its insurance coverage.

3.    In communications with customers after the discovery of the failed QuantCoin investment, Cred indicated that the loss was insignificant and did not pose a significant risk to client funds.  At the same time, certain Cred employees were recommending that

Cred pull 100% of its assets from three asset managers in an effort to address liquidity concerns stemming, in part, from the failed QuantCoin investment.

4.      It appears that Cred understated its assets-to-liabilities gap internally and mischaracterized its ability to close that gap to customers in or around August 2020, a time at which Cred knew that moKredit was either unable or unwilling to pay down the principal balance on the moKredit loan.

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

*In re:*

CRED INC., *et al.*,[1]

                              Debtors.

Chapter 11

Case No. 20-12836 (JTD)

(Jointly Administered)

## CERTIFICATE OF SERVICE

I, Gregory A. Taylor, hereby certify that, on March 8, 2021 I caused one copy of the

*Report of Robert J. Stark, Examiner* reference pleadings to be served to (1) all parties of record

via CM/ECF and (2) to the attached service list via electronic mail unless otherwise indicated.


Dated: March 8, 2021
Wilmington, Delaware

                              */s/ Gregory A. Taylor*
                              Gregory A. Taylor (DE Bar No. 4008)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

**SERVICE LIST**

| | | |
|---|---|---|
| **VIA FIRST CLASS MAIL**<br>Arizona Attorney General Office<br>P.O. Box 6123<br>MD 7611<br>Phoenix, AZ 85005-6123 | Baker Hostetler LLP<br>Attn: Jeffrey J. Lyons<br>1201 North Market St.,14th Floor<br>Wilmington, DE 19801-1147<br>Email: JLyons@bakerlaw.com | Baker Hostetler LLP<br>Attn: Jorian L. Rose and Michael Sabella<br>45 Rockefeller Plaza<br>New York, NY 10111<br>Email: JRose@bakerlaw.com<br>Email: MSabella@bakerlaw.com |
| Billion Law<br>Attn: Mark M. Billion<br>1073 S. Governor Ave<br>Dover, DE 19904<br>Email: markbillion@billionlaw.com | Buchalter, P.C.<br>Attn: Shawn M. Christianson<br>55 Second St., 17th Floor<br>San Francisco, CA 94105-3493<br>Email: schristianson@buchalter.com | Buchanan Ingersoll & Rooney P.C.<br>Attn: Geoffrey G. Grivner<br>919 N Market St., Suite 900<br>Wilmington, DE 19801<br>Email: Geoffrey.grivner@bipc.com |
| Carlton Fields, PA<br>Attn: David L. Gay<br>2 Miami Central<br>700 NW 1st Ave., Suite1200<br>Miami, FL 33136-4118<br>Email: DGay@carltonfields.com | Cousins Law LLC<br>Attn: Scott D. Cousins<br>Brandywine Plaza West<br>1521 Concord Pike, Suite 301<br>Wilmington, DE 19803<br>Email: scott.cousins@cousins-law.com | **VIA FIRST CLASS MAIL**<br>Cred Inc.<br>Attn: President/CEO<br>3 East Third Avenue<br>San Mateo, CA 94401 |
| DCP Capital<br>Attn: Kevin Hu<br>Kingston Chambers<br>P.O. Box 173<br>Rd Town<br>Tortola Vg1110<br>British Virgin Islands<br>Email: Kevin@dcp.capital | **VIA EMAIL AND**<br>**FIRST CLASS MAIL**<br>Delaware Attorney General<br>Bankruptcy Dept.<br>Carvel State Office Building<br>820 N French St., 6th Floor<br>Wilmington, DE 19801<br>Email: attorney.general@state.de.us | **VIA EMAIL AND**<br>**FIRST CLASS MAIL**<br>Delaware Division Of Revenue<br>Attn: Christina Rojas<br>Carvel State Office Building<br>8th Floor<br>820 N. French St.<br>Wilmington, DE 19801<br>Email: Christina.rojas@delaware.gov |
| **VIA EMAIL AND**<br>**FIRST CLASS MAIL**<br>Delaware Secretary of State<br>Division Of Corporations Franchise Tax<br>P.O. Box 898<br>Dover, DE 19903<br>Email: dosdoc_ftax@state.de.us | **VIA FIRST CLASS MAIL**<br>Delaware Secretary of State<br>Division of Corporations<br>401 Federal St., Suite 4<br>Dover, DE 19901 | **VIA FIRST CLASS MAIL**<br>Delaware State Treasury<br>Bankruptcy Dept.<br>820 Silver Lake Blvd.<br>Suite 100<br>Dover, DE 19904 |
| Dragonfly International Holding Limited<br>Attn: Lindsay Lin<br>Maples Corporate Services (BVI) Limited<br>Kington Chambers<br>P.O. Box 173<br>Road Town Tortola, British Virgin Islands<br>Email: lindsay@dcp.capital | Faegre Drinker Biddle & Reath LLP<br>Attn: Patrick A. Jackson<br>222 Delaware Ave., Suite 1410<br>Wilmington, DE 19801-1621<br>Email:<br>Patrick.jackson@faegredrinker.com | Faegre Drinker Biddle & Reath LLP<br>Attn: Dustin R. Deneal<br>600 E. 96th St., Suite 600<br>Indianapolis, IN 46240<br>Email: dustin.deneal@faegredrinker.com |

| | | |
|---|---|---|
| Quinn Emanuel Urquhart & Sullivan, LLP<br>Attn: Toby E. Futter and Marc L. Greenwald<br>51 Madison Avenue, 22nd Floor<br>New York, NY 10010<br>Email: tobyfutter@quinnemanuel.com<br>Email: marcgreenwald@quinnemanuel.com | Lubin Olson & Niewiadomski LLP<br>Attn: Mia S. Blackler<br>The Transamerica Pyramid<br>600 Montgomery Street, 14th Floor<br>San Francisco, CA 94111<br>Email: mblackler@lubinolson.com | **VIA FIRST CLASS MAIL**<br>Franchise Tax Board<br>Bankruptcy Section MS A340<br>P.O. Box 2952<br>Sacramento, CA 95812-2952 |
| Gellert Scali Busenkell & Brown LLC<br>Attn: Michael Busenkell and Amy D. Brown<br>1201 N. Orange St., Suite 300<br>Wilmington, DE 19801<br>Email: MBusenkell@gsbblaw.com<br>Email: ABrown@gsbblaw.com | **VIA FIRST CLASS MAIL**<br>Internal Revenue SVC<br>Centralized Insolvency Operation<br>P.O. Box 7346<br>Philadelphia, PA 19101-7346 | **VIA FIRST CLASS MAIL**<br>Internal Revenue SVC<br>Centralized Insolvency Operation<br>2970 Market St.<br>Mail Stop 5 Q30 133<br>Philadelphia, PA 19104-5016 |
| JST Capital<br>Attn: Scott Freeman<br>350 Springfield Ave, Suite 200<br>Summit, NJ 07901<br>Email: SFreeman@jstcap.com | Maple Partners LLC<br>Attn: Joshua Segall<br>1309 Coffeen Ave., Suite 1200<br>Sheridan, WY 82801<br>Email: maplepartnersllc@gmail.com | McDermott Will & Emery LLP<br>Attn: Timothy W. Walsh and Darren Azman<br>340 Madison Ave<br>New York, NY 10173-1922<br>Email: twwalsh@mwe.com<br>Email: dazman@mwe.com |
| McDermott Will & Emery LLP<br>Attn: David R. Hurst<br>The Nemours Building<br>1007 North Orange St.,4th Floor<br>Wilmington, DE 19801<br>Email: dhurst@mwe.com | **VIA FIRST CLASS MAIL**<br>Michigan Dept. of Treasury Tax Pol Div.<br>Litigation Liaison<br>430 West Allegan St.<br>2nd Floor Austin Building<br>Lansing, MI 48922 | **VIA EMAIL AND FIRST CLASS MAIL**<br>Office of the United States Trustee<br>Attn: Joseph J. McMahon, Jr. and John Schanne<br>844 King St., Suite 2207<br>Wilmington, DE 19801<br>Email: joseph.mcmahon@usdoj.gov<br>Email: john.schanne@usdoj.gov |
| Paul Hastings LLP<br>Attn: James T. Grogan and Mack Wilson<br>600 Travis Street<br>58th Floor<br>Houston, TX 77002<br>Email: jamesgrogan@paulhastings.com<br>Email: mackwilson@paulhastings.com | **VIA EMAIL AND FIRST CLASS MAIL**<br>US Attorney For Delaware<br>Attn: Charles Oberly and Ellen Slights<br>1313 North Market St.<br>Wilmington, DE 19801<br>Email: usade.ecfbankruptcy@usdoj.gov | Paul Hastings LLP<br>Attn: G. Alexander Bongartz and Derek Cash<br>200 Park Avenue<br>New York, NY 10166<br>Email: alexbongartz@paulhastings.com<br>Email: derekcash@paulhastings.com |
| **VIA FIRST CLASS MAIL**<br>US EPA Region 3<br>Office Of Reg. Counsel<br>1650 Arch St.<br>Philadelphia, PA 19103 | Saul Ewing Arnstein & Lehr LLP<br>Attn: Mark Minuti<br>1201 North Market St., Suite 2300<br>P.O. Box 1266<br>Wilmington, DE 19899<br>Email: mark.minuti@saul.com | **VIA FIRST CLASS MAIL**<br>Social Security Administration<br>Office of The Gen. Counsel Region 3<br>300 Spring Garden St.<br>Philadelphia, PA 19123 |
| Uphold, Inc.<br>Attn: JP Thieriot<br>900 Larkspur Landing Circle<br>Suite 209<br>Larkspur, CA 94939<br>Email: jp.thieriot@uphold.com | Fox Rothschild LLP<br>Attn: Keith C. Owens<br>10250 Constellation Blvd., Suite 900<br>Los Angeles, CA 90067<br>Email: kowens@foxrothschild.com | Fox Rothschild LLP<br>Attn: Seth A. Niederman<br>919 North Market Street<br>Wilmington, DE 19899<br>Email: sniederman@foxrothschild.com |

| Connolly Gallagher LLP<br>Attn: Karen C. Bifferato<br>1201 N. Market Street, 20th Floor<br>Wilmington, DE 19801<br>Email:<br>kbifferato@connollygallagher.com | Archer & Greiner, P.C.<br>Attn: Alan M. Root<br>300 Delaware Ave, Suite 1100<br>Wilmington, DE 19801<br>Email: aroot@archerlaw.com | Foley & Lardner LLP<br>Attn: Joanne Molinaro and Geoffrey S. Goodman<br>321 N. Clark Street, Suite 300<br>Chicago, IL 60654<br>Email: jmolinaro@foley.com<br>Email: ggoodman@foley.com |
|---|---|---|

# EXHIBIT L

| Fill in this information to identify the case: |
| --- |
| United States Bankruptcy Court for the: |
| District of Delaware |
| (State) |
| Case number (*if known*):_____ Chapter __11__ |

☐ Check if this is an
amended filing

<u>Official Form 201</u>

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

04/20

If more space is needed, attach a separate sheet to this form.  On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | | |
| --- | --- | --- |
| 1. | **Debtor's Name** | **Cred Inc.** |
| 2. | **All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names, and *doing business as* names | **Cred LLC, Libra Credit (US) LLC** |
| 3. | **Debtor's federal Employer Identification Number** (EIN) | __85-2308268__ |

4. **Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
| --- | --- |
| **3 East Third Avenue** | |
| Number          Street | Number          Street |
| **Suite 200** | |
| | |
| **San Mateo, California  94401** | |
| City          State     Zip Code | City                    State     Zip Code |
| | **Location of principal assets, if different from principal place of business** |
| **San Mateo** | |
| County | |

| | | |
| --- | --- | --- |
| 5. | **Debtor's website** (URL) | https://mycred.io |
| 6. | **Type of debtor** | ☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))<br><br>☐ Partnership (excluding LLP)<br><br>☐ Other. Specify: _____ |

| Debtor | **Cred Inc.** | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**7. Describe debtor's business**

A. *Check One:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☒ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

**522298**

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check One:*

☐ Chapter 7

☐ Chapter 9

☒ Chapter 11.  *Check all that apply:*

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,725,625. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B)..

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, and it chooses to proceed under Subchapter V of Chapter 11. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934.  File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form**.**

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☒ No

☐ Yes.

| | District | When | | Case number | |
|---|---|---|---|---|---|
| | | | MM/DD/YYYY | | |
| | District | When | | Case number | |
| | | | MM/DD/YYYY | | |

**10. Are any bankruptcy cases pending or being filed by a business partner or an**

☐ No

☒ Yes.

| | | | | | |
|---|---|---|---|---|---|
| Debtor | **See Schedule 1** | | Relationship | **Affiliate** | |
| District | **Delaware** | | When | **11/7/2020** | |

| Debtor | **Cred Inc.** | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

| | affiliate of the debtor? | | MM / DD / YYYY |
|---|---|---|---|
| | List all cases. If more than 1, attach a separate list. | Case number, if known _____ | |

**11. Why is the case filed in *this* district?**

*Check all that apply:*

☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☒ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No
☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?**

| | Number | Street |
|---|---|---|
| | | |
| | City | State | Zip Code |

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____

Contact name _____

Phone _____

---

**Statistical and administrative information**

**13. Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.
☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors[1]**

| | | | |
|---|---|---|---|
| ☐ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☒ 5,001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

**15. Estimated assets[2]**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☒ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

---

[1] Estimated number of creditors, assets and liabilities noted here are provided on a consolidated basis.

[2] Estimated value of assets as of Oct. 30, 2020.

| Debtor | Cred Inc. | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**16. Estimated liabilities**

- ☐ $0-$50,000
- ☐ $50,001-$100,000
- ☐ $100,001-$500,000
- ☐ $500,001-$1 million
- ☐ $1,000,001-$10 million
- ☐ $10,000,001-$50 million
- ☐ $50,000,001-$100 million
- ☒ $100,000,001-$500 million
- ☐ $500,000,001-$1 billion
- ☐ $1,000,000,001-$10 billion
- ☐ $10,000,000,001-$50 billion
- ☐ More than $50 billion

| | Request for Relief, Declaration, and Signatures |
|---|---|

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    __11/7/2020__
               MM/ DD / YYYY

✗   _/s/ Daniel Schatt_                  **Daniel Schatt**
    Signature of authorized representative of debtor      Printed name

Title    __Chief Executive Officer__

**18. Signature of attorney**

✗   _/s/ Scott D. Cousins_       Date    __11/7/2020__
    Signature of attorney for debtor                   MM/DD/YYYY

**Scott D. Cousins**
Printed name

**Cousins Law LLC**
Firm name

**Brandywine Plaza West, 1521 Concord Pike, Suite 301**
Number           Street

**Wilmington**                    **DE**       **19803**
City                              State       ZIP Code

**(304) 824-7081**                   **Scott.cousins@cousins-law.com**
Contact phone                           Email address

**3079**                                  **DE**
Bar number                            State

| Fill in this information to identify the case: |
| --- |
| United States Bankruptcy Court for the: |
| **District of Delaware** <br> (State) |
| Case number *(if known):* _____ Chapter __11__ |

## Schedule 1

## Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor

On the date hereof, each of the entities listed below (collectively, the "Debtors") filed a petition in the United States Bankruptcy Court for the District of Delaware for relief under chapter 11 of title 11 of the United States Code. The Debtors have moved for joint administration of these cases under the case number assigned to the chapter 11 case of **Cred Inc**.

- Cred Inc.
- Cred (US) LLC
- Cred Merchant Solutions LLC
- Cred Capital, Inc.
- Cred (Puerto Rico) LLC

.

**IN UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------------------x
                                                 :
In re:                                           :   Chapter 11
                                                 :
CRED INC.,                                       :   Case No. 20-[_____] ([____])
                                                 :
                      Debtor.                    :
                                                 :
-------------------------------------------------------------x
```

## CORPORATE OWNERSHIP STATEMENT

      Pursuant to Rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the following are corporations, other than a government unit, that directly or indirectly own 10% or more of any class of the debtor's equity interest:

      None.

**Fill in this information to identify the case:**

**Debtor name:** Cred Inc., et al.

**United States Bankruptcy Court for the:** District of Delaware

**Case number (if known):** 20-_____

☐ Check if this is an amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders[1]

12/15

A list of creditors holding the 30 Largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. **Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 Largest unsecured claims.**

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent unliqui-dated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C ☑ U ☐ D | | | $14,065,941.24[1] |
| 2 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C ☑ U ☐ D | | | $13,525,842.95[1] |
| 3 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C ☑ U ☐ D | | | $4,942,850.36[1] |
| 4 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C ☑ U ☐ D | | | $3,829,221.40[1] |
| 5 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C ☑ U ☐ D | | | $2,618,880.60[1] |
| 6 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C ☑ U ☐ D | | | $2,549,184.33[1] |
| 7 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C ☑ U ☐ D | | | $2,169,064.80[1] |

[1]On a consolidated basis, excluding tax claims.  The information herein shall not constitute an admission of liability by, nor is it binding on, any Debtors with respect to all or any portion of the claims listed herein.  Moreover, nothing herein shall affect any Debtor's right to challenge the amount, priority, validity or characterization of any claim at a later date.

Debtor **Cred Inc., et al.**                                                                 Case number *(if known)* **20-_____**

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliqui-dated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If the claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 8 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C  ☑ U  ☐ D | | | $1,997,998.38[1] |
| 9 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C  ☑ U  ☐ D | | | $1,956,794.49[1] |
| 10 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C  ☑ U  ☐ D | | | $1,815,887.23[1] |
| 11 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C  ☑ U  ☐ D | | | $1,500,000.00[1] |
| 12 | DCP Capital Kingston Chambers, PO Box 173 Road Town Tortola VG1110 British Virgin Islands | Kevin Hu kevin@dcp.capital | Convertible Noteholder | ☐ C  ☐ U  ☐ D | | | $1,500,000.00 |
| 13 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C  ☑ U  ☐ D | | | $1,373,647.25[1] |
| 14 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C  ☑ U  ☐ D | | | $1,369,562.05[1] |
| 15 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C  ☑ U  ☐ D | | | $1,269,743.00[1] |
| 16 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C  ☑ U  ☐ D | | | $1,186,566.00[1] |
| 17 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C  ☑ U  ☐ D | | | $1,172,797.75[1] |
| 18 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C  ☑ U  ☐ D | | | $1,093,526.33[1] |

Debtor    **Cred Inc., et al.**                                                        Case number *(if known)* **20-_____**

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 19 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C ☑ U ☐ D | | | $1,088,416.73[1] |
| 20 | JST Capital 350 Springfield Ave Suite 200 Summit NJ 07901 | Scott Freeman sfreeman@jstcap.com | Trade Payable | ☐ C ☐ U ☐ D | | | $983,462.00 |
| 21 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C ☑ U ☐ D | | | $866,297.45[1] |
| 22 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C ☑ U ☐ D | | | $857,200.00[1] |
| 23 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C ☑ U ☐ D | | | $740,553.53[1] |
| 24 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C ☑ U ☐ D | | | $660,589.99[1] |
| 25 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C ☑ U ☐ D | | | $623,954.65[1] |
| 26 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C ☑ U ☐ D | | | $623,258.27[1] |
| 27 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C ☑ U ☐ D | | | $586,400.00[1] |
| 28 | Uphold, Inc. 900 Larkspur Landing Cir Suite 209 Larkspur CA 94939 | JP Thieriot jp.thieriot@uphold.com | Trade Payable | ☑ C ☑ U ☑ D | | | $518,635.45 |
| 29 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C ☑ U ☐ D | | | $443,080.00[1] |

Debtor **Cred Inc., et al.**                                    Case number *(if known)* **20-_____**

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent unliqui-dated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 30 | Name and Address on File | Contact Information On File | Customer Claim | ☐ C ☑ U ☐ D | | | $432,000.00[1] |

[1]Claim amount reflects the book value of the cryptocurrency positions with the Debtors.

## Appendix A
## Resolutions of the Corporation

**WHEREAS**, the directors (the "**Directors**") of Cred, Inc. (the "**Corporation**") have considered presentations by the Corporation's management and financial and legal advisors regarding its liabilities and liquidity situation, the strategic alternatives available to it and the effect of the foregoing on its business; and

**WHEREAS**, the Directors have determined that it is desirable and in the best interests of the Corporation, its creditors, and other interested parties that a petition be filed by the Corporation, seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") in which the authority for the Corporation to operate as a debtor in possession will be sought; and

**WHEREAS**, the Directors have received a draft of the petition under chapter 11 of title 11 of the Bankruptcy Code (the "**Chapter 11 Filing**"); and

**THEREFORE, BE IT RESOLVED THAT**:

Each of the Directors, and duly appointed officers of the Corporation from time to time (each an "**Authorized Person**" and together the "**Authorized Persons**") be and is authorized, empowered and directed, in the name and on behalf of the Corporation, to execute and verify the Chapter 11 Filing and to cause the same to be filed in the Bankruptcy Court at such time or in such other jurisdiction as such Authorized Person executing the same shall determine; and

Each Authorized Person, and such other persons as the Authorized Persons may from time to time designate, be and is authorized, empowered and directed, in the name and on behalf of the Corporation, to engage and retain all assistance by legal counsel, accountants, financial advisors, and such other professionals (in all cases as the Authorized Person deems necessary or desirable) in connection with the Chapter 11 Filing, with a view to the successful prosecution of such case; and

Each Authorized Person, and such other persons as the Authorized Persons may from time to time designate, and any employees or agents (including counsel) designated by or directed by any such persons, be and is, authorized, empowered and directed, in the name and on behalf of the Corporation, to execute and file all petitions, schedules, motions, lists, applications, pleadings and other papers, and to take and perform any and all further acts and deeds which he or she deems necessary, proper or desirable in connection with the Chapter 11 Filing, with a view to the successful prosecution of such case; and

In connection with the Chapter 11 Filing, each Authorized Person, and such other persons as the Authorized Persons may from time to time designate, and any employees or agents (including counsel) designated by or directed by any such persons, be and is, authorized, empowered and directed, in the name and on behalf of the Corporation, to cause the Corporation to enter into, execute, deliver, certify, file and/or record, and perform, such agreements, instruments, motions, affidavits, applications for approvals or ruling of governmental or

regulatory authorities, certificates or other documents, and to take such other action, as in the judgment of such persons shall be or become necessary, proper or desirable to effectuate a successful reorganization of the business of the Corporation; and

Each Authorized Person be and is, authorized and empowered on behalf of and in the name of the Corporation, to execute such consents of the Corporation as such Authorized Person considers necessary, proper or desirable to effectuate these resolutions, such determination to be evidenced by such execution or taking of such action.

**THEREFORE, BE IT FURTHER RESOLVED THAT:**

The law firm of Paul Hastings LLP be and is engaged as attorneys for the Corporation under a general retainer in relation to the Chapter 11 Filing, subject to any requisite Bankruptcy Court approval; and

The law firm of Cousins Law LLC be and is engaged as local counsel to represent and assist the Corporation and its professionals in relation to the Chapter 11 Filing, subject to any requisite Bankruptcy Court approval; and

The firm of MACCO Restructuring Group, LLC ("**MACCO**") be and is engaged as financial advisor to, among other things, assist the Corporation in (i) developing financial data for evaluation by its Board, creditors, or other third parties, (ii) conducting a strategic review of the Corporation's capital structure, (iii) advising the Corporation in connection with a restructuring, and (iii) assisting the Corporation to evaluate financing and acquisition proposals and, in connection therewith, the Authorized Persons be authorized to execute appropriate retention agreements, pay appropriate retainers, and cause to be filed an appropriate application for authority to retain the services of MACCO; and

The firm of Donlin, Recano & Company, Inc. ("**Claims Agent**") be and is engaged as notice and claims agent and administrative advisor to represent and assist the Corporation in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Corporation's rights and obligations in the Chapter 11 Filing and, in connection therewith, the Authorized Persons be authorized to execute appropriate retention agreements, pay appropriate retainers, and cause to be filed an appropriate application for authority to retain the services of the Claims Agent.

**THEREFORE BE IT FURTHER RESOLVED THAT**:

In connection with or to carry out the actions contemplated by the foregoing resolutions, the Director, officer or (if applicable) any attorney or duly authorized signatory of the Corporation (any such person being an "**Attorney**" or "**Authorized Signatory**" respectively) be, and such other persons as are authorized by any of them be, and each hereby is, authorized, in the name and on behalf of the Corporation, to do such further acts and things as the Director or officer or such duly authorized other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Corporation, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all

A-2

amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby; and

That any and all actions of the Corporation, or of the Director or officer or any Attorney or Authorized Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, the Director prior to such action being taken.

Fill in this information to identify the case and this filing:

| | |
|---|---|
| Debtor Name | **Cred Inc.** |
| United States Bankruptcy Court for the: | **District of Delaware** |
| | (State) |
| Case number (If known): | |

## Official Form 202
## Declaration Under Penalty of Perjury for Non-Individual Debtors
### 12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐ *Schedule A/B: Assets-Real and Personal Property (Official Form 206A/B)*

☐ *Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)*

☐ *Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)*

☐ *Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)*

☐ *Schedule H: Codebtors (Official Form 206H)*

☐ *Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)*

☐ Amended Schedule

☒ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders (Official Form 204)*

☒ Other document that requires a declaration  Corporate Ownership Statement, List of Equity Security Holders, and Resolutions of Corporation

I declare under penalty of perjury that the foregoing is true and correct.

Executed on

| | |
|---|---|
| **11/7/2020** | ✗ */s/ Daniel Schatt* |
| MM/ DD/YYYY | Signature of individual signing on behalf of debtor |
| | **Daniel Schatt** |
| | Printed name |
| | **Chief Executive Officer** |
| | Position or relationship to debtor |

**Official Form 202**          **Declaration Under Penalty of Perjury for Non-Individual Debtors**

# EXHIBIT M

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (___) |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS TO (A) MAINTAIN INSURANCE POLICIES, (B) PAY
ALL RELATED OBLIGATIONS, AND (II) GRANTING RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Cred Inc. ("Cred") and its affiliated debtors and debtors in possession (the "Debtors")

respectfully represent as follows in support of this motion:

**Relief Requested**

1.     By this motion, the Debtors request entry of interim and final orders, substantially

in the forms attached as **Exhibit A** (the "Interim Order") and **Exhibit B** (the "Final Order"),

respectively, authorizing, but not directing, the Debtors (a) to continue their Insurance Policies

(as defined below) on an uninterrupted basis in accordance with the same practices and

procedures in effect prior to the Petition Date, and renew its Insurance Policies or obtain

replacement coverage, as needed in the ordinary course of business, without further approval of

the Court; and (b) satisfy, in its sole discretion, all payment obligations related to the Insurance

Policies whether they arose before or after the Petition Date (as defined below).  In support of

this motion, the Debtors rely upon, and incorporate by reference, the *Declaration of Daniel*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number,
as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred
Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East
Third Avenue, Suite 200, San Mateo, California 94401.

*Schatt in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "<u>First Day</u>

<u>Declaration</u>").[2]

### Jurisdiction, Venue, and Statutory Bases

2.     The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>")

has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding

within the meaning of 28 U.S.C. § 157(b)(2).  In accordance with Rule 9013-1(f) of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "<u>Local Rules</u>"), the Debtors confirm their consent to the entry of a final

order by the Court in connection with this motion to the extent that it is later determined that the

Court, absent consent of the parties, cannot enter final orders or judgments in connection

herewith consistent with Article III of the United States Constitution.

3.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The statutory bases for the relief requested in this motion are sections 105(a) and

363(b) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1(m).

### Background

**1.     Chapter 11 Cases**

5.     On November 7, 2020 (the "<u>Petition Date</u>"), the Debtors each commenced a

voluntary case under chapter 11 of the Bankruptcy Code in this Court.  The Debtors are

authorized to continue operating their businesses as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of

creditors has been appointed in these chapter 11 cases.

---

[2]     Capitalized terms used but not otherwise defined in this motion shall have the meanings set forth in the First
Day Declaration.

6.      The Debtors have filed a motion requesting joint administration of their chapter 11 cases under Bankruptcy Rule 1015(b).

7.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the First Day Declaration.

**2.      The Debtors' Insurance Policies**

8.      The Debtors operate a financial services platform catering to cryptocurrency holders around the world.  In the ordinary course of business, the Debtors maintain insurance policies (each an "<u>Insurance Policy</u>" and collectively, the "<u>Insurance Policies</u>") that provide coverage for, among other things, the following types of liabilities: directors and officers; errors and omissions; cyber; and property damage, general commercial, commercial automobile, and umbrella liability.  A schedule of Insurance Policies is attached hereto as **<u>Exhibit C</u>**.[3]  The Debtors obtain the Insurance Policies through various third-party insurance carriers.  The aggregate annual premium for the Insurance Policies is approximately $385,000.  In addition to the premiums, many of the Debtors' Insurance Policies require self-insured retentions and deductibles in connection with certain claims under the Policies.

9.      Continuation of the Insurance Policies, and entry into new insurance policies is essential to the preservation of the value of the Debtors' business and assets.  Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements of the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>"), that a debtor maintain adequate

---

[3]     In addition to the Insurance Policies listed on Exhibit C, Cred maintains numerous employee benefit policies. These policies are described, and relief is requested with respect to such programs, in the *Motion of Debtors for Entry of Order (I) Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief*.

coverage given the circumstances of its chapter 11 case. Accordingly, the Debtors request authorization, but not direction, to continue prepetition practices related to the Insurance Policies, satisfy any payment obligations related to the Insurance Policies, and enter into new Insurance Policies in the ordinary course of business.

**3.     The Debtors' Insurance Broker**

10.     The Debtors obtain the Insurance Policies through their insurance broker, Lockton Companies, Inc. ("Lockton").  Lockton assists the Debtors in obtaining comprehensive insurance coverage for their operations in the most cost-effective manner, negotiating policy terms, provisions, and premiums, assisting Cred with claims, and providing ongoing support throughout applicable policy periods.  The Debtors do not pay Lockton any fees for the professional services rendered, as the Debtors' insurers pay Lockton on commission.

11.     Continuation of the Lockton's services are necessary to assure the Debtors' ability to secure Insurance Policies on competitive terms at competitive rates, facilitate the proper administration of the Insurance Policies, and ensure adequate protection of the Debtors' property. Accordingly, the Debtors request authority to continue utilizing Lockton's services in a manner consistent with its prepetition practices in the ordinary course of business.

## Basis for Relief

**I.     Continuation of the Insurance Policies Is Required by the Bankruptcy Code and U.S. Trustee Operating Guidelines**

12.     Section 1112(b)(4)(C) of the Bankruptcy Code lists "failure to maintain appropriate insurance that poses a risk to the estate or to the public" as "cause" for mandatory conversion or dismissal of a chapter 11 case.  In addition, in many instances, the coverage provided under the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the operating guidelines issued by the U.S.

Trustee (the "U.S. Trustee Guidelines").  Given this backdrop, the Debtors believe it is essential
to their estates, and consistent with the Bankruptcy Code and the U.S. Trustee Guidelines, that
they continue to satisfy all obligations related to the Insurance Policies, and have the authority to
supplement, amend, extend, renew, or replace their Insurance Policies as needed, in their
judgment, without further order of the Court.

## II.     Satisfying Obligations Under the Insurance Policies and Related Financing
       Agreements in the Ordinary Course of Business Is Warranted

        13.     Section 363(b) of the Bankruptcy Code permits the Court to grant the relief
requested in this motion.  It provides in relevant part, that "[t]he [debtor], after notice and a
hearing, may use, sell, or lease, other than in the ordinary course of business, property of the
estate."[4]

        14.     Under section 363, a court may authorize a debtor to pay certain prepetition
claims if a sound business purpose exists for doing so.[5]  The business judgment rule is satisfied
where "the directors of a corporation acted on an informed basis, in good faith and in the honest
belief that the action taken was in the best interests of the company."[6]  Moreover, if "the debtor
articulates a reasonable basis for its business decisions (as distinct from a decision made
arbitrarily or capriciously), courts will generally not entertain objections to the debtor's
conduct."[7]

---

[4]     11 U.S.C. § 363(b)(1).

[5]     *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999).

[6]     [*See, e.g.*, *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147
        B.R. 650, 656 (S.D.N.Y. 1992)] (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985).

[7]     *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616
        (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.,* 416 F.3d 229, 238 (3d Cir. 2005)
        ("Overcoming the presumptions of the business judgment rule is a near-Herculean task.").

15.     In addition, the Court has the authority to authorize the relief requested in this motion pursuant to its equitable powers under section 105(a) because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a).  Section 105 empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."[8]  Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to act as a fiduciary to "protect and preserve the estate, including an operating business' going-concern value," on behalf of the debtor's creditors and other parties in interest.[9]

16.     The Court may also authorize the payment of prepetition claims in appropriate circumstances under section 105(a) and the doctrine of necessity when such payment is essential to the continued operation of a debtor's business.[10]

17.     This "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the Court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code.[11]  The United States

---

[8]     11 U.S.C. § 105.

[9]     *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  *See also In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000) ("A paramount duty of a trustee or debtor in possession in a bankruptcy case is to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors."); *Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232-33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee.").

[10]    *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims under the doctrine of necessity and noting that the bankruptcy court has "power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"); *In re CoServ, L.L.C.*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use § 105(a) of the Bankruptcy Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate.").

[11]    *See In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if essential to the debtor's continued operation); *In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing "existence of a judicial power to authorize trustees . . . to pay claims . . . [for] goods or services indispensably necessary" to debtors' continued operation).

Supreme Court has also recognized courts may authorize payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors.[12]

18.    The relief requested in this motion is a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to Debtors, and is justified under sections 105(a) and 363(b).  Continuation of the Insurance Policies is essential to preserving uninterrupted operations and the value of the Debtors' estates.  Failing to maintain the Insurance Policies would impair — if not altogether halt — the Debtors' ability to operate, resulting in a material adverse effect on the Debtors' businesses and the value of their estates.

### Reservation of Rights

19.    Nothing contained in this motion is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an admission as to the validity, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (f) a waiver of any claims or causes of action which may exist against any entity; or (g) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law.

---

[12]    *See, e.g., Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of the continuance of [crucial] business relations"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases), *cert. denied* 325 U.S. 873 (1945); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285-86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages,  salaries, expenses, and benefits).

**Debtors Have Satisfied Bankruptcy Rule 6003(b)**

21.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition.  As described above and in the First Day Declaration, maintenance of the Insurance Policies is vital to the Debtors' operations and is necessary for the Debtors to operate their business in the ordinary course and maximize the value of their estates. Failure to maintain the Insurance Policies during the first twenty-one (21) days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that the relief requested in this motion is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003(b) is satisfied.

**Bankruptcy Rule 6004(a) and (h)**

22.     To implement the foregoing successfully, the Debtors request that the Court find that notice of this motion is adequate pursuant to Bankruptcy Rule 6004(a) under the circumstances, and waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property pursuant to Bankruptcy Rule 6004(h).  As explained above and in the First Day Declaration, the relief requested in this motion is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify finding that the notice requirements pursuant to Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

**Processing of Electronic Fund Transfers Should Be Authorized**

23.     The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of its access to unencumbered cash on hand and expected cash flows from ongoing business operations.  Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify electronic payment requests relating to the payment of prepetition insurance-related obligations, as applicable.  Accordingly, the Debtors believe that checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently.  Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or electronic payment transfer requests in respect of the relief requested in this motion.

**Notice**

24.     Notice of this motion has been given to (i) the U.S. Trustee; (ii) the Internal Revenue Service; (iii) the United States Attorney for the District of Delaware; and (iv) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors.  As this motion is seeking first-day relief, notice of this motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m)(iii).  In light of the nature of the relief requested in this motion, the Debtors respectfully submit that no further notice of this motion is required.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Interim and

Final Orders, substantially in the form attached hereto: (i) granting the relief requested in this

motion and (ii) granting such other and further relief as the Court may deem proper.

Dated: November 8, 2020
      Wilmington, Delaware

/s/ Scott D. Cousins
Scott D. Cousins (No. 3079)
**COUSINS LAW LLC**
Brandywine Plaza West
1521 Concord Pike, Suite 301
Wilmington, Delaware 19803
Telephone:    (302) 824-7081
Facsimile: :    (302) 295-0331
Email:      scott.cousins@cousins-law.com

- and -

James T. Grogan (admission *pro hac vice* pending)
Mack Wilson (admission *pro hac vice* pending)
**PAUL HASTINGS LLP**
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
Telephone:    (713) 860-7300
Facsimile:    (713) 353-3100
Email:      jamesgrogan@paulhastings.com
          mackwilson@paulhastings.com

- and -

G. Alexander Bongartz (admission *pro hac vice* pending)
Derek Cash (admission *pro hac vice* pending)
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:    (212) 318-6000
Facsimile:    (212) 319-4090
Email:      alexbongartz@paulhastings.com
          derekcash@paulhastings.com

*Proposed Co-Counsel to the Debtors*

**Exhibit A**

**Proposed Interim Order**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (___) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |

## INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) MAINTAIN INSURANCE POLICIES, (B) PAY ALL RELATED OBLIGATIONS, AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (the "Debtors") for entry of an order (this "Interim Order"), pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), authorizing, but not directing, the Debtors (a) to continue their Insurance Policies on an uninterrupted basis in accordance with the same practices and procedures in effect prior to the Petition Date, and renew its Insurance Policies or obtain replacement coverage, as needed in the ordinary course of business, without further approval of the Court; and (b) satisfy, in its sole discretion, all payment obligations related to the Insurance Policies whether they arose before or after the Petition Date, all as more fully set forth in the Motion; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and the Court having reviewed the Motion; and the Court having held a hearing to consider the relief requested in the Motion on an interim basis (the "Hearing"); and upon the First Day Declaration, filed contemporaneously with this Motion, and the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERD THAT:**

1.      The Motion is granted on an interim basis to the extent forth herein.

2.      The Debtors are authorized, but not directed, to continue the Insurance Policies and, in their sole discretion, pay and honor any prepetition amounts outstanding under, or postpetition obligations related to the Insurance Policies in the ordinary course of business and to pay any prepetition amounts due in connection therewith; *provided*, that the Debtors are authorized, but not directed, to pay or honor only amounts or obligations that are or become due and payable between the Petition Date and the date that a final order on the Motion is entered, unless otherwise ordered  by the  Court.

3.      The Debtors are authorized, but not directed, to renew, amend, supplement, extend, or purchase insurance policies to the extent that the Debtors determine, in their sole discretion, that such action is in the best interest of their estates.

4.      Nothing contained in the Motion or this Interim Order, nor any action taken pursuant to the authority granted by this Interim Order, shall constitute or be construed as (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an admission as to the validity, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (f) a waiver of any claims or causes of action which may exist against any entity; or (g) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law.

5.      Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

6.      The banks and financial institutions on which electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order without any duty of further inquiry.

7.      The Debtors are authorized to to effect postpetition fund transfer requests, in replacement of any fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the Insurance Policies.

8.      The requirements of Bankruptcy Rule 6003(b) have been satisfied.

9.      Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

10.     Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

11.     The Final Hearing shall be held on _____, **2020**, at ____ (ET) and any objections or responses to the Motion shall be in writing, filed with the Court, and served in accordance with the Local Rules.

12.     This Interim Order is effective only from the date of entry through this Court's disposition of the Motion on a final basis; *provided* that the Court's ultimate disposition of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this Interim Order.

13.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order.

14.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

**Exhibit B**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (___) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |

**FINAL ORDER (I) AUTHORIZING DEBTORS TO**
**(A) MAINTAIN INSURANCE POLICIES, (B) PAY ALL RELATED**
**OBLIGATIONS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (the "Debtors")

for entry of an order (this "Final Order"), pursuant to sections 105(a) and 363 of title 11 of the

United States Code (the "Bankruptcy Code"), authorizing, but not directing, the Debtors (a) to

continue their Insurance Policies on an uninterrupted basis in accordance with the same practices

and procedures in effect prior to the Petition Date, and renew its Insurance Policies or obtain

replacement coverage, as needed in the ordinary course of business, without further approval of

the Court; and (b) satisfy, in its sole discretion, all payment obligations related to the Insurance

Policies whether they arose before or after the Petition Date, all as more fully set forth in the

Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and

this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that

this Court may enter a final order consistent with Article III of the United States Constitution;

and this Court having found that venue of this proceeding and the Motion in this district is proper

pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in

interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a

hearing on the Motion were appropriate under the circumstances and no other notice need be

provided; and the Court having reviewed the Motion; and the Court having entered an order

granted the relief requested in the Motion on an interim basis on November __, 2020 [D.I.

_____]; and the Court having held a hearing to consider the relief requested in the Motion on a

final basis, if necessary (the "Hearing"); and upon the First Day Declaration, filed

contemporaneously with this Motion, and the record of the Hearing, if necessary; and the Court

having determined that the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein; and it appearing that the relief requested in the Motion is in the best

interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the

proceedings had before the Court and after due deliberation and sufficient cause appearing

therefor,

   **IT IS HEREBY ORDERD THAT:**

   1.  The Motion is granted on a final basis to the extent set forth herein.

   2.  The Debtors are authorized, but not directed, to continue the Insurance Policies

and, in their sole discretion, pay and honor any prepetition amounts outstanding under, or

postpetition obligations related to the Insurance Policies in the ordinary course of business and to

pay any prepetition amounts due in connection therewith.

   3.  The Debtors are authorized, but not directed, to renew, amend, supplement,

extend, or purchase insurance policies to the extent that the Debtors determine, in their sole

discretion, that such action is in the best interest of their estates.

4.      Nothing contained in the Motion or this Final Order, nor any action taken pursuant to the authority granted by this Final Order, shall constitute or be construed as (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an admission as to the validity, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (f) a waiver of any claims or causes of action which may exist against any entity; or (g) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law.

5.      Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

6.      The banks and financial institutions on which electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular electronic payment request as approved by this Final Order without any duty of further inquiry and without liability for following the Debtors' instructions.

7.      The Debtors are authorized to effect postpetition fund transfer requests, in replacement of any fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the Insurance Policies

8.      Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

9.      Notwithstanding Bankruptcy Rule 6004(h), this Final Order shall be immediately effective and enforceable upon its entry.

10.      The Debtors are authorized to take all action necessary to effectuate the relief granted in this Final Order.

11.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Final Order.

## **EXHIBIT C**

## **Insurance Policies**

| Type of Policy Coverage | Insurance Carrier(s) | Policy Number | Policy Term | Annual Policy Premium |
|---|---|---|---|---|
| Commercial Liability Package (Property, General Liability, Auto, Umbrella) | Hartford | 57 SBA BL1118 DX | October 1, 2020 to October 1, 2021 | $4,286 |
| Cyber Liability | AXIS | P-001-000080303-03 | January 25, 2020 to January 25, 2021 | $29,314 |
| Errors & Omissions | Validus Specialty | FIP0000445 | January 25, 2020 to January 25, 2021 | $270,000 |
| Directors & Officers | Validus | FIP0000270 | January 25, 2020 to January 25, 2021 | $40,000 |
| Excess Directors & Officers | Euclid | EFI0701394 01 | January 25, 2020 to January 25, 2021 | $35,200 |
| Employed Lawyers | One Beacon | MML-12988-19 | October 9, 2020 to October 9, 2021 | $4,957 |

# EXHIBIT N

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket Nos. 10** |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO**
**(A) MAINTAIN INSURANCE POLICIES, (B) PAY ALL RELATED**
**OBLIGATIONS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (the

"Debtors") for entry of an order (this "Interim Order"), pursuant to sections 105(a) and 363 of

title 11 of the United States Code (the "Bankruptcy Code"),  authorizing, but not directing, the

Debtors (a) to continue their Insurance Policies on an uninterrupted basis in accordance with the

same practices and procedures in effect prior to the Petition Date, and renew its Insurance

Policies or obtain replacement coverage, as needed in the ordinary course of business, without

further approval of the Court; and (b) satisfy, in its sole discretion, all payment obligations

related to the Insurance Policies whether they arose before or after the Petition Date, all as more

fully set forth in the Motion; and the Court having jurisdiction over this matter pursuant to 28

U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. §

157(b)(2), and that this Court may enter a final order consistent with Article III of the United

States Constitution; and this Court having found that venue of this proceeding and the Motion in

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and the Court having reviewed the Motion; and the Court having held a hearing to consider the relief requested in the Motion on an interim basis (the "Hearing"); and upon the First Day Declaration, filed contemporaneously with this Motion, and the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERD THAT:**

1.      The Motion is granted on an interim basis to the extent forth herein.

2.      The Debtors are authorized, but not directed, to continue the Insurance Policies and, in their sole discretion, pay and honor any prepetition amounts outstanding under, or postpetition obligations related to the Insurance Policies in the ordinary course of business and to pay any prepetition amounts due in connection therewith; *provided*, that the Debtors are authorized, but not directed, to pay or honor only amounts or obligations that are or become due and payable between the Petition Date and the date that a final order on the Motion is entered (such period, the "Interim Period"), unless otherwise ordered  by the  Court; *provided further*,

2

that the aggregate amount of any such prepetition amounts paid or honored during the Interim Period shall be limited to $25,000.

3.       The Debtors are authorized, but not directed, to renew, amend, supplement, extend, or purchase insurance policies to the extent that the Debtors determine, in their sole discretion, that such action is in the best interest of their estates.

4.       Nothing contained in the Motion or this Interim Order, nor any action taken pursuant to the authority granted by this Interim Order, shall constitute or be construed as (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an admission as to the validity, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (f) a waiver of any claims or causes of action which may exist against any entity; or (g) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law.

5.       Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

6.       The banks and financial institutions on which electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order without any duty of further inquiry.

7.     The Debtors are authorized to effect postpetition fund transfer requests, in replacement of any fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the Insurance Policies.

8.     The requirements of Bankruptcy Rule 6003(b) have been satisfied.

9.     Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

10.     Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

11.     The Final Hearing shall be held on **December 9, 2020, at 2:00 p.m. (ET)** and any objections or responses to the Motion shall be in writing, filed with the Court, and served in accordance with the Local Rules.

12.     This Interim Order is effective only from the date of entry through this Court's disposition of the Motion on a final basis; *provided* that the Court's ultimate disposition of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this Interim Order.

13.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order.

14.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

**JOHN T. DORSEY**
**UNITED STATES BANKRUPTCY JUDGE**

Dated: November 10th, 2020
Wilmington, Delaware

4

# EXHIBIT O

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re:  Docket Nos. 10 & 31** |

### FINAL ORDER (I) AUTHORIZING DEBTORS TO (A) MAINTAIN INSURANCE POLICIES, (B) PAY ALL RELATED OBLIGATIONS, AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (the "Debtors") for entry of an order (this "Final Order"), pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), authorizing, but not directing, the Debtors (a) to continue their Insurance Policies on an uninterrupted basis in accordance with the same practices and procedures in effect prior to the Petition Date, and renew its Insurance Policies or obtain replacement coverage, as needed in the ordinary course of business, without further approval of the Court; and (b) satisfy, in its sole discretion, all payment obligations related to the Insurance Policies whether they arose before or after the Petition Date, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and the Court having reviewed the Motion; and the Court having entered an order granted the relief requested in the Motion on an interim basis on November 10, 2020 [D.I. 31]; and the Court having held a hearing to consider the relief requested in the Motion on a final basis, if necessary (the "Hearing"); and upon the First Day Declaration, filed contemporaneously with the Motion, and the record of the Hearing, if necessary; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted on a final basis to the extent set forth herein.

2.      The Debtors are authorized, but not directed, to continue the Insurance Policies and, in their sole discretion, pay and honor any prepetition amounts outstanding under, or postpetition obligations related to the Insurance Policies in the ordinary course of business and to pay any prepetition amounts due in connection therewith.

3.      The Debtors, with the written consent of the Official Committee of Unsecured Creditors of Cred Inc., *et al.* or (in the absence of such consent) further order of the Court, on notice to parties in interest, are authorized, but not directed, to renew, amend, supplement,

extend, or purchase insurance policies to the extent that the Debtors determine that such action is in the best interest of their estates.

4.      Nothing contained in the Motion or this Final Order, nor any action taken pursuant to the authority granted by this Final Order, shall constitute or be construed as (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an admission as to the validity, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (f) a waiver of any claims or causes of action which may exist against any entity; or (g) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law.

5.      Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

6.      The banks and financial institutions on which electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order without any duty of further inquiry and without liability for following the Debtors' instructions.

7.      The Debtors are authorized to effect postpetition fund transfer requests, in replacement of any fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the Insurance Policies

3

8.     Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

9.     Notwithstanding Bankruptcy Rule 6004(h), this Final Order shall be immediately effective and enforceable upon its entry.

10.     The Debtors are authorized to take all action necessary to effectuate the relief granted in this Final Order.

11.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Final Order.

**JOHN T. DORSEY**
**UNITED STATES BANKRUPTCY JUDGE**

**Dated: December 18th, 2020**
**Wilmington, Delaware**

4

# EXHIBIT P

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* <br><br> CRED INC., *et al.*,[1] <br><br>           Debtors. | :<br>:<br>:<br>:<br>:<br>:   Chapter 11 <br><br> Case No. 20-12836 (JTD) <br> (Jointly Administered) |

        Pursuant to Section 1102(a)(1) of the Bankruptcy Code, I hereby appoint the following persons to the Committee of Unsecured Creditors in connection with the above-captioned cases:

1.        **DragonFly International Holding Limited**, Attn: Lindsay Lin, Maples Corporate Services (BVI) Limited, Kington Chambers, PO Box 173, Road Town, Tortola, British Virgin Islands, Phone: (703) 994-5176; Fax: (415) 889-6447; Email: lindsay@dcp.capital

2.        **Wendy Laraine Lee** (an individual)

3.        **Cedric de Lisser** (an individual)

4.        **Maple Partners, LLC**, Attn: Joshua Segall, 1309 Coffeen Avenue Suite 1200, Sheridan, WY 82801, Phone: (334) 245-3112; Fax: (307) 316-0481; Email: maplepartnersllc@gmail.com

5.        **Michael Michelin** (an individual)

6.        **Christopher Moser** (an individual)

7.        **Kyle Tuo Wang** (an individual)

DATED: December 3, 2020            ANDREW R. VARA
                                          United States Trustee, Region 3


                                  /s/ *oseph* . *McMahon* for _____
                                  T. PATRICK TINKER
                                  ASSISTANT UNITED STATES TRUSTEE

Attorneys assigned to these cases: Joseph J. McMahon, Jr., Esq., Tel: (302) 573-6491, Fax: (302) 573-6497, Email: joseph.mcmahon@usdoj.gov and John Schanne, Esq., Tel: (302) 573-6491, Fax: (302) 573-6497, Email: john.schanne@usdoj.gov

Proposed Debtors' Counsel: Scott D. Cousins, Esq., Tel: (302) 824-7081, Fax: (302) 295-0331, Email: scott.cousins@cousins-law.com

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

# EXHIBIT Q

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Hearing Date: Jan. 6, 2020 at 10:00 a.m. (ET)** |
|  | ) | **Obj. Deadline: Dec. 30, 2020 at 4:00 p.m. (ET)** |
|  | ) |  |

## DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 363(b) AND 105(a) FOR AUTHORIZATION TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT TERM SHEET

TO THE HONORABLE BANKRUPTCY JUDGE JOHN T. DORSEY:

Cred Inc. ("Cred") and its affiliated debtors and debtors in possession (the "Debtors")

submit this motion (the "Motion") pursuant to sections 105(a) and 363(b) of title 11 of the

United States Code (the "Bankruptcy Code") for entry of an order, substantially in the form

attached as **Exhibit A**, approving the Debtors' entry into and performance under a plan support

agreement term sheet (the "Plan Support Agreement" or the "PSA")[2] among (a) the Debtors and

(b) the Official Committee of Unsecured Creditors of Cred Inc. (the "Committee").  In support

hereof, the Debtors submit the Declaration of the Debtors' Chief Restructuring Officer, Mr.

Matthew K. Foster, (the "Foster Declaration"), attached as **Exhibit C**, and respectfully state as

follow:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

[2]    A true copy of the PSA is annexed hereto as **Exhibit B**, and incorporated herein by reference.  To the extent of any inconsistency between the description herein and the terms of the PSA, the PSA shall govern.  Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the PSA.  Given the exigencies of these cases, and to preserve estate resources, the Debtors and the Committee have agreed to forgo a more formal definitive agreement and to reflect their agreement in the form of a term sheet.

## PRELIMINARY STATEMENT

1.      The Debtors are pleased to announce that they have reached agreement with the Committee on the general terms of a consensual chapter 11 plan of liquidation that will maximize and preserve the value of these estates for the benefit of the Debtors' creditors.  The agreement, which is the product of extensive negotiations that took into account the exigencies of these chapter 11 cases (the "Chapter 11 Cases") is embodied in the PSA.  The Debtors, as fiduciaries of their estates, and the Committee, as fiduciary for unsecured creditors—which represent the fulcrum interest in these cases—both strongly believe that the restructuring process outlined in the PSA is in the best interests of the estates and all stake holders.

2.      The PSA contemplates a chapter 11 plan of liquidation centered on an expeditious liquidation of the Debtors' assets, first through the Debtors' proposed asset sale process to be conducted pursuant to section 363 of the Bankruptcy Code, and, irrespective of whether an actionable transaction comes to fruition, the transfer of all of the Debtors' assets, including sale proceeds, if any, cryptocurrency, and estate causes of action into a liquidation trust.  The liquidation trustee will monetize all assets in an orderly fashion designed to maximize value and will distribute the proceeds to creditors in accordance with the Bankruptcy Code priority scheme.

## JURISDICTION, VENUE, AND STATUTORY BASES

3.      This Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Debtors consent to the entry of a final order by the Court in connection with the Motion to the extent that it is later

2

determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.     Venue of these Chapter 11 Cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

5.     The statutory predicates for the relief requested herein are sections 363(b) and 105(a) of the Bankruptcy Code.  Such relief also is warranted under Bankruptcy Rule 6004.

## BACKGROUND

6.     On November 7, 2020, the Debtors commenced these Chapter 11 Cases by filing petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  These Chapter 11 Cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

7.     On November 18, 2020, the Debtor filed a motion [Docket No. 65] (the "Bidding Procedures Motion") seeking entry of an order (the "Bidding Procedures Order") (i)  approving bidding procedures for the sale of substantially all of the Debtor's assets (the "Assets"), (ii) scheduling an auction for, and a hearing to approve, the sale of substantially all of the Debtor's assets, and approving the form and manner of notices of thereof, (iii) approving assumption and assignment procedures, (iv) approving the sale of the Debtor's assets free and clear of liens, claims, interests and encumbrances, and (v) authorizing the assumption and assignment of unexpired leases and executory contracts.  As of the filing of this Motion, no order in respect of the Bidding Procedures Motion has been entered.

8.     On December 3, 2020, the United States Trustee for Region 3 appointed the Committee to serve in these Chapter 11 Cases.  The Debtors promptly engaged in discussions

with the Committee over the status of the Cases and the need for an expeditious resolution that would maximize value of the Debtors' estates for the benefit of all creditors. After a series of discussions, the Debtors and the Committee exchanged plan proposals, and ultimately executed the Plan Support Agreement on December 14, 2020. As set forth in the Plan Support Agreement, the Debtors agreed to file a motion for approval thereof. Accordingly, the Debtor are filing this motion (the "Motion") seeking authorization to enter into and perform the Debtors' obligations under the Plan Support Agreement.

## THE TERMS OF THE PLAN SUPPORT AGREEMENT

9. The Plan Support Agreement contemplates the wind-down of the Debtors through a potential sale (the "In-Court Sale") of certain of the Debtors' assets pursuant to Bankruptcy Code sections 105(a), 363(b), (f), (k) and (m), and 365, followed by a chapter 11 plan of liquidation (the "Plan") to be confirmed by the Bankruptcy Court. The Plan will provide for (i) distribution of the net proceeds realized from the In-Court Sale in accordance with the Plan Support Agreement, and (ii)(x) through the Cred Liquidation Trust (as defined below), the liquidation and distribution of proceeds from the claims, causes of action and avoidance actions and other assets included therein, net of any costs of liquidation or distribution, and (y) the funding of such wind-down efforts (collectively, the "Restructuring Transaction").

10. The material terms of the Plan under the Plan Support Agreement will include the following:

| Plan Term | Summary |
|---|---|
| **Treatment of Administrative Expense Claims** | Paid in full in cash on the Effective Date or as otherwise provided in the Bankruptcy Code or approved by the Bankruptcy Court, except to the extent that a holder of such claim agrees to different treatment. |
| **Treatment of Priority Tax Claims** | Either paid in full (a) in cash on the Effective Date or (b) such other less favorable treatment to the holder of an allowed Priority Tax Claim as to which the Debtor and the holder of such allowed Priority Tax Claim shall |

| Plan Term | Summary |
|---|---|
| | have agreed upon in writing. All allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof. |
| **Treatment of Other Priority Claims** | Either (i) paid in full, in cash, or (ii) treatment consistent with the provisions of Bankruptcy Code section 1129(a)(9), in each case, on or as soon as practicable after the later of (x) the Effective Date and (y) the date on which such claim becomes allowed. |
| **Treatment of General Unsecured Claims** | Each holder of an allowed General Unsecured Claim shall receive one or more distributions equal to its share of the interests in the Cred Liquidation Trust, as such distributions become available as is reasonably practicable in the reasonable discretion of the Liquidation Trustee. |
| **Establishment of Liquidation Trust** | Pursuant to the Confirmation Order, the "Cred Liquidation Trust" will be established, all assets of the Debtors' estates will be transferred to the trust, and the Debtors will be dissolved.<br><br>• The Cred Liquidation Trust will be intended to qualify as a "liquidating trust" as described in Treasury Regulations Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-2 C.B. 684, and will be treated for federal income tax purposes as a "grantor trust" under Internal Revenue Code sections 671-677.<br>• The Cred Liquidation Trust shall be managed by the Liquidation Trustee selected by the Committee in its sole discretion.<br>• The Liquidation Trustee shall be subject to a Trust Advisory Board consisting of each member of the Official Committee of Unsecured Creditors who wishes to continue in such role, and such additional members nominated by the Official Committee, if any, as are required for the initial complement of the Trust Advisory Board to be an odd number greater than one.<br>• The Cred Liquidation Trust shall be administered in accordance with the terms of the Liquidation Trust Agreement. |
| **Means for Plan Implementation** | On the Effective Date, the Plan shall be funded by the proceeds of the In-Court Sale (if any) and any other cash or other assets then held by the Debtors, which shall be used satisfy the claims against the Debtors in the manner set forth in the Plan. |
| **Releases** | The Plan shall include full customary debtor and "third party" releases from liability in favor of the Debtors' professionals, Grant Lyon as the Debtors' independent director, the Debtors' chief restructuring officer and any other temporary staff supplied by Sonoran Capital, the Committee's professionals, and each Committee member. |
| **Conditions to Plan Confirmation** | i.   The Plan Support Agreement shall not have been terminated. |

| Plan Term | Summary |
|---|---|
|  | ii.  The Confirmation Order shall be in a form and substance reasonably acceptable to the Committee, as determined by the consent of the Committee.<br>iii. The final version of all of the schedules, documents, and Plan exhibits, including a Plan supplement, shall have been filed in form and substance acceptable to the Committee in its reasonable discretion, as determined by the consent of the Committee.<br>iv. No breach or failure to comply with the terms of the Definitive Documents, the Confirmation Order or any other material final order of the Bankruptcy Court shall have occurred and be continuing. |
| **Conditions to the Effective Date of the Plan** | i.   The Plan Support Agreement shall not have been terminated.<br>ii.  No breach or failure to comply with the terms of the Definitive Documents, the Confirmation Order, or any other material final order of the Bankruptcy Court shall have occurred and be continuing.<br>iii. The conditions to confirmation delineated in the Plan shall have either been satisfied or waived in accordance with the Plan.<br>iv. All documents required under the Plan shall have been delivered.<br>v.  The Confirmation Order in form and substance reasonably satisfactory to the Committee shall have been entered by the Bankruptcy Court, and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto. |
| **Other Plan Terms** | The Plan shall contain all other customary terms for chapter 11 plans of this type, which shall be reasonably acceptable to the Committee, including, without limitation, provisions dealing with retention of jurisdiction, discharge and cancellation of instruments, claims allowance and objections, and exemption from stamp and other transfer taxes pursuant to Bankruptcy Code section 1146. |

11.     The Plan Support Agreement contemplates a "Support Period" commencing on the date of execution and ending on the earliest of (i) the date on which the Debtors' confirmed Plan becomes effective (the "Effective Date") and (ii) the date on which the PSA is terminated according to its terms. The Debtors have agreed to use commercially reasonable efforts to confirm and effectuate the Plan as soon as practicable, and that the Restructuring Transaction will be implemented in accordance with the following milestones (the "Milestones"):[3]

---

[3]    Milestones may be waived by the Committee in its sole discretion, and all dates and deadlines listed herein are subject to extension by mutual agreement of the Debtors and the Committee, without further Court approval.

a. By December 31, 2020, the Debtors must (i) file a motion seeking Bankruptcy Court approval of the Disclosure Statement (as defined below) and Solicitation Materials (as defined below), (ii) obtain entry of an order approving bidding procedures for the In-Court Sale, and (iii) obtain entry of an order authorizing the Debtors to enter into the Plan Support Agreement.[4]

b. By January 7, 2021, the Debtors must file their schedules of assets and liabilities and statements of financial affairs.

c. By January 29, 2021, the Debtors must either (i)(A) obtain entry of an order approving the Disclosure Statement, and (B) obtain entry of an order by the Bankruptcy Court scheduling a hearing on the Plan and setting an objection deadline with respect thereto, or (ii) seek interim approval of a combined Plan and Disclosure Statement under Local Bankruptcy Rule 3017-2, and schedule a combined hearing on final approval of the Disclosure Statement and confirmation of the Plan.

d. By March 17, 2021, the Debtors must (i) obtain the entry of an order confirming the Plan, and (ii) obtain entry of an order approving the In-Court Sale, if applicable.

e. By March 31, 2021, the Effective Date of the Plan must occur.

12. The Committee shall have the right to terminate the Plan Support Agreement in the event the Debtors fail to comply with, satisfy, or achieve any of the Milestones. The Committee shall also have termination rights:

a. Upon the Debtors' material breach of any of their obligations under the PSA;

b. If the Debtors fail to provide the Committee and its advisors with reasonable access to the Debtors' books, records, and management through the Effective Date;

c. If any of the Definitive Documents filed in the Chapter 11 Cases contain terms and conditions materially inconsistent with the Plan Support Agreement;

d. If the Debtors' Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, upon the appointment of a chapter 11 trustee, a responsible officer, or an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the Debtors, or upon dismissal of the Chapter 11 Cases;

---

[4] The Committee has agreed to extend the milestone to obtain entry of an order authorizing the Debtors to enter into the Plan Support Agreement to January 6, 2021.

e.   If the Bankruptcy Court grants relief that is materially inconsistent with the PSA or would reasonably be expected to materially frustrate the purpose of the PSA;

f.   If the Debtors file for approval of or otherwise support any Alternative Transaction or other transaction that is inconsistent with the Plan, the Plan Support Agreement or the Restructuring Transaction; and

g.   If the Bankruptcy Court approves an Alternative Transaction or other transaction that is inconsistent with the terms of the Restructuring Transaction.

13.   The Debtors shall have the right to terminate the PSA under the following circumstances:

a.   Upon the Committee's material breach of any of their obligations under the PSA;

b.   If the Debtors determine in good faith that continued performance under the PSA would be inconsistent with the exercise of its fiduciary duties under applicable law;

c.   If the Bankruptcy Court grants relief that is materially inconsistent with the PSA or would reasonably be expected to materially frustrate the purpose of the PSA;

d.   If the Committee files for approval of or otherwise supports any Alternative Transaction or other transaction that is inconsistent with the Plan or the Restructuring Transaction;

e.   If any of the orders approving the Plan or the Disclosure Statement are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Debtors and the Committee; and

f.   If the Bankruptcy Court confirms a competing plan that is inconsistent with the terms of the Restructuring Transaction.

14.   In addition to the Milestones and termination rights, the PSA contains the following material terms:

| **PSA Term** | **Summary** |
|---|---|
| **Budget and Reporting** | • The Debtors' use of cash shall be subject to (and limited by) a 13-week cash flow forecast commencing on the date hereof, which forecast shall include an itemized list of expenses to be incurred during each week along with information sufficient to denote the purpose of such expenses and shall be in form and substance acceptable to the Committee (the "Approved Budget," a copy of which is attached as Exhibit B to the PSA). |

8

| PSA Term | Summary |
|---|---|
| | • By no later than 12:00 pm ET on the second business day of each week, commencing with the first full week after the date of the PSA (each, a "Reporting Date"), the Debtors shall provide to the Committee an updated 13-week cash flow forecast, containing line items of sufficient detail to reflect the Debtors' projected cash receipts and disbursements for such 13-week period on a weekly basis (the "13-Week Forecast"). Each 13-Week Forecast shall be acceptable to the Committee, and upon acceptance by the Debtors, such 13-Week Forecast shall become the new Approved Budget.<br>• On each Reporting Date, the Debtors shall deliver to the Committee a variance report (each, a "Variance Report") showing comparisons of actual results for each line item against such line item in the Approved Budget.<br>• The Debtors are also required to provide additional reporting to the Committee, as set forth in the PSA. |
| **Estate Causes of Action** | The Debtors will cooperate with the Committee, including the production of documents, in connection with the Committee's investigation of claims and causes of action that the Debtors and their estates could potentially assert against any party, including all causes of action arising under chapter 5 of the Bankruptcy Code (each, a "Cause of Action" and collectively, the "Causes of Action").<br><br>• Subject to Bankruptcy Court approval, the Debtors consent to the Committee having derivative standing to pursue all Causes of Action against any current or prior insider, affiliate, or employee of any Debtor.<br>• Upon reasonable request by the Committee, the Debtors will grant the Committee derivative standing, subject to Bankruptcy Court approval, to pursue any other Cause of Action on behalf of the Debtors' estates that the Committee in good faith, and after consultation with the Debtors, believes must be pursued prior to the Effective Date of the Plan because of exigent circumstances, but only if the Debtors' estates have sufficient funds to pursue such Cause of Action.<br>• The Debtors will consult with the Committee prior to asserting or commencing any Cause of Action, (ii) upon reasonable request by the Committee, the Debtors will. The Debtors will not commence any Cause of Action without Committee consent unless the Debtors, in good faith and in consultation with the Committee, believe such Cause of Action must be pursued prior to the Effective Date of the Plan because of exigent circumstances, but only if the Debtors' estates have sufficient funds to pursue such Cause of Action.<br>• The Debtors will not compromise, resolve, or settle any Cause of Action without the Committee's consent. |

| **PSA Term** | **Summary** |
|---|---|
| **Court Filings** | As reasonably requested by the Committee, the Debtors shall provide to the Committee and/or its professionals draft copies of all material motions and applications that the Debtors intend to file with the Bankruptcy Court at least three (3) calendar days prior to the date on which the Debtors are to file such documents, to the extent reasonably practicable under the circumstances. |
| **Access to Management** | As reasonably requested by the Committee, the Debtors shall provide to the Committee and/or its professionals reasonable access to the Debtors' management and advisors for the purposes of evaluating the Debtors' finances and operations and participating in the planning process with respect to the Restructuring Transaction. |
| **Additional Information** | As reasonably requested by the Committee, the Debtors shall provide to the Committee and/or its professionals such additional financial or other information concerning the acts, conduct, property, assets, liabilities, operations, financial condition, and transactions of any of the Debtors, or concerning any matter that may affect the administration of any of the Debtors' estates, as the Committee may from time to time reasonably request. |
| **Asset Sales** | Subject to the consent of the Committee, the Debtors may enter into an agreement providing for the sale of one or more material asset (defined as any asset the net sale proceeds of which are $100,000 or higher). |
| **Termination of the Sale Process** | In the event the Debtors have not executed a binding stalking horse agreement to sell all or substantially all of their assets on or prior to January 15, 2021, the Debtors shall terminate any sale process, which shall include the termination of Teneo Capital LLC, unless the Debtors and Committee agree that Teneo shall continue to be retained to solicit and negotiate potential exit financing to, among other things, fund the costs of litigation by the Cred Liquidation Trust. |
| **No Sale of Cryptocurrency** | Other than as permitted by an Approved Budget, the Debtors shall not, without the prior consent from the Committee, sell any of the Debtors' cryptocurrency. |
| **Debtor-in-Possession Financing Facility** | Subject to consent of the Committee, the Debtors may enter into an agreement providing for a debtor-in-possession financing facility, provided that no such facility shall provide for the requirement of additional collateral, or acceleration of maturity, on account of any change in the value of liquid cryptocurrency property of the Debtors. Such facility shall remain subject to the Debtors' determination of their fiduciary obligations and thereafter to approval of the Court.<br><br>The Debtors shall provide the Committee's professionals, upon reasonable request to the Debtors' professionals, information |

| PSA Term | Summary |
|---|---|
| | concerning any debtor-in-possession financing facility solicitation, negotiating, and consummation process. |
| **Governance Issues** | Daniel Schatt and Joseph Podulka shall not serve in any capacity with the Debtors, including, without limitation, as an officer, board member, or employee, except that Daniel Schatt may remain employed by the Debtors as an "at will" employee with a monthly salary of $10,000 through no later than January 15, 2021. To the extent the Debtors desire to retain either individual in any other capacity, such retention shall be subject to the Committee's prior written consent, and only for the specific purpose requested and authorized. |
| **Affirmative Covenants** | During the Support Period, the Debtors and the Committee shall: <br><br> i.  support the Restructuring Transaction, which shall be in form and substance consistent with the PSA; <br> ii.  support and not object to entry of any orders proposed in the Chapter 11 Cases that are consistent with the PSA; <br> iii.  in good faith, negotiate the Definitive Documents[5] (as defined below), which shall be in form and substance consistent in all respects with the PSA; <br> iv.  consent to those actions contemplated by the PSA or otherwise required to be taken to effectuate the Restructuring Transaction, including entering into all documents and agreements necessary to consummate the Restructuring Transaction; and <br> v.  support entry of orders approving the Disclosure Statement and confirming the Plan that are in form and substance consistent with the PSA. |
| **Negative Covenants** | During the Support Period, no PSA Party shall take any action materially inconsistent with the Restructuring Transaction that is expressly contemplated by the PSA and the Definitive Documents. During the Support Period, subject to the Debtors' fiduciary duties (as set forth below), and provided the Definitive Documents are consistent with the PSA, no PSA Party shall support any Alternative Transaction or take any action materially inconsistent with the Restructuring |

---

[5]  As used in the PSA, "Definitive Documents" means the documents (including any related orders, agreements, instruments, schedules, or exhibits) that are necessary or desirable to implement or otherwise relate to the Restructuring Transaction, including, but not limited to: (a) a motion to approve the Debtors' entry into the PSA, (b) an order approving the Debtors' entry into the PSA, (c) all documents in connection with the In-Court Sale (including, without limitation, the sale agreement and order approving the sale), (d) the Plan (and all exhibits thereto), (e) the disclosure statement (the "Disclosure Statement") for the Plan, (f) the solicitation materials for the Plan (the "Solicitation Materials"); (g) an order approving the Disclosure Statement, (h) the order confirming the Plan, (i) the agreement establishing the Cred Liquidation Trust, (j) the PSA; and (k) any other documents or exhibits related to or contemplated in the foregoing clauses (a) through (j), in each case in form and substance consistent with the PSA and reasonably acceptable to the Committee.

| **PSA Term** | **Summary** |
|---|---|
|  | Transaction that is expressly contemplated by the PSA, or the Definitive Documents.<br><br>During the Support Period, no PSA Party shall take any action, or fail to take any action, that would result in (or that with the giving of notice or the passage of time, or both would result in) a Debtor Termination Event, or a Committee Termination Event. |
| **Governing Law** | The PSA is governed by the laws of the State of Delaware. |
| **Venue** | Any disputes between the PSA Parties arising out of, or in connection with, the PSA shall be brought in the Bankruptcy Court (for so long as the Debtors are subject to the jurisdiction of the Bankruptcy Court) or, to the extent the Bankruptcy Court does not have jurisdiction, in a court located in New Castle County, Delaware, and the PSA Parties hereby submit to the the to the exclusive jurisdiction of the federal and state courts of the State of Delaware located in New Castle County with respect to any action or legal proceeding commenced by any PSA Party arising out of, or in connection with, the PSA and irrevocably waive any objection the PSA Parties now or hereafter may have respecting the venue of any such action or proceeding brought in such a court or respecting the fact that such court is an inconvenient forum. |

## **RELIEF REQUESTED**

15.     By this Motion, the Debtors respectfully request an order, under Bankruptcy Code sections 363(b) and 105(a), authorizing the Debtors to enter into and perform the Plan Support Agreement.

## **BASIS FOR RELIEF**

16.     The Debtors seek authority to enter into the PSA pursuant to section 363(b)(1) of the Bankruptcy Code.  That section provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate …."  11 U.S.C. § 363(b)(1).  Under section 363(b) of the Bankruptcy Code, courts require only that the debtor show "a sound business purpose justifies such actions."  *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242

12

B.R. 147, 153 (Bankr. D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct").  A debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice."  *In re Aerovox, Inc.*, 269 B.R. 74, 80 (Bankr. D. Del. 2001) (internal quotations omitted)

17.    Where a debtor has articulated a sound business purpose, "the law vests a debtor's decision to use property out of the ordinary course of business with a 'strong presumption' that corporate business decisions are made on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *In re 1031 Tax Grp., LLC*, No. 07-11448 (MG), 2007 WL 2085384, *5 (Bankr. S.D.N.Y. 2007) (citing *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992)); *see also Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "the business judgment rule is a presumption that directors act in good faith, on an informed basis, honestly believing that their action is in the best interests of the company" and stating further that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").  This presumption "shields corporate decision makers and their decisions from judicial second-guessing." *Integrated Res.*, 147 B.R. at 656.

18.    This Court previously has upheld the general validity of post-petition plan support agreements in *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013).  As the

Court explained, there is no *a priori* prohibition in the Bankruptcy Code on plan support agreements "[w]hen [the] deal is negotiated in good faith between a debtor and sophisticated parties, and that arrangement is memorialized a written commitment and promptly disclosed." *Id.* at 297.

19.   Courts have looked to *In re Innkeepers USA Trust*, 442 B.R. 227 (Bankr. S.D.N.Y. 2010), for a list of five factors to be considered in determining whether to authorize a debtor to enter into a specific plan support agreement. Those five factors are:

(a)  whether the plan support agreement resulted from good-faith, disinterested, arm's-length negotiations;

(b)  whether the debtor is exercising due care in entering into the plan support agreement;

(c)  whether the plan support agreement provides value to the estate and the chapter 11 process;

(d)  whether the benefits of the plan support agreement outweigh the burdens; and

(e)  whether the plan support agreement contains a "fiduciary out."

*See id.* at 231-35.

20.   The Debtors submit that each of these five factors is met here.  First, the PSA is the result of extensive, arm's-length negotiations between the Parties, all of which were (and are) represented by experienced, sophisticated and capable counsel.  Second, the Debtors have exercised due care in entering into the PSA: the Debtors have concluded that an expedited sale and distribution of the Debtors' assets is the best way to maximize the value of their estates.  The only alternatives to the approach in the PSA are prolonged Chapter 11 Cases, which would likely involve significant administrative expenses, or conversion of the cases to cases under chapter 7 of the Bankruptcy Code, which the Debtors believe would result in significantly lower distributions to the Debtors' creditors.  Third, the PSA provides significant value to the estates by, among other things, providing funding for distribution of the Debtors' assets by the

Liquidation Trust and establishing a framework for the Liquidation Trustee to pursue estate claims for the benefit of general unsecured creditors.

21.     Fourth, because the Plan contemplated by the PSA currently is the only viable alternative to a prolonged sale process in chapter 11 or the Chapter 11 Cases being converted to chapter 7, the benefits of the PSA significantly outweigh its burdens on the estates.  Finally, the PSA contains an explicit fiduciary out and reserves entirely to the Debtors the right to determine if its fiduciary duties require that it abandon the PSA.

22.     As set forth above, the Debtors believe that there are significant business justifications for entering into the PSA.  In particular, the Debtors believe that the Plan contemplated in the PSA will result in the creditors of the estates receiving a greater distribution on account of their claims than is otherwise possible under the circumstances of these Chapter 11 Cases.

23.     As a result, the Debtors submit that entering into the PSA is in the best interests of the Debtors, their estates and their creditors.

## NO PRIOR REQUEST

24.     No previous request for the relief sought herein has been made to this or any other court.

## REQUEST FOR WAIVER OF STAY

25.     The Debtors request a waiver of any stay of the effectiveness of the order approving the relief requested in the Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  The Debtors submit that, here, where the parties must move forward quickly with

15

the filing of a plan of reorganization and related disclosure statement in order to meet the deadlines imposed by the PSA (which are necessary to conserve the limited funds available in the Debtors' estates), the order authorizing the Debtors' entry into the PSA must be immediately effective to avoid unnecessary delay.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that such rule applies.

## **NOTICE**

26.     Notice of the Motion will be given to: (i) the U.S. Trustee; (ii) counsel to the Committee; and (iii) all parties entitled to notice under Del. Bankr. L.R. 2002-1(b).  The Debtors submits that, under the circumstances, no other or further notice is required.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors request the Court grant the Motion and such other and further relief as is just and proper.

Dated: December 23, 2020
Wilmington, Delaware

/s/  Scott D. Cousins
Scott D. Cousins (No. 3079)
**COUSINS LAW LLC**
Brandywine Plaza West
1521 Concord Pike, Suite 301
Wilmington, Delaware 19803
Telephone:     (302) 824-7081
Facsimile: :    (302) 295-0331
Email:            scott.cousins@cousins-law.com

- and -

James T. Grogan (admitted *pro hac vice*)
Mack Wilson (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
Telephone:     (713) 860-7300
Facsimile:      (713) 353-3100
Email:            jamesgrogan@paulhastings.com
                    mackwilson@paulhastings.com

- and -

G. Alexander Bongartz (admitted *pro hac vice*)
Avram E. Luft (*pro hac vice* pending)
Derek Cash (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:     (212) 318-6000
Facsimile:      (212) 319-4090
Email:            alexbongartz@paulhastings.com
                    aviluft@paulhastings.com
                    derekcash@paulhastings.com

*Proposed Co-Counsel to the Debtors*

17

**Exhibit A**

**Proposed Order**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CRED INC., *et al.*, | ) Case No. 20-12836 (JTD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. ___** |

## ORDER PURSUANT TO BANKRUPTCY CODE
## SECTIONS 363(b) AND 105(a) AUTHORIZING DEBTORS TO ENTER INTO
## AND PERFORM UNDER A PLAN SUPPORT AGREEMENT TERM SHEET

Upon the Motion (the "<u>Motion</u>") of Cred Inc. ("<u>Cred</u>") and its affiliated debtors and

debtors in possession (the "<u>Debtors</u>") pursuant to sections 105(a) and 363(b) of title 11 of the

United States Code (the "Bankruptcy Code") seeking entry of an order approving the Debtors'

entry into and performance under a plan support agreement term sheet (the "<u>Plan Support</u>

<u>Agreement</u>" or the "<u>PSA</u>")[2] among (a) the Debtors and (b) the Official Committee of Unsecured

Creditors of Cred Inc. (the "<u>Committee</u>"); and upon consideration of the Declaration of Matthew

K. Foster in support of the Motion; and it appearing that this Court has jurisdiction to consider

the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these chapter

11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it

appearing that the proceeding on the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b);

and sufficient notice of the Motion having been given; and it appearing that no other or further

notice need be provided; and the Court having found that the relief requested in the Motion is in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

[2] Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Plan Support Agreement. A copy of the Plan Support Agreement is annexed as Exhibit A to the Motion, and incorporated herein by reference.

the best interests of the Debtors' estates and their creditors; and the Court having found that the

Debtors and the Committee negotiated the Plan Support Agreement in good faith and at arm's

length, and that the Debtors' decision to enter into the Plan Support Agreement represents a

sound exercise of the Debtors' business judgment; and after due deliberation and sufficient cause

appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is granted to the extent set forth herein.

2.      All objections to the Plan Support Agreement, the Motion or the relief requested

therein that have not been withdrawn, waived, or settled, are hereby overruled on the merits.

3.      The Debtors are hereby authorized to enter into and perform under the Plan

Support Agreement.

4.      The failure to describe specifically or include any particular provision of the Plan

Support Agreement in the Motion or this Order shall not diminish or impair the effectiveness of

such provision.

5.      The Plan Support Agreement shall be solely for the benefit of the Debtors and the

Committee, and no other person or entity shall be a third-party beneficiary hereof or thereof,

except in accordance with the Plan Support Agreement's terms.  Without limiting the generality

of the foregoing, no person or entity shall have any right to seek or enforce specific performance

of the Plan Support Agreement except the Debtors and the Committee in accordance with the

terms of thereof.

6.      Neither the Debtors' entry into, nor their performance under, the Plan Support

Agreement shall constitute a solicitation of votes on the Plan under section 1125 of the

Bankruptcy Code.

7.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry, notwithstanding Bankruptcy Rule 6004(h).

8.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

**Exhibit B**

**Plan Support Agreement**

<u>**BINDING PLAN SUPPORT AGREEMENT TERM SHEET**</u>

This Binding Plan Support Agreement Term Sheet (the "<u>Term Sheet</u>"), dated December 14, 2020, sets forth the material terms of a plan support agreement between (a) Cred Inc., Cred (US) LLC, Cred Capital, Inc., Cred Merchant Solutions LLC, and Cred (Puerto Rico) LLC (collectively, the "<u>Debtors</u>") and (b) the Official Committee of Unsecured Creditors appointed in the Debtors' Chapter 11 Cases (as defined below) (the "<u>Committee</u>" and, together with the Debtors, the "<u>PSA Parties</u>").

The PSA Parties hereby agree that the terms set forth in this Term Sheet shall be binding and enforceable effective as of the date hereof.  During the Support Period (as defined below), the PSA Parties shall take all necessary or appropriate actions reasonably required to more fully memorialize the transactions and arrangements effectuated hereby, including entering into the Definitive Documents (as defined below).

**THIS TERM SHEET DOES NOT CONSTITUTE AN OFFER OF SECURITIES OR A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**THIS TERM SHEET CONTAINS A SERIES OF ASSUMPTIONS, COMPROMISES AND SETTLEMENTS OF ISSUES AND DISPUTES THAT WILL BE RESOLVED IN CONNECTION WITH A POTENTIAL SALE PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND CONFIRMATION OF A CHAPTER 11 PLAN. ACCORDINGLY, THIS TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE, THE ABSOLUTE MEDIATION PRIVILEGE, AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROHIBITING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.  THIS TERM SHEET IS SUBJECT TO ALL EXISTING CONFIDENTIALITY AGREEMENTS.**

1

## CRED INC.
## PLAN SUPPORT AGREEMENT TERM SHEET

### I. Plan Support Agreement

| | |
|---|---|
| **Overview** | On November 7, 2020, the Debtors commenced chapter 11 bankruptcy cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  The Chapter 11 Cases have been consolidated for procedural purposes and are being jointly administered under the case *Cred Inc.*, Case No. 20-12836 (JTD) (Bankr. D. Del.).  The Restructuring Transaction (as defined below) will be consummated through the Chapter 11 Cases. |
| | The Term Sheet contemplates the wind-down of the Debtors through a potential sale (the "In-Court Sale") of certain of the Debtors' assets pursuant to Bankruptcy Code sections 105(a), 363(b), (f), (k) and (m), and 365, followed by a chapter 11 plan of liquidation (the "Plan") to be confirmed by the Bankruptcy Court.  The Plan will provide for (i) distribution of the net proceeds realized from the In-Court Sale as provided herein, and (ii)(x) through the Cred Liquidation Trust (as defined below), the liquidation and distribution of proceeds from the claims, causes of action and avoidance actions and other assets included therein, net of any costs of liquidation or distribution, and (y) the funding of such wind-down efforts (collectively, the "Restructuring Transaction"). |
| **Support Period** | "Support Period" means the period commencing on the date of execution of the Plan Support Agreement (the "PSA") and ending on the earliest of (i) the date on which the Debtors' confirmed Plan becomes effective (the "Effective Date") and (ii) the date on which the PSA is terminated according to its terms. |
| **Milestones** | The Restructuring Transaction shall be implemented in accordance with the following case milestones (the "Milestones") (unless waived by the Committee in its sole discretion)[1], and the Debtors shall cooperate and use commercially reasonable efforts to confirm and effectuate the Plan as soon as practicable: |
| | • No later than December 16, 2020 |
| |     o File motion seeking the Bankruptcy Court's approval of the Debtors' entry into the PSA and/or this Term Sheet |
| | • No later than December 31, 2020 |
| |     o File motion seeking the Bankruptcy Court's approval of the Disclosure Statement (as defined below) and Solicitation Materials (as defined below) |

---

[1] All dates and deadlines listed herein are subject to extension by mutual agreement of the Debtors and the Committee without Court approval.

|  | o Obtain entry of an order approving bidding procedures for the In-Court Sale |
|--|--|
|  | o Obtain entry of an order authorizing the Debtors to enter into the PSA and/or this Term Sheet |
|  | • No later than January 7, 2021 |
|  | o File the Debtors' schedules and statements of financial affairs |
|  | • No later than January 29, 2021 |
|  | o Obtain entry of an order approving the Disclosure Statement |
|  | o Obtain entry of an order by the Bankruptcy Court scheduling a hearing on the Plan and an objection deadline with respect thereto, or |
|  | o Seek interim approval of a combined Plan and Disclosure Statement under Local Bankruptcy Rule 3017-2, and schedule a combined hearing on final approval of the Disclosure Statement and Confirmation of the Plan. |
|  | • No later than March 17, 2021 |
|  | o Entry of an order confirming the Plan |
|  | o Obtain entry of an order approving the In-Court Sale, if applicable |
|  | • No later than March 31, 2021– The Effective Date of the Plan |
| **Estate Causes of Action** | The Debtors will cooperate with the Committee, including the production of documents, in connection with the Committee's investigation of claims and causes of action that the Debtors and their estates could potentially assert against any party, including all causes of action arising under chapter 5 of the Bankruptcy Code (each, a "<u>Cause of Action</u>" and collectively, the "<u>Causes of Action</u>").<br><br>The Debtors hereby consent, subject to Bankruptcy Court approval, to the Committee having derivative standing to pursue all Causes of Action against any current or prior insider, affiliate, or employee of any Debtor.  Upon reasonable request by the Committee, the Debtors will grant the Committee derivative standing, subject to Bankruptcy Court approval, to pursue any other Cause of Action on behalf of the Debtors' estates that the Committee in good faith, and after consultation with the Debtors, believes must be pursued prior to the Effective Date of the Plan because of exigent circumstances, but only if the Debtors' estates have sufficient funds to pursue such Cause of Action.<br><br>The Debtors will consult with the Committee prior to asserting or commencing any Cause of Action.  The Debtors will not commence any Cause of Action without Committee consent unless the Debtors, in good faith and in consultation with the Committee, believe such Cause of Action must be pursued prior to the Effective Date of the Plan because of exigent circumstances, but only if the Debtors' estates have sufficient funds to pursue |

3

| | such Cause of Action.  If such a determination is made by the Debtors, then the Debtors and the Committee will in good faith determine whether it is appropriate to grant the Committee derivative standing to pursue such Cause of Action on behalf of the Debtors' estates. |
| --- | --- |
| | For the avoidance of doubt, the Debtors will not compromise, resolve, or settle any Cause of Action without the Committee's consent. |
| | Following confirmation of the Plan, and pursuant to the Plan's terms, all Causes of Action will be transferred to the Cred Liquidation Trust for prosecution by the Liquidation Trustee (as defined below). |
| **Budget and Reporting** | The Debtors' use of cash shall be subject to (and limited by) a 13-week cash flow forecast commencing on the date hereof, which forecast shall include an itemized list of expenses to be incurred during each week along with information sufficient to denote the purpose of such expenses and shall be in form and substance acceptable to the Committee (the "<u>Approved Budget</u>," a copy of which is attached as <u>Exhibit A</u> to this Term Sheet) and shall, at a minimum, contain: |
| | (A) operating receipts: |
| |     (i) redemption from third-party asset managers; |
| |     (ii) interest paid on loans to moKredit/Elevar; |
| |     (iii) return of principal on or net proceeds of sale of moKredit loan; |
| |     (iv) net proceeds of sales of cryptocurrency; |
| |     (vi) insurance proceeds; |
| |     (vii) collection of accounts receivable; |
| |     (viii) all other operating receipts |
| | (B) non-operating receipts: |
| |     (i) draws on debtor-in-possession financing facility, if any |
| |     (ii) all other non-operating receipts |
| | (C) operating outflows: |
| |     (i) payroll, including taxes and benefits; |
| |     (ii) contractor payments; |
| |     (iii) insurance premiums; |
| |     (iv) taxes; |

4

(v) rent;

(vi) payment of accounts payable;

(vii) all other operating outflows

(D) non-operating outflows:

(i) Debtor's professionals;

(ii) McDermott, Will & Emery LLP;

(iii) Dundon Advisers, LLC;

(iv) U.S. Trustee fees;

(v) interest paid on debtor-in-possession financing facility, if any;

(vi) principal paid on debtor-in-possession financing facility, if any; and

(vii) other non-operating outflows.

(F) beginning cash

(G) ending cash

(H) accrued post-petition payables

(I) liquid cryptocurrency (Bitcoin, Ether and Ripple) expressed in dollar value and number of coins

(J) key assets, including:

(i) assets held by third-party asset managers or custodians; and

(ii) illiquid cryptocurrency (everything excluding Bitcoin, Ether and Ripple), expressed in dollar value and number coins

(K) calculated values based on the above including:

(i) operating cash flow (total operating receipts less total operating outflows)

(ii) cash flow (all receipts less all outflows)

(iii) liquidity (sum of ending cash, dollar value of liquid cryptocurrency, and availability under debtor-in-possession financing facility, if any)

(each, a "Reporting Category").

By no later than 12:00 pm ET on the second business day of each week, commencing with the first full week after the date hereof (each, a "<u>Reporting Date</u>"), the Debtors shall provide to the Committee an updated 13-week cash flow forecast, containing line items of sufficient detail to reflect the Debtors' projected cash receipts and disbursements for such 13-week period on a weekly basis (the "<u>13-Week Forecast</u>").  Each 13-Week Forecast shall be acceptable to the Committee, and upon acceptance by the Debtors, such 13-Week Forecast shall become the new Approved Budget, and promptly after the Committee's consent of the new Approved Budget, the Debtors shall deliver the new Approved Budget, together with any amendments or modifications thereto approved by the Committee and its counsel.  In the event that the Committee and the Debtors do not agree to an updated Approved Budget, the Approved Budget shall be the then-existing Approved Budget or such Approved Budget as may be approved by the Bankruptcy Court after a hearing.

On each Reporting Date, the Debtors shall deliver to the Committee a variance report (each, a "<u>Variance Report</u>") showing comparisons of actual results for each line item against such line item in the Approved Budget. Each Variance Report shall indicate whether there are any adverse variances that exceed the allowed variances, which means, in each case measured on a cumulative basis for each week and for the period from the date hereof, (x) up to 15.0% of each Reporting Category, or (y) up to 10.0% in the aggregate for all cash receipts and cash disbursements (in either case, a "<u>Permitted Variance</u>").

The Debtors shall also deliver to the Committee the following:

(i)      on each Reporting Date, a summary of all assets under management (the "<u>Assets Under Management Report</u>") and a detailed list of each crypto-currency held (the "<u>Crypto-Currency Summary Report</u>") ;

(ii)      on each Reporting Date, a report setting forth for the most recent 13-Week Forecast, a computation of receipts and expenses set forth in such 13-Week Forecast broken down by Reporting Category; and

(iii)      on the first Reporting Date and every other Reporting Date thereafter, (A) accounts receivable listings and ageings for the preceding two-week period; and (B) accounts payable listings and ageings as of such Reporting Date.

| | |
|---|---|
| **Debtors' Other Reporting Obligations** | To the extent the Debtors receive any information or documents from third parties, including, without limitation, former employees, asset managers, and cryptocurrency exchanges, the Debtors shall:  (i) notify the Committee immediately of the receipt of such information or documents; and (ii) send |

| | such information or documents to the Committee within one (1) business day. |
| | As reasonably requested by the Committee, the Debtors shall provide to the Committee and/or its professionals: |
| | i.   draft copies of all material motions and applications that the Debtors intend to file with the Bankruptcy Court at least three (3) calendar days prior to the date on which the Debtors are to file such documents, to the extent reasonably practicable under the circumstances; |
| | ii.  reasonable access to the Debtors' management and advisors for the purposes of evaluating the Debtors' finances and operations and participating in the planning process with respect to the Restructuring Transaction; and |
| | iii. such additional financial or other information concerning the acts, conduct, property, assets, liabilities, operations, financial condition, and transactions of any of the Debtors, or concerning any matter that may affect the administration of any of the Debtors' estates, as the Committee may from time to time reasonably request. |
| **Asset Sale(s)** | The Debtors may, solely with the consent of the Committee, enter into an agreement providing for the sale of one or more material asset (defined as any asset the net sale proceeds of which are $100,000 or higher). |
| | If the Debtors have not executed a binding stalking horse agreement to sell all or substantially all of their assets on or prior to January 15, 2021, the Debtors shall terminate any sale process, which shall include the termination of Teneo Capital LLC, unless the Debtors and Committee agree that Teneo shall continue to be retained to solicit and negotiate potential exit financing to, among other things, fund the costs of litigation by the Cred Liquidation Trust. |
| | Other than as permitted by an Approved Budget, the Debtors shall not, without the prior consent from the Committee, sell any of the Debtors' cryptocurrency. |
| | The Debtors shall provide the Committee's professionals, upon reasonable request to the Debtors' professionals, information concerning all sale processes. |
| **Debtor-in-Possession Financing Facility** | The Debtors may, solely with the consent of the Committee, enter into an agreement providing for a debtor-in-possession financing facility, provided that no such facility shall provide for the requirement of additional collateral, or acceleration of maturity, on account of any change in the value of liquid cryptocurrency property of the Debtors.  Such facility shall remain subject to the Debtors' determination of their fiduciary obligations and thereafter to approval of the Court. |
| | The Debtors shall provide the Committee's professionals, upon reasonable request to the Debtors' professionals, information concerning any debtor-in- |

7

| | |
|---|---|
| | possession financing facility solicitation, negotiating, and consummation process. |
| **Governance Issues** | Daniel Schatt and Joseph Podulka shall not serve in any capacity with the Debtors, including, without limitation, as an officer, board member, or employee, except that Daniel Schatt may remain employed by the Debtors as an "at will" employee with a monthly salary of $10,000 through no later than January 15, 2021.  To the extent the Debtors desire to retain either individual in any other capacity, such retention shall be subject to the Committee's prior written consent, and only for the specific purpose requested and authorized. |
| **Affirmative Covenants** | During the Support Period, the PSA Parties' shall: |
| | i. support the Restructuring Transaction, which shall be in form and substance consistent with this Term Sheet; |
| | ii. support and not object to entry of any orders proposed in the Chapter 11 Cases that are consistent with this Term Sheet; |
| | iii. in good faith, negotiate the Definitive Documents (as defined below), which shall be in form and substance consistent in all respects with this Term Sheet; |
| | iv. consent to those actions contemplated by this Term Sheet or otherwise required to be taken to effectuate the Restructuring Transaction, including entering into all documents and agreements necessary to consummate the Restructuring Transaction; and |
| | v. support entry of orders approving the Disclosure Statement and confirming the Plan that are in form and substance consistent with this Term Sheet. |
| | "Definitive Documents" means the documents (including any related orders, agreements, instruments, schedules, or exhibits) that are necessary or desirable to implement or otherwise relate to the Restructuring Transaction, including, but not limited to:  (a) a motion to approve the Debtors' entry into this Term Sheet and/or the PSA, (b) an order approving the Debtors' entry into this Term Sheet and/or the PSA, (c) all documents in connection with the In-Court Sale (including, without limitation, the sale agreement and order approving the sale), (d) the Plan (and all exhibits thereto), (e) the disclosure statement (the "Disclosure Statement") for the Plan, (f) the solicitation materials (the "Solicitation Materials") for the Plan; (g) an order approving the Disclosure Statement, (h) the order confirming the Plan (the "Confirmation Order"), (i) the agreement establishing the Cred Liquidation Trust (the "Liquidation Trust Agreement"), (j) the PSA; and (k) any other documents or exhibits related to or contemplated in the foregoing clauses (a) through (j), in each case in form and substance consistent with this Term Sheet and reasonably acceptable to the Committee. |
| **Negative Covenants** | During the Support Period, no PSA Party shall take any action materially inconsistent with the Restructuring Transaction that is expressly contemplated by this Term Sheet and the Definitive Documents. |

8

| | |
|---|---|
| | During the Support Period, subject to the Debtors' fiduciary duties (as set forth below), and provided the Definitive Documents are consistent with this Term Sheet, no PSA Party shall support any Alternative Transaction (as defined below) or take any action materially inconsistent with the Restructuring Transaction that is expressly contemplated by this Term Sheet, the PSA, or the Definitive Documents. |
| | During the Support Period, no PSA Party shall take any action, or fail to take any action, that would result in (or that with the giving of notice or the passage of time, or both would result in) a Debtor Termination Event, or a Committee Termination Event (each as defined below). |
| | "Alternative Transaction" shall mean any reorganization, merger, consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale of a material portion of assets (excluding a sale process separately governed above), financing (excluding a debtor-in-possession financing facility separately governed above), recapitalization, workout or restructuring of the Debtors (including, for the avoidance of doubt, a transaction premised on a chapter 11 plan or a sale of a material portion of assets under section 363 of the Bankruptcy Code), other than the Restructuring Transaction. |
| **Termination** | Upon three (3) business days' written notice to the Committee, during which time the Committee may cure any Debtor Termination Event (as defined below) that is susceptible to cure within such 3-business day period, the Debtors may terminate the PSA upon the occurrence, and during the continuation of, any of the following events (each, a "Debtor Termination Event"): |
| |   i.  the Committee's material breach of any of their obligations under the PSA; |
| |   ii.  the Debtors determine in good faith that continued performance under the PSA would be inconsistent with the exercise of its fiduciary duties under applicable law (as set forth below); |
| |   iii.  the Bankruptcy Court grants relief that is materially inconsistent with the PSA or would reasonably be expected to materially frustrate the purpose of the PSA; |
| |   iv.  the Committee files for approval of or otherwise supports any Alternative Transaction or other transaction that is inconsistent with the Plan or the Restructuring Transaction; |
| |   v.  any of the orders approving the Plan or the Disclosure Statement are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Debtors and the Committee; and |
| |   vi.  the Bankruptcy Court's confirmation of a competing plan that is inconsistent with the terms of the Restructuring Transaction. |
| | Upon three (3) business days' written notice to the Debtors, during which time the Debtors may cure any Committee Termination Event (as defined |

9

|  | below) that is susceptible to cure within such 3-business day period, the Committee may terminate the PSA after the occurrence, and during the continuation of, any of the following events (each, a "Committee Termination Event"):<br><br>i.   the Debtors' material breach of any of their obligations under the PSA;<br><br>ii.   the Debtors fail to comply with, satisfy, or achieve any of the Milestones;<br><br>iii.   the Debtors fail to provide the Committee and its advisors with reasonable access to the Debtors' books, records, and management through the Effective Date;<br><br>iv.   any of the Definitive Documents filed in the Chapter 11 Cases contain terms and conditions materially inconsistent with the PSA or this Term Sheet;<br><br>v.   conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, appointment of a chapter 11 trustee, a responsible officer, or an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the Debtors, or dismissal of the Chapter 11 Cases;<br><br>vi.   the Bankruptcy Court grants relief that is materially inconsistent with the PSA or would reasonably be expected to materially frustrate the purpose of the PSA;<br><br>vii.   the Debtors file for approval of or otherwise support any Alternative Transaction or other transaction that is inconsistent with the Plan, PSA, or the Restructuring Transaction; and<br><br>viii.   the Bankruptcy Court's approval of an Alternative Transaction or other transaction that is inconsistent with the terms of the Restructuring Transaction.<br><br>The PSA may also be terminated by mutual written agreement among the PSA Parties.<br><br>The PSA shall automatically terminate on the Effective Date. |
|---|---|
| **Effectiveness** | The PSA will become effective and binding upon each PSA Party upon the delivery of duly authorized and executed signature pages by such PSA Party. Until the PSA is duly executed and delivered, this Term Sheet shall control. |
| **Governing Law** | The PSA and this Term Sheet shall be governed by and construed in accordance with the internal laws of the State of Delaware, without regard to any conflict of law provisions that would require the application of the law of any other jurisdiction. |
| **Venue** | Any disputes between the PSA Parties arising out of, or in connection with, the PSA or this Term Sheet shall be brought in the Bankruptcy Court (for so long as the Debtors are subject to the jurisdiction of the Bankruptcy Court) |

10

| | or, to the extent the Bankruptcy Court does not have jurisdiction, in a court located in New Castle County, Delaware, and the PSA Parties hereby submit to the exclusive jurisdiction of the federal and state courts of the State of Delaware located in New Castle County with respect to any action or legal proceeding commenced by any PSA Party arising out of, or in connection with, the PSA or this Term Sheet, and irrevocably waive any objection the PSA Parties now or hereafter may have respecting the venue of any such action or proceeding brought in such a court or respecting the fact that such court is an inconvenient forum. |

## II. Plan Treatment of Allowed Claims and Interests

| Class of Claim or Interest | Treatment of Claims and Interests Under the Plan |
|---|---|
| Administrative Expense Claims | All allowed Administrative Expense Claims (as defined below) shall be paid in full in cash on the Effective Date or as otherwise provided in the Bankruptcy Code or approved by the Bankruptcy Court, except to the extent that a holder of such claim agrees to different treatment.<br><br>"Administrative Expense Claims" means any claim (including, but not limited to, Professional Fee Claims (as defined below)) for costs and expenses of administration of the Chapter 11 Cases that is entitled to priority pursuant to Bankruptcy Code sections 503(b), 507(a)(2), or 507(b). |
| Professional Fee Claims | All allowed Professional Fee Claims (as defined below) shall be paid in full in cash in such amounts as may be allowed by the Bankruptcy Court (a) as soon as practicable after the later of the Effective Date and the date on which the Court enters a final order allowing any such Professional Fee Claim, (b) as otherwise provided in the Bankruptcy Code or approved by the Bankruptcy Court, or (c) as may be agreed upon between the holder of any such Professional Fee Claim and the Debtor.<br><br>"Professional Fee Claim" means any claim of a professional approved by the Bankruptcy Court for compensation, indemnification, or reimbursement of costs and expenses incurred on or before the Effective Date pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b), or 1103(a), plus any fees and expenses related to the final fee application of a professional. |
| Priority Claims | Holders of tax claims entitled to priority treatment under Bankruptcy Code sections 502(i) or 507(a)(8) ("Priority Tax Claims") shall receive either payment in full (a) in cash on the Effective Date or (b) such other less favorable treatment to the holder of an allowed Priority Tax Claim as to which the Debtor, the Plan Sponsor, and the holder of such allowed Priority Tax Claim shall have agreed upon in writing. All allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.<br><br>Each allowed Other Priority Claim (as defined below) will receive either (i) payment in full, in cash, of the unpaid portion of its Other Priority Claim or (ii) |

| Class of Claim or Interest | Treatment of Claims and Interests Under the Plan |
|---|---|
| | treatment consistent with the provisions of Bankruptcy Code section 1129(a)(9), in each case, on or as soon as practicable after the later of (x) the Effective Date and (y) the date on which such claim becomes allowed. All allowed Other Priority Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof. "Other Priority Claims" means any claim, other than an Administrative Expense Claim, Professional Fee Claim, or Priority Tax Claim, entitled to priority in right of payment under Bankruptcy Code section 507(a). |
| General Unsecured Claims | Each holder of an allowed General Unsecured Claim shall receive one or more distributions equal to its share of the interests in the Cred Liquidation Trust, as such distributions become available as is reasonably practicable in the reasonable discretion of the Liquidation Trustee. "General Unsecured Claim" means any claim other than an Administrative Expense Claim, Professional Fee Claim, Other Secured Claim, Priority Tax Claim, Other Priority Claim, Prepetition Lender Claim, or DIP Financing Claim. |

## III. Miscellaneous Plan Terms and Conditions

| | |
|---|---|
| Establishment of Liquidation Trust | Pursuant to the Bankruptcy Court's order confirming the Plan, the Debtors will be dissolved, and a trust known as the "Cred Liquidation Trust" will be established. The Cred Liquidation Trust will be intended to qualify as a "liquidating trust" as described in Treasury Regulations Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-2 C.B. 684, and will be treated for federal income tax purposes as a "grantor trust" under Internal Revenue Code sections 671-677. The Cred Liquidation Trust shall be managed by a trustee (the "Liquidation Trustee"), who shall be selected by the Committee in its sole discretion who shall be subject to a Trust Advisory Board consisting of each member of the Official Committee of Unsecured Creditors who wishes to continue in such role, and such additional members nominated by the Official Committee, if any, as are required for the initial complement of the Trust Advisory Board to be an odd number greater than one. The Cred Liquidation Trust shall be administered in accordance with the terms of the Liquidation Trust Agreement. |
| Means for Plan Implementation | On the Plan Effective Date, the Plan shall be funded by the proceeds of the In-Court Sale and any other cash or other assets then held by the Debtors, which shall be used satisfy the claims against the Debtors in the manner set forth in the Plan. |
| Releases | Except as expressly set forth in the Definitive Documents, the Definitive Documents shall include full customary debtor and "third party" releases from liability in favor of the Debtors' professionals, Grant Lyon as the Debtors' independent director, the Debtors' chief restructuring officer and any other temporary staff supplied by Sonoran Capital, the Committee's professionals, and each Committee member (the "Released Parties"). |

12

| | For the avoidance of doubt, no person other than the Released Parties, including any present or former insider of the Debtors, will receive a release of any kind under the Plan, whether from the Debtors or otherwise. |
|---|---|
| **Conditions to Plan Confirmation** | i.   The PSA and/or this Term Sheet shall not have been terminated.<br><br>ii.  The Confirmation Order shall be in a form and substance reasonably acceptable to the Committee, as determined by the consent of the Committee.<br><br>iii. The final version of all of the schedules, documents, and Plan exhibits, including a Plan supplement, shall have been filed in form and substance acceptable to the Committee in its reasonable discretion, as determined by the consent of the Committee.<br><br>iv. No breach or failure to comply with the terms of the Definitive Documents, the Confirmation Order or any other material final order of the Bankruptcy Court shall have occurred and be continuing. |
| **Conditions to Effective Date** | i.   The PSA and/or this Term Sheet shall not have been terminated.<br><br>ii.  No breach or failure to comply with the terms of the Definitive Documents, the Confirmation Order, or any other material final order of the Bankruptcy Court shall have occurred and be continuing<br><br>iii. The conditions to confirmation delineated in the Plan shall have either been satisfied or waived in accordance with the Plan.<br><br>iv. All documents required under the Plan shall have been delivered.<br><br>v.   The Confirmation Order in form and substance reasonably satisfactory to the Committee shall have been entered by the Bankruptcy Court, and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto. |
| **Cancellation of Instruments, Certificates, and Other Documents** | On the Effective Date, except to the extent otherwise provided herein, all instruments, certificates, and other documents evidencing debt or equity interests in the Debtors shall be cancelled and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged. |
| **Other Plan Terms** | The Plan shall contain all other customary terms for chapter 11 plans of this type, which shall be reasonably acceptable to the Committee, including, without limitation, provisions dealing with retention of jurisdiction, claims allowance and objections, and exemption from stamp and other transfer taxes pursuant to Bankruptcy Code section 1146. |

13

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**DEBTORS**

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By:

By:

_____

_____

Name: Matthew Foster

Name: Michael Michelin

Title:  Chief Restructuring Officer

Title: Committee Co-Chair

Date:  December 14, 2020

Date: December 14, 2020

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**DEBTORS**                                    **THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By:                                            By:

_____               _____

Name:                                          Name: Michael Michelin
Title:                                         Title: Committee Co-Chair
Date:                                          Date: December 14, 2020

**EXHIBIT A**

**Budget**

[Forthcoming]

**Exhibit C**

**Foster Declaration**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 20-12836 (JTD) |
| CRED INC., *et al.*, | ) | |
| | ) | (Jointly Administered) |
| Debtors.[1] | ) | |
| | ) | |

### DECLARATION OF MATTHEW K. FOSTER IN SUPPORT OF DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 363(b) AND 105(a) FOR AUTHORIZATION TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT TERM SHEET

I, Matthew K. Foster, declare and state under penalty of perjury as follows:

1.      I am a Managing Director of Sonoran Capital Advisors, LLC ("Sonoran"), a turnaround, crisis management, and financial advisory firm that maintains an office at 1733 N. Greenfield Road, Mesa, Arizona 85205.

2.      Since November 30, 2020, I have been providing CRO services to the Debtors. On December 21, 2020, the Court authorized the Debtors' employment of Sonoran and designated me to serve as the CRO for the Debtors, effective as of November 30, 2020.

3.      In the capacity as CRO for the Debtors, I have provided independent oversight over all the Debtors' operations, including, among other things, the Debtors' cash expenditures, working with the Debtors' professionals, including MACCO Restructuring Group LLC ("MACCO"), to prepare schedules and statements, reviewing and reconciling accounting records, working with the Debtors' investment banker, Teneo Capital LLC ("Teneo") on the marketing and sale process, ensuring the Debtors' compliance with U.S. Trustee requirements,

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566).  The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

and engaging in communications with the official committee of unsecured creditors appointed in these cases (the "Committee").

4.      I am familiar with the matters set forth herein and, if called as a witness, I could and would testify as set forth in this Declaration.

5.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other Sonoran professionals, information supplied to me by MACCO professionals, or learned from my review of other documents. To the extent any information disclosed here requires amendment or modification as additional information becomes available to me, a supplemental declaration will be submitted.

6.      I am duly authorized to make this declaration (the "Declaration"), which is made in support of the *Debtors' Motion Pursuant to Bankruptcy Code Sections 363(b) and 105(a) for Authorization to Enter Into and Perform Under a Plan Support Agreement Term Sheet* (the "Motion").[2]

## THE PLAN SUPPORT AGREEMENT

7.      The Plan Support Agreement contemplates the wind-down of the Debtors through a potential sale (the "In-Court Sale") of certain of the Debtors' assets pursuant to Bankruptcy Code sections 105(a), 363(b), (f), (k) and (m), and 365, followed by a chapter 11 plan of liquidation (the "Plan") to be confirmed by the Bankruptcy Court.  The Plan will provide for (i) distribution of the net proceeds realized from the In-Court Sale in accordance with the Plan Support Agreement, and (ii)(x) through a liquidation trust, the liquidation and distribution of proceeds from the claims, causes of action and avoidance actions and other assets included

---

[2]    Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Motion.

therein, net of any costs of liquidation or distribution, and (y) the funding of such wind-down efforts.

8.     The material terms of the Plan under the Plan Support Agreement are summarized in the Motion and set forth in greater detail in the Plan Support Agreement.  These terms include the treatment of various categories of claims, including Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, General Unsecured Claims, the establishment of a Liquidation Trust, the means for implementation of the Plan, discussion of certain release provisions, and conditions to confirmation and the Effective Date of the Plan.

## THE DEBTORS' BUSINESS JUDGMENT

9.     I believe that entry into the Plan Support Agreement is a reasonable exercise of the Debtors' business judgment, and is in the best interests of the Debtors, their estates and their creditors.

10.     The Plan Support Agreement is the result of arms'-length negotiations between the Debtors and the Committee, both of which were represented by experienced, sophisticated and capable counsel.  The Debtors have exercised due care in entering into the Plan Support Agreement, as they have determined that an expedited sale and distribution of the Debtors' assets is the best way to maximize the value of their estates.  The only realistic alternatives to the approach in the Plan Support Agreement are a prolonged chapter 11 case, which would likely involve significant administrative expenses, or conversion of the case to one under chapter 7 of the Bankruptcy Code, which would likely result in significantly lower distributions to the Debtors' creditors.  The Plan Support Agreement provides significant value to the Debtors' estates by, among other things, providing funding for distribution of the Debtors' assets by the

3

Liquidation Trust and establishing a framework for the Liquidation Trustee to pursue estate claims for the benefit of general unsecured creditors.

11.    I believe that the Plan contemplated in the Plan Support Agreement will result in the creditors of the Debtors' estates receiving a greater distribution on account of their claims than is otherwise possible under the circumstances of these cases.  Because the Plan contemplated by the Plan Support Agreement currently is the most viable alternative, the benefits of the Plan Support Agreement significantly outweigh its burdens on the Debtors' estates.  To the extent a better alternative appears, the Plan Support Agreement contains an explicit fiduciary out and reserves entirely to the Debtors the right to determine if their fiduciary duties require that they abandon the Plan Support Agreement.

12.    For all of these reasons, I believe that entering into the Plan Support Agreement is in the best interests of the Debtors, their estates and their creditors.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   December 23, 2020
                      Mesa, Arizona

                                             */s/ Matthew K. Foster*
                                             Matthew K. Foster
                                             Chief Restructuring Officer for the Debtors

4

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 20-12836 (JTD) |
| CRED INC., *et al.*, | ) | |
| | ) | (Jointly Administered) |
| Debtors.[1] | ) | |
| | ) | **Hearing Date: Jan. 6, 2020 at 10:00 a.m. (ET)** |
| | ) | **Obj. Deadline: Dec. 30, 2020 at 4:00 p.m. (ET)** |
| | ) | |

## NOTICE OF DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 363(b) AND 105(a) FOR AUTHORIZATION TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT TERM SHEET

PLEASE TAKE NOTICE that a hearing on the annexed *Debtors' Motion Pursuant to Bankruptcy Code Sections 363(b) and 105(a) for Authorization to Enter Into and Perform Under a Plan Support Agreement Term Sheet* (the "Motion") filed by the Debtors shall be considered at a hearing before the Honorable John T. Dorsey, United States Bankruptcy Judge for the District of Delaware, at the Court, 824 North Market Street, 5th Floor, Courtroom 5, Wilmington, Delaware 19801, on **January 6, 2020 at 10:00 a.m. (Eastern Time)**.

PLEASE TAKE FURTHER NOTICE that any objections or responses to the relief requested in the Motion, if any, must be made in writing and filed with the Court on or before **December 30, 2020 at 4:00 p.m. (Eastern Time)** and shall be served on: (a) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Joseph McMahon (Joseph.McMahon@usdoj.gov) and John Schanne (John.Schanne@usdoj.gov)); (b) Paul Hastings LLP, 600 Travis Street, Fifty-Eighth Floor, Houston, Texas 77002 (Attn: James T.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

Grogan (jamesgrogan@paulhastings.com) and Paul Hastings LLP, 200 Park Avenue, New York, New York 10166 (Attn: G. Alexander Bongartz (alexbongartz@paulhastings.com)), proposed co-counsel for the Debtors; and (c) Cousins Law LLC, Brandywine Plaza West, 1521 Concord Pike, Suite 301, Wilmington, Delaware 19803 (Attn. Scott D. Cousins (scott.cousins@cousins-law.com)), co-counsel for the Debtors.

**PLEASE TAKE FURTHER NOTICE THAT IF NO OBJECTIONS TO THE MOTION ARE TIMELY FILED, SERVED AND RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.**

*[Remainder of page intentionally left blank.]*

Dated: December 23, 2020
Wilmington, Delaware

/s/ Scott D. Cousins

Scott D. Cousins (No. 3079)
**COUSINS LAW LLC**
Brandywine Plaza West
1521 Concord Pike, Suite 301
Wilmington, Delaware 19803
Telephone:     (302) 824-7081
Facsimile: :    (302) 295-0331
Email:           scott.cousins@cousins-law.com

- and -

James T. Grogan (admitted *pro hac vice*)
Mack Wilson (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
Telephone:     (713) 860-7300
Facsimile:      (713) 353-3100
Email:           jamesgrogan@paulhastings.com
                 mackwilson@paulhastings.com

- and -

G. Alexander Bongartz (admitted *pro hac vice*)
Avram E. Luft (*pro hac vice* pending)
Derek Cash (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:     (212) 318-6000
Facsimile:      (212) 319-4090
Email:           alexbongartz@paulhastings.com
                 derekcash@paulhastings.com

*Proposed Co-Counsel to the Debtors*

3

# EXHIBIT R

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket Nos. 380 & 533** |

### NOTICE OF FILING OF AMENDED PLAN SUPPLEMENT FOR FIRST AMENDED COMBINED JOINT PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT OF CRED INC. AND ITS SUBSIDIARIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that on January 21, 2021, the debtors and debtors-in-possession (collectively, the "Debtors") filed the *First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code* (the "Combined Plan") [Docket No. 380] in the above-captioned chapter 11 cases. Capitalized terms used herein and not otherwise defined have the meanings given to them in the Combined Plan.

**PLEASE TAKE FURTHER NOTICE** that on February 19, 2021, the Debtors filed the *Notice of Filing of Plan Supplement for First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code* [Docket No. 533] (as may be modified, amended, or supplemented from time to time, the "Plan Supplement").

**PLEASE TAKE FURTHER NOTICE** that the Plan Supplement is hereby amended by the following revised documents, as shown on the attached redline:

| Exhibit | Description |
|---------|-------------|
| A | **Trust Advisory Board** |

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve all rights to amend, modify, or supplement the Plan Supplement and any of the documents contained in the Plan Supplement. To the extent material modifications are made to any of these documents, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

Debtors will file a redline version with the Court prior to the Confirmation Hearing (defined below).

      **PLEASE TAKE FURTHER NOTICE** that the hearing to consider final approval and confirmation of the Combined Plan (the "<u>Confirmation Hearing</u>") is scheduled to commence on **March 9, 2021, at 2:00 p.m. (prevailing Eastern Time).** The Confirmation Hearing may be adjourned or continued from time to time by the Court or the Debtors without further notice other than adjournments announced in open court or as indicated in any notice of agenda of matters scheduled for hearing filed by the Debtors with the Court.

      **PLEASE TAKE FURTHER NOTICE** that the Confirmation Order, Combined Plan, Plan Supplement, and related documents and materials filed in these Chapter 11 Cases may be obtained at no charge from Donlin Recano & Company, Inc., by: (i) calling the Debtors' restructuring information center at 1-877-739-9988, and/or (ii) visiting the Debtors' restructuring website at https://donlinrecano.com/Clients/cred/Index. You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via PACER at https://ecf.deb.uscourts.gov.

[<em>Remainder of Page Intentionally Left Blank</em>]

Dated: March 4, 2021
      Wilmington, Delaware

/s/ Scott D. Cousins

Scott D. Cousins (No. 3079)
Scott D. Jones (No. 6672)
**COUSINS LAW LLC**
Brandywine Plaza West
1521 Concord Pike, Suite 301
Wilmington, Delaware 19803
Telephone:    (302) 824-7081
Facsimile:    (302) 295-0331
Email:        scott.cousins@cousins-law.com

- and -

James T. Grogan (admitted *pro hac vice*)
Mack Wilson (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
Telephone:    (713) 860-7300
Facsimile:    (713) 353-3100
Email:        jamesgrogan@paulhastings.com
               mackwilson@paulhastings.com

- and -

Pedro A. Jimenez (admitted *pro hac vice*)
Avram Emmanuel Luft (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:    (212) 318-6000
Facsimile:    (212) 319-4090
Email:        pedrojimenez@paulhastings.com
               aviluft@paulhastings.com

*Co-Counsel to the Debtors*

## Exhibit A

**Trust Advisory Board**

*Identity of Members of Trust Advisory Board*

1.      DragonFly International Holding Ltd.

2.      Kyle Tuo Wang

3.      Eric Schurman

4.      Jamie Shiller

*Compensation of Members of Trust Advisory Board***:** Reimbursement of out of pocket expenses

**<u>Exhibit A-1</u>**

**Redline of Trust Advisory Board**

## Trust Advisory Board

***Identity of Members of Trust Advisory Board***

1.      DragonFly International Holding Ltd.

2.      Kyle Tuo Wang

3.      Eric Schurman

4.      Jamie Shiller

***Compensation of Members of Trust Advisory Board*:** Reimbursement of out of pocket expenses

# EXHIBIT S

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CRED INC., *et al.*, | Case No. 20-12836 (JTD) |
| Debtors.[1] | (Jointly Administered) |
|  | **Re: Docket Nos. 301 & 380** |

## NOTICE OF FILING OF LIQUIDATION TRUST AGREEMENT

PLEASE TAKE NOTICE that on January 21, 2021, the debtors and debtors-in-possession (collectively, the "Debtors") filed the *First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and its Subsidiaries under Chapter 11 of the Bankruptcy Code* (the "Combined Plan") [Docket No. 380] in the above-captioned chapter 11 cases. Capitalized terms used herein not otherwise defined have the meaning given to them in the Combined Plan.

PLEASE TAKE FURTHER NOTICE that on February 19, 2021, the Debtors filed the Plan Supplement [Docket No. 533], which indicated the Debtors would file the Liquidation Trust Agreement on or before March 5, 2021.

PLEASE TAKE FURTHER NOTICE that the Debtors hereby file the Liquidation Trust Agreement, which is attached as **Exhibit 1.**

PLEASE TAKE FURTHER NOTICE that the Debtors reserve all rights to amend, modify, or supplement the Liquidation Trust Agreement. To the extent material modifications

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' headquarters are located at 3 East Third Avenue, Suite 200, San Mateo, California 94401.

are made to the Liquidation Trust Agreement, the Debtors will file a redline version with the Court prior to the Confirmation Hearing.

PLEASE TAKE FURTHER NOTICE that the Confirmation Order, Combined Plan, Plan Supplement, and related documents and materials filed in these Chapter 11 Cases may be obtained at no charge from Donlin Recano & Company, Inc., by: (i) calling the Debtors' restructuring information center at 1-877-739-9988, and/or (ii) visiting the Debtors' restructuring website at https://donlinrecano.com/Clients/cred/Index. You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via PACER at https://ecf.deb.uscourts.gov.

[*Remainder of page intentionally left blank.*]

Dated: March 2, 2021
     Wilmington, Delaware

/s/ Scott D. Cousins
Scott D. Cousins (No. 3079)
Scott D. Jones (No. 6672)
**COUSINS LAW LLC**
Brandywine Plaza West
1521 Concord Pike, Suite 301
Wilmington, Delaware 19803
Telephone:    (302) 824-7081
Facsimile:    (302) 295-0331
Email:        scott.cousins@cousins-law.com

- and -

James T. Grogan (admitted *pro hac vice*)
Mack Wilson (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
Telephone:    (713) 860-7300
Facsimile:    (713) 353-3100
Email:        jamesgrogan@paulhastings.com
              mackwilson@paulhastings.com

- and -

G. Alexander Bongartz (admitted *pro hac vice*)
Derek Cash (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:    (212) 318-6000
Facsimile:    (212) 319-4090
Email:        alexbongartz@paulhastings.com
              derekcash@paulhastings.com

*Co-Counsel to the Debtors*

**<u>Exhibit A</u>**

**Liquidation Trust Agreement**

# LIQUIDATION TRUST AGREEMENT

## PREAMBLE

This Liquidation Trust Agreement (the "**Agreement**") is entered into by and among Cred Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") and Christopher Moser, Michael Michelin, and Cedric de Lisser, not individually, but solely in their capacities as trustees (the "**Liquidation Trustees**" and, together with the Debtors, the "**Parties**") in accordance with the First Amended Combined Joint Plan of Liquidation and Disclosure Statement of Cred Inc. and its Subsidiaries Under Chapter 11 of the Bankruptcy Code, dated January 21, 2021 (including all exhibits thereto, as the same may be further amended, modified, or supplemented from time to time, the "**Plan**").[1]

## RECITALS

WHEREAS, on November 7, 2020 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") commencing their chapter 11 cases (the "**Chapter 11 Cases**");

WHEREAS, on December 3, 2020, the United States Trustee for the District of Delaware (the "**United States Trustee**") appointed an official committee of unsecured creditors in the Chapter 11 Cases (the "**Committee**");

WHEREAS, on January 21, 2021, the Debtors filed the Plan;

WHEREAS, the Plan provides for the creation of the Liquidation Trust, as of the Effective Date, to hold, administer, and liquidate the Liquidation Trust Assets, and to distribute the same or proceeds of the same to the Holders of Allowed General Unsecured Claims, in accordance with the terms of the Plan and this Agreement;

WHEREAS, this Agreement is executed to establish the Liquidation Trust and to facilitate the Plan;

WHEREAS, the Liquidation Trust is created on behalf of, and for the benefit of, the Liquidation Trust Beneficiaries (each, a "**Beneficiary**");

WHEREAS, the Liquidation Trust is intended to qualify as a "liquidating trust" under the United States Internal Revenue Code of 1986, as amended, (the "**IRC**") and the Treasury Regulations promulgated thereunder, specifically Treasury Regulation section 301.7701-4(d), and as such be treated as a "grantor trust" for federal income tax purposes with the Beneficiaries treated as the grantors and owners of the Liquidation Trust, and in that regard it is the Parties' intention that this Agreement satisfy the requirements set forth in Revenue Procedure 94-45, 1994-2 C.B. 684 (July 11, 1994).

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements contained herein and in the Plan, the Parties agree as follows:

---

[1]     Capitalized terms used herein and not otherwise defined herein or when first used shall have the meanings set forth in the Plan.

# ARTICLE I.
## NAME OF TRUST AND LIQUIDATION TRUSTEES

1.1.    Appointment of Liquidation Trustee

The legal name of the Liquidation Trust shall be "Cred Liquidation Trust." Christopher Moser, Michael Michelin, and Cedric de Lisser are hereby appointed to serve as the initial Liquidation Trustees under the Plan and hereby accept this appointment and agree to serve in such capacities effective upon the Effective Date of the Plan and pursuant to the terms of the Confirmation Order, the Plan, and this Agreement. A successor Liquidation Trustee shall be appointed as set forth in Section 11.1 in the event any Liquidation Trustee is removed or resigns pursuant to this Agreement or if any Liquidation Trustee otherwise vacates the position.

# ARTICLE II.
## DUTIES AND POWERS OF THE LIQUIDATION TRUSTEES

2.1.    Generally

The Liquidation Trustees shall be responsible for (a) liquidating and administering (or abandoning, as the case may be) the Liquidation Trust Assets, including the Avoidance Actions, the Debtors' commercial tort claims, the Debtors' claims or Causes of Action against the Debtors' directors and officers, and claims or Causes of Action that may be satisfied by insurance policies, (collectively, the "**Causes of Action**"), and (b) taking actions on behalf of, and representing, the Liquidation Trust. The Liquidation Trustees shall have the authority to bind the Liquidation Trust within the limitations set forth herein, but shall for all purposes hereunder be acting in the capacity of Liquidation Trustees and not individually.

2.2.    Scope of Authority of Liquidation Trustees

Within the limitations set forth herein, and subject to the provisions set forth in this Agreement, the responsibilities and authority of the Liquidation Trustees shall include, without limitation: (i) holding and administering the Liquidation Trust Assets; (ii) evaluating and determining strategy with respect to the Causes of Action and litigating the Causes of Action, or settling, transferring, releasing or abandoning any and all Causes of Action on behalf of the Liquidation Trust; facilitating the prosecution or settlement of objections to or estimations of Claims asserted against the Debtors, their estates, the Liquidation Trust or the Liquidation Trust  Assets; calculating and implementing distributions to the Beneficiaries; (v) filing all required tax returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671- 4(a); (vi) performing such acts as are necessary for the administration, resolution and wind-down of the Debtors after the Effective Date, including, without limitation, preparing and filing final tax returns for the Debtors; (vii) retaining Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals (both as defined herein); (viii) receiving reasonable compensation for performing services as Liquidation Trustees and paying the reasonable fees, costs and expenses of any Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals in accordance with the applicable provisions of this Agreement;  (ix)  filing  periodic reports  as  set  forth  in  section  12.3(b) of the Plan;  and (x) carrying out such other responsibilities not specifically set forth herein as may be vested in the Liquidation Trustees pursuant to the Confirmation Order, the Plan, this Agreement, or other Bankruptcy Court order, or

2

as may be necessary and proper to carry out the provisions of the Confirmation Order, the Plan or this Agreement.

### 2.3.   Obligations to Liquidation Trust and Beneficiaries

The Liquidation Trustees' actions as Liquidation Trustees will be subject to standards required under Delaware law.

### 2.4.   Additional Powers of Liquidation Trustees

In connection with the administration of the Liquidation Trust, subject to and except as otherwise set forth in the Confirmation Order, the Plan or this Agreement, the Liquidation Trustees are hereby authorized to perform those acts necessary to accomplish the purposes of the Liquidation Trust. Without limiting, but subject to, the foregoing, the Liquidation Trustees shall, unless otherwise provided in this Agreement and subject to the limitations contained herein and in the Confirmation Order and the Plan:

(1)     Administer the implementation of the Liquidation Trust, including the making of the Distributions contemplated herein;

(2)     Marshall, market for sale, and liquidate the Liquidation Trust Assets;

(3)     Conduct an analysis of any and all Claims and Equity Interests and prosecuting objections thereto or settling or otherwise compromising such Claims and Equity Interests, if necessary and appropriate, in accordance with Article XIV of the Plan;

(4)     Maintain and administer the Reserves in accordance with the terms hereof;

(5)     Commence, prosecute, or settle claims and Causes of Action, enforce contracts, and assert claims, defenses, offsets, and privileges in accordance herewith and pay all associated costs;

(6)     Recover and compel turnover of the Debtors' property;

(7)     Adjudicate third-party claims assigned, purchased, or otherwise transferred to the Liquidation Trust;

(8)     Pay Liquidation Trust expenses;

(9)     Abandon any property constituting the Estates' Assets that cannot be sold or otherwise disposed of for value and whose Distribution to Holders of Allowed Claims would not be feasible or cost-effective in the Liquidation Trustees' reasonable judgment;

(10)     Prepare and file post-Effective Date operating reports;

(11)     File appropriate tax returns in the exercise of the Liquidation Trustees' fiduciary obligations;

(12)      Retain such Professionals as are necessary and appropriate in the furtherance of the Liquidation Trustees' fiduciary obligations;

(13)      Take such actions as are necessary and reasonable to carry out the purposes of the Liquidation Trust, including winding down the Debtors' business affairs;

(14)      Be expressly authorized to purchase such insurance coverage as the Liquidation Trustees, in their sole discretion, deem necessary and appropriate with respect to real and personal property that may be or may become Liquidation Trust Assets;

(15)      Have any required financial statements and United States Trustee post-confirmation quarterly reports prepared, until such time as the Bankruptcy Court enters an order (i) dismissing the Bankruptcy Cases, (ii) converting the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) approving a final decree closing the Bankruptcy Cases;

(16)      Implement and/or enforce all provisions of the Plan;

(17)      Assert and/or waive, as the Liquidation Trustees deem appropriate, any attorney-client privilege or similar privilege belonging to any Debtor immediately prior to the Effective Date of the Plan; and

(18)      Have such other powers as may be vested in or assumed by the Liquidation Trustees pursuant to this Agreement, the Plan, other Bankruptcy Court order, or as may be needed or appropriate to carry out the provisions of the Plan and this Agreement.

### 2.5.    <u>General Authority of the Liquidation Trustees</u>

Unless specifically stated otherwise herein, the Liquidation Trustees shall not be required to obtain Bankruptcy Court approval with respect to any proposed action or inaction: (a) authorized in this Agreement, or (b) specifically contemplated in the Confirmation Order or the Plan.

### 2.6.    <u>Limitation of Liquidation Trustees' Authority; No Ongoing Business</u>

(a)      The Liquidation Trustees shall have no power or authority except as set forth in this Agreement or in the Confirmation Order or the Plan.

(b)      For federal income tax purposes, the Liquidation Trustees shall not be authorized to engage in any trade or business with respect to the Liquidation Trust Assets or any proceeds therefrom except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. The Liquidation Trustees shall take such actions consistent with the prompt orderly liquidation of the Liquidation Trust Assets as required by applicable law and consistent with the treatment of the Liquidation Trust as a liquidating trust under Treasury Regulation section 301.7701-4(d), to the extent such actions are permitted by this Agreement.

2.7.    Investment and Safekeeping of Liquidation Trust Assets

All monies and other assets received by the Liquidation Trustees shall, until distributed or paid over as herein provided, be segregated from all other monies and assets of the Liquidation Trustees, and further, shall be held in trust for the benefit of the Beneficiaries. The Liquidation Trustees shall be responsible for establishing and maintaining any segregated, reserve or escrow accounts as are required to carry out the obligations of the Liquidation Trust under the Plan.

The Liquidation Trustees shall promptly invest any such monies in the manner set forth in this Section 2.7, but shall otherwise be under no liability for interest or income on any monies received by the Liquidation Trust hereunder and held for distribution or payment to the Beneficiaries, except as such interest shall actually be received. Investment of any monies held by the Liquidation Trust shall be administered in accordance with the general duties and obligations hereunder. The right and power of the Liquidation Trustees to invest the Liquidation Trust Assets, the proceeds thereof, or any income earned by the Liquidation Trust, shall be limited to the right and power to (i) invest such Liquidation Trust Assets (pending distributions in accordance with the Confirmation Order, the Plan or this Agreement) in (a) short-term direct obligations of, or obligations guaranteed by, the United States of America, (b) short-term obligations of any agency or corporation that is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof, or (c) an open-ended management investment company, registered under the Investment Company Act of 1940 that is regulated as a "money market fund" pursuant to Rule 2a-7 under the Investment Company Act of 1940, provided that the fund: (1) invests exclusively in United States Treasury bills and United States Treasury Notes owned directly or through repurchase agreements; (2) has received the highest money market fund rating from a nationally recognized statistical rating organization, such as Standard & Poor's or Moody's; (3) has agreed to redeem funds shares in cash, with payment being made no later than the business day following a redemption request by a shareholder, except in the event of an unscheduled closing of the Federal Reserve Banks or the New York Stock Exchange; and (4) has adopted a policy that it will notify its shareholders 60 days prior to any change in its policy (A) to invest exclusively in Treasury Securities as described in (1) above or (B) to redeem fund shares in cash no later than the business day following a redemption request by the shareholder, with limited exceptions for unscheduled closings of Federal Reserve Banks or the New York Stock Exchange; or (ii) deposit such assets in demand deposits at any bank or trust company, (collectively, the "**Permissible Investments**") *provided*, *however*, that the scope of any such Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulation section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the guidelines of the Internal Revenue Service of the United States of America (the "**IRS**"), whether set forth in IRS rulings, other IRS pronouncements or otherwise.

## ARTICLE III.
## TERM AND COMPENSATION FOR LIQUIDATION TRUSTEES

3.1.    Compensation

(a)    For the term of this Agreement, each Liquidating Trustee shall receive $5,000 per month or portion of a month from the Liquidating Trust. The Liquidating Trust shall

also reimburse the Liquidating Trustees for their reasonable out-of-pocket expenses spent on behalf of the Liquidating Trust as they are incurred.

(b)     All compensation and other amounts payable to the Liquidation Trustees shall be paid out of the Liquidation Trust Expense Fund (as defined hereinafter), subject to any applicable limitations or restrictions set forth in the Confirmation Order, Plan, or this Agreement.

3.2.     <u>Termination</u>

The Liquidation Trust will terminate on the earlier of: (a) final liquidation, administration and Distribution of the Liquidation Trust Assets in accordance with the terms of the Agreement and the Plan, and its full performance of all other duties and functions as set forth herein; and (b) the fifth (5th) anniversary of the Effective Date. Notwithstanding the foregoing, multiple fixed term extensions can be obtained so long as Bankruptcy Court approval is obtained within six (6) months before the expiration of the term of the Liquidation Trust and each extended term provided that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust within the meaning of Section 301.7701-4(d) of the Treasury Regulations for federal income tax purposes. After (a) the final Distributions pursuant hereto, (b) the Filing by or on behalf of the Liquidation Trust of a certification of dissolution with the Bankruptcy Court, and (c) any other action deemed appropriate by the Liquidation Trustees, the Liquidation Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

3.3.     <u>Insurance; Bond</u>

The Liquidation Trustees, in their sole discretion, may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the Liabilities and obligations of the Liquidation Trustees. The Liquidation Trustees shall serve with a bond, the terms of which shall be agreed to by the Trust Advisory Board, and the cost and expense of which shall be paid by the Liquidation Trust.

3.4.     <u>Removal</u>

The Liquidation Trustees may be removed only for cause by a Final Order of the Bankruptcy Court upon a motion by any party in interest and after notice and a hearing; *provided, however*, that no Liquidation Trustee may be removed until a successor Liquidation Trustee has been named or is capable of being named immediately upon such removal. For purposes of removing a Liquidation Trustee, "cause" shall mean gross negligence, breach of fiduciary duty, breach of trust, or reckless or willful mishandling of the Liquidation Trust Assets. Any fees and unreimbursed expenses that have been properly incurred by a Liquidation Trustee in accordance with the terms of this Agreement that are owing to such Liquidation Trustee as of the date of the Liquidation Trustee's removal shall be paid to such Liquidation Trustee within five days after the removal date.

3.5.     <u>Resignation</u>

A Liquidation Trustee may resign by giving not less than sixty (60) days prior written notice thereof to the Bankruptcy Court.

# ARTICLE IV.
## PROVISIONS REGARDING DISTRIBUTIONS

4.1.    Priority and Method of Distributions

(a)    Generally. The Liquidation Trustees, on behalf of the Liquidation Trust, or such other person or entity as may be designated in accordance with this Agreement, will make distributions to the Beneficiaries and holders of other Claims in accordance with this Agreement and in accordance with the priorities set forth in, and the other provisions of, the Plan. Whenever any distribution to be made under the Confirmation Order, the Plan or this Agreement is due on a day other than a Business Day, such distribution shall be made, without interest, on the immediately succeeding Business Day, but any such distribution will have been deemed to have been made on the date due.

(b)    Periodic Distribution Requirement. Subject to the provisions of this Article IV, and only to the extent required to maintain grantor trust tax status, the Liquidation Trustees shall distribute at least once per twelve-month period to the Beneficiaries the Liquidation Trust's net income plus all net proceeds from the sale, realization, settlement or liquidation of the Liquidation Trust Assets, except that the Liquidation Trustees may retain an amount of net proceeds or net income reasonably necessary to maintain the value of the Liquidation Trust Assets, to satisfy current and projected expenses of the Liquidation Trust, and to meet Claims and contingent liabilities (including Disputed Claims).

(c)    Withholding. The Liquidation Trustees may withhold from amounts distributable to any person or entity any and all amounts, to be determined in the Liquidation Trustees' reasonable sole discretion, required by any law, regulation, rule, ruling, directive or other government equivalent of the United States or of any political subdivision thereof. To the extent that amounts are so withheld and paid over to the appropriate governmental entity, such amounts shall be treated for all purposes of this Agreement as having been paid to the person or entity in respect of whom such deduction and withholding was made.

(d)    Tax Identification Numbers and Tax Information. The Liquidation Trustees are authorized to request and obtain from the Beneficiaries or holders of other Claims or any other person or entity Forms W-8 and/or W-9 or such other forms or information relating to the Liquidation Trustees' tax obligations or obligations to withhold as the Liquidation Trustees may reasonably request, and the Liquidation Trustees may condition any distribution to any Beneficiary or other distributee upon receipt of such forms or information.

4.2.    Delivery of Distributions

Subject to the provisions of Federal Rule of Bankruptcy Procedure 2002(g), and except as otherwise provided herein, distributions and deliveries to the Beneficiaries or other holders of Claims shall be made at the address of each such Beneficiary set forth on the Debtors' books and records unless superseded by (i) the address set forth on proofs of claim filed by any such Beneficiary or (ii) the address provided in connection with a transfer pursuant to Section 14.1.

# ARTICLE V.
## TRUST FUNDING

### 5.1.   Trust Funding

The costs and expenses of the Liquidation Trust, including, without limitation, the compensation to and reimbursement of expenses of the Liquidation Trustees and the fees, costs and expenses of all professionals retained by the Liquidation Trustees in connection with the performance of the Liquidation Trustees' duties in connection with this Agreement, shall be paid from a fund set aside for such purpose (the "**Liquidation Trust Expense Fund**") for payment of same on the Effective Date. The initial amount of the Liquidation Trust Expense Fund shall be equal to $750,000. Additional funds may be transferred to the Liquidation Trust Expense Fund from time to time as necessary to pay the reasonable costs and expenses of the Liquidation Trust. The Liquidation Trust Expense Fund shall not be subject to charge for claims against the Liquidation Trust, the Liquidation Trustees, the Debtors or their estates. Any funds remaining in the Liquidation Trust Expense Fund after completion of the Liquidation Trustees' activities and full payment of all reasonable costs and expenses of the Liquidation Trust including, without limitation, the fees, costs and expenses of the Liquidation Trustees and the professionals retained by the Liquidation Trustees, shall be paid to the Beneficiaries according to the terms of the Confirmation Order, the Plan and this Agreement.

# ARTICLE VI.
## PROSECUTION AND RESOLUTION OF DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND CAUSES OF ACTION

### 6.1.   Objections to Claims; Prosecution of Disputed Claims

The Liquidation Trustees, on behalf of the Liquidation Trust, shall have the exclusive right to object to the allowance of any Claims by no later than the Claims Objection Deadline. The Liquidation Trustees shall have the right to object to the allowance of Claims with respect to which the Liquidation Trustees dispute classification, liability or allowance in whole or in part. The Liquidation Trustees shall have the authority to settle, in their sole discretion and without approval of the Bankruptcy Court, any and all such objections to Claims; *provided*, *however*, that the Liquidation Trustees may not settle any objection to a Claim where the remaining claim amount after the settlement exceeds $250,000 without approval of the Bankruptcy Court.

### 6.2.   Estimation of Claims

The Liquidation Trustees may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidation Trustees previously have objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Subject to the provisions of Section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute the maximum allowed amount of such Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidation Trustees may

pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

6.3.    Payments and Distributions on Disputed Claims

(a)    Notwithstanding any provision hereof to the contrary, the Liquidation Trustees may, in their reasonable discretion, pay the undisputed portion of a Disputed Claim. Notwithstanding the foregoing, the Liquidation Trustees will set aside for each Holder of a Disputed Claim such portion of Cash as may be necessary to provide required distributions if that Claim were an Allowed Claim, either based upon the amount of the Claim as filed with the Bankruptcy Court or the amount of the Claim as estimated by the Bankruptcy Court.

(b)    At such time as a Disputed Claim becomes, in whole or in part an Allowed Claim, the Liquidation Trustees shall distribute to the Holder thereof the distributions, if any, to which such Holder is then entitled under the Confirmation Order, the Plan or this Agreement. Such distribution, if any, will be made as soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order. No interest will be paid on Disputed Claims that later become Allowed or with respect to any distribution in satisfaction thereof to a Holder.

6.4.    Prosecution of Causes of Action

The Liquidation Trustees, on behalf of the Liquidation Trust, shall have the exclusive right to assert and prosecute in accordance with the Liquidation Trustees' reasonable business judgment the Causes of Action. The Liquidation Trustees shall have the authority to settle and comprise, in their sole discretion and without approval of the Bankruptcy Court, any and all Causes of Action; *provided*, *however*, that the Liquidation Trustees may not settle any Cause of Action where the initial amount of such Cause of Action, without consideration of any defenses to the same, exceeds $250,000 without approval of the Bankruptcy Court.

## ARTICLE VII.
## LIABILITY AND EXCULPATION PROVISIONS

7.1.    Liability of Liquidation Trustees; Indemnification

None of the Liquidation Trustees, the Trust Advisory Board, nor their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, an "**Exculpation Party**" and collectively, the "**Exculpation Parties**") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Liquidation Trust or for the act or omission of any other Exculpation Party, nor shall the Exculpation Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Agreement or the Plan other than for specific acts or omissions resulting from such Exculpation Party's willful misconduct, gross negligence or actual fraud. Subject to the terms of the Agreement, the Liquidation Trustees shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Trust Advisory Board shall be entitled to enjoy

all of the rights, powers, immunities and privileges of an official committee of unsecured creditors. The Liquidation Trustees, or the Trust Advisory Board, may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with their attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, none of the Liquidation Trustees nor the Trust Advisory Board shall be under any obligation to consult with their attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Liquidation Trustees or the Trust Advisory Board or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud. The Liquidation Trust shall indemnify and hold harmless the Exculpation Parties (in their capacity as such), from and against and in respect of all Liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidation Trust or the Plan or the discharge of their duties hereunder; *provided, however*, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud. Persons dealing or having any relationship with the Liquidation Trustees shall have recourse only to the Liquidation Trust Assets and shall look only to the Liquidation Trust Assets to satisfy any liability or other obligations incurred by the Liquidation Trustees or the Trust Advisory Board to such Person in carrying out the terms of the Liquidation Trust Agreement, and neither the Liquidation Trustees nor the Trust Advisory Board shall have any personal obligation to satisfy any such liability. The Liquidation Trustees and/or the Trust Advisory Board shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Liquidation Trust Agreement against any of them. The Liquidation Trust shall promptly pay expenses reasonably incurred by any Exculpation Party in defending, participating in, or settling any action, proceeding or investigation in which such Exculpation Party is a party or is threatened to be made a party or otherwise is participating in connection with the Liquidation Trust Agreement or the duties, acts or omissions of the Liquidation Trustees or otherwise in connection with the affairs of the Liquidation Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Exculpation Party hereby undertakes, and the Liquidation Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Exculpated Party is not entitled to be indemnified therefor under the Liquidation Trust Agreement. The foregoing indemnity in respect of any Exculpation Party shall survive the termination of such Exculpation Party from the capacity for which they are indemnified.

7.2.   Reliance by Liquidation Trustees

Except as otherwise provided herein:

(a)     the Liquidation Trustees may rely, and shall be protected in acting upon, any resolution, certificate, statement, installment, opinion, report, notice, request, consent, order, or other paper or document reasonably believed to be genuine and to have been signed or

presented by the proper party or parties;

(b)  the Liquidation Trustees shall not be liable for any action reasonably taken or not taken in accordance with the advice of a Liquidation Trustee Professional; and

(c)  persons or entities dealing with the Liquidation Trustees shall look only to the Liquidation Trust Assets to satisfy any liability incurred by the Liquidation Trustees to such person or entity in carrying out the terms of this Agreement, and the Liquidation Trustees shall not have any personal obligation to satisfy any such liability, except to the extent that actions taken or not taken after the Effective Date by the Liquidation Trustees are determined by a Final Order to be solely due to the Liquidation Trustees' own gross negligence, willful misconduct, fraud or breach of fiduciary duty.

## ARTICLE VIII.
## ESTABLISHMENT OF THE LIQUIDATION TRUST

8.1.  Transfer of Assets to Liquidation Trust; Assumption of Liabilities

Pursuant to the Plan, the Debtors and the Liquidation Trustees hereby establish the Liquidation Trust on behalf of the Beneficiaries, to be treated as the grantors and deemed owners of the Liquidation Trust Assets. The Debtors hereby transfer, assign, and deliver to the Liquidation Trust, on behalf of the Beneficiaries, all of their right, title, and interest in the Liquidation Trust Assets, including the Causes of Action, free and clear of any liens, claims or encumbrances, notwithstanding any prohibition of assignability under applicable non-bankruptcy law.[2] Such transfer includes, but is not limited to, all rights to assert, waive or otherwise exercise any attorney-client privilege, work product protection or other privilege, immunity, or confidentiality provision vested in, or controlled by, the Debtors or their estates in respect of the Liquidation Trust Assets. The Liquidation Trustees agree to accept and hold the Liquidation Trust Assets in the Liquidation Trust for the benefit of the Beneficiaries, subject to the terms of the Confirmation Order, the Plan and this Agreement.

8.2.  Title to Assets

(a)  Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, all assets and properties encompassed by the Plan shall vest in the Liquidation Trust in accordance with Section 1141 of the Bankruptcy Code. Upon the transfer of the Liquidation Trust Assets to the Liquidation Trust, the Debtors shall have no interest in or with respect to such Liquidation Trust Assets or the Liquidation Trust.

(b)  For all federal income tax purposes, all Parties and Beneficiaries shall treat the transfer of the Liquidation Trust Assets by the Debtors to the Liquidation Trust, as set forth in this Article VIII and in the Plan, as a transfer of such assets by the Debtors to the Beneficiaries entitled to distributions under this Agreement followed by a transfer by such Beneficiaries to the Liquidation Trust. Thus, the Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

---

[2] For the avoidance of doubt, license number 60DBO-91480 held by CRED (US) LLC shall not be transferred and shall continue to be held by CRED (US) LLC.

8.3.    Valuation

As soon as practicable after the Effective Date, the Liquidation Trustees shall make a good faith determination of the fair market value of the Estates' Assets as of the Effective Date; *provided, however*, that the Liquidation Trustees shall not be required to hire an expert to make such a valuation. This valuation shall be used consistently by all parties (including the Debtors, the Liquidation Trustees, and the Holders of General Unsecured Claims) for all federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of the Liquidation Trust Assets.

## ARTICLE IX.
## BENEFICIARIES

9.1.    Identification of Beneficiaries

In order to determine the actual names and addresses of the Beneficiaries, the Liquidation Trustees shall be entitled, but not required, to conclusively rely on the names and addresses set forth in the Debtors' Schedules, books and records or filed proofs of claim. Each Beneficiary's right to distribution from the Liquidation Trust shall be that accorded to such Beneficiary under the Plan.

## ARTICLE X.
## ADMINISTRATION

10.1.    Purpose of the Liquidation Trust

The Liquidation Trust shall be established for the primary purpose of liquidating its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. Accordingly, the Liquidation Trustees shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidation Trust Assets, make timely distributions to the Beneficiaries and not unduly prolong its duration, and shall take or refrain from taking such other actions as may be necessary, in the Liquidation Trustees' reasonable judgment, to preserve and maintain the status of the Liquidation Trust as a "liquidating trust" and as a "grantor trust" within the meaning of Treasury Regulation sections 301.7701-4(d) and 1.671-4(a). The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in this Agreement. The Liquidation Trust also shall not be deemed a successor-in-interest of the Beneficiaries for any purpose other than as specifically set forth in this Agreement.

10.2.    Books and Records

The Liquidation Trustees shall maintain books and records relating to the administration of the Causes of Action and the distribution by the Liquidation Trustees of the proceeds therefrom in such detail and for such period of time as may be necessary to make full and proper accounting in respect thereof and to comply with applicable provisions of law. The Liquidation Trustees shall also maintain books and records relating to the administration of the Liquidation Trust Assets (including the Causes of Action), the income and expenses of the Liquidation Trust, and the payment of expenses and liabilities of, claims against or assumed by,

12

the Liquidation Trust in such detail and for such period of time as may be necessary to make full and proper accounting in respect thereof and to comply with applicable provisions of law. Except as otherwise provided herein or in the Plan, nothing in this Agreement requires the Liquidation Trustees to file any accounting or seek approval of any court with respect to the administration of the Liquidation Trust, or as a condition for making any payment or distribution out of the Liquidation Trust Assets.

10.3.  Voting

The affirmative vote of a majority of the non-recused, voting members of the Liquidation Trustees shall be the act of the Liquidation Trustees with respect to any matter that requires the determination, consent, approval, or agreement of such Liquidation Trustees.

10.4.  Compliance with Laws

Any and all distributions of Liquidation Trust Assets shall comply with all applicable laws and regulations, including, but not limited to, applicable federal and state tax and securities laws.

## ARTICLE XI.
## SUCCESSOR LIQUIDATION TRUSTEE
## AND TRUST ADVISORY BOARD MEMBERS

11.1.  Successor Liquidation Trustee

In the event a Liquidation Trustee is removed by the Bankruptcy Court, resigns pursuant to this Agreement, or otherwise vacates its position, a successor Liquidation Trustee shall be appointed by the Trust Advisory Board. If the Trust Advisory Board does not appoint a successor within 60 days, then the Bankruptcy Court, upon a motion of any party-in-interest, including counsel to the Liquidation Trust, shall approve a successor to serve as the successor Liquidation Trustee. Any successor Liquidation Trustee appointed hereunder shall execute an instrument accepting such appointment. Thereupon, such successor Liquidation Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor in the Liquidation Trust with like effect as if originally named herein; *provided*, *however*, that a removed or resigning Liquidation Trustee shall, nevertheless, when requested in writing by the successor Liquidation Trustee, execute and deliver any reasonable instrument or instruments conveying and transferring to such successor Liquidation Trustee all the estates, properties, rights, powers, and trusts of such removed or resigning Liquidation Trustee.

11.2.  Successor Trust Advisory Board Members

In the event a member of the Trust Advisory Board is removed by the Bankruptcy Court, resigns pursuant to this Agreement, or otherwise vacates its position, a successor member of the Trust Advisory Board shall by appointed by the Liquidation Trustees.  If the Liquidation Trustees do not appoint a successor within 60 days, then the Bankruptcy Court, upon a motion of any party-in-interest, including counsel to the Liquidation Trust, shall approve a successor to serve as a member of the Trust Advisory Board.  Any member of the Trust Advisory Board appointed hereunder shall execute an instrument accepting such appointment.  Thereupon, such

13

member of the Trust Advisory Board shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor in the Liquidation Trust with like effect as if originally named herein; *provided, however*, that a removed or resigning member of the Trust Advisory Board shall, nevertheless, when requested in writing by the successor member of the Trust Advisory Board, execute and deliver any reasonable instrument or instruments conveying and transferring to such successor member of the Trust Advisory Board all the estates, properties, rights, powers, and trusts of such removed or resigning member of the Trust Advisory Board.

## ARTICLE XII.
## DISPUTED CLAIMS RESERVES

### 12.1.  Disputed Claims Reserves

The Liquidation Trustees shall maintain reserves for any distributable amounts required to be set aside on account of Disputed Claims and shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided in the Plan and the Confirmation Order, as such Disputed Claims are resolved, and such amounts shall be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date.

## ARTICLE XIII.
## REPORTING

### 13.1.  Required Plan Reporting

The Liquidation Trustees shall comply with any reporting requirements set forth in the Confirmation Order and/or the Plan, including as required under section 12.3(b) of the Plan.

### 13.2.  Federal Income Tax

(a)    Grantor Trust Status. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Liquidation Trustees of a private letter ruling if the Liquidation Trustees so request one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustees), the Liquidation Trustees shall file tax returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).

(b)    Treatment of Beneficiaries as Grantors. Subject to the provisions of Section 13.2(a) hereof, (i) for federal income tax purposes, the Beneficiaries shall be treated as grantors and owners of the Liquidation Trust for each tax return filed by the Liquidation Trustees as a grantor trust; and (ii) each Beneficiary shall be responsible for payment of any federal income tax with respect to its share of the taxable income of the Liquidation Trust for any taxable year determined pursuant to Section 13.2(c), whether or not a reserve is established for disputed claims.

(c)    Allocations of Liquidation Trust Taxable Income. Subject to the provisions of Section 13.2(a) hereof, allocations of Liquidation Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income

14

would be distributed (without regard to any restriction on distributions described herein) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the Beneficiaries (treating any Holder of a Disputed Claim, for this purpose, as a current Beneficiary entitled to distributions), taking into account all prior and concurrent distributions from the Liquidation Trust (including any distributions held in reserve pending the resolution of Disputed Claims). Similarly, taxable losses of the Liquidation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidation Trust Assets. The tax book value of the Liquidation Trust Assets for this purpose shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Liquidation Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the Treasury Regulations and any other applicable administrative and judicial authorities and pronouncements.

(d)  Tax Reporting Duties of Liquidation Trustees. In compliance with the IRC and the regulations thereunder, the Liquidation Trustees shall prepare and distribute a statement setting forth the information necessary for each Beneficiary to determine its share of items of income, gain, loss, deduction or credit for United States federal income tax purposes.

13.3.  Other

The Liquidation Trustees shall file (or cause to be filed) any other statement, returns or disclosures relating to the Liquidation Trust or the Liquidation Trust Assets that are required by the Internal Revenue Service or any other governmental unit.

## ARTICLE XIV.
## TRANSFER OF BENEFICIARIES' INTERESTS

14.1.  Transfer of Beneficiaries' Interests

The beneficial interests that are owned by the Beneficiaries shall not be certificated. The Liquidation Trustees may make distributions and send communications to Beneficiaries based on the Liquidation Trust's books and records identifying Holders of Claims as of the Record Date as set forth in the Plan, and in so doing the Liquidation Trustees shall be fully protected and incur no liability to any purported transferee or any other person or entity.

## ARTICLE XV.
## LIQUIDATION TRUSTEE PROFESSIONALS
## AND NON-PROFESSIONALS

15.1.  Retention of Liquidation Trustee Professionals and Non-Professionals

(a)  The Liquidation Trustees shall have the right to retain their own professionals, including, without limitation, claims, disbursing and transfer agents, legal counsel, accountants, experts and other agents or advisors, as the Liquidation Trustees deem appropriate (the "**Liquidation Trustee Professionals**") and on such terms as the Liquidation Trustees deem appropriate. The Liquidation Trustee Professionals shall be compensated in accordance with Section 15.2 hereof. The Liquidation Trustee Professionals so retained need not be "disinterested," as that term is defined in the Bankruptcy Code, and may include, without

limitation, counsel and financial advisors of the Debtors or the Committee.

(b)     The Liquidation Trustees shall have the right to retain non-professionals, including, without limitation, employees, independent contractors or other agents as the Liquidation Trustees deem appropriate (the "**Liquidation Trustee Non-Professionals**") and on such terms as the Liquidation Trustees deem appropriate. Such Liquidation Trustee Non-Professionals shall be compensated in accordance with Section 15.2 hereof. The Liquidation Trustee Non-Professionals so retained need not be "disinterested," as that term is defined in the Bankruptcy Code, and may include, without limitation, employees, independent contractors or agents of the Debtors or the Committee.

15.2.   Payment to Liquidation Trustee Professionals and Liquidation Trustee Non-Professionals

After the Effective Date, Liquidation Trustee Professionals shall be required to submit reasonably detailed invoices on a periodic basis to the Liquidation Trustees. The Liquidation Trustees shall have ten (10) days after receipt of any such invoice to advise the Liquidation Trustee Professional in writing of any objections to the invoice. If no objection to the invoice is made within that time period, then the Liquidation Trustees shall pay that invoice, without Bankruptcy Court approval. If there is a dispute as to a part of an invoice, the Liquidation Trustees shall pay the undisputed portion and the Bankruptcy Court shall resolve any disputed amount; *provided, however,* that the parties shall first attempt to resolve the dispute before submitting the dispute to the Bankruptcy Court for resolution. All payments to Liquidation Trustee Professionals or Liquidation Trustee Non- Professionals shall be paid out of the Liquidation Trust Expense Fund.

## ARTICLE XVI.
## TERMINATION OF LIQUIDATION TRUST

16.1.   Duration and Extension

Notwithstanding any provision of the Plan to the contrary, the Liquidation Trust will terminate as soon as practicable, but in no event later than the fifth (5th) anniversary of the Effective Date; *provided*, *however*, that, the Bankruptcy Court, upon motion by a party-in-interest within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) months prior to the end of an extension period), may extend the term of the Liquidation Trust for a finite period (not to exceed an additional three (3) years, together with any prior extensions, without a favorable ruling from the IRS that any further extension would not adversely affect the status of the Liquidation Trust as a grantor trust for federal income tax purposes) if such an extension is warranted by the facts and based upon a finding that such an extension is necessary to the liquidating purpose of the Liquidation Trust, *provided further*, adequate funding exists for such extension period as determined by the Bankruptcy Court.

16.2.   Diligent Administration

The Liquidation Trustees shall, as applicable, (i) not unduly prolong the duration of the Liquidation Trust; (ii) at all times endeavor to resolve, settle or otherwise dispose of all claims that constitute Liquidation Trust Assets; (iii) effect the liquidation and distribution of the Liquidation Trust Assets to the Beneficiaries in accordance with the terms hereof, and (iv)

endeavor to terminate the Liquidation Trust as soon as reasonably practicable.

## ARTICLE XVII.
## AMENDMENT AND WAIVER

17.1.   Amendment and Waiver.

Any substantive provision of this Agreement may be materially amended or waived only by order of the Bankruptcy Court if necessary to implement the Plan; *provided*, *however*, that no change may be made to this Agreement that would adversely affect the federal income tax status of the Liquidation Trust as a "grantor trust." Technical or non-material amendments to or waivers of portions of this Agreement may be made as necessary, to clarify this Agreement or to enable the Liquidation Trust to effectuate the terms of this Agreement, with the consent of the Liquidation Trustees.

## ARTICLE XVIII.
## MISCELLANEOUS PROVISIONS

18.1.   Intention of Parties to Establish Grantor Trust

This Agreement is intended to create a grantor trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as a grantor trust.

18.2.   Preservation of Privilege

In connection with the vesting and transfer of the Liquidation Trust Assets, including rights and Causes of Action, any attorney-client privilege, work-product protection, or other privilege or immunity attaching or relating to any documents or communications (of any kind, whether written or oral, electronic or otherwise) held by the Debtors shall be transferred to the Liquidation Trust and shall vest in the Liquidation Trust. Accordingly, in connection with the prosecution and/or investigation of the Causes of Action by the Liquidation Trustees, any and all directors, officers, employees, counsel, agents, or attorneys-in-fact, of the Debtors, cannot assert any attorney-client privilege, work product protection, or other privilege or immunity attaching or relating to any documents or communications (of any kind, whether written or oral, electronic or otherwise) held by the Debtors or otherwise prevent, hinder, delay, or impede production or discussion of documents or communications requested by the Liquidation Trustees in discovery (whether formal or informal, and including without limitation, depositions, written discovery, and interviews). The Debtors and the Liquidation Trustees shall take all necessary actions to protect the transfer of such privileges, protections and immunities.

18.3.   Standing

The Liquidation Trust and the Liquidation Trustees shall have standing to object to Claims against the Debtors' estates and to assert and prosecute the Causes of Action, and shall stand in the shoes of the Debtors with respect thereto.

18.4.   Laws as to Construction

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of law.

18.5.   Severability

If any provision of this Agreement or the application thereof to any person or entity or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to persons or entities or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and shall be valid and enforceable to the fullest extent permitted by law.

18.6.   Notices

Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered by electronic mail (at the addresses set forth below) and deposited, postage prepaid, in a post office or letter box addressed to the person or entity (or their successors or replacements) for whom such notice is intended at such address as set forth below, or such other addresses as may be filed with the Bankruptcy Court:

**Liquidation Trustees**:

Christopher Moser
Michael Michelin
Cedric de Lisser
[Address 1]
[Address 2]
[E-mail]


With a copy to:

[Name of Counsel]
[Attn: ]
[Address 1]
[Address 2]
[E-mail]

18.7.   Notices if to a Beneficiary

Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the person or entity for whom such notice is intended, or via electronic mail, to the name and address set forth on such Beneficiary's proof of claim or such other notice filed with the Bankruptcy Court, or if none of the above has been filed, to the address set forth in the Debtors' Schedules or books and records or provided to the Liquidation Trustees

18

pursuant to Section 14.1.

18.8.   <u>Survivability</u>

Notwithstanding any provision of the Plan to the contrary, the terms and provisions of this Agreement shall remain fully binding and enforceable notwithstanding any vacancy in the position of the Liquidation Trustees.

18.9.   <u>Headings</u>

The section headings contained in this Agreement are solely for the convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

18.10.   <u>Conflicts with Plan Provisions</u>

Except as otherwise expressly stated herein, if any of the terms and/or provisions of this Agreement conflict with the terms and/or provisions of the Plan, then the Plan shall govern; <u>*provided, however*</u>, that if any inconsistencies or clarifications are in furtherance of the Liquidation Trust's qualification as a grantor trust for federal income tax purposes, then the terms and/or provisions of the Liquidation Trust shall govern.


*[Remainder of Page Intentionally Left Blank]*

In WITNESS WHEREOF, the Parties hereto have either executed and acknowledged this Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers as of the date first above written.

LIQUIDATION TRUSTEES
By: _____
Not individually, but solely in his capacity as Liquidating Trustee
Title:
Name:


By: _____
Not individually, but solely in his capacity as Liquidating Trustee
Title:
Name:


By: _____
Not individually, but solely in his capacity as Liquidating Trustee
Title:
Name:


CRED INC.
By: _____
Title:
Name:


CRED (US) LLC
By: _____
Title:
Name:


CRED CAPITAL INC.
By: _____
Title:
Name:


CRED MERCHANT SOLUTIONS LLC
By: _____
Title:

Name:


CRED (PUERTO RICO) LLC
By: _____
Title:
Name

# EXHIBIT T

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CRED INC., *et al.*, | Case No. 20-12836 (JTD) |
| Debtors.[1] | (Jointly Administered) |
|  | **Obj. Deadline: 7/7/22 at 4:00 p.m. (ET)** <br> **Hrg. Date: 7/19/22 at 3:00 p.m. (ET)** |

## MOTION OF THE CRED INC. LIQUIDATION TRUST FOR ENTRY OF ORDER APPROVING THIRD PARTY CLAIM ASSIGNMENT PROCEDURES

The Cred Inc. Liquidation Trust (the "Trust") established in the chapter 11 bankruptcy cases (the "Chapter 11 Cases") of the above-captioned debtors (collectively, the "Debtors") hereby submits this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), approving the Assignment Procedures (as defined herein). In support of this Motion, the Trust respectfully states as follows:

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This Motion involves a core proceeding as it concerns matters in connection with, arising out of, or related to the Plan (as defined herein) as to which this Court retained exclusive jurisdiction pursuant to Article XIX of the Plan and Paragraph 33 of the Confirmation Order (as defined herein). *See In re MPC Computers, LLC*, 465 B.R. 384, 393

---

[1]   The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

(Bankr. D. Del. 2012) (finding that the court has jurisdiction over an adversary proceeding involving claims assigned to the post-confirmation trust because the assignment of the claims was contemplated in the plan and trust agreement, and the confirmation order provides for the retention of jurisdiction).

2.    In accordance with Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Trust confirms its consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.    Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### BACKGROUND

**A.    The Chapter 11 Cases**

4.    On November 7, 2020, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On December 3, 2020, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee"). Docket No. 120.

5.    After the Committee's appointment, the Committee undertook extensive efforts to move the cases expeditiously towards confirmation to reduce administrative expenses and begin its investigation into the estates' claims for the benefit of unsecured creditors. Accordingly, shortly after being appointed, the Committee began negotiations with the Debtors on a consensual resolution of the Chapter 11 Cases, which culminated into a plan support agreement term sheet [Docket No. 279] (the "Initial PSA").

6.     The Initial PSA contemplated a sale of all or part of the Debtors' assets under

Bankruptcy Code section 363 consistent with the Bid Procedures Order. Following an

unsuccessful sale process, the Committee and the Debtors entered into an amended plan support

agreement under which, among other things, the Committee established case milestones to

confirm a chapter 11 plan and an outside plan effective date of March 31, 2021. Docket No. 464.

**B.     The Chapter 11 Plan**

7.     On December 31, 2020, the Debtors filed the *Combined Joint Plan of Liquidation*

*and Disclosure Statement of Cred Inc. and its Subsidiaries Under Chapter 11 of the Bankruptcy*

*Code* [Docket No. 301] (as amended, the "Plan").

8.     A key issue for the Committee upon its appointment was whether the Trust should

take assignment of potential claims that Cred's customers have against third parties for

wrongdoing related to Cred (the "Third Party Claims"). These are claims that only Cred's

customers—not the Trust—would have standing to pursue. To address this issue, one of the

Trustees' responsibilities set forth in the Plan includes "[a]djudicating third-party claims

assigned, purchased, or otherwise transferred to the Liquidation Trust." Plan, § 12.3(b)(vii).

9.     On March 11, 2021, the Court entered an order confirming the Plan. Docket No.

629. The Plan became effective on April 19, 2021 (the "Effective Date"). Docket No. 730. On

the Effective Date, the Committee was dissolved and the Trust was established. The Debtors'

assets were transferred and assigned to the Trust. *See* Plan, Art. 12.3. Three members of the

Committee currently serve as Trustees of the Liquidation Trust (the "Trustees").  One Committee

member and two creditors (who were not Committee members) currently serve on the Trust

Advisory Board (the "TAB"). The Trust is governed by the Liquidation Trust Agreement

[Docket No. 579-1] (the "Trust Agreement").

10.     Pursuant to the Trust Agreement, in connection with the administration of the Trust, the Trustees have the authority to "[a]djudicat[e] third-party claims assigned, purchased, or otherwise transferred to the Liquidation Trust." Trust Agreement, Art. 2.4(7).

## C.    Third Party Claim Assignment

11.     Since the Effective Date, the Trust has worked diligently to evaluate and pursue certain actions to recover property for the benefit of creditors. During this process, the Trust continued to evaluate whether the assignment of Third Party Claims to the Trust would be in the best interests of creditors. After careful consideration, the Trustees, with the input and consent of the TAB, determined that there were meaningful benefits to pursuing such assignment, including: (i) the Trust's potential recoveries would likely increase, (ii) defendants would be more likely to engage in comprehensive global resolutions without the uncertainty of subsequent litigation by other third parties; and (iii) reduced risk of duplicative and inconsistent litigation.

12.     After the Trust determined that pursuing the assignment of Third Party Claims would be in the best interests of creditors, the Trust contacted certain of the largest creditors to gauge their interest in assigning their Third Party Claims.[2] The Trust received overwhelmingly positive feedback from such creditors in response to the Trust's proposal.

13.     Many of the creditors reside in countries around the globe. For that reason, the Trust also worked with its claims and noticing agent, Stretto, to determine the most efficient approach to opening communication channels to creditors to consummate the assignment of Third Party Claims. The development of this communication process is still ongoing.

---

[2]     The Trust has not completed its claim reconciliation process, and thus the size of creditors' claims was determined based on scheduled claims and filed proofs of claim.

## D.    **The Assignment Procedures**

14.     After careful consideration, the Trustees, with the guidance of Trust professionals

and consent of the TAB, developed the following procedures for the assignment of Third Party

Claims (collectively, the "Assignment Procedures"):

- a.    Stretto will launch an online information distribution portal (the "Portal"). Information regarding how to access the Portal will be distributed to creditors via email and regular mail, as needed.[3]

- b.    Upon accessing the Portal, creditors will have the choice to opt-in to assigning their legal claims to the Trust.[4] Creditors that choose to opt-in to the legal claim assignment ("Assigning Creditors") will be provided with a Legal Claim Assignment and Assumption Agreement (the "Claim Assignment Agreement") to be executed and returned to the Trust.

- c.    If a creditor opts-in and returns an executed Claim Assignment Agreement to the Trust, all of such creditor's right, title, and interest in such claims and all rights to prosecute such claims in any proceeding will be assigned to the Trust. For the avoidance of doubt, the Trust will be sole party with authority to prosecute assigned Third Party Claims, and any recovery by the Trust with respect to assigned Third Party Claims will flow exclusively to the Trust for the benefit of all creditors (not only the Assigning Creditors).

- d.    In consideration for assigning Third Party Claims to the Trust, Assigning Creditors will be entitled to a 10% increase of their allowed claim amount (*e.g.*, if an Assigning Creditor has an allowed claim equal to $100,000, the allowed claim will be automatically increased to $110,000). No other rights or priorities of claims will be altered.

---

[3]    During the Chapter 11 Cases, the Court authorized the Debtors to serve creditors by email and regular mail, as needed. *See* Docket No. 264. The Trust will use the same service schedule for distributing information regarding access to the Portal.

[4]    In addition to the Third Party Claims assignment process, the Trust also intends to use the Portal for other administrative tasks, including (i) accepting tax forms, (ii) completing distribution questionnaires, and (iii) providing updated contact information to the Trust.

## RELIEF REQUESTED

15.     The Trust respectfully requests entry of the Proposed Order approving the

Assignment Procedures.

## BASIS FOR RELIEF REQUESTED

### A.     The Trust Has Authority to Pursue Assigned Third Party Claims

16.     Pursuant to the Plan and the Trust Agreement, the Trustees are authorized to

"[a]djudicat[e] third-party claims assigned, purchased, or otherwise transferred to the Liquidation

Trust." Plan, Art. 12.3; Trust Agreement, Art. 2.4(7); *see Zazzali v. Hirschler Fleischer, P.C.*,

482 B.R. 495, 510 (D. Del. 2012) (finding that a post-confirmation trustee (as opposed to a

bankruptcy trustee) has standing to pursue assigned third party claims); *Grede v. New York*

*Mellon*, 598 F.3d 899, 902 (7th Cir. 2003) (analogizing post-confirmation trustees to a

reorganized debtor in that a reorganized debtor would be free to pursue third party claims and

stating that the terms of the chapter 11 plan and trust agreement govern the duties of a trustee

after bankruptcy).

17.     Even if the Plan did not contemplate the assignment of Third Party Claims, a

trustee "who obtains valid assignments of claims is not prevented from suing on those claims

simply because the assignee is a creature of bankruptcy." *Taberna Capital Management, LLC v.*

*Jaggi*, Case No. 08 Civ. 11355 (DLC), 2010 WL 1424002, at *3 (S.D.N.Y. April 9, 2010); *see*

*Semi-Tech Litigation, LLC v. Bankers Trust Co.*, 272 F.Supp. 2d 319, 324 (S.D.N.Y. 2003) (the

assignee having no claim of its own "is no different than in most cases, outside the bankruptcy

context, in which assignees may sue on assigned claims . . . . The Court sees no basis for treating

an assignee created by, or assignments made pursuant to, a Chapter 11 plan any differently.");

*see generally Zazzali v. Eide Bailly LLP*, Case No. 1:12-CV-349-S-MJP, 2013 WL 6045978

(D.Id. Nov. 14, 2013) (agreeing with *Grede* and *Semi-Tech*). Accordingly, the Trust has authority to pursue and adjudicate assigned Third Party Claims. Notwithstanding such authority, out of an abundance of caution and before incurring expenses associated with Third Party Claims assignment, the Trust is requesting Court approval of the Assignment Procedures.

**B.    Third Party Claims Assignment and the Implementation of the Assignment Procedures are in the Best Interests of Creditors**

18.    The Trustees and the TAB are fiduciaries acting on behalf of the interests of all creditors. *See* Plan, Arts. 12.3(f)(i). Accordingly, decisions made by the Trustees and the TAB are made solely for the best interests of creditors. After careful consideration, the Trustees and the TAB determined that pursuing the assignment of Third Party Claims is in the best interests of creditors. Adjudicating such Third Party Claims will provide a number of potential benefits to creditors, including: (i) the Trust's potential recoveries for the benefit of creditors would likely increase, (ii) defendants would be more likely to engage in comprehensive global resolutions without the uncertainty of subsequent lawsuits, and (iii) reduced risk of duplicative and inconsistent litigation. Conversely, the Trustees and the TAB determined that the most significant risk of pursuing the Third Party Claims is the potential for increased expenses. However, such risk is mitigated for at least two reasons.

19.    ***First***, the Trust will likely pursue the defendants that are subject to the Third Party Claims regardless of whether the Third Party Claims are assigned. To date, the Trust has conducted an extensive investigation of the Debtors' books and records, conducted numerous interviews, and examined thousands of documents received from third parties. Accordingly, the incremental expenses of pursuing Third Party Claims are likely to be nominal.

20.     *Second*, the Trust will not pursue all Third Party Claims solely because such claims have been assigned. The Trust will continue to analyze the viability of Third Party Claims and the potential for recovery when determining whether to pursue such claims.

21.     Based on the foregoing analysis, the Trust and the TAB unanimously agreed that the assignment of Third Party Claims could provide substantial benefits to creditors. After making that determination, the Trust needed to evaluate procedures to implement the Third Party Claims assignment that would inure to the benefit of creditors. There were two notable obstacles that the Trust needed to overcome.

22.     *First*, incentivizing creditors to agree to assign legal claims to the Trust, notwithstanding that recoveries on such claims would be pooled for the benefit of all creditors. The Trustees and the TAB concluded that increasing the allowed claims of Assigning Creditors by 10% (subject to distributions in accordance with the Plan) provided sufficient incentive without significantly diluting distributable assets. Moreover, the Trustees and the TAB determined that the increase in potential recoveries combined with the potential for a global settlement prior to incurring litigation costs provided a greater potential benefit to creditors than a 10% increase in Assigning Creditors' allowed claims.

23.     *Second*, given the location of creditors, the Trust needed to formulate a cost effective approach to effectuate the assignments. The Trustees and the TAB developed a creative solution to accomplish this goal through launching the Portal. Upon launching the Portal and providing access instructions, the Trust will be able to quickly (i) assess the scope of Assigning Creditors and (ii) effectuate valid assignments. The Portal will also provide a number of other benefits to creditors, including an open line of communication that will assist with accessing and providing information.

24. For the foregoing reasons, the assignment of Third Party Claims to the Trust and the implementation of the Assignment Procedures is in the best interests of creditors, and the Trustees' and TAB's decisions with respect thereto are a sound exercise of their business judgment. *See In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (KJC), 2013 WL 12324114, at *7 (Bankr. D. Del. July 9, 2013) (applying the business judgment standard to post-confirmation liquidating trustee's decision). Accordingly, the Trust respectfully requests that the Court approve the Assignment Procedures.

## NO PRIOR REQUEST

25. No previous request for the relief requested herein has been made to this or any other court.

## NOTICE

26. Notice of the Motion has been provided to parties that have requested notice pursuant to Local Rule 2002-1(b). In light of the nature of the relief requested herein, the Trust submits that no other or further notice is required.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

**WHEREFORE**, the Trust respectfully requests entry of the Proposed Order approving

the Assignment Procedures.

Dated:   Wilmington, Delaware
        June 23, 2022

**MCDERMOTT WILL & EMERY LLP**

*/s/ David R. Hurst*
David R. Hurst (I.D. No. 3743)
1007 North Orange Street, 10th Floor
Wilmington, DE 19801
Telephone: (302) 485-3900
Facsimile: (302) 351-8711

- and -

Darren Azman (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

*Counsel to the Cred Inc. Liquidation Trust*

# EXHIBIT U

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CRED INC., *et al.*, | Case No. 20-12836 (JTD) |
| Debtors.[1] | (Jointly Administered) |
| | Related to Docket No. 356 |
| CRED INC. LIQUIDATION TRUST, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 22-_____ (JTD) |
| EARNITY, INC., EARNITY FINANCIAL, INC., EARNITY FINANCIAL INC., ET TRADER, INC. and DOMENIC CAROSA, | |
| Defendants. | |

## COMPLAINT

The Cred Inc. Liquidation Trust (the "Trust") established in the above-captioned Chapter 11 cases (the "Chapter 11 Cases") of Cred Inc. and its affiliated debtors (collectively, the "Debtors" or "Cred"), by and through its undersigned counsel, files this complaint against Defendants Earnity, Inc. ("Earnity"), Earnity Financial, Inc. (a Delaware corporation) ("Earnity Financial"), Earnity Financial, Inc. (a Florida corporation) ("Earnity Financial (FL)"), and ET Trader, Inc. ("ET Trader") (collectively, the "Earnity Defendants"), and Domenic Carosa ("Carosa") (together with the Earnity Defendants, "Defendants") and alleges as follows:

---

[1] The Debtors in the Chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

## INTRODUCTION

1.     Knowing that Cred's bankruptcy was near, Carosa and Cred's most senior management stole a new business line that Cred's senior executives and technical staff had been creating for Cred.  They planned to implement the work-in-progress decentralized and centralized finance platform by stealing Cred's intellectual property and hiring its most senior employees to continue work and launching the platform at their own company, which would later become Earnity. ███████████████████████████████████████████████████

███████████████████████.  As senior Cred executives described in an internal email on October 26, 2020, they planned to "rename or create [a] new company" by "keeping the "remaining team (and likely current investors)" and emphasized that "*the key will be segregating all of the unnecessary, risky, and unwanted parts of the company away from everything we want to keep.*"[2]  With Cred on the brink of bankruptcy, former CEO Dan Schatt was planning his exit with his inner circle to start a new company—Earnity—that would use what he called the "secret sauce" they had been creating at Cred:[3]

---

**To:**      Ray Ma[lma@mycred.io]; Daniel Goldstein[danny@mycred.io]
**Cc:**      Lu Hua[lu@mycred.io]
**From:**    Dan Schatt[dan@mycred.io]
**Sent:**    Thur 9/24/2020 10:58:09 PM (UTC-04:00)
**Subject:** Re: A bit of thinking around DeFi

Hi Ray – absolutely we should add all stablecoins!

Regarding the platform, we will start offering higher fixed rates than CeFi or DeFi because we have found a way to combine the earnings, which will be our secret sauce!  Get ready to attract back all our users!!

Dan

---

2.     During the months leading up to Cred's bankruptcy, Cred's management team was fully aware of Cred's growing financial difficulties.  Cred suffered massive trading losses in March

---

[2] Exhibit A (emphasis added).

[3] Exhibit B.

2020 and there was little, if any, hope that Cred was ever going to be repaid the tens of millions of dollars' worth of cryptocurrency ("crypto," defined below) that Cred was owed in outstanding loans. As its debts and losses mounted, Cred faced a severe liquidity crisis. But Cred was not yet finished, and its management team was looking for ways that it could pull Cred out of its tailspin. To that end, Cred was quietly working on a new plan to re-invent its business—which, if successful, could turn Cred around and make the company a leader in the digital asset industry.

3.      Cred invested company time and resources into developing this new business platform, which was called "Cred 2.0" which was referred to internally as a "billion-dollar opportunity" for the company. The plan was to create a social media-focused crypto investment platform that would make it easy for retail investors to participate in various forms of crypto investing. These included yield-earning opportunities in the form of loans (as part of Cred's "centralized finance" or "CeFi" (defined below) offerings), as well as more complex "staking" transactions and other opportunities built around "decentralized finance" or "DeFi" (defined below). The business would be a retail-focused "CeFi/DeFi router" that would drive crypto investors to innovative yield-earning and trading opportunities that were previously inaccessible to typical retail investors. But while Cred was busy developing "Cred 2.0", Cred's financial situation continued to deteriorate.

4.      When it became clear that bankruptcy was inevitable, Cred's plan was to focus on restructuring the company so that it could emerge from bankruptcy centered around the new platform it was developing. However, Cred's senior executives—including Chief Executive Officer ("CEO") Dan Schatt ("Schatt"), Chief Financial Officer ("CFO") Joseph Podulka ("Podulka"), and Chief Technology Officer ("CTO") Daniel ("Danny") Goldstein ("Goldstein")— had other ideas. They wanted to take Cred's new platform for themselves.

5.      By the time Cred declared bankruptcy on November 7, 2020, Schatt, Podulka, and Goldstein had agreed on a plan to take Cred 2.0 and start a new company of their own.  Schatt, Podulka and Goldstein started by recruiting key Cred employees (mostly product developers and engineers) who were already working on Cred 2.0 to join them in their new venture.  They needed these employees to identify and extract Cred's software, hardware, programming tools and data, branding and marketing designs, and other highly confidential and proprietary information that they would need to complete Cred 2.0 at their new company.

6.      But Cred's senior management team could not loot Cred and launch Cred 2.0 alone. That is where Carosa, Earnity's other co-founder, came into play.  Carosa is the founder of Banxa Holdings, Inc. ("Banxa"), a fiat-to-cryptocurrency payment processing company.   He was first introduced to Schatt by Cred's restructuring mergers and acquisitions ("M&A") advisor after identifying Banxa as a potential buyer for Cred.  Schatt and Carosa took an immediate liking to each other and were soon communicating privately about "Cred 2.0."  Instead of having Banxa buy Cred, Carosa joined Schatt and his co-conspirators' plan to steal "Cred 2.0" without paying a penny to Cred.

7.      Carosa and Schatt both knew that Banxa was not going to purchase Cred.  Yet Banxa engaged in negotiations with Cred and its advisors for months under that pretense.  These protracted "negotiations" served two purposes.  *First*, they gave Goldstein's team of developers and programmers additional time and use of Cred's limited resources to continue their work on the platform they were supposed to be building for Cred.  *Second*, they gave Carosa and his team time to mine Cred's data room for key intellectual property ("IP") and other proprietary information that would be used to continue building Cred 2.0 at the new companies that would become the Earnity Defendants.

4

8.      Then, with Carosa's assistance, Goldstein and his team of Cred employees used the additional time that Banxa's sham proposal gave them to retrieve everything that would be of value to the new company.  When Goldstein and his team were finally laid off in mid-January 2021, Goldstein and Carosa sent Schatt instructions to steal the remaining items they needed to continue building Cred 2.0 elsewhere.  This material included hardware that Goldstein described as "must-have", customer lists and other data that Carosa had seen from Cred's data room, as well as information technology ("IT") equipment and other tangible assets that Goldstein wanted.  ████

████████████████████████████████████████████████████████████████ [4]

9.      As part of the liquidation of Cred's assets, Carosa—without disclosing his affiliation with Cred's senior management—████████████████████████████████

█████████████████████████████. █████████████████████████████████,

Cred's former executives and Carosa took great pains to operate in secret, even directing a technical consultant hired by the Trust not to disclose his involvement with the new entity to the Trust.  Using Cred's intellectual property, employees, and equipment, Earnity launched on March 5, 2021, and raised in excess of $16 million using the "Cred 2.0" business model that Cred had developed in the months prior to its bankruptcy filing.

10.      ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[4] Exhibit C.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

11.     Earnity was built using resources and property paid for and developed by Cred. Schatt, Podulka, Goldstein, Carosa and their team of former Cred employees stole this confidential and proprietary information from Cred after Cred filed for bankruptcy but before the former Cred management team was laid off.

12.     ████████████████████████████████████████████████, Earnity is now operating the social media/CeFi-DeFi Router platform (defined below) that was created and developed by Cred and its employees, for Cred and using Cred's limited resources. Defendants have raised millions of dollars in outside investment by pitching the same business concept that Cred conceived in early 2020 and invested precious company time and resources developing while it was on the verge of bankruptcy.

13.     Defendants have benefited and will continue to benefit from the same confidential and proprietary information, including trade secrets, that former Cred executives, employees, and their co-conspirators stole from Cred.  Because these assets are property that belong to Cred's estate and that should and would have inured to the benefit of Cred and its creditors had they not been wrongfully misappropriated, the Trust brings this action to recover them.

## PARTIES

14.     The Trust was created pursuant to the *Modified First Amended Combined Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code* (D.I. 629-1) (as amended, the "Plan"), which this Court confirmed on March 11, 2021.  The Plan became effective on April 19, 2021 (D.I.  730), whereupon the Debtors' assets were transferred and assigned to the Trust. (*See* Plan § 12.3.)  The Trust is being administered by the Liquidation Trustees (as defined in the Plan).  (*See id.* § 12.3(a).)

15.     Defendant Earnity is a corporation organized under Delaware law with its principal place of business located at 3 East Third Avenue, Suite 200 in San Mateo, California.  Earnity was first incorporated as Earn Blockchain Holdings Inc. on February 9, 2021, and changed its name to Earnity Inc. on March 5, 2021.  Earnity operates as a social media-based blockchain platform that offers retail customers a combination of "CeFi" and "DeFi" (both defined below) investment opportunities in which customers can lend, borrow, or trade directly in crypto and other digital assets.

16.     Defendant Earnity Financial is a corporation organized under Delaware law with its principal place of business located at 3 East Third Avenue, Suite 200 in San Mateo, California.  Earnity Financial was formed on July 25, 2021 as a wholly-owned subsidiary of Earnity, and provides centralized administrative services to Earnity, including facilitating customer transactions as a registered money transmitter.

17.     Defendant Earnity Financial (FL) is a corporation organized and incorporated under Florida law on October 19, 2021 with the same name as Earnity Financial.  Earnity Financial (FL) is based out of the same offices as Earnity and Earnity Financial, located at 3 East Third Avenue,

Suite 200 in San Mateo, California, and, upon information and belief, operates in the same capacity as Earnity Financial as a wholly-owned subsidiary of Earnity.

18.     Defendant ET Trader is a Delaware corporation with its principal place of business located at 3 East Third Avenue, Suite 200 in San Mateo, California.  ET Trader was formed on July 2, 2021 as a wholly-owned subsidiary of Earnity to undertake the capital markets functions required to support Earnity's retail customer operations.

19.     Defendant Carosa is the other co-founder of the Earnity Defendants.   Upon information and belief, Carosa is a citizen of Australia and resides in the Netherlands.  Carosa serves as Chairman of Earnity's Board of Directors and, upon information and belief, holds a substantial ownership stake in Earnity.  Carosa also is or has served as Earnity's President and CEO.

## RELEVANT NON-PARTIES

20.     Schatt is the co-founder and former CEO of Cred.  Schatt became Cred's CEO in 2018 and resigned from that position in December 2020.  Schatt owns 50% of Cred's equity.  Shortly after Cred filed for bankruptcy in November 2020, Schatt co-founded Earnity in February 2021.   He is currently Earnity's majority shareholder and the CEO of each of the Earnity Defendants.

21.     Podulka was Cred's CFO from July 2019 to December 2020, where he oversaw Cred's corporate cash management and the expenses incurred by Cred Capital.  On June 29, 2020, Podulka became a member of Cred Capital's board of directors.  Shortly before Cred filed for bankruptcy in November 2020, Podulka and Schatt began building the team of Cred executives and employees who would go on to found the Earnity Defendants.  Upon formation of the Earnity

Defendants, Podulka became the CFO of each Earnity Defendant and continues to serve in that capacity.

22.     Goldstein served as Cred's CTO from April 2020 to January 2021, where he was hired to develop a new platform and product for Cred.  Prior to Cred's bankruptcy filing on November 7, 2020, Goldstein was recruited by Schatt and Podulka to be the CTO of the new company they were planning to form in the aftermath of Cred's bankruptcy, which later became Earnity.  Goldstein currently serves as CTO for each of the Earnity Defendants.

23.     Daniel Hummer ("Hummer") is Earnity's Director of IT.  Hummer previously served as Cred's Director of IT from November 2019 until January 2020, where he worked on developing Cred's new platform.  Hummer worked as a consultant during the Trust during Cred's liquidation.  Like Goldstein, Hummer was recruited by Schatt and Podulka to join the company that would later become Earnity prior to Cred's bankruptcy filing, and was hired by Earnity after its formation in February 2021.

24.     Daniyal Inamullah ("Inamullah") served as Cred's Vice President of Capital Markets from January 2020 to April 2020.  In that role, Inamullah was responsible for seeking investment opportunities, conducting due diligence, and proposing investments to Cred's "investment committee."  Inamullah was also recruited by Schatt and Podulka to join Earnity's future executive team, but declined their overtures.

## RELEVANT TERMS AND DEFINITIONS

25.     The term "crypto" or "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," "digital assets," "coins," and "tokens." Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay.  Most

9

customers purchase cryptocurrency speculating that the price of that particular cryptocurrency will increase. Some cryptocurrencies are also used to buy goods and services. Bitcoin ("BTC") and Ethereum ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other cryptocurrencies.

26.     A "blockchain" is an open-sourced string of code which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency.

27.     A crypto exchange ("exchange") is a marketplace where users buy and sell cryptocurrencies. Many exchanges are designed to be user friendly. Although exchanges are not necessary to buy and sell crypto, exchanges are the most popular mechanism for retail customers to buy and sell crypto.

28.     Centralized finance, or "CeFi", is a term that has been used in the crypto industry to describe yield earning and lending opportunities with third parties. The term "centralized" generally refers to a company or entity to which an investor lends its crypto in exchange for interest payments. That "centralized" entity often relends that crypto or engages in proprietary crypto trading to earn a yield in excess of that owed to its customers. By way of example, Cred was a CeFi platform. Crypto investors who participate in CeFi platforms assume credit risk of the centralized entity offering the platform as well as the CeFi platform's borrowers. Like many terms in the crypto industry, different market participants ascribe different meanings. But for purposes of this complaint, CeFi will be defined in accordance with this paragraph.

29.     Decentralized finance, or "DeFi" is a term that is used in the crypto industry to describe offerings in which crypto investors earn yield by "staking" or other automated "smart contracts." "Smart contracts" underly every crypto and can also be set up to automate payments or rewards. The terms of a smart contract are implemented on the blockchain and will self-execute

when certain conditions are met. In DeFi, Crypto investors "stake" or "post" their crypto into smart contracts that define the terms by which staking rewards will be paid. Usually, the crypto is "staked" for a specified period of time after which the investor will be automatically repaid its crypto plus rewards. In effect, the rewards are newly created crypto and so there is no counterparty that must pay interest. The key difference between DeFi and CeFi is that in DeFi (if done correctly) the investor does not incur credit risk because the DeFi opportunity will pay rewards automatically pursuant to the automated smart contract. DeFi is one term in the crypto industry that is often misused and many projects or opportunities are referred to as being "DeFi," when they are actually better described as CeFi.

30.     A "CeFi/DeFi Router" is a website or other application that directs crypto investors to various CeFi and DeFi opportunities and assists in facilitating those investments. The CeFi/DeFi Router creates a marketplace where crypto investors can choose which CeFi or DeFi opportunities to invest, usually with some direction, information, and marketing proliferated by the CeFi/DeFi router.

## JURISDICTION AND VENUE

31.     This Court has original jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because it arises under Title 11 of the United States Code (the "Bankruptcy Code") and relates to cases under the Bankruptcy Code pursuant to 28 U.S.C. §§ 157 and 1334(b). This adversary proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter final orders for matters contained herein.

32.     In accordance with Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"),

the Trust confirms its consent to the entry of a final order or judgment by the Court in connection

with this adversary proceeding to the extent that it is later determined that the Court, absent consent

of the parties, cannot enter a final order or judgment in connection herewith consistent with

Article III of the United States Constitution.

33.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## **BACKGROUND**

### A.     **Cred's Crypto Lending Platform Leads To Significant Financial Problems**

34.     Schatt and Lu Hua ("Hua") co-founded Cred in 2018 as a crypto "yield earning"

platform.[5]  Under this business model, Cred's customers lent crypto to Cred through a program

called "CredEarn", in which Cred agreed to repay its customers the loaned crypto, plus interest.

35.     Cred used approximately 90% of the crypto Cred received from its customers to

make secondary loans to MoKredit, a Chinese lending company owned by Hua (Cred's 50% owner

and co-founder).[6]  MoKredit was in the business of making unsecured and uninsured micro-loans

ranging from RMB10 ($1.45 USD) to RMB1000 ($145 USD) to young, low-income videogamers

in China with no credit history.  These micro-loans were funded by the crypto Cred loaned to

MoKredit.

---

[5] Schatt and Hua initially established an entity named "Libra Credit" in Singapore, which later became known as "Cyber Quantum Pte. Ltd."  On May 14, 2018, Schatt and Hua organized "Libra Credit (US) LLC," in Delaware, which changed its name to "Cred LLC" in August 2018.  On May 13, 2020, Cred LLC converted to Cred Inc.

[6] The entities comprising the defined term MoKredit are MoKredit Inc., MoKredit Technology (Hong Kong) Company Limited, MoKredit (Shanghai) Information Technology, Co. Ltd, and Shanghai Bestone Information Technology Co. Ltd.  They are collectively referred to herein as "MoKredit.")

36.     Given the unsecured nature of MoKredit's micro-loans, Cred's reliance on MoKredit exposed Cred to substantial risk.  MoKredit also consistently failed to repay the principal on its outstanding loans from Cred.

37.     In addition to the risk of MoKredit defaulting, MoKredit would accept only stablecoin from Cred.[7]  Because Cred was obligated to repay its customers' loans in BTC, ETH, and other cryptocurrencies (plus interest), Cred assumed a significant risk of loss if BTC and/or other cryptocurrencies increased in value before Cred could repay its obligations.

38.     To mitigate this risk, Cred hired a trading firm (the "Trading Firm") to design and execute a hedging strategy that would protect Cred against the risk that the price of BTC and other crypto would increase.  Despite this mandate, the Trading Firm executed an extremely risky trading strategy that was completely unsuitable for Cred's needs.

39.     This strategy failed.  In just one night, on March 12, 2020, the price of BTC plummeted and Cred lost hundreds of millions of dollars' worth of crypto as a result of the overleveraged positions that the Trading Firm has established for Cred.  These losses depleted Cred's balance sheet and completely eliminated its hedging positions.  Cred was left with naked exposure to tens of millions of dollars in additional losses if and when the price of BTC and other crypto again increased in value.

40.     Cred faced a severe liquidity crisis in the wake of its March 12, 2020 trading losses and lacked the cash or crypto to re-establish its hedging positions and avoid further losses.

41.     On April 5, 2020, Cred's Vice President of Capital Markets, Inamullah, prepared a memorandum listing Cred's remaining sources of liquidity:  (i) approximately $350,000 in cash

---

[7] "Stablecoin" is cryptocurrency that is supposed to be identical in value to a fiat currency, usually, and, as in this case, the U.S. dollar.

on the balance sheet; (ii) loans from its portfolio amounting to approximately $2 million; (iii) revenue from generating net interest margin from its loan portfolio amounting to approximately $700,000 to $1 million; and (iv) additional contributions that would come from new CredEarn customer deposits.[8]   With few options left, the vast majority of Cred's "liquidity recovery strategy" hinged upon receiving more than $8 million in loan repayments from MoKredit in the immediate future.

42.    ███████████████.[9]  As a result, Cred's financial situation became increasingly dire.  On June 1, 2020, Schatt circulated a memorandum to his management team stating that: (1) "Cred's current liabilities exceeded its invested assets and current assets by approximately $19.5 million or 19% of the total principal balance of liabilities"; and (2) that "Cred does not have the capacity to repay the full liabilities if assets were liquidated today[.]"[10]

43.    With little, if any, chance of being repaid by MoKredit, Cred's only option was to seek funding from outside investors.  On or around June 10, 2020, Schatt and other executives announced that Cred was seeking its first round of capital and began reaching out to potential investors.[11]  These efforts led to multiple conversations between Cred's management team and a number of prospective investors throughout the summer of 2020.

44.    In July 2020, Cred struck a deal with Dragonfly Capital LLC ("Dragonfly") whereby Dragonfly would be the lead investor for a round of convertible notes.  These funds provided a lifeline to the Company to keep it afloat.

---

[8] Exhibit D.
[9] Transcript of December 8, 2020 Deposition of Daniyal Inamullah ("Inamullah Dep.") at 222.
[10] Exhibit E.
[11] Exhibit F.

14

45.     At the same time, however, Cred executives were quietly working on a plan that would re-invent Cred's entire business—which, if successful, could turn the company around and make Cred an industry-wide leader in blockchain-based financial services.

**B.     Cred Develops Cred 2.0**

46.     In or around the first quarter of 2020, Cred's executive team began to formulate an idea referred to internally as "Cred 2.0."  At the time, Cred offered only CeFi investment products to customers through its third-party lending-based yield earning platform.  Cred 2.0 would turn Cred into a CeFi-Defi Router with the ability to not only direct its customers' crypto to traditional counterparty loans, but also blockchain-validated DeFi yield-earning transactions.

47.     This plan would allow Cred to expand its services and revenue base by combining its crypto lending business with a platform that would offer retail customers a wide variety of CeFi and DeFi investment products where customers could lend, borrow, or trade their crypto and other digital assets.  The goal for Cred 2.0 was to make Cred a one-stop shop that would direct customers from traditional blockchain-based CeFi investment products (which would remain available) to new opportunities in the rapidly-expanding market for DeFi products in the digital asset space.

48.     In addition to this core concept, these plans focused on incorporating several other key elements into Cred's new platform.  One was to develop Cred's trading infrastructure to facilitate bilateral trades (as opposed to loans) and other transactions involving digital assets that customers could easily access.  Another was to incorporate a social media element into Cred's new product where users could share, follow and interact with each other while trading and transacting on Cred's platform.

49.     Prior to founding Cred, Schatt had worked at a company called Stockpile that allowed customers to purchase and transact with gift cards or tokens representing fractionalized shares of publicly traded companies that could be shared with or gifted to other users.  Schatt

wanted to incorporate a similar user-to-user token or gift card function into a product that Cred could offer customers separately from its yield earning platform.

50.     To lead the project, Schatt hired Goldstein as Cred's CTO in April 2020.  Goldstein had previously served as an executive at Western Union, Symantec, and Emergent Technology. In that last role, Goldstein led the development of Emergent Technology's G-Coin digital token, a digital certificate of title to "responsibly-sourced" gold, which customers could trade as an investment or use to make payments.

51.     Schatt also recruited Don Kingsborough ("Kingsborough"), a high-profile fintech and retail entrepreneur, to join Cred as a Senior Advisor in March 2020.  Like Goldstein, Kingsborough added experience and know-how to the team tasked with building Cred's new business platform through his executive and operational roles at the intersection of retail, technology and fintech.

52.     Transforming Cred into a combined CeFi-DeFi Router was a priority for Cred's executive team.  It also was a relatively novel idea at the time to create a single social media-based platform that would allow customers access to the full spectrum of CeFi and DeFi investment opportunities for their crypto and other digital assets.

53.     Presentations from the weekly "Cred All Hands" meetings from May 2020 onwards demonstrate that Cred was ramping up development of this new platform and discussing "Cred 2.0" regularly.

54.     Likewise, emails from Schatt and other Cred executives in late June 2020 show that Cred was discussing a move towards DeFi-focused products with prospective investors as part of its plan to offer both CeFi and DeFi optionality on a single platform.  Kevin Hu, the head of "Liquid Strategies" at Dragonfly agreed with Schatt in a June 28, 2020 email that ███████████████████

16

████████████████████████████████████████

████████████████████████ [12]

55. By early July 2020, internal memoranda and draft marketing emails show that Cred was planning a "New Product Announcement" in late 2020 or early 2021,[13] and was clearly investing company time and assets into developing this new business line.

56. On July 2, 2020, Inamullah circulated a memorandum titled "Cred Strategy" to Schatt, Podulka, and another member of Cred's senior management team "to help with ideation for go-forward strategy."[14] The "Strategy Overview" section of this memorandum outlined a plan for a "three phased roadmap to growth":

---

**Strategy Overview**

*Conduct a three phased roadmap to growth*

**Stage 1: Balance sheet / team strengthening**
Core tenets:
- Focus on fee-based services
- Minimize balance sheet restrictive operations
- Increase product diversity for direct sales force execution

**Stage 2: Technology stack and product differentiation**
Core tenets:
- Cred 2.0 API integrations
- Build tech sales force
- DeFi integrations (need engineers)
- Payments

**Stage 3: Expansion**
Core tenets:
- Revisit securitization
- Project / developer finance (VC)

---

[12] Exhibit G.
[13] Exhibit H.
[14] Exhibit I.

57.     As part of this "roadmap to growth", the memorandum detailed a number of "New Product Concepts" in development as of July 2, 2020, including:   (1) Private Debt; (2) Money Markets; (3) Fund Management; (4) Private Wealth Management; (5) DeFi-related Staking Partnerships; (6) Gold Product Ideation; and (7) Celebrity NFTs.[15]  All of these concepts reflect the expanded CeFi-to-DeFi "gateway" that Cred was developing as its future business.

58.     On July 20, 2020, Cred's CTO, Goldstein, created a new Slack Messaging channel for a group of Cred developers and engineers which he called the "cred-10c-platform" team. The term "10c" refers to the Polish-based blockchain and Fintech software development company 10Clouds, S.P. Z.O.O. ("10Clouds"), which Cred had hired in March 2020 to help design the new platform that Cred was developing.[16]  The new Slack channel shows that Cred had started hiring the developers and engineers that were needed to build it.

59.     Schatt was also reaching out to his former colleagues at PayPal for long-term funding to develop Cred's new platform.  On July 29, 2020, Schatt introduced Jeremy Jonker, head of PayPal Ventures, to his contacts at Dragonfly, noting that Cred had "lots of commercial possibilities….just a longer timeframe to implement…."[17]

60.     In August 2020, Schatt and his executive team prepared a "Cred Investor Presentation for Q3 2020" that incorporated several of the concepts described in Inamullah's strategy memorandum into business plans that were being pitched to Dragonfly and other prospective investors.  These concepts included initiatives for Cred to launch "payment cards, trading and market operations, [and] Defi services" as new products in the first quarter of 2021.[18]

---

[15] *Id.*
[16] Exhibit J.
[17] Exhibit K.
[18] Exhibit L at 8.



61.     Cred's last-minute fundraising drive to secure critically needed funds in the wake of Cred's massive trading losses in March 2020 and MoKredit's subsequent default had achieved some small success by August 2020.  Dragonfly had signed on to lead the first funding round, joined by several other blockchain and digital asset-focused investment firms.[19]

62.     The funding Cred was able to obtain from these investors was due in large part to Cred's plan to reinvent its business into a CeFi-DeFi Routing platform.  Investors were interested in the wide-range of services that Cred's new business model would offer.  Schatt summarized the pitch for Cred 2.0 in an August 27, 2020 message he sent to members of Cred's creative and marketing teams:[20]

---

[19] Exhibit M.
[20] Exhibit N.

---

Dan Schatt <dan@mycred.io>                                    8/27/2020, 7:00 PM

1. We allow you to earn where you are most comfortable – your favorite wallet, exchange, or even NBA player 😊
2. Want to mix and match between crypto and fiat? Give us your crypto and we'll give you USD interest, or vice versa! We're highly versatile, across 30+ assets!
3. Interested in going into new asset classes? Cred is the only company offering interest on gold tokens!
4. Want to borrow at single digit rates? If you have some crypto, it's very easy with Cred!
5. Are you located in a country that doesn't have very good financial services? We're in 190 countries!
6. Are you interested in compounding your interest to make your money work even harder? We can help!
7. Do you have a new token that you'd like to borrow against or earn? We can probably help!
8. Interested in purchasing crypto? Coming soon!
9. Interested in spending a line of credit against your crypto? Coming soon!
10. Interested in taking advantage of cefi AND defi opportunities all in one place? Coming soon!

👍 1 · Nicole Skillern

---

63.    By September 2020, however, Cred had secured only $2 million in cash from its fundraising drive.[21] These funds were hardly sufficient to overcome the severe liquidity crisis that Cred was still experiencing following its March 2020 trading losses (in addition to other financial losses). That was in part because Cred allocated a significant portion of the money it raised to hiring more developers to build out its new combined CeFi-DeFi platform.[22]

64.    Despite Cred's financial constraints, Schatt and his executive team continued to prioritize the development of a new CeFi-DeFi platform in the months that followed. Schatt stated as one of his four main points in a September 6, 2020 "Strategy" message to Podulka, Inamullah, and Maxim Rokhline ("Rokhline"), Cred's Chief Product Officer, that "DeFi is exploding…and *we'll want to position ourselves as a company that can act as a gateway to CeFi and DeFi services*, in terms of our allocations, [] liquidity, and in our future consumer interface."[23]

65.    By mid-September 2020, Cred was moving closer to making "Cred 2.0" a reality.

███████████████████████████████████████████████████████████████████

█████████[24]████████████████████████████████████████████████████████

---

[21] Exhibit O.

[22] *See id.*

[23] Exhibit P (emphasis added).

[24] Exhibit Q.



66.     Schatt outlined Cred's plans to begin incorporating DeFi investment options and other diversified products that were part of Cred 2.0 in a September 21, 2020 email to Hua, Goldstein, Rokhline, and Inamullah.[27]  In response to a message that Cred developer Ray Ma ("Ma") had sent Schatt with DeFi-related ideas for Cred to consider, Schatt wrote:

> Thanks for your email, we've been doing LOTs of thinking on this topic, and I'm glad you are involved in helping us lead the charge to do much more in DeFi!
>
> Here's the current thinking:
>
> Phase 0: Start accepting DeFi tokens through our institutional channels, and allocating these to DeFi projects through our asset managers
>
> Phase 1: Retail: Begin supporting key DeFi tokens including Algo, Tezos, Compound, Curve, Yearn
>
> Phase 2: Become a staking node / allocate to DeFi projects directly through Cred / investigate insurance capabilities on DeFi / extend credit card purchasing to DeFi tokens
>
> Phase 3: Retail interface: Offer customers the choice of DeFi vs. CeFi from one interface
>
> We're looking forward to working with you to figure this all out! We'll plan to start setting up some regular meetings soon to make progress!

67.     Later in the thread, Schatt discussed his plans for the new platform—stating that "we will start offering higher fixed rates than CeFi or Defi because we have found a way to combine the earnings, *which will be our secret sauce*!"[28]

---

[25] Exhibit R; Exhibit S.

[26] Exhibit T.

[27] Exhibit U.

[28] Exhibit B (emphasis added).

> **To:** Ray Ma[lma@mycred.io]; Daniel Goldstein[danny@mycred.io]
> **Cc:** Lu Hua[lu@mycred.io]
> **From:** Dan Schatt[dan@mycred.io]
> **Sent:** Thur 9/24/2020 10:58:09 PM (UTC-04:00)
> **Subject:** Re: A bit of thinking around DeFi
>
> Hi Ray – absolutely we should add all stablecoins!
>
> Regarding the platform, we will start offering higher fixed rates than CeFi or DeFi because we have found a way to combine the earnings, which will be our secret sauce! Get ready to attract back all our users!!
>
> Dan

68.     Goldstein followed up in response to additional suggestions from Ma later on the chain, writing in a September 24, 2020 email:[29]

> good analysis. the points you bring are in all of our minds and we have almost daily discussions on the subject. We started to assemble a "brain trust" of internal and external contributors to chart the path forward. I am creating a slack channel for us to chat on this subject.
>
> Danny

69.     The next day, Goldstein invited Schatt, Hummer, Inamullah, Ma, and another software developer to a new Slack channel called "Cred-DeFi."[30] They later added others who would play critical roles in Earnity's growth and development to this Slack channel, including fundraising consultant Miroshnik.[31]

70.     Cred's executives continued advertising Cred's new strategy to potential business partners. On September 24, 2020, Schatt told the head of corporate development at Ripple, a leading provider of crypto solutions for businesses (and a potential source of financing for Cred), that Cred was "Rolling out DeFi+CeFi strategy next month! (hint—combines the best of both)."[32]

---

[29] Exhibit V.
[30] Exhibit W.
[31] Exhibit X; Exhibit Y.
[32] Exhibit Z.

71.     Cred maintained its focus on the new CeFi- DeFi "gateway" that it was developing through September and into mid-October 2020. Discussion took place at weekly "Innovation Meetings", "All Hands" meetings, and on multiple Slack Messaging channels where the concepts and supporting software and coding for the new platform were regularly shared and discussed internally with Cred's management and developer teams.

72.     But Cred's financial situation remained dire. It was unlikely that MoKredit was going to repay Cred for the vast majority of the $38 million that had been outstanding for many months and by October 2020 Cred's fundraising efforts had yielded a total of only $2.65 million.[33]

73.     It was by now apparent that Cred would have to file for bankruptcy protection. Cred's plan at the time was to focus on restructuring the company so that it could emerge from bankruptcy centered around the new CeFi-DeFi platform Cred had been developing. However, Schatt and Podulka had other ideas.

## C.     Schatt And Podulka Conspire To Steal Cred's New Platform

74.     Throughout its development, Schatt avoided disclosing any specific details or creating a clear paper trail about Cred's new "billion-dollar opportunity". Schatt preferred to hold discussions about the new platform on phone calls or at in-person meetings and generally did not circulate memoranda or presentations discussing the plan to reinvent the company.

75.     The reason for this practice is now clear: Schatt knew that Cred was in deep financial trouble. He wanted to save the idea that Cred had developed on Cred's time, with Cred's resources, Cred's employees, and Cred's know-how for himself when Cred went under.

76.     But Schatt was not the only one on Cred's management team who was quietly planning to steal the "Cred 2.0" platform that Cred had been building over the past year. Cred's

---

[33] Exhibit AA.

CFO, Joe Podulka, had exactly the same idea. The same day Cred's counsel advised Schatt and Podulka to prepare for Cred's imminent bankruptcy, Podulka shared his plan to start a new company with the product Cred had been developing in an October 25, 2020 email to Schatt:[34]

---

On Oct 25, 2020, at 10:01 PM, Joe Podulka <joe@mycred.io> wrote:

Hi Dan.

I have most of this stuff and can put in a folder or share directly over email tomorrow.

I also had an idea about keeping the company alive. Assuming Chapter 11 is a possibility, I think the objective should be to select the non-balance sheet elements of the company that could possibly grow into a stand-alone business. Maybe products like Amun, payments for buying/selling crypto, other things Product and Engineering are building today. This way, the focus could be on closing CredEarn and CredBorrow, but coming away with a leaner company and hopefully some start-up capital to focus on areas of Cred we've been working on lately. If we're able to make progress on these items over the next 90 days, there may be a company to operate in 2021.

One key will be communicating with employees and investors that the company is not ending, but pivoting. We'll need to communicate that we're pivoting away from a risky balance sheet business and into a more stable and sustainable one.

Joe

---

77. Schatt wrote back: "***Really great thoughts, agree wholeheartedly***."[35] Podulka followed up later that night with more thoughts on the plan—including calling the new company "CreDeFi", listing which Cred employees to take with them, and emphasizing that the key to their success would be "***segregating all of the unnecessary, risky, and unwanted parts of the company away from everything we want to keep***."[36]

---

[34] Exhibit A.
[35] *Id*.
[36] *Id*.

---

**To:** Dan Schatt[dan@mycred.io]
**From:** Joe Podulka[joe@mycred.io]
**Sent:** Mon 10/26/2020 2:21:38 AM (UTC-04:00)
**Subject:** RE: Cred Follow-up

We could rename or create new company 'CreDeFi' and probably raise capital just on the name **

I also have some ideas about reducing staff, as we would no longer need anyone working on bringing in Cred Earn money, liquidity, or supporting Uphold/Retail.

    • No Randy, Travis, Michael, Devon, Delon, Colin. Would close the LA (and SM) office as part of bankruptcy and be fully remote.
    • No Megan (only would need Min for BD/Marketing)
    • No Poland or Shanghai. Danny could use the local engineering team to support current initiatives. Maybe Amit goes.
    • Maybe no Jonathan or Nicole (and contractors) depending on future projects.
    • Maybe no Addy if D could and would be willing to manage Amun and similar initiatives. Although depending on what we decide to pursue, having a #2 and an analyst in capital markets might be a good idea. Maybe we could work closer with and also be somewhat of a lead-gen for 1AV.
    • Not sure what level Security would be required.
    • Not sure about Product beyond Maxim and maybe Dhiraj
    • Probably no AscaleX, although would likely need Pawan and Cristiane for sure through bankruptcy and likely after given they would manage reporting, account management, integration, customer service, etc.
    • Could outsource Legal through PH and/or Scott (or similar)

All energy and resources would be dedicated to fee-based or revenue sharing products – nothing balance sheet related. I think the remaining team (and likely current investors) could rally around a more focused company. The key will be segregating all of the unnecessary, risky, and unwanted parts of the company away from everything we want to keep.

Joe

---

78.     This is the plan they would execute, but instead of "CreDeFi", they adopted the

name Carosa suggested for the new company and called it Earnity.

## D.     Cred's Executive Team Misallocated Resources Leading Up To Cred's Bankruptcy In Furtherance Of Their Scheme

79.     On November 7, 2020, just twelve days after Schatt and Podulka agreed to siphon

off the most promising and potentially lucrative parts of the company, Cred filed for Chapter 11

bankruptcy. By that time, Schatt and Podulka had already recruited a number of other Cred

executives, board members, and employees to join the team for the new company they intended to

form, including Cred's CTO, Goldstein.

80.     Two days later, Goldstein created a new Slack channel he named "Cred-2."[37] Goldstein invited Cred's top developers and software engineers, including the team that had been working with 10Clouds to develop Cred's new CeFi-DeFi platform.

81.     Several of the employees Goldstein recruited to join his "Cred-2" team were only recently hired by Cred: (i) Pawan Chawla ("Chawla"), a software developer hired on September 19, 2020; (ii) Maitri Kotak ("Kotak"), a business intelligence developer hired on October 6, 2020, (iii) Alex Zavodnik ("Zavodnik"), a programmer hired in mid-October 2020, and (iv) Christiane Ferreira ("Ferreira"), another programmer hired on October 12, 2020.

82.     For a company on the verge of bankruptcy, hiring software programmers and developers was a dubious decision.  Both are highly-paid positions and generally cannot contribute anything in the short term to a company that needed cash to remain a going concern.  Software programmers and developers are, however, essential to *start-up* companies like the one Schatt, Podulka, and Goldstein intended to create with the product that had been conceived and developed at Cred, for Cred, by Cred, and with Cred resources.[38]

83.     By using the outside funding that Cred had received to consolidate this team of new hires, who were immediately assigned to work with 10Clouds on the new CeFi-DeFi platform for Cred, Goldstein was already doing what Podulka had recommended to Schatt in his October 25-26, 2020 emails: "coming away with a leaner company and…[using] start-up capital to focus on areas of Cred we've been working on lately."

---

[37] Exhibit BB.

[38] Given the timing of these moves, it appears that Goldstein and Schatt had already been working in concert on a similar plan prior to Podulka's October 25-26 proposal.

84.     As Cred's bankruptcy progressed through November 2020, it appeared less and less likely that Cred would be able to emerge from Chapter 11 as an independent company.  Cred would either have to be sold or liquidated.

85.     Keeping Cred's programmers and developers on its payroll (including some of its most recent hires) under these circumstances did not make sense.  Yet that is exactly what Schatt, Podulka, Goldstein and others in on their scheme intended to do in order to continue developing the combined CeFi-DeFi platform they sought to take for themselves.

86.     They soon found the perfect excuse for keeping these programmers and developers on staff even after it was clear that Cred itself was no longer viable: a sham sale to a purportedly willing counterparty who was in on their plan.

**E.     Cred's Proposed Sale To Banxa Was A Sham Used To Loot Cred Of Valuable Assets That Cred's Executives Would Use To Start Their New Company**

87.     ███████████████████████████████████████████████████

██████████████████████████████████████████.[39] ████████████████████████████

███████████████████████████████████████████[40]

88.     One of the prospective buyers Teneo identified was Banxa, a Canadian publicly-traded fiat-to-crypto payment processing company founded in 2014 by Carosa.

89.     A mutual contact introduced Teneo to Carosa on November 27, 2020 in connection with Cred's proposed sale.[41]  Teneo arranged a meeting between Schatt and Carosa, where they took an immediate liking to each other.  Soon Schatt and Carosa were privately communicating

---

[39] Exhibit CC.
[40] *Id.* at 7.
[41] Exhibit DD.

with each other about Cred 2.0, which was not advertised or described as a company asset in the Cred "Teaser" that Teneo sent Banxa and other prospective buyers.[42]

90.     On December 1, 2020, Carosa informed Teneo and Schatt that Banxa would be interested in submitting a "Stalking Horse" bid to acquire Cred.[43]   Carosa requested further information about Cred and specifically wanted access to Cred's key IP.[44]  ████████████████

████████████████████████████████████████████████████████

████████████████.[45]

91.     ██████████████████████████████████████████████

██████████████████████[46]  Schatt and Podulka turned their full attention to their plan to misappropriate everything Cred had created and developed for its future business model. These assets included, above all, the programming IP, business plans and customer lists, and employees with past experience and know-how behind the new CeFi-DeFi routing platform that Cred had been developing as Cred 2.0.

92.     Carosa soon proved a willing participant in the scheme hatched by Schatt and Podulka. ██████████████████████████████████████████

██████████.[47] ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████.

---

[42] Exhibit EE.
[43] Exhibit FF at 5-6.
[44] *Id.*
[45] *See* Exhibit DD at 2; Exhibit GG.
[46] Exhibit HH.
[47] Exhibit II.

93. Like Schatt, Carosa did not want to create a paper trail showing his involvement in their scheme. ██████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████[48]

██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

94. ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████[49] ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████

[48] Exhibit RRR.
[49] Exhibit JJ; Exhibit KK; Exhibit LL.

95. 

[51]

96.

[52]

97.    Goldstein, Hummer, and their team of developers and engineers worked to build and retrieve anything that would be of value to the new company.  Goldstein's team continued these efforts right up until they were finally laid-off by Cred on January 15, 2021.

98. 

[54]

99.    Although he was no longer Cred's CEO, Schatt still had access to computers and other hardware and IT equipment in Cred's office.  Almost immediately after Goldstein and his

---

[50] Exhibit MM; Exhibit NN.
[51] *Id.*
[52] *See, e.g.*, Exhibit OO; Exhibit PP; Exhibit QQ.
[53] Exhibit RR.
[54] Exhibit SS.

team were let go, Goldstein sent Schatt instructions on which items they needed from Cred to continue work on the platform they had been building for Cred while still employed by Cred.

100.    At the same time, Carosa was also sending Schatt instructions on other items that they needed from Cred to continue developing its platform at their new company. █████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████[55]

101.    ████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████

102.    ████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

[55] Exhibit TT.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ (Emphasis added).

103. ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████.[57]

104. ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████.[58]



---

[56] Exhibit UU.
[57] *Id.* at 2.
[58] Exhibit VV.

105. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████[59]

## F.  Schatt, Podulka, Goldstein, And Carosa Launch Earnity

106.  Having taken everything from Cred that they could, Schatt, Podulka, Goldstein, Carosa and the rest of their team were almost ready to complete the final stage of their plan: setting up Earnity.

107.  Through January 2021, Schatt and Carosa discussed the structure and composition of the new company's board and management team. ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████[60]

108. ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████[61]

109. ████████████████████████████████████████ ████████████████████████████████████████████████ ██████████[62]

---

[59] *Id.*
[60] Exhibit WW.
[61] Exhibit XX.
[62] Exhibit YY.

33



---

[63] *Id.*
[64] Exhibit ZZ; Exhibit AAA.
[65] Exhibit BBB.
[66] Exhibit CCC.
[67] Exhibit DDD.
[68] Exhibit EEE.



## G. The Trust Uncovers Earnity

113. For obvious reasons, Schatt, Podulka, Goldstein, Hummer, and Carosa tried to conceal Earnity from the Trust. They failed.

114. Most of Cred's IT equipment was secured by the Trust. Along with Cred's office furniture and supplies, this equipment was placed in a storage unit near Cred's former offices in San Mateo, California, to await a sale as part of the liquidation of Cred's remaining assets.

115. ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████[69] That same day, Hummer resigned as a consultant to the Trust and, upon

---

[69] Exhibit FFF.

information and belief, shortly thereafter began working exclusively for Earnity with Carosa and Schatt.

116. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████.

117. Hummer realized that Carosa had made a mistake. ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████[70]

---

[70] Exhibit GGG.



118.    Hummer was right.   Although the Trust was not yet aware that Earnity was

Cred 2.0, █████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████.[72]

───────────────────────

[71] Exhibit HHH.
[72] Exhibit III.

119.



---

[73] Transcript of July 23, 2021 Deposition of Joseph J. Podulka ("Podulka Dep.") at 217.
[74] Podulka Dep. at 215-17 (emphasis added).



120.

121.

---

[75] Podulka Dep. at 217-18.
[76] Podulka Dep. at 218.



[77] Transcript of July 28, 2021 Deposition of Daniel Schatt at 269-71.
[78] Exhibit JJJ.

40



127.    The Trust and its counsel never received a response to this question.  However, the Trust had enough information by now to know that there was more to their story and that the answer was an inevitable "Yes."

128.    █████████████████████████████████████████████████████

███████████████████████████  ███████████████████████████████

██████████████████████████████████████████████████████████

████████████

129.    ████████████████████████████████████████████████  the Trust served the Earnity Defendants with subpoenas pursuant to Bankruptcy Rule 2004 on August 12, 2021 (the "<u>Subpoenas</u>").  The Subpoenas sought information concerning Cred's property—including Cred's intellectual property—that may be in Earnity's possession, custody, or control.

130.    Although Earnity agreed to comply voluntarily with the Subpoenas the Trust served upon it, Earnity refused to produce any documents in response.  Rather, Earnity objected to the Subpoenas in their entirety and claimed that it did not possess responsive documents concerning Cred or Cred's property.

131.    Following repeated communications, discovery letters, and meet and confers, on December 2021, the Trust moved to compel the production of documents from Earnity.  After a

hearing in early January 2022, the Court ordered Earnity to comply with the Subpoenas' document

requests. ████████████████████████████████████████████████████

████████ Earnity produced hundreds of responsive documents, many of which formed the basis

for this Complaint.

## H.    Earnity Is "Cred 2.0"

132.    Earnity is based on and created from the platform that Cred developed prior to its

bankruptcy filing in November 2020. ████████████████████████████████

████████████████████████████████████████████████████████,

Earnity uses the same mailing address (as well as a workspace located across the street).

133.    Earnity's team is and was largely composed of former Cred executives, advisors,

and employees.  Earnity's counsel confirmed that, at a minimum, eight (8) former Cred employees

work for Earnity and, upon information and belief, that number has since increased and includes,

among others:   CEO Schatt, CFO Podulka, CTO Goldstein, senior advisor Kingsborough,

IT Director Hummer, Security Director Marie Kacmarek, programmers and developers Chawla,

Zavodnik, and Kotak, software engineers Joseph Lally and Joseph Liyana, creative director

Nicole Skillern, senior accountant Han Ha, and senior product director Heidi Ng.

134.    Just like Cred 2.0, Earnity was built as a full-service CeFi-DeFi routing platform.

It was specifically designed to provide a combination of traditional CeFi investment products—

including  customer-to-customer  and  third-party  trading  and  lending  transactions—that  would

direct  customers  to  a  variety  of  DeFi  investment  opportunities  on  a  user-friendly  blockchain

platform  that  incorporated  a  social  media  element  into  its  platform.   These  are  the  same  core

elements of the platform that was intended to become "Cred 2.0".

135.    Internal memoranda describing Earnity's operations and product offerings only

confirm  this. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

136.    ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

137.    Again, these functions reflect the same core elements that defined Cred 2.0 as a novel combination of CeFi and DeFi on a single easy-to-use platform. ████████████

████████████████████████████████████████████████

---

[79] Exhibit KKK.
[80] Exhibit LLL.

.[81]



---

[81] *Compare* Exhibit I *with* Exhibit LLL.

138. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████



139. ████████████████████████████████████████████████

████████████████████████████████████████████████████[83]

These are among the core elements of the product and platform that were being developed by Cred executives and employees using Cred software for nearly an entire year before and up through Cred's bankruptcy filing in November 2020.

---

[82] Exhibit MMM.
[83] Exhibit NNN.

140. Led by Schatt and Carosa, Earnity has built partnerships and obtained funding from investors by pitching the same business plans that were conceived and developed for and by Cred in 2020—namely, creating a blockchain-based platform to facilitate crypto investment opportunities for retail customers using social media.

141. For example, on December 27, 2021, Schatt sent an email to Ault Global Holdings ("Ault Global"), a publicly-traded investment holding company. ██████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████.[84]



---



142.     In addition to its flagship social media-based CeFi-DeFi routing platform, Earnity formed two subsidiaries—Earnity Financial and ET Trader.  These companies were designed to perform supporting services and functions that could and would have been utilized by Cred and similarly reflect the key components of what was intended to become "Cred 2.0."

143.     Earnity formed Earnity Financial on June 25, 2021, as a wholly-owned subsidiary █████████████████████████████████████████████████████████████"[85] Among other things, Earnity Financial's website explains that it "offers customers the ability to fund crypto purchases via wire transfers, ACH, as well as debit and credit cards; exchange cryptocurrencies across multiple platforms with low transfer costs; curate bespoke cryptocurrency collections; share and gift cryptocurrency with social communities; [and] seamlessly integrate custodial and non-custodial wallets."[86]

---

[85] Exhibit PPP.
[86] https://www.earnityfinancial.com/

144.    Earnity also formed another subsidiary under Florida law with the same name as Earnity Financial.  Upon information and belief, Earnity Financial (FL) operates in the same capacity as Earnity Financial for customers and business operations located in Florida.

145.    In addition to Earnity Financial and Earnity Financial (FL), Earnity formed ET Trader on July 2, 2021.  ET Trader was designed to expand Earnity's CeFi trading capabilities and generate additional revenue by operating as a third-party intermediary in customer transactions and trades on cryptocurrency exchanges. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.[87]



146.    As with Earnity Financial, ET Trader's services could and would have been a significant asset to Cred in supporting traditional CeFi cryptocurrency trading and investment services that formed one of the key parts of the "Cred 2.0".  And both its concept and the supporting software were developed at Cred, by Cred, and for Cred.

## I.    Earnity Has Raised A Significant Amount Of Money Off "Cred 2.0"

147.    ▉▉▉▉▉▉▉, Earnity sought funding from Ault Global in late 2021 as part of its Series A funding round, which raised $15 million.  The lead investor in that financing round was BitNile Holdings, Inc. ("BitNile"), a cryptocurrency mining company owned by Ault Global.[88]

---

[87] Exhibit QQQ.
[88] Dec. 6, 2021 CoinDesk Article, *DeFi Startup Earnity Raises $15M Led by Miner BitNile*.

148.    In addition to using these funds to build the Cred 2.0 platform at Earnity, upon information and belief, Earnity used these funds, in part, to sponsor an IndyCar for the 2022 IndyCar racing season.  In the February 24, 2022 press release, Earnity described itself as the "world's first community-based crypto platform and marketplace" and "is a new crypto platform and marketplace that was created to take the complexity out of crypto, making it more accessible and secure to manage."[89]  Earnity also noted that it "combines a social media community with a cryptocurrency and decentralized (DeFi) marketplace to give users a place to earn, learn and collect crypto assets."



---

[89] https://www.prnewswire.com/news-releases/earnity-the-worlds-first-community-based-crypto-platform-and-marketplace-joins-with-ed-carpenter-racing-and-bitnile-holdings-on-2022-indycar-program-301490148.html

149.     These promotional descriptions of Earnity's business are, essentially, a carbon copy of the plan devised for Cred 2.0.

150.     Earnity apparently also continues to raise money based off of the confidential and proprietary plans for the new platform that it took from Cred, as members of the Trust recently received emails from a company Earnity hired to solicit funding from prospective investors. This email disclosed a number of facts about Earnity's current activities, including that it was seeking to raise $20 million in "Strategy Series A" funding:

> I am contacting you to set a meeting between Valhalla Capital and Earnity (founded 02/2021). It is a high growth, U.S. based fintech | blockchain crypto trading and investment marketplace that just opened its $20M Strategic Series A.
>
> Earnity's US$20M Strategic Series A capital raise, co-lead investors, and upcoming closing date are outlined in the presentation link below. As of today, US$8M is committed by co-lead investors/insiders and US$12M is available for investment by funds, family offices and accredited investors.
>
> More information about the project can be found by clicking this link:
> https://docsend.com/view/dyaiv8ywwn8b5zns
>
> Click link here to schedule Earnity Management Presentation meeting:
> https://calendly.com/earnity-corp-dev/earnity-management-presentation-dan-arturas-30-min
>
> Earnity makes it simple to learn and transact with custodial & decentralized crypto platforms, all in one place.
> • Regulatorily compliant | Investment marketplace | Users in over 60 countries
> • US headquarters | Financially healthy | High growth
> • Fintech | Blockchain | Crypto accessible in over 120 countries
> • Traditional Finance | Decentralized Finance
>
> Kindly let me know about meeting to explore the potential investment fit.

151.     Along with this email, Earnity also shared a presentation outlining its business as part of its efforts to raise funds from investors.



152.     Because the business that Defendants now operate constitutes property, assets, and opportunities that belong to Cred and that should and would have inured to the Trust and its creditors if they not been wrongfully misappropriated, the Trust now brings this action.

## CAUSES OF ACTION

### Count I
### Avoidance of Unauthorized Post-Petition Transfers, 11 U.S.C. § 549
(*Against All Defendants*)

153.     The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

154.     Pursuant to Bankruptcy Code § 549, the Trust is entitled to avoid the transfer to the Earnity Defendants of the tangible and intangible assets and property of Cred's estate relating to the platform described above as "Cred 2.0", including the trade secrets and other confidential and proprietary information developed by and for Cred—*i.e.*, a CeFi-DeFi platform to connect retail investors to centralized and decentralized cryptocurrency investment opportunities with a built-in social media component to acclimate investors to various CeFi and DeFi investment opportunities—prior to and through its bankruptcy filing on November 7, 2021 (the "Transferred Assets and Trade Secrets").

155.     The Transferred Assets and Trade Secrets belong to Cred's estate and were misappropriated by Cred's former officers and employees, including Schatt, Goldstein, and Podulka, as well as Carosa, after the commencement of these Chapter 11 Cases, and were subsequently transferred to the Earnity Defendants upon their respective formations (the "Post-Petition Transfer").

156.     The Post-Petition Transfer from Cred's estate to the Earnity Defendants was not authorized by the Bankruptcy Code or this Court.

157.    The Earnity Defendants received the Transferred Assets and Trade Secrets in the Post-Petition Transfer and continue to hold them with full knowledge that the Transferred Assets and Trade Secrets were created by and for Cred and properly belonged to Cred's estate.

158.    Thus, the Post-Petition Transfer is avoidable under Bankruptcy Code § 549(a).

### Count II
### Recovery of Avoided Transfer, 11 U.S.C. § 550
(*Against All Defendants*)

159.    The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

160.    The Trust is entitled to avoid the Post-Petition Transfer of the Transferred Assets and Trade Secrets pursuant to Bankruptcy Code § 549.

161.    The Earnity Defendants are the subsequent or mediate transferee of the Transferred Assets and Trade Secrets, which they received pursuant to the Post-Petition Transfer and continue to hold with full knowledge that the Transferred Assets and Trade Secrets were created by and for Cred and properly belong to Cred's estate.

162.    The Earnity Defendants knew that the Post-Petition Transfer was voidable at the time they received the Transferred Assets and Trade Secrets.  Therefore, the Earnity Defendants do not constitute good faith transferees under Bankruptcy Code § 550.

163.    Cred and its estate have been damaged by the loss of the value of the Transferred Assets and Trade Secrets and related business opportunities, as well as by reason of the costs and attorneys' fees that the Trust has incurred in connection with investigating the relevant misconduct underlying and in bringing this action.

164.    Accordingly, the Trust is entitled to recover the Transferred Assets and Trade Secrets, or if this Court so orders, to recover the value of the Transferred Assets and Trade Secrets,

for the benefit of Cred's estate pursuant to Bankruptcy Code § 550(a), as well as the value of the costs that the Trust has had to incur in order to recover them.

## Count III
### Misappropriation Of Trade Secrets, 18 U.S.C. § 1836 and Cal. Civ. Code § 3426
### (*Against All Defendants*)

165. The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

166. Cred created and developed the confidential and proprietary financial, business, technical, and engineering information relating to the platform described above as "Cred 2.0" prior to and through its bankruptcy filing on November 7, 2021.

167. The foregoing confidential and proprietary financial, business, technical, and engineering information relating to the Cred 2.0 platform that Cred created and developed constitute trade secrets as defined under 18 U.S.C. § 1839(3) and Cal. Civ. Code § 3426.1 (the "Cred 2.0 Trade Secrets"), and rightfully and legally belong to Cred and its estate.

168. The Cred 2.0 Trade Secrets that Cred owned derived independent and actual or potential economic value from not being generally known to the public and/or other persons who could obtain economic value from their disclosure or use, and at all relevant times Cred took reasonable measures to keep the Cred 2.0 Trade Secrets confidential and secret including, but not limited to, discussing and developing the Trade Secrets with a limited number of employees using dedicated messaging channels, and requiring its employees to agree to various confidentiality provisions in their employment agreements.

169. The Cred 2.0 Trade Secrets were willfully and maliciously misappropriated by Cred's former officers and employees, including Schatt, Goldstein, and Podulka, as well as Carosa, after the commencement of these Chapter 11 Cases, and were subsequently transferred to the Earnity Defendants upon their formation as part of the Post-Petition Transfer described above.

54

170.    Defendants knew or had reason to know that the Cred 2.0 Trade Secrets were secret and valuable information that belonged to Cred and/or Cred's estate at the time Defendants received them, and Defendants continue to hold and benefit from the Cred 2.0 Trade Secrets with full knowledge that their receipt and continued use of the Cred 2.0 Trade Secrets is unlawful.

171.    Defendants have never received authorization from Cred, Cred's estate, or the Trust to use or possess the Cred 2.0 Trade Secrets, and Defendants have and continue to possess and use the Cred 2.0 Trade Secrets for their own benefit and profit.

172.    Defendants have and continue to do so with full knowledge that the Cred 2.0 Trade Secrets were willfully and maliciously misappropriated from Cred and/or Cred's estate.

173.    Cred and its estate have suffered actual monetary damages as a direct and proximate result of Defendants' unlawful use and possession of the Cred 2.0 Trade Secrets, as the value of the Cred 2.0 Trade Secrets (and the business opportunities they would have brought) should and would have inured to the Trust and its creditors if they not been wrongfully misappropriated.

174.    Accordingly, the Trust is entitled to recover damages from Defendants in the form of actual loss, unjust enrichment, and/or reasonable royalty for the benefit of Cred's estate under Cal. Civ. Code § 3426.3(a) and (b).  Further, because Defendants have and continue to use and benefit from the Cred 2.0 Trade Secrets with the knowledge that they were willfully and maliciously misappropriated from Cred and/or Cred's estate, the Trust is entitled to recover exemplary damages under Cal. Civ. Code § 3426.3 and its attorneys' fees and costs under Cal. Civ. Code § 3426.4.

## Count IV
### Unfair Competition, Cal. Bus. & Prof. Code § 17200, *et seq.*
### (*Against All Defendants*)

175.    The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

176.    Cred conceived of and developed the confidential and proprietary financial, business, technical, and engineering information relating to the platform described above as "Cred 2.0" as a novel idea and business concept prior to its bankruptcy filing on November 7, 2021.

177.    The founding members of the Earnity Defendants, including former Cred officers and employees, and Carosa wrongfully misappropriated these tangible and intangible assets that Cred had created, developed, and owned prior to its bankruptcy filing and fraudulently transferred them to Defendants.

178.    Defendants have and continue to engage in business acts and practices deemed "unlawful" under Cal. Bus. & Prof. Code § 17200, *et seq.* because, as alleged above, the Earnity Defendants have and continue to operate businesses that represent property and assets that belong to Cred and that should and would have inured to the Trust and its creditors if they had not been wrongfully misappropriated by Cred's former officers and employees in violation of the law and the fiduciary duties that they owed to Cred.

179.    Defendants have and continue to engage in business acts and practices deemed "unfair" under Cal. Bus. & Prof. Code § 17200, *et seq.* because, as alleged above, Defendants have and continue to benefit from property, assets, and corporate opportunities that Cred invested its time and resources in creating and developing, yet neither Cred nor its estate received anything of value in return from Defendants.

180.     Defendants have and continue to engage in business acts and practices deemed "fraudulent" under Cal. Bus. & Prof. Code § 17200, *et seq.* because, as alleged above, Defendants obtained the property, assets, and corporate opportunities that Cred invested its time and resources in creating and developing through fraudulent means.  These acts include, among other things, the fraudulent Post-Petition Transfer, which was itself the product of the fraudulent scheme of the Earnity Defendants' founding officers and employees (including Carosa) to steal Cred 2.0 for themselves through the formation and operation of the Earnity Defendants, as well as the fraudulent and deceitful acts they engaged in during Cred's bankruptcy proceedings.

181.     Cred and its estate have and continue to suffer actual monetary damages as a result of Defendants' unlawful, unfair, and fraudulent business acts and practices—including, without limitation, the loss of the Transferred Assets and Trade Secrets, and the loss of other corporate opportunities that should have inured to Cred and its estate rather than to Defendants.

182.     Accordingly, the Trust is entitled to recovery and restitution of all such damages for the benefit of Cred's estate under Cal. Bus. & Prof. Code § 17200, *et seq.*

**<u>Count V</u>**
**Common Law Unfair Competition**
***(Against All Defendants)***

183.     The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

184.     Cred invested a substantial amount of company time and resources in developing the new "Cred 2.0" platform from early 2020 through and even after Cred filed for bankruptcy on November 7, 2020, with the intention that the new platform would reinvent and expand Cred's business.

185.     Defendants unlawfully, unfairly, and fraudulently obtained the confidential and proprietary financial, business, technical, and engineering information that Cred created  and

57

developed for this new "Cred 2.0" platform without providing Cred with anything of value in exchange.

186.     Accordingly, the Trust is entitled to recovery and restitution of all such damages that Cred and/or its estate suffered as a result of Defendants' wrongful misappropriation of the property, assets, and corporate opportunities that rightfully belong to and should and would have inured to Cred and/or its estate.

### Count VI
### Conversion
#### (*Against All Defendants*)

187.     The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

188.     Cred created and developed the confidential and proprietary financial, business, technical, and engineering information, including the Transferred Assets and Trade Secrets, as well as other tangible and intangible assets relating to the "Cred 2.0" platform, prior to and through its bankruptcy filing on November 7, 2021.

189.     These assets properly rightfully and legally belong to Cred and its estate.

190.     The Defendants wrongfully obtained and disposed of these valuable assets through the unlawful, unfair, and fraudulent acts of the Defendants, and the Defendants continue to use and benefit from them, with the knowledge that doing so is wrongful and unlawful.

191.     As a result, Cred and its estate have suffered injury and harm, including through the loss of property and assets which should and would have inured to the Trust and its creditors if they not been wrongfully converted.  Accordingly, the Trust is entitled to recover these assets including, but not limited to, the Transferred Assets and Trade Secrets, or their equivalent value.

**Count VII**
**Unjust Enrichment**
(*Against All Defendants*)

192.    The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

193.    Cred created and developed the confidential and proprietary financial, business, technical, and engineering information, including the Transferred Assets and Trade Secrets, as well as other tangible and intangible assets relating to the "Cred 2.0" platform, prior to and through its bankruptcy filing on November 7, 2021.

194.    These assets properly rightfully and legally belong to Cred and its estate.

195.    Defendants wrongfully obtained these assets through the unlawful, unfair, and fraudulent acts of Defendants, without providing Cred with anything of value in exchange, and Defendants continue to use and benefit from these assets with the knowledge that doing so is wrongful and unlawful.

196.    As a result of the foregoing, Defendants have been and continue to be unjustly enriched at the expense of Cred and its estate.  The Trust is therefore entitled to restitution in an amount equal to the value of the property and assets that Defendants have wrongfully benefitted from at the expense of Cred's estate.

**Count VIII**
**Aiding and Abetting Breach of Fiduciary Duty**
(*Against All Defendants*)

197.    The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

198.    Each Defendant aided and abetted Cred's Chief Executive Officer (Schatt), Chief Financial Officer (Podulka), and Chief Technology Officer (Goldstein) in breaching the fiduciary duties they owed to Cred as officers and executives.

199.    Specifically, Schatt, Podulka, and Goldstein breached the fiduciary duties that they owed to Cred including the duties of loyalty, care, and good faith by, among other things misappropriating and/or converting certain of Cred's tangible and intangible assets that Cred had created, developed, and owned prior to its bankruptcy filing, including those developed as part of the "Cred 2.0" project, and fraudulently transferred them to Defendants.

200.    Each Defendant knew or reasonably should have known that Schatt, Podulka, and Goldstein owed Cred fiduciary duties.

201.    Each Defendant substantially assisted Schatt, Podulka, and Goldstein's breach of their fiduciary duties by using their positions of knowledge and expertise, as well as the trust Cred placed in them, to misappropriate and/or convert certain of Cred's tangible and intangible assets, including corporate opportunities, for the benefit of Defendants and to Cred's detriment.

202.    Carosa knowingly or with reckless indifference participated in Schatt, Podulka, and Goldstein's breaches of their fiduciary duties by, among other things:  (i) collaborating with Schatt, Podulka, and Goldstein's misappropriation and/or conversion of the Cred 2.0 assets and corporate opportunities; (ii) assisting Schatt, Podulka, and Goldstein in segregating all of the unnecessary, risky, and unwanted parts of Cred away from everything the former managers wanted to keep; (iii) assisting Schatt, Podulka, and Goldstein's raising of capital for the Earnity Defendants based upon the use of the misappropriated and/or converted Cred 2.0 assets; and (iv) providing other material and operational support in setting up and founding the Earnity Defendants to take possession of the misappropriated and/or converted assets.

203.    The Earnity Defendants knowingly or with reckless indifference participated in Schatt, Podulka, and Goldstein's breaches of their fiduciary duties by, among other things, facilitating Schatt, Podulka, and Goldstein's misappropriation and/or conversion of the Cred 2.0

assets and corporate opportunities by taking possession of those assets and raising capital on the basis of those assets to run a business that is rightly the property of Cred.

204. As a result of the knowing participating and substantial assistance that each Defendant provided to Schatt, Podulka, and Goldstein's breaches of fiduciary duties, Cred suffered an amount of damages to be determined at trial.

## Count IX
## Actual Fraudulent Transfer, Cal. Civ. Code § 3439.04(a)(1)
### (*Against All Defendants*)

205. The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

206. Cred was involved in a transfer whereby Cred's trade secrets and confidential and proprietary information is now in the possession of Defendants.

207. In connection with the transfer, Cred, through Schatt, Podulka, and other former Cred executives and employees, acted with actual intent to hinder, delay, or defraud the creditors of Cred.

208. Specifically and without disclosing the transfer, Schatt, Podulka, and other former Cred executives and employees conspired with Carosa to steal Cred's property, assets, and corporate opportunities and use them to create a post-bankruptcy entity—in the form of Earnity— when it became clear that Cred's bankruptcy was inevitable. Schatt, Podulka, and other former Cred executives and employees thus misappropriated property which they knew rightfully belonged to Cred and its creditors.

209. Accordingly, the Trust is entitled to void the transfer of Cred's trade secrets and confidential and proprietary information to Defendants pursuant to Cal. Civ. Code § 3439.04(a)(1).

## Count X
### Constructive Fraudulent Transfer, Cal. Civ. Code § 3439.04(a)(2)
### (*Against All Defendants*)

210.    The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

211.    Cred was involved in a transfer whereby Cred's trade secrets and confidential and proprietary information is now in the possession of Defendants.

212.    In connection with this transfer, Cred did not receive a reasonably equivalent value in exchange for the transfer of Cred's trade secrets and confidential and proprietary information made to Earnity and/or Carosa.

213.    Cred, which was insolvent at the time of the transfer, was therefore engaged in a business or transaction for which the remaining assets of Cred were unreasonably small in relation to the business or transaction.

214.    Accordingly, the Trust is entitled to void the transfer of Cred's trade secrets and confidential and proprietary information to Defendants pursuant to Cal. Civ. Code § 3439.04(a)(2).

## Count XI
### Constructive Fraudulent Transfer, Cal. Civ. Code § 3439.05
### (*Against All Defendants*)

215.    The Trust repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

216.    Cred was involved in a transfer whereby Cred's trade secrets and confidential and proprietary information is now held by Defendants.

217.    Cred made the transfer without receiving reasonably equivalent value in exchange for the transfer.

218. Cred was insolvent at the time it made the transfer or became insolvent as a result of the transfer.

219. Accordingly, the Trust is entitled to void the transfer of Cred's trade secrets and confidential and proprietary information to Defendants pursuant to Cal. Civ. Code § 3439.05.

## **PRAYER FOR RELIEF**

WHEREFORE, the Trust requests that this Court grant the following relief in favor of the Trust and against Defendants:

1. Avoiding the Post-Petition Transfer of the Transferred Assets and Trade Secrets pursuant to Bankruptcy Code § 549(a), Cal. Civ. Code § 3439.04, and Cal. Civ. Code § 3439.05 and directing the Earnity Defendants to return the Transferred Assets and Trade Secrets, or an amount to be determined at trial equal to the value of the Transferred Assets and Trade Secrets, to the Trust pursuant to Bankruptcy Code § 550(a);

2. Actual damages and/or restitution in an amount to be determined at trial equal to the lost value of the Cred 2.0 Trade Secrets that were misappropriated from Cred pursuant to 18 U.S.C. § 1836 and Cal. Civ. Code § 3426.3(a); and/or, alternatively, reasonable royalty for Defendants' use of the Cred 2.0 Trade secrets under Cal. Civ. Code § 3426.3(b);

3. Exemplary damages under Cal. Civ. Code § 3426.3(c), as well as attorneys' fees and costs under Cal. Civ. Code § 3426.4;

4. Actual damages and/or restitution in an amount to be determined at trial for Defendants' unlawful, unfair, and fraudulent business acts and practices under Cal. Bus. & Prof. Code § 17200, *et seq.* and/or the common law doctrine of unfair competition;

5. Actual damages and/or restitution in an amount equal to the value of the property and assets that Defendants have wrongfully converted from Cred's estate and have been unjustly enriched at the expense of Cred's estate;

6. Actual damages and/or restitution in an amount to be determined at trial as a result of Defendants' aiding and abetting of the breach of fiduciary duties of Cred's former officers and directors;

7. Such other and further relief as this Court may deem just and proper.

Dated: December 5, 2022
        Wilmington, Delaware

**MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP**

/s/ *David R. Hurst*
David R. Hurst (I.D. No. 3743)
1007 North Orange Street 10th Floor
Wilmington, DE 19801
Telephone: (302) 485-3900
Facsimile: (302) 351-8711

- and -

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
Andrew B. Kratenstein (*pro hac vice*)
Michael R. Huttenlocher (*pro hac vice*
application forthcoming)
Timothy C. Cramton (*pro hac vice* application
forthcoming)
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

*Counsel to the Cred Inc. Liquidation Trust*

DM_US 192193248-4 113270.0023

QUINN EMANUEL URQUHART & SULLIVAN LLP
Michael B. Carlinsky (*pro hac vice* forthcoming)
michaelcarlinsky@quinnemanuel.com
Renita N. Sharma (*pro hac vice* forthcoming)
renitasharma@quinnemanuel.com
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Terry L. Wit (SBN 233473)
terrywit@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Eric D. Winston (SBN 202407)
ericwinston@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Attorneys for Defendants Lockton Companies*
*LLC and Lockton Companies, LLC – Pacific Series*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CEDRIC DE LISSER, CHRISTOPHER MOSER, and MICHAEL MICHELIN, in their capacity as the Trustees of the Cred Liquidation Trust, <br><br> Plaintiffs, <br><br> v. <br><br> LOCKTON INSURANCE COMPANY LLC, d/b/a LOCKTON INSURANCE BROKERS LLC, a Missouri limited liability company; LOCKTON COMPANIES, LLC – PACIFIC SERIES, d/b/a LOCKTON INSURANCE BROKERS LLC, a Missouri limited liability company; and DOES 1-10, inclusive. <br><br> Defendants. | Case No. 3:23-cv-00243 <br><br> **PROOF OF SERVICE** |

**PROOF OF SERVICE**

I, Razmig Izakelian, declare as follows:

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and am not a party to this action.  My business address is 865 S. Figueroa Street, 10th Floor, Los Angeles, CA 90017.

On January 18, 2023, I served true copies of the following document(s):

1.    Notice of Removal
2.    Declaration of Terry L. Wit in Support of Notice of Removal
3.    Civil Cover Sheet

on the parties below, by the following means of service:

**REID COLLINS    TSAI LLP**          **GLUCK DANIEL ATKINSON LLP**
Angela J. Somers                                    Craig C. Daniel
Jeffrey Gross                                          201 Mission Street, Ste. 1330
Minyao Wang                                         San Francisco, CA 94105
420 Lexington Avenue, Ste. 2731         Telephone: (415) 510-2114
New York, New York 10170                  Facsimile: (415) 510-2208
Telephone: (212) 344-5200                    Email: litigation@gluckdaniel.com
Facsimile: (212) 344-5299
asomers@reidcollins.com
jgross@reidcollins.com
mwang@reidcollins.com

*Special Litigation Counsel to Trustees of*
*the Cred Inc. Liquidation Trust*

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**     I caused the document(s) to be sent from e-mail address razmigizakelian@quinnemanuel.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with the practice of Quinn Emanuel Urquhart & Sullivan, LLP for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am a resident or employed in the county where the mailing occurred.  The envelope was placed in the mail at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

-2-

Executed on January 18, 2023, at Los Angeles, California.

_____
Razmig Izakelian

PROOF OF SERVICE

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Cedric de Lisser, Christopher Moser, and Michael Michelin in their capacity as Trustees of Cred Liquidation Trust

**DEFENDANTS**

Lockton Insurance Company LLC and Lockton Companies, LLC - Pacific Series

**(b)** County of Residence of First Listed Plaintiff    Delaware Trust
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Jackson County Missouri
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Gluck Daniel Atkinson LLP 201 Mission Street Suite 1330 San Francisco, CA 94105 (415) 510-2114 and Reid Collins & Tsai LLP 420 LExington Avenue, Suite 2731 New York, New York 10170 (212) 344-5200

Attorneys *(If Known)*

Quinn Emanuel Urquhart & Sullivan LLP 50 California Street, 22nd Floor San Francisco, CA 94111 (415) 875-6600

## II.   BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3   Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)* |

## III.   CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff* *(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.   NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | ☒ 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | 790 Other Labor Litigation | 880 Defend Trade Secrets Act of 2016 | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** | 480 Consumer Credit |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | **IMMIGRATION** | 861 HIA (1395ff) | 485 Telephone Consumer Protection Act |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | 462 Naturalization Application | 862 Black Lung (923) | 490 Cable/Sat TV |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | | 864 SSID Title XVI | 890 Other Statutory Actions |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | 865 RSI (405(g)) | 891 Agricultural Acts |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities–Employment | 535 Death Penalty | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | 950 Constitutionality of State Statutes |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V.   ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation–Transfer    ☐ 8 Multidistrict Litigation–Direct File |

## VI.   CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Common law claims and aiding and abetting alleged violations of California Business and Professions Code section 17200 et seq

Brief description of cause:
Fraudulent misrepresentation, fraud in the inducement, negligent misrepresentation, intentional concealment, aiding and abetting fraudulent misrepresentation and negligent misrepresentation, aiding and abetting violations of California Business and Professions Code section 17200 et seq.

## VII.   REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

DEMAND $ 66,000,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☒ Yes    ☐ No

## VIII.   RELATED CASE(S), IF ANY *(See instructions)*:

JUDGE _____    DOCKET NUMBER _____

## IX.   DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

*(Place an "X" in One Box Only)*    ☒ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE    ☐ EUREKA-MCKINLEYVILLE

**DATE**    01/18/2023    **SIGNATURE OF ATTORNEY OF RECORD**    /s/ Terry L. Wit

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. a)  Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**b)  County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**c)  Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

**II.  Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

(1)  United States plaintiff. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

(2)  United States defendant. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

(3)  Federal question. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

(4)  Diversity of citizenship. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. **(**See Section III below; **NOTE: federal question actions take precedence over diversity cases.)**

**III.  Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.  Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.  Origin.** Place an "X" in one of the six boxes.

(1)  Original Proceedings. Cases originating in the United States district courts.

(2)  Removed from State Court. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

(3)  Remanded from Appellate Court. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

(4)  Reinstated or Reopened. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

(5)  Transferred from Another District. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

(6)  Multidistrict Litigation Transfer. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

(8)  Multidistrict Litigation Direct File. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

Please note that there is no Origin Code 7. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.  Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

**VII.  Requested in Complaint.**  Class Action. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.  Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**IX.  Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.