# EXHIBIT 4

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (___) |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF DANIEL SCHATT IN SUPPORT OF DEBTORS' CHAPTER 11
PETITIONS AND FIRST DAY MOTIONS**

I, Daniel Schatt, hereby declare under penalty of perjury as follows:

1. I am the co-founder and Chief Executive Officer of Cred Inc. ("Cred") and its chapter 11 debtor affiliates (as debtors and debtors in possession, the "Debtors"). The Debtors operate a global financial services platform serving retail and institutional clients in 183 countries. The Debtors, which are licensed lenders, utilize proprietary technology to provide business and retail credit and to allow their customers to earn a yield on more than 15 crypto and fiat currencies through their partner network. I am generally familiar with the day-to-day operations, affairs, and books and records of the Debtors.

2. I have over 20 years' experience working in the finance and financial technology sectors. My previous experience includes tenures with investment bank Salomon Smith Barney, financial services industry analyst firm Celent, and financial technology platform Yodlee. More recently, I served as the General Manager for Financial Innovations for PayPal from 2007 to 2013, and as the Chief Commercial Officer for Stockpile Inc. from 2013 to 2018. I hold both a Master of Business Administration degree and a Master of Internal Affairs degree from

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.

Columbia University. I also hold a bachelor's degree in Law and Society from the University of California, Santa Barbara. I am also the author of *Virtual Banking (Wiley 2013)*.

3. On November 7, 2020 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court. The Debtors also filed a number of motions and applications (collectively, the "First Day Motions") in order to allow the Debtors to continue to operate in Chapter 11 with minimum disruption or loss of value. I am familiar with the contents of each of the First Day Motions and believe that the relief sought in each of the First Day Motions is necessary to ensure a successful restructuring of the Debtors.

4. I submit this declaration in support of the First Day Motions pursuant to 28 U.S.C. § 1746 (the "First Day Declaration"). Except as otherwise indicated herein, all facts set forth in this First Day Declaration (a) are based on my personal knowledge and/or information supplied to me by others at the Debtors and the Debtors' professionals, (b) were learned from my review of relevant documents, or (c) are my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. I am over the age of 18 and authorized to submit this First Day Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

5. This First Day Declaration is divided into six parts. Part I of this First Day Declaration describes the nature of the Debtors' business. Part II provides a brief history of the Debtors. Parts III and IV describe the Debtors' corporate and capital structures, respectively. Part V discusses the events leading up to the Debtors' chapter 11 filings. Part VI provides support for the facts underlying each of the First Day Motions.

## Overview of the Debtors' Business

6.  The Debtors operate a financial technology platform through which customers transfer cryptocurrency to the Debtors—generally through a loan agreement or financing agreement.[2] The Debtors then utilize such cryptocurrency in a variety of investment strategies involving third-party asset managers. The Debtors earn revenue through the the returns generated through their investments, as well as through interest on lines of credit extended to certain of the Debtors' customers in connection with the loans and financings referenced above.

7.  In general, the Debtors have two types of customers: (a) retail investors who transfer (via a pledge or loan) their cryptocurrency to the Debtors through certain e-wallet partners and (b) high net worth individuals who transfer (via a pledge or loan) their cryptocurrency directly to the Debtors. Approximately half of the Debtors' business is generated through e-wallet services that partner with the Debtors. E-wallets are platforms through which end-users (which may be individuals or companies) manage and store their cryptocurrency.

8.  As mentioned above, after receipt of cryptocurrency from a customer, the Debtors work with outside asset managers who focus on investment strategies that are expected to generate a return for the Debtors. These strategies include writing out-of-the-money covered calls and arbitrage strategies. In general, the Debtors seek strategies that generate a consistent return while minimizing risk of loss.

9.  In addition to its investment services, the Debtors also provide lending services to certain customers. These borrowing services are limited to domestic customers.

---

[2] Shortly before the petition date, the Debtors began using contracts to "rent" cryptocurrency from customers. As of the filing date, rental contracts account for less than 1% of the Debtors' customer contracts.

3

10. The Debtors operate from California, but their customer base is located across the globe. Among others, the Debtors have partnered with e-wallet services based in Canada and the European Union.

## Corporate Formation

11. I founded Cred together with my business partner Lu Hua in 2018. I met Mr. Hua during our overlapping tenure at PayPal. Mr. Hua and I founded Cred in 2018 to give businesses and individuals an opportunity to earn a return on cryptocurrency assets and borrow against such assets. Cred was incorporated in May 2018 and launched with its first partner in early 2019.

## Corporate Structure

12. The Debtors consist of five entities, with Debtor Cred as the corporate parent. Mr. Hua and myself each own 50% of the equity in Cred. Cred has four direct, wholly-owned subsidiaries:

- Debtor Cred (US) LLC handles borrowing and lending for domestic customers (while Cred handles business with international customers);

- Debtor Cred Capital was formed in March 2020 for the purpose of selling securities products;

- Debtor Cred Merchant Solutions LLC was formed in October 2019 for the purpose of facilitating the purchase of crypto assets at the physical point of sale. However, as of the Petition Date Cred Merchant Capital has no business and no assets.

- Cred Puerto Rico LLC was formed in March 2020 for the purpose of facilitating transactions for residents in Puerto Rico.

13. All Debtor entities, other than Cred (Puerto Rico) LLC,[3] are incorporated in Delaware and have their principal place of business in California.

---

[3] Cred (Puerto Rico) LLC is an LLC formed under the laws of Puerto Rico.

4

## Capital Structure

14. The Debtors have not issued any secured debt.

15. In August and September 2020, Cred issued approximately $2.6 million in unsecured convertible notes (the "Convertible Notes") through a private placement. The Convertible Notes bear interest at a rate of 3% per annum and have a stated maturity date in September 2024. As of the Petition Date, approximately $2.6 million (which includes accrued interest) remains outstanding on the Convertible Notes. Other than the Convertible Notes, the Debtors do not have any outstanding funded debt.

16. As of the Petition Date, the Debtors' liabilities to customers were approximately $140 million. Because of the nature of the Debtors' business, the Debtors' liabilities to customers fluctuate with changes in the price of cryptocurrency.

17. The Debtors have ordinary course trade debt of approximately $1 million.

## Events Leading to Chapter 11 Filing

18. The Debtors' chapter 11 filings were necessitated by a confluence of events that culminated in mid-October, resulting in a significant deterioration of the Debtors' balance sheet. Of particular note, a material loss connected with the onboarding of a fraudulent asset manager by former Chief Capital Officer, James Alexander, and his misappropriation of certain Debtors' digital assets severely impaired the Debtors balance sheet and limited the ability to hedge their investments against fluctuations in the price of cryptocurrency. Additionally, significant time, attention, and legal costs had to be devoted to litigating against Mr. Alexander.

19. In the early stages of its operations in 2019, the Debtors invested most of their cryptocurrency assets with moKredit[4] and dedicated a portion of their assets to hedge against crypto pricing volatility. Loans to moKredit generally earned interest of approximately 15% to 24% per annum. As of the Petition Date, approximately $39 million in loans to moKredit remained outstanding. By the end of 2019, the Debtors had a positive net income and a balance sheet reflecting an asset to liability ratio of 1.2.

20. The Debtors entered 2020 with the goal of diversifying their fund allocations. In particular, the Debtors' leadership team decided to cease any new loans to moKredit and to allocate all new incoming funds to U.S. asset managers in the form of in-kind placements rather than in the form of U.S. stablecoin,[5] which the Debtors had initially utilized. The decision was prompted in part by the growing COVID-19 crisis in China, as well as new regulations that reduced the income the Debtors could generate from moKredit. In addition, placing funds in-kind with U.S. asset managers would lessen the necessity to hedge cryptocurrency, lower the Debtors' exposure to moKredit, and allow the Debtors to return funds to customers in the same form as initially transferred without additional conversion. Cred began to execute this strategy in January and February 2020.

21. In March 2020, as the COVID-19 crisis prompted the price of bitcoin to drop more than 50% from its February 2020 high, the Debtors found themselves without sufficient reserves to maintain some of their hedging positions, thereby leaving the Debtors short on bitcoin as prices rebounded. Mr. Hua also provided 300-bitcoin loan to Cred to assist the Debtors

---

[4] moKredit (which was founded by Mr. Hua) provides alternative payment services to online gaming publisher sites through the provision of credit (in the form of gaming tokens) to video game enthusiasts.

[5] Stablecoin is a type of cryptocurrency that can be pegged to value of fiat currency, commodities, or other "stable" assets as a means of reducing price volatility.

6

with establishing new hedging positions.  Notwithstanding the significant pricing volatility in March 2020, the Debtors ended the first quarter of 2020 with an asset to liability ratio around 1.0.

22.     Also in March 2020, the Debtors directed their then-Chief Capital Officer, Mr. Alexander, to incorporate Cred Capital as a Delaware entity that would be controlled by Cred for the purposes of (a) creating a vehicle that would assist the Debtors with arranging (through a Luxembourg vehicle) bond offerings for companies in need of capital and (b) oversee the Debtors' asset management strategies.  However, in violation of this directive, Mr. Alexander instead tried to install himself as the sole director of Cred Capital.  Moreover, rather than assigning the majority of Cred Capital's voting shares to Cred, Mr. Alexander assigned only Class B, non-voting shares to Cred, and assigned Class A voting shares to a purported third-party "investor" who purported to give Mr. Alexander a proxy to control the vote on the Class A voting shares.  Notwithstanding the agreement with the purported investor, Cred Capital never received the promised capital contribution from such investor.

23.      Worse, Mr. Alexander did not use the proceeds of Mr. Hua's loan of 300 bitcoin to establish hedging positions as he had been instructed to do, but instead used a portion of the loan to make a series of vendor payments in connection with establishing Cred Capital.

24.     Upon discovery of the foregoing, the Debtors directed Mr. Alexander to take corrective action; however, despite still being an employee of the Debtors at that time, Mr. Alexander refused to comply.  Thereafter, in late June 2020, Mr. Alexander was terminated as an employee and was locked out from access to the Debtors' systems.  The Debtors were forced to file a corrected corporate charter for Cred Capital to regain ownership and control of Cred Capital and correct the stock ownership.

7

25. In July 2020, the Debtors also discovered that Mr. Alexander had absconded with the remaining bitcoin loaned by Mr. Hua - currently worth over $3 million - that had been intended to establish hedging positions for the Debtors, and moved the assets to a private e-wallet. Despite the Debtors' demands, Mr. Alexander has refused to return these assets to the Debtors.

26. Shortly thereafter, the Debtors commenced litigation against Mr. Alexander in California state court seeking, among other things, injunctive relief to prevent Mr. Alexander from any further dissipation of the Debtors' property, an award of compensatory and punitive damages due to Mr. Alexander's improper and illegal conversions, breach of his employment contract, breach of implied covenant of good faith and fair dealing, and breach of employee loan agreement, among other things.[6]

27. Litigation remains pending. Notably, on July 17, 2020, the California state court granted Cred and Cred Capital's motion for a temporary restraining order requiring the preservation of the digital assets Mr. Alexander transferred from Cred Capital. However, as a result of Mr. Alexander's actions and the pendency of litigation, Cred currently does not have access to the approximately $3 million worth of bitcoin and stable coin misappropriated by Mr. Alexander.

28. While the Debtors' asset management strategy again delivered significant returns in July and August 2020, because of continued liquidity pressure and considerable expenses tied to the lawsuits with Mr. Alexander, the Debtors were forced to withdraw funds from asset managers prematurely.

---

[6] Case No. 20-CIV-02915, Superior Court of the State of California; County of San Mateo, Southern Branch.

8

29. Mr. Alexander's conduct also negatively affected the Debtors' ability to raise outside capital. During the summer of 2020, the Debtors sought to raise outside capital in the form of convertible notes. This capital infusion was meant to provide the Debtors with additional liquidity and support the growth of their business. Initially, the Debtors received commitments for more than $5 million in capital. However, after the Debtors disclosed the lawsuit against Mr. Alexander and the irregularities connected with Mr. Alexanders' tenure as Chief Capital Officer, many investors decided not to participate. As a result, the Debtors were only able to raise approximately $2.6 million in convertible notes.

A. <u>Loans to moKredit</u>

30. In May 2020, due to depressed financial markets in China and a downturn in its business partially attributable to the COVID-19 pandemic, moKredit renegotiated the repayment schedule for the loans extended by the Debtors. Under the new schedule, moKredit has continued to make payment of interest with a small amount of principal repayment. Moreover, during the summer of 2020, China began a series of more restrictive lending policies that added liquidity pressure to moKredit. Although MoKredit continued with its interest payments to the Debtors, the absence of larger principal repayments to the Debtors reduced the Debtors' expected financial flexibility.

31. As a result of the foregoing, a material portion of the Debtors' assets with moKredit could not be readily called back to compensate for hedging or redemptions in other parts of the Debtors' business.

B. <u>Theft of Bitcoin</u>

32. In addition to Mr. Alexander's malfeasance in connection with the formation of Cred Capital, the Debtors also suffered a loss of bitcoin (worth over $10 million as of October

9

2020) as a result of a fraudulent investment scheme. Specifically, in February 2020, while still the Chief Capital Officer of the Debtors, Mr. Alexander informed the Debtors' investment committee of a potential investment opportunity with an entity that purported to be Quantcoin (the "Imposter"). Based on Mr. Alexander's representations and purported due diligence, Mr. Alexander was given permission to hire the Imposter to manage a portion of the company's bitcoin allocation.

33. In a series of transactions in February and April 2020, Mr. Alexander directed the transfer of a total of 800 bitcoin to the Imposter. After these transfers, the Debtors were set up with an administrator purporting to be Scott Foster with Kingdom Trust. The alleged Mr. Foster provided what appeared to be performance updates to the Debtors on a monthly basis.

34. In July 2020, the Debtors requested a withdrawal of $2 million from their account with the Imposter. Initially, it was agreed that the distribution would be made during the first week of September 2020. However, after confirmation of the withdrawal request, the Imposter stopped responding to emails from the Debtors. On August 24, 2020, the Debtors contacted Kingdom Trust to inquire as to the July monthly statement. Representatives for Kingdom Trust indicated that they had no records of any accounts for the Debtors, and noted that while Scott Foster was employed by Kingdom Trust, the contact email for Mr. Foster that had been provided to the Debtors was fake.

35. Upon learning of the deception, the Debtors promptly contacted the pertinent law enforcement agency, which has initiated an investigation into the matter.

C. <u>Subsequent Developments</u>

36. As a result of the theft by the Imposter and the misappropriation of digital assets in connection with Mr. Alexander's actions, the Debtors have been deprived of over $13 million

10

worth of digital assets and would-be returns which the Debtors intended to devote to improving their hedging positions. In the absence of such hedging positions, a rapid 30% increase in the price of bitcoin during a short span in October 2020 significantly increased the Debtors' liabilities relative to their assets.

37. Further complicating matters, negative press in connection with the theft by the Imposter, Mr. Alexander's actions, and the overall impact on the business prompted some of the Debtors' core partners to close their accounts with the Debtors. Additional investment of outside capital also failed to materialize as a result of the legal and PR concerns associated with the Imposter.

38. As a result of the growing liability gap, and the lack of liquidity (due to the material loss of a bitcoin connected to the above fraud and Mr. Alexander's malfeasance), the Debtors determined in late October that they should cease the inflow and outflow of all digital assets to assess their financial position and right-size their balance sheets.

39. On October 27, 2020, the Debtors retained Paul Hastings LLP as restructuring counsel to evaluate the Debtors' strategic alternatives. The Debtors also retained MACCO Restructuring Group LLC as financial advisor on November 4, 2020. Furthermore, on November 3, 2020, Grant Lyon was appointed as independent director or manager (as the case may be) to replace Mr. Hua. Mr. Lyon was also appointed as the chair and sole member of the Restructuring Committee of Cred's board of directors. Mr. Lyon is the founder and CEO of Atera Capital, LLC. Grant Lyon has over 30 years of experience in corporate restructuring, expert testimony and corporate governance. Mr. Lyon has spent many years formulating and executing business plans for a diverse range of industries at every stage of a business lifecycle.

40. The Debtors have determined that given their financial condition, they cannot reasonably expect to recover and, accordingly, on November 7, 2020, the Debtors commenced these cases under chapter 11 of the Bankruptcy Code. The Debtors anticipate that the breathing spell afforded by the Bankruptcy Code will allow them to determine the best path forward for their creditors, employees, customers, and other stakeholders. The Debtors will use the tools available to them under the Bankruptcy Code, including certain bankruptcy causes of action and potential asset sales under section 363 of the Bankruptcy Code to maximize value for the benefit of all stakeholders.

### First Day Motions

41. Concurrently herewith, the Debtors have filed or will file a number of First Day Motions seeking various forms of relief designed to facilitate the transition into chapter 11. I have reviewed each of the First Day Motions, including the exhibits thereto, and the facts stated therein are true and correct to the best of my belief with appropriate reliance on corporate officers and advisors. I believe that the Debtors have satisfied the applicable standards for the relief requested, and that the Court's grant of the requested relief is in the best interests of the Debtors, their estates, as well as that of their creditors and other parties in interest.

42. The relief sought in each of the First Day Motion is necessary to enable the Debtors to continue operations with minimal disruption and constitute a critical element in the successful implementation of the Debtors' effort to maximize the recovery of its creditors. To that end, the Debtors have filed the following First Day Motions:

- *Motion of Debtors and Debtors in Possession for Order Directing Joint Administration of Their Chapter 11 Cases;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to File A Consolidated List of Debtors' 30 Largest Unsecured Creditors, (II) Authorizing Debtors to Serve Certain Parties*

*by E-mail, (III) Authorizing Debtors to Redact or Withhold Publication of Certain Personal Identification Information, and (IV) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Insurance Policies, (B) Pay All Related Obligations, and (II) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Order (I) Restating and Enforcing Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of Bankruptcy Code, (II) Permitting Debtors to Modify Automatic Stay, (III) Approving Form and Manner of Notice, and (IV) Granting Related Relief;*

- *Debtors' Application for Entry of Order, Pursuant to 28 U.S.C. § 156(C), Authorizing Retention and Appointment of Donlin, Recano & Company, Inc. as Claims and Noticing Agent for Debtors, Nunc Pro Tunc to Petition Date; and*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions; (II) Granting Administrative Expense Status to Postpetition Intercompany Balances; (III) Waiving the Requirements of Section 345(b) of Bankruptcy Code; and (IV) Granting Related Relief.*

43.     I believe approval of the relief requested in the First Day Motions is in the best interests of all stakeholders.

44.     In addition to the First Day Motions, the Debtors are requesting relief pursuant to the following second day motion:

- *Motion of Debtors for Entry of Order Authorizing Debtors to (I) Reject Unexpired Leases of Nonresidential Real Property and (II) Abandon Property in Connection Therewith.*

13

45. I have reviewed this motion, and the facts stated therein are true and correct to the best of my belief with appropriate reliance on corporate officers and advisors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 8, 2020
San Mateo, California

/s/ Daniel Schatt
_____
Daniel Schatt
Chief Executive Officer